**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FINANCIALAPPS, LLC,<br><br>               Plaintiff,<br><br>    v.<br><br>ENVESTNET, INC.<br>and YODLEE, INC.,<br><br>              Defendants. | Civil Action No.:<br><br><br>**JURY TRIAL DEMANDED**<br><br>REDACTED -- PUBLIC VERSION |

**COMPLAINT**

Plaintiff FinancialApps, LLC ("FinApps"), by and through its undersigned attorneys, Young Conaway Stargatt & Taylor LLP and Kasowitz Benson Torres LLP, for its complaint against defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee") (together, "Defendants"), upon knowledge as to itself and upon information and belief as to all other matters, alleges as follows:

**PRELIMINARY STATEMENT**

1.     This case arises out of an egregious multi-year scheme by Envestnet, a provider of wealth management software solutions, and Envestnet's wholly owned subsidiary, Yodlee, a consumer financial data aggregator, to steal FinApps' valuable proprietary information and trade secrets, in order to unlawfully develop software products that compete with FinApps, a software development company.

2.     In 2014, Bob Sullivan founded FinApps, a software company in the financial technology ("FinTech") space, a booming sector of the financial services industry focused on making financial information and services (such as loans) available to individual and commercial consumers through digital outlets. Over the past two decades, the FinTech sector has

experienced meteoric growth, resulting in unprecedented availability of highly granular consumer financial data.

3.     In early 2014, under Sullivan's leadership, FinApps began building a software product that would analyze this vast amount of consumer financial data to enable financial service companies to make credit risk assessments (and, therefore, decisions on loan issuances and extensions of credit) more quickly, efficiently, and accurately than ever before.

4.     By early 2016, after investing tens of millions of dollars, FinApps had successfully created a proprietary software platform that could analyze consumer financial data in real time, and generate credit risk reports to assist underwriters with making decisions to extend credit.

5.     Meanwhile, beginning in 2015, Defendants sought to build similar consumer credit risk software, which would leverage Yodlee's vast repository of aggregated data to conduct credit risk assessments.  Defendants' efforts were unsuccessful, however, due to their lack of technical know-how and ability.  Nevertheless, Defendants remained interested in the lucrative opportunities available to a FinTech company that could disrupt prevailing credit and lending business models.  Thus, Defendants set their sights on acquiring FinApps' cutting-edge technology.

6.     In April 2016, Yodlee approached FinApps to discuss licensing FinApps' proprietary software and technology for deployment in a new platform known as "Risk Insight." Yodlee falsely represented to FinApps that it intended to forge a long-term strategic partnership with FinApps.  During face-to-face meetings on June 8, 2016 and June 14, 2016, senior Yodlee personnel, including Chris Chen, Senior Vice President Group Manager of Yodlee, and Mike Burger, Yodlee's Vice President of Product Management, made specific and material

misrepresentations of then-present fact to Sullivan, including that Yodlee would: (i) actively market and sell Risk Insight; (ii) dedicate an appropriate and experienced sales team to promote Risk Insight; and (iii) proactively seek to maximize Risk Insight's growth in the FinTech marketplace by aggressively pursuing new clients. Chen represented to Sullivan that working together, FinApps and Yodlee would "own the market." Further, Burger represented to Sullivan that Risk Insight would be "the biggest initiative we have at Yodlee." These representations, however, were known by Yodlee to be false when made.

7.      Indeed, Defendants never had any intention of working with FinApps to grow Risk Insight. To the contrary, Defendants' sole intention at all times was to use a licensing agreement with FinApps as a means to gain access to and misappropriate FinApps' proprietary technology and trade secrets, in order to develop their own platform without FinApps. Unaware of Defendants' true purposes (and relying on their purported good faith), FinApps entered into a licensing agreement and other related agreements with Yodlee on January 31, 2017, in lieu of pursuing other lucrative licensing and business opportunities available to it at the time.

8.      FinApps viewed the specific processes and protocols that its software employed as critical trade secrets, which represented a substantial portion of FinApps' value. Accordingly, FinApps put into place numerous concrete measures to protect the secrecy of its proprietary technology and trade secrets. Among other things, FinApps imposed strict security restrictions on its property, including the issuance of access credentials with password protection to only a limited set of employees, and the encryption of certain parts of its technology. FinApps also regularly monitored, tested, and assessed potential risks and vulnerabilities to its security protocols and took corrective actions when necessary. FinApps also instituted company policies

and nondisclosure agreements for both its employees and third parties to ensure that its valuable proprietary information and trade secrets would remain secret and confidential.

9.     Consistent with that approach, FinApps also insisted that the licensing agreement with Yodlee include strict confidentiality provisions, exclusivity obligations, and other restrictive covenants related to the use of FinApps' proprietary technology and trade secrets.  Based on Yodlee's representations, the protective provisions contained in the licensing agreement, and the other security measures FinApps put in place, FinApps at all times expected that its proprietary technology and trade secrets would be kept confidential, would remain its own, and would not be misappropriated or otherwise misused.

10.     Almost immediately upon entering into these agreements, however, Yodlee sought to capitalize on FinApps' trust, exploiting it to misappropriate of FinApps' proprietary technology and trade secrets.  Indeed, Yodlee demanded virtually unfettered access to the proprietary database architecture and complex schemas FinApps designed and developed, as well as various critical software components of the underlying technology that drives the Risk Insight platform.  Yodlee deceitfully represented that it needed such access to educate its sales and marketing teams about the product, and to permit them to pitch Risk Insight to potential clients. Yodlee knew this representation to be false when made, and only sought such access to facilitate its theft of FinApps' technology.

11.     FinApps had no knowledge of Yodlee's true intentions at the time.  To the contrary, based on Yodlee's representations, the security measures FinApps put in place, and the restrictions in the licensing agreement, FinApps had every reason to think that Yodlee would protect FinApps' proprietary technology and trade secrets.  Thus, on the basis of this expectation

and the belief that Yodlee was operating in good faith in order to maximize the profit of both parties under the license agreement, FinApps granted Yodlee the access it sought.

12.     Yodlee used this access to misappropriate the technology underlying FinApps' platform for incorporation into a competing platform Yodlee was developing in secret. Notably, FinApps is in possession of emails in which senior Yodlee personnel expressly admit attempts to reverse-engineer FinApps' proprietary technology and trade secrets, stating "[w]e cannot go back to FA [FinApps] for this and I looking for a way to do it ourselves (reverse engineering)," and "[m]y assumption here is that we can reverse engineer. We can give it a try. If we hit a roadblock, we'll regroup."

13.     Yodlee also took other steps to facilitate its misappropriation. For example, Yodlee knew that if Risk Insight clients were unaware of FinApps' critical role with respect to the platform, it would be far easier for Yodlee to transition existing Risk Insight customers to the new platform it was developing in secret, with technology stolen from FinApps. Thus, Yodlee deliberately sought to obscure FinApps' involvement with the Risk Insight platform from Risk Insight clients.

14.     As FinApps has learned, Yodlee sought to accomplish this goal in a variety of ways. For example, Yodlee routinely misrepresented to Risk Insight clients that it, not FinApps, owned the intellectual property underlying Risk Insight. Similarly, Yodlee misrepresented to Risk Insight clients that it would be providing all professional services work (including implementation, development and configuration work, post-implementation support, and maintenance) to customers of Risk Insight, when, in fact, FinApps -- not Yodlee -- provided all such professional services to Yodlee customers. Yodlee also required FinApps' personnel to use only Yodlee email addresses when communicating with Risk Insight clients, and even went so

far as to prohibit FinApps personnel from disclosing any affiliation with FinApps whatsoever when interacting with clients. FinApps complied with these arrangements because it believed Yodlee's representations that they were necessary to ensure clients and potential clients that they would receive the security and confidence of a vendor that is a publicly traded company (rather than a smaller, private company).

15. Yodlee's misconduct first came to light in October 2018, when Equifax Inc. (a leading credit bureau directly competing with Risk Insight) publicly announced that it had entered into a deal with Yodlee to "simplify the mortgage loan process by making it easier for lenders to derive insights from borrowers' financial data," however, neither FinApps nor the Risk Insight platform was mentioned in this announcement. Indeed, Yodlee would not be working with Equifax using the Risk Insight platform developed with FinApps. Instead, Yodlee and Equifax would use the competing platform that Yodlee had improperly developed in secret, and which relies heavily, if not entirely, on proprietary information and technology stolen from FinApps.

16. Yodlee's misconduct was further exposed in late March and early April 2019, when FinApps discovered that Yodlee fraudulently used Bank of America's login credentials to make unauthorized use of a piece of proprietary FinApps Software known as YProxy. YProxy was developed to provide a specialized solution for a single Risk Insight client, in connection with a specific and short-lived problem that client faced as it implemented the Risk Insight platform into its business. Yodlee's unauthorized use of YProxy, however, allowed Yodlee (i) to transition current Risk Insight clients to Yodlee's secretly developed platform without losing important account information and preexisting credit analysis; and (ii) to ensure that its new platform generated credit risk reports identical to those generated by Risk Insight. Yodlee did

not have permission to use YProxy and, shockingly, gained unauthorized access to the software by fraudulently using the login credentials of one of Risk Insight's own clients, Bank of America.

17.     In furtherance of its scheme, Yodlee has taken great pains to obscure from FinApps its development of competing business.  Prior to its public announcement, Yodlee concealed the Equifax venture from FinApps entirely.  Yodlee has refused to discuss it with FinApps since.  Yodlee also secretly entered into agreements with other third parties to deliver credit risk software and related services identical to those provided by Risk Insight, and which also rely on proprietary information and technology stolen from FinApps -- but without the involvement of FinApps or the Risk Insight platform.  These transactions -- business opportunities that Yodlee has unlawfully and in violation of the license agreement usurped from FinApps -- further confirm Yodlee's theft of proprietary information and technology from FinApps.  Indeed, Yodlee was unable to provide such services before working with FinApps, and was only able to do so as a result of its misappropriation of FinApps' proprietary information and technology.

18.     Envestnet has also knowingly misappropriated proprietary information and technology stolen from FinApps.  On January 5, 2019, Sullivan had an in-person meeting with Stuart DePina -- Envestnet's Chief Executive of Data & Analytics -- regarding the incorporation of Risk Insight into the Envestnet's Credit Exchange product.  During this meeting, DePina stated to Sullivan that Envestnet's lack of ownership over the technology underlying the Risk Insight platform "was a problem," and that he wanted to explore Envestnet's potential acquisition of FinApps' valuable intellectual property.  Over the next few months, DePina made multiple offers to Sullivan to purchase FinApps proprietary technology outright.

19.     It is now apparent that Envestnet had no intention of integrating Risk Insight into the Envestnet Credit Exchange product.  Rather, Envestnet was interested in acquiring FinApps' technology cheaply to eliminate the possibility of future liability for Defendants' misappropriation and other misconduct.  Further, by early 2019, DePina was aware that Yodlee had nearly completed its competing platform using stolen FinApps technology.  Accordingly, DePina knew that Envestnet could use Yodlee's replacement platform if FinApps was unwilling to sell, and for far less than licensing or acquiring FinApps would cost.  Thereafter, Envestnet ceased its attempts to acquire FinApps, and began to incorporate software from Yodlee's competing platform -- including proprietary information and technology stolen from FinApps -- into its Envestnet Credit Exchange product.

20.     In early 2019, notwithstanding that over two years remained in the term of the parties' agreement, Defendants began to withdraw resources and personnel from the Risk Insight product.  Defendants never intended to honor their commitments to FinApps and by that point, had successfully stolen FinApps' proprietary information and trade secrets.  For Yodlee, Defendants' business relationship with FinApps was nothing more than a Trojan horse, deployed to gain access to and steal FinApps' proprietary information and trade secrets, so that Defendants could illicitly build their competing software products from the building blocks of FinApps' trade secrets.

21.     Accordingly, FinApps brings this action against Defendants for their misappropriation of trade secrets, fraud, deceptive trade practices, unfair competition, and breaches of contract, among other claims for relief.  As a result of Defendants' premeditated, deliberate, and unlawful scheme, FinApps has suffered -- and continues to suffer -- significant harm, in excess of $100 million.

## PARTIES

22.     FinApps is a Florida limited liability company, with its principal place of business located at 6360 NW 5th Way, Suite 101, Fort Lauderdale, Florida 33309.

23.     Envestnet is a Delaware corporation, with its principal place of business located at 35 East Wacker Drive, 24th Floor, Chicago, Illinois 60601.

24.     Yodlee is a Delaware corporation, with its principal place of business located at 3600 Bridge Parkway, Suite 200, Redwood City, California 94065.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because FinApps alleges a claim under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

26.     This Court also has an independent basis for subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties and because the amount in dispute, excluding interests and costs, exceeds $75,000.

27.     Subject matter jurisdiction over any related state law claims is appropriate under 28 U.S.C. § 1367, and the doctrines of ancillary and pendent jurisdiction.

28.     This Court has personal jurisdiction over Envestnet and Yodlee because they are both Delaware corporations with registered agents in Delaware for purposes of service of process.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Envestnet and Yodlee are incorporated in this District.  Venue is also proper in this District pursuant to Section 12(c) of the Software License and Master Services Agreement, dated January 31, 2017, whereby FinApps and Yodlee contractually agreed that "[j]urisdiction and venue for any lawsuit

or proceeding arising out of or related to this Agreement, its subject matter and/or any other dispute whatsoever between the parties shall lie exclusively within the federal and state courts located in Delaware."

## STATEMENT OF FACTS

**A.     The FinTech Industry**

30.     Beginning in the late 1990s, banks and other financial institutions became increasingly interested in ways to conduct and grow their business online, while expanding into new commercial ventures facilitated by the dramatic technological achievements that accompanied the rise of the Internet.  This evolution in the financial industry launched the modern FinTech industry.

31.     In this contemporary context, FinTech is a sector of the financial services industry that (among other things) focuses on taking financial information and services previously available only through manual processes conducted by traditional financial institutions, and making those services available to individual and commercial consumers through digital mediums.  By allowing consumers to access financial services digitally, FinTech companies make it possible to conduct important financial transactions far more efficiently and cost effectively than ever before.

32.     Although the financial industry's pivot to digital and online business resulted in the aggregation of vast repositories of financial data, the commercial potential of that data aggregation remained largely untapped until only recently.  This underdeveloped market segment provided a golden opportunity for innovative software designers with finance experience to develop software technology capable of analyzing aggregated financial data, processing it, and deploying it in new, extremely valuable, and commercially unprecedented ways.

**B.    FinApps Develops Its Proprietary Technology**

33.    FinApps and its founder, Bob Sullivan, were perfectly positioned to capitalize on this once-in-a-lifetime opportunity in the FinTech market.  FinApps was founded in 2014 by Sullivan, a software developer and entrepreneur with over 25 years of experience in FinTech and the credit markets.  Recognizing the unrealized commercial opportunity implicit in the vast quantities of raw data being aggregated by the FinTech industry, Sullivan set out to build a software product that could analyze raw financial data and provide meaningful analysis to facilitate the credit underwriting process.

34.    Sullivan's endeavor -- the creation of a powerful software platform that could rapidly provide enhanced underwriting analytics and generate custom credit risk reports -- was at the forefront of software technology and innovation.  Despite the technical hurdles and the extreme costs of developing such unprecedented software, FinApps was committed to building a robust, enterprise-grade software solution that could be used by large financial institutions easily, and scale with their growing needs.

35.    In pursuit of this goal, in early 2014, FinApps commenced building a proprietary software platform (the "Platform") consisting of four primary technological components:  (i) a specialized system to "cleanse" raw data into a useful format; (ii) a custom-designed database structure to store, organize, and segment cleansed data; (iii) a software program, known as the "Relevancy Engine," to conduct FinApps' complex and proprietary quantitative analysis, and to output usable information concerning a consumer's financial profile, tailored to a client's needs; and (iv) a set of customizable software portals allowing clients to select the types of underwriting reports they wish to calculate, sending those requests to the Relevancy Engine, and using

processed informational output from the Relevancy Engine to generate a report containing the requested underwriting reports in a variety of clear, concise, and understandable formats.

36.     FinApps would spend the next several years, and tens of millions of dollars, to develop these components so that they worked seamlessly and integrally within the Platform at an enterprise level.  As a result of this lengthy research and development process, FinApps' Platform allows financial institutions to provide real-time data analysis and credit reports that permit accurate and fast credit decision-making and investment management decisions relating to consumer requests for credit, loans, mortgages, and other types of financing.

**i.      Data Cleansing**

37.     The first step in FinApps' development of the Platform was to ensure that raw data provided by data aggregators was consistently organized in a uniform format that could be used efficiently by the Relevancy Engine component of the Platform.  This process is known as "cleansing" the data.

38.     Before disorganized, irrelevant, and potentially misformatted raw data can be used by the Platform, it must be processed -- or "cleansed" -- into a uniform structure and organization.  Data cleansing is necessary because raw data is aggregated from different types of accounts, and located in different repositories, at different types of financial institutions, including banking institutions, credit card issuers, lenders, mortgage servicers, and investment managers.  Further, not all of the raw data gathered by data aggregators is useful or even relevant to credit underwriting.  Therefore, part of FinApps' data cleansing process involves isolating only useful data out of larger sets of irrelevant raw data.

39.     The methodology and techniques FinApps uses in this data cleansing software to format, organize, and prioritize relevant data are trade secrets.  They are highly sensitive, non-

public information.  Moreover, FinApps built a piece of proprietary software technology to automate and expedite its data-cleansing process, which was also seamlessly built into the overall Platform.  The data cleansing software component, as well as the methodology and techniques it employs, are proprietary technologies, and have never been shared with the public.

### ii.    Data Storage and Database Architecture

40.    After raw data has been adequately cleansed through FinApps' proprietary processes, it must be stored in a highly customized database that also uses specialized and proprietary technology designed by FinApps.  These databases are also integrated into the Platform.

41.    The way these databases store information, and more importantly, the proprietary manner in which that data is organized and retrieved, is crucial to the success of the Platform. This is because the Platform's most fundamental purpose is to perform complicated mathematical analyses on complex datasets, in order to produce commercially useful underwriting information -- but in a matter of seconds, at unprecedented levels of detail and granularity.

42.    The Platform's ability to operate at such high speed requires that it be able to process cleansed data with extreme efficiency.  This efficiency is achieved, in part, through the complex and proprietary organizational "schemas" that are used in the Platform's databases.  In the context of database architecture, "schemas" consist of the organizational designs that control how individual datapoints are organized, prioritized, and connected to, or interrelated with, other datapoints in the given database.  These schemas permit the Platform to access and analyze critical datapoints at extremely high speeds, and produce granular underwriting information in seconds.

43. Over the course of many years of development and testing, FinApps and its engineers created powerful schemas for the databases used by the Platform, allowing it to process data with a high degree of efficiency, and output consistent results nearly instantaneously.[1]

44. Additionally, FinApps' databases are also designed to be highly scalable, accounting not only for clients' current needs, but also their future needs. If the databases were not assembled so that they could grow alongside increasing demand, then new databases would need to be created in the future, disrupting the scalability and the quantitative abilities of the Platform.

45. The overall architecture of FinApps' databases (*i.e.*, how the structure of the database was assembled, and its scalability) as well as their schemas (*i.e.*, how the data was characterized and prioritized, and how the relationships among the data centered on consumer-driven metrics) are highly confidential proprietary information that were developed (and is maintained) at great cost, and has never been shared with the public at large.

46. Absent misconduct, another entrant into this market space would need to invest years of its own research and development to perfect its own schemas and structure before it could compete with FinApps. Defendants sidestepped this hurdle by stealing and reverse engineering FinApps' trade secret schema.

---

[1] In practical terms, FinApps' database schemas organized consumer data to: (i) isolate consumer data points of particular importance to credit assessment; (ii) prioritize such data in terms of its flow into the Relevancy Engine; and (iii) optimize the organization of disparate but interrelated data points, permitting the Relevancy Engine to take advantage of such relationships while performing its analysis.

### iii.    The Relevancy Engine

47.    The core of the Platform is FinApps' proprietary "Relevancy Engine."  The Relevancy Engine is a software tool that uses tens of thousands of complex equations, advanced mathematical analysis, business logic, business "use cases," and accounting methodologies to transform data taken from FinApps' proprietary databases into detailed reports that assist credit underwriters.

48.    The Relevancy Engine allows the Platform to create, develop, and test proprietary rules ("Rules") that are deployed by the Platform on stored data to perform quantitative analyses, and ultimately, generate reports for credit risk analysis.  The Relevancy Engine, and the Rules on which it is based, were designed and created by a team of highly advanced software engineers, required hundreds of thousands of man-hours to build, test, and perfect, and ultimately cost tens of millions of dollars to develop.

49.    The Rules that drive the Relevancy Engine are essentially mathematical and programmatic expressions of specific financial concepts.  Any financial concept can be expressed as a Rule.  Here, because the Platform was designed to assist with and accelerate the underwriting process, the Rules that FinApps developed for the Relevancy Engine relate to specific financial concepts that underwriters find helpful when assessing credit risk.

50.    The Relevancy Engine consists of three technological components, all of which are fundamentally based on the Rules that FinApps developed.  First, the Relevancy Engine contains a software toolkit that permits the design, development, and testing of Rules in a simplified scripting environment (thus avoiding the need for complex programming languages or coding of Rules during this developmental stage).  Second, the Relevancy Engine contains the library of vetted Rules, which the Relevancy Engine uses to perform its quantitative analysis.

Finally, the Relevancy Engine contains the Platform's core software engine itself, which is a proprietary program that performs complex quantitative analyses dictated by the Rules, thus deriving the financial metrics desired by credit underwriters.

51.     Even with the assistance of FinApps' proprietary Rule creation software, creating a Rule from an abstract financial concept is a complex, labor-intensive process.  The complexity of this process can be illustrated in the following example.

52.     A cashflow matrix is a financial concept that is fundamental to credit risk analysis.  In its most basic form, a cashflow matrix displays the movement of money into and out of a particular account over a designated period of time, at specific internals (*e.g.*, 0-30 days, 31-60 days, 61-90 days, etc.).

53.     The first step in creating a Rule that will calculate a cashflow matrix is to express this financial concept in the form of its basic mathematical components, which work together to form the underlying logic of the cashflow matrix Rule.  In the case of a cashflow matrix, there are three underlying mathematical components:  (i) the inflow of credits into an account over a specified period of time; (ii) the outflow of debits from an account over the same specified period of time; and (iii) the amount remaining in the account.[2]

54.     After a Rule is mathematically articulated, the next step is to test and determine all potential "negative paths" that might result from the operation of a given Rule.  Negative path testing ensures that a Rule does not produce anomalies or exceptions that cannot be processed by the Relevancy Engine, or that would lead to incorrect results.[3]

---

[2]     Thus, the basic mathematics used to calculate the components of the cashflow matrix Rule are:  (1) Inflow = Sum of all credits over a specified time period; (2) Outflow = Sum of all debits over specified time period; and (3) Leftover = Inflow minus outflow.

[3]     A "negative path" is a known case in which the mathematical calculations underpinning a

55.     Before a given Rule can be finalized, all potential negative paths must be uncovered, a task which becomes increasingly laborious and costly as the complexity of a Rule increases.  After a Rule is mathematically articulated, and all negative paths have been identified and incorporated into it, the next step is to define and build the Rule through pipeline stages.

56.     A "pipeline" is a series of programmatic and logical operations generally organized into a number of "stages."  Each stage in the pipeline is a unique step that must be accomplished before the next step can be started.  Taken together, all of the pipeline stages comprise the programmatic operation of a given Rule.  This pipeline process is used because it permits the efficient and organized articulation of a series of mathematical calculations into a shorthand programming workflow, which can then be given to a software engineer to assist in the actual coding of the Rule.

57.     With respect to the cash flow matrix Rule, the mathematical components identified above must be broken down into several pipeline stages in order to be translated into a programming work flow:

     a.  *Pipeline Stage 0*:  Gather all transactions from a specific time period.

     b.  *Pipeline Stages 1-10*:  Gather all debits and credits over given time internals provided by processing the order.

     c.  *Pipeline Stages 11-12*:  Gather aggregate of all debits and credits over total activity period.

---

Rule are deployed to consider non-standard use cases, the results of which might prevent the Relevancy Engine from performing meaningful quantitative analysis of data stored in the Platform.  In the case of the cash flow matrix Rule discussed above, examples of negative paths include instances in which data is processed through the Rule, but results in:  (i) a zero value for inflows (obtained when the cashflow matrix Rule operates on data containing "verified credit activity," but no actual credits); (ii) a zero value for outflows (obtained when the cashflow matrix Rule operates on data containing "verified debit activity," but no debits); or (iii) when the cashflow matrix Rule operates on data containing no "verified bank account activity" at all.

d. *Pipeline Stages 13-17*:  Calculate leftover cash flow over given time internal provided by processing the order (inflows – outflows).

e. *Pipeline Stage 18*:  Calculate aggregate of leftover cash flow over total activity period (same information being retrieved from pipeline stages 13-17 except over total activity period).

f. *Pipeline Stage 19*:  Display final results of the calculation over each time interval.

Thus, even in the relatively straightforward cashflow matrix Rule, there are nineteen discrete pipeline stages, each based on discrete mathematical calculations.

58.     The shorthand programming workflows provided by these pipeline stages are next converted into actual coded script language, which is then tested through a series of business use cases to ensure the Rule's output is accurate.  The coded script is then released into a quality assurance (or "QA") environment to undergo further testing.  Finally, once the Rule passes the QA environment, it is ready for use by the Relevancy Engine, and is saved and stored to the FinApps' database library.

59.     The creation of a Rule is an intricate, time intensive, and complicated process. Depending on its complexity, a given Rule can take months to fully develop, test, and implement.  Creation of a Rule is an interdisciplinary task, requiring command of financial risk concepts, mathematics, and computer science and programming to accomplish.

60.     Unsurprisingly, it has taken FinApps many years to develop and finalize its complete current set of Rules for the Relevancy Engine.  As FinApps has learned first-hand, there are nearly infinite ways to create a Rule incorrectly, but there are only a handful of ways to create a Rule correctly.  Accordingly, FinApps' Rules are among its most valuable, most sensitive, and most proprietary trade secret technology.

### iv. Consumer Portal, Client Portal, and Enhanced Asset Verification Report

61. The final components of the FinApps' Platform are (i) a consumer-facing portal, which allows individual consumers to enter their credentials into the Platform, and provide permission to Risk Insight's institutional clients seeking to access the individual consumers' data; and (ii) an institutional client-facing portal, which allows an institutional client to configure their desired output into an Enhanced Asset Verification ("EAV") Report.

62. These EAV Reports are the final product produced by the Relevancy Engine, and are used by underwriters assessing credit risk in real time, during the process of a potential borrower's application for debt. Leveraging the power of the Relevancy Engine, the EAV Report provides a current record of a consumer's financial accounts and associated transaction details, in a simple and straight-forward format that assists the underwriting process.

63. Traditionally, lending information relied on by underwriters came from credit score companies such as Equifax, Experian, and TransUnion, which provided data based exclusively on a consumer's *historical* debt and debt repayment data. EAV Reports, by contrast, are generated using highly detailed, user-permissioned data related to the full spectrum of a consumer's financial life: bank accounts, investments, loans, etc. Moreover, that panoply of data is gathered and analyzed *in real time* -- not historically, as with traditional methods. The FinApps Platform compiles up-to-date consumer data from across 16,000 financial institutions *every time* a report is generated or refreshed. FinApps' technology, the Platform, and the EAV Reports it generates, essentially enables lenders to expedite the underwriting process, in many cases permitting "on-demand" lending decisions.

64. Additionally, FinApps' client portal allows an institutional client to select from various categories of financial data for inclusion in an EAV Report, depending on the client's

specific needs.  In short, the Platform allows institutional clients to obtain exactly the data they

need, in real time, in a practically useful format and presentation.  The portal's underlying

architecture, and indeed, the overall Platform itself, are both proprietary technologies, and have

never been released to the public.

C.     **FinApps Takes All Reasonable Measures to Protect**
       **Its Proprietary Technology and Trade Secrets**

65.     FinApps viewed the Platform, its implementation, and the processes and protocols

that its software employed as critical trade secrets, which represented a substantial portion of

FinApps' value.

66.     Accordingly, FinApps put into place numerous concrete measures to protect the

secrecy of its proprietary technology and trade secrets.[4]  First, FinApps implemented various

security protocols to tightly cabin access to its proprietary technology and trade secrets,

including but not limited to (i) requiring  "multi-factor" authentication to log into FinApps'

systems; (ii) imposing strict security restrictions on its property, including the issuance of access

credentials with password protection to only a limited set of employees; and (iii) requiring

visitors of FinApps offices to be accompanied by the employee(s) they are visiting for the

duration of their stay.

67.     Additionally, FinApps took steps to carefully protect storage of its proprietary

technology and trade secrets, and how they were accessed, including but not limited to (i)

hosting its network on a private cloud environment, with strict firewalls and other virtual and

physical security protections; (ii) encrypting all data contained on the Platform's database, both

---

[4]     On January 5, 2017, FinApps filed a U.S. provisional patent application in connection
with the Platform.  This application did not publicly disclose any of FinApps' proprietary
information or trade secrets at issue here.

"in transit" (*e.g.*, when the data travels from network-to-network or is being transferred from a local storage device to a cloud storage device), and "at rest" (*e.g.*, when data is not actively traveling and is stored on a hard drive or laptop); and (iii) separately encrypting all of the individual Rules within the Relevancy Engine.

68.     FinApps also required its employees to sign non-disclosure agreements upon hiring, and regularly monitored, tested, and assessed potential risks and vulnerabilities to its security protocols, taking corrective actions when necessary.

**D.     Yodlee Seeks to Enter the Credit and Lending Software Product Market**

69.     Envestnet is an industry leader in the provision of wealth management software solutions to financial advisors and financial institutions.  Envestnet is a publicly traded corporation, and currently has a market capitalization of approximately $3.5 billion.

70.     Yodlee provides financial data aggregation services and went public on NASDAQ on October 3, 2014.  Less than a year later, on August 10, 2015, Yodlee was acquired by Envestnet for a reported $660 million.

71.     At its outset, Yodlee's business model involved charging financial institutions a fee to access Yodlee's aggregated consumer financial data.  This was a low margin business, however, and after it was acquired in 2015, both Envestnet and Yodlee began to look for ways in which Yodlee could build software products for large institutional clients, for which Yodlee could charge a premium.  Envestnet and Yodlee agreed that Yodlee would set its sights on the credit and lending market to create a marketable software product that would leverage its repository of aggregated data.  In or around 2015, Yodlee set out to develop such a product, which is referred to herein as "Risk Insight 1.0."

72.     Risk Insight 1.0 was Yodlee's first attempt to create a software product that could generate a report similar in features and functionality to the reports output by FinApps' Platform. Yodlee was ultimately unable to successfully develop or commercially launch Risk Insight 1.0, however, because the reports it created were elementary in nature and of minimal utility to potential clients.  In fact, when Yodlee tried to offer Risk Insight 1.0 to its clients, they were not interested, and instead turned to Yodlee's competitors for similar software products.

73.     Due to its inadequacies, Yodlee withdrew Risk Insight 1.0 from development. But neither Envestnet nor Yodlee lost interest in developing a functional platform.  Envestnet and Yodlee needed the exact technology that FinApps had already created, tested, and prepared for market, through years of hard work and millions spent in research and development.  Indeed, FinApps' Platform was capable of harnessing Yodlee's aggregated data to provide invaluable and unprecedented credit risk assessment services to Envestnet's and Yodlee's large institutional clients.

74.     Both Envestnet and Yodlee understood the lucrative growth potential in the credit and lending sector of the FinTech market and knew that they needed FinApps' technology in order to break into that market.  Defendants thus induced FinApps into a licensing agreement with Yodlee, exploited that agreement to access and misappropriate FinApps' proprietary software and trade secrets, and used FinApps' valuable property to create a competing credit software product.

**E.     Defendants Fraudulently Induce FinApps Into Licensing
        Its Proprietary Software and Technology to Yodlee**

75.     In or around April 2016, Yodlee approached FinApps to discuss licensing FinApps' proprietary software and technology, including the Platform, to deploy it as the bedrock of what can be viewed as "Risk Insight 2.0" -- the product that was actually marketed as

"Risk Insight."  Yodlee's pitch to FinApps was simple:  FinApps would supply its credit risk software, technology, and technical know-how, and Yodlee would supply its raw aggregated data, as well as provide a fully-staffed team of experienced and trained employees to market and sell Risk Insight.  Yodlee repeatedly and expressly led FinApps to believe that through this collaboration, Yodlee and FinApps would forge a long-term strategic partnership.

76.     At first, FinApps was skeptical that the arrangement could work, due to Yodlee's failure to successfully develop Risk Insight 1.0.  Yodlee, however, repeatedly made specific and material misrepresentation of present fact regarding its intentions, leading FinApps to believe that by entering into a licensing agreement with Yodlee, the parties would be commencing a long term, strategic partnership.

77.     Yodlee knew that these representations were false when it made them.  Yodlee's sole interest at all times was to enter into a licensing agreement to gain an opportunity (and cover) to misappropriate FinApps' technology.  But for Yodlee's misrepresentations about its intentions, FinApps would never have entered into an agreement with Yodlee.

78.     In order to deceive FinApps, Yodlee -- including its senior personnel -- made specific and material misrepresentations of fact to Sullivan, including that Yodlee would: (i) actively market and sell Risk Insight; (ii) dedicate an appropriate and experienced sales team to promote Risk Insight; and (iii) invest in growing Risk Insight and seek other growth opportunities in the marketplace.

79.     For example, on or about June 8, 2016, Sullivan met with Chris Chen, Senior Vice President Group Manager of Yodlee, over a two-day period in Chicago.  During those meetings, Chen boasted to Sullivan about the growth potential for Risk Insight, stating emphatically that "we can own the market."

80.     On or about June 14, 2016, Sullivan was introduced to Mike Burger, Yodlee's

Vice President of Product Management.  Burger had recently joined Yodlee from Experian, one

of the three large credit bureaus.  Burger told Sullivan that Risk Insight was going to be "the

biggest initiative we have at Yodlee," and that Burger would not have left Experian unless

Yodlee provided him with that assurance.  Burger expressly stated to Sullivan that Yodlee

envisioned a long term, strategic partnership with FinApps that would allow the parties to

develop Risk Insight into a formidable alternative to the traditional three credit bureaus.

81.     The strategic partnership with Yodlee also made good business sense for

FinApps.  FinApps had the technology, and Yodlee (with the backing of Envestnet) had the

industry contacts, many of whom were already existing clients of Yodlee and/or Envestnet.

82.     Yodlee, however, knew its representations to be false at the time they were made.

Defendants never had any intention of working with FinApps to grow Risk Insight at all, much

less into a major market player, as Yodlee had led FinApps to believe.  To the contrary,

Defendants' sole intention at all times was to use a licensing agreement with FinApps as a means

to gain access to, and misappropriate, FinApps' proprietary technology and trade secrets, in order

to develop Defendants' own competing platform.

83.     Unaware of Defendants' true purposes (and relying on their purported good faith),

FinApps entered into a licensing agreement and other related agreements with Yodlee on January

31, 2017, in lieu of pursuing other lucrative licensing and business opportunities available to

FinApps at the time.  (*See infra* § F).

84.     Notably, Yodlee's misrepresentations to FinApps caused FinApps to lose out on

other licensing opportunities.  Yodlee was not the only software company seeking to license

FinApps' technology at the time.  In fact, FinApps had licensing opportunities with other

software companies, including Fiserv, Inc. and FormFree Holdings Corporation ("FormFree"). Yodlee's deliberate and express misrepresentations of present fact concerning its intentions to FinApps, however, led FinApps to believe that Yodlee was seeking a strategic, long-term business partnership, and led FinApps to choose Yodlee as its partner.

85.     Even after FinApps entered into its initial agreement with Yodlee, Yodlee continued to make material misrepresentations and omissions to FinApps about its intentions concerning Risk Insight and the parties' business, particularly prior to entering into further contracts with FinApps.  (*See infra* § F).

86.     For example, in June 19, 2017, Mike Burger shared what he claimed were Yodlee's internal growth projections, purportedly reflecting the growth Yodlee intended to achieve working with FinApps on the Risk Insight platform.  Burger represented that Yodlee would grow the Risk Insight platform to over $100 million in revenue by 2021.  Yodlee knew these growth projections to be false at the time they were made, as Yodlee had no intention of seriously growing the Risk Insight platform at all with FinApps as a partner -- much less into a business with revenues in excess of $100 million.

87.     Yodlee also expressly reiterated its purported commitment to a long-term partnership with FinApps, and to growing the Risk Insight platform into a billion dollar business, when negotiating an amended contract with FinApps.  Specifically, on October 24, 2017, Bill Parsons, General Manager and Senior Vice President for Yodlee Products and Analytics, wrote to FinApps' Sullivan and stated (falsely), among other things, that "[Yodlee's] aim here is to clarify our intent and to make clear our goal to establish a solid partnership with [FinApps]", that the contemplated "contractual adjustments will improve and strengthen our relationship;" and

that Yodlee was "committed to the success of our long term partnership." (Attached hereto as Exhibit 6.)

88.     In direct and reasonable reliance on Parson's October 24, 2017 misrepresentations, FinApps entered into certain amended contracts with Yodlee dated January 31, 2018. (*See infra* § F).

89.     Again, Yodlee knew its representations to be false at the time they were made. Defendants' sole intention -- which they actively concealed from FinApps with their misrepresentations -- was, at all times, to use its contractual relationship with FinApps as a means to gain access to and misappropriate FinApps' proprietary technology and trade secrets, in order to develop Defendants' own competing platform.

**F.     The Governing Contracts**

90.     Given the commercially and competitively sensitive nature of FinApps' proprietary technology, as well as the intensely collaborative nature of the business venture into which it was entering, FinApps insisted that the licensing agreement with Yodlee include strict confidentiality provisions, exclusivity obligations, and other restrictive covenants related to the use of FinApps proprietary technology and trade secrets. Accordingly, the Contracts (defined below) contained strict protections against the misappropriation of FinApps' valuable and proprietary information and trade secrets.

91.     The parties executed a Software License and Master Services Agreement, dated January 31, 2017 (as amended and restated on January 31, 2018) (the "MSA") (attached hereto as Exhibit 1), as well as related Statements of Work, dated January 31, 2017 ("SOW No. 1") (attached hereto as Exhibit 2) and January 31, 2018 ("SOW No. 3") (attached hereto as Exhibit 3) (collectively, the "Contracts").

### i.     Confidentiality

92.     The MSA defines "Confidential Information" as "all confidential information disclosed by a party ('Disclosing Party') to the other party ('Receiving Party'), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances under which such information is disclosed," specifying that "Confidential Information of each party shall include . . . **business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such party to the other party**." MSA § 7. (emphasis added).

### ii.     Exclusivity

93.     The MSA includes an exclusivity provision, which provides that FinApps' software and technology would be the exclusive platform "used and promoted by Yodlee to Yodlee Clients and prospective clients in connection with or related to Yodlee's Risk Insight Product **and that offer substantially similar functionality** as articulated in any applicable SOW." MSA § 2(c) (emphasis added).

### iii.     Restricted Activities

94.     The Contracts also imposed restrictions on Yodlee's conduct while in possession of FinApps' proprietary software and trade secrets. Pursuant to Section 6 of the MSA, Yodlee agreed that it would not:

> i.     "Permit any third party to access the Services, Software or Platform except as permitted in [the] Agreement, or attempt to gain unauthorized access to the Services or FinancialApps' or its Affiliates' related systems or networks;"

> ii.     "Modify, distribute, prepare derivative works of, copy, frame, mirror, reverse engineer, reverse assemble, disassemble, decompile, or otherwise attempt to decipher any code used in connection with the Services, Software or Platform and/or other aspect of Financial Apps' technology or FINANCIALAPPS IP;"

iii.   "Access and/or engage in any use of the Services, Software or Platform in a manner that abuses or materially disrupts the networks, security systems, Services, and or websites of FinancialApps or its Affiliates;"

iv.   "Interfere with or disrupt the integrity or performance of the Services, Software or Platform or third-party data contained therein;"

v.   "Use the Services, Software or Platform for fraudulent or illegal purposes;"

vi.   "Offer to sell or resell, license or sublicense the Services, Software or Platform to any third party, except as contemplated hereby;" and/or

vii.   "[B]uild, or engage a third party to build, a competitive product which copies any features, functions, or rules of the Services, Software, or Platform."

95.   In reliance on Yodlee's misrepresentations that it was acting in good faith, and the other security measures FinApps put in place, FinApps at all times expected and believed that its proprietary technology and trade secrets would be kept confidential, would remain its own, and not be misappropriated or otherwise misused.  Accordingly, FinApps provided Yodlee with intimate access to its most sensitive systems and proprietary technology.  Yodlee had near-unfettered access to FinApps' most valuable and sensitive technology, which FinApps believed Yodlee needed and was using in good faith.

**G.   Defendants Misappropriate FinApps' Proprietary Information and Trade Secrets to Create a Replacement for Risk Insight**

96.   Almost immediately upon entering into these agreements, Yodlee sought to capitalize on FinApps' trust, exploiting it to facilitate Defendants' misappropriation of FinApps' proprietary technology and trade secrets.  Yodlee demanded virtually unfettered access to the proprietary database architecture and complex schemas FinApps designed and developed, as well as various critical software components of the underlying technology that drives the Risk Insight platform.  Yodlee falsely represented that it needed such access to educate its sales and marketing teams about the product, to help them pitch Risk Insight to potential clients.  And of

course, Yodlee had repeatedly represented to FinApps that it sought a long-term strategic partnership with FinApps. Yodlee knew these representation to be false when made, and only sought such access to facilitate its theft of FinApps' technology.

97.     Believing that its proprietary information and technology were adequately protected by both the Contracts and Yodlee's apparent good faith, FinApps trusted Yodlee with access to some of its most sensitive information almost immediately after the Contracts were entered into. Among other things, Yodlee was provided with credentials to access FinApps' proprietary databases, as well as electronic repositories containing highly detailed proprietary information concerning the Relevancy Engine, the Rules, and the Rule creation process, including, but not limited to, technical manuals, whitepapers, FAQs, glossaries, flow charts, and knowledge bases.

98.     FinApps has since learned that it was deliberately misled by Defendants all along: Yodlee's purported need for access to FinApps' trade secrets was unrelated to a good faith effort to sell and market Risk Insight. Rather than forging a lasting strategic business enterprise, Yodlee was solely interested in stealing FinApps' valuable proprietary technology, which it secretly intended to use as the basis for a competing software platform developed without FinApps. As soon as they obtained access, Defendants capitalized on FinApps' trust by stealing FinApps' proprietary technology and trade secrets, including, among other things, the architecture and schemas used by the Platform and its proprietary databases, as well as the highly-complex Rules that drive the Platform.

99.     Yodlee then used the misappropriated technology and trade secrets as the backbone of a competing platform that Yodlee packaged to perform functions substantially identical to the Risk Insight platform. Yodlee's knock-off platform relies on the same critical

technological infrastructure that underlies the Risk Insight platform. This similarity is no coincidence: Yodlee's competing platform is based almost entirely on proprietary technology created by FinApps and misappropriated by Yodlee.

100. As detailed below, the technology powering Yodlee's competing platform was created using information and technology misappropriated from FinApps, which Defendants are now using for their own improper purposes. The databases underlying Yodlee's competing software platform utilize architecture, structure, categorization, data prioritization, and optimization strategies created by, and misappropriated from, FinApps. Additionally, the core software engine driving Yodlee's competing software platform is based on Rules misappropriated directly from FinApps or duplicated and reverse engineered using information and technology misappropriated from FinApps.

### i. Yodlee Misappropriates FinApps' Database Technology

101. Shortly after FinApps entered into its partnership with Yodlee, members of Yodlee's Risk Insight team requested access to FinApps' proprietary databases, claiming that Yodlee needed a deeper understanding of FinApps' complex and proprietary database technology. Yodlee asserted that it needed such access to better equip its salesforce to explain and ultimately sell the Risk Insight software to prospective clients.

102. Yodlee claimed that it was crucial for its Risk Insight product sales and marketing teams to have a comprehensive understanding of the Risk Insight platform, because it would permit Yodlee's sales teams to sell potential clients not only on the EAV Reports (and the insight they can provide to underwriters), but also on the sophistication and transformative nature of the Risk Insight platform. Among other things, Risk Insight's economical scalability and practical

flexibility, which depend on FinApps' proprietary database technology, were major selling points to potential clients.

103.     In reality, however, and unbeknownst to FinApps at the time, Yodlee had not requested access to the databases underlying the Risk Insight platform merely to enhance the sales and marketing of the product.  Instead, Yodlee and its team of database and software engineers were using their access to copy and steal the highly sophisticated and proprietary architecture of the databases, which took FinApps years to develop and refine.  This access also afforded Yodlee's database and software engineers unfettered insight into FinApps' proprietary data cleansing and prioritization techniques, which, as discussed above, were integral to the Risk Insight platform.

104.     Yodlee's access to, and misappropriation of, FinApps' proprietary database architecture and schemas also allowed Yodlee to learn how the Relevancy Engine accesses data to run calculations and deliver information for EAV Reports.  In short, Yodlee's ability to observe how FinApps' database technology operated also allowed it to reverse engineer FinApps' highly sensitive Rules, which lie at the heart of the Risk Insight platform.

105.     Indeed, although the code that underlies each Rule is encrypted, the manner in which the Relevancy Engine relies on those Rules to access data while performing its analysis is not encrypted and was thus easily observed by Yodlee through its access to the databases.  Even without direct access to the raw code underlying the Rules themselves, Yodlee's access to the data stored in the databases, coupled with its ability to observe how the Relevancy Engine accessed and operated upon this data, permitted Yodlee to surreptitiously derive or reverse engineer the Rules.  From there, Yodlee was able to reverse engineer the functionality of the Risk Insight platform itself.

106.     To be clear, FinApps' concerns are not merely speculation over the sort of misappropriation Yodlee's access **could** permit.  To the contrary, Yodlee and its software and database engineers **in fact** used their access to reverse engineer the functionality of FinApps' Platform, in order to misappropriate FinApps' proprietary technology and secretly incorporate it into Yodlee's competing platform.  In May 2019, Yodlee senior personnel explicitly instructed members of Yodlee product development team to continue to engage in such reverse engineering.

107.     On May 14, 2019, Kirti Kumar, Yodlee's Director of Technology for Risk Insight Products, and Francois Hedouin, Yodlee's Vice President of Customer Care, along with other senior-level Yodlee personnel including Mike Burger, engaged in the following correspondence (attached hereto as Exhibit 4) regarding reverse engineering certain portions of FinApps' proprietary databases:

> Kumar:          You mean mongoDB of FA?  Yes they are as that is the main application database.  However, FA have never shared their data model so we'll not know where what is.
>
> We can ask for help (confirm with Mike/Irene) or look at the collections to make a guess, **more like reverse engineer.**
>
> Hedouin:          Kirti, Do we have full access to the MongoDB DB?  Can we spend time looking at finding which field could help identify the tenant?
>
> **We cannot go back to FA for this and I looking for a way to do it ourselves (reverse engineering).**
>
> Can you please share your view on this?  This is a critical need for existing customers.
>
> Kumar:          Yes, The DBs are managed by Yodlee DBAs.  We can get the required access.

I would suggest the following: Identify who will run this monitoring, ***get that person/team the access.*** Srini and I can spend couple of hours in a working session to build the queries.

Going forward that person will run the queries, to get the data.

***My assumption here is that we can reverse engineer. We can give it a try. If we hit a roadblock, we'll regroup.***

Hedouin:   Thx Kirti. Yes build the querry to get the data we need. CS/IAE will take care of turning that information into a regular automated report.

***WE just need a jump start looking at their DB and find the right away to extract that data***

When can you have this done?

Kumar:   Francois, I cannot deliver this on my own. We do not have access to these production databases and there is no development environment for FA application where we could build and test the queries. ***I can work with the person with who has obtained the DB access and help reverse engineer in a working session.***

Need somebody to help drive this.

108.   This correspondence irrefutably confirms a concerted effort by Yodlee to reverse engineer FinApps' proprietary databases, in order to develop its own competing platform. Moreover, the participants of this email are senior Yodlee personnel working in disparate departments within Yodlee's organizational structure, confirming that Yodlee had put in place a company-wide directive to steal and misappropriate FinApps' proprietary technology and trade secrets.

### ii. Yodlee Misappropriates FinApps' Rules

109. In addition to misappropriating the architecture and schemas of FinApps' proprietary databases, Yodlee also stole highly confidential information and trade secrets underlying FinApps' Rules and Rule creation process.

110. As explained herein (*supra* ¶¶ 48-49), Rules are highly complex mathematical and programmatic expressions of key financial concepts that are central to credit risk assessment. FinApps' Rules, and the technology FinApps developed to create, test, and deploy these Rules, are among FinApps' most proprietary and valuable trade secrets.

111. Prior to its partnership with FinApps, Yodlee's attempt to create Risk Insight 1.0 failed in large part due to its inability to create accurate Rules capable of properly calculating the credit analysis metrics required by underwriters. In fact, this failure is why Yodlee had to cease its efforts related to the first incarnation of Risk Insight. Yodlee's inability to design and implement adequate Rules is also a primary reason Yodlee induced FinApps into the partnership.

112. Yodlee targeted proprietary information concerning FinApps' Rules from the earliest stages of the parties' negotiations. In fact, during the diligence process, Yodlee required FinApps to provide it with detailed information concerning the Rules driving the Relevancy Engine. Yodlee was openly skeptical about the prospect that FinApps had successfully developed robust and consistently functional Rules, when it had been wholly unable to do so. Before considering business with FinApps, Yodlee demanded that FinApps convincingly demonstrate it had developed a comprehensive set of Rules (a "Ruleset") that had undergone successful testing and was confirmed to be operationally viable.

113. To prove that the Platform was exactly what Yodlee needed, FinApps provided its EAV Data Validation Test Plan (the "Validation Test Plan") to Yodlee on or about

September 20, 2016. The Validation Test Plan contained a comprehensive reference guide describing how data validation testing was performed on all of FinApps' Rules. The Validation Test Plan also detailed the highly successful results of this testing, confirming that FinApps' Rules were capable of performing consistently and with a high degree of accuracy in a variety of real-world conditions.

114.    The Validation Test Plan also included an entire section called "Ruleset documentation," which contained an enormous amount of detailed proprietary information concerning FinApps' Rules. Among other things, this section of the Validation Test Plan included detailed summaries for approximately two dozen of the most critical, finalized Rules that drive the Risk Insight platform.[5]

115.    In short, the Validation Test Plan provided a how-to guide, explaining how FinApps' key Rules were created, how they worked, and how they were used by the Relevancy Engine. Yodlee used the detailed proprietary information contained in the Validation Test Plan to assist in its misappropriation of FinApps' Rules, and its efforts to build a duplicate platform based on FinApps' valuable proprietary technology.

116.    In addition to the Validation Test Plan, at Yodlee's request, FinApps provided Yodlee with a detailed logic flow chart for certain of the Rules. This highly sensitive chart contained even more granular information concerning a given Rule, and its logical flow and functionality within the Relevancy Engine. Not only were these highly detailed Rule logic flow

---

[5]    For each of these Rules, the Validation Test Plan set forth, among other things: (i) a description of the financial concept for the Rule that was developed; (ii) an articulation of the mathematical calculations used to derive the Rule; (iii) identification of the negative paths associated with the Rule; (iv) identification of the other Rules leveraged to create this specific Rule; (v) each of the pipeline stages for the Rule; (vi) a sample of the code in JSON script language used to implement the Rule within the Relevancy Engine; and (vii) a sample of the Rule's output in a standard EAV Report.

charts provided to Yodlee, but FinApps spent multiple weeks walking over a dozen Yodlee employees through these flow charts, in great detail. FinApps' Rule engineers spent countless hours educating Yodlee about specific Rules and the Rule creation process. These sessions were a combination of live demonstrations at FinApps' office in Florida, as well as through teleconference.

117. At Yodlee's request, FinApps also provided detailed information concerning each pipeline stage for certain Rules. This information comprised the most granular representation of a Rule, how it accesses information within the database, and what calculations must be performed and in what order. The script codes underlying different portions of the Rule were also provided and described.

118. Yodlee used the foregoing information to create identical, or substantially identical, copies of FinApps' proprietary Rules, which Yodlee then incorporated into its own competing platform. Yodlee also used the detailed information FinApps provided regarding how its Rules interact with the Relevancy Engine to copy this functionality into Yodlee's competing product.

119. Finally, as an overlay to all of the proprietary information it provided Yodlee, FinApps also provided a free flow of information in the form of telephone conversations, video conferencing, in-person meetings, training sessions, emails, and other communications to answer any questions Yodlee had concerning the Rules, Rule creation, and the inner workings of the Relevancy Engine.[6]

---

[6] Not surprisingly, because Yodlee was close to consummating its theft of the technology, Yodlee's communications regarding the Rules became less frequent over 2018, and tapered off almost entirely by the beginning of 2019.

**H. Yodlee Facilitates Its Misappropriation by Misrepresenting Its Ownership Over Risk Insight and by Concealing FinApps' Identity**

120.    Yodlee took other, concrete steps to facilitate its misappropriation, including engaging in a concerted effort to conceal FinApps' critical role with respect to Risk Insight. Yodlee knew that if Risk Insight clients were unaware of FinApps, it would be far easier for Yodlee to transition existing Risk Insight customers to the new platform it was developing in secret, with technology stolen from FinApps. Further, obscuring FinApps' critical role would allow Yodlee, and not FinApps, to gain credibility as a FinTech software provider with new and existing customers. Thus, Yodlee deliberately sought to conceal FinApps' involvement with the Risk Insight platform from Risk Insight clients.

121.    Yodlee sought to obscure FinApps' role in two primary ways. First, Yodlee routinely misrepresented to Risk Insight clients and potential clients that it owned the intellectual property underlying Risk Insight. This was false. FinApps -- not Yodlee -- owns (and has always owned) the intellectual property that underpins Risk Insight. Nevertheless, in contracts with its customers -- including, among others, CoreLogic, First Republic Bank, PNC Bank, Synchrony Financial, FormFree, Lender Price, and Sierra Pacific Mortgage Company -- Yodlee included an "Ownership" clause stating falsely that Yodlee retained "all right, title and interest in and to the deliverables under [the contract], including all Intellectual Property Rights therein and thereto."

122.    FinApps was not a party to any of the contracts in which Yodlee made this material misrepresentation, nor was FinApps even mentioned in any of these contracts. Accordingly, FinApps was never provided with an opportunity to object to the "Ownership" clauses in Yodlee's contracts with its customers, which constituted material misrepresentations of fact. By including the false "Ownership" clause, Yodlee was attempting to build a false

reputation in the marketplace as a significant FinTech software provider, not just an ordinary data aggregator.

123.    Similarly, Yodlee misrepresented to Risk Insight clients that it would be providing all professional services work (including implementation, development and configuration work, post-implementation support, and maintenance) to customers of Risk Insight. Again, this was false. FinApps -- not Yodlee -- provided all such professional services to Yodlee's customers. Yodlee's work on behalf of clients was largely administrative in nature, such as scheduling meetings and conference calls to address client issues.

124.    Yodlee included these false provisions in its contracts to ensure that its customers would not learn that FinApps was the real technology expert. Yodlee's contracts with its customers even included provisions describing the team members Yodlee would provide on a particular customer's engagement, such as a "Technical Consultant," "Data Consultant," and "Quality Assurance Tester." These titles referred to FinApps employees, however -- not Yodlee employees.

125.    Yodlee also sought to obscure FinApps' role in performing custom work called for by separate contracts with certain of Yodlee's customers. Custom work includes specific and customized configurations of Risk Insight, designed to meet a customer's particular business needs. Yodlee separately negotiated these custom work contracts, and even agreed to the custom work that would be performed, although FinApps -- not Yodlee -- would be performing this work.

126.    FinApps then performed all of this custom work at great effort and cost, in order to meet the specific needs of Risk Insight's customers. FinApps' technical expertise allowed it

to successfully perform all of the custom work Yodlee promised the customers. But FinApps never received credit for this work, nor was even acknowledged as having performed it.[7]

127. In fact, Yodlee was so desperate to ensure that Risk Insight clients never learned that FinApps was performing custom work on behalf of Risk Insight, Yodlee even required FinApps' employees to use *Yodlee* email addresses when communicating with these customers. Further, on conference calls, and during meetings with customers, Yodlee demanded that FinApps' employees refrain from disclosing their affiliation with FinApps.

128. Even with respect to error correction and troubleshooting, Yodlee went to great lengths to ensure that its customers remained unaware that their problems were being solved by FinApps. Prior to the Risk Insight platform going live for a particular client, client error tickets were submitted to Yodlee employees, who forwarded them to FinApps, who then addressed and corrected the issue. After a Risk Insight platform went live, a Yodlee "help center" portal was created through which clients could submit error tickets. Unbeknownst to these clients, however, their error tickets were routed directly to FinApps, who actually addressed their issues. Thus, both prior to, and after, implementation of the Risk Insight product for a given client, Yodlee took steps to conceal FinApps' technical support for the product.

129. Yodlee was desperate to perpetuate the illusion that it was solely responsible for the Risk Insight platform. Apart from allowing Yodlee to garner all of the credit for Risk Insight's success, concealing FinApps would also make it easier for Yodlee to capture Risk Insight's client base, once Yodlee had completed its misappropriation of FinApps' proprietary technology. Yodlee took great pains to ensure that its customers never had any interactions with

---

[7]     Nor was FinApps paid fully for performing this work, as discussed *infra* at ¶¶ 174-92.

FinApps, so that when the time came, Yodlee would be able to wind down Risk Insight and seamlessly transfer Risk Insight's customer base to its own product, without regard for FinApps.

**I.     Defendants' Misuse of YProxy Confirms They Are
        Creating Competing Products to Replace Risk Insight**

130.    By April 2019, Yodlee was well on its way to successfully building its own competing platform. Before Yodlee could launch its competing platform as a standalone product, however, two serious issues needed to be addressed. As described below, the manner in which Yodlee addressed these two issues provides powerful corroborating proof of Yodlee's egregious misconduct.

131.    Yodlee's first issue was that it did not have a way to identify which individual consumer accounts in the Risk Insight platform (*i.e.*, the bank account and account information for a particular individual) had been requested by which institutional Risk Insight client (*i.e.*, the banks and other financial institutions conducting credit risk analysis for that particular individual).

132.    This disconnect posed a serious problem for Yodlee's scheme to move Risk Insight's institutional clients to its new, secretly developed replacement platform. In essence, Yodlee had no way to associate individual consumer accounts with the institutional clients of Risk Insight to which they corresponded. This prevented Yodlee from transitioning existing Risk Insight's institutional clients into its new platform without losing their underlying account data, prior credit risk analysis, and previously generated credit risk reports. Yodlee needed a way to identify all of the individual consumer accounts associated with a particular institutional client before it could transfer that institutional client's account into the competing platform Yodlee was developing.

133.     Yodlee's second issue was that notwithstanding its theft and misappropriation of a vast amount of FinApps' proprietary information and technology, it did not have complete access to the source code underlying Risk Insight, and thus could not ensure that its new platform had all of the same functionality as Risk Insight, and would produce identical credit risk reports. Accordingly, Yodlee needed a way to test the credit risk reports generated by its secretly developed platform against those generated by Risk Insight, in order to confirm that it had accurately copied and linked together all of the underlying software components it had stolen from FinApps.

134.     Yodlee solved both of these problems by misappropriating yet another piece of FinApps' proprietary technology known as "YProxy."  As set forth below, Yodlee's misuse of YProxy can *only* be explained by its scheme to unlawfully build a competing platform based on technology stolen from FinApps.

135.     In October 2018, Yodlee asked FinApps to assist one of its clients, FormFree, with FormFree's transition from a legacy system to the Risk Insight platform.  FormFree had been using Yodlee as their data aggregation provider since 2016, but with an analytical platform FormFree had developed itself.  Yodlee wanted Risk Insight to be the sole platform used with its data, so it required FormFree to switch to Risk Insight.

136.     Before it could switch to the Risk Insight platform, however, FormFree needed to ensure that:  (i) the Risk Insight platform would provide FormFree with the same type of data it had been obtaining directly from Yodlee; and (ii) the credit risk reports that FormFree would be generating using the Risk Insight data would contain the same level of data and information as the credit reports FormFree was already providing to its customers.  Thus, in October 2018,

Yodlee proposed that FinApps develop a software application that would allow FormFree to test Risk Insight to its satisfaction.

137. FinApps' software engineers discussed a solution with both Yodlee and FormFree over the course of many weeks. By late-November 2018, and based on these conversations, FinApps created YProxy,[8] which provided FormFree with the functionality it requested. Specifically, YProxy allowed FormFree to collect all of the raw data for individual accounts through the Risk Insight platform, which would, in turn, enable FormFree to compare its own credit reports against those produced by the Risk Insight platform.

138. FinApps released YProxy to FormFree in mid-December 2018, and FormFree used it for a period of two weeks to confirm the reliability of Risk Insight's data. After FormFree was satisfied with the congruity between its reports and Risk Insight's reports, it began using the Risk Insight platform and ***never*** used YProxy again.

139. On March 29, 2019, FinApps noticed that Yodlee had improperly accessed YProxy by signing into the software using Risk Insight credentials previously assigned to Bank of America. Given that YProxy was made specifically for FormFree, strictly in connection with a unique and temporary purpose, FinApps did not believe that Yodlee had any legitimate reason to use YProxy. In fact, besides FormFree, no other Risk Insight client (and certainly not Bank of America), even knew that YProxy had been developed. On April 8, 2019, after discovering that Yodlee accessed YProxy a ***second time*** using Bank of America's credentials, FinApps suspended Yodlee's access to YProxy.

---

[8] Notably, FinApps created YProxy at its own cost and at no cost to Defendants, even though it was not contemplated in any statement of work with Yodlee.

140. Within a matter of hours, FinApps received a flurry of requests from senior Yodlee personnel demanding that FinApps restore Yodlee's access to YProxy, which FinApps refused to do. Then, on April 11, 2019, Stuart DePina -- Envestnet's Chief Executive of Data & Analytics, with direct oversight of Yodlee's business and operations -- emailed Sullivan directly, formally demanding that FinApps immediately reinstate Yodlee's access to YProxy. In response, Sullivan informed DePina that FinApps would not allow Yodlee to access YProxy until Defendants provided adequate documentation describing their need for such access. Notably, Defendants *never provided their reasoning*.

141. At the time, FinApps did not understand Yodlee's and Envestnet's interest in accessing YProxy. Now, however, Defendants' purpose has become clear. YProxy solves two problems that Yodlee needed to address before it could offer its covertly developed product to the public at large. Specifically, Yodlee's unauthorized use of YProxy allowed it to (i) transition current Risk Insight clients to Yodlee's secretly developed platform without losing all of their individual consumer account information and preexisting credit analysis; and (ii) ensure that its new platform generated credit risk reports identical to those generated by Risk Insight.

142. Using YProxy, Yodlee could log into Risk Insight as each of Risk Insight's existing institutional clients (as it previously had done using Bank of America's credentials), collect all of the accounts and raw account information associated with each specific client, and copy that client's information, account data, and credit risk analytics onto Yodlee's own databases. Second, Yodlee would be able to run the data collected via its unauthorized use of YProxy through its surreptitiously developed credit risk platform, generate reports on the basis of this data, and compare them to Risk Insight reports generated based on the same data. YProxy would allow Yodlee to check the functionality of its competing platform against that of Risk

Insight, and make any changes to its secret platform necessary to ensure conformity. YProxy provided a master key with which Yodlee was able to fine tune its competing platform before bringing it to market.

**J.      Defendants Confirm that They Have Unlawfully Created Competing Products and Are Usurping FinApps' Corporate Opportunities**

143.    As explained herein, Yodlee has been engaged in an ongoing campaign to misappropriate FinApps' proprietary information, technology, and trade secrets, in order to incorporate them into its own competing products. While this work has been conducted in secret, recent announcements concerning software agreements that Yodlee has entered into with third parties confirm its development of competing credit risk products based on FinApps' stolen technology. These products provide features and functionality of Risk Insight, and are based on proprietary technology stolen from FinApps, but are being provided outside of the Risk Insight environment, without FinApps' involvement or approval.

144.    In 2016, Yodlee's initial attempt to develop a product like Risk Insight was an abject failure. Now, a mere three years later, Yodlee is able to provide a service virtually identical to Risk Insight. Yodlee's remarkable progress, its new business agreements with third parties, and announcements concerning those agreements, powerfully corroborate FinApps allegations that Yodlee has misappropriated technology and know-how that belongs to FinApps.

**i.      Yodlee's Improper Partnership with Equifax**

145.    Using the technology misappropriated from FinApps, Yodlee has been working with Equifax to develop an alternative credit software product that enhances Equifax's ability to assess credit risk. This alternative product appears to be substantially identical to the Risk Insight platform, and is based in large part, if not entirely, on technology developed by FinApps, and misappropriated by Yodlee.

146.     In October 2018, Equifax publicly announced that it was working with Yodlee "to help simplify the mortgage loan process by making it easier for lenders to derive insights from borrowers' financial data."[9]  Equifax claimed that the collaboration with Yodlee provided it "with access to real-time asset and income information on prospective customers who have granted permission and helps streamline loan production . . . and give banks, loan originators and lenders additional tools to assess risks in underwriting and portfolio management."[10]  Equifax also stated that its partnership with Yodlee would help it "provide the industry with a fully rounded solution for verifying borrower income, assets and employment, all delivered in a seamless electronic document and API flow."[11]

147.     As discussed herein, Risk Insight provides lenders with "additional tools to assess risk in underwriting" by giving them "access to real-time asset and income information," which are used for "verifying, income, assets and employment."  While the description of the software Yodlee is providing Equifax sounds identical to the features and functionality provided by Risk Insight, ***Yodlee is not providing these tools and analysis to Equifax through the Risk Insight platform***.  Instead Yodlee's business with Equifax is based on an alternative platform that Yodlee developed in secret, based on proprietary information and trade secrets stolen from FinApps.[12]

---

[9]     *See* "Equifax and Yodlee to Accelerate the Digital Mortgage Process with Innovative Verification Products," *available at*:  https://investor.equifax.com/news-and-events/news/2018/10-15-2018-110005909.  (Attached hereto as Exhibit 5.)

[10]     *See id.*

[11]     *See id.*

[12]     Indeed, when Risk Insight was launched, Yodlee issued a press statement describing Risk Insight as "a new solution that provides lenders with the ability to see a complete view of consumer bank account and spending activity" that allows lenders "to create an enhanced risk profile of borrowers and apply those findings immediately in their current underwriting process."

148.     As explained (*supra* ¶¶ 17, 145-46), to facilitate its misappropriation, Yodlee has taken great pains to conceal its misconduct from FinApps.  Not only are both FinApps and Risk Insight absent from Equifax's October 2018 press statement, but Yodlee never made FinApps aware of the partnership with Equifax prior to the public announcement.  In fact, Yodlee refused to discuss its Equifax partnership with FinApps after it was announced and has developed this software product outside of the Risk Insight platform and without FinApps' involvement.

149.     As discussed (*supra* ¶¶ 69-74), prior to working with FinApps, Yodlee did not have the software or technology to provide the sort of real-time asset and income analysis described in Equifax's press release.  Only after misappropriating FinApps' proprietary information and trade secrets, including, but not limited to, the organizational structure and schemas of the databases underlying the Risk Insight platform, and the proprietary Rules and technology underpinning the Relevancy Engine, was Yodlee able to provide a usable risk underwriting tool to Equifax.

## ii.     Yodlee's Engagement with Other Clients for Risk Insight Services

150.     In addition to its partnership with Equifax, it appears that Yodlee has also been entering into agreements with other third parties to deliver credit risk software and related services substantially identical to those provided by Risk Insight, without the involvement of FinApps or the Risk Insight platform.  Each of these engagements constitutes an additional corporate opportunity improperly usurped from FinApps by Yodlee.

---

*See* "Envestnet | Yodlee Introduces Risk Insight to Help Lenders Make More Informed Decisions," *available at*:  https://www.globenewswire.com/news-release/2016/04/11/827605/0/en/Envestnet-Yodlee-Introduces-Risk-Insight-to-Help-Lenders-Make-More-Informed-Decisions.html.

151.   On April 1, 2019, Yodlee announced internally that it had entered into engagements with Verify My Bank and Silver Bullet Marketing to provide them with a "consumer lending solution" that creates "underwriting reports." Yodlee is providing software products to these new clients with the same credit risk analysis features offered by Risk Insight, as well as reports that are functionally equivalent, if not substantially identical, to FinApps' EAV Reports.

152.   Likewise, on May 16, 2019, Yodlee internally announced that it had entered into an agreement with Bankers Healthcare Group, a new client that would "be utilizing the complete Risk Insight report."

153.   FinApps was not aware of Yodlee's agreements with Verify My Bank, Silver Bullet Marketing, or Bankers Healthcare Group prior to Yodlee's announcement of these deals, and Yodlee never discussed these engagements with FinApps. Further, FinApps has not attended any meetings or discussions concerning any of these new clients concerning Risk Insight, and did not assist with the on-boarding of any of these clients onto the Risk Insight platform.

154.   Yodlee's announcements and subsequent behavior suggests that it is providing these new clients with access to its secretly developed credit analysis platform -- rather than Risk Insight. Yodlee's actions are particularly troubling with respect to its engagement with Banks Healthcare Group, due to Yodlee's use of the term "Risk Insight" in its internal announcement. The fact that FinApps was not contacted about this "Risk Insight" engagement and that Bankers Healthcare Group has not been provided with access to the Risk Insight platform, strongly suggest that Yodlee has replaced FinApps' Risk Insight software altogether with their own competing platform, which Yodlee is now improperly marketing as "Risk Insight."

155.     In all three of these cases, it appears that Yodlee has not only stolen FinApps'
proprietary technology and trade secrets to develop competing credit risk analysis products, but
is now also improperly entering into agreements with new clients behind FinApps' back, for
services that should have been provided by Risk Insight, and depriving FinApps of revenues to
which it is entitled.

**K.     Envestnet's Misappropriation of FinApps' Technology and
the Risk Insight Platform**

156.     Envestnet is also using Yodlee's competing version of the Risk Insight platform
and proprietary information and technology stolen from FinApps to develop credit risk software
tools for its wealth management clients.

157.     As discussed herein, Envestnet is one of the largest providers of wealth
management software products to financial advisors and institutions in the nation, and is
constantly developing new technology and software solutions to provide its clients.

158.     On April 9, 2019, Envestnet announced that it was developing a "first-of-its-kind
platform solution" known as "Envestnet Credit Exchange," which would integrate lending
solutions into Envestnet's existing financial wealth management software platform.  Envestnet
announced that its Envestnet Credit Exchange platform will provide its financial advisor clients
with "access to a streamlined screening process that generates real-time, immediately-available
loan offers for their clients with direct referrals to lenders."  The new software platform is
expected to launch in late 2019.

159.     Mere months prior to this announcement, Sullivan had in-depth conversations
with Stuart DePina -- Envestnet's Chief Executive of Data & Analytics -- regarding the
incorporation of Risk Insight into the Envestnet's Credit Exchange product.  Specifically, on
January 5, 2019, Sullivan had an in-person meeting with DePina and Brandon Rembe (Senior

Vice President of Products for Yodlee), in which DePina spoke at length about Envestnet's goal of integrating certain features of the Risk Insight platform into Envestnet Credit Exchange, including Risk Insight's ability to generate real-time credit risk analysis and reports. During the January 5 meeting, DePina explained the importance of credit risk products to Envestnet's future, and how Envestnet Credit Exchange would open the Risk Insight platform to a new network of wealth management providers.

160. During this meeting, DePina also expressed to Sullivan that Envestnet's lack of ownership over the technology underlying the Risk Insight platform "was a problem," and that he was very "uncomfortable" with the revenue share fees that Yodlee had agreed to pay FinApps under the Contracts. DePina explained to Sullivan that he wanted to explore Envestnet's potential acquisition of FinApps' valuable intellectual property. Over the next few months, DePina made multiple offers to Sullivan to purchase FinApps proprietary technology outright. All of these offers, however, were rejected due to their unreasonably low valuation of FinApps' technology. After DePina realized that FinApps was not for sale, all discussion of integrating Risk Insight into the Envestnet Credit Exchange product ceased. DePina never again contacted Sullivan (or anyone else at FinApps) concerning the Envestnet Credit Exchange product.

161. It is now apparent that Envestnet had no intention of integrating Risk Insight into the Envestnet Credit Exchange product. Rather, DePina was interested in acquiring FinApps' technology if he could do so at a fire sale price, and thus cheaply eliminate the possibility of future liability for Defendants' misappropriation and other misconduct. And even if FinApps were unwilling to sell at a desirable price, Envestnet always had Yodlee -- who had misappropriated FinApps' technology -- to fall back on.

162.     Indeed, by early 2019, DePina was aware that Yodlee was in the advanced stages of building its competing platform on the back of stolen FinApps technology.  From a technical standpoint, DePina also knew that Yodlee's replacement platform could be integrated into Envestnet Credit Exchange if FinApps was unwilling to sell.   Further, from Envestnet's standpoint, it made economic sense to incorporate technology from its wholly-owned subsidiary, rather than licensing or acquiring the technology from FinApps.

163.     Ultimately, DePina's attempt to purchase FinApps' intellectual property failed, and Envestnet went ahead with its plan:  incorporating software from Yodlee's competing platform -- including proprietary information and technology stolen from FinApps -- into the Envestnet Credit Exchange product.  When the Envestnet Credit Exchange is unveiled to the public later this year, it will contain features and functionality based entirely on FinApps' misappropriated proprietary technology.

**L.     With Competing Products Close to Completion,
        Defendants Wind Down the Risk Insight Platform**

164.     After the October 2018 announcement of Yodlee's collaboration with Equifax, Defendants immediately took steps to wind down the Risk Insight platform, notwithstanding Yodlee's commitment that it would be FinApps' long-term strategic partner.

165.     Beginning in January 2019, Yodlee began to transition sales and marketing employees that had been working full-time to selling Risk Insight onto other projects and into other positions within Yodlee.  Yodlee also stopped disclosing information regarding Risk Insight sales initiatives to FinApps.  For example, on or about January 10, 2019, Julie Solomon, Senior Vice President of Financial Institution and FinTech Solution Sales at Yodlee, expressly forbid Yodlee employees from providing any sales projection information to FinApps.

166. By March 2019, Yodlee had transitioned nearly all of its sales and marketing personnel off the Risk Insight team, including the senior leadership of the Risk Insight team, Mike Burger, Vice President of Product Marketing, and Jonathan Principi, Senior Director of Business Development.

167. The handful of Yodlee employees who remained assigned to the Risk Insight team were inferior and egregiously lacking in (i) proper training; (ii) experience in the credit and lending sector; and (iii) familiarity with the Risk Insight product. Tellingly, the Yodlee employees who Yodlee convinced FinApps to train on the underpinnings of Risk Insight were moved away from Risk Insight.

168. As a result, on or about March 15, 2019, Sullivan expressed his dissatisfaction concerning Yodlee's sales and staffing decisions to senior executives at both Envestnet and Yodlee, including DePina and Rembe. Sullivan's concerns were ignored, however, and FinApps' calls, emails, and messages went unanswered.

169. Then, on April 7, 2019, DePina informed Sullivan via email that, notwithstanding the two-and-a-half years remaining on the term of the licensing agreement, Defendants had "determined Yodlee will cease marketing and selling the Risk Insight solution developed by Financial Applications." DePina also attached a letter containing numerous false statements concerning purported "Technical Issues" with the Risk Insight platform. These "technical issues," however, were entirely specious, and manufactured by Defendants as a pretext for Yodlee's early termination of the Contracts.

170. On April 9, 2019, Sullivan, on behalf of FinApps, responded to DePina's April 7 communication, detailing how each of the purported "Technical Issues" identified by DePina was either false, or based on incomplete or entirely fabricated information. Sullivan also

explained that to the extent any Risk Insight clients were experiencing issues with the Risk Insight platform, those issues resulted either from Yodlee's failure to bring its own technology to industry standards, or Yodlee's decision not to authorize FinApps to develop additional software outside of the scope of work outlined by the Contracts.

171.     Additionally, in its efforts to wind down Risk Insight, and given that it was gearing up to launch its own competing platform, Yodlee began to refer to Risk Insight as a "legacy" product, both internally, and to clients, such as PNC Bank.

172.     It has become clear that Yodlee never intended to honor its commitment to grow Risk Insight into a billion-dollar business. Rather, Defendants' goal all along was to induce FinApps to enter into the Contracts, so that Defendants could steal FinApps' proprietary information and technology, and use it to develop competing software products whose revenues would not be shared with FinApps.

173.     Once Yodlee succeeded in developing its alternative system, neither its partnership nor its contractual payment obligations to FinApps mattered to Defendants. They had stolen what they needed, and now viewed the Risk Insight platform as a competing product they needed to undermine in order to steer business to their new platforms. Defendants' contrived wind down of the Risk Insight platform was nothing more than the final step in their scheme to replace Risk Insight with their own credit risk analysis software, based on technology stolen from FinApps.

**M.     Yodlee Refuses to Pay All Outstanding Fees Owed to FinApps**

174.     In addition to misappropriating FinApps' proprietary information and trade secrets, and unlawfully incorporating this stolen technology into its own competing software

products, Yodlee has also refused to pay FinApps millions of dollars in fees owed under the Contracts.

### i. Yodlee's Payment and Documentation Obligations

175.    In consideration for the license to use FinApps' proprietary technology and related services, Yodlee was required to compensate FinApps in the form of (i) revenue share fees; (ii) professional service fees; and (iii) fees for custom work for Risk Insight clients. *See* MSA § 4(a); SOWs §§ 1, 3.  Yodlee also agreed to provide FinApps additional fees for customer support, operational support, and marketing in connection with the Risk Insight product. Additionally, Yodlee was required to provide FinApps with documentation supporting these payments, in the form of monthly revenue reports, as well as copies of all contracts that Yodlee entered into concerning the Risk Insight platform.

### a.    *Revenue Share Fees*

176.    Yodlee was required to pay FinApps a percentage of Yodlee's monthly revenue, based on its sales of the Risk Insight platform and related services.  Pursuant to SOW No. 1, Yodlee was required to pay FinApps an amount equal to 30% of revenue received by Yodlee from relationships originated by Yodlee (and 40% of revenue received from relationships originated by FinApps).  Yodlee was also required to pay FinApps a monthly minimum fee of $10,000. *See* MSA § 4(a); SOW No.1 §§ 1, 3.

177.    In January 2018, the parties also entered into SOW No. 3, which, among other things, implemented a new payment structure.  This new structure provided FinApps with a larger portion of revenues as certain targets were hit:  32% of revenue received by Yodlee from relationships originated by Yodlee up to $5,000,000.00 (42% if the relationship was originated by FinApps); 35% of revenue greater than $5,000,000.00 but less than $10,000,000.00 from

relationships originated by Yodlee (45% if the relationship was originated by FinApps); and 38% of revenue greater than $10,000,000.00 received by Yodlee from relationships it originated (48% if the relationship was originated by FinApps).

178.    SOW No. 3 also increased the monthly minimum fees to which FinApps was entitled, setting the monthly minimum amount to: $50,000.00 during the first year of the four-year term; $75,000.00 during the second year; and $100,000.00 for the final two years.  *See* SOW No. 3 § 1.

### b.    *Professional Service Fees*

179.    FinApps is also contractually entitled to fees in connection with its provision of professional services to Yodlee's Risk Insight customers.  *See* SOW No. 1 § 3.  The professional services performed by FinApps included all required work necessary to service the Risk Insight software, including system integration, configuration, testing, maintenance, and error handling and fixes.

### c.    *Custom Work Fees*

180.    FinApps is also contractually entitled to fees in connection with its provision of custom work to certain of Yodlee's Risk Insight customers.  Certain Risk Insight clients needed custom work in connection with their use of the Risk Insight platform, including, among other things, bespoke software design that was not included in Risk Insight's standard software platform.  All custom work was to be provided pursuant to separate contracts between Yodlee and its customers, and FinApps was to be paid by Yodlee for the custom work it performed, at the rate of $250 per hour.  *See* SOW No. 1 § 3.7.  Yodlee's Mike Burger, however, explicitly instructed FinApps not to submit purchase orders for the custom work, and Yodlee instead strung FinApps along while Yodlee never intended to pay FinApps for the custom work it performed.

### d.   *Customer Support, Operational Support, and Marketing Fees*

181.    Additionally, on or about November 13, 2018, Yodlee agreed to pay FinApps a one-time fee of $25,000 to provide Yodlee with marketing services, including, among other things, creating copy and infographics for Risk Insight marketing and promotional materials. Also, on or about November 5, 2018, FinApps and Yodlee entered into a related agreement, in which Yodlee agreed to pay FinApps an additional $50,000 each month, starting in January 2019, for operational support and customer support related to the Risk Insight platform.

### e.   *Monthly Revenue Report and Risk Insight Contracts*

182.    Yodlee was also contractually obligated to provide FinApps with monthly reports of Yodlee's revenues, so that FinApps could properly assess the revenue sharing fees it was entitled to receive from Yodlee.  Additionally, Yodlee was obligated to provide FinApps with any Risk Insight related contracts ***prior to*** Yodlee's entrance into such contracts.  *See* SOW No. 3 § 3.5.  Moreover, FinApps also had the right to audit Yodlee's financials, including fee schedules of all Risk Insight contracts with Yodlee customers, in order to verify the accuracy of Yodlee's royalty reports and the revenue sharing fees received by FinApps.  *See* MSA § 4(h).

### ii.   **Yodlee Breaches Its Payments Obligations and Fails to Provide FinApps with Accurate Revenue Documentation**

183.    In violation of its contractual obligations, Yodlee has failed to make all required payments owed to FinApps under the Contracts and has refused to provide FinApps with monthly revenue reports and information related to contracts with its Risk Insight customers.

184.    Starting in early 2018, not long after the parties entered into the amended and restated MSA, FinApps requested that Yodlee provide the required monthly revenues reports, but Yodlee refused.  It was not until October 2018, after many months of requests, that Yodlee

finally provided a single spreadsheet to FinApps that purportedly contained the requested revenue information.

185.    The October 2018 spreadsheet, however, did not contain the requested revenue information.  Among other things, it failed to provide information sufficient for FinApps to verify the total amount of revenue sharing fees Yodlee owed to FinApps.  In fact, based on the diligence that FinApps was able to conduct using the deliberately limited documents and information Yodlee provided, it appears that Yodlee was significantly underreporting monthly revenues generated by the Risk Insight platform and related services.  Moreover, despite FinApps' numerous requests, Yodlee has refused to provide FinApps with the contracts with its Risk Insight clients, further obscuring the amount of fees that Yodlee is obligated to pay to FinApps.

186.    Further, Yodlee has failed to pay nearly $500,000.00 in fees related to custom work that FinApps performed for certain of its Risk Insight clients, some of which dates back to 2017.  There is no legitimate dispute that this work was performed at the direction of Yodlee.  In fact, on numerous occasions, senior Yodlee personnel promised FinApps that outstanding fees for the custom work would be paid in full.  Notwithstanding Yodlee's assurances, and that FinApps has provided Yodlee with the invoices it requested related to this custom work, Yodlee still refuses to pay FinApps what is owed.

187.    Yodlee also has been delinquent in paying FinApps $50,000.00 per month for operational and customer support, and never paid FinApps the $25,000.00 fee for marketing services provided by FinApps.

188.    After months of being rebuffed, on April 9, 2019, FinApps sent Yodlee a formal demand letter seeking payment of approximately $1,654,322.90 (which included all then

outstanding fees related to revenue sharing, professional service, custom work, customer support, operational support, and marketing) pursuant to the terms of the Contracts, based on the limited information FinApps had received from Yodlee. FinApps again demanded that Yodlee provide FinApps with the required monthly revenue information.

189. In May 2019, Yodlee responded by making a minimal payment, and providing a basic, single-page spreadsheet, which, like Yodlee's prior spreadsheet, did not contain remotely sufficient information for FinApps to determine what it is owed. This spreadsheet also appeared to significantly underreport the monthly revenues generated by the Risk Insight platform and related services. Additionally, Yodlee confirmed its bad faith by flatly refusing to pay *any* further delinquent fees and interest under the Contracts, unless it received an unreasonable amount of highly detailed information from FinApps, to which Yodlee is not entitled under the Contracts.

190. Based on the limited information available to it, FinApps sent Yodlee a Statement of Account on June 1, 2019, detailing all outstanding fees owed to FinApps, including $150,000.00 for revenue share fees; $614,175.99 for professional service fees; and $491,246.00 for custom work. These amounts, however, were only estimates based on the limited information available to FinApps at the time -- particularly the revenue share fees and professional service fees. The actual amounts outstanding are almost certainly much higher, but those amounts are currently unknown to FinApps given Yodlee's refusal to provide the necessary revenue information required to be provided to FinApps under the Contracts.

191. In addition to interest accrued on this outstanding balance, Yodlee also owes FinApps for operational support, customer support, and marketing fees, totaling $275,000.00.

192.    Yodlee's refusal to pay its outstanding fees to FinApps constitutes a clear and material breach of the Contracts, and starkly underscores Yodlee's bad faith and dilatory tactics as it secretly worked to launch a new competing product in the marketplace.

**N.    FinApps Terminates the Contracts and Suspends Services**

193.    As a result of Yodlee's egregious theft and misuse of FinApps' valuable proprietary software and trade secrets, as well as Yodlee's refusal to pay FinApps millions of dollars owed under the Contracts, FinApps sent a notice of material breach and cease and desist to Yodlee on May 17, 2019 (the "May 17 Notice").

194.    Specifically, FinApps placed Yodlee on notice that it was in material breach of the Contracts' exclusivity provision (MSA § 2(c)); the Contracts' fee provisions (MSA § 4); the Contracts' restricted activities provision (MSA § 6); and the Contracts' confidentiality provision (MSA § 7).

195.    Further, FinApps demanded that Yodlee, immediately cease and desist from, among other things:  (i) stealing, misusing, or otherwise unlawfully misappropriating FinApps' confidential and proprietary information and intellectual property; (ii) modifying, copying, reverse engineering, disassembling, or otherwise attempting to decipher any code or algorithms used in connection with any aspect of FinApps' technology; (iii) developing any software or technology that is intended, or may reasonably be deemed, to compete with or replace Risk Insight; and (iv) developing any software or technology that copies any features, functions, or rules of the Risk Insight.

196.    FinApps also demanded that Yodlee immediately pay outstanding fees and interest totaling (at that time) at least $1,424,322.99, and immediately provide FinApps with the royalty reports and Risk Insight agreements that FinApps needs to determine what it is owed, and to which it is entitled under the Contracts.

197.     On May 24, 2019, Yodlee responded to the May 17 Notice, but failed to meaningfully address any of the serious issues raised therein, and notably refused to provide assurances that Yodlee was and would remain in compliance with the terms of the Contracts. Yodlee also provided no legitimate explanation or basis for its continued refusal to pay outstanding fees and interest owed to FinApps under the Contracts, totaling at least $1,424,322.99.

198.     Pursuant to Section 11(d) of the MSA, "[a]t any time, either party may terminate th[e] Agreement immediately upon written notice to the other party if . . . the other party breaches any of its material obligations under this Agreement and such breach is not cured within thirty (30) days of receipt of written notice from the non-breaching party." Yodlee has been on notice that it owes FinApps substantial sums under the Contracts since, at the latest, April 9, 2019, when FinApps sent Yodlee its formal demand letter seeking payment of outstanding fees.

199.     Accordingly, on May 27, 2019, FinApps invoked its contractual right to terminate the Contracts for cause and sent Yodlee a notice of Termination for Cause resulting from Yodlee's theft and misuse of FinApps' valuable proprietary information and intellectual property, and its material breaches of the Contracts. The Contracts also provide that FinApps "may terminate th(e) Agreement immediately upon written notice to Yodlee in the event Yodlee breaches Section 6 (Restricted Activities)." MSA § 11(d). FinApps provided such written notice to Yodlee on May 17, 2019 when it sent its notice of material breach and cease and desist to Yodlee.

200.     As a result of FinApps' termination of the Contracts for cause, Yodlee is required to pay FinApps any unpaid fees "covering the remainder of the Term after the effective date of

termination." MSA § 11(f). Accordingly, Yodlee is obligated to pay FinApps the monthly minimum fees until the term of the Contracts expire on January 31, 2021, which total $3,025,000.

201. Finally, on June 11, 2019, having failed to resolve its issues with Yodlee, FinApps invoked its contractual right to suspend Yodlee's access to all software and services as a result of Yodlee's continued material breaches of the Contracts, which remain ongoing. *See* MSA § 11(g)(e) ("The duty of FinancialApps to provide [any services under the MSA] shall be conditioned on Yodlee continuing to comply with its obligations under the Agreement[.]").

**O.    Yodlee Continues to Misinform Risk Insight Clients
        After FinApps Suspends Services**

202. Following Yodlee's suspension, Risk Insight clients were unable to access the Risk Insight platform. Rather than direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform, Yodlee chose instead to continue its campaign of disinformation, in order to facilitate adoption of its secretly developed competing platform.

203. After FinApps suspended Yodlee's access to the Risk Insight platform and services, Yodlee misinformed Risk Insight clients that the Risk Insight platform was temporarily down due to an error in the system, which Yodlee was in the process of fixing. This explanation, of course, was wholly false. As the days passed, Risk Insight clients continued to ask questions about when they would be able to access the Risk Insight platform, and Yodlee persisted in its charade.

204. At no point in its communications with Risk Insight clients did Yodlee disclose the real reasons for their inability to access the Risk Insight platform. Yodlee did not explain to these clients that, contrary to its prior representations, it did not own the Risk Insight platform or

its underlying intellectual property, and that Yodlee was only a licensee of the Risk Insight platform. Moreover, Yodlee failed to explain to these clients that FinApps owned the software underlying the Risk Insight platform, and that FinApps had terminated Yodlee's license based on Yodlee's egregious misconduct and continued breach of the Contracts.

205. Yodlee's failure to disclose the truth to its Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, meant that these clients would remain unable to access the Risk Insight platform.

206. Had Yodlee told the Risk Insight clients the truth -- that the software underlying the Risk Insight platform was owned and developed by FinApps, and that they would be able to reconnect to the Risk Insight platform simply by contacting FinApps -- these clients would have experienced minimal downtime, and would be using FinApps' Platform today. Yodlee's strategy, however, has always been designed to conceal FinApps' involvement with the Risk Insight platform in order to facilitate adoption of Yodlee's competing platform. Even after its suspension, Yodlee continued to employ this strategy, no matter the cost.

### COUNT I

**Misappropriation of Trade Secrets in Violation of the
Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836
(Against Envestnet and Yodlee)**

207. FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

208. The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"), provides that an owner of a trade secret that is misappropriated may bring a civil action if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

209.     FinApps' proprietary Platform and its individual components -- including, but not limited to FinApps' technology to automate and expedite its data-cleansing process; the proprietary manner in which data is stored in FinApps' database; the overall architecture and schemas of FinApps' database; the Relevancy Engine, the Rules underlying the Relevancy Engine, and the Rule creation process -- constitute trade secrets belonging to FinApps.

210.     At all times, FinApps took reasonable measures to protect its trade secrets, which are not generally known to, or readily ascertainable through proper means by, the public. FinApps' trade secrets derive independent economic value, actual and potential, from not being generally known to the public.

211.     FinApps put into place numerous concrete measures to protect the secrecy of its proprietary technology and trade secrets.  First, FinApps implemented various security protocols to restrict access to its proprietary technology and trade secrets, including but not limited to (i) requiring  "multi-factor" authentication to log into FinApps' systems; (ii) imposing strict security restrictions on its property, including the issuance of access credentials with password protection to only a limited set of employees; and (iii) requiring visitors to FinApps' offices to be accompanied by the employee(s) they are visiting for the duration of their stay.

212.     Additionally, FinApps took steps to carefully protect storage of its proprietary technology and trade secrets, and how they were accessed, including but not limited to (i) hosting its network on a private cloud environment, with strict firewalls and other virtual and physical security protections; (ii) encrypting all data contained on the Platform's database, both "in transit," and "at rest;" and (iii) separately encrypting all of the individual Rules within the Relevancy Engine.

213.	FinApps also required its employees to sign non-disclosure agreements upon hiring, and regularly monitored, tested, and assessed potential risks and vulnerabilities to its security protocols, taking corrective actions when necessary.

214.	FinApps' trade secrets relate to a product -- the Platform -- that is used in, and intended for use in, interstate and foreign commerce, including but not limited to the global credit industry.

215.	Defendants acquired FinApps' trade secrets by, among other things, misrepresenting Yodlee's purported intention to enter into a long-term strategic partnership with FinApps and misrepresenting Yodlee's need for a deep understanding of FinApps' trade secrets in order to better sell potential customers on the Risk Insight platform. Based on FinApps' expectation that its proprietary information would be kept confidential, FinApps provided Yodlee with intimate access to its most sensitive systems and proprietary technology.

216.	As described more fully herein, Yodlee -- together with, and at the direction of, Envestnet -- has improperly misused and stolen FinApps' trade secrets, including but not limited to FinApps' technology to automate and expedite its data-cleansing process; the proprietary manner in which data is stored in FinApps' database; the overall architecture and schemas of FinApps' database; the Relevancy Engine, the Rules underlying the Relevancy Engine, and the Rule creation process.

217.	Yodlee has improperly misused and stolen FinApps' trade secrets in order to develop a competing platform that performs substantially identical functions as Risk Insight, and which is largely, if not entirely, dependent on the proprietary information and trade secrets that Yodlee stole from FinApps.

218. In fact, the databases underlying Yodlee's competing software platform utilize architecture, structure, categorization, data prioritization, and optimization strategies created by, and misappropriated from, FinApps. Additionally, the core software engine driving Yodlee's competing software platform is based on Rules misappropriated directly from FinApps or duplicated and reverse engineered using information and technology misappropriated from FinApps.

219. Envestnet has also improperly misused and stolen FinApps' proprietary information and trade secrets, which were provided to Envestnet by its wholly owned subsidiary, Yodlee. Envestnet is using proprietary information and technology stolen from FinApps to further develop credit risk software tools for Envestnet's wealth management clients, including in connection with its recently announced "Envestnet Credit Exchange" software product.

220. Defendants' misappropriation of FinApps' trade secrets was premeditated, and willful and malicious within the meaning of DTSA, thus entitling FinApps to exemplary damages.

221. As a direct and proximate result of Defendants' wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT II

**Misappropriation of Trade Secrets in Violation of the
Delaware Uniform Trade Secrets Act, 6 Del. Code § 2001, *et seq*.
(Against Envestnet and Yodlee)**

222. FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

223. The Delaware Uniform Trade Secrets Act ("DUTSA") prohibits the misappropriation of trade secrets in breach of a duty to maintain the secrecy thereof. "Trade secrets" constitute any information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value from not being generally known, and is the subject of reasonable efforts to maintain its secrecy.

224. As described more fully herein, FinApps proprietary Platform and its individual components -- including but not limited to FinApps' technology to automate and expedite its data-cleansing process; the proprietary manner in which data is stored in FinApps' database; the overall architecture and schemas of FinApps' database; the Relevancy Engine, the Rules underlying the Relevancy Engine, and the Rule creation process -- constitute trade secrets belonging to FinApps.

225. FinApps is the sole property owner of the Platform and its components as set forth more fully herein.

226. At all times, FinApps took reasonable measures to protect its trade secrets, which are not generally known to, or readily ascertainable through proper means by, the public, and FinApps' trade secrets derive independent economic value, actual and potential, from not being generally known to the public.

227. FinApps put into place numerous concrete measures to protect the secrecy of its proprietary technology and trade secrets. First, FinApps implemented various security protocols to restrict access to its proprietary technology and trade secrets, including but not limited to (i) requiring "multi-factor" authentication to log into FinApps' systems; (ii) imposing strict security restrictions on its property, including the issuance of access credentials with password

protection to only a limited set of employees; and (iii) requiring visitors to FinApps' offices to be accompanied by the employee(s) they are visiting for the duration of their stay.

228.   Additionally, FinApps took steps to carefully protect storage of its proprietary technology and trade secrets, and how they were accessed, including but not limited to (i) hosting its network on a private cloud environment, with strict firewalls and other virtual and physical security protections; (ii) encrypting all data contained on the Platform's database, both "in transit," and "at rest;" and (iii) separately encrypting all of the individual Rules within the Relevancy Engine.

229.   FinApps also required its employees to sign non-disclosure agreements upon hiring, and regularly monitored, tested, and assessed potential risks and vulnerabilities to its security protocols, taking corrective actions when necessary.

230.   During the course of its partnership with Yodlee, FinApps had an expectation that its trade secrets would be kept confidential based on, among other things:  (i) the strict protections against misappropriation contained in the Contracts; (ii) Yodlee's misrepresentations concerning its purported intention to enter into a long-term strategic partnership with FinApps; and (iii) Yodlee's misrepresentations that it required a deep understanding of FinApps' trade secrets in order to better sell potential customers on the Risk Insight platform.

231.   Based on FinApps' expectation that its proprietary information would be kept confidential, FinApps provided Yodlee with intimate access to its most sensitive systems and proprietary technology.  In fact, Yodlee had near unfettered access to FinApps' most valuable and sensitive technology, which FinApps believed Yodlee was using in good faith.

232.   Yodlee knew and understood that FinApps was operating under an expectation of confidentiality, as a result of the Contract's strict confidentiality and restricted activity

provisions, which protected against misappropriation of FinApps' confidential and proprietary information and trade secrets. See MSA §§ 6, 7.

233. As described more fully herein, Yodlee -- together with, and at the direction of, Envestnet -- has improperly misused and stolen FinApps' trade secrets, including but not limited to FinApps' technology to automate and expedite its data-cleansing process; the proprietary manner in which data is stored in FinApps' database; the overall architecture and schemas of FinApps' database; and the Relevancy Engine, the Rules underlying the Relevancy Engine, and the Rule creation process.

234. Yodlee has improperly misused and stolen FinApps' trade secrets in order to develop a competing platform that performs substantially identical functions as Risk Insight, and is largely, if not entirely, dependent on the proprietary information and trade secrets that Yodlee stole from FinApps.

235. In fact, the databases underlying Yodlee's competing software platform utilize architecture, structure, categorization, data prioritization, and optimization strategies created by, and misappropriated from, FinApps. Additionally, the core software engine driving Yodlee's competing software platform is based on Rules misappropriated directly from FinApps, or duplicated or reverse engineered using information and technology misappropriated from FinApps.

236. Envestnet has also improperly misused and stolen FinApps' proprietary information and trade secrets, which were provided to Envestnet by its wholly owned subsidiary, Yodlee. Envestnet is using proprietary information and technology stolen from FinApps to further develop credit risk software tools for Envestnet's wealth management clients, including in connection with its recently announced "Envestnet Credit Exchange" software product.

237.    Defendants are developing a competing platform in order to take advantage of the commercial utility and economic value of FinApps' trade secrets.

238.    Defendants' conduct and practices, including but not limited to their misappropriation of FinApps' trade secrets in breach of their duty to maintain secrecy, constitute a violation of DUTSA.

239.    Defendants' misappropriation of FinApps' trade secrets was premeditated, and willful and malicious within the meaning of DUTSA, thus entitling FinApps to exemplary damages.

240.    As a direct and proximate result of Defendants' wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT III

### Fraud -- Intentional Misrepresentations and Omissions
### (Against Yodlee)

241.    As described more fully herein, Yodlee fraudulently and intentionally misrepresented its intention to use its licensing agreement with FinApps as a means to gain access to and misappropriate FinApps' proprietary technology and trade secrets, which Yodlee at all times intended to use to develop its own competing platform, without FinApps.  Yodlee took specific and deliberate actions to defraud FinApps (i) prior to the execution of the MSA and SOW No. 1; (ii) prior to the execution of the amended and restated MSA and SOW No. 3; and (iii) throughout the course of its entire business relationship with FinApps.

242.    In face-to-face meetings with Yodlee's senior personnel (including Chen and Burger) that occurred prior to execution of the MSA and SOW No. 1, Yodlee falsely represented

to Sullivan that Yodlee intended to enter into a long term strategic partnership with FinApps, and that with FinApps as a partner, Yodlee had the ability and intention to grow the Risk Insight platform into a multibillion dollar product.

243.     Specifically, on or about June 8 and June 14, 2016, Yodlee -- through Chen, Burger, and others -- made specific and material misrepresentations of fact to Sullivan, including that Yodlee:  (i) wanted to enter into a long term strategic partnership with FinApps; (ii) would actively market and sell Risk Insight; (iii) would dedicate an appropriate and experienced sales team to promote Risk Insight; and (iv) would invest in growing Risk Insight, and seek other growth opportunities in the marketplace.

244.     Yodlee knew these representations to be false when made.  At the time Yodlee and FinApps entered into the MSA and SOW No. 1, Yodlee's sole purpose for entering into the agreement was to facilitate its theft of FinApps' proprietary software and trade secrets in order to build and launch its own competing products.

245.     Yodlee made these false statements for the sole purpose of gaining access to and stealing FinApps' proprietary software and trade secrets.

246.     FinApps had no reason to disbelieve Yodlee, and reasonably relied on Yodlee's misrepresentations when determining whether or not to enter into the business partnership with Yodlee.

247.     Yodlee's misrepresentations and omissions were plainly material -- had FinApps known Yodlee's true intentions, it never would have entered into the partnership with Yodlee, and instead would have pursued the other lucrative licensing and business opportunities available to it at the time.

248.    Yodlee intended for FinApps to rely on its misrepresentations and omissions, and FinApps did, in fact, rely on those misrepresentations and omissions, both in entering into the MSA and SOW No. 1, and in granting Yodlee unfettered access to FinApps' trade secrets once the contracts were executed.

249.    After FinApps entered into the MSA and SOW No. 1 in reliance on Yodlee's fraudulent statements, Yodlee continued to make material misrepresentations and omissions, particularly prior to entering into further contracts with FinApps.

250.    For example, in June 19, 2017, Mike Burger shared what he claimed were Yodlee's internal growth projections, which purportedly reflected the growth Yodlee intended to achieve working with FinApps on the Risk Insight platform.  Burger represented that Yodlee would grow the Risk Insight platform to over $100 million in revenue by 2021.  Yodlee knew these growth projections to be false at the time they were made, as Yodlee had no intention of growing the Risk Insight platform into a business with revenues in excess of $100 million.

251.    Yodlee also reiterated its purported commitment to a long-term partnership with FinApps, and to growing the Risk Insight platform into a billion-dollar business, when negotiating the amended and restated MSA and SOW No. 3 with FinApps.  Specifically, on October 24, 2017, Bill Parsons, General Manager and Senior Vice President for Yodlee Products and Analytics, wrote to FinApps' Sullivan and stated (falsely), among other things, that "[Yodlee's] aim here is to clarify our intent and to make clear our goal to establish a solid partnership with [FinApps]," that the contemplated "contractual adjustments will improve and strengthen our relationship;" and that Yodlee was "committed to the success of our long term partnership."  (Attached hereto as Exhibit 6.)

252.     In direct and reasonable reliance on Parson's October 24, 2017 misrepresentations, FinApps entered into an amended and restated MSA and SOW No. 3, dated January 31, 2018.

253.     At no time prior to entering into the amended and restated MSA and SOW No. 3 did Parson or anyone else at Yodlee disclose that Yodlee sought to enter into these new contracts for the sole purpose of continuing its theft and misappropriation of FinApps' proprietary software and trade secrets.

254.     Yodlee's misrepresentations and omissions were material to FinApps, which would never would have executed the restated MSA and SOW No. 3 had it been aware of Yodlee's true intentions.

255.     Yodlee intended for FinApps to rely on its misrepresentations and omissions, and FinApps did, in fact, rely on those misrepresentations and omissions, both in entering into the new contracts, and in providing Yodlee with continued and virtually unfettered access to FinApps' trade secrets after the new contracts were executed.

256.     Additionally, throughout the course of their business relationship, Yodlee -- having held itself out as FinApps' long-term strategic business partner -- had a continuous duty to (i) communicate truthfully and honestly with FinApps, and (ii) disclose all material facts concerning its partnership with FinApps.  In breach of its duty, Yodlee intentionally concealed from FinApps its ongoing theft and misappropriation of FinApps' proprietary software and trade secrets, as well as its intention to use this stolen material to create its own competing credit software product.

257.     In further breach of its duty, Yodlee also intentionally refused to provide FinApps with monthly revenue reports and information related to contracts with its Risk Insight

customers. Yodlee's refusal was not merely in breach of the Contracts. Rather, Yodlee also needed to conceal its true monthly revenues to hide the business it was conducting outside of the Contracts, using proprietary software and trade secrets stolen from FinApps.

258. As a direct and proximate result of Yodlee's wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT IV

### Tortious Interference with Prospective Business Opportunities
### (Against Envestnet and Yodlee)

259. FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

260. FinApps' development of its proprietary trade secrets and technology provided an economic advantage, including but not limited to the reasonable probability of business opportunities stemming from the licensing of those trade secrets and technology.

261. As described more fully herein, Defendants understood the lucrative growth potential in the credit and lending sector of the FinTech market, and knew that FinApps' technology was required to break into that market. Defendants thus set in motion a fraudulent scheme to: (i) induce FinApps to license its proprietary software and technology to Defendants; (ii) steal and misappropriate FinApps' proprietary software and trade secrets; and (iii) create and launch their own credit software product into the market using the proprietary software and trade secrets stolen from FinApps.

262.     As a result of their fraudulent scheme, Defendants have intentionally, improperly, and willfully interfered with FinApps' prospective business advantage by usurping corporate opportunities from FinApps including, but not limited to:

- Secretly working with Equifax -- while improperly cutting out FinApps -- to develop an alternative credit software product developed using proprietary information and technology stolen from FinApps;

- Secretly entering into agreements with numerous third parties -- including Verify My Bank, Silver Bullet Marketing, and Bankers Healthcare Group -- to deliver credit risk software and related services identical to those provided by Risk Insight, but without the involvement of FinApps or the Risk Insight platform;

- Secretly working together to use Yodlee's competing platform, and the proprietary information and technology stolen from FinApps on which it is based, to develop products for Envestnet's wealth management clients, including the recently announced "Envestnet Credit Exchange" product; and

- Withholding from Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, the truth about FinApps' suspension of Yodlee's services, and failing to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform.

263.     There is no applicable privilege or justification for Defendants' actions.

264.     As a direct and proximate result of Defendants' wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT V

### Unfair Competition
### (Against Envestnet and Yodlee)

265.     FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

266.     FinApps entered into the Contracts expecting a long-term business partnership and relationship with Defendants.

267.     As described more fully herein, Defendants have interfered with FinApps' legitimate expectations when it entered into the Contracts by acting in bad faith and engaging in numerous unfair competitive acts against FinApps, including, but not limited to:

- Fraudulently inducing FinApps into an illusory long-term partnership that Yodlee used for the sole purpose of gaining access to and stealing FinApps' proprietary information and trade secrets, which Yodlee intended to use to illicitly build competing software products;

- Failing to pay FinApps what it was owed under the Contracts in a timely manner, allowing Yodlee to develop its competing technology;

- Failing to assign adequate resources and staff to market and sell Risk Insight, and removing such resources once Yodlee had successfully stolen FinApps' proprietary information and technology;

- Seeking to keep FinApps' involvement with the Risk Insight platform as obscured as possible -- by, among other things, requiring FinApps' personnel to use only *Yodlee* email addresses when communicating with Risk Insight clients, and prohibiting FinApps' personnel from disclosing any affiliation with FinApps when interacting with clients -- so that Yodlee could exert total control over business relationships with Risk Insight clients;

- Misrepresenting to Risk Insight clients that Yodlee -- not FinApps -- owned the intellectual property underlying Risk Insight;

- Referring to Risk Insight as a "legacy" product to Yodlee's clients, notwithstanding that over two years remained in the term of their agreement with FinApps;

- Secretly working with Equifax -- while improperly cutting out FinApps -- to develop an alternative credit software product developed using proprietary information and technology stolen from FinApps;

- Secretly entering into agreements with numerous third parties -- including Verify My Bank, Silver Bullet Marketing, and Bankers Healthcare Group -- to deliver credit risk software and related services identical to those provided by Risk Insight, but without the involvement of FinApps or the Risk Insight platform;

- Secretly working together to use Yodlee's competing platform, and the proprietary information and technology stolen from FinApps on which it is based, to develop products for Envestnet's wealth management clients, including the recently announced "Envestnet Credit Exchange" product; and

- Withholding from Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, the truth about FinApps' suspension of Yodlee's services, and failing to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform.

268.    As a direct and proximate result of Defendants' wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT VI

**Copyright Infringement**
**(Against Envestnet and Yodlee)**

269.    FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

270.    At all relevant times, FinApps has been the exclusive owner of the copyrights to the overall Platform and each of its individual components -- including, but not limited to the overall architecture and schemas of FinApps' database, the Relevancy Engine, and the Rules underlying the Relevancy Engine (consisting of complex programmatic operations and

workflows) -- as well as the confidential and proprietary information concerning its development, operation, and maintenance.

271.     The overall Platform, the overall architecture and schemas of FinApps' database, the Relevancy Engine, and the Rules underlying the Relevancy Engine each constitute separate and original works of authorship of FinApps, which were developed by FinApps as a result of tens of thousands of hours of labor and millions of dollars in expense.

272.     As described more fully herein, by stealing and misappropriating FinApps' confidential information in order to create competing credit software products, Defendants have unlawfully copied and infringed FinApps' original works of authorship without permission.

273.     Defendants willingly and knowingly infringed on FinApps' copyrights for their own commercial advantage.

274.     As a direct and proximate result of Defendants' wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## <u>COUNT VII</u>

**Violation of Delaware Deceptive Trade Practices Act, 6 Del. C. § 2531, *et seq*.**
**(Against Yodlee)**

275.     FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

276.     The Contracts -- including the MSA, SOW No. 1, and SOW No. 3 -- are valid, binding, and enforceable agreements governed by and construed in accordance with Delaware law.  MSA § 12(c).

277.     At all relevant times, Delaware's Deceptive Trade Practices Act, 6 Del. C. § 2531, et seq. ("DDTPA"), was in full force and effect.  The DDTPA is intended to provide relief for any unfair or deceptive trade practices that interfere with the promotion and conduct of another's business

278.     As described more fully herein, Yodlee has committed multiple violations of the DDTPA by, among other things:

- Fraudulently inducing FinApps into an illusory long-term partnership that Yodlee used for the sole purpose of gaining access to and stealing FinApps' proprietary information and trade secrets, which Yodlee intended to use to illicitly build competing software products;

- Failing to pay FinApps what it was owed under the Contracts in a timely manner, allowing Yodlee to develop its competing technology;

- Failing to assign adequate resources and staff to market and sell Risk Insight, and removing such resources once Yodlee had successfully stolen FinApps' proprietary information and technology;

- Seeking to keep FinApps' involvement with the Risk Insight platform as obscured as possible -- by, among other things, requiring FinApps' personnel to use only *Yodlee* email addresses when communicating with Risk Insight clients, and prohibiting FinApps' personnel from disclosing any affiliation with FinApps when interacting with clients -- so that Yodlee could exert total control over business relationships with Risk Insight clients;

- Misrepresenting to Risk Insight clients that Yodlee -- not FinApps -- owned the intellectual property underlying Risk Insight;

- Referring to Risk Insight as a "legacy" product to Yodlee's clients, notwithstanding that over two years remained in the term of their agreement with FinApps;

- Secretly working with Equifax -- while improperly cutting out FinApps -- to develop an alternative credit software product developed using proprietary information and technology stolen from FinApps;

- Secretly entering into agreements with numerous third parties -- including Verify My Bank, Silver Bullet Marketing, and Bankers Healthcare Group -- to deliver credit risk software and related services identical to those provided by

Risk Insight, but without the involvement of FinApps or the Risk Insight platform;

- Secretly working with Envestnet to use Yodlee's competing platform, and the proprietary information and technology stolen from FinApps on which it is based, to develop products for Envestnet's wealth management clients, including the recently announced "Envestnet Credit Exchange" product; and

- Withholding from Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, the truth about FinApps' suspension of Yodlee's services, and failing to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform.

279.    As a direct and proximate result of Yodlee's wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT VIII

**Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.***
**(Against Envestnet and Yodlee)**

280.    FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

281.    FinApps is a Florida limited liability company, with its principal place of business located in the State of Florida.

282.    At all relevant times, Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. ("FDUTPA"), was in full force and effect.  The FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann. § 501.202

283.     As described more fully herein, Defendants have committed multiple violations of

the FDUTPA by, among other things:

- Fraudulently inducing FinApps into an illusory long-term partnership that Yodlee used for the sole purpose of gaining access to and stealing FinApps' proprietary information and trade secrets, which Yodlee intended to use to illicitly build competing software products;

- Failing to pay FinApps what it was owed under the Contracts in a timely manner, allowing Yodlee to develop its competing technology;

- Failing to assign adequate resources and staff to market and sell Risk Insight, and removing such resources once Yodlee had successfully stolen FinApps' proprietary information and technology;

- Seeking to keep FinApps' involvement with the Risk Insight platform as obscured as possible -- by, among other things, requiring FinApps' personnel to use only *Yodlee* email addresses when communicating with Risk Insight clients, and prohibiting FinApps' personnel from disclosing any affiliation with FinApps when interacting with clients -- so that Yodlee could exert total control over business relationships with Risk Insight clients;

- Misrepresenting to Risk Insight clients that Yodlee -- not FinApps -- owned the intellectual property underlying Risk Insight;

- Referring to Risk Insight as a "legacy" product to Yodlee's clients, notwithstanding that over two years remained in the term of their agreement with FinApps;

- Secretly working with Equifax -- while improperly cutting out FinApps -- to develop an alternative credit software product developed using proprietary information and technology stolen from FinApps;

- Secretly entering into agreements with numerous third parties -- including Verify My Bank, Silver Bullet Marketing, and Bankers Healthcare Group -- to deliver credit risk software and related services identical to those provided by Risk Insight, but without the involvement of FinApps or the Risk Insight platform;

- Secretly working together to use Yodlee's competing platform, and the proprietary information and technology stolen from FinApps on which it is based, to develop products for Envestnet's wealth management clients, including the recently announced "Envestnet Credit Exchange" product; and

- Withholding from Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, the truth about FinApps' suspension of Yodlee's services, and failing to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform.

284. Defendants' actions as set forth above offend established public policy and are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

285. As a direct and proximate result of Defendants' wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT IX

**Violation of Illinois Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq*.
(Against Envestnet)**

286. FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

287. Envestnet's principal place of business is located in the State of Illinois.

288. At all relevant times, Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, et seq. ("IUDTPA"), was in full force and effect. IUDTPA prohibits trade practices which are meant to deceive and unreasonably interfere with another's conduct of his business.

289. As described more fully herein, Envestnet has committed multiple violations of the IUDTPA by, among other things:

- Stealing, and aiding and abetting in Yodlee's theft of FinApps' proprietary software and trade secrets, including, but not limited to misappropriating the proprietary database architecture and complex schemas FinApps designed and

developed, as well as various critical software components of the underlying technology that drives the Risk Insight platform; and

- Secretly working with Yodlee to use its competing platform, and the proprietary information and technology stolen from FinApps on which it is based, to develop products for Envestnet's wealth management clients, including the recently announced "Envestnet Credit Exchange" product.

290. As a direct and proximate result of Envestnet's wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT X

**Violation of California Business & Professions Code § 17200, *et seq*.**
**(Against Yodlee)**

291. FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

292. Yodlee's principal place of business is located in the State of California.

293. At all relevant times, California Unfair Competition Law, Bus. & Prof. Code Sections 17200, *et seq*. ("CUCL"), was in full force and effect. The CUCL prohibits any unfair, dishonest, deceptive, destructive, fraudulent, or discriminatory business acts or practices.

294. As described more fully herein, Yodlee has committed multiple violations of the CUCL by, among other things:

- Fraudulently inducing FinApps into an illusory long-term partnership that Yodlee used for the sole purpose of gaining access to and stealing FinApps' proprietary information and trade secrets, which Yodlee intended to use to illicitly build competing software products;

- Failing to pay FinApps what it was owed under the Contracts in a timely manner, allowing Yodlee to develop its competing technology;

- Failing to assign adequate resources and staff to market and sell Risk Insight, and removing such resources once Yodlee had successfully stolen FinApps' proprietary information and technology;

- Seeking to keep FinApps' involvement with the Risk Insight platform as obscured as possible -- by, among other things, requiring FinApps' personnel to use only *Yodlee* email addresses when communicating with Risk Insight clients, and prohibiting FinApps' personnel from disclosing any affiliation with FinApps when interacting with clients -- so that Yodlee could exert total control over business relationships with Risk Insight clients;

- Misrepresenting to Risk Insight clients that Yodlee -- not FinApps -- owned the intellectual property underlying Risk Insight;

- Referring to Risk Insight as a "legacy" product to Yodlee's clients, notwithstanding that over two years remained in the term of their agreement with FinApps;

- Secretly working with Equifax -- while improperly cutting out FinApps -- to develop an alternative credit software product developed using proprietary information and technology stolen from FinApps;

- Secretly entering into agreements with numerous third parties -- including Verify My Bank, Silver Bullet Marketing, and Bankers Healthcare Group -- to deliver credit risk software and related services identical to those provided by Risk Insight, but without the involvement of FinApps or the Risk Insight platform;

- Secretly working with Envestnet to use Yodlee's competing platform, and the proprietary information and technology stolen from FinApps on which it is based, to develop products for Envestnet's wealth management clients, including the recently announced "Envestnet Credit Exchange" product; and

- Withholding from Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, the truth about FinApps' suspension of Yodlee's services, and failing to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform.

295. There is no countervailing benefit to consumers or competition from Yodlee's wrongful conduct.

296.    As a direct and proximate result of Yodlee's wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT XI

### Breach of Contract
### (Against Yodlee)

297.    FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

298.    The Contracts -- including the MSA, SOW No. 1, and SOW No. 3 -- are valid, binding, and enforceable agreements.

299.    FinApps has fully performed all of its responsibilities and obligations under the Contract.

300.    The Contracts contain strict confidentiality protections as well as restrictions against the misappropriation of FinApps' valuable and proprietary information and trade secrets.

301.    The MSA defines "Confidential Information" as "all confidential information disclosed by a party ('Disclosing Party') to the other party ('Receiving Party'), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances under which such information is disclosed," specifying that "Confidential Information of each party shall include . . . business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such party to the other party."  MSA § 7.

302.     The Contracts also imposed restrictions on Yodlee's conduct while in possession of FinApps' proprietary software and trade secrets.  Pursuant to Section 6 of the MSA, Yodlee agreed that it would not:

i.     "Permit any third party to access the Services, Software or Platform except as permitted in [the] Agreement, or attempt to gain unauthorized access to the Services or FinancialApps' or its Affiliates' related systems or networks;"

ii.     "Modify, distribute, prepare derivative works of, copy, frame, mirror, reverse engineer, reverse assemble, disassemble, decompile, or otherwise attempt to decipher any code used in connection with the Services, Software or Platform and/or other aspect of Financial Apps' technology or FINANCIALAPPS IP;"

iii.     "Access and/or engage in any use of the Services, Software or Platform in a manner that abuses or materially disrupts the networks, security systems, Services, and or websites of FinancialApps or its Affiliates;"

iv.     "Interfere with or disrupt the integrity or performance of the Services, Software or Platform or third-party data contained therein;"

v.     "Use the Services, Software or Platform for fraudulent or illegal purposes;"

vi.     "Offer to sell or resell, license or sublicense the Services, Software or Platform to any third party, except as contemplated hereby;" and/or

vii.     "[B]uild, or engage a third party to build, a competitive product which copies any features, functions, or rules of the Services, Software, or Platform."

303.     The MSA also includes an exclusivity provision, which provides that FinApps' software and technology would be the exclusive platform "used and promoted by Yodlee to Yodlee Clients and prospective clients in connection with or related to Yodlee's Risk Insight Product and that offer substantially similar functionality as articulated in any applicable SOW." MSA § 2(c).

304.     As described more fully herein, by (i) stealing and misappropriating FinApps' proprietary software and trade secrets, and (ii) creating its own competing credit software product using the proprietary software and trade secrets it stole from FinApps, Yodlee has

materially breached the Contracts' exclusivity provision (MSA § 2(c)), the Contracts' restricted activities provision (MSA § 6), and the Contracts' confidentiality provision (MSA § 7).

305.    Additionally, pursuant to the Contracts, as described more fully herein, Yodlee was required to compensate FinApps in the form of (i) revenue share fees; (ii) professional service fees; (iii) custom work fees; and (iv) customer support, operational support, and marketing fees. *See* MSA § 4(a); SOW No. 1 §§ 1, 3; SOW No. 3 §§ 1, 3.

306.    Further, Yodlee was contractually obligated to provide FinApps with monthly reports of Yodlee's revenues, so that FinApps could properly assess the revenue sharing fees it was entitled to receive from Yodlee, as well as any Risk Insight related contracts prior to Yodlee's entrance into such contracts. *See* SOW No. 3 § 3.5.

307.    The parties also entered into additional agreements on or about November 13, 2018 for FinApps to perform marketing services, and, on or about November 5, 2018, for FinApps to perform operational support and customer support related to the Risk Insight platform. As described more fully herein, FinApps performed such services pursuant to these agreements.

308.    Despite these clear obligations, Yodlee has failed to make all required payments owed to FinApps under the Contracts and has refused to provide FinApps with monthly revenue reports and information related to contracts with its Risk Insight customers, in material breach of the Contracts. *See* MSA § 4(a); SOW No. 1 §§ 1, 3; SOW No. 3 §§ 1, 3.

309.    Based on the limited information available to FinApps, Yodlee's outstanding balance of fees owed to FinApps under the Contracts are, at minimum: $150,000.00 for revenue share fees; $614,175.99 for professional service fees; $491,246.00 for custom work; $275,000.00

for operational support, customer support, and marketing fees; plus interest accrued on this outstanding balance.

310. These amounts, however, are only estimates based on the limited information available to FinApps at this time. The actual amounts outstanding -- particularly the revenue share fees and professional service fees -- are almost certainly much higher. The correct amounts are currently unknown to FinApps due to Yodlee's refusal to provide the required revenue information to FinApps, which itself constitutes a material breach of the Contracts.

311. In addition to its outstanding balance, as a result of FinApps' termination of the Contracts for cause, Yodlee is required to pay FinApps any unpaid fees "covering the remainder of the Term after the effective date of termination." MSA § 11(f). Yodlee is thus obligated to pay FinApps the monthly minimum fees until the term of the Contracts expire on January 31, 2021, which total $3,025,000.00.

312. Yodlee is also obligated, pursuant to the Contracts, to pay FinApps' "reasonable attorneys' fees, expert witness costs and other costs incurred in the action or proceeding (including all appeals and retrials)." MSA § 12(i).

313. Moreover, pursuant to Section 9(c) of the MSA, FinApps is entitled to all "indirect, punitive, special, exemplary, incidental, consequential or other damages of any type or kind (including loss of data, revenue, profits or other economic advantage)" as a result of Yodlee's breach of the confidentiality provisions (MSA § 7).

314. As a direct and proximate result of Yodlee's material breaches of contract, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT XII

### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Yodlee)

315. FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

316. The Contracts -- including the MSA, SOW No. 1, and SOW No. 3 -- are valid, binding, and enforceable agreements.

317. The Contracts are governed by and construed in accordance with Delaware law. MSA § 12(c).

318. The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law, and requires that a party in a contractual relationship refrain from arbitrary or unreasonable conduct that has the effect of preventing a counterparty to a contract from receiving the fruits of the bargain.

319. As described more fully herein, Yodlee breached the implied covenant of good faith and fair dealing during the course of its contractual relationship with FinApps by, among other things:

- Failing to assign adequate resources and staff to market and sell Risk Insight, and removing such resources once Yodlee had successfully stolen FinApps' proprietary information and technology;

- Seeking to keep FinApps' involvement with the Risk Insight platform as obscured as possible -- by, among other things, requiring FinApps personnel to use only *Yodlee* email addresses when communicating with Risk Insight clients, and prohibiting FinApps personnel from disclosing any affiliation with FinApps when interacting with clients -- so that Yodlee could exert total control over business relationships with Risk Insight clients;

- Misrepresenting to Risk Insight clients that Yodlee -- not FinApps -- owned the intellectual property underlying Risk Insight;

- Referring to Risk Insight as a "legacy" product to Yodlee's clients, notwithstanding that over two years remained in the term of their agreement with FinApps; and

- Withholding from Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, the truth about FinApps' suspension of Yodlee's services, and failing to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform.

320.  As a result of the forgoing, Yodlee deprived FinApps of the fruits of the bargain that FinApps reasonably expected at the time the parties entered into what was supposed to be their long-term partnership.

321.  As a direct and proximate result of Yodlee's wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

**COUNT XIII**

**Declaratory Judgment**
**(Against Yodlee)**

322.  FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

323.  As described more fully herein, Yodlee has materially breached the Contracts' exclusivity provision (MSA § 2(c)); the Contracts' fee provisions (MSA § 4); the Contracts' restricted activities provision (MSA § 6); and the Contracts' confidentiality provision (MSA § 7).

324.  Pursuant to Section 9(c) of the MSA, FinApps is entitled to all "indirect, punitive, special, exemplary, incidental, consequential or other damages of any type or kind (including

loss of data, revenue, profits or other economic advantage)" as a result of Yodlee's breach of the confidentiality provisions (MSA § 7).

325.    Pursuant to Section 11(d) of the MSA, "[a]t any time, either party may terminate th[e] Agreement immediately upon written notice to the other party if . . . the other party breaches any of its material obligations under this Agreement and such breach is not cured within thirty (30) days of receipt of written notice from the non-breaching party."

326.    Yodlee has been on notice that it owes FinApps substantial sums under the Contracts since, at the latest, April 9, 2019, when FinApps sent Yodlee its formal demand letter seeking payment of outstanding fees.

327.    The Contracts also provide that FinApps "may terminate th(e) Agreement immediately upon written notice to Yodlee in the event Yodlee breaches Section 6 (Restricted Activities)." MSA § 11(d).  FinApps provided such written notice to Yodlee on May 17, 2019 when it sent its notice of material breach and cease and desist to Yodlee.

328.    On May 27, 2019, FinApps invoked its contractual right to terminate the Contracts for cause as a result of Yodlee's material breaches of the Contracts.  *See* MSA § 11(d).

329.    On June 11, 2019, FinApps invoked its contractual right to suspend Yodlee's access to all software and services as a result of Yodlee's continued material breaches of the Contracts.  *See* MSA § 11(g)(e) ("The duty of FinancialApps to provide [any services under the MSA] shall be conditioned on Yodlee continuing to comply with its obligations under the Agreement[.]").

330.    As described more fully herein, FinApps is entitled to a declaratory judgment from the Court decreeing that:

i.   FinApps was within its rights to terminate the Contracts for cause as a result of Yodlee's material breaches (MSA § 11(d));

ii.  Yodlee is required to pay FinApps any unpaid fees "covering the remainder of the Term after the effective date of termination," which total $3,025,000.00 (MSA § 11(f));

iii. FinApps was within its rights to suspend Yodlee's access to all software and services as a result of Yodlee's continued material breaches of the Contracts (MSA § 11(g)(e)); and

iv.  FinApps is entitled to consequential damages resulting from Yodlee's breach of the Contracts' confidentiality provision (MSA § 9(c)).

331.   On information and belief, Yodlee contests FinApps' entitlement to such declarations, and as a result, there exists between the parties an actual justiciable controversy ripe for judicial determination, as it is real and adverse.

**WHEREFORE**, FinApps prays for relief as set forth below.

## COUNT XIV

**Unjust Enrichment**
**(Against Envestnet and Yodlee)**

332.   FinApps incorporates by reference all of the preceding paragraphs as if fully set forth herein.

333.   As described more fully herein, by stealing and misappropriating FinApps' proprietary software and trade secrets to create and use a competing credit software product, Defendants have unjustly received the benefit of FinApps' substantial time and investment into the development of its proprietary software and trade secrets.  Defendants have avoided the

expense and effort necessary to independently develop a competing product through their scheme.

334.    Yodlee has also been unjustly enriched by its unearned credibility with new and existing customers, which would have been directed to FinApps but for Yodlee's concealment of FinApps' identity from Risk Insight customers and obscurement of FinApps' involvement with the Risk Insight platform.

335.    Yodlee has also been unjustly enriched by its retention of substantial sums of money for itself that rightfully belongs to FinApps, as a result of its failure to make all required payments owed to FinApps under the Contracts.

336.    As described more fully herein, at all times, Defendants knew, appreciated, and intended to be enriched by their misconduct and have subsequently accepted and retained all of the benefits generated by their misconduct.

337.    Defendants' misconduct and unjust enrichment have no justification in law or fact.

338.    As a direct and proximate result of Defendants' wrongful conduct, as described more fully herein, FinApps has sustained substantial monetary damages, in an amount to be determined at trial, but no less than $100 million.

**WHEREFORE**, FinApps prays for relief as set forth below.

## JURY DEMAND

FinApps hereby demands a trial by jury on all issues so triable.

# PRAYER FOR RELIEF

**WHEREFORE**, FinApps respectfully requests that this Court enter judgment against Defendants, and enter an order:

A.     Declaring that FinApps' termination of the Contracts for cause was proper (MSA § 11(d));

B.     Declaring that Yodlee is required to pay FinApps any unpaid fees "covering the remainder of the Term after the effective date of termination" (MSA § 11(f)), which total $3,025,000.00;

C.     Declaring that FinApps' suspension of Yodlee's access to all software and services was proper (MSA § 11(g)(e));

D.     Declaring that FinApps is entitled to consequential damages resulting from Yodlee's breach of the Contracts' confidentiality provision (MSA § 9(c));

E.     Compelling Yodlee to provide a comprehensive accounting of all revenues it has received that were in any way derived from or related to the Risk Insight platform, as well as copies of all contracts entered into by Yodlee that are in any way related to the Risk Insight platform;

F.     Granting FinApps reasonable royalties, in an amount to be determined at trial, for any software or technology sold by Defendants that is intended to or may reasonably be deemed to compete with or replace the Platform;

G.     Granting FinApps reasonable royalties, in an amount to be determined at trial, for any software or technology sold by Defendants that copies or is otherwise based on any features, functions, trade secrets, technology, or other proprietary information that underlie the Platform;

H.   Granting FinApps indirect, economic, consequential, and compensatory damages in an amount to be determined at trial, but not less than $100 million;

I.   Granting FinApps punitive and exemplary damages in an amount to be determined at trial;

J.   Granting FinApps pre- and post-judgment interest at the maximum rate allowed by law;

K.   Granting FinApps all costs and disbursements resulting from this action, together with attorneys' fees;

L.   Issuing a permanent injunction enjoining Defendants from:

   i.   Stealing, misusing, or otherwise unlawfully misappropriating Financial Apps' confidential and proprietary information and intellectual property, including, but not limited to the Platform;

   ii.   Modifying, copying, reverse engineering, disassembling, or otherwise attempting to decipher any code or algorithms used in connection with any aspect of Financial Apps' technology, including, but not limited to the Platform;

   iii.   Disclosing FinApps' confidential and proprietary information, trade secrets, and/or intellectual property, making such information available to any person, company, or other party, or using such information for Defendants' own benefit or for the benefit of any third party;

   iv.   Developing, using, marketing, or selling any software or technology that is intended to or may reasonably be deemed to compete with or replace the Platform; and

   v.   Developing, using, marketing, or selling any software or technology that copies or is otherwise based on any features, functions, trade secrets, technology, or other proprietary information that underlies the Platform;

M.   Ordering Defendants to shut down, and to cease any further development, sales, and/or marketing of, any software or technology that is intended to or may reasonably be deemed to compete with or replace the Platform;

N.    Ordering Defendants to shut down, and to cease any further development, sales, and/or marketing of, any software or technology that copies or is otherwise based on any features, functions, trade secrets, technology, or other proprietary information that underlies the Platform;

O.    Ordering Defendants to return any and all property of FinApps, including but not limited to any of FinApps' confidential and proprietary information, trade secrets, and/or intellectual property; and

P.    Granting all such further relief, both general and special, at law or in equity, to which FinApps may show itself justly to be entitled or as this Court may deem appropriate.

Dated: July 17, 2019

YOUNG CONAWAY STARGATT
& TAYLOR LLP

By: */s/ C. Barr Flinn*
    C. Barr Flinn (No. 4092)
    Emily V. Burton (No. 5142)
    Pilar G. Kraman (No. 5199)
    1000 North King Street
    Wilmington, Delaware 19801
    (302) 571-6692
    bflinn@ycst.com
    eburton@ycst.com
    pkraman@ycst.com

- AND -

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
Joshua E. Hollander
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com
jhollander@kasowitz.com

*Attorneys for Plaintiff FinancialApps, LLC*