IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FINANCIALAPPS, LLC, | |
| Plaintiff, | |
| v. | C.A. No. 19-1337-CFC-CJB |
| ENVESTNET, INC. and YODLEE, INC., | **REDACTED – PUBLIC VERSION** |
| Defendants. | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

KASOWITZ BENSON TORRES LLP

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
Emily V. Burton (No. 5142)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
eburton@ycst.com
pkraman@ycst.com

*Attorneys for Plaintiff FinancialApps, LLC*

Dated:  December 20, 2019

# TABLE OF CONTENTS

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ............................................. 1

SUMMARY OF ARGUMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 3

ARGUMENT .......................................................................................................................... 5

I.     DEFENDANTS' CLAIM FOR BREACH OF CONTRACT FAILS ............................... 5

     A.     Yodlee Admits Various Material Breaches Of The Contracts ............................ 6

     B.     Defendants Fail To Allege A Violation Of MSA §§ 9(d)(2) And 9(d)(4) .............. 7

     C.     Defendants Fail To Allege A Violation Of MSA § 11 .......................................... 9

     D.     Defendants Fail To Allege A Violation Of MSA § 10 ......................................... 9

II.     DEFENDANTS' FRAUD CLAIM FAILS AS A MATTER OF LAW ......................... 10

     A.     Defendants' Fraud Claim Sounds In Contract, Not Tort .................................. 10

     B.     Defendants Fail To Meet The Pleading Requirements Of FRCP 9(b) ............... 11

          i.     Defendants Fail To Adequately Allege Falsity And Scienter ................ 12

          ii.     Defendants Fail To Allege Affirmative Concealment
                 Or A Duty to Disclose ............................................................................ 13

          iii.     Defendants Fail To Allege Justifiable Reliance As A Matter Of Law ......... 14

          iv.     Defendants Fail To Adequately Plead Damages ................................... 15

     C.     Defendants Fail To Plead Statutory Fraud ....................................................... 16

III.     DEFENDANTS' CLAIM FOR DEFAMATION FAILS AS A MATTER OF LAW ..... 16

     A.     Plaintiff's Counsel's Statement To The Press Constitutes Opinion .................. 17

     B.     Plaintiff's Counsel's Statement Is Protected By The Fair Report Privilege ........ 18

     C.     Defendants Fail To Adequately Allege Malice ................................................... 19

IV.     DEFENDANTS' CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD
         FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW ............................... 20

CONCLUSION .................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Air Prod. & Chem., Inc. v. Wiesemann*,
    237 F. Supp. 3d 192 (D. Del. 2017) ...................................................................13

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*,
    223 F. Supp. 3d 207 (D. Del. 2016) ...................................................................12

*Anderson v. Wachovia Mortg. Corp.*,
    497 F. Supp. 2d 572 (D. Del. 2007) .....................................................................8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................8

*Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*,
    2009 WL 1124451 (Del. Ch. 2009) ....................................................................13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................................5

*Black Horse Capital, LP v. Xstelos Holdings, Inc.*,
    2014 WL 5025926 (Del. Ch. Sept. 30, 2014) .....................................................14

*Breakaway Sol., Inc. v. Morgan Stanley & Co. Inc.*,
    2004 WL 1949300 (Del. Ch. 2004) ......................................................................9

*Coll. Health & Inv., L.P. v. Diamondhead Casino Corp.*,
    2015 WL 5138093 (Del. Super. Ct. July 2, 2015) ...............................................6

*Cornell Glasgow, LLC v. La Grange Prop., LLC*,
    2012 WL 2106945 (Del. Super. Ct. June 6, 2012) .......................................10, 15

*Curtis Pub. Co. v. Butts*,
    388 U.S. 130 (1967) ............................................................................................19

*Dicuio v. Brother Intern. Corp.*,
    2015 WL 3403144 (D.N.J. 2015) .......................................................................16

*Dolan v. Altice USA, Inc.*,
    2019 WL 2711280 (Del. Ch. June 27, 2019) ......................................................20

*Fortis Advisors LLC v. Dialog Semiconductor PLC*,
    2015 WL 401371 (Del. Ch. 2015) ......................................................................20

*Gardner v. Safeco Ins. Co. of Am.*,
    2014 WL 2568895 (N.D. Cal. 2014) ...................................................................16

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ............................................................................................19

*Greenstar, LLC v. Heller*,
    814 F. Supp. 2d 444 (D. Del. 2011) ...................................................................10

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) ..............................................................................13

*Haberstroh v. Crain Publications, Inc.*,
    189 Ill. App. 3d 267 (1989) .........................................................................17, 18

*Hawran v. Hixson*,
    147 Cal. Rptr. 3d 88 (Cal. Ct. App. 2012) .........................................................18

*Healthsmart Pac., Inc. v. Kabateck*,
    212 Cal. Rptr. 3d 589 (Cal. Ct. App. 2016) .......................................................18

*Heritage Handoff Holdings, LLC v. Fontanella*,
    2019 WL 1056270 (D. Del. 2019) ...............................................................15, 16

*John Doe 2 v. Superior Court*,
    1 Cal. App. 5th 1300 (Cal. Ct. App. 2016) ..................................................17, 18

*La Marca v. Capella Univ.*,
    2009 WL 10698387 (C.D. Cal. Jan. 6, 2009) ....................................................19

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Tech. Inc.*,
    854 A.2d 121 (Del. Ch. 2004) ......................................................................12, 13

*Mosiman v. Madison Companies, LLC*,
    2019 WL 203126 (D. Del. 2019) .......................................................................16

*NACCO Industries, Inc. v. Applica Inc.*,
    997 A.2d 1 (Del. Ch. 2009) ...............................................................................20

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...........................................................................................19

*OC Tint Shop, Inc. v. CPFilms, Inc.*,
    2018 WL 4658211 (D. Del. Sept. 27, 2018) ........................................................8

*Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*,
    710 F. Supp. 2d 458 (D. Del. 2010) ...................................................................12

*Pinkert v. John J. Olivieri, P.A.*,
    2001 WL 641737 (D. Del. May 24, 2001) .........................................................10

*Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*,
  2013 WL 3934992 (Del. Ch. July 24, 2013) .................................................... 6

*Progressive Intern. Corp. v. E.I. Du Pont de Nemours & Co.*,
  2002 WL 1558382 (Del. Ch. 2002) ............................................................. 14

*Reliance Ins. Co. v. Barron's*,
  442 F. Supp. 1341 (S.D.N.Y. 1977) ........................................................... 19

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
  302 F. Supp. 3d 1005 (N.D. Cal. 2017) ....................................................... 20

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
  311 F.3d 198 (3d Cir. 2002) .................................................................. 5, 12

*Siever v. BWGaskets, Inc.*,
  2009 WL 528624 (M.D. Fla. Mar. 2, 2009) .................................................. 16

*Sipple v. Found. For Nat. Progress*,
  83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999) ................................................... 18

*Syral Belgium N.V. v. U.S. Ingredients Inc.*,
  2016 WL 4728101 (D. Del. 2016) .............................................................. 8

*Travelers Casualty and Surety Company of America v. PJM Consulting, Inc.*,
  2009 WL 10671269 (M.D. Fla. 2009) ......................................................... 16

*Tristate Courier & Carriage, Inc. v. Berryman*,
  2004 WL 835886 (Del. Ch. Apr. 15, 2004) .................................................. 10

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
  61 F. Supp. 3d 391 (D. Del. 2014) ............................................................ 14

*Ward v. Hildebrand*,
  1996 WL 422336 (Del. Ch. July 8, 1996) .................................................... 15

**Other Authorities**

FRCP 8 ............................................................................................ 8

FRCP 9(b) .................................................................................. 2, 12, 16

FRCP 12(b)(6) ................................................................................ 1, 5

Plaintiff FinancialApps, LLC ("Plaintiff" or "FinApps") respectfully submits this opening brief pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6) in support of its motion to dismiss the counterclaims filed by Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee," and together with Envestnet, "Defendants").[1]

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

On July 17, 2019, Plaintiff filed a complaint (the "complaint") against Defendants asserting fourteen counts.  (D.I. 7.)  On October 30, 2019, Defendants filed counterclaims (the "counterclaims") against Plaintiff asserting breach of contract, breach of the implied covenant, defamation, and fraud.  (D.I 21.)

## SUMMARY OF ARGUMENT

As alleged in the complaint, Defendants have egregiously defrauded FinApps and misappropriated its proprietary information and trade secrets.  Defendants now attempt to obscure their wrongdoing behind specious counterclaims.  Specifically, Defendants allege FinApps made numerous misrepresentations, and concealed relevant information, to induce Defendants into licensing software they claim was defective, below industry standards, and unusable in the marketplace.  The plausibility of these accusations, however, collapses under even the barest scrutiny.  Indeed, despite alleging their awareness in early 2017 of all of FinApps' supposed misconduct, and all of the deficiencies in FinApps' software, Defendants nevertheless entered into a second contract with FinApps in early 2018, which extended their prior licensing agreement to a four-year term, and significantly *increased* the fees payable to

---

[1]  Citations to "Counter." refer to Defendants and Counter-Plaintiff's Counterclaims Against Counter-Defendant FinancialApps, LLC.  (D.I. 21.)  Citations to "Compl." refer to Plaintiff's complaint filed on July 17, 2019.  (D.I. 7.)  All other capitalized terms not defined herein shall have the meaning ascribed to them in the complaint.

FinApps.  Defendants allege that they did so without addressing *any* of the issues with FinApps' performance they now raise as a basis for their counterclaims.  Defendants' counterclaims are a factual and legal fiction.

Further, even if assumed to be true, Defendants' allegations in the counterclaims are nevertheless replete with pleading defects, and fail to state a claim.  First, Defendants' breach of contract claim (Count 1) fails because, as a threshold matter, the allegations admit multiple breaches of the Contracts, precluding Defendants from alleging their own contractual compliance.  Defendants also fail to identify any specific conduct by FinApps that breached any particular provision of the Contracts – an incurable deficiency in light of the integration clause, other disclaimers in the Contracts, and Defendants' *voluntary* renewal thereof on *worse* economic terms, without addressing the purported issues they now raise.

Second, Defendants' fraud claim (Count 4) fails because it is nothing more than a disguised breach of contract claim, and because Defendants fail to plead falsity, scienter, active concealment, a duty to disclose, or damages with the specificity required by FRCP 9(b).

Third, Defendants' flawed defamation claim (Count 3) attempts to transform a one-sentence statement of opinion to the press regarding this litigation by FinApps' lead counsel into a claim for defamation.  Even if this statement were not protected speech (which it is), Defendants are public figures and have failed to allege actual malice.

Finally, Defendants' claim for breach of the implied covenant of good faith and fair dealing (Count 2) is not only inadequately alleged, but also improper as a matter of law.

Accordingly, and as further detailed below, Defendants' counterclaims fail to state a claim and must be dismissed as a matter of law.

## STATEMENT OF FACTS

The parties entered into the Software License and Master Services Agreement (the "MSA") and Statement of Work #1 ("SOW #1," and with the MSA, the "Agreement") as of January 31, 2017.  (Counter. ¶¶ 34-35.)  Despite claiming they "soon discovered" that Risk Insight "lacked basic functionality" (*id.* ¶¶ 3, 43), Defendants do not allege that they raised their concerns contemporaneously, or considered such "issues" to be material breaches.

In fact, despite the purported issues with Risk Insight they only now raise, in October 2017, Defendants negotiated to extend the Agreement (*id.* ¶ 42), delivering a "notice of non-renewal" on October 23, 2017.  (Counter. Ex. A at 21.)  The next day, Bill Parsons – Yodlee's General Manager and Senior Vice President for Products and Analytics – clarified that Yodlee was "required to send a notice by October 30 or else lose the chance to discuss contract changes," but that its "aim" was "to clarify [Yodlee's] intent and to make clear our goal to establish a solid partnership with" FinApps.  (Compl. ¶ 87; *id.* Ex. 6.)

On February 12, 2018, Yodlee formally entered into an amended and restated MSA and Statement of Work #3 ("SOW No. 3," and with the Agreement, the "Contracts"), effective as of January 31, 2018.  (Counter. ¶ 42.)  The Contracts were substantially identical to the previous Agreement, but for increased monthly minimums and an increased revenue share owed to FinApps, as well as a four year period.  (*See* Compl. ¶¶ 177-78; *id.* Ex. 3.)  In short, the only material difference in the new agreement was that it was economically ***less favorable to Yodlee***. Yodlee agreed to these terms without attempting to address any of the purported issues it now raises, despite admitting its awareness of them as of early 2017.  (Counter. ¶ 43.)

In early 2019, after misappropriating Plaintiff's valuable property, Defendants began to wind down Risk Insight.  (*See* Compl. ¶¶ 164-67.)  Defendants attempt to re-cast this wind-down

as a "pause" in marketing (Counter. ¶ 6), which concedes a breach of their own obligations under the Contracts.  (*Id.* ¶ 37.)

On or about April 2019, FinApps discovered Defendants' egregious wrongdoing. (Compl. ¶ 16.)  Although Defendants claim that FinApps suspended services "without warning" (Counter. ¶ 66), in reality, FinApps provided Defendants with a lengthy cure period, having sent notice of material breach on May 17, 2019.  (Compl. ¶¶ 193-94.)  Defendants refused to cure, and, on May 27, 2019, FinApps invoked its contractual right to terminate the Contracts for cause "immediately upon written notice" (MSA § 11(d)), sending a notice of Termination for Cause (the "Termination Letter").  (Compl. ¶ 199.)  Over the next two weeks, FinApps sought to resolve the dispute, but Defendants' "business proposals" (Counter. ¶ 66) fell far short.  On June 11, 2019 – almost a *month* after FinApps notified Yodlee of its breach, and the possibility of a service suspension – FinApps invoked its contractual right to suspend Yodlee's access to all software and services, due to its ongoing material breach.  (*Id.* ¶ 66; *see also* Compl. ¶ 201.)

Plaintiff filed its sealed complaint on July 17, 2019, and the redacted public version of the complaint on July 26, 2019.  (*See generally* Compl.; *see also* Counter. ¶ 73.)  Although Defendants complain of a purportedly defamatory statement made by FinApps' "agent" (Counter. ¶ 74), the agent they avoid identifying is Plaintiff's lead counsel, and the statement in question is his opinion regarding central allegations in this case.  (*See* Counter. Exs. E-G.) Notably, the article on which Defendants base their defamation claim also contains extensive references to – and even quotes from – FinApps' complaint, and offers competing opinions about the merits of Plaintiff's case, as well as additional background information (as is common for any publication reporting on a pending litigation), thus belying Defendants' insinuation that a reasonable reader might construe the statement as fact.  (*Id.*)

4

## ARGUMENT

Under FRCP 12(b)(6), dismissal is warranted where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). FRCP 12(b)(6) requires "more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Id.* Courts are "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).

## I.   DEFENDANTS' CLAIM FOR BREACH OF CONTRACT FAILS

Defendants' breach of contract claim appears to allege that Plaintiff violated provisions of the Contracts concerning (i) "Performance of Services" and "Conformance to Specifications," (*see* Counter. ¶¶ 78(a)-(d)); (ii) termination for cause, and certain post-termination services (*see id.* ¶¶ 78(e)-(f)); and (iii) Yodlee's indemnification (*see id.* ¶¶ 81-82). None of these theories have merit. As a threshold matter, Defendants' own allegations expressly admit not only that Defendants breached various material obligations, but also that they were already in breach of the Contracts upon their execution. Moreover, although Defendants gripe about Risk Insight, they do not identify any specific conduct by FinApps that breached any particular provision of the Contracts. (*See id.* ¶¶ 45-60.) Nor can they, in light of the integration clause contained in the Contracts, the disclaimer set forth at MSA § 9(b), and the irrefutable fact that Defendants ***voluntarily renewed*** the Contracts on significantly worse economic terms, without even attempting to address the purported issues they now raise. Further, Defendants' allegations regarding FinApps' purportedly improper termination are utterly disingenuous, and undermined by record evidence. Lastly, Defendants' theory that FinApps breached the Contracts by failing to indemnify is flatly contravened by Delaware law.

5

A.      **Yodlee Admits Various Material Breaches Of The Contracts**

It is black-letter law in Delaware that, "to recover damages for a breach of contract, the plaintiff must demonstrate that it substantially complied with all of the provisions of the contract." *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *10 (Del. Ch. July 24, 2013), *aff'd sub nom.*, *Preferred Inv. Servs., Inc. v. T & H Bail Bond, Inc.*, 108 A.3d 1225 (Del. 2015). Here, Defendants' own allegations expressly admit multiple material breaches, precluding them from making such a demonstration.[2]

First, the MSA's "Exclusivity" provision prohibits Yodlee from using, developing, or offering any product that provides substantially similar features or functionality as Risk Insight:

> [T]he Software and Platform . . . shall be the only and exclusive Software and or related services used and promoted by Yodlee to Yodlee's Client and prospective Clients in connection with or related to Yodlee's Risk Insight Product and that offer substantially similar functionality as articulated in any applicable SOW.

(MSA § 2(c).) Additionally, the MSA's "Restricted Activities" section states that "Yodlee shall not build, or engage a third party to build, a competitive product which copies any features, functions, or rules or the Services, Software, or Platform." (MSA § 6(g).) Notwithstanding these clear restrictions, Defendants allege that they developed a product known as "Snapshot" that was virtually identical to Risk Insight,[3] and that one of their clients "has used Snapshot ***continuously from 2015 until the present*.**" (Counter. ¶¶ 18-22.)

---

[2] *Preferred*, 2013 WL 3934992, at *21 ("A party who first commits a material breach of a contract cannot enforce the contract going forward."); *see also Coll. Health & Inv., L.P. v. Diamondhead Casino Corp.*, 2015 WL 5138093, at *3 (Del. Super. Ct. July 2, 2015) (same).

[3] Specifically, Defendants allege that "[l]ike Snapshot, Risk Insight would present data collected and aggregated by Yodlee to provide reports to financial institutions and fintech companies. Like Snapshot, Risk Insight would not generate credit scores or make determinations about creditworthiness. Like Snapshot, Risk Insight would give lenders the information necessary to make those decisions." (Counter. ¶ 36.)

Second, Defendants allege that "[t]he gist of the Agreement [between the Parties] was that Yodlee **would market Risk Insight to potential clients**, serve as the main point of contact with clients, and provide Yodlee's data aggregation." (*Id.* ¶ 37.) Defendants expressly admit, however, that they unilaterally ceased marketing Risk Insight. (*See id.* ¶ 61 ("Yodlee . . . pause[d] marketing Risk Insight to new clients"); *see also* Counter. Ex. D (April 3 Letter) (". . . Yodlee has determined to suspend further marketing and sales of the Product").)

Third, although Defendants quibble over the amount they owe, asserting that FinApps failed to provide supporting documentation (to which Defendants are not entitled under the Contracts), Defendants do not dispute that they have failed to pay FinApps, further underscoring their own breach. (*See* Counter. ¶¶ 63-64.)

The foregoing allegations confirm Defendants' *ab initio* and material noncompliance with the MSA, precluding them from stating a claim for breach.

**B.    Defendants Fail To Allege A Violation Of MSA §§ 9(d)(2) And 9(d)(4)**

Defendants also fail to allege a valid nexus between any specific conduct on Plaintiff's part, and any specific provisions of the Contracts purportedly breached by such conduct.

Indeed, Defendants' purported grievances with Risk Insight all relate to the platform's "functionality" and ability to "work well with Yodlee's software" (*id.* ¶¶ 43-44), and merely complain that Risk Insight was unsuited for Yodlee's business purposes. Specifically, Defendants assert that FinApps (i) "insisted on building redundant software to provide features that Yodlee already offered to clients" (*id.* ¶ 45); (ii) created "software [that] was shockingly rudimentary" (*id.* ¶ 46); (iii) failed to utilize "'agile' development" (*id.* ¶ 47); (iv) failed to implement "asynchronous background aggregation" ("ABA") (*id.* ¶ 51); and (v) had unspecified (and unalleged) "problems implementing" multi-factor authentication ("MFA"). (*Id.* ¶¶ 54-55.) *Nowhere*, however, do Defendants identify a single specific contractual provision that FinApps

7

purportedly breached with such alleged conduct.  Courts routinely dismiss contract claims where, as here, a complainant "has not identified any express contract provision that was breached." *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007); *Syral Belgium N.V. v. U.S. Ingredients Inc.*, 2016 WL 4728101, at *4 (D. Del. 2016) (FRCP 8 "requires [plaintiff] to allege which 'industry standards and customs' were part of the pertinent contract(s) and how they were breached").  Indeed, mere conclusory legal assertions of breach are "not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Defendants' failure to identify any contractual provisions purportedly breached by FinApps is unsurprising, given the express language of the Contracts, in which FinApps ***expressly stated*** that it was making "NO REPRESENTATION . . . THAT THE USE OF [Risk Insight] WILL MEET THE BUSINESS REQUIREMENTS OF YODLEE."  (MSA § 9(b); Counter. Ex. A at 12.)  This clear and unambiguous contractual language must "be given its ordinary and usual meaning," *Anderson*, 497 F. Supp. 2d at 581, and precludes Defendants from alleging a breach based on vague, *ex post facto* grievances about the suitability of Risk Insight for Yodlee's purposes.

In any event, Defendants' assertion that FinApps breached MSA §§ 9(d)(2) and 9(d)(4) is also facially implausible.  Indeed, as discussed (*supra* at 3), although Defendants expressly admit their awareness of these purported issues in early 2017, they chose not to address them over the following year, and also failed to do so in January 2018, when they instead entered into the Amended and Restated MSA on worse economic terms.[4]

---

[4]  *See OC Tint Shop, Inc. v. CPFilms, Inc.*, 2018 WL 4658211, at *3 (D. Del. Sept. 27, 2018) (emphasizing importance of warranty disclaimers where alleged breach began "around the same time that the new contract was provided," and plaintiff "chose to continue" the contractual relationship).

### C.      Defendants Fail To Allege A Violation Of MSA § 11

Defendants next allege that FinApps committed a breach because it was "obligated to . . . [n]ot terminate access to Risk Insight without cause; and [p]rovide certain transition services to Yodlee and its clients in the event that the Contracts were terminated."  (Counter. ¶¶ 78(e)-(f), 80.)  Defendants are incorrect, and ignore record evidence already before the Court. Indeed, MSA § 11(d) permits FinApps to "terminate this Agreement immediately upon written notice to Yodlee in the event Yodlee breaches Section 6 (Restricted Activities)."  Plaintiff exercised this right via the Termination Letter on May 27, 2019, following Plaintiff's discovery of Defendants' flagrant breaches of Section 6 of the MSA.  (Compl. ¶¶ 93, 143-64.)

Moreover, by terminating for cause due to Yodlee's ongoing breach, FinApps was contractually absolved from providing "transition services" to Yodlee.  Indeed, under the clear terms of MSA § 11(g)(e), FinApps' duty to provide such services was expressly "***conditioned on Yodlee continuing to comply with its obligations under the Agreement***, including payment of all REVENUE SHARE AMOUNTS AND OTHER fees," and due to Yodlee's undisputed non-payment, FinApps was under no obligation to provide transition services.  (MSA § 11(g)(e) (emphasis added).)  Here, Defendants do not – because they cannot –allege compliance with their payment obligations, and thus cannot assert that FinApps' withholding of "transition services" constituted breach.

### D.      Defendants Fail To Allege A Violation Of MSA § 10

Finally, Defendants' claim (Counter. ¶¶ 81-82) that Plaintiff violated its indemnification obligations is wholly contrary to law.  Under Delaware law, indemnification claims "do not accrue 'until the party seeking indemnification has made payment to the injured person.'" *Breakaway Sol., Inc. v. Morgan Stanley & Co. Inc.*, 2004 WL 1949300, at *15 (Del. Ch. 2004) (finding "no reason to depart from this general rule" where entitlement to indemnification

"depends on specific facts" "currently being litigated").[5]  Here, Defendants do not allege that any "claim, suit or proceeding" has been brought, much less that any damages, costs, or other liabilities have been "awarded in any such suit or proceeding."  (MSA § 10.)

## II.    DEFENDANTS' FRAUD CLAIM FAILS AS A MATTER OF LAW

Defendants' fraud counterclaim rests on two discrete but equally baseless theories.  Specifically, Defendants allege that FinApps (i) made several "misrepresentations" of fact to "induce Yodlee to enter the Contracts" (Counter. ¶¶ 26-29, 94-98); and (ii) "fraudulently concealed and failed to disclose" facts purportedly "material to Yodlee's decision to enter the Agreement."  (*Id.* ¶¶ 30-33, 100.)  For multiple dispositive reasons, however, Defendants fail to state a counterclaim for fraud under either theory, as detailed below.

### A.    Defendants' Fraud Claim Sounds In Contract, Not Tort

It is well established that where "an action is based entirely on a breach of the terms of a contract between the parties, and not a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."  *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, at *5 (D. Del. May 24, 2001).  Further, a contract claim cannot transform into a fraud claim "merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform."  *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004).  Thus, where, as here, a putative fraud claim "relate[s] to . . . failed performance" under a contract, it must be dismissed.  *Cornell Glasgow, LLC v. La Grange Prop., LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012).

---

[5]  *See also Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 451 (D. Del. 2011) (a claim for breach for failure to indemnify only "becomes ripe after liability . . . has been established").

Defendants allege that FinApps misrepresented (i) "that the Risk Insight software was configurable" (Counter. ¶ 26); (ii) that it "did not utilize the waterfall model of software development" (*id.* ¶ 27); (iii) that it "had the capability to update its software quickly, every two or three weeks" (*id.* ¶ 28); and (iv) that Risk Insight had and was able to generate reports.  (*Id.* ¶ 29.)  Defendants also allege that FinApps "failed to disclose" and "fraudulently concealed" that "the Risk Insight code was tightly coupled, meaning that any updates to one part of the software would likely have significant effects on other parts."  (*Id.* ¶ 30.)

Each of these topics is expressly covered by the Contracts, invalidating Defendants' fraud claim as a matter of law.  Specifically, (i) the configurability of the Risk Insight platform is set forth in SOW #1 ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████; (ii) the development process on which the Parties agreed is set forth at length in SOW #1 █████████████████████████████████████████████; (iii) the update schedule and methodology on which the Parties agreed is set forth expressly in a table in SOW #1 ██████████; and (iv) the generation of reports is covered in SOW #1.  ██████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████

In fact, Defendants begin their counterclaim allegations by expressly admitting as much – "[a]t its core, this is a breach of contract case."  (Counter. ¶ 1.)  In short, Defendants' fraud counterclaim is a poorly disguised breach claim, and accordingly, must be dismissed.

## B.   Defendants Fail To Meet The Pleading Requirements Of FRCP 9(b)

Defendants' fraud claim should also be dismissed for the independent reason that Defendants have failed to allege their claim with sufficient particularity.  It is well-established

that FRCP 9(b) "adds a heightened pleading standard for allegations of fraud," requiring "a complainant to provide both a theoretically viable claim and the factual allegations that make it plausible." *Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, 223 F. Supp. 3d 207, 212 (D. Del. 2016).[6]  "Courts apply [FRCP] 9(b) to every element of a fraud claim." *Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 478 (D. Del. 2010). Here, Defendants fail to adequately allege numerous elements of fraud.

### i.    Defendants Fail To Adequately Allege Falsity And Scienter

Although Defendants vaguely assert that FinApps made "several important misstatements of fact," regarding the functionality and capabilities of Risk Insight, they fail to allege what statements were made, or how they were false, with sufficient specificity.

For example, Defendants vaguely allege that FinApps "represented that the Risk Insight software was configurable" (Counter. ¶¶ 26, 94(e)).  But Defendants do not adequately allege the falsity of this statement.  Instead, Defendants inject their own ex-post facto (and self-serving) definition of what configurability "mean[s]" (*id.* ¶ 26), without alleging any representation by FinApps that Risk Insight would meet this definition, and without alleging how Risk Insight is not "configurable" – despite having licensed the platform for years.[7]  Similarly, while Defendants vaguely allege that FinApps "represented . . . that FA had the capability to update its software quickly, every two or three weeks" (*id.* ¶¶ 28, 94(d)), Defendants do not specifically allege that this representation was false *at all*.  (*Id.* ¶ 28.)

---

[6]  *See also In re Rockefeller*, 311 F.3d at 216 (3d Cir. 2002) ("[B]oilerplate and conclusory allegations will not suffice.  Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible.").

[7]  Further, and in any event, Delaware courts are "rightly reluctant" to hold that "mere expressions of opinion about the future can buttress a claim of fraud."  *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Tech. Inc.*, 854 A.2d 121, 148 (Del. Ch. 2004).

Defendants' allegations regarding scienter fare even worse.  Indeed, Defendants' *sole* allegation of scienter is that "FA knew these statements were false when made." (*Id.* ¶ 97.)  As the Third Circuit has held, "it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004).  Instead, complainants "must plead allegations of scienter with particularity [and] support their allegations with the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *Id.* Defendants' failure to meet this standard is fatal to their fraud claim.

### ii.    *Defendants Fail To Allege Affirmative Concealment Or A Duty To Disclose*

To state a claim for fraudulent concealment, "facts supporting an inference that the defendant took some *action affirmative in nature* designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim" must be plead.  *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch. 2009).  Similarly, to plead fraud by failure to disclose, "an independent duty, such as a fiduciary duty" that exists "by operation of law, rather than purely by contract" must be alleged.  *Id.* at *11. Here, Defendants' allegations of an affirmative act of concealment committed by FinApps, or a duty to disclose owed by FinApps, are not merely deficient but non-existent.[8]

---

[8]  *See, e.g.*, *Metro*, 854 A.2d at 151 (a complaint that "does not describe any specific instance in which [plaintiff] requested information, indicating what information was requested, to whom that request was made, when it was made, and the response [plaintiff] received" is "insufficiently particularized to state a claim for fraud by active concealment"); *Air Prod. & Chem., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 215 (D. Del. 2017) (active concealment requires a showing of "some affirmative act designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim" and a duty to disclose).

### iii.        *Defendants Fail To Allege Justifiable Reliance As A Matter Of Law*

It is well-settled under Delaware law that any fraud claim must include plausible allegations of justifiable or detrimental reliance in order to survive dismissal.  *See Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 398-99 (D. Del. 2014). As a matter of law, Defendants cannot adequately allege justifiable reliance due to various disclaimers of reliance contained in the Contracts, including a robust integration clause.

As discussed *supra* at § II.A, the substance of each of the Defendants' fraud claims are comprehensively covered by the Contracts.  Moreover, as discussed at length *supra* at § I.B., the Contracts include a robust integration clause (MSA § 12(h)), as well as an additional disclaimer stating that Plaintiff "MAKES NO REPRESENTATION . . . THAT THE USE OF [Risk Insight] WILL MEET THE BUSINESS REQUIREMENTS OF YODLEE."  (MSA § 9(b).)  Taken together, these provisions render Defendants' vague and conclusory allegation that they "reasonably and justifiably relied on these statements" wholly implausible, and inadequate as a matter of law to state a claim for fraud.  *See, e.g.*, *Progressive Intern. Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *8 (Del. Ch. 2002) ("[S]ophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations."); *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, 2014 WL 5025926, at *24 (Del. Ch. Sept. 30, 2014) (dismissing fraud claims due to "clear integration clauses").

Defendants are also incapable of plausibly alleging justifiable reliance due to the critical fact that, on January 31, 2018, they entered into the Restated and Amended MSA and SOW #3 with Plaintiff (Counter. Ex. A at 21-23), which are nearly identical to original Agreements, except that they include payment terms that are substantially ***more favorable*** to FinApps than the original MSA.  (*See supra* at 3.)  Defendants' willingness to enter into the Restated and

Amended MSA with Plaintiff on worse terms without addressing *any* of the issues they now

raise – despite *admitting* that they were aware of them, and having ample opportunity to

negotiate their resolution in the renewed agreement – puts the lie to Defendants assertion that it

justifiably relied on Plaintiff's representations.  Moreover, taking Defendants' allegations as true,

Defendants became aware these purported misrepresentations were false before entering the

Amended and Restated MSA, and therefore cannot allege fraudulent inducement as a matter of

law.  *See, e.g.*, *Ward v. Hildebrand*, 1996 WL 422336, at *4 (Del. Ch. July 8, 1996) ("[A]

recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows

that it is false or if its falsity is obvious to him.").

### iv.   *Defendants Fail To Adequately Plead Damages*

Delaware courts have "consistently held that to successfully plead a fraud claim,

the . . . damages allegations may not simply 'rehash' the damages allegedly caused by the breach

of contract."  *Cornell*, 2012 WL 2106945, at *8.  Here, in connection with their claim for breach,

Defendants allege that "Yodlee has been damaged by the reduced revenues generated by Risk

Insight and the reimbursements it has paid to clients."  (Counter. ¶ 83.)  With respect to their

fraud claim, Defendants allege that "Yodlee has sustained economic injury and actual damages,

***including all payments made to FA under the Contracts and lost business opportunity and***

***profits***."  (*Id.* ¶ 102.)  These damages are substantively identical – underscoring another pleading

deficiency that is fatal to Defendants' fraud claim.[9]  *See Heritage Handoff Holdings, LLC v.*

---

[9]  Although Defendants seek "punitive damages, attorneys' fees, treble damages" in connection
with their statutory claims, such remedies are not provided for by either statute, and in any event,
such requests do "not sufficiently distinguish the damages claims to allow a fraud claim to
stand."  *Heritage*, 2019 WL 1056270, at *5.

*Fontanella*, 2019 WL 1056270, at *5 (D. Del. 2019) ("[C]ourts routinely dismiss fraud claims

that seek damages which are identical to the damages alleged for a breach of contract claim.").

### C.     Defendants Fail To Plead Statutory Fraud

Defendants' weak attempt to piggyback California and Florida law "statutory fraud"

claims onto their common law fraud claim by merely name-checking those statutes in conclusory

fashion (*see* Counter. ¶¶ 103-04) is wholly insufficient to state a claim under either statute.

Defendants also fail to plead such claims with the particularity required by FRCP 9(b), for the

same reasons discussed *supra* at § II.B.[10]  Additionally, both statutes require allegations of

***consumer-facing*** misconduct and damages, and Defendants' boilerplate recitations of buzzwords

such as "unlawful, unfair, fraudulent, and/or deceptive" (*id.* ¶ 103) and "punitive . . . and

enhanced statutory damages" (*id.* at 30) are insufficient to meet these requirements.[11]

## III.    DEFENDANTS' CLAIM FOR DEFAMATION FAILS AS A MATTER OF LAW

Defendants' flawed defamation theory (Counter. ¶¶ 73-76) relies *solely* on a statement

made by Plaintiff's lead counsel to the press following the public filing of the complaint, which

expressed his opinion of this litigation, accurately reflected Plaintiff's allegations, and is

obviously non-defamatory.  As an expression of opinion that is also subject to the fair reporting

---

[10]  *See, e.g.*, *Gardner v. Safeco Ins. Co. of Am.*, 2014 WL 2568895, at *5 (N.D. Cal. 2014) (UCL claims "premised on fraudulent conduct trigger the heightened pleading standard of [FRCP] 9(b)"); *Siever v. BWGaskets, Inc.*, 2009 WL 528624, at *3 n.l (M.D. Fla. Mar. 2, 2009) (FRCP 9(b) applies to FDUTPA claims "grounded in fraud").

[11]  *See, e.g.*, *Travelers Casualty and Surety Company of America v. PJM Consulting, Inc.*, 2009 WL 10671269, at *6 (M.D. Fla. 2009) ("vague allegations" of "misrepresentations made to [plaintiff]" insufficient to show defendant engaged in conduct "*likely to mislead the consumer*") (emphasis added); *Gardner*, 2014 WL 2568895, at *5 ("[C]onclusory allegations" insufficient to show defendant "engaged in a fraudulent business act or practice that was *likely to deceive the public*") (emphasis added); *Mosiman v. Madison Companies, LLC*, 2019 WL 203126, at *5 (D. Del. 2019) (UCL suits are "equitable," thus compensatory damages is not "relief . . . which the UCL claim can provide"); *Dicuio v. Brother Intern. Corp.*, 2015 WL 3403144, at *30 (D.N.J. 2015) (FDUTPA claims require "actual damages" shown by specific allegations).

laws, the statement of which Defendants complain constitutes protected, non-actionable speech. Further, Defendants' failure to allege actual malice is fatal to their claim.

###  A.    Plaintiff's Counsel's Statement To The Press Constitutes Opinion

It is black-letter law that a statement of opinion is not defamation. *John Doe 2 v. Superior Court*, 1 Cal. App. 5th 1300, 1313 (Cal. Ct. App. 2016) ("[S]tatements of opinion can never subject the speaker to liability for making a false and defamatory statement."); *see also Haberstroh v. Crain Publications, Inc.*, 189 Ill. App. 3d 267, 273 (1989) ("It is an established first amendment principle that expressions of opinion are protected forms of speech no matter how vigorously the opinion is expressed."). Courts have sole discretion "to determine whether a statement is actionable as a statement of fact" or "a nonactionable statement of opinion privileged under the First Amendment" by considering "the context in which [the statement] was made," placing themselves "in the situation of the hearer or reader," and determining "the sense or meaning of the language . . . according to its natural and popular construction." *John Doe*, 1 Cal. App. at 1312 ("[W]hether an allegedly defamatory statement is fact or opinion is a 'totality of the circumstances' test" under California law); *see also Haberstroh*, 189 Ill. App. 3d at 273 (Illinois courts similarly follow a "totality-of-the-circumstances analysis").

Here, the totality of the circumstances confirm that no defamation has occurred. As a threshold matter, the Court must consider the true context of the statement at issue:

> Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful. We look forward to proving that Envestnet and Yodlee are liable for significant damages to our client, and persuading the court to issue a permanent injunction enjoining defendants from further unlawful activity.

(Counter. Ex. E at 3.) This statement was made by Plaintiff's lead counsel, immediately following the public filing of a complaint that explicitly alleges (numerous times) that Defendants unlawfully stole and misappropriated Plaintiff's technology. (*See, e.g.*, Compl. ¶¶ 7,

10, 12.)  Moreover, the same article in which this statement appears presents alternative opinions concerning the merits of Plaintiff's case.  (Counter. Ex. E at 2 (quoting a self-professed "software guru" stating "I would be shocked if this gets any real traction").)  The article also characterizes the reported-on information as "according to court papers" or what "the suit claims."[12]  (*See generally id.*)  This context – which Defendants ignore – makes clear that the statement is constitutionally protected opinion that no reasonable reader could possibly construe as fact.  *John Doe*, 1 Cal. App. 5th at 1312; *Haberstroh*, 189 Ill. App. 3d at 273 (1989).

**B.**     **Plaintiff's Counsel's Statement Is Protected By The Fair Report Privilege**

The fair report privilege "confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding or anything said in the course thereof."  *Sipple v. Found. For Nat. Progress*, 83 Cal. Rptr. 2d 677, 685 (Cal. Ct. App. 1999). Statements must only "capture the gist or sting of the statements" in order to be "absolutely privileged regardless of the defendants' motive for reporting it."  *Hawran v. Hixson*, 147 Cal. Rptr. 3d 88, 107 (Cal. Ct. App. 2012).  Courts consider the communications as a whole, and "whether the average viewer or listener of the media reports would understand the attorneys' statements as communications about the [] complaint (which would be privileged) or as facts (which would not)."  *Healthsmart Pac., Inc. v. Kabateck*, 212 Cal. Rptr. 3d 589, 605 (Cal. Ct. App. 2016).  Here, as discussed above, Plaintiff's counsel was accurately summarizing recently-filed claims exactly as alleged in the complaint.  (*See, e.g.*, Compl. ¶¶ 7, 10, 12.)  Accordingly, the fair report privilege bars Defendants' defamation claim.

---

[12]  The two other articles on which Defendants rely quote the same language and contain similar context common for publications reporting on litigation proceedings.  *See* Counter. Ex. F; Counter. Ex. G.

### C.   Defendants Fail To Adequately Allege Malice

Even assuming, *arguendo*, that the statement in question were actionable as defamation (which it is not), where, as here, a putative defamation plaintiff is a "public figure," actual malice must also be plead.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280-81 (1964).  Despite being public figures, Defendants do not – and cannot – plead actual malice, requiring dismissal.

Whether a plaintiff is a public figure is a question of law.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).  Courts examining whether a corporation constitutes a general public figure consider, among other things, the size of the corporation, whether it is publicly traded, and whether it is well-known.  *La Marca v. Capella Univ.*, 2009 WL 10698387, at *6 (C.D. Cal. Jan. 6, 2009) (large public corporation with over $100 million was all-purpose public-figure); *see also Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977) (same).  Envestnet is a decades-old company with over three thousand employees, stock traded publically on the New York Stock Exchange, recent annual revenues of over $680 million, and total assets in excess of $1.3 billion.  For its part, Yodlee – a wholly-owned subsidiary of Envestnet – describes its "vast reach" as extending to "over 1,100 financial institutions and fintech clients" (Counter. ¶ 16), and further claims that it "has developed the software and necessary business relation to connect with over 20,000 sources of information."  (*Id.* ¶ 14.)  Moreover, Yodlee admits that its "core business is aggregating and analyzing financial information" that it collects by obtaining "permission" from hundreds of thousands, if not millions, of "individual customers."  (*Id.* ¶ 13.) Defendants here plainly qualify as an all-purpose public figure.  *See Gertz*, 418 U.S. at 345.

As public figures, Defendants *must* allege actual malice to state a claim for defamation, *id.* at 351, and are thus required to allege that the allegedly defamatory statement was made with "knowledge that it was false or with reckless disregard of whether it was false or not."  *Curtis*

*Pub. Co. v. Butts*, 388 U.S. 130, 134 (1967).  Mere "formulaic recitation[s]" of actual malice "will not do,"[13] but here, Defendants make ***no*** allegations regarding actual malice at all.

## IV.   DEFENDANTS' CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW

The implied covenant of good faith and fair dealing applies only "where a contract lacks specific language governing an issue." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. 2015).  Where the language of a contract "speaks directly regarding the issue in dispute," the "existing contract terms control." *Id.*  Further, "[t]he implied covenant is a 'limited and extraordinary' legal remedy [that] adheres only when 'the contract is truly silent with respect to the matter at hand.'" *Dolan v. Altice USA, Inc.*, 2019 WL 2711280, at *10 (Del. Ch. June 27, 2019).  Here, Defendants vaguely allege that FinApps "violated the implied covenant . . . by threatening to terminate the Contracts unless Yodlee paid the unsubstantiated amount demanded by FA then abruptly shutting off service to clients."  (Counter. ¶ 87.)  As Defendants' own pleading concedes (*see id.* ¶¶ 41, 69), however, both termination of the Contracts, and the amount owed thereunder by Yodlee, are expressly contemplated in the MSA – a "detailed contract containing specific provisions governing the issues." *NACCO Industries, Inc. v. Applica Inc.*, 997 A.2d 1, 20 (Del. Ch. 2009) (dismissing good faith and fair dealing claim).

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that Defendants' counterclaims be dismissed in their entirety.

---

[13]  *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1019 (N.D. Cal. 2017).

Dated: December 20, 2019

YOUNG CONAWAY STARGATT
& TAYLOR LLP

By: _____/s/ *Pilar G. Kraman*_____
    C. Barr Flinn (No. 4092)
    Emily V. Burton (No. 5142)
    Pilar G. Kraman (No. 5199)
    Rodney Square
    1000 North King Street
    Wilmington, Delaware 19801
    (302) 571-6692
    bflinn@ycst.com
    eburton@ycst.com
    pkraman@ycst.com

- AND -

Marc E. Kasowitz, Esq.
(*Admitted Pro hac vice*)
Matthew A. Kraus, Esq.
(*Admitted Pro hac vice*)
A. MacDonald Caputo, Jr., Esq.
(*Admitted Pro hac vice*)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com

*Attorneys for Plaintiff FinancialApps, LLC*