## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINANCIALAPPS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.  19-cv-1337-CFC/CJB |
| | ) | |
| v. | ) | |
| | ) | |
| ENVESTNET, INC. and | ) | |
| YODLEE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ENVESTNET, INC. AND YODLEE, INC.'S RESPONSE IN OPPOSITION TO FINANCIALAPPS, LLC'S MOTION TO DISMISS COUNTERCLAIM

Of Counsel:

Gary M. Miller
Gary M. Elden
Ian M. Hansen
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
gmiller@shb.com
gelden@shb.com
ihansen@shb.com

Henry E. Gallagher, Jr. (#495)
Ryan P. Newell (#4744)
Lauren P. DeLuca (#6024)
CONNOLLY GALLAGHER LLP
1201 North Market Street
20th Floor
Wilmington, DE 19801
Tel: (302) 757-7300
hgallagher@connollygallagher.com
rnewell@connollygallagher.com
ldeluca@connollygallagher.com

***Attorneys for Defendants Yodlee, Inc. and Envestnet, Inc.***

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ......................................................................................... 3

ARGUMENT ...................................................................................................... 3

I.   YODLEE STATES A CLAIM FOR BREACH OF CONTRACT. ........................... 3

    A.   The Counterclaim alleges that Yodlee worked in good faith to address Risk Insight's problems. ........................................................ 3

    B.   The Counterclaim does not allege that Yodlee breached the Contract. ............ 4

    C.   The Counterclaim identifies each provision FA breached and how FA breached it. ................................................................................ 5

    D.   Yodlee's contractual indemnification claim is ripe. ......................... 9

II.   YODLEE STATES CLAIMS FOR COMMON LAW AND STATUTORY FRAUD. ........................................................................................... 9

    A.   Count 4 is not based on a breach of the Contract. .......................... 10

    B.   The allegations satisfy Rule 9(b). .................................................. 11

        1.   Yodlee alleges the "essential factual background" for each misrepresentation. ............................................................ 11

        2.   Yodlee alleges falsity and scienter. ....................................... 12

        3.   Yodlee alleges a duty to disclose and affirmative concealment. .................................................................... 13

        4.   Yodlee alleges justifiable reliance. ....................................... 13

        5.   Yodlee adequately alleges damages. ..................................... 15

    C.   Yodlee states claims under California and Florida statutory law. ................. 15

III.   YODLEE AND ENVESTNET STATE CLAIMS FOR DEFAMATION. ................. 16

    A.   The statement is actionable. ......................................................... 16

B.      The fair report privilege would require a premature choice-of-law analysis.................................................................................................. 17

C.      Neither Yodlee nor Envestnet is an all-purpose public figure.  In any event, the Counterclaim alleges actual malice.................................................. 19

IV.     YODLEE STATES A CLAIM FOR BREACH OF THE IMPLIED COVENANT................................................................................................................ 20

CONCLUSION ........................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AgroFresh Inc. v. Essentiv LLC,*
  2018 WL 6974947 (D. Del. Dec. 27, 2018) .................................................................... 17

*Anvil Holding Corp. v. Iron Acquisition Co., Inc.,*
  2013 WL 2249655 (Del. Ch. May 17, 2013) .................................................................. 14

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................................... 3

*Bert Smith Oldsmobile, Inc. v. Franklin,*
  400 So. 2d 1235 (Fla. Ct. App. 1981) ............................................................................ 15

*Branin v. Stein Roe Investment Counsel, LLC,*
  2015 WL 4710321 (Del. Ch. July 31, 2005) .................................................................... 9

*Breakaway Soutions, Inc. v. Morgan Stanley & Co. Inc.,*
  2004 WL 1949300 (Del. Ch. Aug. 27, 2004) ................................................................... 9

*Cedar Tree Books Ltd. v. Sushi Rock, Inc.,*
  2014 WL 12684298 (Del. Com. Pl. May 20, 2014) .......................................................... 4

*CMS Investment Holdings, LLC v. Castle,*
  2015 WL 3894021 (Del. Ch. June 23, 2015) .................................................................. 20

*Corporate Prop. Assoc. 14 Inc. v. CHR Holding Corp.,*
  2008 WL 963048 (Del. Ch. Apr. 10, 2008) ................................................................... 13

*D'Aiuto v. City of Jersey City,*
  2007 WL 2306791 (D.N.J. Aug. 8, 2007) ...................................................................... 19

*Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC,*
  832 A.2d 116 (Del. Ch. 2003) ........................................................................................ 10

*GSC Partners CDO Fund v. Washington,*
  368 F.3d 228 (3d Cir. 2004) ..................................................................................... 11, 12

*Gutter v. Wunker,*
  631 So. 2d 1117 (Fla. Ct. App. 1994) ............................................................................ 13

*Healthsmart Pac. Inc. v. Kabateck,*
  7 Cal. App. 5th 416 (Cal. Ct. App. 2016) ...................................................................... 18

iii

*HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*,
    685 So. 2d 1238 (Fla. 1996)............................................................. 10, 11, 14, 15

*ITW Global Inv. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*,
    2015 WL 3970908 (Del. Super. Ct. June 24, 2015) .................................................. 10, 11

*John Doe 2 v. Superior Court*,
    1 Cal. App. 5th 1300 (Cal. Ct. App. 2016) ................................................. 16, 17

*Kurczaba v. Pollock*,
    742 N.E.2d 425 (Ill. App. Ct. 2000) ................................................................ 18

*Makaeff v. Trump Univ., LLC*,
    715 F.3d 254 (9th Cir. 2013) ........................................................................ 19

*Marcelos v. Dominguez*,
    2008 WL 2788173 (N.D. Cal. July 18, 2008)....................................................... 15

*MicroStrategy Inc. v. Acacia Research Corp.*,
    2010 WL 5550455 (Del. Ch. Dec. 30, 2010)....................................................... 14

*Miller v. Comcast*,
    724 F. App'x 181 (3d Cir. 2018) ........................................................... 3, 5, 13

*Missner v. Clifford*,
    914 N.E.2d 540 (Ill. App. Ct. 2009) ................................................................ 18

*Queregan v. New Castle Cty.*,
    2006 WL 2522214 (Del. Ch. Aug. 18, 2006) ...................................................... 9

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
    302 F. Supp. 3d 1005 (N.D. Cal. 2017) ..................................................... 19, 20

*Ringler Assoc. Inc. v. Maryland Cas. Co.*,
    80 Cal. App. 4th 1165 (Cal. Ct. App. 2000) ............................................. 16, 17

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
    34 Cal. 4th 979 (Cal. 2004)........................................................................ 10

*Rollins, Inc. v. Heller*,
    454 So. 2d 580 (Fla. Ct. App. 1984)............................................................. 15

*Smith v. Del. State Univ.*,
    47 A.3d 472 (Del. 2012) ............................................................................. 17

*State Farm Mut. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*,
    278 F. Supp. 3d 1307 (S.D. Fla. 2017) ............................................................ 15

*Vega v. Jones, Day, Reavis & Pogue*,
    121 Cal. App. 4th 282 (Cal. Ct. App. 2004) .................................................... 13

*Zazzali v. Hirschler Fleischer, P.C.*,
    482 B.R. 495 (D. Del. 2012) ............................................................................ 18

*ZL Tech., Inc. v. Does 1-7*,
    13 Cal. App. 5th 603 (Cal. Ct. App. 2017) ..................................................... 16

**Statutes**

CAL. BUS. & PROF. CODE § 17200 *et seq.* ........................................................ 15, 16

FLA. STAT. ANN. § 501.203 .................................................................................... 16

FLA. STAT. ANN. § 501.2105 .................................................................................. 15

**Rules**

FED. R. CIV. P. 9(b) ....................................................................................... 9, 11, 12

FED. R. CIV. P. 12(b)(6) ............................................................................................ 3

**Other Authorities**

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 150 (1971) ........................ 17, 18

**INTRODUCTION**

Defendants/Counterclaim-Plaintiffs Yodlee, Inc. and Envestnet, Inc. are the true plaintiffs in this case, and their Counterclaim (D.I. 21) ("Counter.") explains why.  FA's Opening Brief in support of its Motion to Dismiss the Counterclaim (D.I. 47) ("Op. Br.") misstates the law and misquotes the Contract by lopping off clauses and omitting entire sentences that foreclose its arguments.  FA also disregards the basics:  it ignores key factual allegations in the Counterclaim—all that matter at this stage—and instead cites extrinsic material and, at times, *its own* Complaint.  As explained below, the Counterclaim alleges facts sufficient to sustain every element of each Count and meets even the heightened pleading standard applicable to fraud claims.  FA's Motion to Dismiss should be denied.[1]

**SUMMARY OF FACTUAL ALLEGATIONS**

In 2016, Yodlee entered into talks with FA to build and market a new credit reporting product called Risk Insight.  (Counter. ¶¶ 2, 24.)  During negotiations, FA represented that its software met important industry criteria and could perform several of the functions Yodlee needed.  (*Id.* ¶¶ 26–29.)  These representations were important because Yodlee wanted to get a credit product to market quickly.  (*Id.* ¶ 30.)  Relying on them, Yodlee entered into the Master Services Agreement (the "Contract") with FA in January 2017.  (*Id.* ¶ 34.)

Shortly thereafter, it became clear that FA had knowingly misrepresented the then-current state of its software.  (*Id.* ¶ 43.)  Risk Insight lacked basic functionality and was plagued by problems (*id.* ¶¶ 45–60), but clients had already signed up, and both Yodlee and its clients had committed significant resources to it.  Yodlee reasonably believed that the best path forward was to help FA bring Risk Insight up to standard.  (*Id.* ¶¶ 44, 50.)  After thousands of developer hours

---

[1] Emphasis added throughout unless otherwise noted.

and an amendment to the Contract, many problems persisted due to FA's ineptitude, and FA breached several terms of the Contract along the way.  (*Id.* ¶¶ 42, 44, 50, 60.)  Finally, on April 3, 2019, Yodlee sent FA a letter detailing many of the problems FA had proven unable or unwilling to fix.  (*Id.* ¶¶ 60–63; Counter. Ex. D.)  Yodlee informed FA of its decision to pause marketing Risk Insight to new clients until the problems were fixed and reserved its right to terminate the Contract if they were not fixed within the agreed-upon cure periods.  (*Id.*)

In response, FA demanded that Yodlee pay $1,654,322.90 in purportedly outstanding fees dating back over a year.  (*Id.* ¶ 63.)  Yodlee responded that it would pay whatever it owed so long as FA could provide basic supporting documentation.  (*Id.* ¶ 64.)  Instead of supporting its demand, FA accused Yodlee of stealing its technology and threatened to shut down Risk Insight if Yodlee did not pay.  FA abruptly did just that on June 11, 2019.  (*Id.* ¶¶ 64–66.)  This reckless move—which itself breached the Contract—disrupted the operations of all Risk Insight customers, several of whom later demanded restitution from Yodlee.  (*Id.* ¶¶ 66–67, 72.)  Then, in an attempt to damage Yodlee and Envestnet's reputations and standing in the market, FA filed its frivolous claims alleging trade secret theft and copyright infringement and later defamed Yodlee and Envestnet in the trade press.  (*Id.* ¶¶ 73–76.)  Yodlee and Envestnet now seek redress for FA's fraud, breach of contract, defamation, and breach of the implied covenant of good faith and fair dealing.  (*Id.* ¶¶ 77–104.)

## LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss, courts must "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Miller v. Comcast*, 724 F. App'x 181, 182 (3d Cir. 2018).   A complaint need only allege facts sufficient to state a claim "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)*.*

## ARGUMENT

**I.     YODLEE STATES A CLAIM FOR BREACH OF CONTRACT.**

FA challenges Count 1 (breach of contract) on four grounds: (1) Yodlee's allegations are implausible because Yodlee agreed to amend the contract despite having never addressed Risk Insight's problems; (2) Yodlee materially breached the Contract and cannot now enforce it; (3) Yodlee does not identify any contractual provision FA supposedly breached; and (4) Yodlee's indemnification claim is not ripe.  (Op. Br. at 5–10.)  Each challenge fails.

**A.     The Counterclaim alleges that Yodlee worked in good faith to address Risk Insight's problems.**

A major theme of FA's brief is that Yodlee's allegations are "facially implausible" because Yodlee was aware of and "chose not to address" the problems with Risk Insight before amending the Contract with FA in January 2018.  (Op. Br. at 1–2, 5, 8.)  The Counterclaim contradicts this theme.  Yodlee "dedicated thousands of developer hours to helping FA's team try to make Risk Insight usable" in 2017 alone (*see* Counter. ¶ 44) and that, in spite of these efforts, many problems persisted even *after* the parties amended the Contract.  Many problems were never fixed.  (*Id.* ¶¶ 47–60, 63.)  There is nothing implausible about Yodlee making the best of a bad situation by attempting to remedy the problems with Risk Insight in order to serve clients.  Yodlee certainly cannot be punished for *trying to mitigate its damages* during the life of

the Contract. *See Cedar Tree Books Ltd. v. Sushi Rock, Inc.*, 2014 WL 12684298, at \*4 (Del. Com. Pl. May 20, 2014) (After a breach, "a duty is imposed on the non-breaching party to mitigate damages.").

**B.      The Counterclaim does not allege that Yodlee breached the Contract.**

FA argues that the Counterclaim admits that Yodlee materially breached the Contract and thus bars Count 1.  (Op. Br. at 6–7.)  FA first suggests that developing and selling Snapshot— Yodlee's predecessor to Risk Insight—breached the Contract's "Exclusivity" and "Restricted Activities" provisions.  (*Id.* at 6.)  But Snapshot did not "cop[y] any features, functions, or rules of the Services, Software, or Platform."  (MSA § 6(g).)  Yodlee developed and sold Snapshot *years before the Parties entered into the Contract*.  (Counter. ¶¶ 18–22.)

Nor did Yodlee's continued use of Snapshot violate the "Exclusivity" provision.  That provision bars Yodlee from using any software that offers substantially similar functionality to FA's software "*in connection with or related to Yodlee's Risk Insight Product*" "for a period of six (6) months following termination" except if the termination was for cause.  (MSA § 2(c).) This provision was never triggered at all:  (1) the Counterclaim alleges that Yodlee terminated for cause (Counter. ¶ 69), and (2) Snapshot is a different product unrelated to Risk Insight.[2]  (*Id.* ¶¶ 18–22.)

FA argues next that Yodlee breached the Contract by pausing marketing until the many problems that plagued Risk Insight were fixed.  (Op. Br. at 7.)  Yet FA does not point to any

---

[2] FA might argue that the Exclusivity provision barred Yodlee from promoting any product offering "substantially similar functionality as articulated in any applicable SOW" for six months even if that product was unrelated to Risk Insight.  This is wrong:  the provision bars Yodlee from using other software or services "in connection with or related to Yodlee's Risk Insight Product *and*"—not "*or*"—"that offer substantially similar functionality."  (MSA § 2(c).)  The Court need not address this now because the facts alleged in the Counterclaim establish that the provision was not triggered.

provision in the Contract that Yodlee allegedly breached by pausing marketing.  Nor could it

because nothing in the Contract obligated Yodlee to market Risk Insight *no matter what*, and

continuing to market such a flawed product would have risked both parties' reputations.

FA then argues that Yodlee refused to pay more than $1.6 million in fees.  (Op. Br. at 7.)

But the Counterclaim does not allege that.  It alleges instead that Yodlee "repeatedly asked for

information regarding FA's request for payment, including what work was covered by the

invoices, when the work was performed, and under what contract or statement of work it was

undertaken," and after Yodlee "told FA that it would pay any money it owed, but that it needed

information to determine what was actually owed," FA failed to provide backup documentation.

(Counter. ¶ 64.)  The Contract contemplates payment disputes like this one:

> Payment Disputes.  FinancialApps shall not exercise its rights
> under Section 4(c) (Overdue Charges) or 4(d) (Suspension of
> Services) of this Contract if the applicable charges are under
> reasonable and good-faith dispute and Yodlee is cooperating
> diligently to resolve the dispute.

(MSA § 4(e).)  Yodlee alleges that the invoices were subject to a reasonable dispute that Yodlee

was cooperating to resolve.  FA cannot summarily assert that these payments were duly owed

when the Counterclaim alleges otherwise.  *Miller*, 724 F. App'x at 182.

**C.     The Counterclaim identifies each provision FA breached and how FA breached it.**

FA next claims that Yodlee fails to identify "a single specific contractual provision that

FinApps purportedly breached[.]"  (Op. Br. at 7–8.)  This just ignores the Counterclaim, as

becomes apparent when FA proceeds to devote entire subsections to the contractual provisions

Yodlee did identify.  (*See id*. at 7–10.)  The Counterclaim alleges that FA breached the following

provisions by doing the following:

5

| Provision breached | FA's breaching misconduct |
|---|---|
| **MSA § 4(e):**  FA shall not suspend access to Risk Insight on the basis of charges "under reasonable and good-faith dispute" when "Yodlee is cooperating diligently to resolve the dispute." (*See* Counter. ¶ 64.) | Suspending access to Risk Insight on the basis of unpaid invoices even though "Yodlee told FA that it would pay any money it owed, but it needed information to determine what was actually owed." (Counter. ¶¶ 64–68.) |
| **MSA § 9(a)(3):**  FA warranted that it would "comply in all material respects with applicable federal, state, local, international, or other laws and regulations[.]" (*See* Counter. ¶ 58.) | Failing to ensure that Risk Insight complied with the American Disabilities Act ("ADA"). (Counter. ¶ 58.) |
| **MSA § 9(a)(7):**  FA warranted that Risk Insight "currently compl[ies] with all other existing federal, state and local laws[.]" (*See* Counter. ¶ 58.) | Failing to ensure that Risk Insight complied with the ADA.  (Counter. ¶ 58.) |
| **MSA § 9(d)(2), (4):**  FA agreed to perform "in accordance with generally accepted professional standards, practice, methods and techniques for similar services" and to "retain the ability and competency to perform its obligations . . . . All Services and Deliverables shall conform to the applicable specifications during the term. FinancialApps shall institute quality controls . . . to ensure that the Services and Deliverables comply with the specifications and service levels and in a manner consistent with the highest applicable industry standards." (*See* Counter. ¶¶ 38–39.) | Storing customer financial information in an unencrypted database, in violation of industry standard.[3]  (Counter. ¶ 46.)<br><br>Failing to implement "agile" development, which is industry standard.  (*Id*. ¶ 47.)<br><br>Failing to implement asynchronous background aggregation, which is industry standard.  (*Id.* ¶¶ 51–52.)<br><br>Failing to implement multi-factor authentication, a "necessary procedure used by financial institutions."  (*Id.* ¶¶ 53–54.)<br><br>Failing to deliver ADA-compliant software, which is industry standard.  (*Id.* ¶ 59.)<br><br>Other technical issues identified in Yodlee's April 3, 2019 letter.  (*See id.* ¶ 60; Ex. D.) |

---

[3] FA implies Yodlee failed to specify industry standards (*see* Mot. at 8), again ignoring the allegations cited next.

| Provision breached | FA's breaching misconduct |
|---|---|
| **MSA § 10:**  Each party shall indemnify the other in connection with "any claim, suit or proceeding brought against the other party" resulting from "an act or omission caused by the Indemnifying Party, or the Indemnifying Party['s] breach of any warranty contained herein."  (*See* Counter. ¶¶ 81–82.) | Refusing to indemnify or defend Yodlee against Risk Insight clients' claims for repayment resulting from FA's breaches. (Counter. ¶¶ 72, 81–82.) |
| **MSA § 11(g)(e):** FA shall perform "Termination Assistance Services" "[u]pon the expiration of this Contract *or its termination by either Party for any reason*" and "shall have no right to withhold or limit its performance or any of such transition services on the bases of any alleged breach of this Contract by Yodlee, other than a failure by Yodlee to timely pay the amounts due hereunder *during the transition period*." (*See* Counter. ¶ 71.) | Abruptly suspending access to Risk Insight without offering the Termination Assistance Services.  (Counter. ¶¶ 65–72.) |
| **SOW # 1 § 4.2:**  FA shall ensure "99.9% system availability measured over calendar month."  (*See* Counter. ¶ 40; Ex. B.) | Suspending access to Risk Insight and failing to offer the Termination Assistance Services. (Counter. ¶¶ 65–72.) |
| **SOW # 1 Support Priorities (Ex. B):**  FA shall resolve P3 Support Priorities within 14 days.  (*See* Counter. ¶ 56.) | Never resolving the loss of multi-factor authentication after Yodlee submitted notice of the problem as a P3 Support Priority. (Counter. ¶¶ 56–57.) |

FA misrepresents the MSA's "Disclaimer" provision to make it appear that FA disclaimed *all* representations that Risk Insight would meet *any* Yodlee business requirement. (Op. Br. at 8.)  This would of course gut the contract and make no sense.  Unsurprisingly, it is false:

> **EXCEPT AS EXPRESSLY PROVIDED HEREIN** . . . FINANCIALAPPS MAKES NO REPRESENTATION, WARRANTY, OR GUARANTY THAT THE USE OF THE SERVICES LICENSED HEREUNDER WILL MEET THE BUSINESS REQUIREMENTS OF YODLEE.

(MSA § 9(b).)  FA omits the opening clause when quoting this provision.  (*See* Op. Br. at 8.) The Counterclaim alleges that FA made—and later breached—each of the representations,

warranties, and guarantees listed in the Table above.  This provision obviously does not cancel out the commitments FA *did* make as part of the Contract.

FA tries a similar trick with respect to its duty to provide transition services.  It first claims that it was absolved of its transition duties under MSA § 11(g)(e) when it terminated the Contract due to Yodlee's supposed breaches of MSA § 6 (Restricted Activities).  (Op. Br. at 9.)  None of this is in the Counterclaim; for support, FA cites only to *its* Complaint.  (*See id.*)  More importantly, FA was obligated to provide transition services "[u]pon the expiration of this Contract or its termination by either Party *for any reason*, *including the breach of this Contract by either Party.*"  (MSA § 11(g)(e).)  FA could only be excused from its transition duties if Yodlee stopped paying revenue shares and other fees *during the transition period*:

> The duty of FinancialApps to comply with such services shall be conditioned on Yodlee continuing to comply with its obligations under the Contract, including payment of all REVENUE SHARE AMOUNTS AND OTHER fees . . . .  ***FinancialApps shall have no right to withhold or limits its performance*** or any of such transition services on the basis of any alleged breach of this Contract by Yodlee, other than a failure by Yodlee to timely pay the amounts due hereunder ***during the transition period***.

(*Id.*)  FA again omits all of this when quoting the provision.  The Counterclaim alleges that FA submitted unsupported payment demands and that Yodlee was working in good faith to resolve the dispute.  (Counter. ¶ 64.)  MSA § 4(e), quoted above at 5, barred FA from suspending access to Risk Insight during a good-faith payment dispute.  MSA § 11(g)(e) barred FA from withholding post-termination transition services for any reason other than Yodlee's failure to continue payments *during the transition period*.  As the Counterclaim alleges, FA violated both provisions.  (*See id.* ¶¶ 64–72.)

### D.     Yodlee's contractual indemnification claim is ripe.

FA argues that under Delaware law, indemnification claims accrue only after payment to a third party.  (Op. Br. at 9.)  But the case it cites applied *New York* law.  *See Breakaway Solutions, Inc. v. Morgan Stanley & Co. Inc.*, 2004 WL 1949300, at *2 n.3, 15 (Del. Ch. Aug. 27, 2004).  Under Delaware law, the rule is different.  A *common law* claim "does not accrue until after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded," but "[t]here is *no such requirement* for a *contractual* indemnity claim."  *Queregan v. New Castle Cty.*, 2006 WL 2522214, at *5 (Del. Ch. Aug. 18, 2006).  Instead, "when a claim for contractual indemnification accrues depends upon the contractual language."  *Branin v. Stein Roe Investment Counsel, LLC*, 2015 WL 4710321, at *4 (Del. Ch. July 31, 2005).

Here, the relevant provision requires FA to "defend or at its option settle" and "indemnify" Yodlee against "any *claim*, suit, or proceeding" it causes *and also* "pay any damages awarded in any such suit or proceeding or settlement thereof."  (MSA § 10.)  The first set of obligations must be performed prior to final resolution.  The indemnification provision is not, as FA argues, limited to liabilities awarded in lawsuits.  (*See* Op. Br. at 10.)  These duties can arise before—or without—a lawsuit.  The Counterclaim alleges that several Risk Insight clients submitted claims to Yodlee after FA cut off access to Risk Insight.  (Counter. ¶¶ 71–72.)  Yodlee notified FA, and "FA refused to indemnify or defend Yodlee."  (*Id*. ¶ 82.)  Yodlee's claim ripened on that refusal.

## II.     YODLEE STATES CLAIMS FOR COMMON LAW AND STATUTORY FRAUD.

FA seeks dismissal of Count 4 arguing that Count 4:  (1) seeks relief for FA's breaches of the Contract; (2) fails to satisfy heightened pleading standards under FED. R. CIV. P. 9(b); and (3)

merely "name-check[s]" the deceptive trade statutes of California and Florida.  These arguments fail.[4]

### A.      Count 4 is not based on a breach of the Contract.

Yodlee seeks relief for both (1) FA's pre-contractual misrepresentations that induced Yodlee to enter the Contract; and (2) FA's subsequent breaches of the Contract.  These are distinct claims:  "a right of action on a contract and for fraud in inducing [a party] to enter into such contract may exist at the same time."  *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *accord Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 274 (Cal. 2004); *ITW Global Inv. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at *6–7 (Del. Super. Ct. June 24, 2015).

None of FA's misrepresentations are "expressly covered by the Contracts," as FA argues. (Op. Br. at 11.)  *First,* Bob Sullivan "represented that the Risk Insight *software* was configurable" (*see* Counter. ¶ 26); FA points to a portion of the Contract requiring the *report the software generated* to be "configurable."  (Counter. Ex. B at 11.)  *Second*, Sullivan said that FA "did not utilize the 'waterfall model'" (*see* Counter. ¶ 27); the provision FA cites says nothing about the waterfall model.  (*See* Counter. Ex. B at 14).  *Third*, Sullivan said that FA could "update its software quickly" and "push out new releases" every two or three weeks (Counter. ¶ 28); FA cites to schedules to "*respond to and resolve Errors*" in the software.  (Counter. Ex. B at 24).  *Fourth*, Sullivan stated that Risk Insight was already—prior to the Contract—*capable* of

---

[4] Without explaining why, FA assumes that Delaware law governs Yodlee's common law fraud claim.  (*See* Mot. at 10–15 (citing only Delaware law).)  This is not so clear.  *See, e.g., Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d  116, 124 (Del. Ch. 2003) (narrow choice of law provision governing only contract claims did not reach "tort claims that are related to the formation of the [contract]," "such as fraud in the inducement").  While one of California, Florida, or Delaware law likely applies, the states agree on each of the points that follow.  For now, Yodlee will cite to cases from all three jurisdictions.

generating the asset reports (Counter. ¶ 29); FA points to the provision that Risk Insight *would in fact, in the future* generate asset reports.  (Counter. Ex. B at 11.)  These misstatements induced Yodlee to enter the Contract.  (Counter. ¶¶ 29, 93–99.)  They are not themselves breaches of the Contract.  *See HTP, Ltd.*, 685 So. 2d at 1239 ("whether [a party] was truthful during the formation of the contract is unrelated to the events giving rise to the breach of the contract"); *ITW Global*, 2015 WL 3970908, at *6–7 (claims alleging "fraudulent inducement occurring *prior* to entering the contract" survive).  At a minimum, discovery and testimony would be necessary to allow a contrary conclusion.

### B.    The allegations satisfy Rule 9(b).

#### 1.    Yodlee alleges the "essential factual background" for each misrepresentation.

Yodlee alleges "the 'who, what, when, where, and how'" for each misrepresentation, as required by *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004):

| False Statement (What) | Who | When | Where | How |
|---|---|---|---|---|
| The Risk Insight software was configurable. (Counter. ¶ 26.) | Sullivan to Mike Burger, Yodlee VP. | June 29, 2016; July 12, 2016<br><br>October 24–25, 2016<br><br>December 8–9, 2016<br><br>January 11–12, 2017 | Teleconferences<br><br>Conference in Boston<br><br>Conference in San Francisco<br><br>FA's offices in Florida | Via phone<br><br>In-person<br><br>In-person<br><br>In-person |
| FA did not use the "waterfall" model. (Counter. ¶ 27.) | Sullivan to Burger. | June 29, 2016; July 12, 2016 | Teleconferences | Via phone |

| False Statement (What) | Who | When | Where | How |
|---|---|---|---|---|
| FA could update its software and push out new releases every two or three weeks. (Counter. ¶ 28.) | Sullivan to Burger. | June 29, 2016; July 12, 2016<br><br>January 11–12, 2017 | Teleconferences<br><br><br>FA's offices in Florida | Via phone<br><br><br>In-person |
| Risk Insight was then able to generate the asset reports that would be provided to lenders. (Counter. ¶ 29.) | Sullivan to Burger. | August 31, 2016<br><br>December 8–9, 2016<br><br>January 11–12, 2017 | Via email<br><br>Conference in San Francisco<br><br>FA's offices in Florida | Via email<br><br>In-person<br><br>In-person |

### 2.    Yodlee alleges falsity and scienter.

FA asserts that Yodlee fails to allege that two of these misrepresentations were actually false.  (Op. Br. at 12.)  This again ignores the pleadings.  As to the first, Yodlee alleges that Sullivan said that Risk Insight "was configurable, meaning that certain calculated values could be implemented in the software without requiring the deployment of additional code" and that Risk Insight in fact was not configurable.  (Counter. ¶¶ 26, 94(e), 95.)  As to the second, Yodlee alleges that Sullivan said that FA could "update its software quickly, every two or three weeks" and that this statement was "false when made," obviously meaning that FA in fact could not then update its software every two or three weeks.  (*Id.* ¶¶ 28, 95.)

Yodlee also adequately pled scienter, which under Rule 9(b) "may be alleged generally." FED. R. CIV. P. 9(b).  The Counterclaim alleges that "FA knew these statements were false when made" (*id.* ¶ 97) and includes "essential factual background."  *Washington*, 368 F.3d at 239. Sullivan is FA's CEO and founder.  (Counter. ¶ 24.)  The obvious inference is that Sullivan

knew—likely better than anyone—that Risk Insight and FA were unable to do the things he said they could do. *See Miller*, 724 F. App'x. at 182 (allegations must be read in "the light most favorable to the plaintiff").[5]

### 3. Yodlee alleges a duty to disclose and affirmative concealment.

"[T]he question in a nondisclosure case is whether the defendant knows of material facts, and also knows that those facts are neither known nor readily accessible to plaintiff." *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 295 (Cal. Ct. App. 2004). The Counterclaim alleges that FA failed to disclose several material facts during negotiations (Counter. ¶¶ 31–32, 100); knew that Yodlee did not know those facts and could not discover them (*id.* ¶¶ 25, 33); and actively concealed them.  (*Id.* ¶ 25.)  These allegations suffice because "even where no duty to disclose would otherwise exist, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated." *Vega*, 121 Cal. App. 4th at 292; *accord Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. Ct. App. 1994) ("[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed."); *Corporate Prop. Assoc. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008) (discussing "the duty to make a full and fair disclosure as to the matters about which [one] assumes to speak").

### 4. Yodlee alleges justifiable reliance.

Yodlee alleges that it "reasonably and justifiably relied on" FA's misrepresentations "in choosing to enter the Contracts."  (Counter. ¶ 99.)  FA believes that the Contract's integration

---

[5]  If more facts are needed to make this point, see FA's own allegations that Sullivan—a software developer with decades of experience in the fintech market—built Risk Insight himself.  (*See, e.g.*, Compl. ¶¶ 33–35.)

clause negates this allegation.  (Op. Br. at 14.)  But without "unambiguous anti-reliance language," an integration clause will not bar a fraudulent inducement claim:

> [Delaware courts] will not give effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements.  In order to bar a claim for fraud based on extra-contractual fraudulent representations, the integration clause must contain language that can be said to add up to a ***clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract***.

*Anvil Holding Corp. v. Iron Acquisition Co., Inc.*, 2013 WL 2249655, at *8 (Del. Ch. May 17, 2013).  The Contract's integration clause (MSA § 12(h)) "does not contain an *explicit anti-reliance expression*" and therefore "cannot preclude [Yodlee] from alleging justifiable reliance in support of its fraud claim."  *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010).

FA also argues that Yodlee cannot show reliance because Yodlee discovered the fraud before the parties amended the Contract.  (Op. Br. at 14–15.)  But the Counterclaim alleges that FA fraudulently induced Yodlee to enter into the *original* Contract (*see* Counter. ¶¶ 23–34)—not the amendment—and FA cites no authority suggesting that a party waives fraud claims related to the formation of a contract by later agreeing to amend it.  (*See* Op. Br. at 14–15.)  Yodlee had invested significantly in Risk Insight, and within a year of signing the Contract, 28 clients had signed up to use it.  (Counter. ¶ 49.)  Yodlee reasonably decided, upon discovering that Risk Insight was not what Sullivan had represented, that the best path forward was to work with FA to improve it.  (*Id.* ¶¶ 43–44.)  This does not absolve FA of the original fraud because "one who has been fraudulently induced into a contract *may elect to stand by that contract **and** sue for damages for the fraud*."  *HTP, Ltd.*, 685 So. 2d at 1239 (citing *Bankers Trust Co. v. Pac. Employers Ins. Co.*, 282 F.2d 106, 109 (9th Cir. 1960)).

14

### 5.     Yodlee adequately alleges damages.

Count 4 does not "simply rehash" Yodlee's damages for breach of contract.  (Op. Br. at

15.)  Whereas Count I seeks damages caused by FA's failure to perform under the Contract—

including indemnification and reduced revenues (Counter. ¶¶ 82–83)—Count 4 seeks to recover

the "lost business opportunity and profits" Yodlee would have enjoyed by "enter[ing] into a

license Contract *with another firm* to build and market a credit product."  (*Id.* ¶¶ 101–102.)

These are distinct harms.  *See HTP, Ltd.*, 685 So. 2d at 1239 ("[A]n action on a contract is not

inconsistent with *an action for damages for the deceit*.").

FA also is wrong about punitive damages and fees.  Punitive damages are available

where fraud forms the basis of a claim under both the California and the Florida statutes.  *See,

e.g.*, *Marcelos v. Dominguez*, 2008 WL 2788173, at *11 (N.D. Cal. July 18, 2008) ("Plaintiff *is*

correct, however, in that his properly-pled claims for fraud, aiding and abetting fraud, and

violation of Section 17200 do allow for punitive damages.") (citing Cal. Civ. Code § 3294

(authorizing punitive damages in non-contract actions involving fraud));  *Rollins, Inc. v. Heller*,

454 So. 2d 580, 586 (Fla. Ct. App. 1984) (noting "award of punitive damages based upon a

violation of FDUTPA" is proper if based in fraud); *Bert Smith Oldsmobile, Inc. v. Franklin*, 400

So. 2d 1235, 1237 (Fla. Ct. App. 1981) (affirming jury's award of punitive damages for

FDUTPA violation involving fraud).  The Florida statute also allows for attorneys' fees.  *See*

Fla. Stat. Ann. § 501.2105.

### C.     Yodlee states claims under California and Florida statutory law.

FA's challenge to Yodlee's California and Florida statutory claims is thin.  (*See* Op. Br.

at 16.)  Both statutes reach fraud.  *See* Cal. Bus. & Prof. Code § 17200 ("unfair competition

shall mean . . . fraudulent business act"); *State Farm Mut. Ins. Co. v. Performance Orthopaedics

& Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1328 (S.D. Fla. 2017) (collecting FDUTPA fraud

cases).  Facts sufficient to sustain a claim for common law fraud (*see* Part II(A)–(B) above) sustain claims under the statutes, and corporations can sue under both statutes.  *See* CAL. BUS. PROF. CODE §§ 17201, 17204 ("person who has suffered injury in fact" can sue, and "person" includes "corporations"); FLA. STAT. ANN. § 501.203 ("consumer" includes "business," "firm," "corporation," and "any corporate entity").  FA knows this, of course:  it has brought its own claims under both of these statutes in this lawsuit.  (*See* Compl. ¶¶ 280–85; 291–96.)

## III.    YODLEE AND ENVESTNET STATE CLAIMS FOR DEFAMATION.

FA argues that Count 3 should be dismissed because: (1) the defamatory statement was non-actionable opinion; (2) the fair report privilege protects the statement; and (3) the Counterclaim fails to plead actual malice.  (Op. Br. at 18–20.)  Each argument fails.

### A.    The statement is actionable.

FA's own cases make clear that the sole question for this Court is whether a jury *might* reasonably construe FA's counsel's statement as defamatory.  *See John Doe 2 v. Superior Court*, 1 Cal. App. 5th 1300, 1312 (Cal. Ct. App. 2016).  If so, the claim must go forward.  *Id.*  And while courts do distinguish between statements of fact and statements of opinion, the latter do not enjoy "blanket protection."  *ZL Tech., Inc. v. Does 1-7*, 13 Cal. App. 5th 603, 624 (Cal. Ct. App. 2017).  Even an opinion may be defamatory if it "*implies knowledge of facts* which may lead to a defamatory conclusion."  *Ringler Assoc. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1181 (Cal. Ct. App. 2000).

The Court cannot dismiss Count 2 unless no jury could reasonably conclude that the following states or implies a knowledge of defamatory facts:

> ***Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful.***  We look forward to proving that Envestnet and Yodlee are liable for significant damages to our client, and persuading the court to issue

> a permanent injunction enjoining defendants from further unlawful
> activity.

(*See* Counter. Ex. E.)  This is a statement of fact:  FA's counsel affirmatively states that

Envestnet and Yodlee deliberately stole FA's technology.  He is not summarizing the Complaint,

and he omits "cautionary language" indicating opinion.  *John Doe 2*, 1 Cal. App. 5th at 1314–15

(noting that language like "I think," "apparently," and "my impression is" indicates an opinion).

But even if it is an opinion, it at least "implies knowledge" of defamatory facts.  *Ringler*, 80 Cal.

App. 4th at 1181.  The speaker is a lawyer with a reputation as a litigator.  He has just filed suit

on the issue and knows (or should know) the details of any "deliberate" theft *and* what

constitutes deliberate theft—at least that is implied to the reader.  Dismissal on this issue is

unwarranted at the pleadings stage.

## B.  The fair report privilege would require a premature choice-of-law analysis.

The Court cannot consider FA's fair report privilege argument without first deciding

which state's fair report privilege matters in this case.  FA assumes—without explaning why—

that California law applies to both Yodlee's and Envestnet's defamation claims.  (*See* Op. Br. at

18.)  But Delaware courts follow the Restatement's choice-of-law rules, *see Smith v. Del. State

Univ.*, 47 A.3d 472, 480 (Del. 2012), which apply the "most significant relationship" test in

multistate defamation claims like this one.  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS

§ 150 (1971).  And, as FA itself noted in prior briefing, "a formalistic choice of law analysis . . .

would be highly premature at this preliminary stage" (*see* D.I. 22 at 19) because "the factual

17

record establishing the location of the relevant conduct has not been fully established."[6]

*AgroFresh Inc. v. Essentiv LLC*, 2018 WL 6974947, at *7 (D. Del. Dec. 27, 2018) (cited by FA

at D.I. 22 at 15, 19).  Discovery is needed to determine, among other things, where, how, and to

whom FA's agent made the statement and the states in which each of the several articles

containing the statement was published, and the likely result is that different states' laws govern

these claims.  *See* RESTATEMENT (SECOND) § 150.

While this argument is premature, *see Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495,

517 (D. Del. 2012) (cited by FA at D.I. 22 at 19), both claims would survive anyway.  FA's own

case makes clear that in California, "[a]n attorney may not . . . make defamatory allegations in a

complaint and then report the same alleged facts, *as facts*, to the media with impunity."

*Healthsmart Pac. Inc. v. Kabateck*, 7 Cal. App. 5th 416, 435 (Cal. Ct. App. 2016) (emphasis

original).  And whereas the attorney in *Healthsmart* made clear that he was summarizing the

complaint, *see id.* at 436 (noting attorney said "as we allege in the complaint"), FA's attorney did

not qualify his statement.  (*See* Counter. Ex E.)  Likewise in Illinois—Envestnet's principal place

of business—"[a] person cannot confer the fair report privilege upon himself by making the

original defamatory publication himself and then reporting to other people what he had stated."

*Missner v. Clifford*, 914 N.E.2d 540, 551 (Ill. App. Ct. 2009).  This applies to attorneys who file

defamatory complaints.  *Id.; accord Kurczaba v. Pollock*, 742 N.E.2d 425, 443 (Ill. App. Ct.

2000).

---

[6] Note that FA correctly stated this proposition of law even though it was inapposite in the
context of Defendants' Motion to Dismiss.  There, Defendants did not ask this Court to
undertake an affirmative choice-of-law analysis; they instead argued that FA had not pled a
sufficient nexus to Delaware to state claims under the DUTSA and DDTPA.  (*See* D.I. Nos. 16 at
5–8; 27 at 1–4.)  Courts grant motions to dismiss on that basis all the time.  (*See* D.I. 27 at 4.)
By contrast, FA here asks the Court to dismiss based on an issue—the scope of the fair report
privilege—that first requires an affirmative choice-of-law analysis.  Thus, while Defendants'
argument was correct, FA's present argument is premature.

**C.   Neither Yodlee nor Envestnet is an all-purpose public figure.  In any event, the Counterclaim alleges actual malice.**

FA argues that Yodlee and Envestnet are all-purpose public figures (Op. Br. at 19–20), meaning they "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes."  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265 (9th Cir. 2013).  FA's own case shows that this is absurd.  In *Resolute Forest Products, Inc. v. Greenpeace International,* the court held that a "controversial logging company" was not an all-purpose public figure in light of the Ninth Circuit's holding in *Makaeff* that **Trump University** did not meet this bar.  302 F. Supp. 3d 1005, 1016–17 (N.D. Cal. 2017).  Here as in *Resolute Forest*, "[i]t is difficult to see how [Yodlee or Envestnet], however large or influential, could be an all-purpose public figure when *Trump University . . . was not*."[7]  *Id.*

The Counterclaim alleges actual malice anyway.  FA intentionally "provoked adverse publication in the trade press" (Counter. ¶ 73) as part of its scheme "to destroy Yodlee's relations with its clients and investors."  (*Id.* ¶ 6.)  The Counterclaims alleges that FA first filed a frivolous suit baselessly accusing Yodlee and Envestnet of stealing its technology—an accusation it knew was false, given that "FA did not permit Yodlee to review source code or the so-called 'relevancy engine.'"  (*Id.* ¶ 25.)  Then, two weeks later, "kn[owing] how damaging this fabrication was for a firm like Yodlee that depended on its reputation for nurturing young fintech companies," FA "defamed Yodlee and Envestnet in the trade press" by statements that "*were false and demonstrated a reckless disregard for the truth*" (*id.* ¶ 90) and intended to damage Yodlee's and Envestnet's reputations.  (*Id.* ¶ 92.)  "The plausible inference from th[ese]

---

[7] FA does not argue that Yodlee and Envestnet are limited-purpose public figures.  That issue therefore is waived.  *D'Aiuto v. City of Jersey City*, 2007 WL 2306791, at *4 n.1 (D.N.J. Aug. 8, 2007) ("It is improper for the moving party to 'shift gears' and introduce new . . . or different legal arguments in the reply brief than those that were presented in the moving papers.") (collecting cases).

allegations" is that FA "acted with malice," not that it merely "made a mistake." *Resolute Forest Prods.*, 302 F. Supp. 3d at 1019.

## IV.   YODLEE STATES A CLAIM FOR BREACH OF THE IMPLIED COVENANT.

Count 2 alleges that "FA violated the implied covenant of good faith and fair dealing by threatening to terminate the Contracts unless Yodlee paid the unsubstantiated amount demanded by FA then abruptly shutting off services to clients."  (Counter. ¶ 87; *see also* ¶¶ 63–67.)  FA argues that the Contract "speaks directly" to this issue and thus moots the claim (*see* Op. Br. at 20), but the Contract does not address FA threatening to shut Risk Insight down if Yodlee refused to pay unsubstantiated invoices.  FA owed an implied duty to exercise its exclusive control over Risk Insight in good faith, and it breached that duty "by taking advantage of [that] position" in an effort to extort Yodlee for payments it could not or would not justify.  *CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021, at *16 (Del. Ch. June 23, 2015).  Count 2 states a viable claim.

<u>**CONCLUSION**</u>

For all the reasons stated herein, FA's motion to dismiss Defendants' Counterclaims must be denied.

20

Of Counsel:                             Respectfully submitted,

Gary M. Miller                          */s/ Henry E. Gallagher, Jr.*
Gary M. Elden                           Henry E. Gallagher, Jr. (#495)
Benjamin E. Sedrish                     Ryan P. Newell (#4744)
Ian M. Hansen                           Lauren P. DeLuca (#6024)
SHOOK, HARDY & BACON L.L.P.             CONNOLLY GALLAGHER LLP
111 South Wacker Drive, Suite 4700      1201 North Market Street
Chicago, IL 60606                       20th Floor
Tel: (312) 704-7700                     Wilmington, DE 19801
gmiller@shb.com                         Tel: (302) 757-7300
gelden@shb.com                          hgallagher@connollygallagher.com
bsedrish@shb.com                        rnewell@connollygallagher.com
ihansen@shb.com                         ldeluca@connollygallagher.com

Dated:  February 3, 2020                ***Attorneys for Envestnet, Inc. and Yodlee, Inc.***