## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FINANCIALAPPS, LLC,                    )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        Civil Action No. 19-1337-CFC-CJB
                                       )
ENVESTNET, INC. and YODLEE, INC.,      )
                                       )
                    Defendants.        )

## REPORT AND RECOMMENDATION

Plaintiff FinancialApps, LLC ("Plaintiff" or "FinApps") filed this action against

Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee" and collectively with

Envestnet, "Defendants") asserting 14 counts, including claims for misappropriation of trade

secrets, fraud, tortious interference with prospective business opportunities, unfair competition,

copyright infringement, violation of state deceptive trade practices statutes, breach of contract,

breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  (D.I. 2)

Presently pending before the Court is Defendants' partial motion to dismiss Counts II-X and

Count XIV of Plaintiff's Complaint, filed pursuant to Federal Rule of Civil Procedure 12(b)(6)

(the "Motion").  (D.I. 15)  For the reasons set forth below, the Court recommends that the

District Court GRANT-IN-PART and DENY-IN-PART the Motion.

## I.      BACKGROUND

### A.      Factual Background

Plaintiff is a Florida limited liability company with its principal place of business in Fort

Lauderdale, Florida.  (D.I. 2 at ¶ 22)  Founded in 2014, Plaintiff is a software development

company in the financial technology ("FinTech") space—a technological area in which

consumers can access financial services digitally.  (*Id.* at ¶¶ 1-2, 31)  Defendant Envestnet is a

Delaware corporation with its principal place of business in Chicago, Illinois. (*Id.* at ¶ 23) Envestnet provides wealth management software solutions to financial advisors and financial institutions. (*Id.* at ¶¶ 1, 69) Defendant Yodlee is a Delaware corporation with its principal place of business in Redwood City, California. (*Id.* at ¶ 24) Yodlee provides consumer financial data aggregation services. (*Id.* at ¶¶ 1, 70) Yodlee has been a wholly-owned subsidiary of Envestnet since 2015. (*Id.*)

By early 2016, Plaintiff had created a software platform (referred to in the Complaint as the "Platform") that was capable of analyzing vast amounts of consumer financial data in real time; the Platform was also able to generate credit risk reports for underwriters to use in making decisions on loan issuances and extensions of credit. (*Id.* at ¶¶ 4, 35) Beginning in 2015, Defendants sought to create similar consumer credit risk software that would use Yodlee's large repository of aggregated data. (*Id.* at ¶¶ 5, 71) The parties began discussions in 2016 regarding the formation of a long-term strategic partnership, which would include Yodlee licensing Plaintiff's software and technology for use in a new application called "Risk Insight." (*Id.* at ¶¶ 6, 75-76) In exchange for Plaintiff's supplying its software, technology and technical knowledge, Yodlee would: (1) supply its raw aggregated financial data and (2) provide a team of experienced, trained employees to market and sell Risk Insight. (*Id.* at ¶ 75)

On January 31, 2017, Plaintiff and Yodlee executed a Software License and Master Services Agreement ("MSA") and other related agreements. (*Id.* at ¶¶ 7, 83 & exs. 1-3) Plaintiff had put into place several specific measures to protect the secrecy of its proprietary technology and trade secrets, and therefore insisted that the MSA include confidentiality provisions, exclusivity obligations and other restrictive covenants related to the use of thereof. (*Id.* at ¶¶ 8-9, 90)

Plaintiff alleges, however, that Yodlee never had any intention of working with Plaintiff to grow Risk Insight.  (*Id*. at ¶ 7)  Instead, it alleges that Yodlee was solely interested in entering into a licensing agreement in order to gain access to, and misappropriate, Plaintiff's technology—all so that Defendants could develop their own competing application.  (*Id.* at ¶¶ 7, 77, 82)  In this way, Yodlee is alleged to have intentionally misled Plaintiff to convince it to enter the MSA.  (*Id.*)  According to Plaintiff, Yodlee's misrepresentations caused Plaintiff to lose out on other lucrative business and licensing opportunities available to it at the time.  (*Id.* at ¶¶ 83-84)  Plaintiff further alleges that Yodlee:  (1) misused access to critical components of the Risk Insight Platform, so that those components could be incorporated into a competing platform that Yodlee was secretly developing; and (2) sought to obscure Plaintiff's involvement with Risk Insight from clients, in order to be able to later transition those clients to its new secret platform. (*Id.* at ¶¶ 10-13, 98-99, 120)

As for Envestnet, Plaintiff alleges that it too is using Yodlee's competing platform (including the proprietary information and trade secrets stolen from Plaintiff, i.e., the Platform) to develop credit risk software applications for its clients.  (*Id.* at ¶ 156)  Plaintiff alleges that Envestnet made multiple offers to purchase FinApps' proprietary technology because it wanted to eliminate the possibility of future liability for Defendants' misappropriation of that technology.  (*Id.* at ¶¶ 18-19, 160-61)  After Yodlee's competing platform was nearly complete, Envestnet no longer attempted to purchase FinApps' intellectual property; instead, it began to incorporate software from Yodlee's platform into Envestnet's Credit Exchange product.  (*Id.* at ¶¶ 19, 163)

In early 2019, with over two years remaining in the term of the parties' agreement, Plaintiff alleges that Defendants withdrew resources and employees from the Risk Insight

product.  (*Id.* at ¶¶ 20, 164-65)  According to Plaintiff, by this point Defendants had successfully misappropriated Plaintiff's proprietary information and trade secrets.  (*Id.* at ¶¶ 20, 173)  In addition to Yodlee's misappropriation, Plaintiff alleges that Yodlee has also refused to pay Plaintiff millions of dollars owed to it pursuant to the parties' contracts.  (*Id.* at ¶ 174)

Further relevant facts related to resolution of the Motion will be set out as needed in Section III.

> **B.    Procedural Background**

Plaintiff filed the Complaint on July 17, 2019.  (D.I. 2)  On September 17, 2019, Defendants filed the instant Motion, seeking dismissal of 10 of Plaintiff's 14 claims.  (D.I. 15)  On October 7, 2019, United States District Judge Colm F. Connolly referred this case to the Court to conduct all proceedings and to hear and determine all motions, pursuant to 28 U.S.C. § 636(b).  (D.I. 18)  Briefing on the Motion was completed thereafter on November 13, 2019.  (D.I. 27)

## II.    STANDARD OF REVIEW

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting all of the complaint's well-pleaded facts as true, but disregarding any legal conclusions.  *Id.* at 210-11.  Second, the court determines whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In assessing the plausibility of a claim, the court

must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III.   DISCUSSION

Defendants make two primary arguments for dismissal of certain of Plaintiff's claims.[1] First, Defendants assert that Plaintiff's Delaware statutory claims for misappropriation of trade secrets against both Defendants (Count II) and for deceptive trade practices against Yodlee (Count VII) must be dismissed, because Plaintiff does not allege a sufficient nexus between the parties' dispute and Delaware. (D.I. 16 at 2, 5-7) Second, Defendants argue that Plaintiff's claims in Counts III-V, VII-X and XIV are preempted under the Federal Copyright Act, 17 U.S.C. § 301 (the "Copyright Act") and/or the Uniform Trade Secrets Act ("UTSA"). (*Id.* at 2, 8-17)[2] The Court will take up these arguments in turn.

---

[1]       In addition to these two arguments, in their opening brief Defendants further sought dismissal of Plaintiff's claim for copyright infringement against both Defendants (Count VI of the Complaint) on the grounds that Plaintiff failed to allege that it had successfully registered its purported copyrights. (D.I. 16 at 2, 4-5) Plaintiff did not expressly respond to this argument, (*see* D.I. 22 at 3 n.2; D.I. 27 at 1), but did request that dismissal be without prejudice to Plaintiff's right to amend and re-plead this count, (D.I. 22 at 3 n.2). Therefore, the Court recommends that Defendants' Motion be GRANTED without prejudice with respect to Count VI.

[2]       Thus, certain of Defendants' points regarding this second argument (i.e., the preemption argument) necessarily contemplate that there is a claim for copyright infringement in the case. As noted above, *see supra* n.1, the Court is recommending the dismissal of the copyright infringement claim in Count VI without prejudice. Despite this, the Court will below address Defendants' arguments regarding copyright-related preemption issues. It does so partly for sake of completeness, as it is possible that there will be an objection to the Court's recommendation of dismissal of Count VI. It also does so because, as a practical matter, it appears likely that Plaintiff will later amend its pleading to re-add a copyright claim in a similar form to the claim in Count VI, (D.I. 22 at 3 n.2); in that event, the Court's decision would also provide helpful guidance for the parties in the future.

A.      **Plaintiff's Delaware Statutory Claims (Counts II and VII)**

The first dispute here, which relates to Count II (alleging a violation of the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, *et seq.*, or "DUTSA") and Count VII (alleging a violation of the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2531, *et seq.*), relates to a choice of law issue.  In a case implicating diversity jurisdiction, like this one, this Court follows the choice of law rules of the state of Delaware.  *Carrick v. Zurich-Am. Ins. Grp.*, 14 F.3d 907, 909 (3d Cir. 1994); *Hurley v. Columbia Cas. Co.*, 976 F. Supp. 268, 271-72 (D. Del. 1997).  If a contractually-designated choice of law provision exists, Delaware courts will generally honor that provision, so long as the jurisdiction selected bears some material relationship to the transaction.[3]  *VSI Sales, LLC v. Int'l Fidelity Ins. Co.*, Civil Action No. 15-507-GMS, 2015 WL 5568623, at *2 (D. Del. Sept. 22, 2015); *J.S. Alberici Const. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000).  Otherwise, Delaware courts would apply the "most significant relationship" test to determine which state's law should apply to tort claims like these.  *VSI Sales*, 2015 WL 5568623 at *2 (citing cases); *see also AgroFresh Inc. v. Essentiv LLC*, Civil Action No. 16-662-MN-SRF, 2018 WL 6974947, at *7 (D. Del. Dec. 27, 2018).

---

[3]      Pursuant to Delaware statutory law, the parties to a contract (so long as they are subject to jurisdiction of the courts of Delaware and may be served with legal process) may agree in writing that the agreement "shall be governed by or construed under the laws of" Delaware, without regard to conflict of laws principles, or that Delaware law should govern, in whole or in part, their rights; this decision "shall conclusively be presumed to be a significant, material and reasonable relationship" with Delaware to be enforced, whether or not there are other relationships with Delaware.  Del. Code tit. 6, § 2708(a) ("Section 2708"); *see also Anschutz Corp. v. Brown Robin Capital, LLC*, C.A. No. 2019-0710-JRS, 2020 WL 3096744, at *7 (Del. Ch. June 11, 2020) (Section 2708 "requires courts to presume that, where parties have chosen Delaware law in their contract, the transaction memorialized in the contract has a material relationship with" Delaware).

Here, the MSA does have a choice of law provision, and it is that provision that gives rise to the parties' dispute.[4]  Section 12(c) of the MSA provides that:

> *This Agreement will be governed by and construed under the laws of the State of Delaware without regard to its rules concerning conflicts of laws.*  Jurisdiction and venue for any lawsuit or proceeding arising out of or related to this Agreement, its subject matter and/or any other dispute whatsoever between the parties shall lie exclusively within the federal and state courts located in Delaware.

(D.I. 2, ex. 1 at 18 (emphasis added))  But this provision says only that "[t]his Agreement" will be governed by and construed under the laws of Delaware.  Does that mean that Delaware law applies to claims like those in Count II and Count VII, which are not claims alleging a breach of the MSA, but are nevertheless claims that bear a relationship to the MSA (in that they relate to purported trade secrets that Defendants had access to due to the execution of the MSA, and because they relate to purportedly deceptive trade practices that Defendants engaged in leading up to, and as a consequence of, the execution of the MSA)?  (D.I. 2 at ¶¶ 222-40, 275-79)  As the parties' arguments make clear, there are two lines of authority in Delaware state caselaw with respect to this issue.  (D.I. 16 at 7-8; D.I. 22 at 17 & n.17; D.I. 27 at 2-3)

On the one hand, there are those cases in which Delaware courts have held that choice of law provisions similar to this one encompass not only claims for a breach of the contract in which the provision is found, but also tort claims that have some connection to that contract.  For example, in *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006),

---

[4]       Because one of the MSA's signatories is a Delaware corporation (Yodlee), this choice of law provision would be enforceable, as Yodlee's incorporation in Delaware would demonstrate that Delaware had some substantial relationship to the transaction.  *See Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162, 166-67 (3d Cir. 2011).  The question here, however, as is further explained below, is whether the choice of law provision actually applies to the claims at issue.

the parties to the contract were Delaware entities, and the agreement at issue stated that it "shall be governed by, and construed in accordance with the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law." *Id.* at 1046. The *Abry* Court rejected the buyer's assertion that another state's law governed its claims, finding that Delaware bore a material relationship to the transaction where the entities "chose the law of the state each had looked to in choosing their juridical home and whose law they wished to have govern their entities." *Id.* at 1046-47; *see also id.* at 1049-50. And the court also rejected the buyer's contention that while the parties meant for Delaware law to govern any *contract claims* between them, they did not intend for Delaware law to apply to related *tort claims* alleging that false contractual representations were made. *Id.* at 1047-48; *see also id.* at 1047 n.22 (quoting *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032-33 (Del. Ch. 2005) for the proposition that the "'text [of an agreement] should not be interpreted in a crabbed way that creates a commercially senseless bifurcation between pure contract claims and other claims that arise solely because of the nature of the relations between the parties created by contract'"). The *Abry* Court found that to hold that the parties' choice of Delaware law was "only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid." *Id.* at 1048. Other Delaware courts have thereafter applied *Abry*'s reasoning in a similar manner. *See Anschutz Corp. v. Brown Robin Capital*, C.A. No. 2019-0710-JRS, 2020 WL 3096744, at *7-8 & nn.106, 113 (Del. Ch. June 11, 2020) (finding that a choice of law provision stating that the agreement "shall be exclusively construed and interpreted" according to Delaware law also applied to the plaintiff's extra-contractual claims, including fraud claims, as such claims were "entangled" with the operative contract's allocation

of risk, and also noting that this approach "has been endorsed consistently" by Delaware state

courts) (internal quotation marks and citations omitted); *AT&T Wireless Servs., Inc. v. Fed. Ins.*

*Co.*, C.A. No. 03C-12-232 WCC, 2007 WL 1849056, at *6 (Del. Super. Ct. June 25, 2007) ("The

Delaware Courts have moved toward applying only one state law to contract and tort disputes

that arise out of the same contractual relationship and that are controlled by the terms and

conditions of that contract.").

　　　　But on the other hand, there is an alternate strain of Delaware state caselaw on this issue,

as this Court recognized in *VSI Sales, LLC v. International Fidelity Insurance Co.*, Civil Action

No. 15-507-GMS, 2015 WL 5568623 (D. Del. Sept. 22, 2015).  In *VSI Sales*, this Court

described the *Abry* Court's approach as one reasoning that "the law chosen to apply to contract

claims should also apply to related tort claims" regardless of "whether the choice-of-law

provision [at issue] was narrow or broad[.]"  2015 WL 5568623, at *3 n.5.  The *VSI Sales* Court,

however, noted that other Delaware state court decisions had instead examined (rightly, in its

view) whether a contractual choice of law provision applied to particular claims by assessing

"whether the contracting parties drafted the provision broadly or narrowly."  *Id.* at *3.  It noted

that these decisions held that choice of law provisions that explicitly apply to "any claim arising

out of or relating to" a contract are "broad" enough to cover quasi-contract and tort claims

arising from the contractual agreement—but that "narrow" choice of law provisions that do not

include such expansive language apply only to claims arising directly from the contract itself.

*Id.* (citing *Huffington v. T.C. Grp., LLC*, C.A. No. N11C-01-030 JRJ CCLD, 2012 WL 1415930,

at *11 (Del. Super. Ct. Apr. 18, 2012); *Eby v. Thompson*, No. Civ.A. 03C-10-010THG, 2005 WL

1653988, at *3 (Del. Super. Ct. Apr. 20, 2005); *Gloucester Holding Corp. v. U.S. Tape & Sticky*

*Prods., LLC*, 832 A.2d 116, 124 (Del. Ch. 2003)); *see also Lorem Vascular, Pty. Ltd. v. Cytori*

*Therapeutics, Inc.*, Case No.: 18cv815 MMA (MDD), 2018 WL 3388096, at *8 (S.D. Cal. July 11, 2018).  Here, the choice of law provision in the MSA is surely a "narrow" one, in that on its face, it notes only that "[t]his Agreement" will be governed by and construed under the law of Delaware—not that any matters "arising out of or relating to the Agreement" will be governed by Delaware law.[5]

In *Underhill Investment Corp. v. Fixed Income Discount Advisory Co.*, 319 F. App'x 137 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit examined the effect of a similarly "narrow" choice of law provision pursuant to Delaware law.  There, the provision in question stated that the agreement was "governed by and . . . construed in accordance with the laws of the State of Delaware."  *Id.* at 139 (citation omitted).  The *Underhill* Court reached three conclusions.  First, it concluded that "by its express terms, the [agreement] limit[ed] the choice-of-law provision to claims arising from '[t]his Agreement.'"  *Id.* at 141 (certain alterations in original).  Second, it reasoned that the Supreme Court of Delaware would conclude that this choice of law provision applied to a pure contract claim arising under the agreement, but that it would not apply to the "quasi-contract" claims that were at issue in the case (quantum meruit and promissory estoppel claims).  *Id.* & n.3; *see also id.* at 138, 139-40.  Third, the *Underhill* Court reasoned that the Supreme Court of Delaware would then "proceed directly to 'the most significant relationship test'" to determine which state's law would apply to those non-contract claims.  *Id.* at 141 (citation omitted).  Although *Underhill* is a non-precedential opinion, in light

---

[5]      This is only underscored by the fact that the choice of law provision is much narrower than the forum selection clause provision found in the next sentence of the MSA, as the latter states that jurisdiction or venue for any lawsuit or proceeding "arising out of or related to" the Agreement would be found in Delaware courts.  (D.I. 2, ex. 1 at 18)  The parties knew how to craft language that would broadly apply to any claims "arising out of or related to" the MSA, but did not do so with respect to the choice of law provision.  (D.I. 16 at 7-8; D.I. 27 at 3)

of the Third Circuit's clear guidance on this issue provided therein, the Court concludes that it should follow the *VSI Sales* line of caselaw.  *See Naturalock Sols., LLC v. Baxter Healthcare Corp.*, No. 14-cv-10113, 2016 WL 5792377, at *4 (N.D. Ill. Oct. 4, 2016) (citing *Underhill*). Thus, the choice of law provision in the MSA would not apply to Plaintiff's non-contract claims.

That said, as was noted in *Underhill*, the next step would be to apply the "most significant relationship" test to determine which state's law should apply to the claims in Count II and Count VII.  *VSI Sales*, 2015 WL 5568623 at *2; *see also AgroFresh Inc.*, 2018 WL 6974947, at *7.  As even Defendants acknowledge, application of this test involves a multi-factor analysis, which would consider:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the parties' relationship is centered.  (D.I. 16 at 5 (citing *Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 987 (Del. 2013)))  Here, in light of Defendants' status as Delaware corporations, that inquiry would not be entirely one-sided.  Faced with such a scenario at the pleading stage, many courts choose to defer this "most significant relationship" test analysis until later in the case, when a more complete factual record has been developed.  *See, e.g.*, *AgroFresh Inc.*, 2018 WL 6974947, at *7 & n.6 (citing cases); *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 517 (D. Del. 2012).  The Court concludes that this is the right path here, as the relevant inputs for this test are not fully flushed out in the parties' briefing.  It therefore recommends that Defendants' Motion be denied with respect to Counts II and VII on this ground, and that Defendants be permitted to re-raise this issue later in the proceeding.

**B.      Preemption (Counts III-V, VII-X and XIV)**

Defendants next argue that Plaintiff's claims for fraud (Count III), tortious interference with prospective business opportunities (Count IV), unfair competition (Count V), violations of Delaware, Florida, Illinois and California deceptive trade practices statutes (Counts VII-X), and unjust enrichment (Count XIV) should be dismissed because they are preempted by the Copyright Act and by the UTSA.  (D.I. 16 at 8-17; D.I. 27 at 4-10)[6]  The Court will first set out the applicable legal standards with respect to the Copyright Act and the UTSA, and will then assess the claims at issue.

### 1.    Legal Standard with Respect to Preemption

#### a.    Copyright Act

The Copyright Act grants a copyright owner the exclusive rights to reproduce, prepare derivative works based upon, distribute, perform and display the copyrighted material at issue. 17 U.S.C. § 106 ("Section 106").  Section 301 of the Copyright Act provides that a state law claim is expressly preempted where the elements of the claim are the same as those required for a copyright infringement claim under Section 106.  17 U.S.C. § 301(a); *see also CollegeSource, Inc. v. AcademyOne, Inc.*, 597 F. App'x 116, 128 (3d Cir. 2015).  Courts apply a two-part test to determine whether Section 301 preempts a state law claim.  First, a court must determine whether the work at issue is protected by the copyright laws; second, it must assess whether the right claimed is equivalent to one of the exclusive rights protected by Section 106.  *See Peirson v. Clemens, Inc.*, No. Civ.A.03-1145 JJF, 2005 WL 681309, at *2 (D. Del. Mar. 23, 2005); *see*

---

[6]    Preemption is an affirmative defense, *see Big Squid, Inc. v. Domo, Inc.*, Case No. 2:19-cv-193, 2019 WL 3555509, at *14 (D. Utah Aug. 5, 2019), and a Court may determine that a claim should be dismissed in light of an affirmative defense at the pleading stage when the well-pleaded factual allegations in a complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense, *see Juju, Inc v. Native Media, LLC*, Civil Action No. 19-402-CFC, 2020 WL 3208800, at *5 n.2 (D. Del. June 15, 2020) (citing cases).

*also, e.g.*, *Bath Auth., LLC v. Anzzi LLC*, CIVIL ACTION NO. 18-00834, 2018 WL 5112889, at *6 (E.D. Pa. Oct. 19, 2018).

The parties focus on the second prong of the two-part test here.  (*See* D.I. 16 at 9; D.I. 22 at 7)  With respect to this second prong, courts apply a "functional test" (known as the "extra element test") to determine whether a state cause of action requires an extra element (beyond mere copying, preparation of derivative works, distribution, performance or display) that renders the state case of action qualitatively different from (and thus not preempted by) a copyright infringement claim.  *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 217-18 (3d Cir. 2002); *Raucci v. Candy & Toy Factory*, 145 F. Supp. 3d 440, 452 (E.D. Pa. 2015).

### b.     UTSA

The UTSA, which is a model statute that has been adopted by the majority of states (such as Delaware, via the DUTSA, at issue in Count II) "provides civil remedies for the misappropriation of trade secrets."  *See, e.g.*, *Truinject Corp. v. Nestle Skin Health, S.A.*, C.A. No. 19-592-LPS-JLH, 2020 WL 70981, at *7 (D. Del. Jan. 7, 2020), *report and recommendation adopted*, 2020 WL 1270916 (D. Del. Mar. 17, 2020); *see also Bruhn Newtech, Inc. v. United States*, 129 Fed. Cl. 656, 671 (Fed. Cl. 2016).  The UTSA/DUTSA preempts state law claims that are "grounded in the same facts which purportedly support" companion trade secret misappropriation claims.  *Accenture Global Servs. GMBH v. Guidewire Software Inc.*, 631 F. Supp. 2d 504, 508 (D. Del. 2009) (internal quotation marks and citations omitted); *see also, e.g.*, *Digital Spectrum Sols. v. Eastman Kodak Co.*, Case No. SACV 07-00729-JVS (RNBx), 2008 WL 11340373, at *3 (C.D. Cal. Feb. 14, 2008).  "[I]f the success of the common law claim does not depend on the success of the trade secrets claim, that is, if a plaintiff need not prove all the

facts underlying the trade secrets claim in order to prove the common law claim, then the common law claim is not grounded in the same facts and is not preempted." *Accenture*, 631 F. Supp. 2d at 508 (internal quotation marks and citation omitted).

### 2.   Analysis

#### a.   Fraud (Count III)

The gravamen of Plaintiff's fraud claim is that Yodlee made a series of false representations to Plaintiff, wherein Yodlee stated that it wished to enter into a long-term strategic partnership with Plaintiff to grow the Risk Insight application into a multibillion dollar project[7]—and that Yodlee did so for the "sole purpose of gaining access to and stealing FinApp's proprietary software and trade secrets." (D.I. 2 at ¶¶ 241-45) Plaintiff further alleges that had it not been for these misrepresentations, it would have not entered into partnership with Yodlee and would have pursued other licensing and business opportunities. (*Id.* at ¶ 247) Defendants argue that Plaintiff's fraud claim is preempted because "the alleged fraud has to do with entering a contract to exploit copyrighted material" (here, alleged to be the "overall Platform and each of its individual components") and trade-secret protected material (here, alleged to be the "Platform and its individual components"). (D.I. 27 at 7 (emphasis and quotation omitted); D.I. 2 at ¶¶ 209, 270; *see also* D.I. 16 at 11)

---

[7]      More specifically, these alleged misrepresentations included Yodlee's pre-MSA misrepresentations that:  (1) it wanted to enter a long-term strategic partnership with Plaintiff; (2) it would actively market and sell Risk Insight; (3) it would dedicate an appropriate and experienced sales team to promote Risk Insight; and (4) it would invest in growing Risk Insight, and seek other growth opportunities in the marketplace. (D.I. 2 at ¶ 243) And they included Yodlee's post-MSA representations that:  (1) provided false future revenue projections to Plaintiff about Risk Insight; (2) falsely reiterated its commitment to a long-term partnership. (*Id.* at ¶¶ 250-51)

With regard to Copyright Act preemption, as a general matter, courts have explained that a fraud claim is typically not preempted by that Act.  This is because in order to plead a fraud claim, a plaintiff necessarily must allege the element that the defendant made a misrepresentation that induced the plaintiff's reliance and that caused damages not attributable to copyright infringement.  *See, e.g.*, *Tanksley v. Daniels*, 259 F. Supp. 3d 271, 300 n.11 (E.D. Pa. 2017).  However, a fraud claim can be "disguised as a copyright infringement claim if the sole basis of the fraud claim is that a defendant represented materials as his own."  *Id.* (internal quotation marks and citation omitted); *see also, e.g.*, *Envoy Techs., Inc. v. Northrop Grumman Co.*, Civil Action No. 19-13976 (FLW), 2020 WL 2079376, at *8 (D.N.J. Apr. 30, 2020) ("Plaintiff's fraud and [copyright] infringement claims are both based on Defendant's alleged unauthorized continued use of a licensed product, and thus, the cause of action for fraud is preempted.").

Here, Plaintiff's fraud claim is not merely a disguised copyright claim.  (D.I. 22 at 8-9) Instead, Plaintiff's claim relies upon specific false misrepresentations that Yodlee made about, *inter alia*, the nature of its planned partnership with Plaintiff regarding Risk Insight.  *See supra* n.7.  These purported misrepresentations are not the equivalent of assertions that Defendants wrongly "represented copyright materials as [their] own," nor are they acts that otherwise amount to copyright infringement.  Thus, these allegations sufficiently distinguish Count III from Plaintiff's copyright claim in Count VI.  *See Tanksley*, 259 F. Supp. 3d at 300 n.11 (finding that plaintiff's fraud claim was not preempted by plaintiff's claim under the Copyright Act, where the plaintiff alleged that the defendant made a statement to him at an event that was a misrepresentation, as this constituted an "extra element" absent from the copyright infringement claim); *see also, e.g.*, *McNeese Photography, L.L.C. v. Access Midstream Partners, L.P.*, No. CIV-14-0503-HE, 2014 WL 3919575, at *4 (W.D. Okla. Aug. 11, 2014) (rejecting the

15

defendant's argument that plaintiff's fraud claims, like its copyright claims, were directed to the defendant's use of plaintiff's photographs without plaintiff's permission, where the fraud claims arguably arose out of the defendant's "affirmative false statements to [the plaintiff] *and* use of the photographs when requested not to do so") (internal quotation marks and citation omitted) (emphasis in original); *Bean v. McDougal Littell*, 538 F. Supp. 2d 1196, 1200 (D. Ariz. 2008) (concluding that a fraud claim was not preempted by the Copyright Act because intentional misrepresentation of one's intent to perform a contract at the time the contract is formed is a sufficient "extra element which distinguishes the nature of [plaintiff's] fraud action from a copyright claim").

As for UTSA preemption, Defendants argue that Plaintiff's fraud claim is preempted because under the UTSA, "misrepresentation" is an improper means of obtaining trade secrets. (D.I. 16 at 11-12; D.I. 27 at 7); *see, e.g.*, *Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp. 2d 426, 434 (D. Del. 2005). Plaintiff's DUTSA claim in Count II alleges that: (1) based on, *inter alia*, Yodlee's misrepresentations concerning Yodlee's purported intention to enter into a long-term strategic partnership with Plaintiff, and Yodlee's misrepresentations that it required understanding of Plaintiff's trade secrets in order to better sell the Risk Insight platform to customers, (2) Yodlee gained unfettered access to Plaintiff's technology, which it has improperly misused and stolen to develop a competing application. (D.I. 2 at ¶¶ 230-35)[8]

While certain of the alleged fraudulent misrepresentations cited in Count III do seem to mirror some of the content of Count II's trade secret misappropriation claim, (*see id*. at ¶¶ 230, 243), at a minimum, other of the alleged misrepresentations referenced in Count III are not so

---

[8]     Count II also alleges that Envestnet improperly misused and stole Plaintiff's proprietary information and trade secrets, which it is using to further develop software tools. (D.I. 2 at ¶ 236)

duplicative, as they concern post-MSA false statements made about Yodlee's intention to further grow the Risk Insight Platform and to continue to maintain a long-term partnership with Plaintiff, (*id.* at ¶¶ 250-51).  Under these circumstances, the Court cannot say that Plaintiff's fraud claim is entirely preempted by the UTSA.  *Cf. OOO-RM Invest v. Net Element Int'l, Inc.*, CASE NO. 14-20903-CIV-ALTONAGA/O'Sullivan, 2014 WL 12613283, at *10 (S.D. Fla. Nov. 3, 2014) (finding that a fraud claim was not preempted by the UTSA where "the allegations of misappropriation do not alone comprise the underlying wrongs" in the fraud claim as the fraud claim was "based on statements and representations made . . . prior to the parties entering the Oral Agreement"); *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla. 2005) (holding that a fraud claim was not entirely dependent upon a claim brought pursuant to the Florida Uniform Trade Secrets Act, where the fraud claim also contained unique allegations "that the [counterclaim defendant] intentionally induced the [counterclaim plaintiffs] to abstain from contracting with other business entities with respect to the system").

For these reasons, the Court recommends that Defendants' Motion be denied on this ground as to Count III.

### b.    Tortious Interference with Prospective Business Opportunities (Count IV)

Plaintiff's claim for tortious interference with prospective business opportunities alleges that Defendants intentionally and improperly interfered with Plaintiff's prospective business opportunities in the market by usurping certain opportunities from Plaintiff.  Among the four listed examples of this conduct in Count IV are the following:  (1) Defendants secretly worked with Equifax (while improperly "cutting out" Plaintiff) to develop an alternative platform to Risk Insight using Plaintiff's proprietary information; (2) Defendants secretly entered into agreements

with numerous third parties to deliver the alternative platform; (3) Defendants secretly worked together to develop their competing platform for Envestnet's wealth management clients; and (4) Defendants withheld from several Risk Insight clients (10 of whom are listed in the claim) the truth regarding Plaintiff's suspension of Yodlee's services with respect to the Risk Insight Platform, and failed to direct these clients to Plaintiff (who could have reconnected them to the Platform).  (D.I. 2 at ¶ 262; *see also id.* at ¶¶ 202-06)

Defendants argue that this claim is preempted by the Copyright Act and UTSA because the first three of these four allegations essentially amount to allegations that Defendants copied, created and sold copyrightable technology and stole and misused trade secrets.  (D.I. 27 at 8; *see also* D.I. 16 at 12-13)  And with respect to the fourth allegation (that Yodlee failed to direct Risk Insight clients to Plaintiff, who could have minimized their service interruption), Defendants assert that this does not constitute a claim because "Yodlee cannot be liable in tort for not directing *its own clients* to its failed former licensor."  (D.I. 27 at 8 (emphasis in original))

Defendants' arguments as to the first three allegations appear well-founded, for the reasons set out by Defendants.  But the Court does not agree that the fourth allegation fails to make out a claim for tortious interference with prospective business opportunities.  Thus, on this basis, the claim should survive.

With regard to that fourth allegation, Plaintiff's Complaint alleges that the clients at issue were "*Risk Insight* clients" and that these clients would still be using the platform that Plaintiff created had it not been for Defendants' improper interference.  (D.I. 2 at ¶¶ 206, 262 (emphasis added))  In other words, the allegation seems to be that these clients represented not just a business opportunity for Defendants, but also for Plaintiff—such that if the Risk Insight partnership did not flounder, Plaintiff would have had a reasonable probability of maintaining a

business relationship with these companies (in the present and in the future).  And Defendants

are said to have taken actions that interfered with Plaintiff's ability to maintain such business

opportunities going forward.  This all seems like a viable allegation of the claim—an allegation

that is not preempted by the Copyright Act or the UTSA, (D.I. 22 at 10-11), as Defendants seem

to concede, (D.I. 16 at 12-13; D.I. 27 at 8).  *See Pelfrey v. Mahaffy*, Case No.: 17-cv-80920-

MIDDLEBROOKS/Brannon, 2018 WL 3110797, at *6 (S.D. Fla. Feb. 7, 2018) (finding that

defendant's tortious interference with prospective business relationship counterclaim was not

preempted by the UTSA, where the claim included allegations that the plaintiff engaged in

deception by holding himself out to be the owner of the technology at issue in order to interfere

with the owner's ability to sell the technology).

  For this reason, the Court recommends that Defendants' Motion on this ground be denied

as to Count IV.

    **c.**  **Unfair Competition (Count V) and Deceptive Trade Practices Statutes (Counts VII-X)**

  Defendants argue that Plaintiff's claims for unfair competition and claims under the

deceptive trade practices statutes of Delaware, Florida, Illinois and California are preempted by

the Copyright Act and UTSA.  (D.I. 16 at 13-16; D.I. 27 at 8-10)  The Court will first address

Counts V, VII, VIII and X, and will then address Plaintiff's claim against Envestnet for violation

of the Illinois Deceptive Trade Practices Act (Count IX).

  Counts V, VII, VIII and X are based on the same set of allegations, which include 10

bullet points describing various acts allegedly taken by Defendants.  (D.I. 22 at 11-12; *see also*

D.I. 2 at ¶¶ 267, 278, 283, 294)  These claims should survive at this stage, as at least five of these

10 bullet points describe conduct that does not appear to be preempted by the Copyright Act or

the UTSA, because the essence of those bullet points is not that Defendants stole copyrighted

material or misappropriated trade secrets.

For example, Defendants do not even challenge the content of the following four bullet

points on preemption grounds, (D.I. 16 at 14-15; D.I. 27 at 9):

> • "Failing to pay FinApps what it was owed under the Contracts in a timely manner, allowing Yodlee to develop its competing technology[.]";

> • "Failing to assign adequate resources and staff to market and sell Risk Insight, and removing such resources once Yodlee had successfully stolen FinApps' proprietary information and technology[.]";

> • "Seeking to keep FinApps' involvement with the Risk Insight platform as obscured as possible -- by, among other things, requiring FinApps' personnel to use only *Yodlee* email addresses when communicating with Risk Insight clients, and prohibiting FinApps' personnel from disclosing any affiliation with FinApps when interacting with clients -- so that Yodlee could exert total control over business relationships with Risk Insight clients[.]";

> • "Withholding from Risk Insight clients, including Bank of America, Morgan Stanley, First Republic Bank, PNC Bank, Avant, Fannie Mae, Freddie Mac, FormFree, Equifax, and CoreLogic, the truth about FinApps' suspension of Yodlee's services, and failing to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform."[9]

(D.I. 2 at ¶¶ 267, 278, 283, 294 (emphasis in original))  A fifth bullet point alleges that

Defendants referred to "Risk Insight as a 'legacy' product to Yodlee's clients, notwithstanding

that over two years remained in the term of their agreement with FinApps[.]"  (*Id.*)  Defendants

challenge this allegation on the grounds that it involves "reverse passing off," (D.I. 16 at 15; D.I.

---

[9]       This fourth bullet point was also discussed in Section III.B.ii.b., as it is also included in Plaintiff's allegations in Count IV.

27 at 9), which occurs when a party misrepresents another's goods or services as its own. *Nicassio v. Viacom Int'l, Inc.*, 309 F. Supp. 3d 381, 397 (W.D. Pa. 2018) (citing cases). Claims based on alleged reverse passing off are preempted when the goods at issue are copyrightable, as they are essentially a claim for unauthorized use of copyrightable material. *Id.* However, the Court does not agree that this conduct clearly amounts to reverse passing off (i.e., that it clearly conveys that the Platform, utilized in Risk Insight, was owned by Defendants). Considering the facts in the light most favorable to Plaintiff, it is plausible to read this reference to a "legacy product" as simply a signal to customers that Risk Insight was an older product (and not as a necessary claim to ownership of the Platform utilized therein). *See, e.g.*, *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, 1:17-cv-444-RP, 2017 WL 5588190, at *1 n.1 (W.D. Tex. Nov. 20, 2017); *Lary v. Boston Sci. Corp.*, No. 11-CV-23820-O'SULLIVAN, 2014 WL 7152769, at *7 (S.D. Fla. Dec. 15, 2014).

For these reasons, the Court concludes that Plaintiff's unfair competition claims and claims under the deceptive trade practices statutes of Delaware, Florida and California are not preempted by the Copyright Act and UTSA. *See, e.g.*, *XPO Logistics, Inc. v. Best Dedicated Sols., LLC*, No. 17 C 1946, 2017 WL 4150779, at *3 (N.D. Ill. Sept. 18, 2017) (determining that the part of a claim seeking to hold the defendant liable for raiding its workforce to unfairly compete with plaintiff, based not on the misappropriation of confidential information but on the solicitation of plaintiff's customers, was not preempted by the UTSA); *Rudolph v. Yari Film Grp. Releasing*, Civil Action No. 06-cv-1511 (DMC), 2007 WL 674708, at *4 (D.N.J. Feb. 23, 2007) (holding that an unfair competition claim was not preempted by federal copyright law, where the claim asserted the right to be free from direct competition with another's use of one's own work, which was an extra element from a copyright claim).

With respect to Count IX, Plaintiff alleges that Envestnet has violated the Illinois Deceptive Trade Practices Act by doing the following two things:  (1) stealing, and aiding and abetting in Yodlee's theft of Plaintiff's proprietary software and trade secrets and (2) secretly working with Yodlee to use its competing platform and the information stolen from Plaintiff to develop products.  (D.I. 2 at ¶ 289)  Defendants' opening brief asserted that this claim is preempted by the Copyright Act and the UTSA, and Defendants made this argument in a separate section of their brief from their arguments about why Counts V, VII, VIII and X should be dismissed.  (D.I. 16 at 15-16 (asserting that, as to Count IX, these allegations of stealing and misappropriating information (and using it to develop products) mirrored Plaintiff's allegations of copyright infringement and violations of the UTSA))  Plaintiff did not respond substantively with respect to Count IX in its answering brief.  (D.I. 22 at 11-12 (discussing the alleged violations of Delaware, Florida and California's deceptive trade practices statutes, but not Illinois' statute))  The Court thus concludes that this claim has been abandoned by Plaintiff.  *See Baldonado v. Avrinmeritor, Inc.*, Civil Action No. 13-833-SLR-CJB, 2014 WL 2116112, at *7 (D. Del. May 20, 2014).  To the extent it was not, the Court agrees with Defendants that (for the reasons they articulated) the claim is preempted.

For the above reasons, the Court recommends that Defendants' Motion on this ground be denied in the manner set out above with respect to Counts V, VII, VIII and X, but granted with prejudice with respect to Count IX.

### d.   Unjust Enrichment (Count XIV)

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (internal quotation

marks and citation omitted).  Plaintiff's unjust enrichment claim in Count XIV alleges that

Defendants have been unjustly enriched in three forms:  (1) "by stealing and misappropriating

FinApps' proprietary software and trade secrets[,]" as Defendants thus received the benefit of

Plaintiff's investment into the development of its proprietary software and trade secrets; (2) by

Yodlee's "unearned credibility with new and existing customers, which would have been

directed to FinApps but for Yodlee's concealment of FinApps' identity from Risk Insight

customers and obscurement of FinApps' involvement with the Risk Insight platform" and (3) by

Yodlee's retention of large sums of money that belongs to Plaintiff, as a result of its failure to

make all required payments owed to Plaintiff under the contracts between them.  (D.I. 2 at ¶¶

333-35)

In Defendants' opening brief, their argument that Plaintiff's unjust enrichment claim is

preempted by the Copyright Act and UTSA solely referenced the first form of alleged

enrichment set out above.  (D.I. 16 at 17 (citing D.I. 2 at ¶ 333))  Defendants did not mention or

cite to the other two forms of alleged enrichment referenced in the Count.  (*Id.*)  For that reason,

they have forfeited the argument that reference to these two alleged forms of enrichment are not

sufficient to state a claim.[10]

---

[10]    Defendants do address these other two forms of alleged enrichment in their reply
brief.  (D.I. 27 at 10)  However, because these arguments could have and should have been
raised in the opening brief, they have been waived.  *See, e.g.*, *TriDiNetworks Ltd. v. Signify N.
Am. Corp.*, Civil Action No. 19-1063-CFC-CJB, 2020 WL 2839224, at *4 n.6 (D. Del. June 1,
2020).

Even were the Court to reach the merits with respect to these two forms of alleged
enrichment, Defendants' reply brief offers a preemption argument only as to the first of the
two—that relating to Yodlee's alleged concealment of Plaintiff's identity from Yodlee's
customers.  (D.I. 27 at 10)  There Defendants argue that the allegation is preempted by the
Copyright Act.  (*Id.*)  However, courts have found that unjust enrichment claims based on
concealment of information like this are not preempted by the Act.  *See, e.g.*, *Life After Hate,
Inc. v. Free Radicals Project, Inc.*, No. 18 C 6967, 2020 WL 1903956, at *4 (N.D. Ill. Apr. 16,

And in responding to this portion of Defendants' brief, Plaintiff points only to the latter two forms of alleged enrichment, in arguing that this claim is not preempted. (D.I. 22 at 13-14) Thus, Plaintiff appears to (rightly) concede that an allegation premised on the first form of alleged enrichment would be preempted. *See Brantley v. Epic Games, Inc.*, Case No. 8:19-cv-594-PWG, 2020 WL 2794016, at *8 (D. Md. May 29, 2020) (holding that an unjust enrichment claim alleging that the defendant has been unjustly enriched by selling a misappropriation of the Running Man dance was preempted by the Copyright Act).

For these reasons, the Court recommends that Defendants' Motion on this ground as to Count XIV be denied (to the extent the Count is premised on the two alleged forms of unjust enrichment that Defendants did not sufficiently challenge here).

## IV.   CONCLUSION

For the reasons set out above, the Court recommends that Defendants' Motion be: (1) GRANTED without prejudice with respect to Plaintiff's copyright claim in Count VI; (2) DENIED with respect to Defendants' argument that Counts II and VII must be dismissed at this stage because they lack a sufficient connection to Delaware; (3) DENIED in the manner set out above with respect to Counts III-V, VII-VIII, X and XIV; and (4) GRANTED with prejudice with respect to Count IX.[11]

---

2020) (finding that an unjust enrichment claim was "not entirely preempted because it also relies on the allegation that [the plaintiff] concealed the fact that Picciolini was no longer associated with the organization" which "is qualitatively different from conduct regulated by federal copyright law"). Thus, the Court recommends denial of Defendants' arguments as to these two forms of alleged enrichment on the merits as well.

[11]     While the Court has recommended denial of the motion to dismiss as to certain claims because there appears to be a basis on which those claims would not be preempted, Defendants could re-raise a preemption argument in the future if discovery as to the claims suggests a different outcome. *See Accenture*, 631 F. Supp. 2d at 508-09 (denying a motion to dismiss, as the Court could not declare at that stage that a tortious interference claim was

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: July 6, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

preempted by the DUTSA, but suggesting that the facts could further develop in discovery, such that if once the claim was fully flushed out the claim *did* appear to be grounded in the same facts as the DUTSA claim, then preemption as to the claim would be appropriate).