## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINANCIALAPPS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1337-CFC-CJB |
| | ) | |
| ENVESTNET, INC. and YODLEE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff FinancialApps, LLC ("Plaintiff" or "FinApps") filed this action against Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee" and collectively with Envestnet, "Defendants") asserting various federal and state law causes of action. (D.I. 2) Presently pending before the Court is Plaintiff's Motion to Dismiss Defendants' Counterclaims, filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 46) For the reasons set forth below, the Court recommends that the District Court GRANT-IN-PART and DENY-IN-PART Plaintiff's Motion.

## I.    BACKGROUND

The Court assumes familiarity herein with its July 6, 2020 Report and Recommendation ("July 6, 2020 R&R"), in which, *inter alia*, it described the general nature of the instant suit. (D.I. 109 at 1-4) Below, it will include additional factual and procedural background that is particularly relevant to the instant Motion.

In January 2017, Yodlee entered into the Master Services Agreement (the "MSA")[1] with FinApps that is at issue in this case. (D.I. 21 at ¶ 34) It alleges it did so in reliance on FinApps'

---

[1]    The MSA is attached to FinApps' Complaint as Exhibit 1. (D.I. 2, ex. 1) When citing to this document below, the Court will simply cite to the "MSA."

representations that FinApps' Risk Insight software was configurable, utilized modern software models, was capable of updates every two to three weeks and could generate asset reports. (*Id.* at ¶¶ 3, 26-29, 47)[2]  However, Yodlee thereafter learned that the Risk Insight product was not close to being ready to launch, that its design could not be adapted easily to client demands, that FinApps stored customer financial data in a manner that put the information at risk and that FinApps required weeks of lead time to address even minor problems. (*Id.* at ¶¶ 2-4, 29-32, 43, 46-48)  This led to substantial problems and client complaints. (*Id.* at ¶¶ 5, 60)  In an April 3, 2019 letter to FinApps, Yodlee described the various significant technical issues with the Risk Insight software; Yodlee also explained that it was going to pause marketing of Risk Insight (though it would commit to servicing existing clients) and asked FinApps, in the meantime, to solve these various technical issues. (*Id.* at ¶¶ 5, 60-62 & ex. D)

Defendants allege that after FinApps realized that Yodlee might terminate the contract between them, FinApps demanded over $1.6 million for unspecified work dating back to the beginning of the parties' relationship. (*Id.* at ¶¶ 5, 63)  However, FinApps provided "no backup information [regarding these invoices], including information tying the invoices to specific work." (*Id.* at ¶ 63)  FinApps then allegedly sought to destroy Yodlee's relations with its clients and investors, as it suspended access to Risk Insight suddenly on June 11, 2019 without providing advance notice or offering substitute products to those clients. (*Id.* at ¶¶ 6, 66)  On June 12, 2019, Yodlee sent FinApps a letter terminating the MSA and its related SOW #1 and

---

[2]       The parties also executed a Statement of Work #1 ("SOW #1") along with the MSA that established service levels, workflow and payment terms with respect to Risk Insight. (D.I. 21 at ¶ 35 & ex. B)  The SOW #1 set forth a 12-month term that would automatically renew in the absence of 90 days' notice of termination. (*Id.*)  The parties then negotiated an amendment to the MSA effective January 31, 2018 which added Statement of Work #3 ("SOW #3"). (*Id.* at ¶ 42 & ex. C)

SOW #3 (together, the "Contracts") because FinApps had not remedied the above-referenced technical issues and because FinApps had suddenly suspended Risk Insight.  (*Id.* at ¶¶ 35, 42, 69-71)  Yodlee alleges that as a result of FinApps' conduct, many clients of Risk Insight have stopped using Yodlee's products and have requested reimbursement from Yodlee.  (*Id.* at ¶ 72)

On July 17, 2019, FinApps filed the instant litigation.  (D.I. 2; D.I. 21 at ¶ 73)  Soon after, FinApps allegedly defamed Defendants in the trade press in various ways.  (D.I. 21 at ¶¶ 74-76)

On October 30, 2019, Defendants filed four counterclaims (the "Counterclaims").  (D.I. 21)  These include Yodlee's claim for breach of contract (Count One), Yodlee's claim for breach of the implied covenant of good faith and fair dealing (Count Two), both Defendants' claims for defamation (Count Three) and Yodlee's claim for fraud (Count Four).  (*Id.*)[3]

In response, FinApps filed the instant Motion, seeking dismissal of all four Counterclaims.  (D.I. 46)  Briefing on the Motion was completed by February 28, 2020.  (D.I. 77)

Further relevant facts related to resolution of the Motion will be set out as needed in Section III.

## II.    STANDARD OF REVIEW

The Court incorporates by reference its summary of the standard of review for motions to dismiss set out in the July 6, 2020 R&R.  (D.I. 109 at 4-5)

## III.    DISCUSSION

---

[3]    In lieu of filing an answer to Plaintiff's Complaint, Defendants filed a motion to dismiss 10 of Plaintiff's 14 counts.  (D.I. 15)  In the July 6, 2020 R&R, the Court recommended that Defendants' motion to dismiss be granted-in-part and denied-in-part.  (D.I. 109)

As noted above, FinApps seeks dismissal of each of Defendants' four Counterclaims. The Court will consider the Counterclaims in the order they were addressed by FinApps in its briefing.

### A.    Yodlee's Breach of Contract Counterclaim (Count One)

In Count One, Yodlee alleges breach of contract.  (D.I. 21 at ¶¶ 77-83)  To sufficiently set out this claim pursuant to Delaware law, a party must plead facts plausibly showing:  (1) the existence of the contract; (2) the breach of an obligation imposed by that contract; and (3) resultant damage to it.  *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007); *VLIW Tech., LLC. v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).[4]

FinApps challenges the sufficiency of Count One on three grounds.  The Court addresses each of those grounds below.

### 1.    Whether the Counterclaim Alleges that Yodlee Breached the Contracts

FinApps first asserts that Yodlee's allegations expressly admit three types of material breaches of the Contracts *by Yodlee*, which if true would preclude Yodlee from asserting this breach of contract claim *against FinApps*.  (D.I. 47 at 6-7; D.I. 77 at 1-2); *College Health & Inv., L.P. v. Diamondhead Casino Corp.*, C.A. No. N15C-01-119 WCC, 2015 WL 5138093, at *3 (Del. Super. Ct. July 2, 2015) ("It is also well settled in contract law that a party who first commits a material breach of a contract cannot enforce the contract going forward.") (internal quotation marks and citations omitted).

---

[4]    The MSA contains a provision establishing that it "will be governed and construed under the laws of the State of Delaware[.]"  (MSA at § 12(c))  The parties agree that Delaware law applies to Yodlee's breach of contract counterclaim.  (*See* D.I. 47 at 6; D.I. 73 at 9)

As an initial matter, FinApps argues that Yodlee admits to a breach of the MSA's "Exclusivity" and "Restricted Activities" subsections by pleading that Yodlee developed a product known as "Snapshot" and that one client used this product continuously from 2015 to the present.  (D.I. 47 at 6 & n.3 (citing D.I. 21 at ¶¶ 18-22, 36); D.I. 77 at 2)  The "Exclusivity" provision states that Risk Insight "shall be the only and exclusive Software and or related services used and promoted by Yodlee to Yodlee's Clients and prospective Clients in connection with or related to Yodlee's Risk Insight Product and that offer substantially similar functionality[.]"  (MSA at § 2(c))  And the "Restricted Activities" section provides that "Yodlee shall not build, or engage a third party to build, a competitive product which copies any features, functions, or rules of the Services, Software, or Platform."  (*Id.* at § 6(g))  Yet Yodlee's allegations do not expressly establish breaches of these provisions.  With regard to the "Exclusivity" provision, it only prohibits Yodlee from using and promoting any product, *inter alia*, "in connection with or related to" Risk Insight; the Counterclaims do not allege that Snapshot was a product used or promoted by Yodlee *in connection with or related to* Risk Insight.  (D.I. 73 at 4 & n.2)  And as for the "Restricted Activities" provision, Yodlee alleges that it "built" or developed Snapshot in 2015 (and sold the product in that year)—i.e., years *before* the parties entered into the Contracts.  (D.I. 21 at ¶¶ 21-22)

Next, FinApps suggests that Yodlee admitted that it "pause[d] marketing Risk Insight to new clients until [continuing problems] could be fixed"; it asserts that these allegations establish a breach of the Contracts, because Yodlee also alleged that the "gist of the [MSA] was that Yodlee would market Risk Insight to potential clients[.]"  (*Id.* at ¶¶ 37, 61 (*cited in* D.I. 47 at 7); D.I. 77 at 2)  But as Yodlee rightly counters, FinApps does not point to a specific provision in the Contracts that Yodlee purportedly breached in this way.  (D.I. 73 at 4-5)  Nor does FinApps

explain why any such provision required Yodlee to continue to market Risk Insight "*no matter what* [happens thereafter.]"  (*Id.* (emphasis in original))

Finally, FinApps argues that Yodlee's failure to pay FinApps over $1.6 million in requested fees, referenced in the Counterclaims, establishes a breach of the Contracts.  (D.I. 47 at 7 (citing D.I. 21 at ¶¶ 63-64); D.I. 77 at 2)  But while the Counterclaims do note FinApps' *request for payment* of these monies, they also allege that:  (1) FinApps provided no backup information regarding that request (i.e., information tying FinApps' invoices to specific work done on the project), and (2) Yodlee "told [FinApps] it would pay any money it owed" after receiving confirmatory paperwork indicating that Yodlee actually did owe FinApps this money.  (D.I. 21 at ¶¶ 63-64)  Read in the light most favorable to Yodlee, these sound like allegations that FinApps made an *unfounded and unsupported* request for payment, nothing more.  They do not preclude Yodlee from pursing a breach of contract counterclaim.  (D.I. 73 at 5)

For all of these reasons, this first basis for dismissal of Count One is insufficient.

### 2. Whether the Counterclaim Identifies the Provisions that FinApps Breached and How FinApps Breached Them

Second, FinApps argues that Yodlee fails to allege a sufficient nexus between any specific conduct by FinApps and any specific provisions of the Contracts that were allegedly breached by such conduct.  (D.I. 47 at 7-10; D.I. 77 at 2-4)  Courts applying Delaware law to breach of contract claims have dismissed claims that fail to identify the express contract provision that was breached, and why such a provision was breached.  *Anderson*, 497 F. Supp. 2d at 581; *see also Somersault Snack Co., LLC v. Baptista Bakery, Inc.*, Case No. 19-cv-03131-DMR, 2019 WL 6173168, at *2 (N.D. Cal. Nov. 20, 2019) (assessing a breach of contract claim governed by Delaware law and requiring plaintiff to amend its complaint to:  (1) identify the provisions of the contract that the defendant allegedly breached; and (2) describe how

defendant's actions constitute a breach of those provisions); *Players Network, Inc. v. Comcast Corp.*, No. 2:14-CV-00238-GMN, 2015 WL 427909, at *4 (D. Nev. Feb. 2, 2015) (applying Delaware law and granting a defendant's motion to dismiss a plaintiff's breach of contract claim, where "Plaintiff has failed to identify which obligation(s) of the nine listed in [the contract] was breached").[5]

In response, Defendants' answering brief includes a chart setting out: (1) the contractual provisions purportedly breached by FinApps; and (2) the misconduct that amounts to an alleged breach of these provisions. (D.I. 73 at 5-7) But as FinApps notes, it is the *Counterclaims* that must clearly link FinApps' conduct to purported breaches of the MSA. (D.I. 77 at 2-3) Defendants' chart does identify eight of the MSA's provisions/sets of provisions that were allegedly breached and does identify portions of the Counterclaims that are said to lay out the conduct amounting to breach. (D.I. 73 at 6-7) However, at no point in Count One itself or in the earlier paragraphs of the Counterclaims does Yodlee concisely and cogently: (1) specifically reference the section number of the MSA provision said to be breached; (2) state the portion of that provision that is applicable; and (3) clearly link the allegedly breached contractual provision with a description of the conduct that plausibly establishes a breach of that provision. (D.I. 21)

---

[5]     FinApps additionally argues that Defendants *cannot* plausibly set out breach of contract claims, in light of the fact that after becoming aware of FinApps' purported wrongful conduct, Defendants thereafter entered into new, contractual terms with FinApps in which Defendants agreed to pay "substantially more in fees and revenues shares — without addressing any of the issues they raise as the basis for their counterclaims." (D.I. 77 at 1; *see also* D.I. 47 at 1-2, 5, 8) The Court does not agree that this fact somehow automatically precludes the breach of contract counterclaim. As Yodlee points out, Defendants' Counterclaims allege that Yodlee "dedicated thousands of developer hours to helping" try to make Risk Insight usable in 2017, (D.I. 21 at ¶ 44), and "[t]here is nothing implausible about Yodlee making the best of a bad situation by attempting to remedy the problems with Risk Insight in order to serve clients[,]" (D.I. 73 at 3).

This makes it decidedly unclear, when one reads Count One and the rest of the Counterclaims, as to exactly what contractual provisions are really at issue in the case, and exactly what allegedly wrongful conduct is supposed to be relevant to those provisions.  That is not a good thing.  Indeed, in the Court's view, such confusion fails to provide FinApps with fair notice of the claim against it, and is a viable basis for dismissal of Count One.  *See In re Am. Bus. Fin. Servs., Inc*., 362 B.R. 135, 147 (Bankr. D. Del. 2007); *cf. CareDx, Inc. v. Natera, Inc*., Civil Action No. 19-662-CFC-CJB, 2019 WL 7037799, at *13 (D. Del. Dec. 20, 2019).[6]

### 3.    Whether Yodlee's Contractual Indemnification Claim is Ripe

In Count One, Yodlee's breach of contract counterclaim includes allegations that:  (1) the Contracts "required that [FinApps] indemnify Yodlee for any claim, suit, or proceeding brought against Yodlee to the extent that claim, suit or proceeding is based on a claim that [FinApps'] actions or omissions caused harm to the third party"; (2) multiple Risk Insight clients have demanded repayment for development costs associated with their adoption of Risk Insight; and (3) Yodlee has given FinApps notice of the demands and requested indemnification pursuant to the Contract, but FinApps has refused to indemnify or defend Yodlee.  (D.I. 21 at ¶¶ 81-82; *see also id*. at ¶ 72)  As noted above, these allegations in Count One did not clearly link the alleged misconduct with a specific subsection of the MSA that is said to have been breached, and are deficient on that basis.

Yodlee's brief (though not its Counterclaims) makes clear that this is meant to be an allegation of breach of Section 10 of the MSA.  (D.I. 73 at 9)  Again, that fact should have been

---

[6]    In any future amended pleading, Yodlee should, all together in the same paragraph or consecutive series of paragraphs (ideally paragraphs that are located in the Count itself), state:  (1) what contractual provision has been breached; (2) what portion of that provision is at issue; and (3) what conduct of FinApps is said to give rise to the breach of that provision.

mentioned in the Counterclaims along with these allegations.  But even if it had been, FinApps

contends that this breach allegation should still be subject to dismissal for another reason.  It

cites to Delaware law for the proposition that as a general matter, "decisions about indemnity

should be postponed until the underlying liability has been established[,]" *LaPoint v.*

*Amerisource Bergen Corp.*, 970 A.2d 185, 197 (Del. 2009) (internal quotation marks and citation

omitted) (*cited in* D.I. 77 at 4), and argues that Yodlee does not allege that "any 'claim, suit or

proceeding' has been brought, much less that any damages, costs, or other liabilities have been

'awarded in any such suit or proceeding[,]'" (D.I. 47 at 9-10).

However, the Delaware Supreme Court has also explained that "the question of when a

claim for contractual indemnification accrues depends on the contractual language." *LaPoint*,

970 A.2d at 197.  And in answering FinApps' argument here, Yodlee explained that:  (1) in the

Counterclaims, multiple Risk Insight clients are described as in fact having made demands for

repayment for costs against Yodlee, relating to FinApps' suspension of Risk Insight; and (2) the

particular language of the MSA's Section 10 requires FinApps not only to indemnify Yodlee as

to liabilities awarded in lawsuits, but also to "*defend* . . . any [relevant] *claim*" made against

Yodlee by a third party and indemnify Yodlee as to such a claim.  (D.I. 73 at 9 (citing MSA §

10) (certain emphasis added))  That is a plausible reading of what Section 10's language

requires, and a plausible allegation as to why these third party "demands" triggered such an

indemnification obligation.  So the Court cannot agree that this is a separate basis as to why such

a claim should be dismissed.

### 4.    Conclusion

In sum, the Court recommends that Count One be dismissed due to Yodlee's failure to

clearly link the alleged breaches of certain provisions of the MSA with the conduct said to give

rise to such a breach.  Yodlee can attempt to remedy this failing in an amended pleading.  The other two bases for dismissal cited by FinApps are insufficient to allow for a recommendation of dismissal.

**B.      Yodlee's Fraud Counterclaim (Count Four)**

FinApps next attacks Yodlee's fraud counterclaim, set out in Count Four, on a number of grounds.  For the reasons discussed below, none of these grounds have merit.

**1.      Whether Yodlee's Fraud Counterclaim is a Disguised Breach of Contract Claim**

First, FinApps contends that Yodlee's fraud counterclaim fails because it is merely a disguised breach of contract claim.  (D.I. 47 at 10-11; D.I. 77 at 4-5)  According to FinApps, the misrepresentations at issue in Yodlee's counterclaim are "expressly covered by the Contracts," thus "invalidating [Yodlee's] fraud claim as a matter of law."  (D.I. 47 at 11; *see also* D.I. 77 at 4-5)  Where a claim is based entirely on a breach of a contract and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort.  *ITW Global Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, C.A. No.: N14C-10-236 JRJ CCLD, 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015).[7]  However, a fraud claim and a breach of contract claim may both be pleaded where the fraud claim is based on conduct that is separate and distinct from the conduct constituting breach, such as where the fraud allegations are based on fraudulent *inducement* to enter into the contract.  *Id.*

---

[7]      It is not clear what state's laws apply to Yodlee's fraud counterclaim; Yodlee asserts that either the law of California, Florida or Delaware likely applies.  (D.I. 73 at 10 n.4)  However, the parties agree that the above-cited principle applies no matter what state's law governs the fraud claim.  (*Id.*; D.I. 47 at 10)  And the parties do not suggest that application of one state's law as opposed to another's would impact the remainder of the analysis herein with respect to this claim.  In light of that, in this subsection the Court will simply reference Delaware state caselaw, though it comes to no definitive conclusion about what state's law actually applies to this counterclaim.

For its part, Yodlee retorts that its fraud claim seeks relief solely for FinApps' "pre-contractual misrepresentations that induced Yodlee to enter" into the MSA—while its breach of contract claim seeks relief for FinApps' subsequent breaches of the Contracts.  (D.I. 73 at 10)  Count Four bears this out.  The allegations therein are centered on statements that FinApps' Chief Executive Officer Bob Sullivan made to Yodlee's representatives in 2016, in order to induce Yodlee to sign the MSA.  (D.I. 21 at ¶¶ 94-99; *see also id.* at ¶¶ 26-33)  For example, Yodlee alleges that Mr. Sullivan falsely represented that FinApps did not develop software using the "waterfall model" of development, and was able to release software updates at least every two to three weeks.  (*Id.* at ¶¶ 27-28, 94)  While FinApps asserts that these topics are "expressly covered by the Contracts," (D.I. 47 at 11), the key point here is that these allegations are about allegedly fraudulent representations made *before* the contract was signed, which are said to have *induced* Yodlee to sign that contract.  Regardless of whether there is some or a lot of overlap between the *general subject matter* of these fraudulent inducement allegations and the later-occurring breach of contract allegations, the allegations are legally distinguishable.  *See ITW Global Invs. Inc.*, 2015 WL 3970908, at *6-7; *see also LaPesca Grande Charters, Inc. v. Moran*, 704 So. 2d 710, 713 (Fla. Dist. Ct. App. 1998).

The Court is therefore not persuaded that Yodlee's fraud claim must be dismissed on this ground.

### 2.    Whether Yodlee's Fraud Counterclaim Meets the Pleading Requirements of Rule 9(b)

Next, FinApps argues that Yodlee failed to plead certain required elements of its fraud claim with the specificity required by Federal Rule of Procedure 9(b).  (D.I. 47 at 11-16; D.I. 77 at 5-7)  A fraud claim requires a plaintiff to plead facts sufficiently establishing:  (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the

11

representation was false, or the defendant's reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result. *MarkDutchCo 1 B.V. v. Zeta Interactive Corp.*, 411 F. Supp. 3d 316, 332 (D. Del. 2019).  Rule 9(b) applies to a fraud claim, and it adds a heightened standard for such allegations; a plaintiff must plead a fraud claim with particularity, which means it must set out "the who, what, when, where and how of the events at issue" or otherwise inject precision or some measure of substantiation into its allegations.  *Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, 223 F. Supp. 3d 207, 212 (D. Del. 2016) (internal quotation marks and citation omitted); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

The Court agrees with Yodlee that Yodlee more than sufficiently alleges the "who, what, when, where, and how" for each misrepresentation at issue.  (D.I. 73 at 11-12 (citing D.I. 21 at ¶¶ 26-29))  Indeed, FinApps does not really push back on this point.  (D.I. 77 at 5-6)  Instead, FinApps primarily argues that Yodlee's fraud claim insufficiently pleads the elements of falsity and scienter, affirmative concealment, justifiable reliance and damages.  (*Id.* at 6-7; *see also* D.I. 47 at 12-15)  The Court addresses these allegations in turn below.

With respect to falsity, FinApps argues that Yodlee fails to allege how two specific misrepresentations were false:  (1) FinApps' representation that Risk Insight was configurable; and (2) FinApps' representation that it could update its software and push out new releases every two to three weeks.  (D.I. 47 at 12 (citing D.I. 21 at ¶¶ 26, 28))  But the Counterclaims *do* address the falsity of these statements.  They flatly assert that:  (1) FinApps "failed to disclose that its software was not . . . configurable" (which negatively impacted "development and customization"), (D.I. 21 at ¶ 30; *see also id.* at ¶¶ 26, 94, 96); and (2) after the parties signed the

MSA, FinApps "admitted that it could not push out updates, no matter how small, more frequently than every two months[,]" (*id.* at ¶ 47; *see also id.* at ¶¶ 30, 96).  Moreover, Yodlee's fraud counterclaim relies on additional allegedly false representations that FinApps does not specifically challenge.  (*Id.* at ¶ 94)  Thus, its counterclaim sufficiently pleads false representations made by FinApps.[8]

As for scienter, a fraud defendant's mental state may be alleged generally.  Fed. R. Civ. P. 9(b); *see also Ninespot, Inc. v. Jupai Holdings Ltd.*, Civil Action No. 18-144-RGA, 2018 WL 3626325, at *12 (D. Del. July 30, 2018) (explaining that Rule 9 provides that "the mental state may be alleged generally" and "[a]t this pleading stage, Plaintiff does not have to allege how Puji knew its representations were false, only that Puji made representations to Plaintiff that were factually different than what Puji knew to be true").  The Counterclaims allege that the statements were made by Sullivan, and that FinApps knew that the statements were false when made.  (D.I. 21 at ¶¶ 24, 26-29, 95, 97)  At this stage, nothing more is required as to scienter.[9]

---

[8]    In Delaware, there are three types of fraudulent misrepresentations: (1) false statements represented as truth; (2) active concealment of facts which prevents the other party from discovering them; and (3) silence in the face of a duty to speak.  *Ashland LLC v. Samuel J. Heyman 1981 Continuing Trust for Heyman*, C.A. No. N15C-10-176 CCLD EMD, 2018 WL 3084975, at *7 (Del. Super. Ct. June 21, 2018); *see also, e.g.*, *MKE Holdings Ltd. v. Schwartz*, C.A. No. 2018-0729-SG, 2020 WL 467937, at *10 (Del. Ch. Jan. 29, 2020).  As noted above, FinApps argues that another basis for dismissal is that Yodlee's fraud claim does not allege either an affirmative act of concealment or a duty to disclose.  (D.I. 47 at 13; D.I. 77 at 6) However, to survive a motion to dismiss, only one type of misrepresentation need to be pleaded with particularity.  *See MKE Holdings Ltd.*, 2020 WL 467937, at *11.  Because Yodlee has sufficiently pleaded that FinApps made false statements, the Court need not further address this issue.

[9]    FinApps contends that more *is* required—that a complainant must "plead allegations of scienter with particularity[.]"  (D.I. 47 at 13)  But the case it cites to for support, *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), is a case involving a securities fraud claim brought pursuant to a statute containing a "particularity requirement [that] supersedes Rule 9(b)'s provision allowing state of mind to be averred generally."  368 F.3d at 237.  So that case is not applicable here.

Next, FinApps asserts that Yodlee's fraud claim fails to allege justifiable reliance. Yodlee's counterclaim does assert that Yodlee "reasonably and justifiably relied on [FinApps' false statements] in choosing to enter the Contracts[.]" (*Id.* at ¶ 99)  But FinApps contends that Yodlee nevertheless cannot plausibly plead justifiable reliance here, in light of the fact that:  (1) the MSA has an integration clause in Section 12(h); and (2) the MSA also has an additional disclaimer in Section 9(b) stating that FinApps "MAKES NO REPRESENTATION . . . THAT THE USE OF [Risk Insight] WILL MEET THE BUSINESS REQUIREMENTS OF YODLEE." (D.I. 47 at 14-15; D.I. 77 at 7; MSA at §§ 9(b), 12(h))

The Court is not persuaded.  It is true that where a contract contains an integration clause unambiguously stating that neither party relied upon extra-contractual promises in connection with the transaction, then courts will dismiss fraud claims based on such promises. *Anschutz Corp. v. Brown Robin Capital, LLC*, C.A. No. 2019-0710-JRS, 2020 WL 3096744, at *13 (Del. Ch. June 11, 2020).  However, "the anti-reliance language must be *explicit and comprehensive*, meaning the parties must forthrightly affirm that they are not relying upon any representation or statement of fact not contained [in the contract]." *Id.* (internal quotation marks and citation omitted) (emphasis added).  A standard integration clause, without more, is insufficient to disclaim all reliance on extra-contractual representations. *Id.*

Here, the integration clause at issue is a "standard" one; it states:

> Entire Agreement.  All of the terms and conditions to this Agreement (which is further comprised of the SOW and all documents checked on the SOW) are specified herein and include the terms and conditions contained in any and all attached exhibits. The recitals and attached exhibits are hereby incorporated and made a part of this Agreement.  This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous communications, representations, understandings and agreements among the parties with respect to such subject matter, whether oral

14

> or written.  No other rights are granted hereunder except as
> expressly set forth herein.

(MSA at § 12(h))  FinApps points to nothing therein that would qualify as the type of unambiguous, explicit anti-reliance language necessary to trigger a bar on extra-contractual fraud claims.  (D.I. 47 at 14; D.I. 77 at 7); *Anschutz Corp.*, 2020 WL 3096744, at *14-15 & n.191 (noting that "[w]hile our law does not require 'magic words' to disclaim reliance, when the contract does not actually include a specific acknowledgment by a party that it is only relying on information contained within the four corners of the agreement, that party is not shirking its bargain when it later alleges that it did, in fact, rely on extra-contractual representations" and concluding that an agreement with a "standard integration clause" like that at issue in the MSA's section 12(h) was insufficient to disclaim reliance); *see also REI Holdings, LLC v. LienClear – 0001, LLC*, No. 18-1401 (MN), 2019 WL 3546881, at *5 (D. Del. Aug. 5, 2019) (finding that language in the contract stating that the seller "makes no representations or warranties with respect to the Tax Liens or any other matters" did not constitute an affirmative anti-reliance disclaimer from the buyer, and thus declining to find at the pleading stage that the fraud claim was barred "by a clear, enforceable integration clause"); *MicroStrategy Inc. v. Acacia Research Corp.*, Civil Action No. 5735-VCP, 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010).  Nor can the Court see how the language in Section 9(b) of the MSA (either considered alone, or together with the integration clause) amounts to this type of clear anti-reliance language.  Thus, this argument fails.[10]

---

[10]    FinApps additionally asserts that Yodlee is incapable of alleging justifiable reliance, since it was willing to enter into subsequent contracts without addressing any of the issues that it now raises.  (D.I. 47 at 14-15)  But as Yodlee retorts, its fraud counterclaim alleges that FinApps fraudulently induced Yodlee to enter into the *original* MSA.  (D.I. 73 at 14 (citing D.I. 21 at ¶¶ 23-33))  So FinApps' argument here also falls flat.

Lastly, FinApps asserts that Yodlee's fraud claim fails to adequately plead damages, because the damages Yodlee seeks for fraud are simply a re-hash of the damages it alleges related to breach of contract.  (D.I. 47 at 15 (citing *Cornell Glasgow, LLC v. La Grange Props., LLC*, C.A. No. N11C-05-016 JRS CCLD, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012) ("Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's actions [and] the damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract.") (internal quotation marks and citation omitted)))  But they are not.  (D.I. 73 at 15)  While Yodlee's breach of contract claim seeks damages caused by the "reduced revenues generated by Risk Insight and the [non-indemnified] reimbursements it has paid to clients[,]" (D.I. 21 at ¶¶ 82-83), its fraud claim seeks to recover "all payments made to [FinApps] under the Contracts" as well as the "lost business opportunity and profits" Yodlee would have gained by "enter[ing] into a licensing agreement with another firm to build and market a credit product[,]" (*id.* at ¶¶ 101-02).[11]

For these reasons, Yodlee has well-pleaded the above-challenged elements of its fraud claim.

### 3.    Whether Yodlee's Fraud Counterclaim Sufficiently Pled Statutory Fraud

Finally, FinApps contends that in Count Four Yodlee failed to sufficiently state fraud claims under California and Florida statutory law.  In part, FinApps argues this is so because such claims suffer from the same deficiencies as Yodlee's common law fraud claim.  (D.I. 47 at

---

[11]    This issue may be revisited down the line if it is later demonstrated that Yodlee's damages claims for breach of contract and fraud are identical.  *Cf. Novipax Holdings LLC v. Sealed Air Corp.*, C.A. No.: N17C-03-1682 EMD CCLD, 2017 WL 5713307, at *14 (Del. Super. Ct. Nov. 28, 2017).

16; D.I. 77 at 7-8)  However, as explained above, the Court is not persuaded that Yodlee's common law fraud claim was insufficiently pleaded.  (D.I. 73 at 15-16)  FinApps also suggests (in a single sentence) that these statutory claims should fail because Yodlee has not pled the requisite allegations of "*consumer-facing* misconduct and damages[.]"  (D.I. 47 at 16 (certain emphasis in original))  But the Court is not convinced that Yodlee's allegations fail on this basis, either.  *See, e.g.*, *State Farm Mut. Automobile Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1327 (S.D. Fla. 2017) (explaining that courts have held that misrepresentations regarding invoices may support claims under Fla. Stat. § 501.204 ("FDUTPA" claims)); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (explaining that FDUTPA "applies to private causes of action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction or a single contract"); *see also Gardner v. Safeco Ins. Co. of Am.*, Case No. 14-cv-02024-JCS, 2014 WL 2568895, at *6 (N.D. Cal. June 6, 2014) (rejecting defendant's argument that a claim brought under the California Business & Professions Code section 17200 must relate to the general public and not just the individual plaintiff bringing the action, as unfair competition under the statute "mean[s] and include[s] *any* unlawful, unfair or fraudulent business *act* or practice") (internal quotation marks and citation omitted) (emphasis in original).

### 4.     Conclusion

For all of the reasons set out above, the Court recommends that the Motion be denied with regard to Count Four.

### C.     Defendants' Defamation Counterclaim (Count Three)

Plaintiff next challenges Defendants' defamation counterclaim in Count Three.  The claim relates to statements published on the Internet following the filing of the Complaint in this

action.  (D.I. 21 at ¶¶ 73-76, 88-92)  Specifically, on July 30, 2019, *RIAbiz*, an online journal

about the financial advice business, published an article containing the following statement made

by FinApps' counsel:

> FinancialApps developed brilliant technology which disrupts the
> credit and lending market, allowing financial service companies to
> evaluate credit risk more effectively than ever before . . . .
> *Envestnet and Yodlee have deliberately stolen FinApps'*
> *technology, which is entirely unwarranted and unlawful.* We look
> forward to proving that Envestnet and Yodlee are liable for
> significant damages to our client, and persuading the court to issue
> a permanent injunction enjoining defendants from further unlawful
> activity.

(*Id.*, ex. E (emphasis added); *see also id.* at ¶ 74)  Similar statements by FinApps' counsel were

quoted online in *InvestmentNews* and *StreetInsider.com* on July 30, 2019 and August 1, 2019.

(*Id.* at ¶¶ 75-76 & exs. F-G)

FinApps makes three arguments as to why Defendants' defamation claim[12] fails as a

matter of law:  (1) the statement at issue constitutes nonactionable opinion; (2) "fair report" laws

---

[12]     Defendants assert that California law and/or Illinois law applies to Defendants'
defamation counterclaim.  (D.I. 73 at 17-18)  FinApps also cites to California law and Illinois
law in discussing Count Three.  (D.I. 47 at 17; D.I. 77 at 9)  At no point below does the Court
need to definitively determine which state's law would actually apply, since the parties never
suggest that the outcome of the court's analysis turns on a choice-of-law determination.

Defamation under California law is defined as:  (1) a publication that is (2) false, (3)
defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.
*John Doe 2 v. Super. Ct.*, 206 Cal. Rptr. 3d 60, 68 (Cal. Ct. App. 2016) (citation omitted).  The
defamatory statement must specifically refer to or concern the plaintiff.  *Id.*  Under Illinois law, a
plaintiff stating a defamation claim must plead facts demonstrating that:  (1) the defendant made
a false statement regarding the plaintiff; (2) the defendant made an unprivileged publication of
the statement to a third party, and (3) the publication caused damages to the plaintiff.  *Tirio v.
Dalton*, 144 N.E.3d 1261, 1273 (Ill. App. Ct. 2019).  No matter what state's law applies, where
the plaintiff is a public figure, there is an additional constitutional requirement that the defendant
act with actual malice.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

protect the statement at issue; and (3) Defendants failed to adequately allege malice.  (D.I. 47 at 17-19; D.I. 77 at 8-10)  The Court will address these arguments in turn.

### 1.    Actionable Fact vs. Nonactionable Opinion

FinApps first asserts that Count Three should be dismissed because the alleged defamatory statements at issue are merely statements of opinion.  (D.I. 47 at 17-18; D.I. 77 at 8-9)  It is well settled that pure expressions of opinion are protected under the First Amendment, although an opinion may still be defamatory if it implies a knowledge of facts which may lead to a defamatory conclusion.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).  Whether a statement constitutes a nonactionable opinion or actionable fact is a question of law determined by consideration of the language of the statement and the context in which the statement was made from the position of an ordinary reader.  *See John Doe 2 v. Super. Ct.*, 206 Cal. Rptr. 3d 60, 68-70 (Cal. Ct. App. 2016) (explaining that California law applies a totality-of-the-circumstances test to determine whether an allegedly defamatory statement is one of fact or opinion); *see also Haberstroh v Crain Publ'ns, Inc.*, 545 N.E.2d 295, 299-300 (Ill. App. Ct. 1989) (Illinois courts also follow a "totality-of-the-circumstances analysis").  If the court determines that a challenged statement is "reasonably susceptible" of being construed as a provably false assertion of actual fact, the claim must go forward so that the jury can ultimately consider the question.  *John Doe 2*, 206 Cal. Rptr. 3d at 69 (internal quotation marks and citation omitted); *see also Benton v. Little League Baseball, Inc.*, — N.E.3d — , 2020 WL 3542710, at *9 (Ill. App. Ct. June 30, 2020) ("Under what is a restrictive test . . . a defamatory statement is entitled to first amendment protection only if it *cannot* be reasonably interpreted as stating actual fact.").

FinApps, using the *RIAbiz* article as a proxy for all of the alleged defamatory statements at issue, asserts that the article references merely nonactionable opinion. And to be sure, there are aspects of the statement that could lead a factfinder to so conclude. Among those are: (1) the statement was made by FinApps' litigation counsel and it relates to the filing of a Complaint, which in turn contains only *allegations* of wrongdoing; (2) the statement is found in an article that also presents alternative opinions on the merits of FinApps' case and (3) the article characterizes other aspects of the Complaint's allegations with the qualifier "[a]ccording to court papers" or "[t]he suit claims." (D.I. 21, ex. E)[13] But on the other hand, the key language at issue here ("Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful") sure reads as if it is a flat statement of fact, one that is subject to objective verification. And it does not appear that FinApps' counsel *himself* used any qualifiers or cautious language in his own statements, such as "we allege that" or "our impression is." *John Doe 2*, 206 Cal. Rptr. 3d at 70-71 (noting that the use of "cautionary language" in such a statement can help indicate that the statement is one of opinion). In light of this, it would be wrong to dismiss the claim, as it is at least plausible that the statement at issue can be construed as a provably false assertion of actual fact.[14]

---

[13]    *See Dreamstone Entm't Ltd. v. Maysalward Inc.*, No. 2:14-cv-02063-CAS(SSx), 2014 WL 4181026, at *6-8 (C.D. Cal. Aug. 18, 2014) (granting a motion to dismiss a libel per se counterclaim under California law because the statement at issue was nonactionable opinion, where an attorney asserted in a press release that the defendants had "maliciously absconded with my clients' valuable intellectual property and hard earned money[,]" in part because the press release contained "cautionary language" signaling that it contained only "allegations" and because the average reader would expect the "colorful" statement to "relate to a predictably one-sided account of the circumstances giving rise to the litigation"—but also where the press release was issued by the law firm and was published on the firm's website) (internal quotation marks and citation omitted).

[14]    *See Dickinson v. Cosby*, 225 Cal. Rptr. 3d 430, 458-61 (Cal. Ct. App. 2017) (overturning a lower court's grant of a motion to strike under California law regarding a

For these reasons, this first basis for dismissal is not convincing.

### 2.    Fair Report Privilege

FinApps next argues that the "fair report privilege" bars Count Three.  (D.I. 47 at 18; D.I. 77 at 9)  Under California law, this privilege "confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof."  *Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 685 (Cal. Ct. App. 1999).  California law allows an attorney to claim the privilege if he makes a fair and true report to the media about what was alleged in a complaint; however, the attorney may not claim the privilege if he or she reports facts alleged in the complaint to the media *as facts* (i.e., without reference to the complaint).  *See Blatt v. Pambakian*, 432 F. Supp. 3d 1141, 1170-74 (C.D. Cal. 2020); *Healthsmart Pac., Inc. v. Kabateck*, 212 Cal. Rptr. 3d 589, 603-04 (Cal. Ct. App. 2016). Illinois law recognizes a similar fair report privilege.  *See Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 842 (Ill. 2006); *Missner v. Clifford*, 914 N.E.2d 540, 551 (Ill. App. Ct. 2009).

In pushing back against Plaintiff's argument, Defendants first suggest that in order to resolve this issue, the Court might need to determine whether California or Illinois law applies to which claims (and that it would be premature to do so now).  (D.I. 73 at 17-18)  But Defendants then go on to say the outcome of such an analysis would not matter here, as under either state's law, "both claims would survive anyway."  (*Id.* at 18)  If both states' law is similar as to the key

---

defamation claim, and concluding that statements in a demand letter and press release issued by defendant's litigation counsel contained actionable statements of fact, where, *inter alia*, the statements (regarding plaintiff's rape allegations against defendant) were not phrased cautiously in terms of opinion, but instead repeatedly and unconditionally asserted that the allegations were false—and where it was likely that counsel had consulted with his client, who "would certainly know whether or not" plaintiff's allegations were true).

issues, the Court does not understand why a choice-of-law analysis is a necessary precursor to addressing the issue at the pleading stage.

Regardless, the Court concludes that there is at least a plausible basis to believe that the privilege would not attach (under either state's law, which the Court understands to be similar for all material purposes). It is possible that FinApps' counsel's statement could be reasonably read as a simple report about what was in a pleading (in light of the overall nature of the *RIAbiz* article, and its various references to what was alleged in the Complaint). But because the key portion of counsel's statement does not reference the Complaint at all, it might also reasonably be viewed as reporting the facts in that Complaint *as facts*. *See Healthsmart Pac., Inc.*, 212 Cal. Rptr. 3d at 604. A final assessment of this issue should not be made until the dispositive stage of the case.

Thus, the Court does not find this to be a proper basis for dismissal of Count Three.

### 3.    Actual Malice

As was noted above, where the defamation plaintiff is a "public figure," there is an additional constitutional requirement that the defamation defendant act with actual malice. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also supra* note 10.[15] Here, FinApps' final argument is that Count Three must be dismissed because Defendants (i.e., the

---

[15]    Actual malice is required in such a case because public figures enjoy "'significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy'" and because for the most part, they "'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 66 F. Supp. 2d 1117, 1122 (C.D. Cal. 1999) (quoting *Gertz*, 418 U.S. at 344-45).

plaintiffs as to this counterclaim) are public figures and they have failed to plead actual malice. (D.I. 47 at 19-20; D.I. 77 at 9-10)

Even assuming *arguendo* that Defendants are public figures, they have sufficiently pleaded actual malice here. Actual malice exists where the declarant acts with "knowledge that [the statement] was false or with reckless disregard of whether it was false or not" (and that the statement was in fact materially false). *N.Y. Times*, 376 U.S. at 279-80; *see also Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1017-18 (N.D. Cal. 2017). To demonstrate reckless disregard for the truth, the party seeking to show actual malice must show that the speakers entertained serious doubts about the truth of their statements. *Resolute Forest Prods., Inc.*, 302 F. Supp. 3d at 1017-18 (citing *Gertz*, 418 U.S. at 334 n.6).

Here, Defendants alleged that FinApps terminated Risk Insight "[f]or no reason other than harassment[,]" (D.I. 21 at ¶ 6), and that it thereafter filed a meritless suit solely to "destroy Yodlee's relations with its clients and investors[,]" (*id*.). Defendants also alleged that FinApps then made the purportedly defamatory statements at issue (to the effect that Defendants had deliberately stolen Plaintiff's technology), while knowing that those statements were false or in reckless disregard for their truth. (*Id*. at ¶ 90) And Defendants noted that the truth of this allegation can also be reasonably inferred from their claim that FinApps had not even previously permitted Yodlee to review FinApps' source code or the key technology that powered Risk Insight. (*Id*. at ¶ 25; *see also* D.I. 73 at 19) This all sufficiently asserts that FinApps acted with actual malice. *Cf. MacKinnon v. Logitech Inc.*, Case No. 15-CV-05231-TEH, 2016 WL 2897661, at *4 (N.D. Cal. May 18, 2016) (concluding that actual malice was sufficiently pleaded under California law, such that a defamation claim should not be dismissed, because the plaintiff sufficiently alleged that defendants lacked a reasonable ground for their belief in the statement

that plaintiff was terminated for "performance[-]based" issues, in light of plaintiff's allegations

that he had recently been praised by defendants for his performance) (internal quotation marks

and citation omitted).

### 4.    Conclusion

For the reasons set out above, the Court recommends that the Motion be denied as to

Count Three.

### D.    FinApps' Breach of Implied Covenant of Good Faith and Fair Dealing Counterclaim (Count Two)

Yodlee also brings a counterclaim in Count Two for breach of the implied covenant of

good faith and fair dealing against FinApps.  (D.I. 21 at ¶¶ 84-87)  In it, Yodlee claims that

FinApps violated the implied convent when FinApps "threaten[ed] to terminate the Contracts

unless Yodlee paid the unsubstantiated amount [of money] demanded by [FinApps and] then

abruptly shut[] off service to clients."  (*Id.* at ¶¶ 86-87)

Under Delaware law, which the parties agree applies to this claim, the implied covenant

of good faith and fair dealing requires "a party in a contractual relationship to refrain from

arbitrary or unreasonable conduct which has the effect of preventing the other party to the

contract from receiving the fruits[] of the bargain." *Fortis Advisors LLC v. Dialog*

*Semiconductor PLC*, C.A. No. 9522-CB, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015)

(internal quotation marks and citation omitted).  The implied covenant only applies, however,

where a contract lacks specific language governing the issue; where the contract "speaks directly

regarding the issue in dispute" its existing terms control, and implied good faith cannot be used

to circumvent the parties' bargain. *Id.*  FinApps moves to dismiss this claim on the ground that

"both termination of the Contracts, and the amount owed thereunder by Yodlee, are expressly

contemplated in the MSA[.]"  (D.I. 47 at 20)

This argument for dismissal is underdeveloped, having been raised only in a short paragraph in FinApps' opening and reply briefs, respectively. (*Id.*; D.I. 77 at 10) Surely, it is true (as FinApps notes) that the MSA contains provisions dealing with circumstances relating to the termination of the agreement. (D.I. 47 at 20; D.I. 77 at 10) But without more and better argument or citations to relevant caselaw, the Court cannot say that Yodlee's allegations here are wanting. Read in the light most favorable to it, Yodlee's allegations are that the parties would have understood that FinApps could not (even though the Contracts do not specifically address this) "threaten [termination] unless Yodlee paid [] unsubstantiated amount[s] demanded by [FinApps at pains of facing the prospect of FinApps] shutting off service to [Yodlee's] clients." (D.I. 21 at ¶ 87; *see also* D.I. 73 at 20)

Thus, the Court recommends that FinApps' Motion be denied as to Count Two.

## IV. CONCLUSION

For the reasons set out above, the Court recommends that FinApps' Motion be: (1) granted with respect to Yodlee's counterclaim for breach of contract (Count One); (2) denied with respect to Yodlee's counterclaim for fraud (Count Four); (3) denied with respect to Defendants' counterclaim for defamation (Count Three); and (4) denied with respect to Yodlee's counterclaim for breach of the implied covenant of good faith and fair dealing (Count Two).

With respect to Count One, because it is not clear to the Court that allowing the opportunity to amend would be a futile act, because this is the first time the Court has found this claim to be deficiently pleaded, and because leave to amend should be given freely "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court recommends that dismissal of the claim should be without prejudice. It further recommends that Defendants be given leave to file a further

amended pleading addressing the deficiencies outlined above, and that if the District Court affirms its decision herein, that Defendants be given 14 days to file such an amended pleading.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **August 4, 2020** for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated: July 30, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE