IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FINANCIALAPPS, LLC,

                Plaintiff,

      v.

ENVESTNET, INC.
and YODLEE, INC.,

              Defendants.

C.A. No. 19-1337-CFC-CJB

REDACTED - PUBLIC VERSION

**PLAINTIFF FINANCIALAPPS, LLC'S REPLY IN SUPPORT
OF ITS EMERGENCY MOTION TO AMEND THE SCHEDULING
ORDER**

Plaintiff FinancialApps, LLC ("FinApps") hereby submits this reply brief in further support of its motion to amend the Scheduling Order (D.I. 28, as subsequently amended by D.I. 93, 101, and 168) in the above-captioned case.

As set forth in its opening brief,[1] FinApps seeks to move the deadline for opening expert reports from December 22, 2020 to June 11, 2021, so that the expert report deadline postdates the close of fact discovery on March 12, 2021, and so that FinApps' experts have sufficient time to review the significant additional discovery that will result from multiple ongoing discovery disputes between the parties. The amendment FinApps seeks ensures the existence of a complete factual record prior to the submission of expert reports, provides the experts with adequate time to prepare their opinions on a full record, and reduces the possibility of piecemeal or supplemental expert reports resulting from an evolving factual record.

In opposition, Defendants fundamentally disregard the central scheduling problem, proposing that expert reports be due on February 8, 2021, one month *prior to* the close of fact discovery, and thereby denying experts sufficient time to analyze a complete factual record. In support of their proposed schedule, Defendants mischaracterize the factual record, and decline to meaningfully address

---

[1]     Citations to FinApps' opening brief shall appear herein as "Br. ¶ __."
Citations to Defendants' opposition brief shall appear herein as "Opp. Br. ¶ __."

the impact of their discovery failures on the schedule.[2]  This makes no sense.

Defendants should remedy their discovery deficiencies, the factual record should

be closed, and experts should have sufficient time to analyze a complete factual

record before submitting their reports.

### *Access to Development and Operational Systems – Competing Products*

As shown in the opening brief (Br. ¶ 4), the Court's Oct. 8 Order (the

"Oct. 8 Order") obligated Defendants to "facilitate access" to Development and

Operational Systems related to their "Competing Products" – information of

critical importance to FinApps' experts.  As further shown, to date, Defendants

have facilitated no access of any kind to the vast majority of Competing Products

*that they identified* pursuant to the Oct. 8 Order.  (Br.  ¶ 10.)  Finally, as also

shown, expert review of the materials Defendants did produce confirms that they

omit key attachments and files, and/or postdate the relevant timeframe. (Br. ¶ 8.)

Defendants respond to these issues in a single paragraph, falsely claiming

that FinApps has "been unwilling to examine the information and seek additional

information in an incremental fashion."  (Opp. Br. ¶ 16.)  As Defendants have been

---

[2]      Defendants deflect from these issues by invoking their motions for
bifurcation and jury waiver, which are neither before the Court, nor material to the
*pre-trial* scheduling concerns at issue.  FinApps will respond to those arguments in
due course.  The parties mutually request that, to the extent the Court adopts
FinApps' schedule proposal, the Court leave the trial date undetermined pending
resolution of Defendants' trial-related motions.

informed repeatedly, however, FinApps *and* its experts have invested significant time and resources reviewing all of the materials provided to date by Defendants, and have specifically identified numerous deficiencies therein.[3]  (Br. Ex. B.) Moreover, FinApps' request for information *is* incremental, seeking only a specific and significantly lesser subset of the Developmental and Operational Systems identified by Defendants in their Supplemental Disclosures.  (*Compare* Br. Ex. B at 11 to Br. Ex. A.)

Unable to refute these discovery deficiencies substantively, Defendants instead attempt to obscure them, by re-litigating key defined terms that have been settled and agreed to, including before the Court.  For example, Defendants now take issue with "FA's definition of 'Competing Product,'" and "Development and Operational Systems."  (Opp. Br. ¶¶ 11-12.)  But Defendants ignore that on October 16, 2020, the parties submitted a joint letter pursuant to the Court's Oct. 8 Order, in which Defendants *expressly agreed* to the definition of both "Competing Product" and "Development and Operational Systems."  (D.I. 172.)  Defendants also ignore that *they* – not FinApps – identified "all Development and Operational

---

[3]      Defendants do not even respond to the specific problems identified by FinApps (Br. ¶ 8), ignoring, for instance, that many of the records in the Bugzilla and JIRA data they produced are missing critical attachments and screenshots. (Br. Ex. B at 2-3.)  Nor do Defendants address the fact that the Snapshot 2.0 data they provided *post-dates* the relevant timeframe for the development and testing of that product.  (*Id.*; *see also* Br. ¶ 8.)

Systems used in connection with the development, testing, QA/QC, demonstration, and/or production of the 'Competing Products.'"  (Br. ¶ 5; Br. Ex. A at 3-4.)

In any event, the data and information contained in the Development and Operational Systems for Defendants' Competing Products is of crucial importance to this case.  FinApps' experts will require access to such data and information, consistent with the Court's Oct. 8 Order, and sufficient time to review and analyze it before submitting their expert reports.

### Access to Development and Operational Systems – Risk Insight 2.0

As shown (Br. ¶ 12), Defendants represented on August 12, 2020 that the Development and Operational Systems related to Risk Insight 2.0 to which FinApps requested access had been "backed up," and, on August 17, 2020, that "each of the Risk Insight operations servers and other services that interfaced with the Risk Insight AWS environments have been fully preserved and maintained by Yodlee during the pendency of the litigation."  (*Id.*)

Defendants now concede that these statements were materially false when made.  (Opp. Br. ¶ 18.)  Defendants knowingly decommissioned these systems after commencement of this lawsuit (Br. Ex. C), and did so without inquiring whether FinApps would be interested in temporary cost-sharing to facilitate expedited review of these materials, as is standard operating procedure in such scenarios.  Moreover, Defendants should have promptly told FinApps to seek this

4

material from the third-parties in August, when FinApps brought the decommissioning issue to Defendants' attention.  (Br. Ex. D.)  Instead, Defendants waited until November 3, 2020 to inform FinApps that this information was no longer in Yodlee's possession.[4]

Defendants do not even attempt to explain this conduct, or why the delay it has caused fails to justify the scheduling amendment FinApps seeks.  FinApps could have sought these materials from third-parties months ago, and Defendants' attempt to block reasonable scheduling amendments to address delays they manufactured is improper.  Further, FinApps' experts will need sufficient time to review and analyze this information after it is produced.

### *Access to Yodlee's AWS Environments and Related Data*

Defendants also fail to respond to the deficiencies in their AWS production that FinApps specifically identified in its opening brief.  (Br. ¶ 3.)  For example, Defendants have produced no data related to Risk Insight 2.0's "lower" environments (*i.e.*, the UAT, Demo, and Sandbox environments), where FinApps believes significant misconduct occurred.  (Br. ¶ 16.)  Further, the limited AWS data that Defendants did produce is devoid of the critical system and activity logs that are central to FinApps' request.  Defendants do not refute this, and provide no

---

[4]    Defendants' claim that these materials "were never in Yodlee's possession" is directly contradicted by Exhibit C .

evidence that such materials were made available, failing to attach even a single document supporting their claims of discovery compliance.

Instead, Defendants claim that "FA stopped all access to the AWS environment by Yodlee as well as customers of Risk Insight 2.0 by 'sealing the vault.'" (Opp. Br. ¶ 17.)  This is patently false.  As Defendants expressly recognize, the "vault-sealing" to which they refer merely "shut down the operation of the Risk Insight 2.0 product *by [external] customers*."  (*Id.*)  It had no impact on Yodlee's ability to internally access any relevant environments on its own AWS servers.  Indeed, when asked at deposition what access he believed "Yodlee would have to the AWS environment given that FA has sealed the vault," FinApps' President, Bob Sullivan responded under oath, "[f]ull and complete access to the AWS environment.  Sealing the vault has nothing to do with the AWS environment."[5]  (Ex. I (Sullivan Dep. Tr. at 565:3-10).)  And, as with the other materials that Defendants have yet to provide, FinApps' experts will need sufficient time to review and analyze this AWS information after it is made available, and prior to submission of their reports.

---

[5]      Further, Defendants' statement that "Yodlee does not have a 'backdoor' to the AWS system" is inaccurate, because, as Defendants have been informed, Yodlee was provided with the "keys" to the Vault service, and can "unseal the vault" at any time.  (Br. Ex. B at 10.)

*Additional Discovery Deficiencies and Outstanding Depositions*

As shown (Br. ¶¶ 16-19), numerous additional discovery deficiencies also justify the relief sought by FinApps.  Defendants fail to address any of these issues specifically, and their conclusory assertion that "[o]ther perceived 'deficiencies' can be resolved by the end of fact discovery" does not address the problem of expert reports being due two months prior to the end of fact discovery.  Further, Defendants' own purported discovery concerns (Opp. Br. § III) militate in favor of the schedule amendment sought by FinApps.

## CONCLUSION

WHEREFORE, FinApps respectfully requests that the Court grant this Motion and enter FinApps' proposed Amended Scheduling Order.

Dated: December 11, 2020

Redacted: December 21, 2020
*Of Counsel*:

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
Joshua E. Hollander
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com
jhollander@kasowitz.com

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

/s/ *Pilar G. Kraman*

C. Barr Flinn (No. 4092)
Emily V. Burton (No. 5142)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
eburton@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff FinancialApps,
LLC*

27459733

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FINANCIALAPPS, LLC,

                        Plaintiff,

            v.                                        C.A. No. 19-1337-CFC

ENVESTNET, INC.
and YODLEE, INC.,

                        Defendants.

## **WORD COUNT CERTIFICATION**

The undersigned hereby certifies that Plaintiff's Reply Brief in Support of its Emergency Motion to Amend the Scheduling Order contains 1,506 words (exclusive of the title, caption, and signature block) in Times New Roman 14-point font, counted using Microsoft Word's word count feature.

Dated:  December 11, 2020

*Of Counsel*:

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
Joshua E. Hollander
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com
jhollander@kasowitz.com

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

*/s/  Pilar G. Kraman*
C. Barr Flinn (No. 4092)
Emily V. Burton (No. 5142)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6692
bflinn@ycst.com
eburton@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff*
*FinancialApps, LLC*

2

# EXHIBIT I
# REDACTED IN ITS
# ENTIRETY

## **<u>CERTIFICATE OF SERVICE</u>**

I, Pilar G. Kraman, Esquire, hereby certify that on December 21, 2020, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to registered participants.

I further certify that on December 21, 2020, I caused the foregoing document to be served by e-mail on the following counsel of record:

> Henry E. Gallagher, Jr.
> Lauren P. DeLuca
> CONNOLLY GALLAGHER LLP
> 1201 North Market Street, 20th Floor
> Wilmington, DE 19801
> hgallagher@connollygallagher.com
> ldeluca@connollygallagher.com
>
> Gary M. Miller
> Gary M. Elden
> Hugh A. Abrams
> Amy Y. Cho
> Ian M. Hansen
> SHOOK, HARDY & BACON, L.L.P.
> 111 S. Wacker Drive, Suite 4700
> Chicago, IL 60606
> gmiller@shb.com
> gelden@shb.com
> habrams@shb.com
> acho@shb.com
> ihansen@shb.com
>
> Jason M. Richardson
> SHOOK, HARDY & BACON, L.L.P.
> One Montgomery Street, Suite 2600
> San Francisco, CA 94104
> jmrichardson@shb.com
>
> *Attorneys for Defendants, Envestnet, Inc.*
> *and Yodlee, Inc.*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/ Pilar G. Kraman
C. Barr Flinn (No. 4092)
Emily V. Burton (No. 5142)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
eburton@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff FinancialApps, LLC*

24864483.1

2