IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FINANCIALAPPS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-1337-CFC/CJB |
| | ) |
| ENVESTNET, INC. and | ) |
| YODLEE, INC., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM ORDER**

Plaintiff FinancialApps, LLC (FinApps) has sued Defendants Envestnet, Inc. and Yodlee, Inc. for trade secret misappropriation, fraud, tortious interference with prospective business opportunities, unfair competition, unjust enrichment, breach of contract, and unfair trade practices. I have before me three pending motions.

The first motion is mistitled "Plaintiff FinancialApps, LLC's Emergency Motion to Amend the Scheduling Order." D.I. 216. The motion does not present or seek to remedy an emergency, and its request to amend the schedule is at most incidental to the thrust of the motion. The motion is really a motion to compel. In other words, it's a discovery motion; and it should have been presented to the Magistrate Judge and should have complied with the procedures and briefing requirements the Magistrate Judge put in place for resolution of discovery disputes

in this case. Accordingly, I will deny the motion. FinApps can raise its discovery issues with the Magistrate Judge. The Magistrate Judge has the authority to resolve those issues and, if he sees fit, to amend the Scheduling Order to give FinApps adequate relief for any failures by Defendants to produce timely discovery.

The second motion is titled "Defendants' Motion for Trial Phasing and Other Relief." D.I. 223. Defendants request by this motion that I break the case into four—yes, four—trials. In Defendants' words:

> [T]his case is sprawling. It will require resolution of dozens of complex and often quite disparate factual issues under multiple [ ] areas of substantive law (of multiple states), and trying all of these issues at once would prove unwieldy, unnecessarily costly, and confusing.

D.I. 223 at 4. This characterization of the case stands in stark contrast to how Defendants described the case in an earlier letter they filed with the Magistrate Judge in an effort to limit the number of hours for depositions. In that letter, Defendants' counsel stated that "[t]his litigation does not involve a complicated, expansive set of facts . . . ." D.I. 26 at 1.

I think Defendants' previous description of the case is likely more accurate. It is evident from the nature and number of discovery disputes the parties have brought before the Magistrate Judge and the overreaching of both sides in the motions and briefs they have filed with the Court to date that counsel treat this case

as if it were the only case pending before the Court. But this case is only one of 600 cases on my docket; and it is certainly not among the more complex cases I am currently handling. In any event, I am not persuaded that breaking the case along the lines Defendants now request will simplify things or create efficiencies. Accordingly, I will deny the motion for phasing.

The third motion is titled "Defendants' Rule 39 Motion to Amend Scheduling Order to Set Case for Bench Trial." D.I. 230. The Magistrate Judge understandably had set this case for a jury trial. D.I. 28. I say "understandably" because the Magistrate Judge instructed the parties that "[i]f there [were] disputed issues between the parties regarding the content of the Scheduling Order, the parties should note those areas of dispute in the proposed Scheduling Order, along with their proposals for the language the Court should adopt as to that issue" and that "the parties may each separately file a letter . . . setting forth their position as to these disputed issues." D.I. 19. The proposed scheduling order subsequently submitted by the parties to the Magistrate Judge called for a ten-day trial and provided that "[u]ntil the case is submitted to the jury for deliberations, the jury will be excused each day at 4:30 p.m." D.I. 24 ¶ 16. Nothing in the proposed order suggested that Defendants sought a bench trial. Moreover, although Defendants submitted with the proposed order a letter that outlined a dispute over

3

the appropriate number of hours for depositions, Defendants did not mention in their letter that they wanted a bench trial. D.I. 26.

Now, thirteen months after the Magistrate Judge scheduled a jury trial, Defendants ask for a bench trial. FinApps does not argue that Defendants' delay in making this request constitutes a waiver of their right to object to FinApps's jury trial demand or that Defendants are otherwise estopped from asserting at this late juncture a right to a bench trial. Accordingly, I turn to the merits of Defendants' motion.

Defendants argue that a so-called Master Services Agreement or "MSA" that FinApps and Yodlee executed in January 2017 lies "at the heart of this case" and that by signing that agreement FinApps waived its right to a jury trial in this action. D.I. 231 at 1. Consistent with the manner in which both sides have litigated this case, Defendants did not mention in their motion or opening brief that Envestnet was not a party to the MSA and thus they did not explain in those filings how any jury trial waiver in the MSA bears on FinApps's claims against Envestnet.

Defendants are correct that the MSA lies at the heart of the case and that FinApps waived its right to a jury trial for its claims against Yodlee. Section 12(e) of the MSA provides that "[e]ach party hereby waives any right to a jury trial in connection with any action or litigation arising out of or related to this Agreement." D.I. 2, Ex. 1 § 12(e). FinApps argues—again, consistent with the

4

litigation tactics employed by both sides—that the MSA is "unrelated" to FinApps's claims for trade secret misappropriation, fraud, tortious interference with prospective business opportunities, unfair competition, unjust enrichment, and unfair trade practices. D.I. 244 at 2 n.2. This assertion does not pass the straight-face test. It is belied by FinApps's Complaint.

According to the Complaint, "[t]his case arises out of an egregious multi-year scheme by Envestnet, a provider of wealth management software solutions, and Envestnet's wholly owned subsidiary, Yodlee, a consumer financial data aggregator, to steal FinApps'[s] valuable proprietary information and trade secrets, in order to unlawfully develop software products that compete with FinApps, a software development company." D.I. 2 ¶ 1. The Complaint alleges that the multi-year scheme began in April 2016 when "Yodlee approached FinApps to discuss licensing FinApps'[s] proprietary software and technology for deployment in a new platform known as 'Risk Insight.'" D.I. 2 ¶ 6. The Complaint alleges that "Defendants' sole intention at all times was to use [the MSA] with FinApps as a means to gain access to and misappropriate FinApps's proprietary technology and trade secrets, in order to develop their own platform without FinApps." D.I. 2 ¶ 7. This sentence alone refutes FinApps's assertion that its misappropriation and trade secret claims are unrelated to the MSA.

But there is more. Much more. For example, the Complaint alleges:

5

9. . . . FinApps also insisted that the [MSA] with Yodlee include strict confidentiality provisions, exclusivity obligations, and other restrictive covenants related to the use of FinApps'[s] proprietary technology and trade secrets. *Based on* Yodlee's representations, *the protective provisions contained in the [MSA]*, and the other security measures FinApps put in place, *FinApps at all times expected that its proprietary technology and trade secrets would be kept confidential, would remain its own, and would not be misappropriated or otherwise misused.*

10. *Almost immediately upon entering into [the MSA and related Statement of Work agreements and amendments to the MSA], however, Yodlee sought to capitalize on FinApps'[s] trust, exploiting it to misappropriate of FinApps'[s] proprietary technology and trade secrets. Indeed, Yodlee demanded virtually unfettered access to the proprietary database architecture and complex schemas FinApps designed and developed, as well as various critical software components of the underlying technology that drives the Risk Insight platform.* Yodlee deceitfully represented that it needed such access to educate its sales and marketing teams about the product, and to permit them to pitch Risk Insight to potential clients. Yodlee knew this representation to be false when made, and only sought such access to facilitate its theft of FinApps'[s] technology.

11. FinApps had no knowledge of Yodlee's true intentions at the time. To the contrary, *based on* Yodlee's representations, the security measures FinApps put in place, and *the restrictions in the [MSA], FinApps had every reason to think that Yodlee would protect FinApps'[s] proprietary technology and trade secrets. Thus, on the basis of this expectation and the belief that Yodlee was operating in good faith in order to maximize the profit of both parties under the [MSA], FinApps granted Yodlee the access it sought.*

6

> 12. *Yodlee used this access to misappropriate the technology underlying FinApps'[s] platform for incorporation into a competing platform Yodlee was developing in secret.*

D.I. 2 ¶¶ 9–12 (emphasis added).

Every count that FinApps says is "unrelated" to the MSA is in fact *premised* on the allegation that the MSA gave Yodlee access to FinApps's proprietary information and trade secrets. Counts I and II of the Complaint allege that Defendants used that access to misappropriate FinApps's trade secrets. Count III alleges that Yodlee fraudulently mispresented its intention to use the MSA as a means to gain access to FinApps's proprietary technology and trade secrets. Counts V and X allege unfair trade practice claims based on the use of FinApps's proprietary information and trade secrets to build software products that compete with FinApps's products. Counts VII and VIII allege deceptive trade practices claims premised on Yodlee's theft of FinApps's proprietary software and Defendants' sales and deceptive marketing of the Risk Insight platform that was developed pursuant to the MSA. And Count XIV alleges that Defendants were unjustly enriched by Yodlee's misappropriation of FinApps's trade secrets and proprietary information that Yodlee obtained by virtue of the MSA.

It is simply not credible to argue as FinApps has that these claims are unrelated to the MSA. Accordingly, since FinApps does not dispute that it

knowingly and voluntarily entered into the MSA, Yodlee can enforce FinApps's contractual waiver of its right to have a jury try its claims against Yodlee. *In re DaimlerChrysler AG Sec. Litig.*, No. CIV.A. 00-993-JJF, 2003 WL 22769051, at *3 (D. Del. Nov. 19, 2003), *aff'd sub nom. Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212 (3d Cir. 2007).

Envestnet, however, was not a party to the MSA and therefore it lacks standing to enforce the jury trial waiver provision in the MSA against FinApps. *Brown & Brown, Inc. v. Cola*, No. CIV.A. 10-3898, 2011 WL 4380445, at *6 (E.D. Pa. Sept. 20, 2011) (nonparties to a contract "lack standing to enforce [the contract's] jury waiver clause"). Accordingly, FinApps's claims against Envestnet need to be tried before a jury.

Defendants argue that *Tracinda* "confirms" that Envestnet has standing as a nonsignatory to enforce the MSA's jury trial waiver. D.I. 245 at 1. In *Tracinda*, the Third Circuit held that "when a valid contractual jury trial waiver provision applies to a signatory corporation, the waiver also applies to nonsignatory directors and officers seeking to invoke the waiver as agents of the corporation." 502 F.3d at 225. The Court explained that "[t]his rule is consistent with the concept that corporations can act only through agents and employees" and that "if [the court] did not allow nonsignatory agents of a signatory corporation to invoke a valid contractual jury waiver provision, such an agreement would be of little practical

8

value, as it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity itself." *Id.* (internal quotation marks and citations omitted).

*Tracinda* does not support Defendants' position for two reasons. First, the right to a jury trial is a constitutional right grounded in the Seventh Amendment. Because the right "is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937). Accordingly, I read *Tracinda* to stand for the narrow proposition that a corporation's contractual jury trial waiver provision applies to nonsignatory directors and officers seeking to invoke the waiver as agents of the corporation. Second, even if *Tracinda* were read to stand for the broader proposition that any and all nonsignatory agents of the signatory corporation can invoke the signatory corporation's jury trial waiver, it would not help Envestnet. There is no allegation or suggestion here that Envestnet acted or acts as Yodlee's agent. On the contrary, Envestnet owns Yodlee, and FinApps's theory of liability with respect to Envestnet is based on Yodlee acting as Envestnet's agent, not the other way around.

Having determined that FinApps waived its right to a jury trial of its claims against Yodlee but not its claims against Envestnet, I have no choice but to hold two trials in this case. I will therefore grant in part and deny in part Defendants' motion for a bench trial.

I have determined that it will be more efficient to first try FinApps's claims against Envestnet and then hold a bench trial of FinApps's claims against Yodlee. I believe that efficiencies can be gained by providing the jury a special verdict form that will obtain findings for issues that necessarily must be decided to resolve the claims alleged against both defendants. I will therefore ask the jury, for example, (1) whether the purported trade secrets and other confidential information alleged by FinApps to have been misappropriated are legally protectable and (2) whether Yodlee accessed, stole, misappropriated or otherwise violated any of the trade secrets, confidential information, or other legally protectable information identified by FinApps. The jury's answers to these questions could significantly narrow the issues that I would have to decide at a later bench trial.

NOW THEREFORE, it is hereby ORDERED that:

1. Plaintiff FinancialApps, LLC's Emergency Motion to Amend the Scheduling Order (D.I. 216) is DENIED;

2. Defendants' Motion for Trial Phasing and Other Relief (D.I. 223) is DENIED;

3. Defendants' Rule 39 Motion to Amend Scheduling Order to Set Case for Bench Trial (D.I. 230) is GRANTED IN PART AND DENIED IN PART; and

4. The jury trial set for September 20, 2021 will address only FinApps's claims against Envestnet; a bench trial of FinApps's claims against Yodlee will be scheduled after the jury returns its verdict.

1.14.21
Date

                                          *[signature]*
United States District Judge