# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINANCIALAPPS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 19-1337-GBW-CJB |
| v. | ) | |
| | ) | **PUBLIC REDACTED VERSION** |
| ENVESTNET, INC. and | ) | |
| YODLEE, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ENVESTNET, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT NO. 1

OF COUNSEL:

Gary M. Miller
Gary M. Elden
John D. Garretson
Amy Y. Cho
Justin R. Donoho
Ian M. Hansen
SHOOK, HARDY & BACON LLP
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
(312) 704-7700

Henry E. Gallagher, Jr. (No. 495)
Lauren P. DeLuca (No. 6024)
CONNOLLY GALLAGHER LLP
1201 North Market St., 20th Floor
Wilmington, DE 19801
(302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

*Attorneys for Defendants Yodlee, Inc. and Envestnet, Inc.*

Dated: January 6, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................**Error! Bookmark not defined.**

INTRODUCTION ................................................................................ 1

FACTUAL BACKGROUND AND FA'S ALLEGATIONS .......................................... 2

A.    Background regarding Yodlee, FA, and the Risk Insight 2.0 dispute. .............................. 2

B.    Envestnet and Yodlee. ................................................................................ 3

C.    FA's allegations against Envestnet. ................................................................. 5

LEGAL STANDARD ................................................................................ 5

ARGUMENT ........................................................................................ 6

I.    ENVESTNET IS NOT VICARIOUSLY LIABLE FOR ACTIONS OF YODLEE. **Error! Bookmark not defined.**

II.    ENVESTNET IS NOT DIRECTLY LIABLE FOR ACTIONS OF YODLEE. ................ 8

    A.    The actions of Yodlee personnel do not implicate Envestnet. ............................... 8

    B.    The actions of Yodlee executives do not implicate Envestnet. ............................. 9

III.    COUNTS 1 AND 2 FAIL. ........................................................................ 11

    A.    FA's purported trade secrets are not trade secrets. ............................................ 11

    B.    Envestnet did not use FA trade secrets in connection with Credit Exchange. ........................................................................................... 12

    C.    Envestnet did not misappropriate FA trade secrets in connection with any Yodlee product. ...................................................................................... 12

    D.    Envestnet did not direct Yodlee to misappropriate FA trade secrets. ................... 13

IV.    COUNT 4 FAILS. ................................................................................. 14

    A.    The first three allegations are preempted and lack evidence. .............................. 14

    B.    The fourth allegation cannot sustain Count 4. ................................................ 15

V.    COUNTS 5 AND 8 FAIL. ........................................................................ 16

A.     The misappropriation allegations fail. ..................................................... 17

B.     The fraud and contract allegations fail........................................................ 17

C.     The allegations relating to Risk Insight 2.0 fail. .................................... 18

D.     Count 8 fails for additional reasons. ..................................................... 19

VI.     COUNT 14 FAILS.................................................................................... 20

CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)......................................................................................................5

*Bell v. City of Philadelphia*,
   275 F. App'x 157 (3d Cir. 2008) ...............................................................................6

*C&C Int'l Computers & Consultants, Inc. v. Dell Mktg. L.P.*,
   2011 WL 13217489 (S.D. Fla. Nov. 7, 2011)..........................................................18

*CB Lewes, LLC v. Brightfields, Inc.*,
   2020 WL 6364521 (Del. Super. Ct. Oct. 29, 2020) ..........................................17, 18

*Doberstein v. G-P Indus., Inc.*,
   2015 WL 6606484 (Del. Ch. Oct. 30, 2015) .............................................................6

*E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*,
   335 F. Supp. 3d 657 (D. Del. 2018)............................................................................9

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
   647 So. 2d 812 (Fla. 1994).......................................................................................15

*Ethyl Corp. v. Balter*,
   386 So. 2d 1220 (Fla. Dist. Ct. App. 1980) .............................................................16

*F:A J Kikson v. Underwriters Lab'ys, Inc.*,
   492 F.3d 794 (7th Cir. 2007) ...................................................................................16

*Finjan LLC v. Trustwave Holdings, Inc.*,
   2021 WL 5051147 (D. Del. Oct. 29, 2021) ...............................................................9

*In re Clorox Consumer Litig.*,
   2013 WL 3967334 (N.D. Cal. July 31, 2013)..........................................................19

*In re Maxus Energy Corp.*,
   617 B.R. 806 (Bankr. D. Del. 2020) ........................................................................10

*Instant Tech., LLC v. DeFazio*,
   40 F. Supp. 3d 989 (N.D. Ill. 2014), *aff'd*, 793 F.3d 748 (7th Cir. 2015) ..............15

*Jones v. Treece*,
   774 F. App'x 65 (3d Cir. 2019) .............................................................................6, 7

*Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*,
    361 So. 2d 769 (Fla. Dist. Ct. App. 1978) ............................................................15

*Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*,
    2005 WL 8176878 (E.D. Mo. Apr. 13, 2005) ....................................................20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................5

*Maxi-Taxi of Fla., Inc. v. Lee Cty. Port Auth.*,
    2008 WL 1925088 (M.D. Fla. Apr. 29, 2008), *aff'd*, 301 F. App'x 881 (11th
    Cir. 2008 ) ..........................................................................................................16

*Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*,
    2005 WL 3159680 (N.D. Ill. Nov. 22, 2005) ....................................................16

*Mobil Oil Corp. v. Linear Films, Inc.*,
    718 F. Supp. 260 (D. Del. 1989) ...................................................................6, 13

*NACCO Indus., Inc. v. Applica Inc.*,
    997 A.2d 1 (Del. Ch. 2009) ...............................................................................18

*Nespresso USA, Inc. v. Ethical Coffee Co. SA*,
    263 F. Supp. 3d 498 (D. Del. 2017) ....................................................................9

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001)........................................................10, 13, 18, 19

*Phoenix Canada Oil Co. v. Texaco, Inc.*,
    658 F. Supp. 1061 (D. Del. 1987), *aff'd*, 842 F.2d 1466 (3d Cir. 1988) ..............6, 7

*Podobnik v. U.S. Postal Serv.*,
    409 F.3d 584 (3d Cir. 2005)................................................................................6

*RMG Media, LLC v. iBoats, Inc.*,
    2021 WL 1226466 (D. Del. Mar. 31, 2021) ......................................................10

*Round Rock Research LLC v. ASUSTeK Computer Inc.*,
    967 F. Supp. 2d 969 (D. Del. 2013)....................................................................6

*Santucci Const. Co. v. Baxter & Woodman, Inc.*,
    502 N.E.2d 1134 (Ill. App. Ct. 1986) ................................................................16

*Scott v. Gage*,
    2011 WL 13196262 (M.D. Fla. Dec. 12, 2011)..................................................19

*Telcordia Techs., Inc. v. Alcatel S.A.*,
    2005 WL 1268061 (D. Del. May 27, 2005)..........................................................7

*U.S. v. Bestfoods*,
  524 U.S. 51 (1998) ......................................................................................................10

*Wesch v. Yodlee, Inc.*,
  2021 WL 3486128 (N.D. Cal. Aug. 5, 2021) ....................................................7, 8

*Westland v. Sero of New Haven, Inc.*,
  601 F. Supp. 163 (N.D. Ill. 1985) ...............................................................................16

**Statutes**

Copyright Act ......................................................................................................................14

Florida Deceptive and Unfair Trade Practices Act (FDUTPA) .......................................... *passim*

Uniform Deceptive Trade Practices Act ...................................................................14, 15

**Rules**

Federal Rule of Civil Procedure 56(a) ............................................................................5

# INTRODUCTION

After its relationship with Yodlee, Inc. ("Yodlee") unraveled, FinancialApps, LLC ("FA") filed this lawsuit against both Yodlee and Yodlee's parent, Envestnet, Inc. ("Envestnet"). FA's sprawling Complaint asserted fourteen counts premised principally on an allegation that Yodlee and Envestnet used FA's trade secrets to develop creditworthiness assessment products. FA can prevail on its six remaining claims against Envestnet only by (1) piercing the corporate veil to hold Envestnet **vicariously** liable for the purported misconduct of its subsidiary or (2) showing that Envestnet **directly** engaged in the alleged misconduct. FA cannot pierce the veil because there is no evidence of abuse of the corporate form or fraud. Just last year, a federal court refused to pierce the veil between Envestnet and Yodlee, finding no basis to impose such an extreme remedy.

With that route foreclosed, FA must prove direct liability. But FA has abandoned its Complaint's allegation that Envestnet developed a product called Credit Exchange using FA's trade secrets, and the record lacks any evidence that Envestnet personnel participated in, directed, orchestrated, or so much as knew about Yodlee's alleged misappropriation of FA trade secrets when developing Yodlee products. FA's direct liability theories rely on the premise that Yodlee personnel were employed by Envestnet when engaging in the alleged misconduct. The uncontroverted facts undermine this premise. Envestnet is merely a holding company; it does not develop software products or technology and does not even maintain a team of software engineers. Envestnet does not employ Yodlee's personnel, nor did it enter into any contract with FA.

Because FA contractually waived its right to a jury trial against Yodlee, this case is set to be decided in two separate trials: a jury trial on FA's claims against Envestnet, and a bench trial on FA's claims against Yodlee. (*See* D.I. 250.) FA, though, does not want to try its case to the bench and hopes instead to use the Envestnet trial as a vehicle to have its core misappropriation claims against Yodlee decided by a jury. But FA does not have the evidence it needs against

Envestnet to warrant the jury trial because Envestnet was not involved in the events giving rise to this lawsuit. Granting this Motion would eliminate unfounded claims against the wrong defendant and greatly streamline this case by eliminating the jury trial altogether. FA then would be permitted to try its case against the right party—Yodlee—to the Court, in accordance with the parties' agreement. Envestnet is entitled to summary judgment on all of FA's claims.

## FACTUAL BACKGROUND AND FA'S ALLEGATIONS

### A. Background regarding Yodlee, FA, and the Risk Insight 2.0 dispute

Yodlee is a California-based corporation that provides consumer-permissioned financial data aggregation services. (Ex. 2 ¶ 6.) In January 2017, Yodlee executed a Master Services Agreement (the "MSA" (Ex. 4)) with FA, a Florida-based tech startup. Under the MSA, the parties were to develop and sell a product—called Risk Insight 2.0—that would generate personal finance reports for use by lenders when deciding whether to issue loans. (D.I. 1 ¶ 4; D.I. 160 ¶ 36.) FA was to provide a software platform (the "Platform") capable of pulling consumer-permissioned data for a loan applicant from Yodlee's core data aggregation offering and producing a report of that applicant's data for use by lenders. (*Id.*)

The Risk Insight 2.0 project encountered problems, and over two years, the relationship between Yodlee and FA broke down. (D.I. 160 ¶ 43-65.) Each side viewed the other as being in breach of the MSA: FA thought it was not being paid what it was owed, and Yodlee thought that the FA Platform performed poorly and that FA was failing to cure problems according to agreed-upon timelines. (D.I. 1 ¶ 308; D.I. 160 ¶¶ 43-61.) The dispute came to a head starting on April 3, 2019, when Yodlee sent FA a letter enumerating the technical problems with the product and demanding they be cured. (D.I. 160 ¶¶ 61-62, Ex. D.) FA responded through a series of letters from counsel alleging that Yodlee had wrongfully withheld payments due to FA and that Yodlee had stolen FA technology and used it to develop competing products with Equifax, LLC

("Equifax"). (D.I. 160 ¶¶ 63-65.) FA threatened to shut off access to Risk Insight 2.0 if Yodlee did not pay the demanded amounts. (*Id.*) Seeking to deescalate and avoid a service interruption for its clients, Yodlee offered to place the disputed amount in escrow while the parties worked things out. (*Id.* ¶ 66.)

FA nevertheless shut off access to the product on June 11, 2019, which blocked both Yodlee and Risk Insight 2.0 clients from accessing or using the product and prompted Yodlee to terminate the MSA for cause the following day. (*Id.*) A month later, on July 17, 2019, FA filed this lawsuit against Yodlee *and Yodlee's parent*, Envestnet—even though Envestnet was not a party to the MSA or involved in the Risk Insight 2.0 project. FA's Complaint alleges all manner of misconduct, including trade secret misappropriation, fraud, tortious interference, unfair competition, and breach of contract, but specifics as to Envestnet's involvement are sparse. (*See* D.I. 1 ¶ 207-338.)

## B. Envestnet and Yodlee

Envestnet is a holding company. (SOF ¶ 1.) Envestnet does not itself provide goods or services but, rather, owns operating subsidiaries that provide financial and wealth management technology to financial advisors, investors, and financial institutions. (*Id.*) Envestnet acquired Yodlee in November 2015. (*Id.* ¶ 7.) Envestnet and Yodlee are distinct companies with separate headquarters in different time zones, and Yodlee has its own management structure and conducts business through its own departments, including operations, product development, sales, finance, engineering, and legal. (*Id.* ¶¶ 1, 3, 4-5.) Yodlee has its own articles of incorporation and by-laws, maintains its own books, and is amply capitalized; as of December 31, 2021, Yodlee held $520.4 million in assets. (*Id.* ¶¶ 6, 8.) Envestnet does not employ Yodlee personnel. (*Id.* ¶¶ 9-10.) Yodlee bears the expenses of employing its personnel. (*Id.* ¶¶ 7, 9-10.)

For purposes of public financial reporting, Envestnet's operating subsidiaries are organized into three business segments: "Envestnet Wealth," "Envestnet WealthTech," and "Envestnet Data & Analytics." (SOF ¶¶ 22-24, 26; Ex. 2 ¶ 27.) These segments are not corporate entities. (SOF ¶¶ 22-24, 26; Ex. 2 ¶ 27.) Yodlee and its subsidiaries comprise the "Envestnet Data & Analytics" segment, and its financials are reported under that label in Envestnet's public filings. (SOF ¶ 23.) This label also is used in other contexts as an informal name to refer to Yodlee and its subsidiaries. (SOF ¶¶ 24-25; Ex. 2 ¶ 28.) For instance, "Envestnet Data & Analytics" often is used in the job titles of Yodlee personnel. As an example, the Chief Operating Officer of Yodlee sometimes is called the Chief Operating Officer, Envestnet Data & Analytics. (SOF ¶ 25.) These two alternative titles describe the same single role *at Yodlee*; Envestnet does not employ the person in that role. (*Id.*) While all Yodlee personnel may in this informal sense be considered part of the "Envestnet Data & Analytics" team, they are not Envestnet, Inc. employees; they are employed by and work for an Envestnet subsidiary. (Ex. 2 ¶ 28.) Envestnet "does not have its own data and analytics team." (Ex. 3 at 32:2-4; SOF ¶ 24.)

As a holding company, Envestnet does not itself develop software products or technology. (SOF ¶ 2.) Envestnet does not employ personnel as software developers or engineers. (*Id.* ¶ 17.) Yodlee, on the other hand, does develop software products and technology and maintains its own team of developers and engineers, the majority of whom are located in India. (Ex. 2 ¶ 23.) Envestnet personnel are not involved in the technical development of Yodlee products. (SOF ¶ 17.) No Envestnet personnel worked on the technical development of Risk Insight 2.0—or any technology related to or used alongside it—or had access to any of the development environments that were used by FA, Yodlee, or Risk Insight 2.0 clients in connection with the product. (*Id.* ¶¶ 17-19.) Envestnet was not involved in servicing Risk Insight 2.0 clients or troubleshooting. (*Id.*

¶ 20.)  Envestnet did not negotiate and was not a party to any of the contracts relating to Risk Insight 2.0—whether between Yodlee and FA, or Yodlee and Risk Insight 2.0 clients.  (*Id.* ¶¶ 15-16.)  Likewise, no Envestnet personnel worked on the technical development of any Yodlee product under any agreement between Yodlee and Equifax.  (*Id.* ¶ 21.)

## C.    FA's allegations against Envestnet

Even though Envestnet was not involved in the Risk Insight 2.0 project, FA's Complaint includes six remaining claims against Envestnet (the rest having been dismissed):  Counts 1 and 2 (state and federal trade secret misappropriation); Count 4 (tortious interference with prospective business opportunity); Counts 5 and 8 (common law and Florida statutory unfair competition); and Count 14 (unjust enrichment).  (D.I. 1 ¶¶ 207-240; 259-264; 280-285; 332-338.)

FA's claims rest on three theories:  *First*, FA alleges that Envestnet took and used FA trade secrets to develop a product called Credit Exchange.  (*See* D.I. 1 ¶¶ 18-19, 156-163, 219, 236.) *Second*, FA alleges that Yodlee acted "together with and at the direction of Envestnet" when Yodlee "improperly misused" FA trade secrets in developing Yodlee products.  (*Id.* ¶¶ 216, 233.) *Third*, FA alleges that Envestnet "intentionally, improperly, and willfully interfered with" and "usurp[ed] corporate business opportunities" from it.  (*Id.* ¶ 262.)

## LEGAL STANDARD

Summary judgment should be entered where "there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a).  To defeat a motion for summary judgment, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The mere existence of some evidence in support of the nonmoving party is insufficient; the nonmoving party must present enough evidence to enable a jury to reasonably find for it.  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986).  The non-moving party "must present more than just 'bare assertions,

conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005).

## ARGUMENT

### I.     ENVESTNET IS NOT VICARIOUSLY LIABLE FOR ACTIONS OF YODLEE.

As a threshold matter, FA cannot pierce the corporate veil to hold Envestnet vicariously liable for Yodlee's actions. Veil piercing "is an 'extraordinary remedy,'" *Round Rock Research LLC v. ASUSTeK Computer Inc.*, 967 F. Supp. 2d 969, 978 (D. Del. 2013), reserved only for cases in which (1) the corporate form is used to work a "fraud or inequity" (the "alter ego" theory), or (2) the parent's control over the subsidiary is so complete that it "dominates" the subsidiary's activities (the "agency" theory). *Phoenix Canada Oil Co. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D. Del. 1987), *aff'd*, 842 F.2d 1466 (3d Cir. 1988). Both theories fail here.

The alter ego theory fails for two reasons. *First,* "[t]o state a 'veil-piercing' claim, the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015). FA's Complaint does not allege that Yodlee is a sham entity designed by Envestnet to defraud investors and creditors, and a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Jones v. Treece*, 774 F. App'x 65, 67 (3d Cir. 2019); *Bell v. City of Philadelphia,* 275 F. App'x 157, 160 (3d Cir. 2008) (same). This alone bars any veil piercing here. *Second*, any such attempt would fail on the merits anyway for lack of evidence that Envestnet abused the corporate form to "work . . . a fraud or something in the nature of a fraud." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 267 (D. Del. 1989). All evidence is to the contrary: as discussed above, the companies observe all required corporate formalities and operate as separate

businesses, and Yodlee is amply capitalized. (*See* SOF ¶¶ 1-10, 14, 22, 26.) There is no triable issue on these points.

The agency theory does not work either. *First*, FA's Complaint does not contain allegations that would suffice to carry an agency theory, which requires the parent to exert such control over the subsidiary that it "dominates" the subsidiary's actions. *Phoenix Oil Co. Ltd.*, 658 F. Supp. at 1084 (under agency theory, "the parent corporation will be held liable for the activities of the subsidiary *only if* the parent dominates those activities").[1] This alone bars an agency theory. *See Jones*, 774 F. App'x at 67. *Second*, there is no evidence that Envestnet "dominates" Yodlee's activities. Envestnet is a holding company that does not sell products (SOF ¶ 2), and Yodlee has its own executive and management structure and conducts business through its own departments, including operations, product development, sales, finance, engineering, and legal. (Ex. 2 ¶ 9.) Yodlee maintains its own bank accounts, books, and records, and it pays its own business expenses. Envestnet has never financed Yodlee's operations. Yodlee pays its own debts and liabilities and bears the costs of employing its personnel. (*Id.* ¶¶ 10, 14-16.) *Compare, e.g.*, *Telcordia Techs., Inc. v. Alcatel S.A.*, 2005 WL 1268061, at *3 (D. Del. May 27, 2005) (no agency where parent was "merely a holding company that does not manufacture [or] sell" products, and subsidiary "maintain[ed] its own executive team" and "financial statements" and "finance[d] its day-to-day activities through funds generated from its business activities").

Last year, another federal court refused to pierce the veil between Envestnet and Yodlee. *See Wesch v. Yodlee, Inc.*, 2021 WL 3486128, at *6-7 (N.D. Cal. Aug. 5, 2021). Relying in part

---

[1] Emphasis added throughout unless otherwise noted.

on Patrick Marr's sworn testimony as to the respective companies' operations[2] (*see id.* at *3), the court noted the absence of "any evidence of fraud or bad faith" and held that the plaintiffs had "fail[ed] to show that the extreme alter ego remedy [was] warranted [t]here." *Id.* at *7. Nor is it warranted here.

## II.     ENVESTNET IS NOT DIRECTLY LIABLE FOR ACTIONS OF YODLEE.

Because FA cannot pierce the corporate veil, FA's sole route is to hold Envestnet directly liable on its claims. This route leads nowhere, too, as there is no evidence that any Envestnet employee was involved in the alleged misconduct.

### A.     The actions of Yodlee personnel do not implicate Envestnet.

FA likely will argue that Yodlee personnel actually (or also) worked for Envestnet as members of the "Envestnet Data & Analytics" team and that Envestnet therefore can be directly liable for their actions. This theory is baseless because, as explained above, "Envestnet Data & Analytics" is not an entity but merely a business segment name used to refer to Yodlee and its subsidiaries in Envestnet's public filings. (*See* SOF ¶¶ 22-26.)

As Envestnet's corporate designee explained, Envestnet sorted its operating subsidiaries into three business segments—"Wealth," "WealthTech," and "Data & Analytics"—for purposes of its financial reporting, and this was done █████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████ sorting. (Ex. 3 at 27:19-28:24; SOF ¶¶ 26.) Yodlee and Envestnet remain distinct companies with separate headquarters in different time zones, separate executive teams, and separate personnel. (SOF ¶ 26; Ex. 3 at 34: 13-18; 35: 9-12; 195:16-196:2.) Segmenting for

---

[2] Mr. Marr also has served as Envestnet's Rule 30(b)(6) corporate designee in this case and has submitted a sworn declaration in support of this Motion. (*See* Ex. 2). He testified as to the respective companies' operations at his deposition, and his declaration adds further such testimony.

financial reporting purposes changed none of this. Nor did it somehow convert Yodlee personnel into Envestnet employees. (*See* Ex. 2 ¶¶ 28-29; *see also* Ex. 3 at 32:2-4 ████████████ ████████████████████████████████████ ), 33:13-22, 34:13-35:4 ████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████

None of the following Yodlee personnel FA has implicated in the purported misconduct ever has been employed by or worked for Envestnet: Arun Anur, Julie Solomon, Thomas Hempel, Dipak Nandi, Michael Burger, Kirti Kumar, Sagar Das, Andrew Walsh, Martin Crombie, Christopher Chen, and Olga Amaya. (SOF ¶ 11.) The fact that Envestnet reports Yodlee's earnings as its "Data & Analytics" segment does not make Envestnet liable for the actions of Yodlee personnel. *See Finjan LLC v. Trustwave Holdings, Inc.*, 2021 WL 5051147, at *12 (D. Del. Oct. 29, 2021) ("[A] parent corporation's filings of the assets, liabilities, and financial earnings of its subsidiaries as one indistinguishable whole do not prove agency."); *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 678 (D. Del. 2018) (same); *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 505 (D. Del. 2017) (same).

## B. The actions of Yodlee executives do not implicate Envestnet.

FA likely also will attempt to use the actions of two then-Yodlee executives—Stuart DePina and Brandon Rembe—as a means of holding Envestnet directly liable for the actions of Yodlee on the theory that they also worked for Envestnet. This would require FA to show, as a threshold matter, that they acted culpably *while holding a position with Envestnet*. But neither Mr. DePina nor Mr. Rembe held *any* role at Envestnet during the key period.

Specifically, Mr. DePina served as Chief Executive of Yodlee (a.k.a. "Envestnet Data & Analytics") starting in January 2019 and held only that role until March 2020, when he assumed a dual role as President of Envestnet. (SOF ¶ 12.) Mr. DePina's dual role tenure thus did not begin

until some eight months *after* FA filed this lawsuit.  Mr. Rembe was SVP of Products and Strategy at Yodlee from June 2018 to September 2020.  (*Id.* ¶ 13.)  He held only that role during this time period.  (*Id.*)  In September 2020, Mr. Rembe left that position at Yodlee and became Chief Product Officer of Envestnet.  (*Id.*)  Mr. Rembe thus held no position at Envestnet until over a year after the Complaint was filed and never held dual roles at the two companies.  (*Id.*)

Even if Mr. DePina had served a dual role during the relevant time period (and he did not), his actions taken while a dual officer could not salvage FA's claims against Envestnet.  It is a "well established principle" that "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998).  The Supreme Court has explained that, in such cases, "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," and it therefore is error to "attribut[e] the actions of dual officers and directors to the corporate parent" as a means of "imposing direct liability" on the parent.  *Id.* at 69-70; *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) ("Nor will liability be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary."); *RMG Media, LLC v. iBoats, Inc.*, 2021 WL 1226466, at *5-6 (D. Del. Mar. 31, 2021) ("[J]ust because Mr. Besse is concurrently employed as the director of iBoats [subsidiary] and an executive at Gracelock [parent], it does not necessarily follow that each of his decisions at iBoats—and perhaps more importantly, his decisions in this context—are done at the inducement of Gracelock.").  To the extent FA points to evidence dating to Mr. DePina's tenure as a dual officer, the law will presume he was "acting for the subsidiary" unless FA proffers evidence sufficient to rebut that presumption.  *In re Maxus Energy Corp.*, 617 B.R. 806, 818 (Bankr. D. Del. 2020) (party opposing presumption bears "burden to show" that

dual officer "[was] ***not*** wearing [his] 'subsidiary hat'" when acting); *Bestfoods*, 524 U.S. at 69 (same). FA cannot make that showing. *Accord iBoats, Inc.*, 2021 WL 1226466, at *5-6 ("Mr. Besse's employment at both iBoats [subsidiary] and Gracelock [parent], even in an executive position, does not provide factual basis to plausibly argue that Gracelock 'induced, caused, encouraged, or materially contributed' to contributory infringement.").

*   *   *

In sum, there is no triable issue as to the following: Envestnet and Yodlee are distinct companies, and Envestnet does not employ Yodlee personnel. Accordingly, FA cannot hold Envestnet directly liable for the actions of Yodlee personnel without either (1) ***both*** showing that Yodlee personnel who committed a culpable act also held a separate role with Envestnet ***and*** proffering evidence sufficient to overcome the presumption that the individual was acting for Yodlee (the subsidiary) when so acting, or (2) showing that Envestnet personnel ***specifically directed*** Yodlee personnel to engage in the alleged misconduct. FA cannot make either showing.

## III.    COUNTS 1 AND 2 FAIL.

FA's trade secret misappropriation claims (Counts 1 and 2) fail against Envestnet because (1) FA has abandoned its initial allegation that Envestnet used FA's trade secrets in developing the Credit Exchange product, and (2) there is no evidence that Envestnet participated in, directed, or orchestrated any purported misappropriation in connection with any Yodlee product.

### A.    FA's purported trade secrets are not trade secrets.

First, Envestnet should be granted summary judgment on Counts 1 and 2 because none of FA's purported trade secrets qualify for trade secret protection, as laid out in Envestnet's concurrently-filed Motion for Summary Judgment No. 2. For purposes of this Motion, assuming (but not conceding) that FA does possess trade secrets at issue, Counts 1 and 2 still fail as to Envestnet for the following reasons.

**B.      Envestnet did not use FA trade secrets in connection with Credit Exchange.**

FA initially alleged that Envestnet took its trade secrets and used them to develop a product called Credit Exchange. (D.I. 1 ¶¶ 219, 236.) Discovery yielded no evidentiary support for this allegation; indeed, FA has abandoned it. FA's technical expert, Mr. Pflaum, conceded that he ███ ████████████████████████████████████████████████████████████████ (Ex. 10 at 224:3-7), and nothing else in the record supports the notion that Credit Exchange contains, reflects, or was developed by Envestnet using any information originating with FA—proprietary or not. Counts 1 and 2 thus fail to the extent premised on Credit Exchange.

Having abandoned its Credit Exchange allegation, FA must adduce evidence sufficient to establish that Envestnet misappropriated FA trade secrets in connection with *Yodlee* products.

**C.      Envestnet did not misappropriate FA trade secrets in connection with any Yodlee product.**

Envestnet did not misappropriate any FA technology—proprietary or not—in connection with any Yodlee product. *First*, Yodlee maintains its own development personnel, none of whom is employed by Envestnet. (SOF ¶¶ 10-11, 17; Ex. 2 ¶ 23; Ex. 3 at 195:16-196:2 ████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████. *Second*, as a holding company, Envestnet does not itself develop software products or employ any personnel as developers or engineers, and it is not involved in the development of Yodlee products. (SOF ¶¶ 2, 17, 24.) *Third*, no Envestnet personnel worked on Risk Insight 2.0—the project through which FA alleges Defendants gained access to its purported trade secrets. (*Id.* ¶ 18.) *Fourth*, no Envestnet personnel had access to any of the development systems or environments used by FA, Yodlee, or customers in connection with Risk Insight 2.0. (*Id.* ¶ 19; Ex. 11 at 283:7-19 ████████████████████████████ ████████████████████████████ *Fifth*, no Envestnet personnel worked on the development of any

accused Yodlee product.  (SOF ¶ 21.)  Rather, as Envestnet's corporate designee explained,

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████  (Ex. 3 at 195:24-196:2; *see also* Ex. 2 ¶¶ 23, 26.)

In sum, no Envestnet personnel worked on or had access to *either* (1) the project through which Defendants purportedly gained access to FA's trade secrets, *or* (2) the Yodlee products that purportedly were developed using those trade secrets.  What is more, there is no evidence in the record that any Envestnet personnel so much as *received* any of the documents FA claims contain its trade secrets—much less actually used them—and even FA's technical expert conceded that he

█████████████████████████████████████████████████████████████████

█████████████████████████  (Ex. 11 at 408:24-409:1.)  Counts 1 and 2 thus fail to the extent they rest on any allegation that Envestnet directly misappropriated FA technology in connection with the development of Yodlee products.

**D.     Envestnet did not direct Yodlee to misappropriate FA trade secrets.**

Nor is there any evidentiary support for FA's conclusory allegation that Yodlee misappropriated FA trade secrets "at the direction of Envestnet."  (D.I. 7 ¶¶ 216, 233.)  To prevail on this theory, FA would need evidence that Envestnet "**directed the specific actions** of [Yodlee] which resulted in [misappropriation of FA trade secrets]." *Mobil Oil Corp.*, 718 F. Supp. at 267; *accord Pearson*, 247 F.3d at 487 (explaining parent may be directly liable only where "it has **forced** the subsidiary to take the **complained-of action**, in disregard of the subsidiary's distinct legal personality . . . . [D]irect liability may attach if the parent has **overridden the subsidiary's ordinary decision-making process** and **ordered** it to" engage in the misconduct).  Nothing in the record suggests that any Envestnet executive or other personnel directed or orchestrated Yodlee's

supposed misuse of FA technology or documents; indeed, all evidence is to the contrary.  (*See*

SOF ¶¶ 17-21.)  FA cannot rely on the purported actions of Mr. DePina or Mr. Rembe—as neither

one held any position at Envestnet during the key period—and it could not rely on the actions of

any dual officer without proffering evidence sufficient to overcome the presumption that the dual

officer was acting on behalf of the subsidiary (Yodlee) when so acting, which it could not do in

any event.  *See* Section II(B) *supra*.  As explained above, Yodlee's inclusion in the "Data &

Analytics" business segment does not open Envestnet up to liability for the actions of Yodlee's

personnel.  Envestnet and Yodlee are separate companies, and Envestnet does not employ Yodlee

personnel.  (SOF ¶¶ 4, 10-11.)

## IV.    COUNT 4 FAILS.

FA Count 4 (tortious interference with prospective business opportunities) relies on four

allegations.  (*See* D.I. 1 ¶ 262.)  Count 4 fails for several reasons.

### A.    The first three allegations are preempted and lack evidence.

The first three allegations comprising Count 4 simply recycle FA's trade secret

misappropriation claims.  (*Id.*, bullets 1-3.)  This Court already held that these three allegations

are preempted by the Copyright Act and/or the Uniform Deceptive Trade Practices Act.  (*See* D.I.

109 at 17-18 (finding that "Defendants' arguments as to the first three allegations appear well-

founded, for the reasons set out by Defendants"); *see also id.* at 22 (finding misappropriation

allegations preempted in connection with dismissed Count 9).)  FA thus could not recover ***under***

***Count 4*** for these three allegations even if it could prove them against Envestnet, and, as explained

in Section III, it cannot prove them against Envestnet.  This leaves just one allegation under Count

4: that Envestnet "withh[eld] from Risk Insight clients . . . the truth about FinApps' suspension of

Yodlee's services, and fail[ed] to direct these clients to FinApps[.]"  (D.I. 1 ¶ 262, bullet 4.)

## B.    The fourth allegation cannot sustain Count 4.

This fourth allegation fails too.  *First*, there is no evidence that Envestnet personnel "withh[eld]" anything at all from Risk Insight clients.  As already noted, Envestnet was not a party to the contracts between Yodlee and FA *or* the contracts Yodlee executed with Risk Insight clients. (SOF ¶¶ 14-16.)  Envestnet did not participate in servicing Risk Insight clients while the product was in use.  (*Id.* ¶ 20.)  Envestnet personnel were not involved in troubleshooting.  (*Id.*)

*Second*, Count 4 fails in any event because FA cannot prove a sufficiently developed prospective business relationship with any Risk Insight client.  A tortious interference claim requires a potential business relationship that is "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994); *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So. 2d 769, 772 (Fla. Dist. Ct. App. 1978) ("There must be some attendant legal rights" between plaintiff and prospect); *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014), *aff'd*, 793 F.3d 748 (7th Cir. 2015) (same under Illinois law, which requires "reasonable expectation of future business from a specific client" who "actually contemplated entering" relationship with plaintiff).[3]  FA can proffer no evidence of any "actual and identifiable understanding" with any Risk Insight 2.0 client that "would have been completed" but for something Envestnet *did* to interfere with it.[4]  *Ethan*

---

[3] The law of either Florida (FA's residence and, therefore, location of purported injury) or Illinois (the place of Envestnet's purported misconduct) likely governs FA's tortious interference claim. Because there is no conflict on the legal propositions cited in this Section, however, a choice-of-law analysis is not necessary as the outcome is the same under either state's law.

[4] Actually, FA expressly agreed that it would not "target or solicit Yodlee Clients" using "information obtained in connection with the [MSA]" during the term of the MSA "and in perpetuity thereafter."  (Ex. 4 § 7(g).)  Thus to the extent FA *had* cultivated any "actual and identifiable understanding" of future business with any Risk Insight 2.0 client by the time it suspended access to the product, it breached the MSA.

*Allen, Inc.*, 647 So. 2d at 814. Indeed, this fourth allegation does not claim that Envestnet actively "interfered" with opportunities that already existed; rather, it blames Envestnet for ***not affirmatively creating*** an opportunity for FA. (D.I.1 ¶ 262, bullet 4.) Envestnet of course owed FA no such duty. *See Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, 2005 WL 3159680, at *9 (N.D. Ill. Nov. 22, 2005) ("Plaintiff must also allege ***action*** by the interfering party[.]"); *Westland v. Sero of New Haven, Inc.*, 601 F. Supp. 163, 166 (N.D. Ill. 1985) (tortious interference requires "that the defendant's ***contact*** with the third party caused the disruption").

*Third*, FA cannot prove intent. There is "no such thing as a cause of action for interference which is only negligently or consequentially effected." *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224 (Fla. Dist. Ct. App. 1980); *Santucci Const. Co. v. Baxter & Woodman, Inc.*, 502 N.E.2d 1134, 1137-38 (Ill. App. Ct. 1986) (tortious interference requires "intentional interference and has not been extended to negligent interference"). A plaintiff "must establish the defendant's 'intent to interfere,' as opposed to the defendant's mere 'intent to act.'" *Maxi-Taxi of Fla., Inc. v. Lee Cty. Port Auth.*, 2008 WL 1925088, at *16 (M.D. Fla. Apr. 29, 2008), *aff'd*, 301 F. App'x 881 (11th Cir. 2008 ); *F:A J Kikson v. Underwriters Lab'ys, Inc.*, 492 F.3d 794, 800 (7th Cir. 2007) ("Illinois courts have consistently held that the plaintiff must . . . prove facts which demonstrate that the defendants ***acted with the purpose of injuring*** the plaintiff's expectancies."). Summary judgment is appropriate where there is no evidence of intent. *Maxi-Taxi*, 2008 WL 1925088, at *16. Because there is no evidence in the record that Envestnet did *anything* with the specific intent of interfering with any FA business opportunity, Count 4 fails.

## V. COUNTS 5 AND 8 FAIL.

Count 5 (unfair competition) and Count 8 (Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")) are premised on the same set of ten allegations. (D.I. 1 ¶¶ 267, 283.) Counts 5 and 8 fail for several reasons.

## A. The misappropriation allegations fail.

Certain of the ten allegations—specifically, the seventh, eighth, and ninth—recycle FA's misappropriation allegations again. (*Id.*, bullets 7-9.) This Court already found these three allegations preempted. (D.I. 109 at 17-18 (in connection with Count 4, finding that "Defendants' arguments as to [these same] three allegations appear well-founded, for the reasons set out by Defendants"); *see also id.* at 22 ("agree[ing] with Defendants" that Count 9—which also recycled FA's misappropriation allegations—"is preempted").) Additionally, these three allegations could not sustain Counts 5 and 8 even if they were not preempted because, as discussed in Section III above, Envestnet did not misappropriate FA's trade secrets.

## B. The fraud and contract allegations fail.

The first and second allegations recycle FA's claim against Yodlee for fraud (Count 3) and breach of contract (Count 11), respectively. (D.I. 1 ¶¶ 267, 283, bullets 1-2.) FA has asserted neither claim against Envestnet, however, leaving it unclear whether these two allegations are directed at Envestnet in connection with Counts 5 and 8. To the extent these two allegations *are* directed at Envestnet, they fail. *First*, there is no evidence that Envestnet "fraudulently induc[ed] FinApps into an illusory long-term partnership that Yodlee used for the sole purpose of gaining access to and stealing FinApps' proprietary information and trade secrets." (*Id.*) Envestnet did not participate in the pre-contract negotiations between Yodlee and FA and was not a party to the purported "illusory long-term partnership" that resulted. (SOF ¶ 15.) Tellingly, FA did not assert fraud against Envestnet. *Second*, Envestnet was not a party to the MSA and obviously cannot be liable in tort or under FDUTPA for "[f]ailing to pay FinApps what it was owed under . . . Contracts" to which it was not a party. *See CB Lewes, LLC v. Brightfields, Inc.*, 2020 WL 6364521, at *3 (Del. Super. Ct. Oct. 29, 2020) (dismissing tort claim where "Defendant's alleged conduct is specifically covered by the allegations made by Plaintiffs' breach of contract claim . . . there exists

no reason to extend tort law into areas that can be adequately governed by contract law"); *C&C Int'l Computers & Consultants, Inc. v. Dell Mktg. L.P.*, 2011 WL 13217489, at *2 (S.D. Fla. Nov. 7, 2011) ("[B]reach of contract claims may not be converted into FDUTPA claims."). There is no evidence that Envestnet "forced" Yodlee to "take the[se] complained-of action[s]" either. *Pearson*, 247 F.3d at 487.

### C. The allegations relating to Risk Insight 2.0 fail.

The remaining allegations—specifically, the third, fourth, fifth, sixth, and tenth—all assert purported misconduct occurring within the context of the Risk Insight 2.0 project. (D.I. 1 ¶¶ 267, 283, bullets 3-6, 10.) These are the same allegations underlying FA's claim for breach of the implied covenant of good faith and fair dealing (Count 12), which FA brought against Yodlee only—not Envestnet. (*Compare id.* ¶¶ 267, 283, bullets 3-6, 10 *with* D.I. 1 ¶ 319.) It thus is unclear whether these allegations are directed at Envestnet in connection with Counts 5 and 8. In any event, these allegations could not sustain Counts 5 and 8 against Envestnet for two reasons.

*First*, these allegations repurpose FA's claim for breach of the implied covenant (Count 12), which is a contract claim. *See, e.g., NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 20 (Del. Ch. 2009) ("the implied covenant of good faith and fair dealing" is "part of every contract governed by Delaware law"). Envestnet was not a party to the contracts between Yodlee and FA and therefore owed FA no implied duty of good faith and fair dealing. As noted above, Envestnet cannot be liable in tort or under FDUTPA for breaching an implied term of a contract to which it was not a party. *See CB Lewes*, 2020 WL 6364521, at *3 (tort); *C&C Int'l Computers & Consultants, Inc.*, 2011 WL 13217489, at *2 (FDUTPA).

*Second*, there is no evidence that Envestnet engaged in any of this alleged conduct. Envestnet was not a party to the contracts between Yodlee and FA *or* the contracts between Yodlee and Risk Insight 2.0 clients. (SOF ¶ 14-16.) No Envestnet personnel worked on Risk Insight 2.0

18

or had access to the development environments that were used by FA, Yodlee, or Risk Insight 2.0 clients. (*Id.* ¶¶ 17-19.) No Envestnet personnel participated in servicing Risk Insight 2.0 clients or troubleshooting. (*Id.* ¶ 20.) Risk Insight 2.0 was a Yodlee product, and ██████████████ ████████████████████████████████████████████████ (Ex. 2 ¶ 23; SOF ¶ 17.) As a result, FA cannot point to any evidence of Envestnet: "[f]ailing to assign adequate resources and staff to market and sell Risk Insight"; "requiring FinApps' personnel to use only Yodlee email addresses when communicating with Risk Insight clients"; "[m]isrepresenting to Risk Insight clients that Yodlee—not FinApps—owned the intellectual property underlying Risk Insight"; or "[r]eferring to Risk Insight as a 'legacy' product to Yodlee's clients." (D.I. 1 ¶¶ 267, 283, bullets 3-6.) Nor, as discussed above, did Envestnet "[w]ithhold from Risk Insight clients . . . the truth about FinApps' suspension of Yodlee's services" from Risk Insight clients. (*Id.*, bullet 10.) Nor is there any evidence that Envestnet "forced" Yodlee to take any of these "complained-of action[s]." *Pearson*, 247 F.3d at 487.

### D. Count 8 fails for additional reasons.

FA's FDUTPA claim fails for other reasons as well. *First*, "FDUTPA claims can only be asserted by Florida residents **for conduct occurring in the state**" (*Scott v. Gage*, 2011 WL 13196262, at *6 (M.D. Fla. Dec. 12, 2011)), and there is no evidence in the record of Envestnet personnel engaging in any alleged misconduct—or indeed *any* conduct relating to this case—in Florida. The fact that FA resides in Florida is not sufficient to support a claim under FDUTPA. *See In re Clorox Consumer Litig.*, 2013 WL 3967334, at *9 (N.D. Cal. July 31, 2013) (dismissing FDUTPA claim because "[a]n FDUTPA claim can only be brought by Florida residents in connection with activities occurring in Florida . . . Plaintiffs argue that they have alleged that Clorox disseminated false information 'throughout the United States,' and that the Florida Plaintiffs are citizens of Florida . . . this is not enough"). This alone bars Count 8.

*Second*, the FDUTPA is intended to protect *consumers* from deceptive trade practices, and FA was not a "consumer" of Envestnet. *See Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, 2005 WL 8176878, at *10, n.15 (E.D. Mo. Apr. 13, 2005) (dismissing FDUTPA claim because "Matrix was not in any way **acting in a consuming capacity** in its relationship with Rawlings or K2. Rather, Matrix had a license agreement with Rawlings" such that it was not "acting in any kind of consuming capacity"). FA was not purchasing anything from Envestnet (or from Yodlee, for that matter); indeed, Envestnet is a holding company that does not itself sell products (SOF ¶ 2), and FA had no commercial relationship at all with Envestnet.

## VI.  COUNT 14 FAILS.

Count 14 (unjust enrichment) is based on three allegations. (D.I. 1 ¶¶ 333-35.) As a threshold matter, the second and third allegations comprising Count 14 are alleged as to Yodlee only—not Envestnet. (*Id.* ¶¶ 334-35 ("***Yodlee*** has also been unjustly enriched by . . . .").) Accordingly, because FA cannot pierce the corporate veil, the only allegation that could sustain Count 14 against Envestnet is the first one. (*Id.* ¶ 333.)

The first allegation—that Defendants were unjustly enriched "[b]y stealing and misappropriating FinApps' proprietary software and trade secrets" (*id.*)—cannot sustain Count 14. *First*, this Court already concluded that this first allegation would be preempted in connection with Count 14. (*See* D.I. 109 at 24 ("Thus, Plaintiff appears to (rightly) concede that an allegation premised on the first form of alleged enrichment would be preempted.").) This alone bars Count 14 as to Envestnet. *Second*, this allegation would fail even if not preempted because, as detailed above, Envestnet did not misappropriate FA's trade secrets. Count 14 therefore fails.

## CONCLUSION

Envestnet, Inc. respectfully requests that the Court enter summary judgment in its favor on FA's Counts 1, 2, 4, 5, 8, and 14.

OF COUNSEL:                         CONNOLLY GALLAGHER LLP

Gary M. Miller                      */s/ Henry E. Gallagher, Jr*
Gary M. Elden                       Henry E. Gallagher, Jr. (No. 495)
John Garretson                      Lauren P. DeLuca (No. 6024)
Amy Y. Cho                          1201 North Market St., 20th Floor
Justin R. Donoho                    Wilmington, DE 19801
Ian M. Hansen                       (302) 757-7300
SHOOK, HARDY & BACON LLP            hgallagher@connollygallagher.com
111 S. Wacker Dr., Suite 4700       ldeluca@connollygallagher.com
Chicago, IL  60606
(312) 704-7700
                                    *Attorneys for Defendants Envestnet, Inc. and*
Dated: January 6, 2023              *Yodlee, Inc.*