# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FINANCIALAPPS, LLC,                )
                                   )
                    Plaintiff,     )
                                   )    C.A. No. 19-1337-GBW-CJB
          v.                       )
                                   )    **REDACTED PUBLIC VERSION**
ENVESTNET, INC. and                )
YODLEE, INC.,                      )
                                   )
                    Defendants.    )
                                   )

## ENVESTNET, INC.'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT NO. 2

OF COUNSEL:

Gary M. Miller
Gary M. Elden
John D. Garretson
Amy Y. Cho
Justin R. Donoho
Ian M. Hansen
SHOOK, HARDY & BACON LLP
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
(312) 704-7700

Henry E. Gallagher, Jr. (No. 495)
Lauren P. DeLuca (No. 6024)
CONNOLLY GALLAGHER LLP
1201 North Market St., 20th Floor
Wilmington, DE 19801
(302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

*Attorneys for Defendants Yodlee, Inc. and Envestnet, Inc.*

Dated: January 6, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

LEGAL STANDARD......................................................................................................... 6

ARGUMENT ..................................................................................................................... 8

I.   COUNTS I AND II FAIL BECAUSE FA'S PURPORTED TRADE SECRETS
     ARE NOT SECRET. ................................................................................................ 8

     A.   PowerWallet technology in the Platform is not secret.......................................... 8

     B.   FA disclosed its purported trade secrets in patents and other public-facing
          documents. ................................................................................................. 9

     C.   Yodlee possessed much of the purported trade secret information prior to the
          inception of its relationship with FA. ............................................................ 10

     D.   FA disclosed specific documents containing purported trade secrets to third
          parties without confidentiality protections....................................................... 10

          i.    FA's disclosures of the Data Dictionary precludes trade secret
                status for anything contained therein. ..................................................... 11

          ii.   FA's disclosure of the Training PowerPoint precludes trade secret
                status for any information it contains....................................................... 15

          iii.  FA's disclosure of the API Manual and JSON Schema preclude
                trade secret status. ................................................................................. 15

     E.   Because none of FA's purported trade secrets were a secret, they cannot derive
          economic value from their secrecy. ................................................................ 16

II.  COUNTS 1 AND 2 FAIL BECAUSE FA DID NOT MAINTAIN
     REASONABLE SECURITY MEASURES OVER ITS PURPORTED TRADE
     SECRETS. ............................................................................................................. 19

     A.   FA failed to maintain reasonable security measures by disclosing purported trade
          secrets to third parties absent confidentiality protections. ................................. 19

     B.   FA failed to maintain reasonable security measures over all information that was
          available on the Website. ............................................................................. 20

CONCLUSION......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)..............................................................................................7

*BDT Prod., Inc. v. Lexmark Int'l, Inc.*,
    274 F. Supp. 2d 880 (E.D. Ky. 2003), *aff'd*, 124 F. App'x 329 (6th Cir. 2005) .........14, 15, 16

*Bradbury Co. v. Teissier-duCros*,
    413 F. Supp. 2d 1209 (D. Kan. 2006) ................................................................16, 18

*Dow Chem. Canada Inc. v. HRD Corp.*,
    909 F. Supp. 2d 340 (D. Del. 2012), *aff'd* 587 F. App'x 741 (3d Cir. 2014)....................7, 20

*E.I. du Pont de Nemours & Co. v. Hou*,
    2017 WL 2531940 (D. Del. June 9, 2017)..............................................................19

*Feenix Payment Sys., LLC v. Steel Cap. Mgmt., LLC*,
    2021 WL 2587844 (D. Del. June 24, 2021)...............................................................9

*Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*,
    2010 WL 338219 (Del. Ch. Jan. 29, 2010)...................................................... *passim*

*Inteum Co., LLC v. Nat'l Univ. of Singapore*,
    371 F. Supp. 3d 864, 877-78 (W.D. Wash. 2019) ................................................17

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974)....................................................................................8, 9, 10

*KT Grp. Ltd. v. NCR Corp.*,
    2018 WL 11213091 (S.D.N.Y. Sept. 29, 2018).........................................12, 13, 15

*Marketel Int'l, Inc. v. Priceline.com, Inc.*,
    36 F. App'x 423 (Fed. Cir. 2002) ......................................................................13

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................................................6

*Motor City Bagels, L.L.C. v. Am. Bagel Co.*,
    50 F. Supp. 2d 460 (D. Md. 1999) (D. Md. 1999)...........................................13, 19

*On-Line Tech v. Bodenseewerk Perkin-Elmer*,
    386 F.3d 1133 (Fed. Cir. 2004).............................................................................9

*Peloton Interactive, Inc. v. iFIT Inc.*,
2022 WL 1523112 (D. Del. May 13, 2022)...............................................7, 20

*Podobnik v. U.S. Postal Serv.*,
409 F.3d 584 (3d Cir. 2005)...............................................................................7

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)...........................................................................10, 14, 15

*Silicon Image, Inc. v. Analogix Semiconducter, Inc.*,
2008 WL 166950 (N.D. Cal. Jan. 17, 2008) ....................................................13

*Structured Capital Solutions LLC v. Commerzbank AG*,
177 F. Supp. 3d 816 (S.D.N.Y. 2016)...............................................................13

*Sun Media Sys., Inc. v. KDSM, LLC*,
564 F. Supp. 2d 946 (S.D. Iowa 2008) ......................................................16, 18

*SW. Stainless, LP v. Sappington*,
582 F.3d 1176 (10th Cir. 2009) ............................................................. *passim*

*Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
2009 WL 1387115 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) ...............10, 12

*Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*,
2014 WL 897223 (Del. Ch. Mar. 5, 2014)..........................................................9

**Statutes**

35 U.S.C. § 112(a) ............................................................................................3, 18

Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1839(3), *et seq.* ......................... *passim*

Delaware Uniform Trade Secrets Act ("DUTSA"), Del. Code § 2001(4), *et seq.* ............... *passim*

**Rules**

Fed. R. Civ. P. 56(a)..............................................................................................6

## INTRODUCTION

For Counts 1 and 2 of its Complaint, FinancialApps, LLC ("FA") asserts claims for trade secret misappropriation against Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee") under the federal Defend Trade Secrets Act ("DTSA") and the Delaware Uniform Trade Secrets Act ("DUTSA"). FA alleges that Envestnet and Yodlee misappropriated trade secrets relating to its software platform (the "FA Platform") and used those trade secrets to develop competing creditworthiness reporting products for use by banks and lenders.

FA's claims are specious. There is no evidence that Envestnet or Yodlee used any of FA's purported trade secrets to develop any competing products. Indeed, as laid out in Envestnet's separate Motion for Summary Judgment No. 1, there is no evidence that any Envestnet personnel so much as *accessed* any of the documents FA has claimed contain its trade secrets. But FA's claims also fail for a simpler and more fundamental reason—none of FA's purported trade secrets are, in fact, secret. To the contrary, as FA's principal investor testified, others in the industry possessed and were giving away the same technology underlying the FA Platform for free.

The claimed trade secret at issue in this case is not the source code underlying the FA Platform as the parties agree that neither Envestnet nor Yodlee ever had access to FA's source code. Rather, FA has asserted that Envestnet and Yodlee misappropriated and used other information about its Platform. FA remains vague about what information, specifically, was taken and used, but it has asserted that the trade secret information at issue is found somewhere in a series of specific technical documents.

However, many of these specific technical documents contain information that is disclosed in publicly available documents or information that Yodlee already possessed by the time it met FA. Others were disclosed by FA to third parties without the protections of a confidentiality agreement or even were posted on a developer website FA maintained (but failed to preserve for

litigation) that anyone with an internet connection could access without need of so much as a password. None of the information in these documents qualifies for trade secret protection, and FA's proffered expert opined that just one of these disclosed documents ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ SOF ¶ 8, Ex. 2 at 19-20, ¶ 31.) After accounting for all of these disclosures, there is nothing left to claim as a trade secret.

FA must show, as threshold elements to establish the existence of a trade secret, that: (1) its claimed trade secret in fact was secret, and (2) it used reasonable security measures to protect it. FA fails on both prongs. Envestnet is entitled to summary judgment on FA Counts 1 and 2.

## FACTUAL BACKGROUND

### A. Neither Envestnet nor Yodlee had access to or copied FA's source code.

The Parties agree that neither Envestnet nor Yodlee had access to the source code underlying the FA Platform. (SOF ¶ 2.) Accordingly, there is no factual issue as to whether Envestnet or Yodlee took or used the actual source code underlying the FA Platform.

### B. FA's alleged trade secrets.

According to FA's Complaint, its alleged trade secrets consist of the following purported aspects of the FA Platform: ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ (SOF ¶ 1; Ex. 2 Section X; D.I. 1 ¶¶ 35-64).

According to FA's proffered expert Isaac Pflaum, FA's alleged trade secrets at issue consist of ████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ (SOF ¶ 1; Ex. 2 § X).  FA and Pflaum now have claimed that the trade

secret information is contained in the following documents:  ██████████████████████

██████████████████████████████████████████████████

████████████████████ Each document is discussed below.

**C.     Others were providing "the same technology" underlying the Platform "for free."**

FA's earliest attempt to commercialize its technology was a product called PowerWallet,

which was intended to help individuals manage their personal finances.  (SOF ¶ 6; Ex. 27 29:22-

30:3.)  Importantly, ████████████████" underlying PowerWallet was incorporated into the FA

Platform used for Risk Insight 2.0.  (SOF ¶ 6.)  FA's principal investor, Howard Dvorkin, testified

PowerWallet failed to turn a profit ██████████████████████████████████████

██████████████████████████████████ (SOF ¶ 7; Ex. 27 28:15-29:5.)

**D.     FA's purported trade secrets were available in public documents.**

On July 5, 2019, FA filed a patent application describing "[a] computer implemented

system for aggregating and analyzing financial and other data for creating reports and decisions in

real time."  (SOF ¶ 4; App. A, Tab 12, '140 Application).  A patent was issued to FA based on the

application, (*id.* Tab 13, '462 Patent), meaning that the patent's specification was ***sufficiently full,***

***clear, concise, and exact to enable any person skilled in the art to make and use the invention***

***described***.  35 U.S.C. § 112(a).  These public patent filings disclose the Relevancy Engine and

other aspects of the FA Platform.  For example, the '462 Patent describes the ██████████████

██████████████████████████████████████████████████

████████████████████████ (SOF ¶¶ 2–3; App. A, Tab 13, '462 Patent.)

Numerous other documents placed by FA into the public domain also disclose many of FA's alleged trade secrets. Such documents include a whitepaper, data sheets, and sample reports—all of which were distributed to prospective customers—as well as a detailed presentation FA personnel delivered at a developer conference. (SOF ¶ 4.) ███████████

████████████████████████████████████████████████████████████

███████████ (App. A, Tabs 33-35.) ███████████████████████████

███████████████████████████████ (*Id.*) ████████████████████

████████████████████████████████████████████████████████████

(*Id.*) ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████ (App. A, Tab 27.) ███████████████████████████

████████████████████ (SOF ¶ 4; App. A, Tabs 1-3.)

### E.    Yodlee already possessed much of the information FA claims as proprietary.

Yodlee had developed and marketed similar creditworthiness reporting software before it ever met FA. Documents relating to those products—which undisputedly were in Yodlee's possession before it entered into a relationship with FA in January of 2017—also contain information FA has claimed as proprietary. (SOF ¶ 5.) For example, Yodlee's API Implementation Guide from 2016 ████████████████████████████████████████

████████████████████████████████████ (SOF ¶ 5; App. A., Tab 18.)

Yodlee's Fastlink 2.0, as evidenced by its Product Description, describes ███████████

████████████████████████████████████████████████████████████

4

████████████████████████ (SOF ¶ 5; App. A., Tab 16.)[1]

**F.     FA made non-confidential disclosures of documents undisputedly containing its purported trade secrets.**

On March 27, 2019, FA emailed a copy of the ████████████ to Christian Dye at NTT Data (a Japanese multinational IT service and consulting company that provides application development and related services).  (SOF ¶¶ 9–10.)  According to FA's own expert, this version of the ████████ sent to Dye is a ████████████ of FA's purported trade secrets and it alone ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ (SOF ¶ 8(a-d).)  Neither Christian Dye individually, nor NTT Data as an entity has executed an NDA or other confidentiality agreement with FA.  (SOF ¶ 12.)

On July 27, 2017, FA emailed Brian Francis at FormFree (a mortgage lending technology provider) a copy of the ██████████████████████████████████████████

████████ (SOF ¶ 14.)  These documents each contain FA's purported trade secrets.  (SOF ¶ 13.)  Subsequently, from October 19, 2017, to January 19, 2018, FA made additional disclosures of later versions of these same documents to Brian Francis and Doug Brewer at FormFree, including sending them ████████████████████████████ (SOF ¶ 15.)  Brian Francis and Doug Brewer did not execute an NDA with FA and the only NDA that FormFree executed with FA expired over two months before this disclosure occurred.  (SOF ¶ 16.)

---

[1] Appendix A to Envestnet's Statement of Facts contains copies of the specific documents cited in Sections C and D of this Factual Background, as well as additional documents (in total 38) that (1) were either publicly available or in Yodlee's possession prior to the beginning of the Yodlee-FA relationship, and (2) contain information FA has claimed as proprietary.  (SOF ¶¶ 3-5.)  None of the information contained in Appendix A is secret and therefore cannot form the basis of FA Counts 1 and 2.

In May of 2018, FA made multiple disclosures of a 179‑██████████ ██████████████████████████████████ that includes FA's purported trade secrets, including ████████████████████████████████ (SOF ¶ 16.) FA disclosed the ████████████ to Steven Horwitz at Morgan Hill Partners (a management consulting firm), Terry Askew at Western Union (a multinational financial services company), and "undisclosed-recipients." (SOF ¶¶ 19-20.) None of these individuals or entities was covered by an NDA or other confidentiality agreement. (SOF ¶ 21.)

**G.    FA's publicly-available developer website disclosed purported trade secrets.**

FA used the Website, formerly located at https://developer.financialapps.com, to upload and share information with prospective developers, purchasers, product managers, and others. (SOF ¶ 22.) Website users were not limited to those who had signed NDA's—to the contrary, *anyone* with access to the internet could access and use the Website without need of a password. (SOF ¶ 23.) FA published the information contained in what FA's expert has claimed was an ████████████████████████████ on the Website and updated that information until at least "early mid 2017." (SOF ¶¶ 24–25.) The record shows that FA kept the technical information it had posted on its Website current through at least June 28, 2017. (SOF ¶ 25.) At that point, FA's ████████████████████████████ contained a significant amount of the information FA claims constitute its trade secrets. (SOF ¶ 26 (a-f).) For example, the Spring 2017 version of the ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ (SOF ¶ 26 (a-f).)

<u>**LEGAL STANDARD**</u>

Summary judgment should be entered where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To defeat a

motion for summary judgment, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting FED. R. CIV. P. 56(a)). The mere existence of some evidence in support of the nonmoving party is insufficient. The nonmoving party must provide enough evidence to enable a jury to reasonably find for it on that issue. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986). The non-moving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005).

FA has the burden to prove the existence of a trade secret. *See Dow Chem. Canada Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 347 (D. Del. 2012), *aff'd* 587 F. App'x 741 (3d Cir. 2014) (The Plaintiff bears "the burden to establish facts from which one could conclude the existence of trade secrets."); *Peloton Interactive, Inc. v. iFIT Inc.*, 2022 WL 1523112, at *2 (D. Del. May 13, 2022) ("To establish a violation of the DTSA, [Plaintiff] must prove: '(1) the existence of a trade secret . . .'") (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)); *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219 at * 16 (Del. Ch. Jan. 29, 2010) ("under the DUTSA, the plaintiff affirmatively must prove . . . that a trade secret exists . . ."). Under both the DTSA and the DUTSA, FA must make two threshold showings to avoid summary judgment. *First*, FA's claimed trade secret must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B); 6 Del. Code § 2001(4)(a). *Second*, FA must have "taken reasonable measures" to ensure its claimed trade secret remained "secret." 18 U.S.C. § 1839(3)(A); 6 Del. Code § 2001(4)(b).

**ARGUMENT**

Counts 1 and 2 fail because FA cannot satisfy either threshold element under DTSA and DUTSA. *First*, none of FA's purported trade secrets in fact are secret. *Second*, FA did not maintain reasonable security measures to maintain the secrecy of its purported trade secrets.

## I.  COUNTS I AND II FAIL BECAUSE FA'S PURPORTED TRADE SECRETS ARE NOT SECRET.

The requirement that a proffered trade secret derive independent economic value from its secrecy embodies the most fundamental principle of trade secret law—that the information at issue must in fact be a secret. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) ("The subject of a trade secret **must be secret**, and must not be of public knowledge or of a general knowledge in the trade or business")[2]; *Agrofresh Inc. v. Essentiv LLC*, 2020 WL 7024867 at *3 (D. Del. Nov. 30, 2020), *appeal dismissed sub nom. AgroFresh Inc. v. Decco U.S. Post-Harvest, Inc.*, 2021 WL 2555475 (Fed. Cir. Mar. 29, 2021) ("A necessary predicate [for a misappropriation claim] is a showing that Plaintiff possessed a trade secret, i.e., information that . . . derives independent economic value *from not being generally known or readily ascertainable by proper means*"). Here, FA's purported trade secrets were not secret because each one was either: (1) disclosed in patent filings or other public-facing documents; (2) already possessed by Yodlee prior to the inception of the commercial relationship between Yodlee and FA; (3) specifically disclosed by FA to third parties who owed no confidentiality obligations to FA; and/or (4) published on FA's publicly-accessible developer Website.

### A.  PowerWallet technology in the Platform is not secret.

The FA Platform is comprised of technology that originally was developed for a

---

[2] Emphasis added throughout unless otherwise noted.

predecessor product called PowerWallet. (SOF ¶ 6.) FA claims that the PowerWallet technology was ███████████████████████████████████████████████████████ (Ex. 28 ¶¶ 15, 65.) But none of this technology qualifies for trade secret status because, as FA's principal investor explained, ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ (SOF ¶¶ 6-7.) Accordingly, the aspects of the FA Platform that originated with PowerWallet do not qualify for trade secret protection. *Kewanee Oil*, 416 U.S. at 475.

### B. FA disclosed its purported trade secrets in patents and other public-facing documents.

Many of FA's alleged trade secrets were widely disclosed to the public—either through FA's patent filings or other public-facing documents. FA's '462 Patent disclosed the key functionality of ████████████████████ (SOF ¶ 4; App. A, Tab 13.) ████████████████████ ████████████████████████████████ also were made publicly available in ████████████████ ██████████████████████████████████ circulated to prospective customers. (SOF ¶ 4.)

As a matter of law, none of the information contained within these documents is a trade secret. *On-Line Tech v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed. Cir. 2004) ("After a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret."); *Feenix Payment Sys., LLC v. Steel Cap. Mgmt., LLC*, 2021 WL 2587844 at *3 (D. Del. June 24, 2021) ("To qualify as a trade secret. . . the information must not be publicly available"); *Great Am. Opportunities*, 2010 WL 338219 at *18 (information that could be "obtained by making a modest effort searching [the] website or similar public listings" was not a trade secret under the DUTSA); *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223 at *15 (Del. Ch. Mar. 5, 2014), judgment entered, (Del. Ch. 2014) (holding the information at issue was not a trade secret because there was no evidence it was not

publicly available).  Thus, Counts 1 and 2 fail to the extent premised on any information contained in them.  *Kewanee*, U.S. 416 U.S. at 475 (trade secrets "must not be of public knowledge").

## C. Yodlee possessed much of the purported trade secret information prior to the inception of its relationship with FA.

Other information that FA now claims is a trade secret cannot be so because the record shows that the information was in Yodlee's possession ***before*** Yodlee and FA executed the MSA in January 2017.  In particular, ███████████ similar to those FA now claims are its "trade secrets" were present in Yodlee's earlier products, as demonstrated by Yodlee's API documentation and integration guides.  (SOF ¶ 5.)  Information that is "general knowledge in the trade or business" cannot be a trade secret.  *Kewanee*, U.S. 416 U.S. at 475; *see also AgroFresh Inc.*, 2020 WL 7024867 at *3.  As the information contained in Yodlee's pre-MSA documentation was undisputedly not only known in the industry, but known *by Yodlee specifically*, such information cannot constitute a trade secret that can sustain Counts 1 and 2.

## D. FA disclosed specific documents containing purported trade secrets to third parties without confidentiality protections.

During the expert-discovery phase, FA pivoted to claiming that specific technical documents contain the purported trade secrets at issue in Counts 1 and 2.  But it is well established that such documents and information that are disclosed without confidentiality protections cannot be trade secrets.  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.").

For that reason, courts in Delaware and across the country routinely find that a disclosure of trade secrets to individuals or entities that are not obligated to maintain the confidentiality of those trade secrets precludes trade secret status.  *See, e.g.*, *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *22 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010).

FA disclosed undisputedly ████ sources of FA's alleged trade secrets—including ████ ████████████████████████████████████████—to third parties without the protection of a confidentiality agreement. As with the materials discussed in Sections I.A and I.B above, nothing contained in these disclosures can constitute a trade secret.

### i. FA's disclosures of the ████████ precludes trade secret status for anything contained therein.

The most important technical document for FA's case—according to FA's proffered expert, at least—████████████████████████████████ Pflaum testified that ████████████████████████████████ (Ex. 6 at 132:4-6) and ████ ████████████████████████ (*Id.* at 132:13-14.) Pflaum emphasized that t████ ████████████████████████████████████████████████████

(*id.* at 132:25-133:1)—so much so that it:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

(Ex. 2 at 19-20, ¶ 31.) ████████████ is central to his analysis; Pflaum references it hundreds of times across his written reports.

Its purported importance notwithstanding, FA at various points disclosed multiple versions of ████████ to third parties with no confidentiality protections in place. Most glaringly, on March 27, 2019, FA emailed the full ████████████████ to Christian Dye ("Dye"), who at the time was "Senior Management Consultant" at NTT Data Corporation ("NTT Data"). (SOF ¶¶ 9-10.) And although this disclosure furnished both Dye and NTT Data with, in Pflaum's words, ████████████████████████████████████████████

████████████████████████████████████████████

████████ (Ex. 2 at 19-20 ¶ 31), there is no record evidence of any confidentiality agreement

between FA and either Dye *or* NTT Data. (SOF ¶ 12.) This disclosure alone therefore suffices to preclude trade secret status for everything contained in the Data Dictionary. *See SW. Stainless, LP v. Sappington*, 582 F.3d 1176, 1189-90 (10th Cir. 2009) (reversing bench trial to hold that purported trade secret lost its trade secret status based on disclosure to a single entity without an NDA); *KT Grp. Ltd. v. NCR Corp.*, 2018 WL 11213091, at *14 (S.D.N.Y. Sept. 29, 2018) (disposing of misappropriation claims on summary judgment because one disclosure of purported trade secret to owner's vendor destroyed trade secret status).

Envestnet anticipates that FA will attempt to argue that Dye was FA's employee at the time of the disclosure, such that no NDA was necessary. This fails for three reasons. *First*, there is no evidence that Dye was employed by FA at any point, and certainly not as of March 27, 2019. To the contrary, the record shows that Dye was a Senior Management Consultant at NTT Data at the time of the disclosure. (SOF ¶ 11.) And while there is evidence that Dye performed work for FA as an independent contractor at some point later in 2019, the record is clear that as late as October 14, 2019—that is, five months after the disclosure—FA was paying Dye *as an independent contractor*, not an employee. (*See* SOF, ¶ 11; Ex. 11.) *Second,* it would not matter even if Dye *had* been employed by FA at the time of the disclosure, because even disclosures to then-present employees without NDA protection can preclude trade secret status. *See Triton*, 2009 WL 1387115 (post-trial finding that sharing purported trade secrets with a small number of employees precluded trade secret status). *Third*, Dye's status at the time of the disclosure is irrelevant as to *NTT Data*. FA's March 27, 2019 email placed the ███████████ in NTT Data's possession as much as Dye's, and the record contains no confidentiality agreement between FA and NTT Data.

On July 27, 2017 FA similarly disclosed an earlier version of the ███████████—which Pflaum does not dispute contains FA's purported trade secrets—to Brian Francis and Doug Brewer

of FormFree without any confidentiality agreements in place with any of Francis, Brewer, or FormFree. (SOF ¶¶ 13–16.) FA continued to send updated versions of the █████████ to Francis, Brewer, and FormFree, and never under the protection of a confidentiality agreement. *Id.* Again, just one of these disclosures, standing alone, is sufficient to preclude trade secret status for all of the purported trade secrets contained in the ███████. *Sw. Stainless, LP*, 582 F.3d at 1189-90 (rejecting trade secret status based on disclosure to a single entity); *KT Grp. Ltd.*, 2018 WL 11213091 at \*14 (same).

FA may try to invoke an older NDA it had executed with FormFree to cure these disclosures. But that older NDA between FA and FormFree expired on May 16, 2017—that is, two months before FA's first disclosure of the ███████ to FormFree (on July 27, 2017). This expired NDA provides FA no cover. *See Structured Capital Solutions LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 835-36 (S.D.N.Y. 2016) (holding that information disclosed to a third party "pursuant to a nondisclosure agreement that had . . . since expired" precluded trade secret status); *Marketel Int'l, Inc. v. Priceline.com, Inc.*, 36 F. App'x 423, 425 (Fed. Cir. 2002) (rejecting an argument that an "implied duty of confidentiality" extended beyond the expiration of an NDA because "the written non-disclosure agreement supplanted" any such duty); *see also Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 2008 WL 166950, at \*17 (N.D. Cal. Jan. 17, 2008) (noting that a number of "courts have denied trade secret protection where allegedly confidential information has been revealed to third parties . . . where the information was disclosed under a non-disclosure agreement with only a limited duration"). And as courts routinely recognize, the fact that a trade secret holder takes some measures to protect its trade secrets does not cure subsequent failures to continue taking those measures. *See Sw. Stainless, LP*, 582 F.3d at 1189-90 (rejecting trade secret status in light of a single unprotected disclosure even though plaintiff

"t[ook] *general* measures to keep its company information private") (emphasis original); *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 480 (D. Md. 1999) (D. Md. 1999) (rejecting trade secret status after disclosure of purported trade secret without obtaining NDAs even though plaintiff had obtained NDAs from other individuals in other instances).

Similarly, the fact that FormFree entered into a business relationship with Yodlee does not save FA's purported trade secret status. Disclosures of purported trade secrets even to potential customers or business partners can preclude trade secret status. *SW. Stainless, LP*, 582 F.3d at 1189-90 (reversing bench trial to hold that purported trade secret lost its trade secret status based on disclosure to a customer without an NDA); *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 890-91 (E.D. Ky. 2003), *aff'd*, 124 F. App'x 329 (6th Cir. 2005) (disposing of misappropriation claims on summary judgment after finding that disclosure of purported trade secrets to potential customers or business partners without an NDA destroyed trade secret status). Nor can FA find shelter under *Yodlee's* contract with FormFree, as that contract expressly precludes third party beneficiaries from enforcing or claiming benefits under its provisions. (SOF ¶ 17, Ex. 20, ¶ 17.11.)

Finally, earlier iterations of the ███████████ were disclosed on the Website and updated through June 2017. (SOF ¶¶ 24-25.) While the exact contents of the latest version of this information are unknown due to FA's failure to preserve the Website or any records of the Website's contents, a version of the ███████████ dated one month ***before*** FA stopped updating the Website undisputedly contained purported FA trade secrets. (SOF ¶ 26.) Despite this, FA disclosed the information from its ███████████ on a public-facing Website that anyone with an internet connection could access without so much as a password. (SOF ¶ 23.) This disclosure precludes trade secret status for any information contained in the versions of the ███████████

14

that were made available on the Website.  *See Ruckelshaus*, 467 U.S. at 1002 (trade secret status is not possible when the purported owner "publicly discloses the secret").

         **ii.**    **FA's disclosure of the ████████████ precludes trade secret status for any information it contains.**

Another key document (according to Pflaum) is FA's ████████████████ Pflaum claimed that the ███████████████████████████████ ████████████████████████████████████████████████████ ████████████ (SOF ¶ 18, Ex. 15 at ¶ 492.)

As with the ████████, FA disclosed the ████████████ several times without confidentiality protections.  In May 2018, FA sent the ████████████ to the following individuals and entities:  (1) Steven Horwitz of Morgan Hill Partners (a consulting firm) (SOF ¶ 19); (2) certain "undisclosed-recipients" (SOF ¶ 19); and (3) Terry Askew of Western Union (a multinational financial services company).  (SOF ¶ 20.)  The record contains no evidence of any confidentiality agreement executed between FA and any of these individuals or entities.  (SOF ¶ 21.)  The information contained in the ████████████ therefore cannot be a trade secret.  *See BDT Prod., Inc.*, 274 F. Supp. 2d at 890-91 (finding trade secret status precluded based on unprotected disclosures to potential customers or business partners); *KT Grp. Ltd.*, 2018 WL 11213091 at *14 (disposing of misappropriation claims on summary judgment based on single disclosure to the owner's vendor); *Ruckelshaus*, 467 U.S. at 1002 (information disclosed "to others who are under no obligation to protect the confidentiality of the information" is not a trade secret).

         **iii.**   **FA's disclosure of the ████████████████ preclude trade secret status.**

On July 27, 2017, FA also disclosed copies of its ███████████████████ ████████████ to Francis and FormFree without any confidentiality agreement in place.  (SOF ¶ 14.)  These documents also contained information FA has claimed constitute its trade secrets.

(SOF ¶ 13.)  This disclosure to FormFree precludes trade secret status for all of the information these documents contain for the same reasons articulated above in Section I(C)(i).  *See Sw. Stainless, LP*, 582 F.3d at 1189-90 (rejecting trade secret status in light of a single unprotected disclosure even though plaintiff "t[ook] *general* measures to keep its company information private"); *BDT Prod.,* 274 F. Supp. 2d at 890-91 (disposing of misappropriation claims on summary judgment based on disclosure of purported trade secrets to potential customers or business partners without an NDA).  Accordingly, none of the information contained in the ███ ████████████████████████████████ can sustain Counts 1 and 2.

**E.  Because none of FA's purported trade secrets were a secret, they cannot derive economic value from their secrecy.**

To salvage Counts 1 and 2, FA "affirmatively must prove . . . that a trade secret exists." *Great Am. Opportunities*, 2010 WL 338219 at *16.  This requires FA to prove that its claimed trade secret is "not generally known to . . . or readily ascertainable by" professionals in FA's industry—i.e. that the information is in fact, secret.  18 U.S.C. § 1839(3)(B); 6 Del. Code § 2001(4)(a).  FA has not done so and indeed cannot do so.  As will be discussed at length in Defendants' forthcoming motion to exclude certain testimony of FA's proffered expert Isaac Pflaum, Pflaum has not even opined that any purported trade secrets were not generally known within the fintech industry—nor is he qualified to do so.  FA's failure to meet this burden as to any purported trade secrets likewise dooms Counts 1 and 2.  *Sun Media Sys., Inc. v. KDSM, LLC*, 564 F. Supp. 2d 946, 969 (S.D. Iowa 2008) (disposing of misappropriation claims on summary judgment because the plaintiff "pointed to no evidence in the record that would support [] a conclusion" that the purported trade secrets "were unknown to Defendants specifically or were not otherwise readily ascertainable"); *Bradbury Co. v. Teissier-duCros*, 413 F. Supp. 2d 1209, 1221-1224 (D. Kan. 2006) (disposing of misappropriation claims where the plaintiff "fails to provide

facts that show that [its purported trade secrets] were not readily ascertainable").

Further, as discussed at length above, each of FA's purported trade secrets was either already known in the industry, made available to the public, already known by Yodlee prior to meeting FA, and/or disclosed to individuals outside the protections of a confidentiality agreement. As the undisputed record shows that none of this information was in fact secret, FA cannot show that the information derived independent economic value *from its secrecy*, as required to show the existence of a trade secret under the DTSA or the DUTSA. *See, e.g., Great Am. Opportunities*, 2010 WL 338219 at \*16. ("to prove that a trade secret exists, [Plaintiff] must demonstrate [] that it possessed information sufficiently secret ***and valuable*** to give it a competitive advantage"); *Inteum Co., LLC v. Nat'l Univ. of Singapore*, 371 F. Supp. 3d 864, 877-78 (W.D. Wash. 2019) (disposing of misappropriation claims on summary judgment, in part, because Plaintiff failed to provide evidence that the trade secret "derive[s] economic value from being kept secret" and thus "Plaintiff has not carried its burden of establishing that the DD tables are entitled to protection as trade secrets"). Indeed, as FA's principal investor testified, FA's pre-Yodlee attempt to commercialize the technology now underlying the FA Platform was unprofitable ████ ██████████████████████████████████████████ (SOF ¶ 18-19, Ex. 27 at 28:15-29:5.)

In sum, as laid out in detail above, the information in each of the following documents was either (1) known in the industry, (2) publicly available, (3) already in Yodlee's possession, or (4) specifically disclosed by FA to third parties without confidentiality protections: ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Accordingly, there is no triable issue of fact as

to whether the information contained in these documents qualifies for trade secret protection.

Neither Envestnet nor Yodlee had access to the source code underlying the FA Platform. (SOF ¶ 2.) And after excluding all of the PowerWallet technology and the technical information contained in the foregoing documents, FA has made no showing of what, if anything, is left. For example, FA's publicly available '462 Patent specification is sufficiently full, clear, concise, and exact to enable any person skilled in the art to make and use the Platform. *See* 35 U.S.C. § 112(a). The ██████████ disclosed without confidentiality protections to Dye, NTT Data, FormFree, and others is a ████████████████████████ (Ex. 6 at 132:25-133:1) that, according to FA's expert, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████ (Ex. 2 at 19-20, ¶ 31.) The ██████████████ disclosed without confidentiality protections to Steven Horwitz, Morgan Hill Partners, Terry Askew, and Western Union ██████████ ██████████████████████████████████████ that FA's expert has opined constitute FA's trade secrets. (Ex. 15 at 208 ¶ 492.) In light of the totality of these disclosures, FA has failed to pinpoint any truly secret and independently valuable information relating to the Platform. Envestnet therefore is entitled to summary judgment on Counts 1 and 2. *See Bradbury Co.*, 413 F. Supp. at 1221-24 (disposing of multiple misappropriation claims on summary judgment because the plaintiff "fails to provide facts that show that [its purported trade secrets] were not readily ascertainable"); *Sun Media Sys.*, 564 F. Supp. 2d at 969 (disposing of misappropriation claims on summary judgment because "Plaintiff cannot show that such 'trade secrets' were unknown to Defendants specifically or were not otherwise readily ascertainable, and has pointed to no evidence in the record that would support such a conclusion").

## II. COUNTS 1 AND 2 FAIL BECAUSE FA DID NOT MAINTAIN REASONABLE SECURITY MEASURES OVER ITS PURPORTED TRADE SECRETS.

To avoid summary judgment, FA also must satisfy a second threshold element by showing that it maintained reasonable security measures over its purported secrets. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Hou*, 2017 WL 2531940, at *2 (D. Del. June 9, 2017) ("A failure by the owner to employ reasonable security measures to safeguard its trade secrets can cause such information to lose its trade secret status.") (internal quotations removed) (quoting *Bro–Tech v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009)). In light of its multiple unprotected disclosures of its purported trade secrets and the lack of security measures enacted to protect the information it posted on the Website, FA has not satisfied and cannot satisfy this element. Envestnet is entitled to summary judgment on Counts 1 and 2.

### A. FA failed to maintain reasonable security measures by disclosing purported trade secrets to third parties absent confidentiality protections.

One of the most basic security measures used to protect trade secrets are nondisclosure and other confidentiality agreements. As discussed above, FA disclosed many of its purported trade secrets to contractors, potential competitors, potential customers, and others without ensuring that those individuals and entities were required to maintain the confidentiality of its purported secrets. (*See* Section I(C) *supra*.) In the words of FA's proffered expert, these disclosures furnished the recipients with ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ (Ex. 2 at 19-20 ¶ 31.)

The fact that FA sometimes *did* execute confidentiality agreements with third parties does not cure its failure to do so in the instances discussed at length above. *See Sw. Stainless, LP*, 582 F.3d at 1189-90 (rejecting trade secret status in light of a single unprotected disclosure even though plaintiff "t[ook] *general* measures to keep its company information private"); *Motor City Bagels*,

50 F. Supp. 2d at 480 (rejecting trade secret status because plaintiff disclosed its purported trade secret to a group of investors without obtaining NDAs from the investors even though plaintiff had obtained NDAs from other individuals in other instances before disclosing its purported trade secret). As FA cannot establish that it took reasonable security measures to protect any of the information contained in documents it disclosed to third parties without confidentiality protections, none of the information contained in those documents can form the basis of Counts 1 and 2.

### B. FA failed to maintain reasonable security measures over all information that was available on the Website.

As discussed above, various purported trade secrets were made available on the Website and updated at least through June 2017. (SOF ¶¶ 24-26.) Despite the purported value of this information to FA, there were no technical safeguards implemented on the Website to protect the so-called secrets. Neither an NDA nor any other kind of confidentiality agreement was required to use the Website. (SOF ¶ 23.) The Website was not password-protected; users of the Website were not required to register with FA or limited to those with specific credentials; and the Website was admittedly available to anyone with access to the internet. (SOF ¶ 23.)

This complete lack of security measures precludes trade secret status for any and all information contained on the Website, which—as discussed above—includes information which FA now claims forms part of the basis for Counts I and II. *Dow Chem.*, 909 F. Supp. 2d at 347; *Peloton*, 2022 WL 1523112, at *2; *Great Am. Opportunities*, 2010 WL 338219 at *16. Because FA cannot meet its burden to establish that it took reasonable security measures to protect this information, it cannot support Counts I and II.

### CONCLUSION

For the foregoing reasons, Envestnet, Inc. respectfully requests that the Court enter summary judgment in its favor on FA's Counts 1 and 2.

OF COUNSEL:                          CONNOLLY GALLAGHER LLP

Gary M. Miller                       */s/ Henry E. Gallagher, Jr.*
Gary M. Elden                        Henry E. Gallagher, Jr. (No. 495)
John D. Garretson                    Lauren P. DeLuca (No. 6024)
Amy Y. Cho                           1201 North Market St., 20th Floor
Justin R. Donoho                     Wilmington, DE 19801
Ian M. Hansen                        (302) 757-7300
SHOOK, HARDY & BACON LLP             hgallagher@connollygallagher.com
111 S. Wacker Dr., Suite 4700        ldeluca@connollygallagher.com
Chicago, IL 60606
(312) 704-7700

Dated:  January 6, 2023              *Attorneys for Defendants Envestnet, Inc. and Yodlee, Inc.*

## CERTIFICATE OF SERVICE

I, Henry E. Gallagher, Jr., Esquire, hereby certify that on January 6, 2023, I caused to be electronically filed a true and correct copies of the foregoing sealed document(s) with the Clerk of the Court using CM/ECF, which will send notification of such filing to registered participants.

I further certify that on January 6, 2023, I caused the foregoing sealed document(s) to be served by e-mail on the following counsel of record:

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
Joshua E. Hollander
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10619
(212)506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com
jhollander@kasowitz.com

C. Barr Finn
Emily V. Burton
Pilar G. Kraman
Robert M. Vrana
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302)571-6600
bflinn@ycst.com
eburton@ycst.com
pkraman@ycst.com
rvrana@ycst.com


/s/ *Henry E. Gallagher, Jr.*
Henry E. Gallagher, Jr. (#495)