IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FINANCIALAPPS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ENVESTNET, INC.<br>and YODLEE, INC.,<br><br>Defendants. | C.A. No. 19-1337-GBW-CJB<br><br>**REDACTED VERSION** |

**PLAINTIFF'S OPENING BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
<u>ON DEFAMATION COUNTERCLAIM</u>**

KASOWITZ BENSON TORRES LLP

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com

Dated: January 6, 2023

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

C. Barr Flinn (No. 4092)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff FinancialApps, LLC*

# **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ............................................................................................................................. 2

I.      Legal Standard ................................................................................................................. 2

II.    The Allegedly Defamatory Statements Are Protected By The Fair Reporting Privilege .. 2

      A.     The Fair Reporting Standard.................................................................................. 2

      B.     The Statements Fairly And Accurately Reported On FinApps'
            Complaint.............................................................................................................. 3

            1.     The First Allegedly Defamatory Statement ............................................... 3

            2.     The Second Allegedly Defamatory Statement........................................... 5

            3.     The Third Allegedly Defamatory Statement.............................................. 7

III.   The Allegedly Defamatory Statements Can Be Construed Innocently ........................... 8

IV.   Defendants Cannot Establish An Essential Element Of Defamation ............................... 9

      A.     Defendants Cannot Show That FinApps Acted Negligently ................................. 9

            1.     FinApps Had Reasonable Bases For Its Statements That Defendants
                  Reverse Engineered, Stole, And Misappropriated FinApps'
                  Technology .............................................................................................. 10

            2.     FinApps Had Reasonable Bases For Its Statements Regarding
                  Defendants' Misrepresentations................................................................. 13

      B.     Defendants Cannot Establish That FinApps Acted With Actual Malice............. 14

V.    The Record Confirms That The Allegedly Defamatory Statements Are True ................ 15

      A.     Ample Evidence Demonstrates Defendants' Misconduct .................................. 15

            1.     Misappropriation And Theft ..................................................................... 15

            2.     Reverse Engineering ................................................................................. 18

      B.     Ample Evidence Demonstrates Defendants' Misrepresentations....................... 19

CONCLUSION....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Am. District Tel. Co. v. Brink's Inc.*,
   380 F.2d 131 (7th Cir. 1967) ...................................................................3

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..............................................................................2

*Benihana of Tokoyo, Inc. v. Benihana, Inc.*,
   828 F. Supp.2d 720 (D. Del. 2011) .........................................................1

*Brown & Williamson Tobacco Corp. v. Jacobson*,
   713 F.2d 262 (7th Cir. 1983) .................................................................14

*Bryson v. News Am. Publ'ns., Inc.*,
   672 N.E.2d 1207 (Ill. 1996) ...................................................................8

*Cianci v. Pettibone Corp.*,
   298 Ill. App. 3d 419 (1998) ..................................................................15

*DePinto v. Sherwin-Williams Co.*,
   776 F. Supp. 2d 796 (2011) ..................................................................14

*Doctor's Data, Inc. v. Barrett*,
   170 F. Supp. 3d 1087 (N.D. Ill. 2016) .....................................................3

*Fedders Corp. v. Elite Classics*,
   279 F. Supp. 2d 965 (S.D. Ill. 2003) .....................................................14

*FinancialApps, LLC v. Envestnet, Inc.*,
   2020 WL 4569466 (D. Del. 2020) ...........................................................2

*Fox v. Crain Commc'ns, Inc.*,
   2021 WL 4295773 (Ill. App. 1 Dist. 2021) .............................................15

*Healthsmart Pac., Inc. v. Kabateck*,
   212 Cal. Rptr. 3d 589 (Cal. Ct. App. 2016) .......................................2, 3, 5

*Huon v. Denton*,
   841 F.3d 733 (7th Cir. 2016) ...............................................................3, 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..............................................................................2

*Maui Jim, Inc. v. Smartbuy Guru Enters.*,
   386 F. Supp. 3d 926 (N.D. Ill. 2019) .......................................................9

*New York Times v. Sullivan*,
    376 U.S. 254 (1964).............................................................................14

*Owen v. Carr*,
    134 Ill. App. 3d 855 (1986) ...............................................................9

*Pope v. Chron. Publ'g. Co.*,
    95 F.3d 607 (7th Cir. 1996) ...............................................................9

*Smith v. Maldonado*,
    72 Cal. App. 4th 637 (1999) .............................................................15

*Solaia Tech., LLC v. Specialty Publ'g Co.*,
    852 N.E.2d 825 (Ill. 2006) .............................................................2, 3

*St. Amant v. Thompson*,
    390 U.S. 727 (1968).....................................................................10, 14

*Stoller v. Johnson*,
    2014 WL 1018069 (Ill. App. Ct. Mar. 13, 2014)............................2, 3

*Todd v. Lovecruft*,
    2020 WL 60199 (N.D. Cal. Jan. 6, 2020) ........................................10

*Troman v. Wood*,
    62 Ill. 2d 184 (1975) ..........................................................................9

## Statues / Rules

Fed. R. Civ. P. 56(a) .......................................................................1, 2

Plaintiff FinancialApps, LLC ("FinApps") respectfully submits this opening brief in support of its motion, under Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Defendant Envestnet Inc.'s ("Envestnet") defamation counterclaim in Count 3 of Defendants' First Amended Counterclaims (D.I. 160).[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Judgment should be entered in FinApps' favor on Envestnet's defamation counterclaim – which alleges that three statements reported in two news articles concerning the filing of this action "impugned the integrity of both Envestnet and Yodlee in their business" – for three independent reasons. *First*, all three statements are protected under the fair reporting privilege, which absolutely shields from liability any fair and true report regarding the content of a filed complaint in a communication to a public journal. The indisputable facts confirm that the allegedly defamatory statements provided only fair and accurate reports on the content of the Complaint.

*Second*, Defendants cannot establish, as they must to prove a defamation claim, that FinApps' statements were made either negligently or with malice, because, as the indisputable facts also confirm, FinApps had a reasonable basis for the statements.

*Third*, the allegedly defamatory statements are indisputably true. As those statements reported, Defendants did in fact: (i) "reverse engineer" FinApps' technology to develop competing products; (ii) steal FinApps' technology for use in a competing product developed with a third party, Equifax, Inc.; and (iii) make misrepresentations to FinApps, as well as third parties.

---

[1] Pursuant to the Court's guidance (D.I. 442), the instant dispositive motion is made only as to Envestnet, however, Defendants jointly pled the defamation counterclaim ("Count 3") based on identical allegations (D.I. 160 ¶¶ 94-101). Under Delaware law, a corporate plaintiff's residence determines applicable law for defamation claims, *see Benihana of Tokoyo, Inc. v. Benihana, Inc.*, 828 F. Supp.2d 720, 724-25 (D. Del. 2011) (citing Restatement § 150), but applicable defamation law in Illinois (where Envestnet resides) and California (where Yodlee resides) is substantially similar. Both dictate dismissal of Defendants' joint defamation counterclaim. Therefore, FinApps includes applicable California law for the Court's reference.

## ARGUMENT

### I.  Legal Standard

Summary judgment is granted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the movant demonstrates that no such genuine factual dispute exists, the nonmovant must "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986) (emphasis in original).  The nonmoving party must "do more than simply show . . . some metaphysical doubt as to the material facts," *id.* at 586, and evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

### II.  The Allegedly Defamatory Statements Are Protected By The Fair Reporting Privilege

All three allegedly defamatory statements fairly and accurately reported on FinApps' Complaint in communications to public journals, and therefore are absolutely privileged.

#### A.  The Fair Reporting Standard

Under Illinois law, the fair report privilege "confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof." *FinancialApps, LLC v. Envestnet, Inc.*, 2020 WL 4569466, at *10 (D. Del. 2020) (citing *Sipple v. Found. For Nat'l Progress*, 83 Cal. Rptr. 2d 677, 685 (Cal. Ct. App. 1999)). This privilege "applies to defamatory reports of judicial proceedings from the time a complaint is filed." *Stoller v. Johnson*, 2014 WL 1018069, at *9 (Ill. App. Ct. Mar. 13, 2014) (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 842 (Ill. 2006)).[2]  Application of this privilege

---

[2]  California law privileges an attorney's "fair and true report to the media about what was alleged in a complaint." *FinancialApps*, 2020 WL 4569466, at *10 (citing *Healthsmart Pac., Inc. v. Kabateck*, 212 Cal. Rptr. 3d 589, 603-04 (Cal. Ct. App. 2016)).

is a question of law for the Court, *see Solaia*, 852 N.E.2d at 842; *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1104 (N.D. Ill. 2016), and Illinois courts hold statements reflecting the content of a complaint to be privileged. *See, e.g.*, *Doctor's Data*, 170 F. Supp. 3d at 1104 (finding statements in article based on filed complaint privileged); *Huon v. Denton*, 841 F.3d 733, 741 (7th Cir. 2016) (fair reporting privilege applied where "article accurately conveyed the crux of [Plaintiff's] complaint against the [] Defendants.").

## B. **The Statements Fairly And Accurately Reported On FinApps' Complaint**

The allegedly defamatory statements were made in communications to public journals. Defendants' own allegations confirm this, as do the journalists who published the statements, as well as FinApps' agent. (D.I. 160 ¶ 95 ("FA's agent made [the] defamatory statements in the press."); SOF ¶ 3; Ex. 1 at 55:10-25; Ex. 2 at 19:24 20:6, 47:8-17; Ex. 3 at 86:13-17.)[3] *See, e.g.*, *Stoller*, 2014 WL 1018069, at *9 ("The privilege extends to any person who makes an oral, written or printed report to pass on the information that is available to the general public."); *Am. District Tel. Co. v. Brink's Inc.*, 380 F.2d 131, 135 (7th Cir. 1967) (same)); *Healthsmart*, 212 Cal. Rptr. 3d at 601 (same).) Further, each of the allegedly defamatory statements were indisputably fair and true reports on the allegations in the Complaint, as explained below.

### 1. **The First Allegedly Defamatory Statement**

The first allegedly defamatory statement, that "Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful" (D.I. 160 ¶ 96) was published in four articles (Exs. 56-59; SOF ¶ 5). The record confirms that Mr. Kasowitz did not make this statement directly to any reporter, and that it was excerpted from a July 30, 2019 press

---

[3]     Plaintiff's Concise Statement of Facts ("SOF") sets forth the undisputed facts. Citations to "Ex." refer to the exhibits appended to the Declaration of Joshua E. Hollander filed herewith.

release (the "Press Release") (Ex. 4).[4]  (SOF ¶¶ 2, 6.)  The only journalist who published this excerpt and also spoke with Mr. Kasowitz was Brooke Southall (Ex. 56), who testified that his source was "the press release," not his interview with Mr. Kasowitz.  (SOF ¶¶ 5-6; Ex. 1 at 70:18-25 ("Q: [T]hat was not a quote made by Mr. Kasowitz during your discussion with him; correct?  A: [Y]es."); *see also id.* at 24:2-13, 29:20-30:5; 69:6-15.)

The Press Release was circulated with the subject line "Complaint Filed: FinApps v. Envestnet," and opens with the statement "[o]n Friday, July 26, 2019, the District of Delaware made public a complaint filed by Kasowitz Benson Torres LLP, on behalf of FinancialApps, LLC ('FinApps') against Envestnet, Inc. . . . and its subsidiary Yodlee, Inc" (Ex. 4 at 1).  The Press Release expressly states what the "complaint alleges," and further states that "[w]e look forward to proving" FinApps' claims at trial (*id*. at 3).  (SOF ¶ 2.)

The first allegedly defamatory statement closely paraphrases the opening allegation in the Complaint (D.I. 7 ¶ 1), which alleges over fifty times that Defendants *stole* FinApps' technology (*see, e.g.*, *id.* ¶ 216 ("Yodlee – together with, and at the direction of, Envestnet – has improperly misused and stolen FinApps' trade secrets"); *see also id.* ¶¶ 233-36).  Further, Mr. Kasowitz confirmed that the Press Release was "based explicitly on the allegations of the complaint.  In fact, it's almost verbatim from the complaint" (Ex. 3 at 43:25-44:19; *see also id.* at 107:5-13; Ex. 5 at 369:11-19).  (SOF ¶ 6.)  There can be no genuine issue that a press release – titled after, referring to, quoting from, and attaching a filed complaint – "accurately conveyed the substances of the

---

[4]      In his decision denying FinApps' motion to dismiss Defendants' defamation claim, Judge Connolly questioned (i) whether this statement "was made orally in response to media inquiries or as part of a written press release;" and (ii) whether the "assert[ion] that Defendants deliberately stole Plaintiff's technology" was "immediately thereafter qualified by stating that 'we look forward' to proving that assertion in court."  (D.I. 139 at 4-5.)  The evidentiary record confirms that (i) this statement was made as part of the written Press Release, and (ii) the Press Release did, in fact, contain such qualifying language.  (*See infra* § II.C.1.)

allegations," and is privileged under the fair reporting doctrine. *Huon*, 841 F.3d at 741; *see also Healthsmart*, 212 Cal. Rptr. 3d at 603.

### 2. The Second Allegedly Defamatory Statement

The second allegedly defamatory statement – that "[Defendants] were reverse engineering, but they were also misappropriating, and we have a lot of proof of that" (D.I. 160 ¶ 97) – was also published by Mr. Southall in his *RIABiz* article (Ex. 56; SOF ¶ 7), after a brief telephone conversation with Mr. Kasowitz (SOF ¶ 3; Ex. 1 at 55:10-25).[5] Mr. Kasowitz and Mr. Southall confirmed that their discussion – including the second allegedly defamatory statement – solely concerned the allegations in, and evidence attached to, the Complaint. (SOF ¶ 4; Ex. 3 at 20:23-25 ("my discussions with the reporters were only about the complaint."), 10:2-6 ("I don't recall anything other than discussing the allegations of the complaint"); Ex. 1 at 56:19-21 ("Q: Other than the allegations of the complaint, did you and Mr. Kasowitz discuss anything else? A: I doubt it."), 72:6-11 ("Q: this quoted statement was directly related to the allegations against Envestnet and Yodlee that were made in this complaint; correct? A: Yeah. I think everything was in this conversation, so yes.").)

Mr. Southall confirmed that Mr. Kasowitz's reference to "proof" did not refer to unidentified evidence, but rather to the documents identified in and filed with the Complaint. (SOF ¶¶ 8-9; *see, e.g.*, Ex. 1 at 57:19-23 ("Q: [D]id [Mr. Kasowitz] discuss or . . . refer to any of the documents that were cited in the complaint? A: I mean, I think our whole conversation was about those documents."), 58:4-8 ("Q: [T]he documents that he was referring to or you discussed during the phone call, were those documents that were referred to in the complaint; correct? A: Yes."),

---

[5] Mr. Southall confirmed that the statement "Kasowitz told RIABiz he already has plenty of evidence" was "certainly not a quote" from Mr. Kasowitz, but that he was "paraphrasing" and "introduc[ing] the next line, which is a quote" (Ex. 1 at 32:15-33:5). (SOF ¶ 10.)

75:25-76:11 ("Q: [S]o when Mr. Kasowitz is quoted as saying . . . 'we have a lot of proof of that,' you understood that he was referring to the allegations of the complaint; correct? A: [G]enerally speaking, I assumed everything was in the context of these documents."); Ex. 3 at 48:23-49:14 ("the complaint itself had lots of allegations of the steps that the defendants were taking [to] steal and misappropriate and reverse engineer FinApps's intellectual property, [and] even . . . referred to emails and other evidence throughout").)

The second allegedly defamatory statement also fairly and accurately reports the content of the Complaint, which alleges that Defendants engaged in reverse engineering and misappropriation of FinApps' technology, and includes corroborating documentary evidence. First, the Complaint alleges that Defendants were "stealing and reverse engineering" FinApps' trade secrets (D.I. 7 ¶ 46), and that "senior personnel explicitly instructed" the product development team "to engage in such reverse engineering" (*id.* ¶ 106). The Complaint also attaches inadvertently forwarded correspondence from May 2019 in which Defendants discuss a strategy to "reverse engineer" elements of FinApps' technology. (Ex. 7.) Specifically, Yodlee engineer Kirti Kumar suggested that Defendants review FinApps' Mongo DB collections to "reverse engineer" certain reporting fields. (*Id.* at 8.) Francois Hedouin (Yodlee SVP) responded that "[w]e cannot go back to FA for this and I [sic] looking for a way to do it ourselves (reverse engineering)." (*Id.* at 6.) Mr. Kumar replied "I can work with the person with who has obtained the [Mongo] DB access and help reverse engineer." (*Id.* at 4-5.)

Second, the Complaint alleges that FinApps' technology was misappropriated by Defendants to assist in developing competing products, citing to internal emails in which Yodlee announced deals with various entities (D.I. 7 ¶¶ 150-52) that it hid from FinApps in order to provide these "new clients with access to its secretly developed credit analysis platform" instead

of the Risk Insight platform developed by FinApps (*id.* ¶¶ 154, 262, 267, 283).  The Complaint also alleges that "Defendants [were] secretly working with Equifax – while improperly cutting out FinApps – to develop an alternative credit software product [] using proprietary information and technology stolen from FinApps."  (*Id.* ¶¶ 262, 267, 283.)

### 3.      The Third Allegedly Defamatory Statement

The third allegedly defamatory statement – that Defendants engaged in "a pattern of misrepresentation," and "were making misrepresentations in all directions . . . [b]oth to Fin[A]pps claiming to be working pursuant to the agreement, and meanwhile, telling customers it was their own technology" (D.I. 160 ¶ 98) – was published on August 7, 2019 in the *FinancialPlanning* article written by Sean Allocca (Ex. 60; SOF ¶ 11).  Prior to publishing the article, Mr. Allocca had a brief telephone conversation with Mr. Kasowitz.  (SOF ¶ 3; Ex. 2 at 19:24-20:6, 47:8-17.) Mr. Kasowitz and Mr. Allocca testified that their discussion solely concerned the allegations in the Complaint.  (SOF ¶¶ 4, 12; Ex. 2 at 48:19-22 ("Q: [T]hat discussion was only about the allegations in the complaint.  Correct?  A: Correct."), 50:3-6 ("Q: With respect to the statements attributed to Mr. Kasowitz, are those also discussing the allegations of the complaint? A: Correct."); Ex. 3 at 20:23-25 ("my discussions with the reporters were only about the complaint"), 10:2-6 ("I don't recall anything other than discussing the allegations of the complaint"); *see also id.* at 93:23-94:24.

This statement also fairly and accurately reports the allegations in the Complaint, which alleges that "Defendants acquired FinApps' trade secrets by, among other things, misrepresenting Yodlee's purported intention to enter into a long-term strategic partnership with FinApps and misrepresenting Yodlee's need for a deep understanding of FinApps' trade secrets in order to better sell potential customers on the Risk Insight platform."  (D.I. 7 ¶ 215.)  The Complaint also alleges that Defendants "misrepresent[ed] to Risk Insight client[s] that Yodlee – not FinApps – owned the

Risk Insight customers entered into "included an 'Ownership' clause stating falsely that Yodlee retained 'all right, title and interest in and to the deliverables under [the contract], including all Intellectual Property Rights therein and thereto'" (*id.* ¶ 121), and that "FinApps was not a party to any of the contracts . . . nor was FinApps even mentioned" (*id.* ¶ 122). The Complaint further alleges that Defendants sought "to keep FinApps' involvement with the Risk Insight platform as obscured as possible" by "requiring FinApps' personnel to use only *Yodlee* email addresses when communicating with Risk Insight clients, and prohibiting FinApps' personnel from disclosing any affiliation with FinApps when interacting with clients." (*Id.* ¶¶ 267, 283.)

In short, all three allegedly defamatory statements expressly reference and restate allegations in the Complaint. This is particularly evident when the statements are read in the context of the articles in which they were published, wherein, among other things, (i) Mr. Kasowitz was "identified by the reporter" as FinApps' attorney (Ex. 56 at 3; Ex. 60 at 1); (ii) the articles repeatedly quoted, cited to, and otherwise referenced the Complaint (Ex. 56 at 1-5; Ex. 60 at 1-2), and (iii) the statements were interspersed among frequent references to the lawsuit and expert opinions on the strengths or weaknesses of the claims (Ex. 56 at 2; Ex. 60 at 3). (SOF ¶¶ 12-13.) The allegedly defamatory statements are therefore privileged under the fair report doctrine and judgment should be entered in FinApps' favor on Count 3.

### III.    The Allegedly Defamatory Statements Can Be Construed Innocently

Defendants' defamation counterclaim also fails because the alleged defamatory statements are non-actionable under Illinois' innocent construction rule, pursuant to which statements "reasonably capable of an innocent construction" are not defamatory. *Bryson v. News Am. Publ'ns., Inc.*, 672 N.E.2d 1207, 1215 (Ill. 1996). Whether an allegedly defamatory statement is reasonably susceptible to an innocent construction is a question of law, and courts must consider such statements "in context, with the words and the implications therefrom given their natural and

obvious meaning." *Pope v. Chron. Publ'n. Co.*, 95 F.3d 607, 610 (7th Cir. 1996). The Illinois Supreme Court has determined that an attorney's summary of the allegations in a client's complaint, made in an interview with a reporter, can be innocently interpreted as an "advocate's view of his client's cause of action," and are not actionable as defamation. *Owen v. Carr*, 134 Ill. App. 3d 855, 861, *aff'd* 113 Ill. 2d 273, 279 (1986). This is particularly true where, as here, the relevant publication "speaks in terms of claims, allegations, and what [the plaintiff] is trying to prove." *Id.* at 861; *see also Maui Jim, Inc. v. Smartbuy Guru Enters.*, 386 F. Supp. 3d 926, 943 (N.D. Ill. 2019) (statements referring to plaintiff's "lawsuit allegations" and dealing "entirely with [plaintiff's] lawsuit" subject to innocent construction).

As explained above (*supra* § II.B.), the record indisputably demonstrates that (i) the allegedly defamatory statements exclusively refer to the Complaint; and (ii) the articles specified that FinApps "look[s] forward to *proving*" its allegations to the court (*see, e.g.*, Ex. 56 at 1-3), while offering critiques regarding the viability of those same allegations (*see, e.g.*, *id.* at 2). Accordingly, the allegedly defamatory statements are plausibly susceptible to an innocent construction and, thus, are not actionable as defamation.

## IV.    Defendants Cannot Establish An Essential Element Of Defamation

Summary judgment should also be granted because the record confirms that FinApps had a reasonable basis for each of the allegedly defamatory statements, and consequently, Defendants cannot establish that FinApps acted negligently or with actual malice, as they must.

### A.    Defendants Cannot Show That FinApps Acted Negligently

To prove that a putatively defamatory statement was made negligently, Illinois courts require a showing that the speaker either knew the statement was false, or "lacked reasonable grounds for [their] belief" that it was true. *See Troman v. Wood*, 62 Ill. 2d 184, 198 (1975). Here, the documents attached to the Complaint, and FinApps' direct, contemporaneous knowledge, both

confirm that it had a reasonable basis for the allegedly defamatory statements and entertained no doubt as to their truth.[6] *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

1.    **FinApps Had Reasonable Bases For Its Statements That Defendants Reverse Engineered, Stole, And Misappropriated FinApps' Technology**

At all times, FinApps had a reasonable basis for its belief that Defendants were reverse engineering, misappropriating, and stealing its technology.  As set forth in his accompanying declaration, Bob Sullivan, President of FinApps, understood that, following Envestnet's internal reorganization in January 2019, certain high-level Yodlee executives had been selected by Jud Bergman, CEO of Envestnet, to be members of the Envestnet Data & Analytics executive leadership team, and to oversee and direct Yodlee's day-to-day operations.  (*See* Sullivan Decl. ¶¶ 3-5;[7] SOF ¶¶ 14-15; Ex. 55.)  These individuals included Stuart DePina, Brandon Rembe, Arun Anur, and Julie Solomon – all of whom Mr. Sullivan believed to be involved in the misconduct alleged in FinApps' Complaint.  (*See* Sullivan Decl. ¶¶ 6-10; SOF ¶ 16; Ex. 55.)

Further, prior to document discovery, Defendants served joint interrogatories, inquiring into FinApps' basis for its allegations, including those concerning Defendants' reverse engineering, misappropriation, and theft of FinApps' technology.  (Ex. 6 at 37, 49, 64, 78, 86.) FinApps explained the contemporaneous basis for its allegations and its agent's statements about them at length (*id.* at 34-36), including, among other things, that Defendants had direct access to FinApps' proprietary technology and technical documentation (*id.* at 34-36), and that in May 2019, Yodlee inadvertently forwarded to FinApps its own internal correspondence demonstrating its improper use of this access to reverse engineer FinApps' technology (*id.* at 88; SOF ¶ 19; *see also*

---

[6]    Similarly, California courts require a showing that the speaker "did not act with reasonable care in checking on the truth or falsity of the information."  *Todd v. Lovecruft*, 2020 WL 60199, at *18 (N.D. Cal. Jan. 6, 2020).

[7]    Citations to "Sullivan Decl." refer to the January 6, 2023 Declaration of Bob Sullivan filed herewith.

Ex. 7).  Yodlee also inadvertently sent FinApps emails confirming that they had closed Risk Insight engagements with Verify My Bank, Silver Bullet Marketing, and Banker's Healthcare Group, without informing FinApps or utilizing FinApps' Risk Insight platform.  (Ex. 6 at 38, 87.)  Because it would have been "impossible for Defendants to provide such services without utilizing FinApps' proprietary software," FinApps concluded that Defendants were surreptitiously operating and selling an exact (or substantially identical) version of Risk Insight based on technology misappropriated from FinApps.  (*Id.* at 87.)  Further, in early 2019, Stuart DePina (Chief Executive of Envestnet Data & Analytics) made multiple failed attempts to acquire FinApps on behalf of Envestnet, after which Defendants deemed FinApps' version of Risk Insight a "legacy product," and sought to wind it down "given that [Yodlee] was gearing up to launch its own competing platform."  (*Id.* at 41; *see also* SOF ¶¶ 17-18; Exs. 8-9.)

Additionally, on March 29, 2019, FinApps learned that Defendants had improperly accessed FinApps' software called "YProxy," prompting their suspension.  (Ex. 6 at 41.)  In "a matter of hours," FinApps received multiple requests, including from Mr. DePina, demanding that access be restored.  Defendants refused to explain their use case for YProxy, leading FinApps to conclude that Defendants were using it "to 'check their work'" on "a competing Platform based on FinApps' misappropriated software," and that this was "an endeavor so important" that it "elicited a response from the highest levels of Defendants' corporate hierarchy."  (*Id.* at 88-89.)

At deposition, Bob Sullivan further explained the bases for FinApps' allegations concerning Defendants' reverse engineering and misappropriation, as well as its agent's statements regarding Defendants' "unwarranted and unlawful" theft of its technology.  Specifically, Mr. Sullivan testified regarding emails forwarded "directly from Yodlee" using the term "reverse engineering," which were "reviewed and commented on by multiple senior executives at Yodlee,"

causing him to believe Defendants had "stolen a large percentage of the platform" and "reversed engineered [FinApps'] technology" (Ex. 10 at 314:24-315:7; *see also* Ex. 7). (SOF ¶ 19.) Mr. Sullivan also testified that "Yodlee kept us completely out of the loop as far as the deployment of Risk Insight for Equifax" (Ex. 10 at 321:5-9; SOF ¶ 21), which, along with Defendants' "unauthorized access" and use of YProxy, the "fire drill that happened" when access to YProxy was suspended, and Defendants' refusal to provide a "business use case," Mr. Sullivan believed to be further evidence of theft, misappropriation, and reverse engineering (Ex. 10 at 328:18-329:15). (SOF ¶ 21.) Lastly, Mr. Sullivan testified that Defendants' sale of "competing products to Risk Insight outside of the terms of our contract" (Ex. 10 at 321:24-322:13), and specifically to "Banker's Healthcare Group, Silver Bullet, and Verify My Bank," without those clients being "permissioned into the system" or receiving "tenancy numbers that only [FinApps] could create" (Ex. 10 at 387:3-388:2), "led [him] to believe that Envestnet and Yodlee had deliberately stolen [FinApps'] technology (Ex. 10 at 320:22-25, 322:1-13, 325:10-20; *see also* Ex. 11). (SOF ¶ 20.)

Explaining Yodlee's abandonment of FinApps, Mr. Sullivan testified that Olga Amaya (a member of Yodlee's Risk Insight team who reported to Brandon Rembe) worked very closely with FinApps to extract details about FinApps' proprietary calculations but suddenly "went dead," leading FinApps to believe she had begun "re-architecting all of the attributes and rules" (Ex. 10 at 315:22-316:11). (SOF ¶¶ 22-23.) Neil Carroll, a senior developer at FinApps, confirmed that his meetings with Ms. Amaya "abruptly cut off towards the end of 2018 and into 2019," and he "immediately contact[ed]" Mr. Sullivan to "notify him that [he] felt it was suspicious" and "felt uncomfortable with the type of questions and thoroughness of the questions that [he] was [fielding] on how [FinApps'] platform worked" (Ex. 12 at 153:1-14). (SOF ¶ 22.)

The foregoing facts, among others, were specifically alleged in the Complaint, which Mr. Kasowitz testified repeatedly was his sole basis for his statements to the press. (SOF ¶¶ 25-26; Ex. 3 at 150:8-18 ("whatever knowledge I had about these matters at the time . . . was based on the allegations of the complaint); Ex. 5 at 366:13-20 ("my understanding at the time was set forth within the complaint [that] quoted from and attached emails and other documents").) Mr. Kasowitz also specifically referenced his knowledge and review of the documentary evidence referenced in and attached to the Complaint. (Ex. 5 at 369:11-19 ("my best understanding of the actions that Yodlee and Envestnet had taken to steal [FinApps'] software. . . through reverse engineering or otherwise, was set forth in the complaint, which included references to [Defendants'] documents"); Ex. 3 at 48:23-49:14 ("the complaint itself had lots of allegations of the steps . . . defendants were taking [to] steal and misappropriate and reverse engineer FinApps' intellectual property [and] even . . . referred to emails and other evidence throughout.").)

### 2. FinApps Had Reasonable Bases For Its Statements Regarding Defendants' Misrepresentations

Similarly, FinApps also had reasonable bases to believe Defendants were making misrepresentations to both FinApps and customers. *First*, as described above, FinApps and its agent explained at length in both interrogatory responses and at deposition their belief that Defendants deceived FinApps into believing that they were supporting the parties' strategic relationship, when they in fact were reverse engineering and misappropriating FinApps' technology, and winding down Risk Insight for replacement with a competing product.

*Second*, Mr. Sullivan testified that Defendants were selling Risk Insight as their own technology, "claiming that they owned the IP" in "contracts and SOWs to their clients" (Ex. 10 at 349:17-350:23; *see also id.* at 353:4-22; Exs. 13-15). Mr. Sullivan also testified that FinApps was "not identified" and that Defendants "took our e-mails off any communication and actually

assigned [a] Yodlee e-mail to Dexter Weatherly to be included in these correspondence[s]" (Ex. 10 at 520:17-22; *see also* Ex. 16 (transmittal of Yodlee email credentials)).  (SOF ¶ 24.)

Additionally, Mr. Kasowitz specifically referenced his knowledge and review of the documentary evidence referenced in and attached to the Complaint, which corroborated FinApps' beliefs at the time regarding Defendants' misrepresentations to FinApps and third-parties. (SOF ¶ 25; Ex. 3 at 94:4-24 ("we know . . . from other allegations in the complaint, and from the materials that those allegations are based on, . . . that there were clear misrepresentations that . . . Yodlee was making, you know, to its customers about the origin and derivation . . . of the software, whose it was."), 93:22-94:3 ("[I]t's based on what's in the complaint.  The complaint attaches . . . a contract that Yodlee had with one of its customers where it says . . . that the software  . . . was owned by itself, that it was its own proprietary software, and that's not true.  It was FinApps's.").)

## B.  Defendants Cannot Establish That FinApps Acted With Actual Malice

Defendants also cannot meet the higher bar of establishing actual malice,[8] which they must as public figures.  *See New York Times v. Sullivan*, 376 U.S. 254, 285-86 (1964).  Doing so requires clear and convincing evidence of FinApps' "high degree of awareness" of falsity, "reckless disregard" for the truth or "serious doubts as to the truth" *St. Amant*, 390 U.S. at 731; *DePinto v. Sherwin-Williams Co.*, 776 F. Supp. 2d 796, 805 (2011).  Moreover, the "inquiry as to whether a

---

[8]     Large publicly traded companies such as Defendants are public figures.  *See Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 273 (7th Cir. 1983) ("there seems no reason to classify a large corporation as a private person"); *Fedders Corp. v. Elite Classics*, 279 F. Supp. 2d 965, 969 (S.D. Ill. 2003) ("because the counter-claimants are corporations, they must show actual malice").  Envestnet is a publicly traded company with a market capitalization in excess of $3 billion.  (Ex. 17.)  Envestnet's SEC filings describe Yodlee as having been "reorganize[ed]" into a "business unit" at Envestnet called "Envestnet Data & Analytics" (*id.*; SOF ¶¶ 14-15), and Yodlee's corporate witness confirmed that Yodlee was a "business unit inside of Envestnet" and ████████████████████████████████████████████████████████████ (Ex. 18 at 20:5-23:14).  (SOF ¶ 28.)

statement was made with actual malice is subjective." *Fox v. Crain Commc'ns, Inc.*, 2021 WL 4295773, at *9 (Ill. App. 1 Dist. 2021).

Here, the record confirms not only that FinApps had a reasonable basis for all of the statements, but also that both it and its agent *subjectively* "believed that the statements contained in the article were true and accurate," and that neither had "any information that any statement in the article was false," foreclosing a showing of actual malice. *Fox*, 2021 WL 4295773, at *9; *see also* SOF ¶¶ 26-27; Ex. 10 at 312:22-313:7, 314:24-315:11, 321:5-322:13, 322:24-323:2, 333:15-25, 347:18-24; Ex. 3 at 150:8-18 ("And those allegations, [] we had a good faith belief that they were true. . . . And had no reason to [] believe that they weren't true at the time.")

## V.     The Record Confirms That The Allegedly Defamatory Statements Are True

Under Illinois law, "[t]ruth is a defense to a defamation action and . . . defendant need only show the truth of the "gist" or "sting" of the defamatory material. Only 'substantial truth' is required for this defense." *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 424 (1998).[9] Here, the record confirms the allegedly defamatory statements were substantially (if not entirely) true.

### A.     Ample Evidence Demonstrates Defendants' Misconduct

Defendants' own documents and witness testimony confirm that they did, in fact, misappropriate, steal, and reverse engineer various elements of FinApps' technology to secretly build competing products – including a software product known as the ███████████ .

### 1.     Misappropriation And Theft

The record confirms that Defendants misappropriated FinApps' technology in connection with their development of the ███████████ .    In early January 2019, Envestnet

---

[9]     Similarly, under California law, a "defendant need not justify the literal truth" but rather "prove[] true the *substance* of the charge . . . so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 646-47 (1999).

implemented "organizational changes" by which the Company sought to "align[] its operations into two business units," and Stuart DePina formally assumed "the role of Chief Executive of Envestnet Data & Analytics" (Ex. 17; *see also* Ex. 20). (SOF ¶ 14.) This restructuring folded Yodlee into Envestnet, in order to "███████████████████████████████████ ████████████████████████████████████████." (Ex. 19.) Several other high-level Yodlee personnel – including Julie Solomon, Brandon Rembe, and Arun Anur – were also assigned to the Envestnet Data & Analytics executive leadership team. (SOF ¶ 28; Ex. 55; Ex. 18 at 20:5-23:14; Ex. 21 at 17:2-5; Ex. 34 at 15:14-16:4.) Thereafter, members of the Envestnet Data & Analytics team, along with members of Yodlee's Risk Insight team, worked together to develop ███████████████ that was intended to replace Risk Insight. (SOF ¶ 29; Ex. 23.) Specifically, Mr. DePina, Mr. Rembe, Ms. Solomon, and Lisa Hingley (all members of Envestnet Data & Analytics) were identified as the "Executive Leadership," and Mike Burger, Mr. Hempel, and Andrew Walsh (all part of Yodlee's Risk Insight team) were identified as the "Program Leadership" responsible for the execution of ████████████████████ ██████████████████████. (*Id.*)

To that end, ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ (Ex. 24). ████████████████████████████ ██████████████████████████████████ (Ex. 25). (SOF ¶ 33.) ████████ ████████████████████████████████████████████████ ██████████████████████████████ (Ex. 25). ████████████

███████████████████████████████████████ (Ex. 26) ████████████████████████

███████████████████████████████████ (Ex. 27). (SOF ¶ 34.)

Defendants implemented their plan to replace FinApps using its own technology. ██

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████ (Ex. 28). (SOF ¶¶ 35-36.) ████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (Ex. 29), but later,

███████████████████████████████████████████████████████████████████████████

██████████████████████████████ (*Id.*) In response, ███████████████ (Ex. 30), ███████████

███████████████████████████████ (Ex. 29). ██████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████ (Ex. 31). ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████ (Ex. 31). █████████████████████████████████████████

████████████████████ (Ex. 32), ███████████████ (Ex. 33). (SOF ¶ 36.)

Numerous witnesses testified that █████████████████████ utilized FinApps' technology.

For example, Mr. DePina ████████████████████████████████████████████████████

███████████████████████████████ (Ex. 34 at 227:25-228:19). (SOF ¶ 37.)

Sagar Das, Manager of Software Development, testified that ██████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ (Ex. 35 at 191:14-23;

*see also id.* at 199:10-20, 201:15-20, 203:13-15, 211:9-20).  (SOF ¶ 38.)  Mr. Nandi also testified

████████████████████████████████████████████████████████████████

██████ (SOF ¶ 39; Ex. 36 at 180:5-14), and that the ████████████████████████████

███████████████████ (Ex. 36 at 199:16-200:3; *see also id.* at 224:6-227:12, 232:8-234:11,

235:7-236:8).  (SOF ¶ 39.)

### 2.    Reverse Engineering

The record also confirms that Defendants reverse engineered FinApps' technology in

connection with their development of the ███████████████████. Specifically, ███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████ (Ex. 37).  (SOF ¶¶ 29-30.)  Mr. Rembe ███████████████████████████████

███████████████████████████████████ (Ex. 38 at 221:22-222:25, 223:25-224:1).  (SOF ¶ 30.)

Thereafter, on April 23, 2019, in connection with building ██████████████████████, ██

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ (Ex. 39).  (SOF ¶ 31.)

███████████████████████████████████████████████████████████████████

████████████████████ (SOF ¶ 31; Ex. 40.)  ██████████████████████████████████

███████████████████████████████████████████████████ (Ex. 36 at 251:1-9),

███████████████████████████████████████████████████████████████████

██████ (*id.* at 253:5-255:11), ██████████████████████████████████████████████

█████████████ (*id.* at 256:19-257:3, 259:11-23).  Moreover, ██████████████████████████

███████████████████████████████████████████████ (Ex. 31 at 91:17-94:5), as

memorialized in the file ██████████████████████████████████████████████

████████████████████████████████████ (Ex. 39). ████████████

████████████████████████████████████████ (Ex. 42). (SOF ¶ 31.)

On May 7, 2019, Mr. Kumar stated that ████████████████████████████████

████████████████████████████████████████████████ (Ex. 43).

He later discussed a strategy to "*reverse engineer*" FinApps' technology in the email chain that

was forwarded to FinApps (D.I. 7 ¶ 107; Ex. 7; *see also* Ex. 44 at 284:14-285:25), ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████ (Ex. 45). (SOF ¶ 32.)

**B.** **Ample Evidence Demonstrates Defendants' Misrepresentations**

Defendants' own documents and witness testimony confirm that they engaged in "a pattern

of misrepresentation" to FinApps and their customers. In particular, Defendants deceived FinApps

into believing that they were supporting the parties' strategic relationship, while Defendants were,

in fact, misappropriating FinApps' technology, and also secretly working to transition current and

prospective Risk Insight clients to a competing product that used FinApps' technology. On

April 7, 2019, Mr. DePina confirmed that ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ (Ex. 46). (SOF ¶ 40.) Ms. Solomon

later ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ (Ex. 47). Then, on April 17, 2019,

Mr. Burger ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



████████████ (Ex. 48).  (SOF ¶ 41.)  Mr. Walsh testified that in early 2019, ████████

████████████████████████████████████████████████ (Ex. 49 at

247:10-17), ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ (*id.* at 305:8-17).  (SOF ¶ 42.)

The record also confirms that Defendants misrepresented Risk Insight as their own

technology to customers and concealed FinApps' existence.  On November 30, 2016, Chris Chen,

Senior VP of Sales, expressly stated that ████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (Ex. 50).  Moreover, Martin

Crombie, Senior Solution Architect, confirmed ████████████████████████

████████████████████ (Ex. 51 at 156:24-157:3).  On March 16, 2018,

Mr. Walsh confirmed that ████████████████████████████████████

████████████████████ (Ex. 52).  On July 30, 2018, Mr. Rembe stated ████

████████████████████████████████████████████████

████████████████████ (Ex. 53).  (SOF ¶ 43.)  On June 11, 2020, Bank

of America sent Defendants a letter, ████████████████████████████████

████████████████████ (Ex. 54).  (SOF ¶ 44.)

## CONCLUSION

For the foregoing reasons, FinApps respectfully requests that the Court grant its motion in

its entirety, along with any other relief the Court deems appropriate.[10]

---

[10]    FinApps respectfully submits that summary judgment should also be granted as to Yodlee's
counterclaim for defamation, which is identical to and jointly alleged with Envestnet's, at whatever
time the Court deems appropriate, given the phased trials in this case.

Dated: January 6, 2023

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

By: */s/ Robert M. Vrana*
   C. Barr Flinn (No. 4092)
   Pilar G. Kraman (No. 5199)
   Robert M. Vrana (No. 5666)
   Rodney Square
   1000 North King Street
   Wilmington, Delaware 19801
   (302) 571-6692
   bflinn@ycst.com
   rvrana@ycst.com
   pkraman@ycst.com

- AND -

Marc E. Kasowitz, Esq.
(*Admitted Pro hac vice*)
Matthew A. Kraus, Esq.
(*Admitted Pro hac vice*)
A. MacDonald Caputo, Jr., Esq.
(*Admitted Pro hac vice*)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com

*Attorneys for Plaintiff FinancialApps, LLC*

29936210

21

## CERTIFICATE OF SERVICE

I, Robert M. Vrana, Esquire, hereby certify that on January 17, 2023, I caused a true

and correct copy of the foregoing document to be served in the manner indicated below

upon the following counsel of record:

**By EMAIL:**

Henry E. Gallagher, Jr.
Lauren P. DeLuca
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

Gary M. Miller
Gary M. Elden
Amy Y. Cho
Ian M. Hansen
Justin R. Donoho
SHOOK, HARDY & BACON, L.L.P.
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
gmiller@shb.com
gelden@shb.com
acho@shb.com
ihansen@shb.com
jdonoho@shb.com

Jason M. Richardson
SHOOK, HARDY & BACON, L.L.P.
One Montgomery Street, Suite 2600
San Francisco, CA 94104
jmrichardson@shb.com

John D. Garretson
SHOOK, HARDY & BACON, L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
jgarretson@shb.com

*Attorneys for Defendants, Envestnet, Inc.*

*and Yodlee, Inc.*

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

*/s/ Robert M. Vrana*
C. Barr Flinn (No. 4092)
Emily V. Burton (No. 5142)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
eburton@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff FinancialApps, LLC*