**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FINANCIALAPPS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ENVESTNET, INC. and YODLEE, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 19-1337-CFC-CJB<br><br>**PUBLIC VERSION** |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR**
**MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS OF ISAAC J. PFLAUM**


OF COUNSEL:

Gary M. Miller
Gary M. Elden
John D. Garretson
Amy Y. Cho
Justin R. Donoho
Ian M. Hansen
SHOOK, HARDY & BACON LLP
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
(312) 704-7700

Henry E. Gallagher, Jr. (No. 495)
Lauren P. DeLuca (No. 6024)
CONNOLLY GALLAGHER LLP
1201 North Market St., 20th Floor
Wilmington, DE 19801
(302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

*Attorneys for Defendants Yodlee, Inc. and Envestnet, Inc.*


Dated: January 12, 2023

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

LEGAL STANDARD ........ 2

ARGUMENT ........ 3

I. Pflaum's Opinion That FA Used Reasonable Security Measures Should Be Excluded. ........ 3

II. Pflaum's Opinions That FA Derived Economic Value From the Secrecy Of Its Purported Trade Secrets Should Be Excluded. ........ 9

A. Pflaum is unqualified to proffer an expert opinion that FA derived non-trivial economic value from purported trade secrets being not generally known or readily ascertainable in the fintech industry. ........ 9

B. Pflaum's opinion is unreliable because Pflaum undertakes no analysis to reach his conclusions. ........ 12

III. Pflaum's Opinions That Snapshot 2.0 Incorporated Relevant Source Code From The Equifax VOA MVP Product Should Be Excluded As Impermissible *Ipse Dixit*. ........ 15

CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AgroFresh Inc. v. Essentiv LLC*,
2019 WL 9514565 (D. Del. Oct. 7, 2019) ....................14, 16

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
2022 WL 3021560 (D. Del. July 29, 2022) ....................11

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) ....................3, 9

*Calhoun v Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003)....................9, 10, 11

*Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc.*,
2004 WL 1534786 (D. Del. May 21, 2004)....................10

*Cates v. Whirlpool Corp.*,
2017 WL 1862640 (N.D. Ill. May 9, 2017) ....................3, 9

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ....................3, 9

*Daubert v. Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993)....................2

*Dow Chem. Canada Inc. v. HRD Corp.*,
909 F. Supp. 2d 340 (D. Del. 2012), *aff'd* 587 F. App'x 741 (3d Cir. 2014) ....................12, 13

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)....................2

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................2, 14, 15, 16

*Godreau-Rivera v. Coloplast Corp.*,
2022 WL 1120371 (D. Del. Apr. 14, 2022)....................11

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)....................3, 9, 14, 15

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................2

*Peloton Interactive, Inc. v. iFit Inc.*,
2022 WL 1523112 (D. Del. May 13, 2022)....12, 13

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)....8

*Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
2009 WL 1387115 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010)....8

*Wood v. Showers*,
822 F. App'x 122 (3d Cir. 2020)....2

**Statutes**

6 Del. C. § 2001(4)....12, 14

18 U.S.C. § 1839(3)....13, 14

**Rules**

Federal Rules of Evidence Rule 702....2, 3, 9, 11

## INTRODUCTION

Defendants move to exclude three opinions offered by Plaintiff's technical expert Isaac Pflaum. These opinions are conclusory and fail to address undisputed, contrary evidence. Pflaum also lacks the necessary expertise to opine on the value of information in the fintech industry.[1]

*First*, Pflaum offers an opinion that FA used reasonable security measures to protect the secrecy of its alleged trade secrets. In reaching that conclusion, Pflaum recites a series of actions FA took that, in his mind, helped to protect such secrecy. However, he completely fails to consider the multiple disclosures of such information to third parties. Ignoring or summarily dismissing evidence when it does not support a desired conclusion is not a reliable methodology. Accordingly, Pflaum's opinion as to the reasonableness of FA's security measures should be excluded.

*Second*, Pflaum offers an opinion that FA derived non-trivial economic value from its purported trade secrets not generally known by, or readily ascertainable to, other professionals in the fintech industry. But, he lacks the qualifications to render that opinion. Pflaum admittedly has no expertise in the fintech industry. His reports and deposition testimony also provide no evidence of knowledge regarding particular information in that industry. Consequently, Pflaum cannot testify as to whether FA's purported trade secrets were not generally known or readily ascertainable by the relevant professionals: *i.e.* that the information was "secret." Nor can he testify that FA derived economic value from such secrecy.

Pflaum's reports and deposition also demonstrate that he did no analysis to reach this conclusion. Instead, he merely opines that there are indicia that the purported trade secrets have

[1] For purposes of this matter, Plaintiff has defined the "fintech" industry as the "sector of the financial services industry focused on making financial information and services (such as loans) available to individual and commercial consumers through digital outlets." (D.I. 1 at ¶ 2.)

*some* economic value, then summarily asserts that this value is derived in part from the information's secrecy. This is not a reliable methodology. It is *ipse dixit* from an expert who is not even qualified in the relevant field.

*Third*, Pflaum purports to opine on source code, even though it is undisputed that neither Yodlee nor Envestnet had access to FA's source code. Nevertheless, Pflaum offers an opinion that Yodlee's Snapshot 2.0 source code incorporates code from a previous development project called Equifax VOA MVP.

Pflaum's reports state this opinion is based on a review of the source code for each application. At his deposition, however, Pflaum confirmed this "analysis" was limited only to observing that some Equifax VOA MVP source code was copied into a file registry used for Snapshot 2.0, and then "development continued" on that code until Snapshot 2.0 was completed. Pflaum provides no analysis of what portions of the Snapshot 2.0 code, if any, ultimately were similar to the Equifax VOA MVP source code. Further, he does not tie any such similarities to FA's purported trade secrets. Pflaum's opinion on this issue is not based on a reliable methodology and should be excluded.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993) require the district court to perform "a critical gatekeeping function" to ensure that a proposed expert report or testimony "is not only relevant, but reliable." *Wood v. Showers*, 822 F. App'x 122, 125 (3d Cir. 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). "Before an expert witness may offer an opinion pursuant to Rule 702, he must first be qualified by virtue of specialized expertise." *Elcock v.*

*Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Id.*

**ARGUMENT**

**I. Pflaum's Opinion That FA Used Reasonable Security Measures Should Be Excluded.**

For expert testimony to be reliable, and thus admissible, the testimony must be "based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994). Certain of Pflaum's opinions are based on either unreliable methodologies that ignore contradictory evidence, or no apparent methodology whatsoever. In order for an expert's method to be reliable, it must be "based on sufficient facts or data." Fed. R. Evid. 702. Accordingly, it is fundamental that an expert's methodology must examine all the available evidence—not only that which is favorable to the expert's desired opinion or "unsupported speculation." *In re Paoli*, 35 F.3d at 749; *see also Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("Because . . . Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony."); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-57 (8th Cir. 2000) (excluding expert testimony because it did not incorporate all relevant circumstances and ignored inconvenient evidence). Put simply, "[i]gnoring relevant data is not a scientifically valid method." *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017).

In his reports, Pflaum opines that FA used reasonable security measures to protect its purported trade secrets. (*E.g.*, Ex. 1[2] at Section V.) However, in reaching this opinion Pflaum failed to consider or otherwise sufficiently address significant contradictory evidence.

[2] References to Exhibits contained herein correspond with the matching exhibit numbers in the attached Declaration.

*First*, Pflaum concedes that he did not consider a crucial disclosure of FA's full data dictionary—a document Pflaum contends contains a plethora of FA's trade secrets—to Christian Dye and NTT Data. At the time, Dye was a Senior Management Consultant for NTT Data, a Japanese multinational IT service and consulting company headquartered in Tokyo, Japan that provides application development and related services. The disclosure in question occurred on March 27, 2019, when Dexter Weatherly emailed Dye at his NTT Data email address, attaching a copy of the Data Dictionary v.2.3.3 and stating:

> Here's a copy of our data dictionary. Take a look at the blue tabs to see the types of fields we output today. I know there's a lot here, so let me know if you need me to talk you through anything.

(Ex. 2, attaching Ex. 3.)

According to Pflaum, the version of the Data Dictionary disclosed to Dye [redacted] (Ex. 4 at 430:7-431:5, 432:19-433:18; Ex. 1 at ¶ 31; *see also* Ex. 4 at 132:4-6 (the Data Dictionary [redacted]), 132:13-14 (the Data Dictionary is [redacted]), 132:25-133:1 (the Data Dictionary is a [redacted]).)

Despite this conceded importance, the record contains no evidence that the disclosure of the Data Dictionary to Dye and NTT Data was covered by an NDA or any other confidentiality obligations with either Dye or NTT Data. (*See, e.g.*, Ex. 4 at 431:22-432:18 (no confidentiality agreement or nondisclosure agreement identified for Christian Dye or NTT Data); Ex. 1 at 95-98

(Christian Dye and NTT Data are absent from the listings of FA's NDAs identified by Pflaum).) Pflaum's reports do not address: (1) this unprotected disclosure of FA's purported trade secrets; (2) Christian Dye; (3) NTT Data; or (4) the lack of any NDA covering Dye and NTT Data. And Pflaum conceded at his deposition that this disclosure was not among the materials considered in forming his opinions. (Ex. 4 at 433:24-434:4.)

*Second*, Pflaum fails to address FA's unprotected disclosure of a 179-page Risk Insight Solutions General Training PowerPoint (the "RI Training PPT"). Pflaum opined that this RI Training PPT [redacted] constituting the purported trade secrets. (Ex. 5 at ¶ 492.) Despite this, the record shows that FA disclosed the RI Training PPT to multiple recipients who were not obliged to maintain the document's secrecy through an NDA or other confidentiality obligations. Specifically, on May 2, 2018, FA emailed the RI Training PPT to Steven Horwitz at Morgan Hill Partners (a management consulting firm) and further "undisclosed-recipients." (Ex. 6; Ex. 7.) FA also shared the RI Training PPT with Terry Askew at Western Union (a multinational financial services company) on May 4, 2018. (Ex. 8.) The record contains no evidence that any of these individuals or entities were subject to an NDA or other confidentiality agreement covering this disclosure. (*See, e.g.*, Ex. 1 at 95-98 (not identified in the lists of FA's NDAs, according to Pflaum).)

Pflaum's reports do not address: (1) this demonstrated unprotected disclosure of FA's purported trade secrets; (2) Steven Horwitz; (3) Terry Askew; (4) the "undisclosed recipients"; (5) Morgan Hill Partners; (6) Western Union; or (7) the lack of any NDA covering these individuals and entities.

*Third*, Pflaum does not adequately address the unprotected disclosure of FA's purported trade secrets to FormFree. On July 27, 2017, FA emailed Brian Francis at FormFree (a mortgage lending technology provider) the following documents: an API Manual v1.5, the MAV Sample JSON Schema, and an earlier version of the Data Dictionary (v1.4). Defendants' expert identified (and Pflaum did not dispute) that each of these documents contains a number of FA's purported trade secrets. (Ex. 9 at ¶¶ 104.2-104.4 (opining that the documents contain FA's purported trade secrets); Ex. 5 at ¶¶ 107, 109 (opining in response, that only a separate document—not included in this discussion—did not contain purported FA proprietary information).) The record contains no evidence that Brian Francis ever entered into an NDA or other confidentiality agreement with FA. (*See* Ex. 1 at 95-96 (Brian Francis not identified in Pflaum's listing of FA NDAs).) As for FormFree, the only NDA between FormFree and FA in the record expired in May of 2017, over two months before the disclosure of these documents. (Ex. 10 at ¶ 5; *see also* Ex. 1 at 97-98 (identifying only the 2015 NDA between FormFree and FA).)

Pflaum's opening report does not discuss this disclosure. After the issue was raised in the rebuttal report of Defendants' expert, Pflaum's only response was to state that the disclosure was not unprotected because, at the time of the disclosure, FormFree had entered into an agreement with *Yodlee*, under which FormFree owed certain confidentiality obligations *to Yodlee*. (*See, e.g.*, Ex. 5 at ¶¶ 437-38.) But Pflaum does not dispute—nor could he—that the disclosure in question was made by *FA*. And Pflaum does not adequately explain how any confidentiality protections owed separately by FormFree to Yodlee would protect FA's own disclosures.

*Fourth*, Pflaum does not adequately address the unprotected disclosure by FA of many of its purported trade secrets on a publicly accessible website. FA previously used a website located at https://developer.financialapps.com (the "Website"), which was hosted by a third party, to

upload and share technical information about its Platform with prospective developers, prospective purchasers, product managers, and others. (Ex. 1 at 113; Ex. 11 at 7:7-9:10.) The website included technical information from at least an API markdown document, an API guide, and an early iteration of the Data Dictionary. (*See* Ex. 1 at ¶ 226; Ex. 11 at 84:15-20.) FA admittedly continued to update the information on the Website, including the information drawn from these technical documents like the Data Dictionary, periodically through [redacted] (Ex. 11 at 9:11-10:7, 38:17-39:18, 40:7-41:13, 84:24-85:9.) The record further demonstrates that FA kept current documentation on the Website through at least June 28, 2017. (Ex. 12.) Defendants' expert opines, and FA's expert does not dispute, that FA's Data Dictionary v1.2, dated May 15, 2017 (over a month before FA stopped updating the Website) includes a multitude of FA's purported trade secrets. (Ex. 5 at ¶ 207.) Despite containing these purported secrets, the Website was a [redacted] (Ex. 11 at 44:24-45:15.)

In response to Defendants' expert pointing out that this public disclosure included some of FA's purported trade secrets, Pflaum merely states that the versions of the API documentation and Data Dictionary on the Website [redacted] (*E.g.*, Ex. 5 at ¶ 186.) Crucially, Pflaum does not conduct any analysis to show that the information contained on the Website was not also included in the documents Pflaum contends contain FA's purported trade secrets. The mere fact that further additions were made to the documentation after FA stopped updating the Website does not erase the disclosure of the information that *was* contained in the earlier versions of FA's publicly-available technical documentation.

*Fifth*, Pflaum does not address the unprotected disclosure of FA's purported trade secrets to Robert Massuh-Fox. Mr. Massuh-Fox became an FA employee in or around April 2018. On

April 16, 2018, FA sent an email to his personal Gmail account containing several documents: the Data Dictionary v2.0.1, the Risk Insight Consumer Portal Integration Guide (v2.0.2), and the Risk Insight Embedded Flow Integration Document (v3.0.3). Pflaum opines that each of these documents contains purported FA trade secrets. (*See, e.g.*, Ex. 5 at ¶ 491 (Embedded Flow Integration Document), 498 (Consumer Portal Integration Guide).)

While Mr. Massuh-Fox later became an FA employee, he is not listed on Pflaum's list of FA employees or contractors who executed an NDA or other confidentiality agreement (Ex. 1 at 95-96), a list that Pflaum admits contains [redacted] in the record. (Ex. 5 at ¶ 429.) Later, Mr. Massuh-Fox continued to have access to numerous documents containing proprietary information (as evidenced by a multitude of emails sent and received through his FA email account), all of which was apparently permitted by FA without requiring Mr. Massuh-Fox to maintain the confidentiality of such documents. Despite this, Pflaum's reports do not address: (1) this demonstrated, unprotected disclosure of FA's purported trade secrets, including to a personal, non-FA Gmail account; (2) Robert Massuh-Fox; or (3) the lack of any NDA covering Mr. Massuh-Fox.

It is well established that when a party discloses its purported trade secrets without confidentiality protections, that lack of reasonable security measures destroys any purported trade secret status. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."); *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, No. CIV.A. 3290-VCP, 2009 WL 1387115, at *22 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (finding unprotected disclosure of information precludes trade secret status). Despite this, Pflaum either fails to adequately explain—or makes

no effort to explain—how the numerous unprotected disclosures of FA's purported trade secrets discussed above are consistent with his opinion that FA used reasonable security measures to protect the secrecy of its purported trade secrets. Instead, Pflaum simply ignores this contradictory evidence in reaching his conclusion. "Ignoring relevant data is not a scientifically valid method." *Cates*, 2017 WL 1862640 at *15. Pflaum's failure to consider FA's multitude of unprotected disclosures thus renders his opinions as to FA's security measures unreliable and subject to exclusion. *In re Paoli*, 35 F.3d at 749; *Barber*, 17 F. App'x at 437; *Concord Boat Corp.*, 207 F.3d at 1055-57.

## II. Pflaum's Opinions That FA Derived Economic Value From the Secrecy Of Its Purported Trade Secrets Should Be Excluded.

Pflaum offers an opinion that FA derived non-trivial economic value from its alleged trade secrets not being generally known to, or readily ascertainable through proper means by, other professionals in the fintech industry. (Ex. 1 at ¶¶ 241-247; Ex. 5 at ¶ 423 (explaining his testimony on this point is limited to an opinion that [redacted] (emphasis added).) This opinion should be excluded for two independent reasons. *First*, Pflaum has no established expertise on which to base it. *Second*, even if he were qualified to offer such an opinion, it is unreliable because he did no analysis to reach his conclusions.

### A. Pflaum is unqualified to proffer an expert opinion that FA derived non-trivial economic value from purported trade secrets being not generally known or readily ascertainable in the fintech industry.

Rule 702 requires that an expert possess "knowledge, skill, experience, training, or education" related to the testimony that he proffers. Fed. R. Evid. 702. "An expert may be generally qualified but may lack qualifications to testify outside his area of expertise." *Calhoun v*

*Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003); *see also Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc.*, 2004 WL 1534786, at *2 (D. Del. May 21, 2004) ("A party cannot qualify a person as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue."). Pflaum offers himself as [redacted] (Ex. 1 at ¶ 2.) However, Pflaum does not offer himself as—and in fact is not—an expert on the fintech industry or what is known to professionals within that industry. Accordingly, opinions regarding what information is generally known or readily ascertainable *within the fintech industry* fall outside his area of expertise and are thus inadmissible. *Calhoun*, 350 F.3d at 322.

Pflaum testified at his deposition that he is *not* experienced in the fintech industry. [redacted] (Ex. 4 at 33:19-33:22.)

The [redacted]. (Ex. 4 at 26:23-27:17, 29:4-29:17.) Integrating an existing model into a web portal does not require expertise as to the state of the industry to which the existing model applies and thus is a far cry

from the type of "knowledge, skill, experience, training, or education" needed to qualify one as an expert to opine on the fintech industry. Indeed, Pflaum himself admits that [redacted])

Despite his complete lack of experience in the fintech industry, Pflaum provides no justification for how he is qualified to opine on whether FA's purported trade secrets were, in fact, secret within that industry. Nor can he. Put simply, Pflaum's experience in the realm of software code does not qualify him to go beyond the scope of that expertise and offer opinions about what information was generally known to, or readily ascertainable through proper means by, professionals in the relevant industry here. *Calhoun*, 350 F.3d at 322 ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise."). Neither of Pflaum's expert reports nor his deposition testimony establishes that Pflaum has any "knowledge, skill, experience, training, or education" related to what is known or ascertainable within the fintech industry. Fed. R. Evid. 702. Accordingly, Pflaum's testimony that FA's purported trade secrets derived non-trivial economic value from not being known or ascertainable within that industry should be excluded. *See Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560, at *24 (D. Del. July 29, 2022) (excluding specific expert opinions about Microsoft Azure tenants when the expert's only knowledge about the topic came from an introductory course, self-experimentation with creating a tenant, and consultation with another expert, because the expert "lacks qualifications" to testify on the specific topic); *Godreau-Rivera v. Coloplast Corp.*, 2022 WL 1120371, at *6 (D. Del. Apr. 14, 2022) (excluding expert testimony as to a particular subject

where the expert's "report does not reveal any experience, education, or knowledge about" the specific opinion proffered).

**B. Pflaum's opinion is unreliable because Pflaum undertakes no analysis to reach his conclusions.**

Even if he were qualified to offer an opinion on economic value in the fintech industry—which he is not—Pflaum's opinion should be excluded because it is not based on a reliable methodology. As the purported trade secret owner, Plaintiff bears the burden to establish that the elements of a trade secret are met. *See Dow Chem. Canada Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 347 (D. Del. 2012), *aff'd* 587 F. App'x 741 (3d Cir. 2014) ("under the DUTSA, [Plaintiff] *affirmatively must prove* . . . that a trade secret exists") (emphasis added); *Peloton Interactive, Inc. v. iFit Inc.*, 2022 WL 1523112, at *2 (D. Del. May 13, 2022) ("To establish a violation of the DTSA, [Plaintiff] must prove: (1) the existence of a trade secret . . . .").

Under the DUTSA and the DTSA, a trade secret is defined as follows:

> "Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. C. § 2001(4).

> The term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(a) The owner thereof has taken reasonable measures to keep such information secret; and

(b) The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Thus, the relevant issue for alleged trade secret misappropriation is whether the economic value of the purported trade secret *is derived from the secrecy of that information*—not just whether the information has some value.

In his reports, Pflaum opines that each of FA's purported trade secrets [redacted] (*E.g.*, Ex. 1 at ¶¶ 13, 43, 63, 81, 103, 122, 142.) However, Pflaum offers no actual explanation or analysis of how the economic value of FA's purported trade secrets is derived from the secrecy of such information. Instead, Pflaum offers six paragraphs listing reasons why he believes that FA's purported trade secrets have value generally. Then, in conclusion, he summarily states that [redacted] (Ex. 1, at ¶¶ 241-247.) Pflaum's Reply Report offers no further opinions explaining how the economic value of FA's purported trade secrets stems from the secrecy of that information. Indeed, Pflaum does not even opine that FA's purported trade secrets are *not* generally known to or readily ascertainable by other professionals in the industry. Instead, Pflaum improperly flips the standard for establishing secrecy on its head, arguing that *Defendants'* expert has not established that it *was* known or ascertainable. (*E.g.*, Ex. 5 at ¶¶ 30, 130-131.) But it is FA's burden to prove a trade secret exists, not Defendants' to show the contrary. *Dow Chem.*, 909 F. Supp. 2d at 347; *Peloton Interactive, Inc.*, 2022 WL 1523112 at *2.

An expert witness must base his testimony on a reliable methodology. *In re Paoli*, 35 F.3d at 749. It is axiomatic that for an opinion to be based on a "reliable" methodology, it must of course be based on *some* methodology. In other words, an expert opinion is inadmissible when it is based merely on the *ipse dixit* of the expert. *Joiner*, 522 U.S. at 146. Pflaum's opinions that FA derived economic value from the secrecy of its purported trade secrets violates this cardinal rule of expert testimony. Further, in order for expert testimony to be admissible, it must fit the issues in the case. *AgroFresh Inc. v. Essentiv LLC*, 2019 WL 9514565, at *1 (D. Del. Oct. 7, 2019) (excluding expert testimony in a trade secret misappropriation case when the expert "fail[ed] to connect the trade secret (or any other) issues in the case with his [proffered opinion]").

If Pflaum had conducted an actual analysis of the issues in this case, he would have had to consider how the purported trade secrets could possibly derive value from secrecy in light of: (1) the state of general knowledge in the fintech industry (*see* 6 Del. C. § 2001(4); 18 U.S.C. § 1839(3)); (2) the state of ready ascertainability of the purported trade secrets in the fintech industry (*see id.*); (3) the numerous disclosures discussed in Section I *supra*; (4) the fact that many of FA's purported trade secrets were either publicly disclosed or in Defendants' possession prior to the beginning of the Yodlee-FA relationship (*see* D.I. 450 at 9-10); and (5) the fact that, with regard to the portions of the FA Platform stemming from FA's prior PowerWallet product, multiple [redacted][3] (Ex. 13 at 28:15-29:5.) Pflaum does none of this.

---

[3] Though Pflaum makes no mention of PowerWallet in his reports or his deposition, FA's damages expert, Dr. DeForest McDuff, [redacted] (Ex. 17 at ¶ 65.)

Absent any actual analysis tying the supposed value of the purported trade secrets to the actual secrecy of that information, Pflaum offers nothing more than his *ipse dixit* that the economic value he believes exists in FA's purported trade secrets is derived from their secrecy. That is not an opinion based on a reliable methodology. *Joiner*, 522 U.S. at 146.

### III. Pflaum's Opinions That Snapshot 2.0 Incorporated Relevant Source Code From The Equifax VOA MVP Product Should Be Excluded As Impermissible *Ipse Dixit.*

Pflaum further opines that Yodlee's Snapshot 2.0 product incorporated the source code of the Equifax VOA MVP product allegedly developed using FA's purported trade secrets. (*E.g.*, Ex. 1 at ¶¶ 410-411; Ex. 5 at ¶¶ 726, 731.) This appears to be offered as a purported basis for associating Envestnet with FA's allegations of misappropriation against Yodlee. This opinion should also be excluded. As with the others above, it is not based on a reliable scientific or technical methodology, but on the *ipse dixit* of Pflaum. *Joiner*, 522 U.S. at 146; *In re Paoli*, 35 F.3d at 749.

Pflaum's reports claim that his opinion on the similarities between Snapshot 2.0 and the Equifax VOA MVP source code stems from a review of the source code of the two products. (Ex. 1 at ¶¶ 410-411; Ex. 5 at ¶¶ 726, 731.) As an initial matter, a review of the two sets of source code is not an appropriate methodology because both parties agree that *neither Yodlee nor Envestnet had access to or copied FA's source code*. (*See,* Ex. 14 at 35:12-37:15, 38:5-40:18, Ex. 15 at 48:12-49:25; Ex. 16 at 236:17-20.)

Setting that issue aside, Pflaum's methodology is still flawed as his reports do *not* identify what source code he reviewed, explain the comparison he undertook, or identify which of FA's purported trade secrets, if any, are supposedly contained within the portion of the Snapshot 2.0 code that is similar to the Equifax VOA MVP code. To the contrary, Pflaum's response to the criticisms of Defendants' expert on this point simply amount to a recitation that Pflaum [redacted]

[redacted] (Ex. 5 at ¶ 726.)

When questioned about his purported source code review at his deposition, Pflaum confirmed that he did not, in fact, actually undertake a comparison of the Snapshot 2.0 product source code and the source code for Equifax VOA MVP. [redacted] (Ex. 4 at 213:23-215:10.) Pflaum does not explain anywhere what the continued "development" consisted of. He does not explain how, if at all, the Snapshot 2.0 source code changed during that development. Most importantly, he does not opine as to how any similarities between the Snapshot 2.0 source code and the Equifax VOA MVP source code relate to FA's purported trade secrets.

A vague and unsupported assertion, without any explanation of a reliable scientific or technical methodology employed to reach that conclusion, is not permissible expert testimony. *Joiner*, 522 U.S. at 146 (the *ipse dixit* of an expert is not admissible). As Pflaum himself admits, [redacted]. However, Pflaum makes no effort to "fit" his expert opinion to this fact by explaining how the continued development impacted any purported similarities in the source code and how any such similarities relate to FA's purported trade secrets. This failure warrants exclusion of Pflaum's opinions on this issue. *See AgroFresh Inc. v. Essentiv LLC*, 2019 WL 9514565, at *1 (D. Del. Oct. 7, 2019) (excluding expert testimony in a trade secret misappropriation case when the expert "fail[ed] to connect the trade secret (or any other) issues in the case with his [proffered opinion]").

**CONCLUSION**

Defendants Envestnet, Inc. and Yodlee, Inc. respectfully request that the Court exclude the portions of Pflaum's testimony identified herein.

OF COUNSEL:

Gary M. Miller
Gary M. Elden
John D. Garretson
Amy Y. Cho
Justin R. Donoho
Ian M. Hansen
SHOOK, HARDY & BACON LLP
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
(312) 704-7700

Dated: January 12, 2023

CONNOLLY GALLAGHER LLP

*/s/ Henry E. Gallagher, Jr.*
Henry E. Gallagher, Jr. (No. 495)
Lauren P. DeLuca (No. 6024)
1201 North Market St., 20th Floor
Wilmington, DE 19801
(302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

*Attorneys for Defendants Envestnet, Inc. and Yodlee, Inc.*