**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FINANCIALAPPS, LLC,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )      Civil Action No. 19-1337-GBW-CJB
                                   )
ENVESTNET, INC. and YODLEE, INC.,  )
                                   )
            Defendants.            )

## <u>MEMORANDUM ORDER</u>

Presently pending in this action is Defendants Envestnet, Inc. ("Envestnet") and Yodlee,

Inc.'s ("Yodlee, and collectively with Envestnet, "Defendants") "Motion to Compel Marc

Kasowitz to Answer Questions Relating to Defamation Counterclaims" (the "Motion").  (D.I.

405)  Plaintiff FinancialApps, LLC ("Plaintiff" or "FinApps") opposes the Motion.  (D.I. 413)[1]

For the reasons set out below, the Court DENIES the Motion.

## I.      BACKGROUND

In this action, FinApps asserts claims against Defendants for misappropriation of trade

secrets, fraud, tortious interference with prospective business opportunities, unfair competition,

violation of state deceptive trade practices statutes, breach of contract, breach of the implied

covenant of good faith and fair dealing, and unjust enrichment.  (D.I. 2; D.I. 126)  FinApps'

claims arise out of an alleged "systematic scheme to copy, misappropriate, and 'reverse

---

[1]     On October 7, 2019, United States District Judge Colm F. Connolly referred this
case to the Court to conduct all proceedings and to hear and determine all motions, pursuant to
28 U.S.C. § 636(b) (the "referral").  (D.I. 18)  On September 7, 2022, this case was reassigned to
United States District Judge Gregory B. Williams, who subsequently ordered that the referral
remained in effect.  (D.I. 437)

engineer' FinApps' proprietary technology in order to assist [Defendants'] secret development of several Competing Products" that compete with FinApps' products.  (D.I. 134 at 1)

Shortly after FinApps filed its Complaint in July 2019, a public relations firm circulated a press statement on behalf of FinApps that attached a copy of the Complaint.  (D.I. 414, ex. B) Two reporters subsequently contacted Mr. Kasowitz, an attorney for Plaintiff, seeking comment. (*Id.*, ex. C at 55-56; *id.*, ex. D at 18-20)  In late July and early August 2019, articles were published on the Internet regarding the litigation; these articles attributed certain statements to Mr. Kasowitz.  (D.I. 160, exs. E-I).

On September 30, 2020, Defendants filed First Amended Counterclaims against FinApps, including a defamation counterclaim (the "defamation counterclaim") relating to Mr. Kasowitz's statements; the defamation counterclaim was brought by both Defendants.  (D.I. 160 at ¶¶ 73-79, 94-101)  In that pleading, Defendants assert that on July 30, 2019, *RIAbiz*, an online journal about the financial advice business, published an article entitled "Entrepreneurial firm hits Envestnet with $100-million lawsuit for alleged Yodlee 'Trojan Horse' scheme used to steal proprietary technology[.]"  (*Id*. at ¶ 74)  The article contained the following statements quoting Mr. Kasowitz:

- "'Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful.'"  (*Id.*, ex. E at 3; *see also* D.I. 160 at ¶¶ 74, 96)

- "[Plaintiff] already has plenty of evidence" regarding Defendants' misconduct, including that "'[t]hey were reverse engineering, but they were also misappropriating, and we have a lot of proof of that[.]'"  (*Id.*, ex. E at 3; *see also* D.I. 160 at ¶¶ 75, 97)

Similar statements by Mr. Kasowitz were quoted online in *StreetInsider.com* and *InvestmentNews* on July 30, 2019 and August 1, 2019, respectively.  (*Id.* at ¶¶ 76-77 & exs. F-G) On August 7, 2019, another article was published online by *Financial Planning* entitled

"Envestnet accused of stealing trade secrets, hit with lawsuit[,]" and it quoted Mr. Kasowitz as stating that "[t]hey were making misrepresentations in all directions. . . . Both to FinApps claiming to be working pursuant to the agreement, and meanwhile, telling customers it was their own technology[.]" (*Id.*, ex. H at 1; *see also* D.I. 160 at ¶¶ 78, 98)  Herein, the Court will refer to Mr. Kasowitz's statements referenced in this paragraph as the "Alleged Defamatory Statements."[2]

In its Answer to Defendants' Counterclaims, FinApps asserted as an affirmative defense to the defamation counterclaim that Defendants are public figures that have failed to demonstrate actual malice:

> Defendants' Counterclaims are barred, in whole or in part because Defendants are required, and have failed, to demonstrate actual malice.  As public figures, Defendants are required to prove that any purportedly defamatory statements were made with knowledge of their falsity, or a reckless disregard for the truth.  As the statements in question here were based on a publicly filed complaint, alleging 14 causes of action, 12 of which have survived a motion to dismiss and will proceed to trial, it is impossible for Defendants to prove actual malice.

(D.I. 199 at 44)[3]

---

[2]    Defendants' briefing identifies certain additional statements, beyond those expressly identified in their counterclaim, as constituting the defamatory statements at issue here. (D.I. 406 at 2-3; *see also* D.I. 160 at ¶¶ 95-98; D.I. 413 at 4)  FinApps pointed this out in its responsive brief, asserting that these statements are not alleged in the counterclaim and were not made by Mr. Kasowitz.  (D.I. 413 at 4)  The Court here focuses on the Alleged Defamatory Statements that were expressly identified in Defendants' counterclaim.  It does so because the issue of whether Defendants can rely on additional statements is not well briefed, and because Defendants represent that the outcome here would not be impacted were the Court to focus exclusively on the Alleged Defamatory Statements.  (D.I. 420 at 9 n.7)

[3]    Defendants assert that California law and/or Illinois law applies to Defendants' defamation counterclaim.  (D.I. 113 at 18 n.12; D.I. 406 at 10 n.6)  Defamation under California law is defined as:  (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. *John Doe 2 v. Super. Ct.*, 206 Cal. Rptr. 3d 60, 68 (Cal. Ct. App. 2016) (citation omitted).  The defamatory statement must specifically

In late December 2020, the Court granted Defendants' request (over FinApps' objection) that Mr. Kasowitz be ordered to sit for a deposition of up to 7 hours in connection with Defendants' defamation counterclaim.  (D.I. 188 at 1; D.I. 406, ex. A at 95-98)  In doing so, the Court explained that:

> [T]here are other elements to the defamation claim[] that the [D]efendants are going to want to pursue and have to establish at trial, and those elements have to do with things like intent and malice, and those relate to not just what was said, but what was known by the speaker [and] what was [not] known, and that could well take some time to go through.
>
> It also I think is relevant that[,] as I understand this claim, Mr. Kasowitz really is the key witness.  I mean, he is the speaker who is alleged to have defamed the [D]efendants' side.

(D.I. 406, ex. A at 98)  That deposition took place on March 5, 2021 (the "March deposition").

(D.I. 318, ex. D)  Later in the discovery period, the Court ordered (again, over FinApps' objection) that Mr. Kasowitz must sit for an additional three hours of deposition time in light of a significant number of inappropriate objections that were made during the March deposition. (D.I. 335)

Mr. Kasowitz's second deposition took place on June 17, 2021 (the "June deposition").

(D.I. 373, ex. A)  FinApps' counsel defending the June deposition instructed Mr. Kasowitz not to

---

refer to or concern the plaintiff.  *Id.*  Under Illinois law, a plaintiff stating a defamation claim must plead facts demonstrating that:  (1) the defendant made a false statement regarding the plaintiff; (2) the defendant made an unprivileged publication of the statement to a third party, and (3) the publication caused damages to the plaintiff.  *Tirio v. Dalton*, 144 N.E.3d 1261, 1273 (Ill. App. Ct. 2019).  No matter what state's law applies, where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant act with actual malice.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  If the plaintiff is not a public figure, under both California and Illinois law, it need not prove actual malice, but will instead need to prove that the defendant was negligent in making the defamatory statements.  *See, e.g.*, *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 803 (Cal. 2001); *Rosner v. Field Enters., Inc.*, 564 N.E.2d 131, 152 (Ill. App. Ct. 1990).

answer 57 questions (the "57 questions") on privilege grounds.  (*See* D.I. 406 at 4)  Defendants

subsequently moved to compel various relief relating to the June deposition (the "third motion to

compel"), including an order compelling Mr. Kasowitz to answer the 57 questions.  (D.I. 373 at

3)[4]  In its responsive letter brief with respect to the third motion to compel, FinApps clarified

that its assertion of privilege with respect to these questions was "over Mr. Kasowitz's legal

opinion and work product" and that it was not asserting privilege over attorney-client

communications (a doctrine that FinApps called "irrelevant" to the instant dispute).  (D.I. 375 at

2)  The Court denied without prejudice to renew this portion of the third motion to compel,

explaining, *inter alia*, that:

> [T]he Court does not presently have a sufficient record to allow for
> a ruling.  This is due to:  (a) the truncated nature of the discovery
> dispute briefing process; and (b) the fact that only in the answering
> brief did it become clear that Plaintiff was relying on the attorney
> work product doctrine (and so there was not fully-engaged briefing
> on the nuances of this legal dispute). . . .  Accordingly, to the
> extent that Defendants choose to renew their Motion as to this
> issue, they should file a separate motion, and the parties shall fully
> brief the issue in accordance with Local Rules 7.1.1-7.1.3.
> Additionally, the Court offers the following guidance with respect
> to any such future motion and corresponding briefing:  (a)
> *Defendants' opening brief should explicitly identify the deposition
> questions and responses that are truly at issue here (the Court
> doubts that all 53 [now understood to be 57] instances mentioned
> in Defendants' brief fit this bill) . . . and should explain how they
> are relevant to the allegations at issue in this case*.; [and] (b) Each
> party should address what jurisdiction's privilege law applies,
> should describe that applicable law in detail as to the relevant work
> product and waiver questions, and should point out the judicial
> opinions that best support the party's position.

---

[4]    In briefing in connection with the third motion to compel, Defendants stated that
the total number of questions that Mr. Kasowitz was instructed not to answer on privilege
grounds was 53.  (D.I. 373 at 1)  However, in their briefing on the instant Motion, Defendants
note that that number was a mistake; they explain that they are in fact seeking relief with respect
to 57 questions, not 53.  (D.I. 406 at 4 & n.3)

(D.I. 387 (emphasis added))

On April 22, 2022, Defendants renewed the third motion to compel via the instant

Motion.  (D.I. 405)  The Motion was fully briefed as of June 10, 2022.  (D.I. 420)[5]

Further relevant facts related to resolution of the Motion will be set out as needed in

Section III.

## II.    STANDARD OF REVIEW

The work product doctrine is a privilege that is distinct from, and broader than, the

attorney-client privilege.  *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975).[6]  The doctrine,

which is partially codified in Federal Rule of Civil Procedure 26(b)(3) ("Rule 26(b)(3)"),

"shelters the mental processes of the attorney, providing a privileged area within which he can

analyze and prepare his client's case."  *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661 (3d

Cir. 2003) (internal quotation marks and citations omitted); *Westinghouse Elec. Corp. v.

Republic of Phil.*, 951 F.2d 1414, 1428 (3d Cir. 1991) ("Protecting attorneys' work product

promotes the adversary system by enabling attorneys to prepare cases without fear that their

work product will be used against their clients.") (citations omitted).  While Rule 26(b)(3)

applies to "documents and tangible things that are prepared in anticipation of litigation or for

trial[,]" Fed. R. Civ. P. 26(b)(3), the Supreme Court of the United States has held that work

---

[5]     This parties in this case have been particularly litigious.  For example, the instant motion marks the 10th different time in which the Court has been called upon to resolve one or more discovery disputes in the case.  (D.I. 346; D.I. 371; D.I. 389)  And the adversarial nature of the case has at times, unfortunately, resulted in unduly argumentative exchanges between counsel, including as part of the run-up to the filing of this Motion.  (*See, e.g.*, D.I. 335; D.I. 413 at 6-7; D.I. 414, ex. N at 4-44)

[6]     The work product doctrine is governed by uniform federal law embodied in Federal Rule of Civil Procedure 26(b)(3), even in diversity cases.  *DeShields v. Mountain Laurel Resort & Spa*, Civil Case No. 3:09-CV-2125, 2010 WL 4536771, at *3 (M.D. Pa. Nov. 2, 2010); *see also In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661 (3d Cir. 2003).

product protection also extends to intangible work product, such as information that may be sought through deposition questions, *see Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *Solano-Sanchez v. State Farm Mut. Auto Ins. Co.*, CIVIL ACTION NO. 19-4016, 2021 WL 2156367, at *7 (E.D. Pa. May 27, 2021); *see also, e.g.*, *In re Cendant*, 343 F.3d at 662 ("It is clear from *Hickman* that work product protection extends to both tangible and intangible work product."); *Sys. Am., Inc. v. Tyagi*, Civil Action No. 97-42, 1997 WL 35386736, at *2 (D. Del. Feb. 20, 1997). The party asserting that evidence is protected by the work product doctrine bears the burden of establishing the applicability of the doctrine. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000); *INVISTA N. Am. S.A.R.L. v. M&G USA Corp.*, Civil Action No. 11-1007-SLR-CJB, 2013 WL 12171721, at *5 (D. Del. June 25, 2013). Work product prepared in the ordinary course of business (i.e., not in anticipation of litigation) is not protected by the work product doctrine. *Sharp v. Gov't of V.I.*, 77 F. App'x 82, 85 (3d Cir. 2003).

Rule 26(b)(3) establishes two tiers of protection for work product. *In re Cendant*, 343 F.3d at 663. The first tier of protection governs "ordinary work product[,]" which includes "raw factual information." *Kickflip, Inc. v. Facebook, Inc.*, Civil Action No. 12-1369-LPS, 2016 WL 5929003, at *4 (D. Del. Sept. 14, 2016) (internal quotation marks and citation omitted); *see also* Fed. R Civ. P. 26(b)(3). Ordinary work product is discoverable upon a showing that the movant has (1) "substantial need for the materials" and (2) "cannot, without undue hardship, obtain their substantial equivalent by other means[.]" Fed. R. Civ. P. 26(b)(3); *see also In re Cendant*, 343 F.3d at 663. Meanwhile, the second tier of protection governs "core" or "opinion" work product; this type of work product constitutes the "mental impressions, conclusions, opinion[s], or legal theories of an attorney or other representative of a party concerning the litigation[.]" *In re*

7

*Cendant*, 343 F.3d at 663 (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 26(b)(3)(B).  The United States Court of Appeals for the Third Circuit has explained that opinion work product is "generally afforded near absolute protection from discovery[,]" such that it "receives greater protection than ordinary work product and is discoverable only upon a showing of rare and exceptional circumstances."  *In re Cendant*, 343 F.3d at 663 (internal quotation marks and citation omitted); *see also id*. at 664 (further describing this showing as a "heightened showing of extraordinary circumstances").  The party seeking to compel production bears the burden of establishing that discovery of otherwise protected opinion work product is warranted. *See, e.g.*, *Utesch v. Lannett Co., Inc.*, CIVIL ACTION NO. 16-5932, 2020 WL 7260775, at *9 (E.D. Pa. Dec. 9, 2020).

## III.    DISCUSSION

With their Motion, Defendants request an order compelling Mr. Kasowitz to sit for an additional three hours of deposition time to answer the 57 questions he was instructed not to answer during the June deposition, as well as any follow-up questions that his answers to those questions might generate.  (D.I. 406 at 18)  According to Defendants, the 57 questions are all aimed at exploring whether Mr. Kasowitz "acted with negligence or actual malice" in making the Alleged Defamatory Statements at issue in Defendants' defamation counterclaim; Defendants group those questions into four broad categories:

- Category 1:  What did Mr. Kasowitz mean by the [Alleged] Defamatory Statements?

- Category 2:  What investigation preceded and/or informed the [Alleged] Defamatory Statements?

- Category 3:  What information did Mr. Kasowitz have when he made the [Alleged] Defamatory Statements?

8

- Category 4:  How, if at all, did Mr. Kasowitz vet the legal
  soundness of the [Alleged] Defamatory Statements?

(*Id.* at 1-2, 4)  Defendants argue that:  (1) FinApps has failed to demonstrate that the information sought by the 57 questions qualifies as work product; and (2) even if some or all of the information does qualify as work product, Defendants are nevertheless entitled to discover it. (*Id.* at 7-18; D.I. 420 at 1-10)  Meanwhile, FinApps contends that all 57 questions seek opinion work product, and that Defendants have not shown that they are entitled to discover this material. (D.I. 413 at 4, 8-20)  The Court takes up these issues in turn.

### A.     Does the Information Sought by the 57 Questions Qualify as Work Product?

The Court first considers whether FinApps has sufficiently demonstrated that the information sought by the 57 questions qualifies as attorney work product—i.e., that the information was prepared in anticipation of litigation.  In their opening brief, Defendants argue that FinApps "has not yet explained how the information sought by *any* [of the 57] question[s]" so qualifies.  (D.I. 406 at 7 (emphasis in original); *see also* D.I. 420 at 2 ("[FinApps] must establish that the mental impressions for which it claims work product protection were generated in anticipation of this litigation or trial."))  FinApps retorts that it has done so "at length, in writing and verbally, on numerous occasions."  (D.I. 413 at 8)

Having considered the various portions of the record that FinApps cites, the Court agrees with Defendants that FinApps did not do a very good job of explaining how the information sought by the 57 questions qualifies as information prepared in anticipation of litigation or for trial.  (*Id.* at 4-6, 8-9; D.I. 420 at 1 ("FA must establish that the questions at issue seek information generated *in preparation for this litigation or trial.*  In response, [FinApps] summarizes the many times it has proclaimed that the questions seek Mr. Kasowitz's mental impressions and ignores Defendants' point that such is not enough.") (emphasis in original); D.I.

420 at 2 ("[I]t is not enough for [FinApps] merely to proclaim (even many times) that the questions seek Mr. Kasowitz's mental impressions."))[7]  With all of that said, in the Court's view, it is self-evident that the work product doctrine would have to attach to the information sought by the 57 questions.  After all, Defendants assert that the answers to all of these questions are relevant to the Alleged Defamatory Statements at issue.  (D.I. 406 at 4-5, 8-12, 17-18; D.I. 420 at 2-3, 6)  They claim that with these questions, they seek information that will assertedly shed light on "intent and malice," "what was known by the speaker," and "what wasn't known" with respect to those statements.  (D.I. 406 at 4)  And the Alleged Defamatory Statements, in turn, were clearly about and have to do with certain matters at play in *this ongoing litigation*.  (D.I. 160 at ¶¶ 96-98)  Moreover, even Defendants are wrong, and if some or all of the information responsive to these questions is not relevant to the Alleged Defamatory Statements, that information must still have been generated in connection with this litigation.  Indeed, nearly every one of the 57 questions includes the qualifier that it seeks information regarding Mr. Kasowitz's knowledge or actions in or around "July 2019" and "August 2019[.]"  (D.I. 406, ex. C)  This is presumably because the Alleged Defamatory Statements were made in these months

---

[7]      For example, some of FinApps' argument relating to this issue pertains to questions asked during Mr. Kasowitz's first deposition, which are not at issue here.  (D.I. 413 at 4)  FinApps then points to its objections during the June deposition of Mr. Kasowitz, but in those objections, FinApps' counsel simply noted its view that certain questions sought privileged information, nothing more.  (*Id.* (citing D.I. 414, ex. J at 374, 386, 391, 401, 431, 447))  Next, FinApps points to correspondence that its counsel sent to Defendants' counsel following the June deposition, in which FinApps asserted that additional questioning of Mr. Kasowitz would constitute "an attempt to elicit irrelevant attorney mental impressions immune from disclosure under the work product doctrine."  (D.I. 414, ex. K at 4 (*cited in* D.I. 413 at 4-5))  But that letter too does not specifically delve into the "in anticipation of litigation or trial" issue.  And the remainder of the intra-party communications that FinApps cites amount to more of the same.  In those communications, FinApps states that Mr. Kasowitz's mental impressions are privileged—without going on to specifically explain why it is that the information sought by the 57 questions amounts to information generated in Mr. Kasowitz's mind in preparation for this litigation or for trial.  (D.I. 413 at 5-6 (citing D.I. 414, ex. L at 59, 63-64, 69; D.I. 375 at 2-3))

and, in turn, because *this litigation was filed in July 2019*.  In light of this, it cannot reasonably be suggested that Mr. Kasowitz's thoughts and actions at issue were generated in response to something other than this litigation matter.

Thus, Defendants' threshold claim—i.e., that the work product doctrine does not apply to the information that it seeks—is not persuasive.  *See, e.g.*, *Rudolf v. Am. Int'l Grp., Inc.*, Civil Action No. 19-1468, 2021 WL 5883366, at *7 (W.D. Pa. Dec. 13, 2021) (finding that the defendant did not meet its burden of proving that the material in question was prepared in anticipation of litigation where "Defendants do not proffer any evidence demonstrating these materials were prepared in anticipation of litigation at that time, *and this conclusion is not evident from the materials provided for the Court's review*") (emphasis added); *Kenco Grp., Inc. v. Kennedy*, Case No. 1-20-cv-00129-DCLC-CHS, 2021 WL 6335214, at *3 (E.D. Tenn. Sept. 29, 2021) (finding that an e-mail was protected by the work product doctrine where "[i]t is self-evident that this email was created in anticipation of litigation").

### B.    Are Defendants Entitled to the Work Product Information Sought by the 57 Questions?

The Court now turns to whether Defendants are entitled to the work product information sought by the 57 questions.

In making this decision, the Court must first establish whether the 57 questions seek ordinary work product or opinion work product—since different tests govern whether the two types of work product are discoverable.  While it is undisputed that Category 4 seeks opinion work product, Defendants argue that Categories 1, 2 and 3 seek only ordinary work product. (D.I. 406 at 8, 14; D.I. 420 at 3-4)

### 1.    Is the Information Sought by Categories 1, 2 and 3 Ordinary Work Product or Opinion Work Product?

11

The Court thus first asks whether Categories 1, 2 and 3 constitute ordinary work product or opinion work product.  It will address the three categories in order.

With regard to Category 1, Defendants frame the 12 questions therein as probing "[w]hat did Mr. Kasowitz mean" by the Alleged Defamatory Statements.  (D.I. 406 at 4; *id.*, ex. C at 1) These questions are similar, in that they all generally ask Mr. Kasowitz whether, in July and August 2019, he considered various methods or information or aspects of technology to be a trade secret.[8]  (*Id.*, ex. C at 1)  Defendants explain that they must prove that Mr. Kasowitz's Alleged Defamatory Statements are false in order to prevail with respect to their defamation counterclaim, and that the Category 1 questions query what technology Mr. Kasowitz was referring to when he accused Defendants of "deliberately st[ealing]," "reverse engineering," and "misappropriating" FinApps' property.  (D.I. 406 at 8; *see also* D.I. 420 at 3 ("Category 1 seeks to pin down the [FinApps] technology Mr. Kasowitz intended to reference when he said in the [Alleged] Defamatory Statements that Defendants stole, reverse engineered, and misappropriated [FinApps'] technology"))  According to Defendants, "[w]hat Mr. Kasowitz meant by his statements is a factual question" which means that the information sought by these questions seeks only ordinary work product.  (D.I. 406 at 8)

For its part, FinApps disputes that the Category 1 questions merely seek factual information.  (D.I. 413 at 9-10)  Instead, FinApps argues that each of these questions "expressly seeks Mr. Kasowitz's mental impressions regarding trade secrets . . . a key legal doctrine in this case that is entirely absent from, and thus irrelevant to, any defamatory statement alleged."  (*Id.*

---

[8]     For example, one such question asks "[w]as it your understanding in July and August 2019 that averaging, summing, and eliminating duplications from consumer information could be trade secrets?"  (D.I. 406, ex. C at 1)

(emphasis omitted))  And so FinApps contends that the questions sought by Category 1 seek opinion work product, which is subject to heightened protection.  (*Id.*)

Here the Court agrees with FinApps.  These 12 questions (and the follow up questions they might elicit) will seek Mr. Kasowitz's views about whether certain concepts or things qualify as trade secrets under governing law.  The questions are asked in an open-ended way, with many using the phraseology "did you think it was a trade secret that . . ." (or the equivalent).  (D.I. 406, ex. C at 1)  Those questions are worded such that they do not seek purely factual information; they will elicit an attorney's mental impressions about the nuances of trade secret law and how and why it should or should not apply to certain facts.  *In re Cendant*, 343 F.3d at 663 (opinion work product constitutes an attorney's mental impressions).

With respect to Category 2, Defendants assert that the answers to these questions will allow them to probe "[w]hat investigation preceded and/or informed" the Alleged Defamatory Statements.  (D.I. 406 at 4; *id.*, ex. C at 1-2)  There are 16 questions in this category.  Some of them ask whether Mr. Kasowitz investigated or attempted to determine certain things in July and August 2019,[9] while others ask about Mr. Kasowitz's understanding as to what his "obligation[s]" were before he made the Alleged Defamatory Statements.[10]  (*Id.*, ex. C at 1-2) Defendants also assert that the six questions in Category 3 seek to uncover the results of any investigation that Mr. Kasowitz or his firm undertook—i.e., "[w]hat information did Mr. Kasowitz have when he made" the Alleged Defamatory Statements?  (D.I. 406 at 4, 9)

---

[9]      For example, one question asks "[w]hat did you do to determine what Yodlee knew before it met FinApps?"  (D.I. 406, ex. C at 2)

[10]     One typical question falling into this bucket asks "[i]n July and August 2019, before you accused Yodlee and Envestnet of stealing trade secrets, did you think you had an obligation to check to see what information FinApps was instructing its salespeople to provide to customers without nondisclosure agreements?"  (*Id.*)

Defendants argue that information regarding factual investigations (and their results) constitutes ordinary work product.  (*Id.* at 8-9)  FinApps, meanwhile, asserts that the questions in Categories 2 and 3 do not seek only facts regarding an investigation.  (D.I. 413 at 10)  Rather, FinApps characterizes these questions as being directed towards:  (1) Mr. Kasowitz's mental impressions regarding "the legal decisions, strategy, and conclusions relating to FinApps' pre-Complaint investigation" and (2) Mr. Kasowitz's understanding of legal issues relating to trade secret law, patent law and confidentiality issues.  (*Id.*)

Here again, the Court agrees with FinApps.  It is true that courts have found that "factual material" such as "the result of a factual investigation" does not receive the heightened protection of opinion work product.  *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 73 (S.D.N.Y. 2010) (internal quotation marks and citations omitted); *see also, e.g.*, *In re Symbol Techs., Inc. Sec. Litig.*, CV 05-3923 (DRH) (AKT), 2017 WL 1233842, at *19 (E.D.N.Y. Mar. 31, 2017) (finding that interview memoranda created by the plaintiff's private investigator, which consisted of basic factual summaries of interviews, did not constitute opinion work product as "none of the memoranda divulge the mental impressions, conclusions, legal theories or opinions of [p]laintiff's counsel, which would otherwise transform these memoranda from fact work product into opinion work product").  But the questions in Categories 2 and 3 are not seeking disclosure of "pure facts" from Mr. Kasowitz.

Consider, for example, the questions that ask whether Mr. Kasowitz investigated or attempted to determine certain things in or around July and August 2019.  Because these questions are directed to Plaintiff's lead attorney, many of them would necessarily elicit details regarding how Mr. Kasowitz and his law firm colleagues crafted Plaintiff's litigation strategy in this case (and how those decisions, in turn, related to the type of pre-Complaint investigation

employed by the firm).  For example, one question in Category 2 asks "[w]hat investigation [Mr. Kasowitz] did before July and August 2019 to determine if information was confidential[.]" (D.I. 406, ex. C at 2)  But the Complaint here was filed in mid-July 2019.  And a key premise of the Complaint is that Defendants were engaged in a "multi-year scheme . . . to steal FinApps' valuable proprietary information and trade secrets, in order to unlawfully develop software products that compete" with Plaintiff's products.  (D.I. 2 at ¶ 1)  And so the answer to this question (and the answers to the follow-up questions it will elicit) is likely going to provide insight into FinApps' counsel's mindset with regard to their pre-Complaint inquiry—i.e., about what they thought were key and important facts/theories that should be pursued, and what were not.  Of course, one could try to frame questions like these as simply eliciting "factual" information (i.e., that on a certain date, Mr. Kasowitz or his colleagues interviewed person X about subject Y).  But any such information would be intimately intertwined with FinApps' counsel's mental impressions regarding the litigation.  Thus, these questions seek opinion work product.  *See, e.g.*, *S.E.C. v. Roberts*, 254 F.R.D. 371, 373, 383 (N.D. Cal. 2008) (declining to order disclosure of factual information contained in interview meeting notes taken by an attorney, where, the "facts contained within the notes are likely inextricably tied with the attorneys' mental thoughts and impressions"); *In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 379, 386 (E.D. Pa. 2006) (concluding that in-house counsel's recollection of any facts learned during his internal investigation would be "so intertwined with mental impressions" as to amount to "opinion work product"); *cf. Hausman v. Holland Am. Line-U.S.A.*, CASE NO. CV11-1308 BJR, 2015 WL 8327934, at *2 (W.D. Wash. Dec. 9, 2015) (explaining that "in the work-product analysis, the 'fact' and 'opinion' labels are even less useful because even if it can be agreed that a collection of statements constitute 'facts,' the collection itself might nonetheless reveal an

15

attorney's mental impressions of the case, thereby converting the information into 'opinion' work-product") (citing *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997) ("At some point, . . . a lawyer's factual selection reflects his focus; in deciding what to include and what to omit, the lawyer reveals his view of the case.")). [11] Additionally, the other questions in these Categories—i.e., those asking about Mr. Kasowitz's understanding about what obligations (e.g. legal obligations) he must satisfy before he made the Alleged Defamatory Statements—clearly mean to elicit his thoughts on legal issues.  That is opinion work product.

This leaves the 23 questions that make up Category 4.  As noted above, Defendants do not dispute that these questions ask for opinion work product.  (D.I. 406 at 14; *see also* D.I. 413

---

[11]     Defendants cite to *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 415 F. Supp. 3d 498 (E.D. Pa. 2019), in support of their argument that the questions in Categories 2 and 3 seek factual information that is not opinion work product.  (D.I. 406 at 8-9; D.I. 420 at 3) In that case, the United States District Court for the Eastern District of Pennsylvania (the "Eastern District of Pennsylvania") considered whether, *inter alia*, work product protection attached to answers to requests for admissions ("RFAs") that were directed to attorneys for a plaintiff.  The RFAs were submitted in support of a motion for sanctions brought against these attorneys for failure to adequately investigate whether a factual basis existed to support the plaintiff's allegations; the RFAs asked whether the attorneys had requested certain documentation from their client.  *In re Avandia*, 415 F. Supp. at 503, 507.  The Eastern District of Pennsylvania found that this information did not qualify as opinion work product, because the requests did not "ask after theories or strategies, but rather after the factual underpinning (or lack thereof) of Allied's claims."  *Id.* at 507.  The Eastern District of Pennsylvania further noted additional reasons for its conclusion in this regard:  first, that affording opinion work product status to "even the broadest, vaguest contours of an attorney's investigation" would vitiate the court's ability to police the conduct of the bar; and second, that the requests were indistinguishable from disclosures that the attorneys had already made voluntarily.  *Id.* at 507-08.

The circumstances here are different than in *In re Avandia*.  In that case, RFAs were at issue, which simply asked plaintiff's counsel to admit or deny whether and when certain documents were requested.  Here, however, many of the 57 questions seek broad, open-ended narrative answers (and Defendants' counsel seeks the ability to ask follow-up questions regarding all 57 questions).  Moreover, unlike in *In re Avandia*, here Defendants do not assert that Mr. Kasowitz or his firm has otherwise voluntarily disclosed the equivalent of this information.

at 11)  So the Court does not really need to analyze that question here.  Nevertheless, it is useful

to consider these Category 4 questions for a different reason:  because they help underscore why

the questions in Categories 1, 2 and 3 *also* seek the same kind of opinion work product material.

(D.I. 413 at 11-12)  Defendants describe the Category 4 questions as seeking to understand

"[h]ow, if at all, did Mr. Kasowitz vet the legal soundness of the Defamatory Statements?"  (D.I.

406 at 5)  But many of these Category 4 questions are very similar to questions falling into the

other categories.  For example, a Category 4 question asks: "Did you have an understanding in

July and August 2019 that something could not be a trade secret if it was in a document like this

provided to customers who did not have nondisclosure agreements?"  (*Id.*, ex. C at 4)  This

question looks a lot like a question in Category 3 ("Were you aware generally in July and August

2019 that in order to know if something was a trade secret, you needed to know what FinApps

had disclosed to third parties without getting a nondisclosure agreement from them?") and a

question in Category 2 ("In July and August 2019, did you feel you had an obligation before

accusing Yodlee and Envestnet of theft of trade secrets, to determine whether a document like

this existed that had been given out to third parties without a nondisclosure agreement?").[12]  All

three questions are essentially asking Mr. Kasowitz for his view about the contours of trade

secret misappropriation law (and, once one understands that view, how it applies to certain facts

at issue in this case).  Therefore, the similarly between some of the Category 4 questions and

---

[12]     There are a number of other similar examples.  The Court will not list them all
here.  But to provide just one more, a question in Category 2 asks:  "[i]n deciding whether some
information was a trade secret and deciding whether given the nature of the information, it
should be considered a trade secret, did you consider whether some of that information had been
disclosed in patents or patent applications by FinApps?"  (D.I. 406, ex. C at 2)  And a similar
question in Category 4 asks "[i]n July and August 2019, would you have understood that a
decision by Bob Sullivan [the founder of FinApps] and Dexter Weatherly to include information
in a patent application would mean that the information was no longer a trade secret?"  (*Id.*, ex.
C at 4)

those in other categories also helps demonstrate why the latter questions seek opinion work product too.

###    2.    Did Defendants Meet Their Burden of Demonstrating that They are Entitled to Discover the Opinion Work Product Sought by the 57 Questions?

So we have now established that all of the 57 questions at issue seek to discover opinion work product.  With that understood, the Court now asks:  Have Defendants met their burden to demonstrate that they are nevertheless entitled to this information?  In answering this question, it is first helpful to explore the law regarding what, exactly, is the nature of this burden?

As was noted earlier, the Third Circuit has explained that while "opinion work product protection is not absolute, [it] requires a heightened showing of extraordinary circumstances" or "rare and exceptional circumstances."  *In re Cendant*, 343 F.3d at 663-64.  But what does this mean in practice?  It feels safe to say that the number of cases in which a movant will be able to meet this burden must be very few.  And it is surely the case that in order to do so, a party will have to make a showing greater than that required to obtain ordinary work product (i.e., to demonstrate that it has a "substantial need" for the material and that it is unable to obtain the equivalent without "undue hardship").  *Upjohn Co. v. United States*, 449 U.S. 383, 401 (1981).  Yet beyond this, things get unclear.  This is because the Third Circuit has not otherwise articulated a more specific test to be applied in these circumstances.  *See Bolus v. Carnicella*, No. 4:15-cv-01062, 2020 WL 6531007, at *7 (M.D. Pa. Nov. 5, 2020).

Figuring out this answer was made more difficult by the fact that, in their briefing, Defendants never explicitly argued that "rare and exceptional" or "extraordinary" circumstances exist in this case.  (*See* D.I. 413 at 8)  Indeed, Defendants' briefs never mentioned those terms in

this context.  Nor did Defendants explicitly cite to the portion of Third Circuit caselaw requiring that such a showing be made.

Instead, in describing how they would overcome the barrier to obtaining opinion work product,[13] Defendants pointed the Court to a test utilized by the United States District Court for the Middle District of Pennsylvania.  (D.I. 406 at 6, 14; *see also* D.I. 413 at 12)  This test was, in turn, first employed by the United States Court of Appeals for the Ninth Circuit in *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573 (9th Cir. 1992); it states that opinion work product should be discoverable where:  (1) the attorney's "'mental impressions are at issue' in a case; and (2) 'the need for the material is compelling.'"  *Bolus*, 2020 WL 6531007, at *8 (quoting *Holmgren*, 976 F.2d at 577) (emphasis omitted).  The Court is uncertain as to whether these elements of the *Holmgren* test are aligned with the Third Circuit's requirement that opinion work product should only be available in "rare and exceptional" or "extraordinary circumstances."  *See Hall v. Sargeant*, Case No.:  9:18-CV-80748, 2019 WL 3796764, at *5 (S.D. Fla. Aug. 12, 2019) (suggesting that satisfying the *Holmgren* test's "compelling need" requirement may require a lesser showing than demonstrating the applicability of "rare and extraordinary circumstances") (internal quotation marks and citations omitted); *Smith v. Scottsdale Ins. Co.*, 40 F. Supp. 3d 704, 723 n.15 (N.D.W. Va. 2014) (suggesting that the *Holmgren* test permits opinion work product to be obtained without showing "'rare and extraordinary circumstances'") (citation omitted).  Nevertheless, below the Court will assume *arguendo* that the *Holmgren* test is appropriate here.  That is because, even were the Court to apply it, Defendants will not have met their burden to obtain the information at issue.

---

[13]      Again, as was noted earlier, it is the movant's burden to demonstrate that opinion work product is discoverable under whatever is the applicable test.  *See, e.g.*, *United States v. Vepuri*, NO. 21-mj-1220, 2022 WL 3648184, at *3 (E.D. Pa. Aug. 24, 2022).

The first prong of the *Holmgren* test asks whether the attorney's mental impressions are "at issue" in a case. Cases implementing *Holmgren*'s first prong have seemed to indicate that if the moving party can demonstrate that the opinion work product in question is *relevant* to a claim or defense in the case, then it is "at issue."[14] *See Roberts v. City of Fairbanks*, Case No. 4:17-cv-00034-SLG CONSOLIDATED, 2022 WL 889401, at *6 (D. Alaska Mar. 25, 2022) ("Likewise, this Court finds that any applicable protection afforded for opinion work product is overcome. Because the *Rumery* analysis entails analyzing 'the propriety of the prosecutor's decisions' in negotiating and agreeing to the release-dismissal agreement, the contemporaneous documents memorializing the State's mental impressions in its decision-making are directly at issue."); *Vepo Design Corp. v. Am. Econ. Ins. Co.*, No. CV 20-04950-MWF (JEMx), 2022 WL

---

[14]     Linguistically, the *Holmgren* "at issue" test sounds a bit like the test that the Third Circuit uses to determine whether a party has waived its right to assert either the attorney-client privilege or work product protection; this latter test is known as the "at issue" doctrine. The Third Circuit explained the contours of the "at issue" doctrine in *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994). The *Rhone-Poulenc* Court discussed the doctrine in the context of addressing waiver of the attorney-client privilege, but courts have also applied it to work product as well.

It is difficult for a party to demonstrate that its adversary has waived its right to assert the attorney-client privilege or to protect its work product, pursuant to *Rhone-Poulenc*'s "at issue" doctrine. *See Sensormatic Elecs., LLC v. Genetec (USA) Inc.*, Civil Action No. 20-760-GBW, 2022 WL 14760185, at *2 (D. Del. Oct. 20, 2022). This is because the doctrine only applies when a party puts the *actual contents of an attorney-client communication or work product-protected material* at issue in support of its claim. *Id.*

Here, Defendants are not asserting that the "at issue" waiver doctrine set out in *Rhone-Poulenc* applies to this case. (D.I. 420 at 5 & n.3) That is, they are not explicitly claiming that Mr. Kasowitz or FinApps utilized otherwise work product-protected material in defending against the defamation counterclaim. (*Id.*) Instead, they are relying on the *Holmgren* test in order to try to establish their right to the opinion work product at issue—a test that does not necessarily have to do with waiver at all. And the *Rhone-Poulenc* doctrine appears to be more demanding on the movant than the first prong of the *Holmgren* test—in the sense that in order to satisfy the latter, one only needs to demonstrate how the opinion work product material is *relevant* to the claim at issue.

2101743, at *5 (C.D. Cal. Mar. 24, 2022) ("[I]n bad faith insurance litigation, the strategies,

mental impressions and opinions of the insurer and its agents (including attorneys) concerning

the evaluation and handling of the claim are directly at issue and discoverable, particularly when

Plaintiff has no other means to discover such evidence."), *adhered to on denial of*

*reconsideration*, 2022 WL 3596621 (C.D. Cal. July 8, 2022).[15]

     Nevertheless, in the Court's view, Defendants have failed to make a showing pursuant to

*Holmgren*'s first prong that Mr. Kasowitz's mental impressions sought by the 57 questions are

"at issue" with regard to the defamation counterclaim.  To a great degree, this was due to

Defendants' failure in their briefing to clearly set out their entitlement to relief.

     As an initial matter, the procedural approach Defendants took in litigating this Motion

worked against them here.  Prior to the Motion's filing, the Court encouraged Defendants to take

a hard look at the breadth of their request, in order to assess whether every one of the 57

questions was truly relevant to the Motion (or whether some narrower subset might instead be

properly at issue).  (D.I. 387)  Despite this, Defendants' Motion again asserted that all 57

questions were relevant and in play.  (*See* D.I. 413 at 1)  As a result, the amount of discovery that

---

[15]    *See also Flynn v. Love*, Case No. 3:19-CV-00239-MMD-CLB, 2021 WL
4893069, at *5 (D. Nev. Oct. 19, 2021) ("Finally, while Plaintiffs seem to believe that their 'state
of mind' is not at issue in this case, they are mistaken.  The very nature of the allegations in the
Complaint, including about the alleged breach of the fee agreements, put their state of mind at
issue.  Along the same lines, as to the applicability of the work-product doctrine, Plaintiffs have
again not met their burden of showing the documents on their privilege logs are shielded.  The
descriptions of the documents do not show that they were prepared in anticipation of litigation.
And because Plaintiffs' mental impressions have been placed at issue—by Plaintiffs
themselves—their opinion work-product, is likely disclosable."); *Colonies Partners LP v. Cnty.
of San Bernardino*, Case No. 5:18-cv-00420-JGB (SHKx), 2019 WL 2895187, at *12 (C.D. Cal.
May 1, 2019) ("Similarly, in this case, mental impressions are at the core of Colonies' claims
regarding retaliation and conspiracy.  Accordingly, the Court rejects the County's argument that
the prosecutors' mental impressions are not relevant to this litigation."), *objections overruled*,
2019 WL 13029903 (C.D. Cal. June 28, 2019).

Defendants are seeking here is quite wide-ranging.  And yet because that discovery constitutes opinion work product, it is discoverable only in "rare" or "exceptional" or "extraordinary" circumstances.[16]  Thus, with their Motion, Defendants are trying to make an "exceptional" and "extraordinary" showing of need on the one hand, but are trying to do so as to a very large swath of otherwise protected material on the other hand.  This is a heavy lift, to be sure.

Moreover, because the number of questions at issue is so large and unwieldy, in their briefing, Defendants decided to group those 57 questions into 4 expansively-worded categories.  Yet in doing so, when it came time to explain why they were entitled to disclosure of the material at issue, Defendants *only referenced those broad categories*—and they largely ignored the *actual content of the 57 questions*.  As FinApps notes, this approach meant that Defendants failed to explain how any information sought by any *particular* question had actually been put at issue by any *particular* Alleged Defamatory Statement.  (*Id.* at 13-14)  It is not the Court's job to sift through each of the 57 questions and try to figure out, on its own, whether the information sought therein is in fact relevant to the content of one or more of the Alleged Defamatory Statements (and if so, why).  That was Defendants' job as the movant.  And they failed to do it.

Another problem with Defendants' approach is that with respect to Categories 1, 2 and 3, Defendants did not offer a specific argument in their opening brief as to why the test for disclosure of opinion work product had been satisfied.  Instead, Defendants simply noted that, to the extent that the Court were to find that Categories 1, 2 and/or 3 seek opinion work product, then the same arguments Defendants made with respect to Category 4 would also apply to Categories 1, 2 and/or 3.  (D.I. 406 at 8, 14-18)  FinApps called out Defendants for their failure

---

[16]     As the Court noted above, *see supra* p. 17 & n.12, there are many questions across the Categories that are similar to one another.  It is therefore absolutely perplexing why Defendants failed to craft a narrower set of questions upon which to move for relief.

in this regard.  (D.I. 413 at 13 ("Defendants make no attempt to establish that roughly 60% [] of the questions on which they have moved the Court even meet the first prong of the [Ninth Circuit] test they claim applies [to analyzing whether opinion work product should be disclosed], warranting denial as to Categories 1-3."))  Defendants attempted fix this problem in their reply brief, but as the Court explains below, their arguments were not sufficient.  (D.I. 420 at 6)

With respect Category 4, Defendants argued broadly in their opening brief that the answers to the 23 questions in this category should be disclosed because Mr. Kasowitz's mental impressions are "at issue" for three reasons:  (1) FinApps put them at issue by choosing to have Mr. Kasowitz be the spokesman of a publicity campaign in which he made the Alleged Defamatory Statements, (D.I. 406 at 15-16; D.I. 420 at 5-6);[17] (2) since FinApps has raised "actual malice" as an affirmative defense in this case, Defendants are entitled to discover whether FinApps, through its attorney-spokesman Mr. Kasowitz, acted with that type of intent when making the statements, (D.I. 406 at 16; D.I. 420 at 7); and (3) FinApps' culpability level bears on the availability and extent of damages, (D.I. 406 at 16; D.I. 420 at 8).  Defendants also argued that there is a compelling need for the material.  (D.I. 406 at 16-18)  But here again, Defendants failed to "specifically link the core opinion work product they seek to any of the defamatory statements they have alleged, or explain with any particularity how the latter put the former at issue[.]"  (D.I. 413 at 15)

The Court will provide a few examples, on a category-by-category basis, to explain why Defendants' failure of specificity in their briefing is fatal to their Motion:

---

[17]      In an August 14, 2019 e-mail, one of FinApps' attorneys emailed Mr. Kasowitz to relay that he had spoken with FinApps' founder, who suggested that counsel "hit Envestnet pretty hard with the articles in the investment and wealth management publications" as well as in "mortgage and fintech vertical publications[.]"  (D.I. 406, ex. D at 3)

- With regard to information sought by the questions in <u>Category 1</u>, Defendants say that they must pin down what Mr. Kasowitz meant by the Alleged Defamatory Statements—e.g., "[w]hen he said he had 'evidence' and 'proof' . . . what evidence and proof did he have in mind?" (D.I. 420 at 6; *see also* D.I. 406 at 9-10)  But none of the questions in Category 1 actually ask this or anything like it. (D.I. 406, ex. C at 1; *see also* D.I. 413 at 9 ("[N]ot even one Category 1 question—or indeed, any question ever asked by Defendants of Mr. Kasowitz—inquires into his intended meaning, or even refers to any of the statements alleged, much less what was 'meant' by them.") (emphasis omitted))  Instead, as noted above, each of the questions in Category 1 are broadly worded and seek Mr. Kasowitz's legal views as to whether certain information/issues/things would constitute trade secrets.  And Defendants provided no further explanation in their briefing about how these information/issues/things are said to relate to the Alleged Defamatory Statements or the defamation counterclaim.

- For <u>Categories 2 and 3</u>, Defendants reiterate that these questions seek to understand whether any factual investigation preceded the Alleged Defamatory Statements, and if so, what were the results (all of which goes to culpability).  (D.I. 420 at 6; *see also* D.I. 406 at 10-11)  Here again, though, these questions do not seem narrowly tailored to specifically probe what factual investigation preceded the Alleged Defamatory Statements (and any results thereof).  For example, the first question in Category 2 asks "[a]s of July and August 2019, had you done any inquiry to determine the circumstances under which information was disclosed to Yodlee and Envestnet?" (D.I. 406, ex. C at 1)  But Defendants simply did not make clear to the Court (despite the Court's prior urging that they do so) how the actual content of any Alleged Defamatory Statement affirmatively places the answer to this question at issue.  Put another way, what does "any inquiry to determine the circumstances under which information was disclosed to Yodlee and Envestnet" have to do with any of the Alleged Defamatory Statements?  Defendants do not explain as to this first question in Category 2, nor as to any of the other questions in these categories. [18]  The Court could try to guess at the

---

[18]     That said, the first Category 3 question asks "Other than what's attached to the complaint and these emails that refer to reverse engineering, other than those, did you have any information in July and August 2019 on which you could base the claim that a trade secret had been reverse engineered by Yodlee or Envestnet? (D.I. 406, ex. C at 2)  Because this question makes direct reference to one of the assertions in one of Mr. Kasowitz's Alleged Defamatory

answers, but that would be an improper way to resolve a
motion of this import.

- With respect to <u>Category 4</u>, Defendants assert that these
  questions seek to understand what legal considerations (if any)
  Mr. Kasowitz explored before accusing Defendants of stealing,
  reverse engineering and misappropriating FinApps'
  technology.  (D.I. 420 at 6)  But with no more particular
  explanation of how answers to the questions making up this
  category relate to Mr. Kasowitz's Alleged Defamatory
  Statements, Defendants have again failed to meet their burden
  to show that the material is "at issue."  For example, one such
  question in this category asks "[i]f a report of a competitor has
  the same attributes, the same derived attributes as a report by
  FinApps, could that be a copyright violation?  Did you know
  that back in July and August 2019?"  (D.I. 406, ex. C at 3)  In
  the absence of a *specific explanation* from Defendants, the
  Court is not sure how the content of any of the Alleged
  Defamatory Statements affirmatively places the answer to this
  question at issue.  Relatedly, the Court also does not
  understand why the question is relevant to the defamation
  counterclaim.  And the Court cannot be expected to parse
  through all 23 questions in this category and make a guess
  (hoping that it is right) as to how the answer to each of those
  questions might be relevant and important to the counterclaim
  at issue.  It needed help from Defendants, on a question-by-
  question basis, in order to connect those dots.  It specifically

---

Statements (i.e., the one in which Mr. Kasowitz stated that "[t]hey were reverse engineering, but
they were also misappropriating, and we have a lot of proof of that"), the Court can see (even
without any help from Defendants) how the question is relevant to the defamation counterclaim.
But even then, at prong two of the *Holmgren* test, Defendants should have (but did not) address
why they have a "compelling need" for the answer to that *particular* question.  *See Pollock v.
Nationwide Mutual Ins. Co.*, 549 F. Supp. 3d 1202, 1217 (D. Idaho 2021) (explaining that a party
can demonstrate a "compelling need" for certain material if it can show that there is no other way
to get the information).  Mr. Kasowitz was already asked what material he was referring to with
his "reverse engineering" accusation, and he seemed to testify under oath that he was
referencing:  (1) statements from Defendants' own employees in which they purportedly
admitted that they were trying to reverse engineer FinApps' software; and (2) information
contained in FinApps' Complaint.  (D.I. 406, ex. B at 366-68)  Additionally, Mr. Sullivan had
testified about why FinApps believed that Defendants had reverse engineered its products.  (D.I.
414, ex. P at 314-315; *see also id*. at 320-22)  If a compelling need still existed for the answer to
this question, then it was Defendants' burden to make a *specific* argument as to why that was so.
It never did.

asked Defendants to provide that help before they filed the
Motion.  (D.I. 387)  And Defendants did not provide it.[19]

For these reasons, Defendants have not met their burden of specifically explaining how

the answers sought by the 57 questions are at issue in this case.[20]  Therefore, Defendants'

Motion must be denied.  *Cf. Servis One, Inc. v. OKS Grp. Int'l Pvt. Ltd.*, CIVIL ACTION NO.:

20-cv-4661, 2021 WL 5882101, at *13 (E.D. Pa. Dec. 13, 2021) (finding no waiver of the work

product doctrine where the plaintiffs did not take the affirmative step of placing protected

communications at issue).

## IV.    CONCLUSION

For the reasons set out above, the Court hereby ORDERS that Defendants' Motion is

DENIED.[21]

---

[19]      To provide just one additional example of why Defendants' lack of specificity
here was wanting, the Court points to the following Category 4 question:  "In July or August
2019, do you understand that information included in this EAV Quick Start Guide could not be a
trade secret as against Yodlee?"  (D.I. 406, ex. C at 4)  The Alleged Defamatory Statements do
not facially refer to a "Quick Start Guide."  The Court then went back to review the 95-page
Complaint, and does not see a reference to such a guide.  So the Court is just not sure what this
question is about, how it relates to the Alleged Defamatory Statements or how it otherwise
relates to the defamation counterclaim.

[20]      In light of this conclusion, there is no further need to consider whether
Defendants' need for the material is compelling.  *See, e.g.*, *United States v. Nosal*, No. CR-08-
0237 EMC, 2013 WL 1402336, at *3 (N.D. Cal. Apr. 5, 2013).

[21]      FinApps requests that Defendants be ordered to pay FinApps' costs of responding
to the Motion pursuant to Federal Rule of Civil Procedure 37.  (D.I. 413 at 20)  The Court
DENIES this request, as it cannot say that the Motion was not substantially justified (even
though Defendants did not prevail on it).  *See* *Williams v. CVS Caremark Corp.*, CIVIL
ACTION NO. 15-5773, 2016 WL 4409190, at *6 (E.D. Pa. Aug. 18, 2016) ("'Substantial
justification' requires justification to a degree that could satisfy a reasonable person that parties
could differ as to whether the party was required to comply with the disclosure request.  The
proponent's position must have a reasonable basis in law and fact.  The test is satisfied if there is
a genuine dispute concerning compliance.") (certain internal quotation marks and citations
omitted).  The work product protection issues implicated by the Motion are tricky ones, and had

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the document.  Any such redacted version shall be submitted by no later than **February 3, 2023** for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure."  *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated:  January 31, 2023

Christopher J. Burke
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

Defendants provided more detail along with their Motion, it is possible that they might have prevailed (at least in part).