# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINANCIALAPPS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 19-1337-GBW-CJB |
| | ) | |
| v. | ) | |
| | ) | **REDACTED PUBLIC VERSION** |
| ENVESTNET, INC. and | ) | |
| YODLEE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ENVESTNET INC.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFAMATION COUNTERCLAIM

OF COUNSEL:

Gary M. Miller
Gary M. Elden
John D. Garretson
Amy Y. Cho
Justin R. Donoho
Ian M. Hansen
SHOOK, HARDY & BACON LLP
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
(312) 704-7700

Henry E. Gallagher, Jr. (No. 495)
Lauren P. DeLuca (No. 6024)
CONNOLLY GALLAGHER LLP
1201 North Market St., 20th Floor
Wilmington, DE 19801
(302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

*Attorneys for Defendant Envestnet, Inc.*

Dated: February 24, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I. FACTS ........................................................................................................................ 1

    A. There Are Seven Defamatory Statements, Not Three. ........................................... 1

    B. August And May 2019 Email Chains Circumstantially Prove Accurate Reporting And Intent Of The Statements. ............................................................... 3

    C. What Facts Are "in the Complaint"? ..................................................................... 5

    D. Objection To Use Of Kasowitz Deposition. ........................................................... 9

    E. What Kasowitz Admits He Did Not Know About Whether "Envestnet" "Misappropriated" "Trade Secrets." ........................................................................ 9

II. LEGAL STANDARD ............................................................................................... 11

III. ARGUMENT ............................................................................................................ 11

    A. The Fair Reporting Privilege Does Not Protect The Defamatory Statements. ........................................................................................................... 11

        1. The Privilege Protects Reporters, Not Defamers. ...................................... 11

        2. The Privilege In All Events Does Not Cover Embellishments, Additions, And Inaccurate Summaries. ..................................................... 13

    B. There Can Be No Innocent Construction Of The Challenged Statements............ 15

    C. There Are Issues Of Fact As To Whether Envestnet Is A Public Figure And As To The Negligence, Intent, And Malice Of FA. ...................................... 17

IV. CONCLUSION ......................................................................................................... 19

**Cases**

*Anderson v. Liberty Lobby,*
Inc., 477 U.S. 242 (1986) ................................................................................11

*Aoki v. Benihana, Inc.,*
839 F. Supp. 2d 759 (D. Del. 2012) ................................................................11

*August v. Hanlon,*
975 N.E.2d 1234 (Ill. App. Ct. 2012) .............................................................13

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
489 U.S. 141 (1989) ..........................................................................................8

*Bryson v. News Am. Publications, Inc.,*
672 N.E.2d 1207 (Ill. 1996) ............................................................................15

*Ciolino v. Simon,*
170 N.E.3d 992 (Ill. App. Ct. 2020), *aff'd,*192 N.E.3d 579 (Ill. 2021) ..................................11

*Drabik v. Drabik,*
2013 WL 2285791 (N.D. Ill. May 23, 2013) ...................................................14

*Green v. Rogers,*
917 N.E.2d 450 (Ill. 2009) ................................................................................2

*Huron Consulting Servs. LLC v. Murtha,*
2012 WL 6962119 (Ill. App. Ct. Feb. 15, 2012) .......................................14, 15

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,*
882 N.E.2d 1011 (Ill. 2008) ............................................................................17

*Jacobson v. CBS Broad., Inc.,*
19 N.E.3d 1165 (Ill. App. Ct. 2014) ...............................................................17

*Kurczaba v. Pollock,*
742 N.E.2d 425 (Ill. App. Ct. 2000) .....................................................12, 13, 14

*Loughlin v. Harada,*
2021 WL 4439539 (D. Del. Sept. 28, 2021) ....................................................11

*Makaeff v. Trump Univ., LLC,*
715 F.3d 254 (9th Cir. 2013) ...........................................................................17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).............................................................................................11

*Maui Jim, Inc. v. SmartBuy Guru Enterprises*,
   386 F.Supp. 3d 926 (N.D. Il. 2019) ...................................................................16

*Missner v. Clifford*,
   914 N.E.2d 540 (Ill. App. Ct. 2009) ....................................................11, 12, 15

*Montone v. City of Jersey City*,
   709 F.3d 181 (3d Cir. 2013)................................................................................11

*Owen v. Carr*,
   478 N.E.2d 658 (Ill. App. Ct. 1985) ..................................................................16

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004) ......................................................................12, 15

*Russel v. Delaware Online*,
   2016 WL 3437597 (D. Del. June 20, 2016)..........................................................1

*Solaia Tech., LLC v. Specialty Pub. Co.*,
   852 N.E.2d 825 (Ill. 2006) .................................................................................13

*Sun v. Xu*,
   2020 WL 12815227 (C.D. Ill. May 6, 2020) .......................................................12

*Thompson v. Frank*,
   730 N.E.2d 143 (Ill. App. Ct. 2000) ..................................................................13

*Trident Prod. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*,
   859 F. Supp. 2d 771 (E.D. Va. 2012), aff'd, 505 F. App.'x 242 (4th Cir. 2013) .....................5

*Tuite v. Corbitt*,
   866 N.E.2d 114 (Ill. 2006) .................................................................................15

*U.S Express Lines Ltd. v. Higgins*,
   281 F.3d 383 (3rd Cir. 2002) ...............................................................................1

**Statutes**

6 *Del. C.* § 2001 .....................................................................................................8

18 U.S.C. § 1836(6)(B)...........................................................................................8

**Rules**

Del. Lawyers' R. Prof'l Conduct 3.7 ........................................................9

Fed. R. Civ. P. 8(a)(2) ..............................................................................2

NY St Rpc Rule 3.7 ..................................................................................9

**Other Authorities**

Model R. Prof. Conduct R. 3.7 (Am. Bar Ass'n 2020) .............................9

Pamela Samuelson & Suzanne Scotchmer, *The Law and Economics of Reverse Engineering*, 111 Yale L.J. 1575 (2002) ...................................8

Restatement (Second) of Torts § 611 (1977) .........................................12

This brief will minimize repetition by cross-referencing to Envestnet's simultaneous motions seeking judgments that (i) Envestnet (as opposed to Yodlee) cannot be liable; and (ii) FA has no legally protectable information. This brief will add to what is there by stating (I) the dispositive facts not mentioned by FA;[1] (II) the standard for granting this motion; and (III) arguments that: (A) the fair reporting privilege does not apply to the originator of defamatory statements or to statements that go beyond an accurate summary of the Complaint's allegations; (B) the defamatory statements, especially considered in context and together, cannot be given an "innocent construction"; (C) there are genuine factual issues as to negligence, intent, actual malice, and truth. Envestnet will cite herein to FA Exs. 1-60 (D.I. 456) and our added Exs. 61-79.[2]

## I. FACTS

### A. There Are Seven Defamatory Statements, Not Three.

The Counterclaim attaches a July 30, 2019 press release (Ex. 4) and five July 30-August 12 articles (Exs. 56-60) as Exs. E-I; and incorporates them in the allegations in "VII. Defamation," which in turn is incorporated in Count III (Defamation). D.I. 160 ¶¶ 73-79, 94. The Counterclaim goes on to quote some, but not all, of the statements. Discovery made apparent the seven statements at issue. *See, e.g.*, D.I. 406 at 3 and Ex. 61 111:2-7, 137:15-24, 139:18-23, 255:10-22, 314:5-15 (Kasowitz deposition questions about basis for each statement); *see* D.I. 199 at 74-79 (refusal to admit allegations because exhibits "speak for themselves").[3]

---

[1] These facts are contained in Envestnet's simultaneously filed Responses to Plaintiff's Statement of Facts ("RSOF") and Concise Statement of Material Facts As To Which Genuine Issues Are To Be Tried ("SOF"). Envestnet's additional exhibits are attached to the simultaneously-filed Declaration of Gary Elden and were assigned numbers between 61-79.

[2] These exhibits are included where relevant in this brief, the RSOF, and/or the SOF.

[3] FA asserts only three statements are at issue because they were featured in the body of the Amended Counterclaims. However, "[a]ttachments to the complaint are considered part of it." *U.S Express Lines Ltd. v. Higgins*, 281 F.3d 383, 389 (3rd Cir. 2002); *Russel v. Delaware Online*,

The statements put at issue paraphrase or quote Mr. Kasowitz, not the Complaint. Thus, the press release begins by describing the Complaint, but all that is at issue is the last sentence of the second paragraph: "FinApps' lead lawyer, Marc E. Kasowitz, states that 'FinancialApps developed brilliant technology … Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful.'" Ex. 4.

The July 30 article has Kasowitz's picture on page 1 and on page 2 it has statements that he is a prominent litigator, name partner of a large New York firm, the President's personal lawyer, and lead counsel on a case described in the headline as claiming "Envestnet" caused damages of "$100 million." Ex. 56. Pages 3-4 then quote or paraphrase Kasowitz:

> "Kasowitz told RIABiz he already has plenty of evidence and that he expects to obtain far more in discovery."

> "They were reverse engineering, but they were also misappropriating, and we have a lot of proof of that,' he asserts."

> "DePina's offers [to purchase FA technology to settle the case] were not in good faith, according to Kasowitz."

> "Kasowitz charges that Envestnet kept telling his client to expose more and more of its code with the rationale that it was necessary to better serve large, blue-chip clients."

> "[Kasowitz] adds in the interview that Envestnet kept FinApps on ice by slowwalking payments of its fees or in some cases not paying at all." Ex. 56 p. 3-4.

An August 7 article includes Kasowitz's picture and background, states the suit claims fraud by Envestnet, and on page 1 states: "'They [defendants] were making misrepresentations in all directions,' said Marc Kasowitz, . . .a personal attorney for President Donald Trump, who is representing FinApps. 'Both to FinApps claiming to be working pursuant to the agreement, and

---

2016 WL 3437597, at *1 n. 1 (D. Del. June 20, 2016) (considering full texts of public statements in defamation case where excerpts were in complaint); and Illinois does not require that the complaint set forth the allegedly defamatory words, so long as its substance is pled sufficiently to allow the defendant to respond. *See Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009); *see also* FED. R. CIV. P. 8(a)(2).

meanwhile, telling customers it was their own technology, it's a pattern of misrepresentation that proves they were engaging in the alleged activity.'" Ex. 60.

At his deposition, Envestnet asked Kasowitz what facts he knew to support the above defamatory statements. Kasowitz answered that "all," "everything," and "whatever" he knew of supporting facts was "in the Complaint." Ex. 61 (green) at 41:2-8, 111:2-7, 113:16-21, 130:10-14, 137:14-24, 139:18-23, 141:3-5, 149:1-3. He refused to state specific facts. Ex. 61 (green). A motion to compel was filed and then granted in part. D.I. 317; D.I. 335. At the resumption of the deposition, the questions were repeated, Kasowitz could not identify a single supporting fact, and he refused to answer whether he had, or should have, investigated. *See e.g.*, Ex. 61 at 6-7, 32-33, 112, 145-46, 160, 173-180, 195-201, 214-217, 229-241, 256, 264-67, 274-79, 285-89, 306-07, 320-22, 382, 394-95, 400-401, 412-47 (yellow and blue).

Asked about the accuracy of the articles' attributions to him, he testified: "I don't recall the interview. I don't recall having given the interview." Ex. 61 7:5-6; *see id.* (yellow) at 6:14-9:17: and 48:5-11 (does not deny accuracy).

### B. August And May 2019 Email Chains Circumstantially Prove Accurate Reporting And Intent Of The Statements.

Kasowitz and his firm made no effort to correct any of the challenged statements. He received and wrote two email chains soon after the articles appeared referring to them. On August 14, Kasowitz received from his partner Krause, copying others including firm marketing director Emily Thall, *see* Ex. 61 at 80:14-19, this email: "Marc [Kasowitz], I spoke with [FA CEO] Bob Sullivan last night and he suggested that while we hit Envestnet pretty hard with the articles in the investment and wealth management publications, it may make sense to try to get some traction in the mortgage and fintech vertical publications as well." D.I. 406-4 at 1-2. The email then lists 14 publications, including Forbes and Bloomberg. *Id.* at 2. Thall implemented this advice. *Id.* at 1.

On August 11, Kasowitz emailed a publicist enclosing an article stating that publicity about the lawsuit caused Envestnet stock prices to "plummet." *See* Ex. 78. Kasowitz added: "Andy, it is hard for me to believe that with a case involving these kind of reactions we couldn't get any mainstream legal or business press for this." Ex. 78; *see* Ex. 61 at 70:9-16, 72:4-6.

The prior May, FA CEO Sullivan was in email chains with FA's chairman and main shareholder Howard Dvorkin and an FA executive knowledgeable in technology, Gary Herman. Ex. 62; Ex. 63. Both chains end on May 21, about the time FA terminated the Yodlee relationship and contract. *See* Compl. ¶¶ 193-97 (May 17 and 27 letters terminating relationship). The emails begin with a late April report from an FA consultant expressing pessimism about FA's future due to "limited revenue, the limited number of customers and FA's market position." Ex. 62 at 3. "A new market entrant today could likely 'catch up' and surpass FA with significantly less investment capital." *Id.* FA's only significant asset was "the Envestnet contract." *Id.* at 4. "How does Howard [Dvorkin] get paid back and a return on his investment? The first answer is Envestnet. Envestnet is in good financial shape …. Possible outcomes could be … 3) Pay you through a legal settlement/judgment." *Id.* at 4-5.

The second chain involves Yodlee internal emails forwarded to, and then by, FA senior tech executive Dexter Weatherly. In them, Yodlee asked Weatherly to assist in "reverse engineering" to obtain client data. Ex. 63 at 2-8. When Sullivan and Dvorkin saw "reverse engineering," they decided it was a "smoking gun" providing a basis to sue Envestnet. *Id.* at 1. Herman explained they were misreading the emails, which were "more smoke than gun" and that the emails showed not that Yodlee was trying to copy technology, but only that it was trying to get client data without paying FA a fee to assist. *Id.* Sullivan and Dvorkin continued to insist "reverse engineering" had to mean Yodlee was stealing source code. *Id.* This was the version of facts used

by Kasowitz in two challenged statements. The full story, explained below, is that Herman was right: Envestnet (and Yodlee) never had access to source code, which was encrypted. D.I. 451 ¶ 2. The Complaint does not allege reverse engineering (or indeed any theft) of source code.

## C. What Facts Are "in the Complaint"?

"All," "everything," and "whatever" Kasowitz knew to support the challenged statements was "in the complaint," which as noted says nothing about theft of source code. As to other facts, Kasowitz could not state a single one, and FA has yet to cite any.

What is in the Complaint about "Envestnet" (as opposed to Yodlee)? The headings of the Complaint refer to Envestnet at ¶¶ 156-163, alleging in conclusory terms use of trade secrets by Envestnet in its Credit Exchange product ("ECE"), and that is only mentioned in Count II (misappropriation of trade secrets) at ¶ 236. A computer search for "Envestnet" in the Complaint produces only substantive "hits" relating to ECE. *See* Ex. 79 ¶¶ 2-5. This accords with the Court's view in D.I. 109 at 3, citing ¶¶ 156 and 163 ("As for Envestnet, Plaintiff alleges that it too is using … proprietary information and trade secrets stolen from Plaintiff … to develop credit risk software …."); and *id.* at 16 n. 8, citing ¶ 236 (same).[4]

Since Pflaum's 276-page expert report does not mention ECE, including in his second half analyzing specific (Yodlee) products, that issue is effectively out of the case at this point. *See,* Ex. 79 ¶¶ 6-7; *Trident Prod. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d

---

[4]  The few conclusory allegations not explicitly limiting themselves to ECE contain no fact supporting any challenged statement:  Introductory ¶ 216 asserts that Yodlee acted "together with and at the direction of Envestnet" but provides no details or explanation.  The Complaint calls Stuart DePina an employee of Envestnet, but he was not; before the Complaint was filed, he was only a Yodlee employee.  *See* D.I. 449 ¶¶ 11-12.  Paragraph 262 alleges "Defendants" interfered with four Yodlee customers, but it says nothing as to acts by any Envestnet employee, or relevant to any of the challenged defamatory statements.  Three of the four customer allegations were effectively dismissed.  D.I. 109 at 17-19.

771, 776 (E.D. Va. 2012), aff'd, 505 F. App.'x 242 (4th Cir. 2013) (expert testimony required for matters not "within the common knowledge of a juror").

Without repeating all of the arguments in Envestnet's summary judgment motion on this issue, here are the main undisputed points: Envestnet and Yodlee are separate companies; no basis is alleged to pierce the corporate veil. Envestnet acquired Yodlee in 2015 as a substantial stand-alone business, headquartered in a different city with different employees, doing business in a different industry than Envestnet's other subsidiaries. D.I. 448, Ex. 2 ¶¶ 7-20. Envestnet did not employ any individual named in the Complaint prior to its filing; all were solely Yodlee employees. D.I. 448 at ¶¶ 10-13. DePina became an Envestnet employee in March 2020, eight months after FA filed suit. *Id.* ¶ 12.

In sum, if "all" Kasowitz knew about Envestnet was "in the complaint," he knew nothing to support any statement implicating Envestnet in wrongful conduct. (Even the now obsolete ECE allegations contain no supporting facts, just conclusions.)

What is in the Complaint about "misappropriation" of "trade secrets"? The Complaint alleges four categories of allegedly misappropriated trade secrets. *See* D.I. 451 at ¶ 1. Whether any category of facts can be a trade secret depends on whether the facts were known to the public or disclosed by FA to third parties without NDAs (non-disclosure agreements). There is evidence this was done in many ways, including: FA disclosed this in the same words in a patent filed weeks before the suit; much information was known to the public through patents of Yodlee, its customers and competitors; FA provided the information in "data dictionaries," whitepapers, and many other documents to third parties without NDAs; FA posted the data dictionaries on a public website; FA provided Yodlee some of the information before January 2017, including in connection with FA product Power Wallet; Yodlee, not FA, developed the information before and during the FA

relationship; and more. *See* D.I. 450 at 2-6, 8-20. The Complaint says nothing about any of these issues. Kasowitz, though asked in detail about each, could not state a single fact on any of these topics. Ex. 61 (yellow) at, *e.g.*, 382-431. Since all he knew was "in the complaint," he lacked sufficient knowledge to determine if the four alleged categories of information contained anything that could properly be called a trade secret.

What is in the Complaint about "reverse engineering"? As already noted, the Complaint does not allege "code" was stolen and Pflaum does not claim code was stolen either. The Complaint discusses reverse engineering only at ¶¶ 98-108, and ¶ 105 states: "… although the code … is encrypted … Even without direct access to the raw code …." Weatherly in his deposition admitted that Envestnet (and Yodlee) never had access to code. D.I. 451 ¶ 2, D.I. 451 Ex. 3. What is "in the Complaint" is mostly a long quote (in ¶ 107) from the May 14 email discussed above, the one Sullivan and Dvorkin thought "smoking gun" and Herman "more smoke than gun." Ex. 63 at 1. Here is the context in which that email was sent: Six days earlier, on May 8, Yodlee emailed Dexter Weatherly to seek help in "reverse engineering" to obtain information on Risk Insight customers. Ex. 64. Nothing in the email suggests any interest in code, and the Complaint and Pflaum nowhere suggest the customer information sought was a FA trade secret. Previously FA had said that it would supply the information if it were paid for doing so; nothing in this email chain suggests a general FA objection to Yodlee getting the information. *See* Ex. 65 at 1. Wanting to avoid having to pay (as Herman explained), Yodlee asked FA for assistance to "reverse engineer the fields" to get the information without involving FA. *See* Ex. 66. Weatherly did not object to the reverse engineering proposed, said nothing about trade secrets, and indeed emailed back a line of code to assist Yodlee. *See* Ex. 67. Yodlee promptly emailed "Thank you," Ex. 68, but then discovered and emailed Weatherly that the "line of code you provided is not sufficient" and sought

further help from FA.  Ex. 69.  When this was not forthcoming before FA's May 17 and 27 letters effectively ended the relationship, *see* Compl. ¶¶ 193-99, Yodlee gave up on the proposed ███████

███████  *See* Ex. 70 253:5-255:11, 260:16-261:1.

In sum, the "reverse engineering" discussed in the May 14 email quoted in the Complaint was (i) disclosed to FA, (ii) not objected to, (iii) never done, and (iv) not related to code or confidential information.

In addition, it was plainly legal.  The statutes alleged in the Complaint specify that information that can be reverse engineered cannot be protected as a trade secret.  *See* Compl ¶¶ 207-240; 18 U.S.C. § 1836(6)(B) (the Uniform Trade Secrets Act "does not include reverse engineering, independent derivation, or any other lawful means of acquisition"); 6 *Del. C.* § 2001 (1), (4)(a) (similar in substance), codifying such common law cases as the leading such case *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 164 (1989) ("Where an item in general circulation is unprotected by patent, reproduction of a functional attribute is legitimate competitive activity.") (citation and quotation omitted); Pamela Samuelson & Suzanne Scotchmer, *The Law and Economics of Reverse Engineering*, 111 YALE L.J. 1575 (2002) (explaining in detail common and statutory law and why, for information that can be reverse engineered, owner must obtain copyright, patent or contract for protection since statutes and common law will not protect it).  The Complaint alleges (correctly) that the MSA prohibits reverse engineering of "**code,**" s*ee* Compl. ¶ 94, 302, but Envestnet is not a party to the MSA.  *See* D.I. 442, 1-3 (Court so held, and for that reason refused to apply the jury waiver to Envestnet).

In sum, if "all" Kasowitz knew about "reverse engineering" is "in the complaint," he knew nothing that could support his statements since there is nothing in the Complaint about theft of code, information that can be reverse engineered is not a trade secret, and the quoted "more smoke

than gun" email pertains to proposed engineering that was never done, would have been legal, involved no protectable information, was disclosed to FA, and was not objected to.

### D. Objection To Use Of Kasowitz Deposition.

FA proposes 13 "uncontested facts" about statements to the press and contents of the Complaint. Five of these (3, 4, 6, 8 and 12) and the later statements 25 and 26 rely on Exs. 3 and 5, its excerpts of the deposition of Kasowitz. He is lead trial counsel and, for that reason, cannot testify to material contested facts under rules applicable to this case. *See* Ex. 61 at 230:17-19 (Kasowitz's counsel explaining he is the lead attorney when invoking privilege); MODEL R. PROF. CONDUCT R. 3.7 (Am. Bar Ass'n 2020); NY ST RPC RULE 3.7; Del. Lawyers' R. PROF'L CONDUCT 3.7. Kasowitz declined to explain how he can comply with these rules and even whether he intends to. Ex. 61 at 337-43, 460-63. He declined to say whether he had a contingency agreement though he concedes another rule forbids a witness from having one. Ex. 61 at 339:5-9. FA lists no lawyer from Kasowitz's firm as a witness or a person with knowledge of relevant facts in its Rule 26(a)(1) disclosure. Ex 71. On these bases, Envestnet objects to any attempt by FA to use any Kasowitz deposition testimony to support its motion.

### E. What Kasowitz Admits He Did Not Know About Whether "Envestnet" "Misappropriated" "Trade Secrets."

Kasowitz, though mostly refusing or unable to supply specific answers, did admit to lack of knowledge, as summarized in this section. The four types of trade secrets described in the Complaint at ¶¶ 33-64, were disclosed in much the same language in a patent FA filed July 5, 2019, just before it sued. *See* D.I. 451 ¶ 4. Shown the patent and the alleged categories, Kasowitz could not tell how they differed. Ex. 61 at 195-213. He did not recall seeing the patent (or any patent) before he made the challenged statements. Ex. 61. at 176:20-177:2, 214:17-217:9. He did not think he had to look at patents because he thought that a patent would not "explain how it

accomplishes" the invention it discloses and "doesn't at all get into the details of the how." *Id.* at 202:15-203:2, 205:4-205:16, accord, *id.* at 217:4-217:9. Kasowitz did not know there was a statute requiring the inventor to state under oath that the patent disclosed enough information so that one skilled in the art could use or build the invention, or that inventor Sullivan, the CEO of FA, had provided such a statement under oath. *Id.* at 176-197 (yellow), 393:8-395:3. For this reason, he also did not know or care about whether patents issued to Yodlee and third parties contained supposedly protectable relevant information. *Id.* at 176-217, 382, 391; *see also* 274:14-276:15 (refusal to answer).

Kasowitz also did not know what was in the "data dictionary," which was described by Pflaum as containing essentially all the trade secrets alleged, or even what it was; nor whether it had been provided to third parties. Ex. 61 at 238:3-18, 413:20-414:4. He did not know what information was provided to third parties without NDAs, (*see, e.g., id.* at 413-437; *see also* 229-234, 237-241, 319-322) what Yodlee knew independently of FA or had learned from FA in dealings before 2017, including in connection with the FA product PowerWallet (*see, e.g., id.* at 419:14-420:8, 426:7-429:7; *see also* 278:25-279:15, 285:15-286:2, 289:5-14, and 306:18-307:7 (refusals to answer)).

He could not say what "reverse engineering" meant or whether something that could be reverse engineered could be a trade secret. *Id.* at 160:1-160:19, 253-257, 399-406. He did not know of any reason to think that Envestnet (or Yodlee) had access to "code" or caused FA to expose it, *id.* at 58:6-59:21, 410:8-13; whether Envestnet ever owed any money to FA that could be "slowwalked," *id.* at 65:1-25; or whether any document showed that DePina had made his offer in bad faith, *id.* at 54:3-22.

## II.    LEGAL STANDARD

A court will not grant summary judgment when the nonmoving party "come[s] forward with 'specific facts showing that there is a genuine issue for trial,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and emphasis omitted). That is, enough evidence to enable a jury to reasonably find for the nonmoving party, *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986), "view[ing] the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013) (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995)).

## III.    ARGUMENT

### A.    The Fair Reporting Privilege Does Not Protect The Defamatory Statements.

#### 1.    The Privilege Protects Reporters, Not Defamers.

In cases involving "internet-published defamations . . . Delaware's choice-of-law rules provide for application of the laws of the plaintiff's domicile." *Loughlin v. Harada*, 2021 WL 4439539, at *4 n.2 (D. Del. Sept. 28, 2021); accord *Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 765 (D. Del. 2012). For Envestnet, this means Illinois. D.I. 2, ¶ 34. FA agrees. *See* D.I. 453, 1 n.1.

The Illinois privilege applies to one who "reports information obtained from governmental and public proceedings on matters of public interest." *Ciolino v. Simon*, 170 N.E.3d 992, 1011 (Ill. App. Ct. 2020), *aff'd*,192 N.E.3d 579 (Ill. 2021). This is an "*exception* to the general common law rule that the *republisher* of defamatory material bears the same degree of liability for defamation as the *original publisher*." *Missner v. Clifford*, 914 N.E.2d 540, 550 (Ill. App. Ct. 2009) (emphasis added). Accordingly, a "person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had

11

stated." RESTATEMENT (SECOND) OF TORTS § 611 (1977) (comment c); followed in *Missner*, 914 N.E.2d at 551 ("we are bound to apply section 611, comment c") and 552-53 (if defendants "did participate in the publication of the original defamatory statements, the self-conferral exception would preclude them from enjoying the benefit of the fair report privilege"); *Kurczaba v. Pollock*, 742 N.E.2d 425, 442-43 (Ill. App. Ct. 2000) (privilege "not available" to one who "seeks to confer the privilege upon himself") (quotation omitted); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 732 (7th Cir. 2004) ("the Illinois Supreme Court would determine that the privilege may not be self-conferred" because that Court has adopted the Second Restatement of Torts); *Sun v. Xu*, 2020 WL 12815227 at *3 (C.D. Ill. May 6, 2020) (relying on Illinois cases following Restatement).

Four of these cases involved attorneys or litigants sued for press comments about a complaint they filed. *Missner* involved attorneys and a press release, 914 N.E.2d at 544-47; it found no privilege applied to any who originated defamatory statements. *Id.* at 760-65 (remanded to determine whether any attorneys were originators). In *Kurczaba*, an attorney suing former law partners mailed his complaint to potential clients with an ad about his new firm. 742 N.E.2d at 430. The attorney was not allowed to thus confer the fair report privilege on himself; indeed, by including the ad with the complaint, he went beyond the bounds of a mere report (the issue discussed in the next section). *Id.* at 441-43. In *Republic Tobacco*, a tobacco company sent a letter to its customers after it filed suit against Republic Tobacco, informing those customers that it was alleging that Republic Tobacco committed various bad acts. 381 F.3d at 723-24. The Seventh Circuit held the privilege inapplicable. *Id.* at 729-33. In *Sun*, three plaintiffs commented about their allegations in interviews and online, including an interview with CBS. 2020 WL 12815227, at *1. The fair report privilege did not apply to the interview. *Id.* at *2-3.

Though the fair reporting privilege does not apply to originators of defamatory statements, the "litigation privilege" does. Not noted by FA, this privilege allows a party to do what is needed to proceed in court even if that involves accusing another party in a way which would be defamatory. *See Thompson v. Frank*, 730 N.E.2d 143, 145-46 (Ill. App. Ct. 2000). The rule balances the need to avoid what is obviously undesirable, potentially inaccurate smearing of another, against the need to allow litigation without always having a second suit for defamation brought by successful defendants. This balancing rationale shows the proper limit of the privilege. Litigation can go forward without having defamations repeated outside the litigation context. *August v. Hanlon*, 975 N.E.2d 1234, 1247 (Ill. App. Ct. 2012) ("Because the privilege provides complete immunity, its scope is necessarily narrow."). In Illinois, the privilege therefore does not apply to one giving a complaint to journalists. *See id.* at 1247-48 (holding litigation privilege inapplicable to statements made to a reporter by an attorney); *Kurczaba*, 742 N.E.2d at 438-442 (rejecting argument that a defendant has a per se right to disseminate a complaint). This balancing by Illinois courts is a good guide to interpreting the fair reporting privilege. It too is a necessary evil to allow <u>reporters</u> to do their job <u>of reporting</u> but it, like the litigation privilege, cannot be so broad as to allow the use of a complaint to exempt the pleader from prohibitions against defamation.

### 2. The Privilege In All Events Does Not Cover Embellishments, Additions, And Inaccurate Summaries.

The fair reporting privilege protects reports (i) <u>of the complaint </u>that are (ii) "accurate and complete, or a fair abridgement of the occurrence reported." *Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 842 (Ill. 2006) (quoting RESTATEMENT (SECOND) OF TORTS § 611) (quotations omitted). "[A] reporter is not privileged to make additions of her own that would convey a defamatory impression or indict expressly or by innuendo the veracity or integrity of any

of the parties." *Drabik v. Drabik*, 2013 WL 2285791 at *2 (N.D. Ill. May 23, 2013). Saying that the defendant violated her non-compete agreement, even if alleged in a complaint, was held "neither accurate nor complete," since treating allegations as facts is mischaracterizing them. *Huron Consulting Servs. LLC v. Murtha*, 2012 WL 6962119, at *9 (Ill. App. Ct. Feb. 15, 2012); *see also Kurczaba*, 742 N.E.2d at 443 ("While defendant argues that he did not place any 'spin' on his report, the addition of the ad was clearly meant to convey something.").

Here, the defamatory statements went beyond the Complaint and were inaccurate (or at least there is a genuine issue of fact as to their accuracy). Kasowitz said that he "already has plenty of evidence" and a "lot of proof" against Envestnet, which plainly goes outside the Complaint's allegations. The defamatory statements covered matters not in the Complaint, as indicated already. Without going through each one, it suffices to recall this example: Kasowitz said that "Envestnet engaged in "reverse engineering" and tricked FA into revealing "code," statements not in the Complaint or supported by it or any evidence Kasowitz knew about. Indeed, Kasowitz's statements on code and reverse engineering are contrary to FA's own understanding, as shown by the omission of any charge that code was reverse engineered in either the Complaint or the Pflaum report, as well as reflected in the "more smoke than gun" email chain. Kasowitz was not accurately reporting what the Complaint said (he was inaccurate) but was repeating as fact, on his own authority as a prominent litigator, that there was "evidence" and "proof" known to him that the allegations were correct. He was not able to back up any of these statements.

Thus, Kasowitz did not confine himself to (i) statements in the Complaint or (ii) to statements he can prove accurate. For either of those reasons, the privilege does not apply to him or his client FA (in addition to his not being a reporter of, but the originator of, the defamation).

**B.    There Can Be No Innocent Construction Of The Challenged Statements.**

The "innocent construction rule" is applied by Illinois to remove defamation from the per se category only where the proposed construction is reasonable. "Only *reasonable* innocent constructions will remove an allegedly defamatory statement form the *per se* category." *Bryson v. News Am. Publications, Inc.*, 672 N.E.2d 1207, 1215 (Ill. 1996) (emphasis original). "[T]he innocent construction rule does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable." *Tuite v. Corbitt*, 866 N.E.2d 114, 123 (Ill. 2006). "[I]f the likely intended meaning of a statement is defamatory, a court should not dismiss the plaintiff's claim under the innocent construction rule" because "[i]n those circumstances, an innocent construction of the statement would necessarily be strained and unreasonable because the likely intended meaning is defamatory." *Id.* at 127.

Courts applied this rule in three cases just discussed, *Huron*, *Missner, and Republic Tobacco,* all involving litigators and/or litigants discussing their pleadings. *Huron* rejected the argument that, because the statement said the parties were in litigation, the court should construe as merely summarizing allegations a statement that "blatantly accus[ed] [the plaintiff] of violating her noncompete agreement." 2012 WL 6962119, at *8 (Ill. App. Ct. Feb. 15, 2012). *Missner* refused to innocently construe a press release with "a precise and readily understood meaning" where "the accusation in the press release may be objectively verified as being true or false" and was "replete with details that would indicate to the ordinary reader that it contains factual content." 914 N.E.2d at 553-58 (holding statement not subject to innocent construction or a constitutionally protected opinion). *Republic Tobacco* found no innocent construction where "the letter substantively conveys objectively verifiable facts which can only be read one way." 381 F.3d at 732-33.

The most general of Kasowitz's statements ("deliberately stolen … which is entirely … unlawful"; "misappropriating"; "not in good  faith") cannot be distinguished from the statements in *Huron* that the plaintiff violated a non-compete agreement.  Having a lawyer or litigant utter them implies the speaker has investigated and found proof.  Here, that was not only implied; Kasowitz said it outright.  Kasowitz made specific concrete statements that could be verified with specifics:  Envestnet was "reverse engineering"; inducing FA to reveal "code"; lying; and "slowwalking payment … or in some cases not paying at all."  None of these statements can be supported; for example, on the last point, Envestnet had no contract with FA and never owed it a nickel; there was no payment owing to slowwalk or not pay.  Therefore, in this case Kasowitz's statements are far worse than in the precedents.  In addition, Kasowitz said "Envestnet" (not just Yodlee) was doing these things and there is no support at all for <u>any</u> involvement of Envestnet. *See* D.I. 447.  Further, Kasowitz said Envestnet was "misappropriating," and there is no support at all for any misappropriation.  *See* D.I. 450.

Precedents turn on their facts, alleged defamers win some cases, and so FA can cite two holdings (on those cases' specific facts) that the statement at issue could be viewed as part of a summary of allegations.  *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 386 F. Supp. 3d 926, 942-43 (N.D. Il. 2019) (press release paragraph at issue tied to explanation of the lawsuit); *Owen v. Carr*, 478 N.E.2d 658, 660-61, 662-63 (Ill. App. Ct. 1985) (publisher and journalist defendants included language that allowed one to construe statements as merely summaries of allegations; the co-defendant attorney benefited from this).  Neither case holds that in a suit against a defamer (not a reporting journalist), the defamer gets immunity for an otherwise actionable statement by the non-party journalist's addition of opinions from other sources.  The articles portrayed FA's agent Kasowitz as the expert who knew about the case and had proof and evidence.  The commentators

that discuss trade secret litigation in general were not stated to know anything about the specific evidence that Kasowitz claimed supported what he said.

### C. There Are Issues Of Fact As To Whether Envestnet Is A Public Figure And As To The Negligence, Intent, And Malice Of FA.

An all-purpose public figure will "occupy 'positions of such persuasive power and influence that they are deemed public figures for all purposes'" such that Trump University is not one. *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265-66 (9th Cir. 2013) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). To be a limited purpose public figure, there must be (1) a public controversy "when the statements were made," (2) the statements must relate "to the plaintiff's participation in the controversy," and (3) the plaintiff must have "voluntarily injected itself" into the public debate. *Makaeff*, 715 F.3d at 266. Here, the only publicity was that generated by FA in a few publications, and where those publications quoted Envestnet, it is always to say it had "no comment." Exs. 56-60. Envestnet thus chose to resolve disputes in court rather than in the press and therefore remained a private figure, which needs to prove only ordinary negligence. *See Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1020 (Ill. 2008).

Even if actual malice had to be proven, there is ample evidence of it. Under *Jacobson v. CBS Broad., Inc.*, 19 N.E.3d 1165, 1175 (Ill. App. Ct. 2014), to prove malice it is enough to show that defendant acted with reckless disregard of the truth or falsity of a statement, *id.* at 1178, which can be shown by a "high degree of awareness" of likely falsity or serious doubts about truthfulness. *Id.* In the typical case, the defamer denies such awareness and doubt, so the proof must be circumstantial. Thus, evidence of negligence and malice overlap, so those concepts are next discussed together.

Kasowitz made the defamatory statements as agent of FA, and so the issue is whether he was negligent, reckless, or malicious. The evidence starts with the fact that he had no reason to give interviews other than to make statements intended to "hit … [Envestnet] hard" , as he knows he did. One hits someone else hard to hurt them. Here, this worked, as Envestnet's stock "plummeted." Far from regretting this, Kasowitz, his partner, and his client wanted, and tried, to do more of the same (August emails). This occurred soon after FA leaders were told to search for ways to pressure Envestnet to settle litigation and seized on the phrase "reverse engineering" as a way to do this without getting an accurate understanding of the meaning of the phrase (in the May emails). The statements accused Envestnet of dishonest business dealings, such as lying to its customers and stealing trade secrets, accusations which would harm it if they came to the attention of Envestnet customers and investors, exactly the readers FA targeted in their first round of interviews and in the list of 14 publications in the August emails.

Kasowitz did all this without enough investigation to learn: the law on reverse engineering, trade secrets, and patent enablement; the contents of the patent filed by his client FA obtained weeks before filing suit, a patent disclosing the information now alleged to be secret; the contents of Yodlee patents which showed what it knew without FA; the contents of patents of Yodlee competitors which showed what was in the public domain; what the data dictionary was, whether it contained any "secrets," and whether it was disclosed to those without NDAs and on the FA website; many emails showing that FA disclosed "secrets" to third parties lacking NDAs; what was generally known in the trade or by Yodlee before meeting FA; and what FA disclosed to Yodlee before getting a NDA, including during relationships involving PowerWallet.

Against such evidence, FA provides only (inadmissible) Kasowitz testimony and a content-free declaration by FA CEO Sullivan which says only that he did not understand (i) that a sole

shareholder is not liable for acts of the corporation it owns and (ii) that the people he was dealing with were employees of Yodlee, not Envestnet.  This is irrelevant since ignorance of the law is no excuse, even for a CEO, and in all events such ignorance is not claimed by Kasowitz.

In its last five pages, FA seeks a summary judgment that all of its offending statements are truthful based on quotes with no context of a few sentences each (or less) from a handful of documents and depositions.  These mostly pertain to reverse engineering and Equifax, subjects exhaustively explained at depositions that contradict everything FA is trying to prove (and thus create a genuine issue of fact; Envestnet is not asking the Court to accept its version of things, just to note it exists).  The Equifax relationship is explained in the concise statement of material facts. *See* SOF ¶¶ 3-7.  As to reverse engineering, it is explained above in this response and in the SOF. *See* SOF ¶ 2; Mot. Resp. pp. 8-10.  The Envestnet motions filed herewith identifies numerous facts showing (i) Envestnet had nothing to do with the facts FA alleges; and (ii) FA disclosed everything it now claims to be a trade secret.

## IV.  CONCLUSION

FA has failed to show it is entitled to the fair reporting privilege or that there is any reasonable "innocent construction" of the challenged statements.  There is plainly evidence of negligence, recklessness, and malice, and FA has not shown that Envestnet is a public figure or that the challenged statements are true (as opposed to debatable).  Importantly, FA relies on Kasowitz's testimony that is inadmissible (to which Envestnet objects).  For any, or all, of these reasons, FA's defamation claim needs to be tried and its present motion must be denied.

CONNOLLY GALLAGHER LLP

 */s/ Henry E. Gallagher, Jr.*
Henry E. Gallagher, Jr. (#495)
Lauren P. DeLuca (#6024)
CONNOLLY GALLAGHER LLP
1201 North Market Street
20th Floor
Wilmington, DE 19801
Telephone: (302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

OF COUNSEL:

Gary M. Miller (gmiller@shb.com)
Gary M. Elden (gelden@shb.com)
John D. Garretson (jgarretson@shb.com)
Amy Y. Cho (acho@shb.com)
Justin R. Donoho (jdonoho@shb.com)
Ian M. Hansen (ihansen@shb.com)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195

*Attorneys for Defendants*
*Envestnet, Inc.*

Dated: February 24, 2023