IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FINANCIALAPPS, LLC,

                        Plaintiff,

           v.

ENVESTNET, INC.
and YODLEE, INC.,

                        Defendants.

C.A. No. 19-1337-GBW-CJB

REDACTED - PUBLIC VERSION
Filed March 21, 2023

**FINANCIALAPPS' ANSWERING BRIEF
IN OPPOSITION TO ENVESTNET'S
MOTION FOR SUMMARY JUDGMENT NO. 1**

KASOWITZ BENSON TORRES LLP

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com

Dated:  February 24, 2023

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

C. Barr Flinn (No. 4092)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff FinancialApps, LLC*

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

I.    Envestnet's Corporate Reorganization Resulted In Its Domination of Yodlee ................ 2

II.   Envestnet's Direct Involvement in the Misconduct Alleged by FinApps ........................ 4

      A.    Envestnet Partners with Equifax and Sidelines FinApps ....................................... 4

      B.    Envestnet Uses FinApps Technology to Develop the ████████████ ....... 5

ARGUMENT .......................................................................................................................... 8

III.  Legal Standard ................................................................................................................. 8

IV.   Envestnet Has Failed to Meet its Burden .......................................................................... 8

V.    Envestnet is Directly Liable for Its Own Misconduct ....................................................... 9

VI.   Envestnet is Vicariously Liable for The Acts of Its Agent, Yodlee ............................... 12

VII.  Genuine Issues of Material Fact Exist With Respect to Counts 1 and 2 ........................ 14

VIII. Genuine Issues of Material Fact Exist With Respect to Count 4 .................................... 17

IX.   Genuine Issues of Material Fact Exist With Respect to Counts 5 and 8 ........................ 18

X.    Genuine Issues of Material Fact Exist With Respect to Counts 14 ................................ 20

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akzo Nobel Coatings, Inc. v. Auto Paint & Supply of Lakeland, Inc.*,
    2011 WL 5597364 (M.D. Fla. Nov. 17, 2011) ...................................................20

*United States ex rel. Baker v. Comty. Health Sys., Inc.*,
    2014 WL 10212574 (D.N.M. May 16, 2014) ............................................11, 12

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*,
    2012 WL 1570057 (S.D. Fla. May 2, 2012) ...............................................19

*Beacon Prop. Mgmt., Inc. v. PNR, Inc.*,
    890 So. 2d 274 (Fla. Dist. Ct. App. 2004) ...........................................19, 20

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
    974 F.2d 1358 (3d Cir. 1992)...................................................................8

*Billops v. Magness Const. Co.*,
    391 A.2d 196 (Del. 1978) ......................................................................14

*Buckley v. Moore*,
    2021 WL 3173185 (S.D. Fla. July 26, 2021) ...........................................19

*In re Clorox Consumer Litig.*,
    2013 WL 3967334 (N.D. Cal. July 31, 2013).........................................19

*Drexel v. Union Prescription Ctrs, Inc.*,
    582 F.2d 781 (3d Cir. 1978)....................................................................9

*EA Tapping Servs., LLC v. CDM Constr. Inc.*,
    2021 WL 1985338 (M.D. Fla. Feb. 23, 2021) .......................................20

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
    752 So. 2d 582 (Fla. 2000).....................................................................19

*Furmanite Am., Inc. v. T.D. Williamson, Inc.*,
    506 F. Supp. 2d 1134 (M.D. Fla. 2007).............................................19, 20

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
    498 F. Supp. 2d 25 (D.D.C. 2007) ........................................................12

*Horowitz v. Fed. Kemper Life Assur. Co.*,
    57 F.3d 300 (3d Cir. 1995)...............................................................8, 14

*J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*,
    1988 WL 32012 (Del. Super. Ct. Mar. 30, 1988) ...................................................14

*Jones v. Treece*,
    774 F. App'x 65 (3d Cir. 2019) ...................................................12

*Maldonado v. Ramirez*,
    757 F.2d 48 (3d Cir. 1985)...................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................8

*In re Maxus Energy Corp.*,
    617 B.R. 806 (Bankr. D. Del. 2020) ...................................................11

*Op. Sys. Support, Inc. v. Wang Labs., Inc.*,
    52 F. App'x 160 (3d Cir. 2002) ...................................................8

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001)...................................................11

*Phoenix Canada Oil Co. v. Texaco, Inc.*,
    842 F.2d 1466 (3d Cir. 1988)...................................................12

*RMG Media, LLC v. iBoats, Inc.*,
    2021 WL 1226466 (D. Del. Mar. 31, 2021) ...................................................11

*Rogers v. Omni Sol., Inc.*,
    2010 WL 4136145 (S.D. Fla. Oct. 19, 2010)...................................................19

*Scott v. Gage*,
    2011 WL 13196262 (M.D. Fla. Dec. 12, 2011)...................................................19

*Traxys N. Am. LLC v. Evraz Claymont Steel, Inc.*,
    2011 WL 1322780 (D. Del. Apr. 4, 2011)...................................................12

*United States v. Bestfoods*,
    524 U.S. 51 (1998)...................................................11

*In re Vitamin C Antitrust Litig.*,
    2013 WL 504257 (E.D.N.Y. Feb. 8, 2013)...................................................11

*Wesch v. Yodlee, Inc.*,
    2021 WL 3486128 (N.D. Cal. Aug. 5, 2021) ...................................................3, 12

Plaintiff FinancialApps, LLC ("FinApps") submits this answering brief in opposition to Envestnet, Inc.'s ("Envestnet") Motion for Summary Judgment No. 1 (D.I. 446).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Envestnet cannot establish the absence of genuine issues of material fact, and its motion must be denied. Notwithstanding a factual record comprising over 1.2 million documents and more than 200 hours of witness testimony, Envestnet cites no evidence to support its motion besides unsubstantiated and unsupported testimony from its corporate witness and inside counsel.

The factual record directly refutes each of Envestnet's arguments. Envestnet claims it is not directly liable, because individuals responsible for the alleged misconduct were affiliated *only* with Yodlee, Inc. ("Yodlee"), and *not* Envestnet. As confirmed by Envestnet's own statements, admissions, disclosures to the Securities and Exchange Commission, internal company memoranda, and reams of other documentary evidence, however, the individuals responsible for FinApps' harm worked in the highest echelons of Envestnet, and included the executive leadership team of Envestnet Data & Analytics ("Envestnet D&A") – a business unit at *Envestnet*. While Envestnet contends, without support, that Envestnet D&A is just another name for Yodlee, this assertion is flatly contravened by the evidentiary record. Envestnet D&A is one of two divisions at *Envestnet*, created in 2019, after a years-long multimillion-dollar corporate reorganization effort transforming Envestnet from a traditional "holding company" model, into an "active management" model, in which Envestnet executives and an Envestnet executive leadership team actively managed day-to-day activities of Envestnet's numerous businesses, including Yodlee.

Envestnet also claims it is not vicariously liable because it did not "dominate" Yodlee. Following Envestnet's corporate transformation, however, Yodlee no longer controlled its own affairs, and Yodlee's day-to-day operations were actively managed by Envestnet and Envestnet

D&A's executive leadership team. Senior Envestnet executives were directly involved in the misconduct alleged, and directed Yodlee employees to facilitate and advance such misconduct. The factual record of Envestnet's misconduct is comprehensive, and confirms the existence of genuine issues of material fact. Accordingly, the motion should be denied.

## FACTUAL BACKGROUND

### I. Envestnet's Corporate Reorganization Resulted In Its Domination of Yodlee

In 2017, Envestnet, with the assistance of PriceWaterhouseCooper ("PwC"), commenced Project Scotland, a multi-year process to transform its existing holding-company corporate structure ████████████████████████████████████████████ (Exs. 1-10).[1] PwC determined ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ (Ex. 11 at 3). PwC advised that Envestnet ████████████████ ████████████████████████████████████████████████ ██████████████████ (*id.* at 13).

Over the next year, ██████████████████████████ (Exs. 12-17). Implementing PwC's recommendations, ██████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. 13 at 2; Ex. 15 at 6; *see also* Exs. 18-19). On January 9, 2019, Envestnet ████████████ ████████████████████████████████████████████████ ██████████████ (Exs. 20-21). DePina, a member of Envestnet senior management (Exs. 22-23),

---

[1]      Citations to "Ex." refer to exhibits to the Declaration of Joshua E. Hollander filed herewith.

became "Chief Executive" of Envestnet D&A, an Envestnet role reporting to Envestnet CEO Jud Bergman (Ex. 20 at 3; Ex. 24 at 15 (identifying DePina as an Envestnet "executive officer"); Ex. 25 at 15:14-16:14). In a company-wide memo, Bergman explained that ████████████████ ████████████████████████████████████ (Ex. 21).[2] Bergman stated that ██████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 21).[3] Bergman also elevated Arun Anur, Brandon Rembe,[4] and Julie Solomon, among others, to Envestnet D&A's "executive leadership" team.[5]

As confirmed by DePina at deposition (Ex. 25 at 15:21-25), and by Envestnet in representations to shareholders, clients, and regulators in SEC submissions (Ex. 31), client materials (Exs. 32-33; Ex. 34), and on earnings calls (Exs. 35-36), ██████████████ ████████████████████████████████████████" (Ex. 21) (Ex. 30; Ex. 24). Envestnet's "FAQ" noted that: i) ███████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ (iii) DePina is Chief Executive of both Envestnet D&A *and* Yodlee; and (iv) Envestnet D&A consolidated ██ ██████████████████████████████████████ (Ex. 37). Yodlee's sole board member is



---

[2]    Bergman stated ████████████████████████████████████████████ ██████████ (Ex. 21).

[3]    Envestnet's 2019 10-K discloses that its "***Envestnet Data & Analytics***" segment "includes **product offerings from Envestnet | Yodlee and Envestnet | Analytics**" (Ex. 24).

[4]    Envestnet listed Rembe as an **Envestnet's Chief Product Officer** (a ████████████████ ████████") from July 2018 to present in the *Wesch* case (Ex. 26).

[5]    **Envestnet's** website identified these individuals as Envestnet D&A's executive leadership (Ex. 27), as also confirmed at deposition (Ex. 28 at 219:1-9; *see also* Ex. 29 at 15:21-23, 17:2-7).

an Envestnet executive (Ex. 38 at 85:19-89:4), and all Yodlee employees became █████████ ████████ Ex. 28 at 22:1-4), █████████████ (*id.* at 22:6-23:5).

## II.     Envestnet's Direct Involvement in the Misconduct Alleged by FinApps

Envestnet, through its Envestnet D&A business unit and leadership team, was directly engaged in the misconduct alleged, through its own actions and its direction of Yodlee employees.

### A.     Envestnet Partners with Equifax and Sidelines FinApps



By the end of 2018, Envestnet had identified Equifax as an ideal partner █████████ ██████████████ (*see* Exs. 39-45).  Bergman and DePina, among others, sought to secure this partnership, particularly in the area of "Income, Asset verification and enhanced credit scores" (Exs. 46-49).  DePina continued to update Bergman into 2019 regarding ████ ██████████████(Ex. 50), ██████████████ ███████████████████████████████ ██████ (Ex. 51; *see also* Ex. 52).  On March 8, 2019, DePina and Equifax executed a letter of intent including the distribution of Yodlee's ████████████ Ex. 53).

As its partnership with Equifax crystallized, Envestnet came to view its lack of ownership over FinApps' Risk Insight product as a problem it would be █████████████ (Ex. 54).  In October 2018, recognizing that Envestnet did not ███████████████ █████████████████████████████████████ ████████████████Ex. 55).  On February 11, 2019, DePina alerted Bergman that Envestnet's lack of ownership presented█████████ the partnership with █████████████████████ (Ex. 54; Ex. 159).  Bergman was ███████authorizing up to $10 million for the acquisition (Exs. 56-57).  DePina and Viggy Mokkarala (Executive VP at Envestnet for Strategic Development) spent weeks negotiating unsuccessfully with Bob Sullivan (FinApps' President) (Exs. 58-65; Ex. 66 at 90:7-91:8; Ex. 67

at 340:22-341:22).  Envestnet then changed course, attempted to "unwind" its business relationship with FinApps, and commenced misappropriation and reverse engineering of FinApps' proprietary information and technology to develop a "replica" of Risk Insight for Equifax.

**B.    Envestnet Uses FinApps Technology to Develop the** ▮▮▮▮▮▮▮▮▮▮

On April 3, 2019, DePina notified Sullivan that "further marketing and sale of the [Risk Insight] product" was suspended (Ex. 145; Ex. 160).  DePina **did not** disclose ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Exs. 69-72).  DePina explained to Envestnet D&A leadership that Envestnet's "strategy" was for current and prospective Risk Insight clients ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Exs. 73-74).  Solomon later told DePina it was ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 75).  On April 17, 2019, based on Rembe's instructions, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 76; *see also* Ex. 77).

On April 10, Envestnet D&A informed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 68; *see also* Ex. 78).  ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 79).▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 80; *see also* Exs. 81-85), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,

including ████████████████████████████████████████████████████
████████████████████████████████████ (Ex. 86).

The "Executive Team" responsible for the development and delivery of the ████████
████ was comprised of Envestnet D&A's leadership, including DePina, Rembe, and Solomon
(Ex. 87 at 76).  On April 17, Anur confirmed with DePina that ██████████████████████
████████████████████████████████████████████████████████████████
████████████████ (Ex. 88 at 2). ██████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████ (Ex. 89). ████████████████████████████████████████
████████████████████████████████████████████████████████████████

Envestnet knew FinApps' proprietary information and technology would be used to create
the ████████████████, despite significant risks for Envestnet.  Indeed, ██████████████
████████████████████████████████████████████████████████████████
████████████████████████████████ (Ex. 98; *see also* Ex. 90 ████
████████████████████████████████████████████████████████████████
████████████████ Anur reiterated to his team ████████████████████████
████████████████████████████████████████████████████ (Ex. 91).
████████████████████████████████████████████████████████████████
████████████████████████████ (Ex. 25 at 227:25-228:19). ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████ (Ex. 92 191:14-23; *see also* 199:10-20, 201:15-20,
203:13-15, 211:9-20); (ii) used the same data attributes as Risk Insight (Ex. 93 at 180:5-14); and

(iii) was ████████████████████████ (*id.* at 199:16-200:3; *see also id.* at 224:6-227:12, 232:8-234:11, 235:7-236:8).

Anur's team ████████████████████████████████████ ████████████████████████████ (Ex. 94 (████████████████████ ████████████████████████████████████████); Ex. 93 at 251:1-9, 253:5-255:11 (████████████████████████████████████████ ████████████████████); (*id.* at 256:19-257:3, 259:11-23) (admitting attempts to *reverse engineer* FinApps' proprietary calculations); Ex. 95 at 91:17-94:5 (admitting to reverse engineering); Ex. 96 (demonstrating assistance in reverse engineering); Ex. 81 (providing FinApps proprietary information to Equifax)). In May 2019, members of Envestnet's D&A group, were involved with the "reverse engineering" of FinApps' propriety database technology (Ex. 97).

DePina was also directly involved in advancing Anur's team's efforts to develop the ████████████████████ On or around April 2019, FinApps learned that Defendants had improperly accessed other FinApps software known as "YProxy." When FinApps suspended access to YProxy, FinApps received multiple requests – including from Anur and DePina – demanding it be restored (*see, e.g.*, Exs. 98-100), but DePina refused to explain Defendants' need for YProxy (Ex. 67 at 328:18-329:15). FinApps later determined that YProxy was being used to facilitate development of competing products (Ex. 101 ¶¶ 299-303; Ex. 102 ¶¶ 702-707).

Envestnet D&A's work on the ████████████████ was later incorporated into the Snapshot 2.0 software product (Ex. 93 at 199:16-200:3, 224:6-227:12, 232:8-234:11, 235:7-236:8), which was sold as a replacement for Risk Insight 2.0 (Ex. 25 at 227:25-228:19; Ex. 93 at 180:5-14, 199:16-200:3, 224:6-227:12, 232:8-234:11, 235:7-236:8; Ex. 103; Exs. 157-58).

**ARGUMENT**

## III.  Legal Standard

Summary judgment is appropriate only "where there is no genuine issue of material fact for the jury to decide," *Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).  The movant bears the "burden . . . of demonstrating the absence of a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  The nonmovant, in turn, must provide "specific facts showing that there is a *genuine issue for trial.*" *Id.* at 586-87.  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz*, 57 F.3d at 302 n.1.  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("the opponent need not match, item for item, each piece of evidence proffered by the movant . . . if the opponent has exceeded the 'mere scintilla' threshold and . . . offered a genuine issue of material fact, then the court cannot credit the movant's version of events.").

## IV.  Envestnet Has Failed to Meet its Burden

Envestnet has not established an absence of "genuine issue[s] of material fact," and has failed to meet its initial burden.  *Horowitz*, 57 F.3d at 302.  An affidavit that is "'essentially conclusory and lacking in specific facts' is inadequate to satisfy the movant's burden." *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985).  Moreover, "unsubstantiated legal conclusion [made in] deposition testimony is not sufficiently probative to entitle [movant] to summary judgment." *Op. Sys. Support, Inc. v. Wang Labs., Inc.*, 52 F. App'x 160, 166 (3d Cir. 2002).  Here, Envestnet provides (i) a conclusory declaration from inside counsel (Patrick Marr) citing **no documentary**

evidence; (ii) unsubstantiated and conclusory excerpts from Marr's testimony as Envestnet's corporate representative; and (iii) FinApps' contracts with Yodlee, thus failing to meet its burden as movant. *Drexel v. Union Prescription Ctrs, Inc.*, 582 F.2d 781, 790 (3d Cir. 1978) "essentially conclusory" affidavits from in-house counsel failed to meet burden).

## V.     Envestnet is Directly Liable for Its Own Misconduct

Envestnet argues it bears no direct liability because Envestnet D&A "is not an entity but merely a business segment name used to refer to Yodlee and its subsidiaries in Envestnet's public filings," and because the individuals involved in the alleged misconduct worked for Yodlee, not Envestnet (Br. 8).   The record demonstrates, however, that Envestnet D&A is a division **at Envestnet** (and is not synonymous with Yodlee), actively managed by an Envestnet "executive leadership" team responsible for the alleged misconduct.

First, the record confirms that "Envestnet Data & Analytics" is a division **at Envestnet, Inc**. (Exs. 20-21; Ex. 24; Ex. 37; Ex. 25 at 15:14-16:14), created after Envestnet deployed significant resources to implement a multiyear corporate reorganization (Ex. 3 at 41; *see also* Exs. 4-11; Exs. 14-15; Exs. 18-19; Ex. 21; Exs. 104-06) transitioning Envestnet from a ████ ████████████████████████████████████████ (Ex. 11 at 3) that would allow its ████ ████████████████████████████████████████████████ ████████████████████████████████████ (Ex. 11 at 13; Ex. 13 at 43; Ex. 21).   Envestnet created two new "business units" – Envestnet Wealth Solutions and Envestnet D&A (Exs. 20-21; Ex. 24) – and installed two members of ████████████████████████ (Ex. 22) to actively manage them, and control the operations of their subsidiaries (Ex. 21; Ex. 34; Ex. 107).

Second, Envestnet D&A is separate and distinct from Yodlee, and not merely a "name used to refer to Yodlee" – an assertion for which Envestnet offers no support (Br. 8).  To the contrary, SEC disclosures (Ex. 20; Ex. 24), company-wide emails referring to Yodlee as a "brand" **within**

Envestnet D&A (Ex. 21), and an internal ████████████████████████████████
█████████████████████████████ (Ex. 108; Ex. 37) all confirm that Yodlee is a separate

entity within Envestnet D&A.[6] Citing no evidence, Envestnet claims its reorganization was "done

from a financial visibility perspective, but not from a corporate structuring perspective" (Br. 8).

As its CEO explained, however, Envestnet ████████████████████████████████████

████████████████████████ (Ex. 21),

█████████████████████ noting that ████████████████████████████████

████████████████████ (Ex. 37). Envestnet D&A leadership also internally referred

to the ██████ made to the Envestnet organization as ██████████ (Ex. 109).

Third, multiple members of Yodlee's senior management (including Rembe, Solomon, and

Anur) were elevated by Envestnet's CEO to Envestnet D&A's executive leadership team, actively

managing day-to-day operations at both Envestnet D&A and its subsidiaries (Ex. 21; *see also*

*supra* § I). Further, Yodlee's sole board member is an Envestnet executive (Ex. 38 at 85:19-89:4),

and all ███████████████████████████████████████████████████████████████

████████████████████████ (Ex. 28 at 22:1-23:5).

Envestnet's claim that "neither DePina nor Rembe held *any* role at Envestnet during the

key period" is also contravened by the record. DePina was CEO of Envestnet D&A – an Envestnet

role – and part of Envestnet "executive leadership" (Exs. 31-37; Ex. 110; Ex. 20; Ex. 24; Ex. 111),

---

[6]     Envestnet's claim of separateness is also belied by the Yodlee.com site, which states
"Introducing **Envestnet Data & Analytics** See how **Yodlee has moved under one ecosystem**
offering data, analytics and experiences." This *Yodlee*-domained landing page includes a link to
"Learn More," which leads to an *Envestnet*-domained page (https://www.envestnet.com/data-and-
analytics), which states that "Envestnet Data & Analytics brings **all of our offerings under one
umbrella**," and provides four brand logos, including Yodlee's and three other businesses,
underscoring that Yodlee is a part of, and not equivalent to, Envestnet D&A (Ex. 22).

while Rembe was elevated to Envestnet D&A's "executive leadership" (also an Envestnet role) (Ex. 21) and served as Envestnet's Chief Product Officer from "July 2018 – Present" (Ex. 26).

Envestnet claims that "[e]ven if" DePina and Rembe (and potentially others) "served a dual role," the law "presume[s]" they were 'acting for the subsidiary' unless" FinApps "rebut[s] that presumption" (Br. 10). Defendants misstate the law. This presumption applies *only* where a party has first established an executive is "acting for the subsidiary." *United States v. Bestfoods,* 524 U.S. 51, 69 (1998). Here, Defendants have failed to establish that DePina or Rembe were ever acting on behalf of Yodlee, and instead recycle their claim that DePina and Rembe "never held *any* role at Envestnet," which is contravened by the record (*see supra* at 2-4). Ample record evidence demonstrates that DePina and Rembe acted on behalf of Envestnet, not Yodlee (*see supra* §§ I-II), thus directly rebutting the *Bestfood* presumption, and raising significant questions of fact for the jury.[7] *See United States ex rel. Baker v. Comty. Health Sys., Inc.*, 2014 WL 10212574, at *26-*28 (D.N.M. May 16, 2014) (denying summary judgment where plaintiff offered "rebuttal evidence" and showed "genuine issues of material fact"); *see also In re Vitamin C Antitrust Litig.*, 2013 WL 504257, at *8 (E.D.N.Y. Feb. 8, 2013) (officer's "hat" is "issue for the jury"). Indeed, courts regularly find the *Bestfoods* presumption rebutted where, as here, directors acted directly for the parent by: (1) "identif[ying] their corporate affiliation" as with the parent, and "us[ing] email addresses with [the corporate parent] in the domain name" (*see supra* § I; Ex. 50;

---

[7] Envestnet's reliance on *Bestfoods* and *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) is also misplaced because the court was addressing a dispute over the interpretation and application of defined terms used by federal statutes. *See Bestfoods*, 524 U.S. at 51 (interpreting CERCLA term "operator"); *Pearson*, 247 F.3d 471 (interpreting WARNA term "employer"). Envestnet's remaining authority is inapposite, and does not concern parental liability on summary judgment with the benefit of a substantial factual record. *See RMG Media, LLC v. iBoats, Inc.*, 2021 WL 1226466 (D. Del. Mar. 31, 2021) (motion to dismiss); *In re Maxus Energy Corp.*, 617 B.R. 806, 818 (Bankr. D. Del. 2020) (motion to compel).

Exs. 159-60), *Traxys N. Am. LLC v. Evraz Claymont Steel, Inc.*, 2011 WL 1322780, at *4 (D. Del. Apr. 4, 2011); *see also U.S. ex rel. Baker*, 2014 WL 10212574, at *26-*28; (2) "assuming [a] controlling role" over negotiations and transactions (*see* Exs. 51-52), *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1478 (3d Cir. 1988); and (3) being "directly involved in the process of finalizing" the effectuation of the alleged misconduct (*see supra* at § VII), *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62 (D.D.C. 2007).

## VI.    <u>Envestnet is Vicariously Liable for The Acts of its Agent, Yodlee</u>

Envestnet also claims it cannot be held "vicariously liable for Yodlee's actions" (Br. 6-7) through a theory of corporate agency.[8]   As shown below, however, Envestnet did, in fact, "dominate" Yodlee, including with respect to misconduct alleged.

Envestnet first asserts that FinApps' complaint lacks "allegations that would suffice to carry an agency theory," claiming this "alone bars an agency theory" (Br. 7).   Envestnet's sole legal authority, however, is inapposite: in *Jones v. Treece*, 774 F. App'x 65 (3d Cir. 2019), an Eighth Amendment *claim* was raised for the first time in opposition to summary judgment.  Here, by contrast, FinApps has sufficiently plead its claims against Envestnet since the outset (D.I. ¶ 216 ("Yodlee -- together with, and at the direction of, Envestnet – has improperly misused and stolen FinApps' trade secrets"), ¶ 233 (same); *see also id.* ¶¶ 18-19, 71, 81, 140, 156-63, 219, 236).

Second, Envestnet claims that "there is no evidence that Envestnet 'dominates' Yodlee's activities" (Br. 7).  Envestnet first asserts that it "is a holding company that does not sell products" (*id.*).   As discussed above, however, this is false; after a years-long, multi-million-dollar transformation process, Envestnet shifted from a ███████████████████ to facilitate Envestnet leadership's active management and control over day-to-day operations of Envestnet

---

[8]      FinApps has never asserted alter ego liability, and does not now.  Envestnet's reliance on *Wesch v. Yodlee, Inc.,* 2021 WL 3486128, at *6-7 (N.D. Cal. Aug. 5, 2021) is misplaced.

D&A and its subsidiaries (*see, e.g.*, Ex. 11 at 3, 13; Ex. 13; Ex. 19; Ex. 21; *see also supra* § I). Envestnet also represented that its █████████████████████████████████████████ █████████████████████████████████████ (Ex. 24 at 76; Ex. 112), and that ████████████ ███████████████████████████████████████████████████████████ █████████████████████████ (Ex. 21 at 143).

Envestnet next claims that "Yodlee has its own executive and management structure and conducts business through its own departments" (Br. 7). Defendants provide no explanation or evidence of Yodlee's "management structure," or any of its individual departments, however, because they cannot: following Envestnet's reorganization, Yodlee did not have a discrete management structure, but rather was managed by Envestnet executives, including DePina and Rembe, among others on the Envestnet D&A executive leadership team (*see supra* § I). Moreover, pursuant to Envestnet's ██████ plan, Yodlee did not conduct business through its "own departments," but rather through shared "non-client facing activities" across Envestnet, including "solutions consulting," "engineering," "Operations," "Finance," "Legal/Compliance," and "Human Resources" (*see* Ex. 15 at 6; Ex. 13).

Lastly, Envestnet claims that "Yodlee pays its own debts and liabilities and bears the costs of employing its personnel" (Br. 7). Yodlee's COO, Arun Anur, testified, unequivocally, however, that that ███████████████████████████████████████████████████████████ ██████ (Ex. 28 at 22:1-4), ████████████████████████████████████ (*id.* at 22:6-23:5).[9]

---

[9]     Envestnet provides no evidence "it has never financed Yodlee'" or that "Yodlee maintains its own bank accounts, books, and records, and it pays its own business expenses."

In short, Envestnet has failed to establish that no genuine issue of material fact exists concerning its liability for Yodlee's conduct as its agent.[10]

## VII.    Genuine Issues of Material Fact Exist With Respect to Counts 1 and 2

Envestnet claims that "none of FA's purported trade secrets qualify for trade secret protection, as laid out in Envestnet's concurrently filed Motion for Summary Judgment No. 2" (Br. 11). Per the Court's rules, the validity of FinApps' trade secrets are appropriately set forth in FinApps' opposition to Envestnet's second motion. Envestnet also attempts to shift its burden, claiming that "FA must adduce evidence sufficient to establish that Envestnet misappropriated FA trade secrets in connection with *Yodlee* products" (Br. 12). This is false. As movants, Defendants are obligated to demonstrate that "no genuine issue of material fact" exists, *Horowitz*, 57 F.3d at 302, but, as discussed below, factual questions regarding Envestnet's misconduct abound.

Envestnet next claims "there is no evidence that [it] participated in, directed, or orchestrated any purported misappropriation in connection with any Yodlee product" (Br. 11), but merely recycles assertions about its corporate structure and relationship to Yodlee, all of which present genuine issues of material fact, as discussed above. Moreover, the record confirms that Envestnet, through Envestnet D&A and its leadership, was engaged in the misconduct alleged, both through its own actions, and by directing the actions of Yodlee employees.

Instead, contrary to Envestnet's assertion, the executive leadership of Envestnet D&A were directly involved with development of the ██████████████, which was based on FinApps proprietary technology, and is "an accused Yodlee product" (Br. 12-13). In early April, 2019,

---

[10]    *See, e.g.*, *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 32012, at *7 (Del. Super. Ct. Mar. 30, 1988) (denying summary judgment where "plaintiff . . . cited sufficient facts to . . . produce the small measure of evidence necessary to rebut summary judgment on the agency relationship."); *Billops v. Magness Const. Co.*, 391 A.2d 196, 198 (Del. 1978) ("The facts of record reveal a triable issue on the question of actual agency.").



(Ex. 68; Ex. 79).

(Ex. 87),

(Ex. 86). Following those discussions,

including necessary functionality, components, required engineer hours, and a development timeline (Ex. 88 at 2). With DePina's blessing, Anur also selected specific software engineers to assist with development of the ▓▓▓▓▓ (*id.*). Further, Rembe, instructed the head of Yodlee's Risk Insight team, Mike Burger,

(Ex. 89). Rembe also

(Exs. 89-90).

DePina was also aware that Envestnet D&A was building a ▓▓▓▓▓ for Equifax that ▓▓▓▓▓" (Ex. 25 at 227:25-228:19), as were the members of Anur's ▓▓▓▓▓ (Ex. 92 at 191:14-23, 199:10-20, 201:15-20, 203:13-15, 211:9-20; Ex. 93 at 180:5-14, 199:16-200:3, 224:6-227:12, 232:8-234:11, 235:7-236:8). To maintain Envestnet D&A's aggressive development timeline for the ▓▓▓▓▓, Anur's team also used various methods to "reverse engineer" FinApps' technology, including FinApps' proprietary calculations and data model (Ex. 94; Ex. 93 at 251:1-9; 253:5-255:11, 256:19-257:3, 259:11-23; Ex. 95 at 91:17-94:5; Ex. 96; Ex. 81). Envestnet D&A was also directly involved with facilitating the "reverse engineering" of FinApps' propriety database technology used in Risk

Insight (Ex. 97). Further, DePina was involved in advancing Anur's team's efforts through its improper use of FinApps' YProxy software (Exs. 98-100; Ex. 67 at 328:18-329:15).

Additionally, Envestnet's claims that no Envestnet personnel "worked on Risk Insight" or "had access to any of the [Risk Insight] development systems or environments" are also undermined by the factual record.[11] Multiple members of Envestnet D&A's executive leadership team were also members of Yodlee's Risk Insight team and enjoyed direct access to repositories of Risk Insight documents maintained by Yodlee, including the Data Dictionary, API documentation and schemas, and API portal development documentation (all containing FinApps' proprietary information) (Ex. 129 at 143:3-143:20; Ex. 130). They also received copies of materials containing FinApps proprietary information when they were distributed to Equifax (*see* Exs. 131-35), as well as technical documentation associated with Snapshot 2.0, which includes information taken from FinApps' proprietary materials, such as an API integration guide, an internal data dictionary, and technical JSON information (Exs. 136-37).

Moreover, members of Envestnet D&A's team provided technical assistance concerning the development and implementation of the Risk Insight product, and were also directly involved servicing Risk Insight customers by overseeing client on-boarding, technical support, and troubleshooting – including Anur (*see, e.g.*, Ex. 115 at 2; Exs. 116-20); Hempel (Ex. 115 at 7; Exs. 118-19; Exs. 121-22); Hingley (Ex. 115 at 7; Ex. 123); Rembe (Ex. 115 at 10; Ex. 120; Exs. 124-26); and Solomon at (Ex. 115 at 10; Exs. 126-28).

---

[11] Members of Yodlee's Risk Insight team were also provided with access to certain Risk Insight development systems maintained by Yodlee. The access logs and other data contained on these systems were destroyed when Defendants decommissioned them, months after the commencement of this litigation (Ex. 113; *see also* Ex. 114)

## VIII. Genuine Issues of Material Fact Exist With Respect to Count 4

Envestnet's arguments for dismissal of Count 4, tortious interference, are also belied by record evidence. Envestnet claims that "there is no evidence that Envestnet personnel 'withh[eld]' anything at all from Risk Insight clients" (Br. 15). Yet the record demonstrates that the executive leadership at Envestnet D&A crafted a "narrative" for use in discussions with Risk Insight customers following Yodlee's suspension of the service (Ex. 138-39). In this "narrative," Hingley stated that "the Risk Insight solution is down" due to ███████████████████████████ ████████████████████████████████████████████████████ ███████████████████████ (*see, e.g.*, Exs. 140-43).

In reality, the software was not "down" due to a technical issue; Yodlee's access been suspended due to its own misconduct. Further, FinApps did not merely deliver "a component" of Risk Insight – it licensed the entirety of software to Yodlee – and Envestnet was not seeking to "resolve" this issue; to the contrary, █████████████████████████████████████ (*see* Exs. 73-74; Ex. 68; Ex. 88 at 2; *see supra* § II.B.). Envestnet D&A leadership deliberately withheld this information from customers to prevent their continued use of Risk Insight with FinApps, ████████████████████████████████ (Ex. 144; Exs. 157-58).

Next, Envestnet claims that FinApps "cannot prove a sufficiently developed prospective business relationship with any Risk Insight client," or that "Envestnet actively 'interfered' with opportunities that already existed" (Br. 15-16). This claim is belied by the record. First, although Equifax was a Risk Insight customer (and thus generated revenues from which FinApps profited), beginning in early 2019, Envestnet D&A took steps to undermine that business relationship by seeking a new strategic partnership with Equifax, which deliberately excluded FinApps, and in connection with which Envestnet developed the ████████████████ using FinApps' proprietary information and technology (*see supra* § II. A.-B.). Second, DePina, Solomon, and Hingley sought

to route Risk Insight's prospective customer pipeline███████████████(Ex. 75; Ex. 73; Exs. 157-58).  Contrary to Envestnet's unsupported claim that FinApps "cannot prove intent" (Br. 16), there is no question Envestnet's actions were intentional and would harm FinApps.

## IX.  Genuine Issues of Material Fact Exist With Respect to Counts 5 and 8

Envestnet first claims that Counts 5 and 8 fail because the court found certain "allegations preempted" (Br. § V.A).  In fact, the Court held the opposite: "Plaintiff's unfair competition claims (Count 5) and claims under the deceptive trade practices statutes of Delaware, Florida and California (Count 8) **are not preempted by the Copyright Act and UTSA**" (D.I. 109 at 21).

Envestnet also claims that Counts 5 and 8 "repurpose FA's claim for breach of the implied covenant," and that it "cannot be liable" for breaching "a contract to which it was not a party." This is beside the point.  That Yodlee and Envestnet engaged in parallel misconduct creating contractual liability for the former and tortious (or statutory) liability for the latter is not a basis for dismissal, as Envestnet appears to argue (without any supporting legal authority).

Envestnet insists that "there is no evidence that [it] engaged in any of this alleged conduct," recycling its prior assertions (Br. 18), but, as detailed herein, Envestnet personnel worked on Risk Insight and "participated in servicing" clients (Exs. 115-28), had access to Risk Insight "development environments" and proprietary information (see supra at 16 n.11; Ex. 115; Ex. 7; Ex. 10; Ex. 130 37; Ex. 81; Ex. 99-100; Ex. 129 at 143:3 20), and ███████████████ ███████████████ (see supra § II.B.).  Rembe removed Yodlee resources and staff from Risk Insight (Exs. 76-77; Ex. 89) and instructed that FinApps needed to be hidden from Risk Insight clients (Exs. 155-56), and DePina informed FinApps that he would be winding down Risk Insight (Ex. 99-100).  DePina and Hingley misrepresented the cause of Risk Insight's suspension to clients (Exs. 138-44).

Lastly, Envestnet claims that "FA's FDUTPA claim fails" because it does not involve

conduct "occurring in the state," and because "FA was not a 'consumer' of Envestnet" (Br. 19-20).

Envestnet is incorrect as a matter of law. First, "nothing in FDUTPA's express language [restricts

its application to] conduct occur[ing] exclusively in Florida." *Buckley v. Moore*, 2021 WL

3173185, at *8 (S.D. Fla. July 26, 2021); *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, 2012

WL 1570057, at *5 (S.D. Fla. May 2, 2012) (same).[12] Rather, where a dispute centers on "whether

enough of Defendants' conduct took place in Florida," the question of "whether the FDUTPA

applies" touches on the Court's personal jurisdiction over Defendants, which will be conferred by

a violation of FDUTPA causing injury in Florida. *See, e.g.*, *Buckley*, 2021 WL 3173185, at *8;

*Rogers v. Omni Sol., Inc.*, 2010 WL 4136145, at *5 (S.D. Fla. Oct. 19, 2010) (out-of-state

defendant that conveyed deceptive "communications to [Plaintiff] into Florida" subject to

FDUTPA claim); *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla.

2000) (Japanese corporation subject to FDUTPA claim filed by Florida residents). Here,

Envestnet's conduct harmed FinApps in Florida, where it resides (D.I. 7 ¶ 22). DePina traveled to

Florida to meet with Sullivan concerning the acquisition of FinApps (*see* D.I. 478 ¶ 4; Ex. 25 at

31:16-32:9) and made misrepresentations by phone and in writing to Sullivan in Florida,

concerning, among other things, the claimed winding down of the Risk Insight product and

Yodlee's access to Y-Proxy (*see, e.g.*, Exs. 145-46; Exs. 99-100; Ex. 67 at 328:22-329:15) in

furtherance of Envestnet's misappropriation of FinApps' information and technology.

Second, the FDUTPA does not exclusively apply to consumer transactions. *Beacon Prop.*

*Mgmt., Inc. v. PNR, Inc.*, 890 So. 2d 274, 279 (Fla. Dist. Ct. App. 2004); *Furmanite Am., Inc. v.*

---

[12] Envestnet's reliance on *In re Clorox Consumer Litig.*, 2013 WL 3967334 (N.D. Cal. July 31, 2013) and *Scott v. Gage*, 2011 WL 13196262 (M.D. Fla. Dec. 12, 2011) is misplaced; in *Clorox*, location was not adequately pled, and in *Scott*, an out-of-state plaintiff sued an out-of-state defendant for out-of-state conduct. Here, FinApps is a Florida resident harmed in Florida.

*T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1146 (M.D. Fla. 2007). Rather, courts have uniformly held that the FDUTPA applies to "legitimate business enterprises." Fla. Stat § 501.202; *Akzo Nobel Coatings, Inc. v. Auto Paint & Supply of Lakeland, Inc.*, 2011 WL 5597364, at *1 (M.D. Fla. Nov. 17, 2011) (holding competing businesses may bring FDUTPA claims).[13] Here, Envestnet engaged in unfair and deceptive practice in trade and commercial activity by, among other things, misappropriating FinApp's proprietary information and technology to develop the ████████████████ *Furmanite*, 506 F. Supp. 2d at 1146-47 (denying summary judgment on FDUTPA claim based on Defendants misappropriation of Plaintiff's trade secrets); *EA Tapping Servs., LLC v. CDM Constr. Inc.*, 2021 WL 1985338, at *9 (M.D. Fla. Feb. 23, 2021).

## X.  Genuine Issues of Material Fact Exist With Respect to Counts 14

Envestnet asserts that Count 14 fails because "this Court already concluded that [FinApps'] allegation" that Envestnet was unjustly enriched by "stealing and misappropriating FinApps' proprietary software and trade secrets" was preempted (Br. 20). Defendants ignore, however, that Judge Connolly specifically overruled this finding (*see* D.I. 126 at 8 n.3; *id.* at 10 (rejecting preemption of Count XIV)). Envestnet also asserts that Count XIV fails because "Envestnet did not misappropriate FA's trade secrets" (Br. 20). This argument fails for the reasons discussed *supra* at Section V, which demonstrate that genuine issues of material fact concerning Envestnet's role in the misappropriation of FinApps technology pervade the record.

## CONCLUSION

For the foregoing reasons, FinApps respectfully requests that the Court deny Envestnet's motion in its entirety.

---

[13]    The Florida Legislature deleted "consumer transaction" from the statute in 1993, and replaced the term "consumer" with "person" in 2011, which includes corporations. *See Beacon*, 890 So. 2d at 279.

Dated: February 24, 2023

YOUNG CONAWAY STARGATT
& TAYLOR LLP

By: _/s/ Pilar G. Kraman_
C. Barr Flinn (No. 4092)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6692
bflinn@ycst.com
pkraman@ycst.com
rvrana@ycst.com

- AND -

Marc E. Kasowitz, Esq.
(*Admitted Pro hac vice*)
Matthew A. Kraus, Esq.
(*Admitted Pro hac vice*)
A. MacDonald Caputo, Jr., Esq.
(*Admitted Pro hac vice*)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com

*Attorneys for Plaintiff FinancialApps, LLC*

## CERTIFICATE OF SERVICE

I, Pilar G. Kraman, Esquire, hereby certify that on February 24, 2023, I caused a true and correct copy of the foregoing document to be served in the manner indicated below upon the following counsel of record:

**By EMAIL:**

Henry E. Gallagher, Jr.
Lauren P. DeLuca
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

Gary M. Miller
Gary M. Elden
Amy Y. Cho
Ian M. Hansen
Justin R. Donoho
SHOOK, HARDY & BACON, L.L.P.
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
gmiller@shb.com
gelden@shb.com
acho@shb.com
ihansen@shb.com
jdonoho@shb.com

Jason M. Richardson
SHOOK, HARDY & BACON, L.L.P.
One Montgomery Street, Suite 2600
San Francisco, CA 94104
jmrichardson@shb.com

John D. Garretson
SHOOK, HARDY & BACON, L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
jgarretson@shb.com

*Attorneys for Defendants, Envestnet, Inc.*
*and Yodlee, Inc.*

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP

*/s/ Pilar G. Kraman*
C. Barr Flinn (No. 4092)
Emily V. Burton (No. 5142)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
eburton@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff FinancialApps, LLC*