IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FINANCIALAPPS, LLC,

        Plaintiff,

v.

ENVESTNET, INC.
and YODLEE, INC.,

        Defendants.

C.A. No. 19-1337-GBW-CJB



REDACTED - PUBLIC VERSION
Filed March 21, 2023

---

### FINANCIALAPPS' ANSWERING BRIEF
### IN OPPOSITION TO ENVESTNET'S
### <u>MOTION FOR SUMMARY JUDGMENT NO. 2</u>

KASOWITZ BENSON TORRES LLP

Marc E. Kasowitz
Matthew A. Kraus
A. Macdonald Caputo, Jr.
Joshua E. Hollander
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com
jhollander@kasowitz.com

Dated: February 24, 2023

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

C. Barr Flinn (No. 4092)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
pkraman@ycst.com
rvrana@ycst.com

*Attorneys for Plaintiff FinancialApps, LLC*

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................... 1

FACTUAL BACKGROUND....................................................................................................... 2

I.  FinApps' Platform .......................................................................................................... 2

II.  FinApps' Technical Documentation ................................................................................ 3

III.  FinApps' Methods to Protect the Platform and Technical Documentation ...................... 4

ARGUMENT ............................................................................................................................. 6

I.  Legal Standard ................................................................................................................ 6

II.  FinApps' Trade Secrets Were Neither Disclosed Nor "Previously Possessed" ................. 7

    A.  PowerWallet Does Not Invalidate FinApps' Trade Secrets .................................. 8

    B.  FinApps' Patent Does Not Disclose Its Trade Secrets........................................... 8

    C.  Risk Insight Marketing Materials Do Not Disclose FinApps' Trade Secrets....... 10

    D.  Defendants Have Never Possessed FinApps' Trade Secrets ................................ 11

    E.  FinApps Did Not Disclose its Trade Secrets at the FinDEVr Conference ........... 11

    F.  FinApps Vigorously Protected Its Trade Secrets................................................. 12

        i.  Christian Dye Was Subject to an NDA..................................................... 12

        ii.  FormFree was a Risk Insight Customer.................................................... 14

        iii.  The Developer Website Never Contained Proprietary Information ......... 15

        iv.  Steven Horwitz Was Consultant for FinApps........................................... 16

        v.  The Terry Askew Disclosure Was Inadvertent ......................................... 16

        vi.  The Purportedly "Undisclosed" Recipients .............................................. 17

III.  FinApps Implemented Robust Measures To Protect Its Trade Secrets ......................... 18

IV.  FinApps' Trade Secrets Derive Economic Value From Their Secrecy........................ 19

CONCLUSION......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*777 Partners LLC v. Pagnanelli,*
    2022 WL 17987267 (S.D. Fla. Nov. 16, 2022)....................................................................7

*Absorption Pharms., LLC v. Reckitt Benckiser LLC,*
    2020 WL 10139487 (D.N.J. June 25, 2020) ......................................................................8

*Allscripts Healthcare, LLC v. Andor Health, LLC,*
    2022 WL 3370177 (D. Del. June 9, 2022).........................................................................8

*Arthur J. Gallagher & Co. v. Petree,*
    2022 WL 1241232 (E.D. Cal. Apr. 27, 2022)...................................................................17

*Atl. Rsch. Mktg. Sys., Inc. v. Troy,*
    659 F.3d 1345 (Fed. Cir. 2011)........................................................................................10

*BDT Prod., Inc. v. Lexmark Int'l, Inc.,*
    274 F. Supp. 2d 880 (E.D. Ky. 2003) ..............................................................................17

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*
    974 F.2d 1358 (3d Cir. 1992).............................................................................................7

*Bro-Tech Corp. v. Thermax, Inc.,*
    651 F. Supp. 2d 378 (E.D. Pa. 2009) ...................................................................13, 14, 19

*Camelot Tech., Inc. v. RadioShack Corp.,*
    2003 WL 403125 (E.D. Pa. Feb. 13, 2003) .................................................................7, 13

*Fabkom, Inc. v. R.W. Smith & Associates, Inc.,*
    1996 WL 531873 (S.D.N.Y. Sept. 19, 1996)................................................................14, 15

*FIMIC, S.r.L. v. ADG Sols., Inc.,*
    2022 WL 4715685 (N.D. Ga. Sept. 30, 2022) ............................................................12, 19

*Fireworks Spectacular v. Premier Pyrotechnics, Inc.,*
    147 F. Supp. 2d 1057 (D. Kan. 2001) ..............................................................................17

*Henry Hope X–Ray Prods., Inc. v. Marron Carrel, Inc.,*
    674 F.2d 1336 (9th Cir. 1982) ...........................................................................................9

*Horowitz v. Fed. Kemper Life Assur. Co.,*
    57 F.3d 300 (3d Cir. 1995)..........................................................................................6, 10

*Houser v. Feldman,*
    569 F. Supp. 3d 216 (E.D. Pa. 2021) ...............................................................................18

*Howmedica Osteonics Corp. v. Howard*,
2022 WL 16362464 (D.N.J. Oct. 28, 2022) ..............................................7, 8, 14, 19

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) ...................................................................................15

*Intell. Ventures I LLC v. Check Point Software Techs. Ltd.*,
215 F. Supp. 3d 314 (D. Del. 2014) ........................................................................15

*KT Grp. Ltd. v. NCR Corp.*,
2018 WL 11213091 (S.D.N.Y. Sept. 29, 2018) ......................................................17

*Le Tote Inc. v. Urb. Outfitters, Inc.*,
2021 WL 2588958 (E.D. Pa. June 24, 2021) ......................................................18, 19

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) .........................................................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..............................................................................................6, 10

*Motor City Bagels, L.L.C. v. Am. Bagel Co.*,
50 F. Supp. 2d 460 (D. Md. 1999) ...........................................................................17

*On-Line Tech v. Bodenseewerk Perkin-Elmer*,
386 F.3d 1133 (Fed. Cir. 2004) ..................................................................................9

*PetroChoice Holdings, Inc. v. Orobono*,
2022 WL 138008 (E.D. Pa. Jan. 14, 2022) ........................................................18, 19

*Phillips v. Frey*,
20 F.3d 623 (5th Cir. 1994) ........................................................................................9

*Pinebrook Holdings, LLC v. Narup*,
2022 WL 1773057 (E.D. Mo. June 1, 2022) ......................................................13, 15

*Progressive Sterilization, LLC v. Turbett Surgical LLC*,
2020 WL 1849709 (D. Del. Apr. 13, 2020) ................................................................7

*S.W. Stainless, LP v. Sappington*,
582 F.3d 1176 (10th Cir. 2009) ................................................................................17

*SkinMedica, Inc. v. Histogen Inc.*,
869 F. Supp. 2d 1176 (S.D. Cal. 2012) .................................................................9, 10

*Subscriber Holdings, LLC v. Brightstar Corp.*,
2022 WL 18034431 (11th Cir. 2022) ........................................................................17

*Syncsort Inc. v. Innovative Routines, Intern., Inc.*,
    2011 WL 3651331 (D.N.J. Aug. 18, 2011) ..................................................................14, 15

*Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, LLC*,
    637 F.3d 604 (5th Cir. 2011) ..................................................................7

*Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
    2009 WL 1387115 (Del. Ch. May 18, 2009) ..................................................................17

*Warman v. Loc. Yokels Fudge, LLC*,
    2022 WL 17960722 (W.D. Pa. Dec. 27, 2022)..................................................................14, 19

*Zoom Imaging Sols., Inc. v. Roe*,
    2022 WL 4025293 (E.D. Cal. Sept. 2, 2022)..................................................................18, 19

**Statutes / Rules**

18 U.S.C. § 1836, *et seq.*..................................................................7

6 Del. C. § 2001, *et seq.*..................................................................7

Fed. R. Civ. P. 26(e)(1)(A) ..................................................................12

Plaintiff FinancialApps, LLC ("FinApps") submits this answering brief in opposition to Envestnet, Inc.'s ("Envestnet") Motion for Summary Judgment No. 2 (D.I. 449).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Envestnet seeks judgment on Counts 1 and 2 for trade secret misappropriation on the grounds that: (1) FinApps' trade secrets are "not secret," and (2) FinApps did not use "reasonable measures" to protect them. Envestnet's arguments, however, are flatly contravened by the record, and thus raise genuine issues of material fact for the jury. Its motion must be denied in its entirety.

*First*, Envestnet's claims that FinApps' trade secrets were not in fact "secret" are unavailing. FinApps' patent discloses no trade secrets, and Envestnet's expert confirmed the patent's purported similarity to FinApps' trade secrets were merely "high level." Risk Insight's public-facing marketing materials also disclose no trade secrets, and provide "only an overview of the product." Envestnet fails to demonstrate how any of FinApps' trade secrets were incorporated into Yodlee's earlier products, or how Yodlee "possessed" them prior to 2017, particularly given its expenditure of millions of dollars over multiple years to license technology Envestnet now claims it already possessed. Envestnet's claim that FinApps freely disclosed its trade secrets to "third parties" is also contravened by the record; as a matter of standard practice and demonstrable fact, FinApps entered into confidentiality agreements with third parties prior to disclosing any proprietary information. Lastly, Envestnet's claims concerning an early "Developer Website" – "a marketing site" that provided content both unrelated to FinApps' trade secrets, and "curated" specifically for a "publicly facing audience" – are nonsensical.

*Second*, Envestnet's assertion that FinApps did not employ reasonable security measures to protect its trade secrets is also refuted by the evidence. Among other things, FinApps: (i) requires employees to maintain confidentiality via employment agreements and internal policies; (ii) protects access to email, databases, code, and software with passwords, encryption,

and "two-factor" authentication; and (iii) requires confidentiality agreements before third parties can access FinApps' information. These steps (among others) amply demonstrate the reasonable measures FinApps uses to protect its trade secrets.

*Finally*, Envestnet's assertion that FinApps' trade secrets "cannot derive economic value from their secrecy" recycles its disclosure arguments, and, in any event, is also contradicted by its own President, who testified that FinApps' technology ████████████████████ ███████████████████ As detailed below, each of Envestnet's arguments at best raises genuine issues of material fact, warranting denial of its motion.

## FACTUAL BACKGROUND

## I.    FinApps' Platform

FinApps spent years and over $20 million to develop a technological platform (the "Platform") that facilitates on-demand creation of lender-initiated and consumer-permissioned financial reports in real time, customized to a lender's specific needs for a particular credit decision (Exs. 1-4).[1] At a high level, the Platform takes raw, consumer-permissioned financial data, refines it using data selection and enhancement methodologies designed by FinApps, and processes refined data through a built-in "Relevancy Engine" component, which deploys an array of business logic, calculations, and other techniques, to derive the advanced financial attributes presented in a report (*see generally* Ex. 5 ¶¶ 20-142; Exs. 2-4).

The Platform comprises user-facing "front-end" components (with which borrowers and lenders interact through "Portals"), and "back-end" components (which drive the Platform's core functionality) (Ex. 5 ¶¶ 35-44). The Platform's front-end and back-end components interact

---

[1]    Citations to "Ex." refer to the exhibits appended to the Declaration of Joshua E. Hollander filed herewith. Citations to "Decl." refer to the Declarations of Anthony Macdonald Caputo, Dexter Weatherly, Howard Dvorkin, and Bob Sullivan also filed herewith.

through application programming interfaces ("API") that communicate data between components of the Platform in various work flows (*id.* ¶¶ 45-63). Specifically engineered data structures and "schema" define the format and content of the data exchanged between these components, and the reports generated by the Platform (*id.* ¶¶ 64-103).

As explained at length by FinApps' expert, Isaac Pflaum, viewing  (*id.* ¶ 10). Bob Sullivan, FinApps' President, summarized these proprietary techniques at deposition:



(Ex. 6 at 220:23-221:13, Nov. 12, 2020.)

On January 31, 2017, Defendant Yodlee, Inc. ("Yodlee") entered into a contract with FinApps (the "MSA") to license the Platform for resale as the "Risk Insight" product, under which FinApps would share in revenues and retain ownership of the technology (Ex. 7).

## II. FinApps' Technical Documentation

FinApps also developed expansive technical and engineering documentation (the "Technical Documentation") concerning the design and functionality of the Platform, which, among other things: (i) defined the Platform's critical workflows; (ii) identified API endpoints utilized in its workflows; (iii) defined data structures exchanged through its endpoints; (iv) defined data structures in its database; (v) defined data schema for reports; (vi) explained how the API and

Relevancy Engine select and condition data; (vii) specified Rules to derive each report attribute; (viii) defined rules execution; and (ix) defined inputs for each rule (Exs. 8-14 ).

FinApps' Technical Documentation includes, but is not limited to: (i) the Risk Insight Solutions Full API Data Dictionary (v2.3.3) (the "Data Dictionary") (Ex. 8), which details the Platform's API architecture, data structures, and schema, including API endpoints, and critical steps of the Platform's core workflows; (ii) the Risk Insight Solutions Full API Portal Development Documentation (v2.1.8) (the "API Documentation") (Ex. 9), which details the Platform's workflows and critical processes; and (iii) the Risk Insight Solutions Attributes Glossary (v1.5) (the "Attributes Glossary") (Ex. 10), which details functionality implemented by the Relevancy Engine source code, its modular design, and its data conditioning processes. As shown by Pflaum, "the engineering information . . . in these documents is sufficiently detailed [to facilitate] reproduc[tion of] key capabilities of the Platform in another product *without access to the Platform source code*" (Ex. 5 ¶ 30 (emphasis added)).

## III.     **FinApps' Methods to Protect the Platform and Technical Documentation**

FinApps implemented robust security protocols and strict access restrictions to its systems (*see, e.g.*, Ex. 15 at 77), requiring that they be hosted on private, encrypted networks with strict firewalls, accessible only through "two-factor authentication" (*id.*), and that Yodlee also implement similar security policies and procedures (Ex. 16). Like 70% of all Fortune 500 companies (and 3 million other organizations), FinApps used GitHub to securely host source code (*see* Ex. 17 at 56:1-8; Ex. 18 at 26:10-12; Ex. 20 at 97:24-98:17, 100:19-101:4). FinApps used other Amazon Web Services (AWS) and Cloud66 – which provide industry-leading security (Ex. 5 ¶¶ 153-54, 163-64) – to operate and manage the Platform (Ex. 22 at 90-95). FinApps also encrypted the Platform's databases, and all individual Rules within the Relevancy Engine (*see*

Ex. 18 at 33:20-23; Ex. 23 at 40:11-22, 45:8-14).  FinApps marked Technical Documentation as "Proprietary and Confidential," or the equivalent.[2]

FinApps required all employees, independent contractors, and consultants to enter confidentiality agreements (*see, e.g.*, Exs. 33-40).  FinApps' employment agreements noted: "disclosure of Confidential Information . . . would cause the Company irreparable injury," and the agreement's intent "to protect the Company from [any] unauthorized use of the Confidential Information" (*see* Ex. 33), while its independent contractor agreements stated: "I will not disclose any Confidential Information to any other person or entity for any reason whatsoever" and "will at all times take such actions as shall be necessary to maintain the confidentiality of the Confidential Information and to prevent its unauthorized disclosure" (*see* Ex. 35).

FinApps also required third-parties to sign nondisclosure agreements ("NDAs") (*see, e.g.*, Exs. 41-44), each including a similar provision stating: "each party agrees [to] keep the other party's Confidential Information confidential, not use such Confidential Information except for the Purpose and not disclose such Confidential Information to another person (and use all reasonable efforts to prevent any such disclosure)" (*id.*).  Yodlee entered into a mutual NDA with FinApps on May 10, 2016 (Ex. 41); a "Data License Agreement" with confidentiality obligations on September 8, 2016 (Ex. 46 at § 8); and the MSA on January 31, 2017 (Ex. 7 at § 7).

The MSA defines "Confidential Information" as "all confidential information disclosed by [FinApps] to [Yodlee] . . . designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances" of disclosure (Ex. 7 § 7(a)).  It obligates Yodlee to "prevent unauthorized access to or use of [the Platform] by third parties" (Ex. 7 § 3(b)), and, with respect to "ANY TRANSACTION BY WHICH YODLEE

---

[2]　　　*See, e.g.*, Ex. 24; Ex. 25; Ex. 26; Ex. 27; Ex. 28; Ex. 29; Ex. 30; Ex. 31; Ex. 32.

SUBLICENSES OR RESELLS" the Platform, requires a "WRITTEN AGREEMENT WHICH CONTAINS RESTRICTIONS WITH REGARDS TO FINANCIALAPPS IP EQUAL TO OR GREATER THAN THOSE SET FORTH HEREIN" (Ex. 7 § 3(c)).

Yodlee knew and understood FinApps' Technical Documentation was proprietary, confidential, and contained "High value IP Item[s]" (*see, e.g.*, Exs. 47-48; Ex. 50 at 285:17-21, 286:4-17, 291:17-23, 292:21-293:3, 293:16-19). For example, the document control policy used with Risk Insight designates ███████████████ as a ███████████████" requiring a ████████████████████████████████████████ (Ex. 47). Similarly, the ████████████████████████████████████████ ████████████████ (*id.*). ████████████████████ ████████████████████████████ (*see, e.g.*, Ex. 51).

## **ARGUMENT**

### I.    **Legal Standard**

Summary judgment is appropriate only "where there is no genuine issue of material fact for the jury to decide," *Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995), and the movant "bear[s] the burden . . . of demonstrating the absence of a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). To prevail, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 586-87. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz*, 57 F.3d at 302 n.1. "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must

be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("[I]f the opponent has exceeded the 'mere scintilla' threshold and . . . offered a genuine issue of material fact, then the court cannot credit the movant's version of events.").

## II.     FinApps' Trade Secrets Were Neither Disclosed Nor "Previously Possessed"

Envestnet contends that FinApps' trade secrets are not protectable[3] (Br. 8) because each was: "(1) disclosed in patent filings or other public-facing documents;" (2) previously "possessed by Yodlee;" (3) "disclosed by FA to third parties;" or (4) "published" on a website (Br. 8). Envestnet's claims, however, merely confirm the existence of genuine issues of material fact.

Nor is this surprising: "whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact." *Camelot Tech., Inc. v. RadioShack Corp.*, 2003 WL 403125, at *5 (E.D. Pa. Feb. 13, 2003); *see also Howmedica Osteonics Corp. v. Howard*, 2022 WL 16362464, at *17 (D.N.J. Oct. 28, 2022) ("the existence of a trade secret is a question of fact, not law"); *Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011) (the existence of "a trade secret ordinarily is best resolved by a fact finder"); *777 Partners LLC v. Pagnanelli*, 2022 WL 17987267, at *9 (S.D. Fla. Nov. 16, 2022), *adopted*, 2022 WL 17985958 (S.D. Fla. Dec. 29, 2022) (whether a trade secret is "generally known" or "readily ascertainable" is an "issue . . . better left for trial"). Trade secret protection is not "an all-or-nothing proposition . . . the inquiry is more nuanced," and the Court must "focus on the precise information that the plaintiff seeks to protect." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 541 (7th Cir. 2021) ("whether the information is public is a question of fact"). Accordingly, courts routinely

---

[3]     Counts 1 and 2 allege violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA"), and its Delaware counterpart, the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, *et seq.* ("DUTSA"), respectively. The essential elements of each are identical. *See, e.g.*, *Progressive Sterilization, LLC v. Turbett Surgical LLC*, 2020 WL 1849709, at *6-*7 (D. Del. Apr. 13, 2020), *adopted*, 2020 WL 3071951 (D. Del. June 10, 2020).

deny summary judgment as to whether plaintiff has a protectable trade secret. *See, e.g.*, *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3370177, at *1 (D. Del. June 9, 2022) (existence of trade secret presented issues of fact); *Howmedica*, 2022 WL 16362464, at *16-*19 (same).

## A. PowerWallet Does Not Invalidate FinApps' Trade Secrets

*First*, Envestnet contends that "[t]he FA Platform is comprised of technology . . . originally developed for . . . PowerWallet,"[4] and that "aspects of the FA Platform [originating] with PowerWallet" are not trade secrets (Br. 8-9). This claim, however, is based solely on a transparent mischaracterization of the testimony of Howard Dvorkin (FinApps' outside investor), in which he observed that PowerWallet's "business model wasn't profitable" because "people were giving away **the same technology for free**" (*id.* (citing Ex. 52 at 28:15-19)). Envestnet's insertion of the phrase "**underlying PowerWallet**" between "technology" and "for free" was refuted by Dvorkin, who confirmed he was referring generally to the fact that personal finance applications (such as "Mint.com") were being offered for free (Dvorkin Decl., ¶¶ 6-8). Dvorkin did not testify concerning any specific technology "underlying" PowerWallet, much less that it was being offered for free (*id.*).

## B. FinApps' Patent Does Not Disclose Its Trade Secrets

*Second*, Envestnet contends that FinApps' trade secrets are disclosed in FinApps' U.S. Patent 10,896,462 (the "462 Patent").[5] Envestnet is wrong as a matter of both law and fact. "[A]

---

[4] PowerWallet was developed by FreedomQuest (FinApps' corporate parent) in 2012 (Ex. 6 at 20:14-17; Ex. 19 at 76:4-24). Envestnet fails to explain how the Platform is "comprised" of PowerWallet's "technology, or how it discloses FinApps' trade secrets. *See, e.g.*, *Absorption Pharms., LLC v. Reckitt Benckiser LLC*, 2020 WL 10139487, at *10 (D.N.J. June 25, 2020) (denying summary judgment where "the items [] highlight[ed] as public disclosures do not form the basis of [plaintiff's] trade secrets claims").

[5] The 462 Patent is the issued patent of FinApps' U.S. Patent Publication 2019/0333140 (the "140 Patent").

plaintiff may **certainly** have a viable trade secret claim **where the implementation details and techniques or other elements of the trade secret go beyond what was disclosed in the patent**." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012) (denying summary judgment); *see also Henry Hope X–Ray Prods., Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1342 (9th Cir. 1982) (no trade secret disclosures in patent providing "only a general depiction").[6]

Here, FinApps' trade secrets go far beyond the content of the 462 Patent. As Pflaum explained, comparing ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ (Ex. 5 ¶ 240). Defendants' own expert also confirmed that any similarities between the 462 Patent and FinApps' trade secrets were merely ████████ (*See* Ex. 53 at 283:2-11, 286:13-21, 290:2-13, 293:7-12). Such ████████ similarities are insufficient to disclose FinApps' trade secrets, which comprise an array of technical and engineering details that are not general in nature, but rather relate to a specific implementation of technology in the Platform. *See, e.g.*, *Henry Hope*, 674 F.2d at 1342; *Phillips v. Frey*, 20 F.3d 623, 629 (5th Cir. 1994) (finding that the patent at issue "merely describes a product," and was "devoid of detailed information of a [] process or specifications"). Tellingly, Envestnet provides no technical analysis linking the 462 Patent content to any FinApps trade secret, nor even a non-technical explanation of how any part of the former discloses any part of the latter. In any event, whether a patent publicly discloses a trade secret "is a triable question

---

[6]      Nor is Envestnet's legal authority to the contrary. It either confirms that only information "**contained within**" a patent becomes public, *On-Line Tech v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed. Cir. 2004), or reiterates that publicly available information does not receive trade secret protection (*see* Br. 9-10 (citing cases)). The 462 Patent describes technology generally, without detailing whatsoever the specific technology implemented in the Platform.

of fact." *SkinMedica*, 869 F. Supp. 2d at 1194; *see also Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011).

### C. Risk Insight Marketing Materials Do Not Disclose FinApps' Trade Secrets

In just a single sentence (Br. 9), Envestnet contends FinApps' trade secrets "were made publicly available in the Risk Insight Whitepaper, Data Sheets, and Sample Reports circulated to prospective customers" (Br. 9). Envestnet provides no analysis to support this claim,[7] which is false. As explained by Pflaum, confirmed by the factual record, and **conceded by Defendants' own expert**, these documents were merely ██████████████," providing ████████ ███████████████████████," and ████████████ ████████████ (Ex. 54 ¶ 14; Ex. 55 ¶¶ 33, 41, 45, 50; *see also* Ex. 56 at 223:2-4; Ex. 57 at 264:17-24). Envestnet does not show how the Risk Insight Whitepaper, Data Sheets, and Sample Reports disclose FinApps' trade secrets (such as, for example, "calculations," the "manner in which the Platform aggregates consumer data and generates usable reports of that data," or the "key engineering objectives relating to reports, workflows, data structures and selection" (Br. 4)) (Ex. 54 ¶¶ 39-105). Nor can it: these documents contain no technical details. They merely list the **names** of certain attributes and data points utilized by Risk Insight, without revealing, for example, the proprietary formulae required to create and derive them, or the technical workflows, methodologies, and techniques utilized to implement them (Ex. 54 ¶¶ 55, 64, 73, 87-89).

---

[7]     Instead, Envestnet attaches the Risk Insight Whitepaper, Data Sheets, and Sample Reports in an appendix, purportedly without "the intention of the Court reviewing all of these voluminous exhibits in detail" (D.I. 451 n.1). Envestnet's failure to provide any analysis to support its arguments underscores the extent to which it has failed to meet its burden on summary judgment. *See, e.g.*, *Horowitz*, 57 F.3d at 302 n.1; *Matsushita*, 475 U.S. at 585 n.10.

### D. Defendants Have Never Possessed FinApps' Trade Secrets

Envestnet also asserts that "information" FinApps "claims is a trade secret" was "in Yodlee's possession" prior to the MSA (Br. 10). Envestnet claims that "program workflows **similar to** those FA now claims are its 'trade secrets' were present in Yodlee's earlier products," such as "Fastlink 2.0" (Br. 4; *see also id.* 10 (citing only a "Product Description" for Fastlink 2.0 and a Yodlee "API Implementation Guide" from 2016 in support)). Again, Envestnet does not specifically identify any "program workflows" from Fastlink 2.0 or its 2016 API Implementation Guide, explain how they were "similar" to any of FinApps' proprietary information, or set forth how any specific technology "possessed" by Yodlee encompassed FinApps trade secrets (Ex. 54 at Section V). Nor does Envestnet demonstrate that (or how) *any* of FinApps' highly detailed, technical proprietary information was incorporated into any of Yodlee's earlier products. Envestnet also fails to explain how Fastlink 2.0 or functionality described in its 2016 API Implementation Guide encompassed, disclosed, or rendered readily ascertainable FinApps' proprietary information – technically or otherwise (*id.*). Most notably, Envestnet fails to explain why Yodlee would spend millions of dollars over multiple years to license technology it claims was already in its "possession."

### E. FinApps Did Not Disclose its Trade Secrets at the FinDEVr Conference

In less than a sentence, Envestnet contends that FinApps disclosed its trade secrets through a "detailed presentation FA personnel delivered at a developer conference" (Br. 4). Again, Defendants provide no further explanation or argument, particularly regarding what trade secrets were purportedly disclosed at the FinDEVR conference in 2016. And again, nor can they.

As is customary at trade shows, FinApps' FinDEVR presentation was merely a product demonstration, illustrating how rudimentary features in a precursor to the Platform are "consumed"

by end users. Nothing in the presentation disclosed or even concerned technical or competitively sensitive details, and unsurprisingly, Envestnet fails to identify any such disclosure (Ex. 54 ¶¶ 166-74). In fact, FinApps' FinDEVR presentation related to technology never even used by the Platform (*id.* ¶ 166). In identical circumstances, Courts have held that presentations of technology provided on websites or at trade shows do not warrant summary judgment, because "whether [plaintiff] achieved the requisite quantum of secrecy to warrant protection over its Trade Secrets Claims is a quintessential jury question." *FIMIC, S.r.L. v. ADG Sols., Inc.*, 2022 WL 4715685, at *10 (N.D. Ga. Sept. 30, 2022).

### F. FinApps Vigorously Protected Its Trade Secrets

Envestnet also claims FinApps disclosed its trade secrets to "third parties" without confidentiality protection[8] (Br. § I.D.). The factual record confirms otherwise.

### i. Christian Dye Was Subject to an NDA

Envestnet first contends that FinApps disclosed its Data Dictionary to Christian Dye (a consultant for NTT Data)[9] on March 27, 2019, without confidentiality protections in place (Br. 11-12). As of March 25, 2019, however – ***two days prior to the purported disclosure*** – FinApps

---

[8] During fact discovery, FinApps requested that Defendants "identify all persons or entities with or to whom You contend FinApps shared, disclosed, or provided any form of information related to or concerning the Platform, Risk Insight 2.0, or any component thereof (whether or not of a confidential or proprietary nature) in the absence of a non-disclosure agreement or similar agreement with confidentiality obligations" (Ex. 58). Despite a continuing obligation under FRCP 26(e)(1)(A), Defendants declined to identify (or mention in their expert reports) Christian Dye, NTT Data, Steven Horwitz, Morgan Hill Partners, Terry Askew, or Western Union, which they now claim received FinApps' trade secrets without adequate confidentiality protection (Br. 5-6). Defendants instead raised the purported disclosure to Dye for the first time after the close of fact discovery, during the last eleven minutes of their two-day deposition of FinApps' expert, and raised the remaining purported disclosures for the first time in their opening summary judgment brief (*see* Declaration of A. Macdonald Caputo, Jr., Esq. ("Caputo Decl."), filed herewith, at ¶¶ 2-20). Following Defendants' belated disclosures, FinApps conducted an investigation and produced documents refuting Defendants' claims (*see id.*).

[9] There is no evidence that Mr. Dye sent the Data Dictionary to anyone at NTT Data.

employed Dye as an independent contractor (Exs. 59-61) to assess opportunities for FinApps in the health care sector (Sullivan Decl., ¶¶ 7-8; Weatherly Decl., ¶¶ 4-5). Like all FinApps independent contractors, Dye was required to sign an NDA. Although FinApps has been unable to locate Dye's NDA after a diligent search of its records, both Sullivan and Weatherly testified an NDA was in place as of March 25, 2019 (Sullivan Decl. ¶¶ 10-11; Weatherly Decl. ¶¶ 7-8).

Moreover, immediately after a March 27, 2019 video conference (Exs. 62-63), Weatherly sent Dye a copy of the Data Dictionary **marked "Confidential" on the cover page** (Ex. 64). *See Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009) (denying summary judgment where documents were marked confidential). Sullivan and Weatherly recall emphasizing to Dye the confidential nature of their conversation and the Data Dictionary during the video conference (Sullivan Decl. ¶¶ 13-14; Weatherly Decl. ¶¶ 10-11).

Even assuming, *arguendo*, the absence of a Dye NDA, "a confidential relationship may also be implied." *Camelot*, 2003 WL 403125, at *7 (citations omitted) (even in undisputed absence of an NDA, jury is required "to determine whether a confidential relationship was formed"). Where, as here, a recipient "knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained" – such as through a confidentiality endorsement or verbal warning – courts have denied summary judgment, because a jury could nevertheless still conclude that "reasonable measures" were taken to protect trade secrets. *See Pinebrook Holdings, LLC v. Narup*, 2022 WL 1773057, at *8 (E.D. Mo. June 1, 2022) (denying summary judgment).

At minimum, FinApps' practice of requiring NDAs (*see, e.g.*, Exs. 33-44), testimony from two witnesses, and the confidentiality endorsement on the document, raises a genuine issue of fact concerning the adequacy of protections in place related to the purported Dye disclosure. *See, e.g.*,

*Bro-Tech*, 651 F. Supp. 2d at 410 (adequacy of security measures is a "question of fact" evaluated "in light of the circumstances and facts of the case"); *Warman v. Loc. Yokels Fudge, LLC*, 2022 WL 17960722, at *11 (W.D. Pa. Dec. 27, 2022); *Howmedica*, 2022 WL 16362464, at *19.

### ii. FormFree was a Risk Insight Customer

Envestnet next claims that FinApps disclosed "an earlier version of the Data Dictionary," among other materials, to Form Free on July 27, 2017 without confidentiality protections (Br. 12-16). A month earlier, however, in June 2017, FormFree **became a Risk Insight customer**, after executing service contracts containing standard confidentiality and non-disclosure obligations specifically protecting all Risk Insight information, including FinApps' proprietary information and technology (Exs. 65-67; Ex. 69). Envestnet also ignores that FinApps shared Risk Insight documentation with FormFree at Yodlee's express direction, and in reliance on Yodlee's contractual obligation to protect FinApps' proprietary information – for which FinApps specifically bargained in the MSA (Exs. 67-69; Ex. 20 at 321:18-24, 374:17-23; Ex. 19 at 142:18-21, 202:4-7). *See, e.g.*, *Syncsort Inc. v. Innovative Routines, Intern., Inc.*, 2011 WL 3651331, at *4 (D.N.J. Aug. 18, 2011) ("Requiring all [] resellers [] to [agree to] confidentiality provisions that bind the reseller [and] its customers [ensures] that resellers . . . keep information, such as software documentation, confidential."); *Fabkom, Inc. v. R.W. Smith & Associates, Inc.*, 1996 WL 531873, at *7 (S.D.N.Y. Sept. 19, 1996) ("Distribution to clients of a computer program through a licensing agreement requiring confidentiality does not destroy secrecy of a trade secret, but rather reinforces it.").[10] Moreover, FinApps entered into an NDA with FormFree on May 16,

---

[10]  FinApps' status as a third-party beneficiary under the Risk Insight contract is irrelevant. FinApps demanded Yodlee agree in the MSA that all Risk Insight contracts into which it subsequently entered would "CONTAIN RESTRICTIONS WITH REGARDS TO FINANCIALAPPS IP EQUAL TO OR GREATER THAN THOSE SET FORTH HEREIN," evidencing FinApps' reasonable measures to protect its trade secrets. *See, e.g.*, *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 661 (9th Cir. 2020) (plaintiff adequately protected

2015 (Ex. 70), and the Data Dictionary was marked "Confidential" (Exs. 71-72) – further confirming FormFree's understanding of its confidentiality obligations. *See, e.g.*, *Pinebrook Holdings*, 2022 WL 1773057, at *8.

### iii. The Developer Website Never Contained Proprietary Information

Envestnet also asserts that FinApps disclosed an "early iteration" of a data dictionary on its developer website in 2017 (the "Developer Website") (Br. 6, 14), but offers no explanation or analysis identifying any proprietary information contained therein, or even a correlation between that information and the Risk Insight Data Dictionary. In fact, Envestnet's use of the phrase "early iteration" concedes that the Risk Insight Data Dictionary is ***not*** the same as the Developer Website "data dictionary" which contained FinApps' trade secrets. Indeed, as FinApps' corporate designee, Dexter Weatherly, explained: (1) the information on the Developer Website was "curated" specifically for a "publicly facing audience;" (2) the Risk Insight Data Dictionary was never available on the Developer Website; and (3) no information relating to Risk Insight was ever available on the Developer Website (Ex. 21 at 26:22-27:10, 82:2-84:20, 86:20-24, 87:14-88:9). Weatherly also testified that he made no updates to information on the Developer Website after "early [to] mid 2017" (*id.* at 85:4-9), which predates the existence of Risk Insight, and the Risk Insight Data Dictionary at issue (Ex. 54 ¶¶ 178, 181-83, 192).[11]

---

trade secrets where contract bound "licensee also bound [clients] and any other third party to which [those clients] needed to show components of [plaintiff's system]"); *Syncsort*, 2011 WL 3651331, at *15; *Fabkom*, 1996 WL 531873, at *7.

[11] Envestnet claims FinApps "failed to preserve" the Developer Website (Br. 1, 14), but FinApps stopped using the Developer Website in "early 2017" (Ex. 21 at 9:12-10:4), and it was taken down by its host (third-party, "Gelato") (Ex. 21 at 7:7-8:4) after reaching "End of Life" on February 1, 2019 (Ex. 73) – ***months before*** the instant dispute arose, and thus well before any preservation duty arose. *See, e.g.*, *Intell. Ventures I LLC v. Check Point Software Techs. Ltd.*, 215 F. Supp. 3d 314, 342 (D. Del. 2014) (holding no duty to preserve).

### iv. Steven Horwitz Was Consultant for FinApps

In disregard for the Federal Rules (*see supra* at n. 8), Envestnet claims for the first time in support of this motion that FinApps disclosed a Risk Insight training PowerPoint to Steven Horwitz (a third-party consultant) in May 2018 without confidentiality protections (Br. 15). FinApps engaged Steven Horwitz as a consultant on ***February 27, 2018***, however, pursuant to an agreement containing a confidentiality provision (Exs. 36-39).[12]

### v. The Terry Askew Disclosure Was Inadvertent

Envestnet claims – again, for the first time – that FinApps disclosed its Risk Insight training PowerPoint without confidentiality protections in a May 4, 2018 email to Terry Askew (a Western Union employee) (Br. 15).[13]  The email, however, was intended to be sent to ***Terry McKeown of Yodlee*** – not Terry Askew (Ex. 75):  it bears the subject ███████████████████████ was sent to eight Yodlee individuals (and Terry Askew), and states:



Neither Askew nor anyone else from Western Union attended FinApps' offices in May 2018 for Risk Insight training (Weatherly Decl. ¶ 16).  McKeown of Yodlee did, however, and was Weatherly's intended recipient (*id*. ¶¶ 14-16; Exs. 76-77).  This inadvertent clerical error – facilitated by "autofill" functionality in email software (Weatherly Decl. ¶ 17) – does not destroy the protected status of FinApps' trade secrets, in no way demonstrates a general failure by FinApps

---

[12]    There is no evidence that Mr. Horwitz sent the Risk Insight training PowerPoint to anyone at his company, Morgan Hill Partners, which, in any event, entered an additional agreement with FinApps containing a confidentiality provision on June 20, 2018 (Ex. 74).

[13]    There is no evidence that Ms. Askew sent the Risk Insight training PowerPoint to anyone at Western Union.

to reasonably protect its trade secrets, and at worst, raises an issue of fact. *See, e.g.*, *Fireworks Spectacular v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057, 1066 (D. Kan. 2001) (customer lists protected despite inadvertent disclosure to "eleven customers" resulting from "good-faith mistake"); *see also Subscriber Holdings, LLC v. Brightstar Corp.*, 2022 WL 18034431, at *3 (11th Cir. 2022) ("limited disclosure does not necessarily mean that trade secret protection is lost"); *Arthur J. Gallagher & Co. v. Petree*, 2022 WL 1241232, at *7 (E.D. Cal. Apr. 27, 2022) (adequacy of secrecy measures presented issue of fact despite accessibility to third parties).[14]

### vi.    The Purportedly "Undisclosed" Recipients

Finally, Envestnet claims that FinApps disclosed the Risk Insight training PowerPoint to certain "Undisclosed-recipients" in May 2018 (Br. 15). In fact, the purportedly "undisclosed" recipients appear in the "BCC" field of this email (Ex. 78), and include: (i) Ed Gonzalez (a FinApps contractor bound by confidentiality provisions in his employment agreement (Ex. 40)); (ii) Anita Hayrapetian (a *Yodlee* employee bound by the confidentiality provisions in the MSA

---

[14]    Envestnet's cases are both inapposite and distinguishable. Citing *S.W. Stainless, LP v. Sappington*, 582 F.3d 1176, 1189-90 (10th Cir. 2009), and *KT Grp. Ltd. v. NCR Corp.*, 2018 WL 11213091, at *14 (S.D.N.Y. Sept. 29, 2018), Envestnet asserts that, as a general matter, even a single unprotected disclosure of a purported trade secret destroys its protected status (Br. 12). Envestnet is wrong. In *S.W. Stainless*, unlike here, plaintiff took no steps at all to prevent disclosure of its trade secrets, 582 F.3d at 1189-90, and in *KT Grp.*, the court expressly held that "disclosure in the absence of a confidentiality agreement *is not necessarily dispositive.*" *Id.* at *13. Here, as discussed above, FinApps has consistently protected its trade secrets and proprietary information. Further, in *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *22 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (Br. 10), unlike here, the proprietary information at issue was available from public sources, and in *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 480 (D. Md. 1999) (Br. 14), plaintiff distributed its proprietary information to over 15 individuals, *ten* of which were not subject to NDAs. Here, the *only* individual to whom FinApps – inadvertently – disclosed a *single* training document absent an NDA was Terry Askew. Lastly, in *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 890-91 (E.D. Ky. 2003), *aff'd*, 124 F. App'x 329 (6th Cir. 2005) (Br. 14), the *entirety* of alleged trade secrets were disclosed to two direct competitors subject to "one-way" NDAs that only protected the competitors.

(Ex. 7)); and (iii) Steven Horwitz (a third-party consultant bound by confidentiality provisions in his agreement with FinApps (Exs. 36-39)).

### III.    <u>FinApps Implemented Robust Measures To Protect Its Trade Secrets</u>

Envestnet cursorily asserts that FinApps "did not maintain reasonable security measures over its purported trade secrets" (Br. 19-20), but in support, simply references and recycles its prior claims that FinApps "disclosed many of its purported trade secrets" or "disclosed [trade secrets] to third parties without confidentiality protections," which are baseless (as discussed *supra* at II.F). Envestnet also claims that no security protocols were implemented on the Developer Website (Br. at 20), ignoring that it contained no proprietary information to secure.

In any event, courts have held that the following constitute "reasonable measures" to maintain the secrecy of trade secrets: (i) requiring employees to maintain confidentiality via employment agreements and internal policies, *see, e.g.*, *Le Tote Inc. v. Urb. Outfitters, Inc.*, 2021 WL 2588958, at *4 (E.D. Pa. June 24, 2021); *Zoom Imaging Sols., Inc. v. Roe*, 2022 WL 4025293, at *7 (E.D. Cal. Sept. 2, 2022); (ii) protecting email, databases, and software with passwords or similar credentials, *see, e.g.*, *Zoom*, 2022 WL 4025293, at *7; *PetroChoice Holdings, Inc. v. Orobono*, 2022 WL 138008, at *4 (E.D. Pa. Jan. 14, 2022); and (iii) requiring confidentiality agreements for third parties, *see, e.g.*, *Le Tote*, 2021 WL 2588958, at *4. Nor is a trade secret owner required to "take every conceivable measure to shroud his or her trade secret in absolute secrecy." *Houser v. Feldman*, 569 F. Supp. 3d 216, 229 (E.D. Pa. 2021). "***[S]ufficient secrecy is all that is needed***, meaning that, except by use of improper means, there would be difficulty in acquiring the information." *Id.* at 229-30 (emphasis added).

The record reflects (and Envestnet fails to address) FinApps' implementation of exactly such methods: (i) robust internal security protocols restricting system access (*see* Ex. 15 at 77); (ii) privately hosted systems on encrypted networks with strict firewalls (*see id.*); (iii) mandatory

"two-factor authentication" (*see id.*); (iv) industry-leading third-party services to securely host source code and to operate and manage the Platform (*see* Ex. 17 at 56:1-8; Ex. 18 at 26:10-12; Ex. 20 at 97:24-98:17, 100:19-101:4; Ex. 22 at 17-22); (v) comprehensive data encryption (*see* Ex. 18 at 33:20-23; Ex. 23 at 40:11-22, 45:8-14); (vi) endorsement of Technical Documentation with "Proprietary and Confidential" or equivalent legends (*see supra* n.1); (vii) mandatory NDAs with all employees, consultants, and independent contractors (*see* Exs. 33-40); and (viii) mandatory NDAs with third-parties (*see* Exs. 41-44). These steps constitute "reasonable measures" to protect FA's trade secrets. *See, e.g.*, *Le Tote*, 2021 WL 2588958, at *4; *Zoom*, 2022 WL 4025293, at *7; *PetroChoice*, 2022 WL 138008, at *4. Further, and in any event, whether "security measures are reasonable is a question of fact." *Bro-Tech*, 651 F. Supp. 2d at 410; *see also FIMIC*, 2022 WL 4715685, at *10 (adequacy of security measures is "quintessential jury question"); *Warman*, 2022 WL 17960722, at *11 (reasonability of efforts to "maintain the secrecy" is "not a question susceptible of black-or-white analysis"); *Howmedica*, 2022 WL 16362464, at *19 (finding factual question as to measures taken to protect trade secrets).

## IV.     FinApps' Trade Secrets Derive Economic Value From Their Secrecy

Lastly, Envestnet argues that "[b]ecause none of FA's purported trade secrets were a secret, they cannot derive economic value from their secrecy" (Br. 16), and that Pflaum has not "opined that any purported trade secrets were not generally known within the fintech industry—nor is he qualified to do so" (*id.*). Envestnet does not explain how or why this is true, because it cannot.

Contrary to Envestnet's assertion, Pflaum specifically opines that the ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. 5 ¶ 10), that the ████████████████████████████████████████████████████████████

████████████████████████████████████████ (*id.* ¶ 20), and that FinApps' █████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ (*id.* ¶ 127).

Further, in his opening expert report (*id.* § VI), Pflaum expressly opines that FinApps' Platform and Technical Documentation "*derive[s] its value in part by virtue of being kept confidential and secret*" (*id.* ¶¶ 241-47). Pflaum further describes the following "indicators of this value": (1) FinApps expended enormous resources to develop the Platform (Ex. 1); (2) FinApps discussed licensing the Platform to other parties prior to the 2017 MSA (Ex. 6 at 125:12-25); (3) Yodlee entered into a *second* amended MSA to license the Platform for four more years (with automatic renewal), on economic terms even more favorable to FinApps (Ex. 79); (4) Defendants made multiple, multi-million dollar offers to acquire "all technology and intellectual property relating to the 'Risk Insights' credit product developed by FinancialApps, LLC" (Exs. 80-83); (5) the Platform attracted multiple paying customers (Ex. 84); (6) Risk Insight had a multi-million dollar sales pipeline of prospective customers (Ex. 85); and (7) **Defendants themselves** considered the technology economically valuable. Indeed, Stuart DePina, Envestnet's President stated: ████

████████████████████████████████████████████ (Ex. 86 at 121:12-24).

Envestnet also recycles its disclosure arguments yet again, asserting that "FA cannot show that the information derived independent economic value *from its secrecy*" (Br. 17). As discussed above, however, Envestnet's disclosure claims are baseless, as is its claim that "FA has failed to pinpoint any truly secret and independently valuable information relating to the Platform" (Br. 18).

## CONCLUSION

For the foregoing reasons, FinApps respectfully requests that the Court deny Envestnet's motion in its entirety.

Dated: February 24, 2023

YOUNG CONAWAY STARGATT
& TAYLOR LLP

By: _/s/ Pilar G. Kraman_
C. Barr Flinn (No. 4092)
Pilar G. Kraman (No. 5199)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6692
bflinn@ycst.com
pkraman@ycst.com
rvrana@ycst.com

- AND -

Marc E. Kasowitz, Esq.
(*Admitted Pro hac vice*)
Matthew A. Kraus, Esq.
(*Admitted Pro hac vice*)
A. MacDonald Caputo, Jr., Esq.
(*Admitted Pro hac vice*)
Joshua E. Hollander, Esq.
(*Admitted Pro hac vice*)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
mkasowitz@kasowitz.com
mkraus@kasowitz.com
acaputo@kasowitz.com
jhollander@kasowitz.com

*Attorneys for Plaintiff FinancialApps, LLC*