IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FINANCIALAPPS, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 19-1337-GBW-CJB ) |
| ENVESTNET, INC. and YODLEE, INC., | ) **REDACTED PUBLIC VERSION** ) ) **Filed: April 20, 2023** ) |
| Defendants. | ) ) |

## ENVESTNET, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT NO. 1

OF COUNSEL:

Gary M. Miller
Gary M. Elden
John D. Garretson
Amy Y. Cho
Justin R. Donoho
Ian M. Hansen
SHOOK, HARDY & BACON LLP
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
(312) 704-7700

Henry E. Gallagher, Jr. (No. 495)
Lauren P. DeLuca (No. 6024)
CONNOLLY GALLAGHER LLP
1201 North Market St., 20th Floor
Wilmington, DE 19801
(302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

*Attorneys for Defendants Yodlee, Inc. and Envestnet, Inc.*

Dated: April 13, 2023

# TABLE OF CONTENTS

                                                 **Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.     FA DOES NOT SHOW ANY GENUINE ISSUE AS TO THE KEY FACTS ................ 2

        A.     Envestnet, Inc. and Yodlee, Inc. are separate companies ....................................... 2

        B.     "Envestnet Data & Analytics" is just Yodlee, Inc. and its subsidiaries ................. 3

        C.     Envestnet, Inc. does not employ Yodlee (a.k.a. "Envestnet D&A") personnel ..... 3

II.    FA CANNOT PROVE VICARIOUS LIABILITY ............................................................. 5

III.   FA CANNOT PROVE DIRECT LIABILITY .................................................................. 6

IV.   COUNTS 1 AND 2 FAIL ................................................................................................ 8

V.    COUNT 4 FAILS ............................................................................................................ 9

VI.   COUNTS 5, 8, AND 14 FAIL ...................................................................................... 10

CONCLUSION .............................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Atl. Med. Specialists, LLC v. Gastroenterology Assoc., P.A.*,
  2017 WL 1842899 (Del. Super. Ct. Apr. 20, 2017) ................................................................. 9

*Consortium of Servs. Innovation v. Microsoft Corp.*,
  2020 WL 885742 (W.D. Wash. Feb. 24, 2020) ....................................................................... 7

*Eagle Canyon Owners Assoc. v. Waste Mgm't, Inc.*
  2017 WL 3017501 (S.D. Cal. July 13, 2017) .......................................................................... 2

*In re EpiPen Direct Purchaser Litig.*,
  2022 WL 1017770 (D. Minn. Apr. 5, 2022) ............................................................................ 8

*Ethypharm S.A. France v. Bentley Pharma., Inc.*,
  388 F. Supp. 2d 426 (D. Del. 2005) ...................................................................................... 10

*MacQueen v. Union Carbide Corp.*,
  2014 WL 6809811 (D. Del. Dec. 3, 2014) (Burke, J.) ............................................................ 2

*Mallet & Co., Inc. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) .................................................................................................... 9

*Mendez v. JFK Med. Ctr. Ltd. Partnership*,
  2018 WL 5045210 (S.D. Fla. Sept. 4, 2018) .......................................................................... 2

*Miami Prods. & Chemical Co. v. Olin Corp.*,
  545 F. Supp. 3d 1 (W.D.N.Y. 2021) ....................................................................................... 7

*Mobil Oil Corp. v. Linear Films, Inc.*,
  718 F. Supp. 260 (D. Del. 1989) ............................................................................................ 5

*Nucar Consulting, Inc. v. Doyle*,
  2005 WL 820706 (Del. Ch. Apr. 5, 2005) .............................................................................. 9

*Pearson v. Component Tech. Corp.*,
  247 F.3d 471 (3d Cir. 2001) ............................................................................................. 6, 8

*Pennington v. Fluor Corp.*,
  19 F.4th 589 (4th Cir. 2021) ................................................................................................... 8

*Ransom v. Equifax, Inc.*,
  2010 WL 1258084 (S.D. Fla. Mar. 30, 2010) ......................................................................... 8

*Rice v. First Energy Corp.*,
 339 F. Supp. 3d 523 (W.D. Pa. 2018) ............................................................................... *passim*

*StrikeForce Techs., Inc. v. PhoneFactor, Inc.*,
 2013 WL 6002850 (D. Del. Nov. 13, 2013) ........................................................................ 5

*U.S. v. Bestfoods*,
 524 U.S. 51 (1998) ................................................................................................ 1, 7, 8, 10

*Wenske v. Blue Bell Creameries, Inc.*,
 2018 WL 5994971 (Del. Ch. Nov. 13, 2018) ...................................................................... 6

*Wesch v. Yodlee, Inc.*,
 2021 WL 3486128 (N.D. Cal. Aug. 5, 2021) ............................................................. 2, 3, 5, 8

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
 2012 WL 5830590 (M.D. Fla. Nov. 16, 2012) .................................................................... 2

## INTRODUCTION

FA wants a jury trial and needs to survive summary judgment against Envestnet, Inc. to get one. But FA's contract was with Yodlee (not Envestnet), all the people involved in this dispute worked for Yodlee (not Envestnet), and the accused products are Yodlee products. FA's attempt to avoid these dispositive points hinges ***entirely*** on the fact that Yodlee is sometimes called "Envestnet Data & Analytics." First, FA claims that "Envestnet D&A" is "a division at Envestnet, Inc." that includes more than just Yodlee. Second, FA argues that because "Envestnet D&A" is broader than Yodlee, all Yodlee personnel listed anywhere as part of the "Envestnet D&A" team must actually (or also) work for Envestnet, Inc. Third, believing its problems solved, FA trots out its favorite evidence of alleged wrongdoing, viewing it all as chargeable to Envestnet, Inc. even though ***all of it*** depicts Yodlee personnel working on Yodlee business with Yodlee clients.

***FA's first two steps fail***. Envestnet, Inc. and Yodlee, Inc. are separate companies. "Envestnet D&A" is just another name for Yodlee, Inc., and none of the people FA accuses of wrongdoing worked for Envestnet, Inc. during the key period—they worked for Yodlee. ***FA's third step also fails***. Even if FA could show a fact issue as to whether anyone involved held dual positions at Yodlee, Inc. and Envestnet, Inc. (it cannot), it fails to rebut the presumption that these individuals were acting for the subsidiary, Yodlee, when engaged in purported misconduct. "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation [] is not liable for the acts of its subsidiaries." *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998). FA violated that principle when it dragged Envestnet into this case and now hopes the Court will see 160 exhibits strung together in a loose narrative and throw up its hands. But FA's filings demonstrate that its claims against Envestnet are frivolous. The Motion should be granted.

# ARGUMENT

## I. FA DOES NOT SHOW ANY GENUINE ISSUE AS TO THE KEY FACTS.

There is no genuine issue as to the following three facts, which dispose of FA's claims.

### A. Envestnet, Inc. and Yodlee, Inc. are separate companies.

Citing a consultant's operational recommendations, FA claims that Envestnet, Inc. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Opp. at 2-4.) None of the recommendations (adopted or not) would or did alter anything that matters: FA *concedes* that Yodlee, Inc. is a distinct corporation (D.I. 493 ¶ 3; 1 ¶ 24; 143 ¶ 24)—not just a brand—and as of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Wesch v. Yodlee, Inc.*, 2021 WL 3486128, at *5 n.6 (N.D. Cal. Aug. 5, 2021) ("***[T]he evidentiary hearing affirmed that Envestnet, Inc. does not engage in any commercial activity***.") FA claims Envestnet sells "offerings" (Opp. at n.3-6) but names only Yodlee, Inc. "offerings" (§ I(B) *infra*) and, tellingly, does not produce even a contract under which Envestnet, Inc. provides a good or service to a customer, as none exist.[1] FA's claim that all Yodlee personnel *became* Envestnet personnel is baseless (§ I(C) *infra*), and that Envestnet subsidiaries use certain shared services (Ex. 12 ¶ 16) "is completely characteristic of a parent-subsidiary relationship." *Eagle Canyon Owners Assoc. v. Waste Mgm't, Inc.* 2017 WL 3017501, at *2 (S.D. Cal. July 13, 2017); *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 2012 WL 5830590, at *6 (M.D. Fla. Nov. 16, 2012). Ultimately, FA's story that Envestnet absorbed Yodlee, Inc. in January 2019 is totally undone by the fact that ▇▇▇

---

[1] FA's attempt to collapse Envestnet and Yodlee into one entity using websites and SEC filings ignores that, ***as this Court has noted***, statements from such sources "in which a parent corporation" is "consolidating by description its subsidiary's efforts and its own" are "not atypical, and certainly do[] not suggest that [] the parent corporation has become indistinguishable from the subsidiary." *MacQueen v. Union Carbide Corp.*, 2014 WL 6809811, at *7 (D. Del. Dec. 3, 2014) (Burke, J.); *Rice v. First Energy Corp.*, 339 F. Supp. 3d 523, 536-39 (W.D. Pa. 2018) (same); *Mendez v. JFK Med. Ctr. Ltd. Partnership*, 2018 WL 5045210, at *4 (S.D. Fla. Sept. 4, 2018) (same).

[REDACTED] (Exs. 13 at 47:6-49:17; 14 at 40-43; 15.) FA does not (because it cannot) explain how this would have been possible under its telling.

B.  **"Envestnet Data & Analytics" is just Yodlee, Inc. and its subsidiaries.**

FA says Envestnet D&A is "distinct from Yodlee" because it includes five entities other than Yodlee: "Envestnet Analytics," "Envestnet Technologies," and "three businesses" on its website: Abe.io, Truelytics, and Harvest. (Opp. n.2-6.) This is wrong. "Envestnet Analytics" is Wheelhouse Analytics, which was merged into Yodlee in 2016. (Exs. 12 ¶ 3; 16-17; 13 at 112:22-113:3.) Abe.io and Truelytics were acquired and merged into Yodlee in 2019 and 2022, respectively. (Exs. 12 ¶¶ 4-5;18-19; 20 at 80.) Harvest is in the Wealth segment (Ex. 20 at 38) and appears on the D&A website only because *Yodlee* sells a Harvest product. (Ex. 12 ¶ 6.) "Envestnet Technologies" was a plan to consolidate certain data utilities to service both Yodlee and the Wealth segment; there is no entity or business called "Envestnet Technologies" in D&A. (*Id.* ¶ 7.) It is thus undisputed that "Envestnet D&A" and Yodlee, Inc. are [REDACTED] (Ex. 22 at 21:4-13.) Yodlee, Inc. is the company. It enters contracts, sells products, and owns subsidiaries. "Envestnet D&A" is merely a segment or brand name [REDACTED] (Ex. 13 at 111:10-12), and nothing more. (Exs. 21 at 16:1 (Envestnet D&A is [REDACTED] 13 at 40:1-14 (confirming [REDACTED]); 22 at 25:8-14 (confirming [REDACTED]

C.  **Envestnet, Inc. does not employ Yodlee (a.k.a. "Envestnet D&A") personnel.**

All Yodlee ("Envestnet D&A") personnel receive their paychecks from Envestnet Financial Technologies, Inc., and the costs of employing them are allocated to and borne by Yodlee, Inc. (SOF ¶¶ 9-10.) This includes cash and stock bonuses. (Ex. 12 ¶ 11.) FA attempts to create a fact issue with a deposition soundbite in which FA counsel asked Mr. Anur whether

3

▮▮ (Opp. at 4.) Mr. Anur was referring to Envestnet *Financial Technologies*, Inc. and has presented his W-2 as proof. (Ex. 23.) There is no fact issue here.

FA's claim that Yodlee leaders Rembe, Anur, Solomon, Hingley, and Hempel "were *elevated*" to "Envestnet D&A's executive leadership" (Opp. at 10) is baseless.[2] They continued as Yodlee's leaders with the same pay from Yodlee and the same responsibilities at Yodlee; none of them assumed new or dual positions at Envestnet, Inc. or began "actively managing" other subsidiaries (*id.*) in 2019. (§ I(B); Ex. 21 at 15:19-20 ▮▮, 19:6-14 (▮▮▮▮); Ex. 2 ¶¶ 28-29; Ex. 3 at 32:2-4 ▮▮, 33:13-22, 34:13-35:4 ▮▮.)[3] With respect to Mr. DePina, FA claims he held two distinct positions. (D.I. 493 ¶ 4.) But FA's exhibits all just list Mr. DePina with his title as CEO of the D&A segment, which—again—is just Yodlee, Inc. § I(B) *supra*. FA's argument runs right into *Action Mfg. Co., Inc. v. Simon Wrecking Co.*, in which a subsidiary's CEO was not "actually an employee" of the parent merely because the parent's SEC filings listed him as an "executive officer." 375 F. Supp. 2d 411, 423-24 (E.D. Pa. 2005). There, *as here*, the SEC filings "collectively referred to [parent] and its subsidiaries as

---

[2] FA also claims Mr. Rembe was Envestnet's Chief Product Officer starting in 2018, but the position did not even *exist* before September 2020. (Exs. 24 (**September 25, 2020** announcement that ▮▮); 25; 26 at 16:1-23.)

[3] Any doubt is dispelled by comparing Yodlee's executive team before and after the January 2019 segmenting. A May 2018 "Yodlee Corporate Overview Intro Deck" ▮▮ (Ex. 27.) An updated April 2019 version presents ▮▮ (Ex. 28.) The 2019 segmenting did not change their roles or the entity for whom they worked.

'we,' 'our,' and us'" and listed him with his "title" as CEO of "the Company's Aviation Fuel Services *segment*"; the "deposition testimony" made clear he did not hold two distinct positions; and the subsidiary paid for his salary, bonus, and stock options. *Id.* As CEO of the D&A *segment*, Mr. DePina's responsibilities pertained only to Yodlee, Inc., and Yodlee, Inc. ▮ ▮ (Exs. 29; 12 ¶¶ 11-13; 13 at 102:25-104:4 ▮ ▮ ▮ ▮ Envestnet ▮ Mr. DePina until after he assumed a second position as President of Envestnet, Inc. in March 2020. (Ex. 12 ¶ 13.)

## II. FA CANNOT PROVE VICARIOUS LIABILITY.

FA seeks to hold Envestnet vicariously liable on the theory that it "dominate[d]" Yodlee after the 2019 segmenting. (Opp. at 2-4, 12-13.) In August 2021 (*after* the 2019 segmenting), a federal court held an evidentiary hearing on the relationship between Envestnet and Yodlee and, crediting Mr. Marr's testimony, refused to pierce the veil between them. *Wesch*, 2021 WL 3486128, at *7. Citing nothing, FA claims *Wesch* is irrelevant because it dealt with the alter-ego theory, not its "domination" theory. (Opp. at n.8.) But "the attributes of this latter form of agency (*i.e.* based upon domination and control by the principal) *are generally identical* to those present when the corporate veil is pierced because of an alter ego relationship." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 271 (D. Del. 1989). "Regardless of the label used, fraud or injustice is a necessary element[.]" *Id.* at 271 n.15; *StrikeForce Techs., Inc. v. PhoneFactor, Inc.*, 2013 WL 6002850, at *6 (D. Del. Nov. 13, 2013) ("[A]gency [] based on the parent's pure dominion and control of the subsidiary indeed requires a showing of fraud or injustice."). Thus, *Wesch* actually bars FA's domination theory. *Mobil*, 718 F. Supp. at 271 ("The Court has already [] rejected

5

application of the alter ego theory [and] likewise concludes that the Delaware corporation cannot be held liable under the *equivalent theory* of agency based upon complete domination and control."). FA claims it pled this theory, but alleging Yodlee acted "together with, and at the direction of, Envestnet" falls well short of the domination theory it now asserts. (*Compare* Opp. at 2-4, 12-13.)[4] Nor is there evidence to support it. FA claims Envestnet is not a holding company, but this is baseless. § I(A) *supra*. It claims that "Yodlee did not have a discrete management structure," but Yodlee's management is clearly established (Exs. 27-28; 22 at 219:1-15; 2 ¶¶ 33-45), and FA's competing claim—that all Yodlee personnel *became* Envestnet personnel in 2019—is baseless too. § I(C) *supra*. FA claims there is "no evidence" of Yodlee's records or that Envestnet has never funded Yodlee, but Yodlee produced its records and also indicated where they are available publicly (Exs. 30-31; 13 at 40:1; 22 at 25:8), and Mr. Marr testified that Envestnet has never funded Yodlee, which FA does not rebut. (Ex. 2 ¶ 15.) Finally, and decisively, FA does not (and could not) argue that fraud or injustice would result: FA's contracts were with Yodlee, the accused products are Yodlee products, and Yodlee is amply capitalized. (Ex. 20 at 110.)

## III. FA CANNOT PROVE DIRECT LIABILITY.

With vicarious liability foreclosed, FA must take the "rarely used" direct liability route. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001). FA must show (1) that an Envestnet employee directly took or "forced [Yodlee] to take the complained-of action," *id.*, and (2) if that employee also held a Yodlee position, that they were acting for Envestnet (not Yodlee)

---

[4] FA hopes the Court will overlook the distinction between its "domination" agency theory and "customary" or "pure agency," which is "an arrangement between the two corporations so that one acts on behalf of the other and within usual agency principles." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *4 (Del. Ch. Nov. 13, 2018) (collecting cases). FA does not argue the latter in its brief and indeed could not prevail on it anyway, as its **sole** purported evidence that "Envestnet authorized Yodlee" to act "on its behalf" is a single email between Yodlee personnel using Yodlee email to discuss Yodlee business. (*See* D.I. 493 ¶ 14 (citing FA Ex. 89).)

when so doing or directing, over the presumption to the contrary. *Bestfoods*, 524 U.S. at 69. FA tries to duck its burden, claiming the *Bestfoods* presumption does not apply until the parent establishes that the dual officer was acting for the subsidiary. (Opp. at 11.) This just erases the presumption, which attaches wherever "the subsidiary's business" is at issue. *Miami Prods. & Chemical Co. v. Olin Corp.*, 545 F. Supp. 3d 1, 10 (W.D.N.Y. 2021). As FA does not (and cannot) claim that Yodlee's business is not at issue, "it is Plaintiff's obligation to come forward with evidence that rebuts the presumption[.] Otherwise, the Court cannot attribute to the parent the actions of a dual officer taken with respect to the subsidiary's business." *Id.* FA tries rebutting *Bestfoods* for Mr. DePina and Mr. Rembe only, with five documents. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Ex. 13 at 87:2-9)), ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (53). The fourth (159) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (FA Exs. 61, 63; Ex. 13 at 77:12.) The fifth (160) depicts Mr. DePina reporting that he had informed FA, as Yodlee CEO, ▬▬▬▬▬▬▬▬▬▬▬▬. (FA Exs. 145-46.) None of this rebuts *Bestfoods* even just for these discrete acts, much less FA's entire case; all of it is "perfectly consistent with the norms of corporate behavior"—when "the presumption is strongest"—and none of it "approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent."[5] *Bestfoods*, 524 U.S. at 70 n.13.

---

[5] Mr. DePina and Mr. Rembe had @envestnet.com addresses from their pre-Yodlee positions at Tamarac, Inc. (Ex. 12 ¶ 15.) FA seems to think Envestnet, Inc. is liable for all of their actions just because they received a few Yodlee-related emails at those addresses, but "use of the same email address" by "employees of the parent corporation and its subsidiaries" is "common practice" (*Rice*, 339 F. Supp. 3d at 538 n.9) and "is insufficient to convey" that they acted for **Envestnet, Inc.** *Consortium of Servs. Innovation v. Microsoft Corp.*, 2020 WL 885742, at *3 (W.D. Wash. Feb.

FA also misunderstands its task, which is to show that someone at Envestnet committed "***the wrong complained of***"—not non-actionable conduct like the above—while acting for Envestnet. *Id.* at 64; *Pearson*, 247 F.3d at 487 (focus is "the *complained-of action*"; "in the labor context," for example, "direct liability may attach if the parent has [] ordered [subsidiary] to institute an *unfair labor practice* or *discriminatory hiring policies*"); *Pennington v. Fluor Corp.*, 19 F.4th 589, 599 (4th Cir. 2021) (direct liability is "a narrow test" for "the unusual case where a company commits *a wrongful act* through the legal form of a distinct entity"); *In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *11 (D. Minn. Apr. 5, 2022) ("It is not enough" that "employees who appear to be employed by [parent] negotiated with [co-defendants]," as "*such conduct is not illegal.*") As discussed next, none of the evidence FA proffers in support of its claims depicts acts taken by a dual employee. And even if there were a fact issue on that point, FA still could not prevail because it cannot rebut *Bestfoods* as to any purportedly culpable act.

## IV. COUNTS 1 AND 2 FAIL.

Counts 1 and 2 fail because, *first*, none of the people FA says acted culpably were dual employees. § I(C) *supra*. And even if there were a fact issue on that point as to any of them, nothing in any exhibit FA cites for Counts 1 and 2 rebuts *Bestfoods*. To the contrary, ***every*** document cited depicts either Yodlee personnel conducting Yodlee business with Yodlee email or Equifax discussing Yodlee business with Yodlee personnel (FA Exs. 68, 79, 81, 87-90, 94, 96-100; D.I. 493 ¶ 21, 28), and none of the transcripts FA cites contain anything suggesting the deponents (all Yodlee personnel) were acting for Envestnet. (FA Exs. 25, 92, 93, 95, 129.) Even

---

24, 2020); *Ransom v. Equifax, Inc.*, 2010 WL 1258084, at *4 (S.D. Fla. Mar. 30, 2010) ("Merely pointing to use of the email address 'Equifax.com'" did "not constitute evidence that ***Equifax, Inc.*** acted[.]") Examining email addresses would not help FA anyway; ***all*** the evidence of purported misconduct FA proffers for its claims depicts them using ***Yodlee*** email. *See* §§ IV-VI *infra*.

8

in attempting to show just that Envestnet was involved with Risk Insight generally or had mere *access* to FA's purported trade secrets, FA relies *entirely* on exhibits listing or depicting Yodlee personnel conducting Yodlee business with Yodlee email, most of which actually ***predate the 2019 segmenting*** that FA claims converted Yodlee personnel into Envestnet personnel in the first place. (FA Exs. 115-28, 130-37; D.I. 493 ¶¶ 17-21.) *Second*, FA relies on purported evidence of reverse engineering, but reverse engineering is not misappropriation. *Mallet & Co., Inc. v. Lacayo*, 16 F.4th 364, 388 n.31 (3d Cir. 2021) (DTSA "excludes reverse engineering" from "conduct it defines as misappropriation"); *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *6 (Del. Ch. Apr. 5, 2005) (under DUTSA, "proper means include [] reverse engineering"); *Atl. Med. Specialists, LLC v. Gastroenterology Assoc., P*.A., 2017 WL 1842899, at *9 (Del. Super. Ct. Apr. 20, 2017) ("Information is not misappropriated" when "reverse engineer[ed]"). FA does not claim Envestnet reverse engineered its platform using *other* proprietary information as a starting point or even ***identify*** any such starting point, much less establish it as proprietary. (Opp. at 7, 15.) FA thus has not presented evidence from which a jury could conclude that this constitutes misappropriation.

## V. COUNT 4 FAILS.

As to Count 4, FA must show, *first*, a "specific client" who "actually contemplated" a relationship "which in all probability would have been completed" absent interference. (D.I. 447 at 15). FA claims Equifax was that client because "Equifax was a Risk Insight customer (and thus generated revenues from which [FA] profited)." (Opp. at 17.) But Equifax was ***Yodlee's*** customer, and FA only "profited" from Yodlee's Equifax "revenues" by way of FA's contracts with Yodlee. (Exs. 4-6.) FA does not show so much as a ***single direct communication*** between FA and Equifax—much less evidence that Equifax "actually contemplated" giving FA any business. *Second*, FA proclaims that "there is no question Envestnet's actions were intentional and would harm" FA (Opp. at 18), but it must show "intent to interfere," not "mere intent to act," such that

9

Envestnet "acted with *the purpose of injuring* [FA's] expectancies" with Equifax. (D.I. 447 at 16.) FA *cites no evidence* that Envestnet did anything with the purpose of injuring FA's purported "expectancies" with Equifax. *Third*, Count 4 fails because none of the people FA accuses of wrongdoing (Mr. DePina, Ms. Solomon, and Ms. Hingley) were dual employees. FA could not rebut *Bestfoods* as to any of them anyway; *every* document FA cites depicts them discussing Yodlee business with Yodlee clients using Yodlee email. (FA Exs. 73-75, 88, 138-44, 157-58.)

## VI.  COUNTS 5, 8, AND 14 FAIL.

FA tries supporting only certain allegations for Counts 5 and 8. (Opp. at 18; D.I. 493 ¶ 30.) *First*, FA claims "Rembe removed" resources from Risk Insight and "directed" that FA be "hidden" from clients (Opp. at 18) but cites exhibits showing Rembe (Yodlee SVP) discussing Yodlee business with other Yodlee personnel using Yodlee email. (FA Exs. 76-77, 89, 155-56.) *Second*, FA says "DePina informed" FA that Yodlee was pausing Risk Insight marketing but fails to explain why that matters and ignores that the letters it cites came from Mr. DePina (Yodlee CEO) using Yodlee email. (FA Exs. 99-100, 145-46.) *Third*, FA claims "DePina and Hingley misrepresented" the suspension to clients but cites only an internal Yodlee FAQ document and six emails in which Ms. Hingley (Yodlee SVP, Ex. 12 ¶ 9) confers with Yodlee clients using Yodlee email. (FA Exs. 138-44.) These allegations thus fail as to Envestnet, and the only remaining (*i.e.*, not abandoned) allegations under Counts 5 and 8 are *misappropriation*. FA likewise concedes that only its *misappropriation* allegations could sustain Count 14. (Opp. at 20.) All three (Counts 5, 8, and 14) therefore are preempted and must be dismissed. *Ethypharm S.A. France v. Bentley Pharma., Inc.*, 388 F. Supp. 2d 426, 435 (D. Del. 2005) ("*If the claim, once developed, is grounded on the same facts as the misappropriation claim, it will be displaced by the DUTSA*.").

## CONCLUSION

Envestnet, Inc. respectfully requests that the Court enter summary judgment in its favor.

| | |
|---|---|
| OF COUNSEL:<br><br>Gary M. Miller<br>Gary M. Elden<br>John Garretson<br>Amy Y. Cho<br>Justin R. Donoho<br>Ian M. Hansen<br>SHOOK, HARDY & BACON LLP<br>111 S. Wacker Dr., Suite 4700<br>Chicago, IL 60606<br>(312) 704-7700<br><br>Dated: April 13, 2023<br><br>**REDACTED PUBLIC VERSION**<br>**Filed: April 20, 2023** | CONNOLLY GALLAGHER LLP<br><br>*/s/ Lauren P. DeLuca*<br>Henry E. Gallagher, Jr. (No. 495)<br>Lauren P. DeLuca (No. 6024)<br>1201 North Market St., 20th Floor<br>Wilmington, DE 19801<br>(302) 757-7300<br>hgallagher@connollygallagher.com<br>ldeluca@connollygallagher.com<br><br>*Attorneys for Defendants Envestnet, Inc. and Yodlee, Inc.* |