IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FINANCIALAPPS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-1337-GBW-CJB |
| | ) |
| ENVESTNET, INC. and YODLEE, INC., | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

Plaintiff FinancialApps, LLC ("Plaintiff" or "FinApps") filed this action against Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee" and collectively with Envestnet, "Defendants") asserting various federal and state law causes of action. (D.I. 2) Presently pending before the Court is FinApp's motion for summary judgment ("Motion") on Envestnet's defamation counterclaim in Count Three of Defendants' First Amended Counterclaims (the "defamation counterclaim"); the Motion is filed pursuant to Federal Rule of Civil Procedure 56. (D.I. 452) Envestnet opposes the Motion. For the reasons set forth below, the Court recommends that the District Court GRANT the Motion.

**I.      BACKGROUND**

   **A.      Factual Background**

The Court has previously set out the relevant background facts relating to the defamation counterclaim in its January 31, 2023 Memorandum Order ("January 31 MO"); it assumes familiarity herein with those background facts. (D.I. 490 at 1-6) To the extent that certain facts relating to the counterclaim are particularly relevant to resolution of the Motion, they will be set out in Section III.

   **B.      Procedural Background**

1

On July 17, 2019, FinApps filed its Complaint in this case. (D.I. 2) The case was thereafter referred to the Court to conduct all proceedings and to hear and determine all motions, pursuant to 28 U.S.C. § 636(b). (D.I. 18; D.I. 437) On September 30, 2020, Defendants filed First Amended Counterclaims against FinApps, including the defamation counterclaim. (D.I. 160) The defamation counterclaim relates to statements attributed to Marc Kasowitz, an attorney for FinApps, in articles about this litigation that were published on the Internet in late July and early August 2019. (*Id*. at ¶¶ 73-79, 94-101)

FinApps filed the instant Motion on January 6, 2023. (D.I. 452) Briefing on the Motion was completed on April 13, 2023. (D.I. 551)

Because FinApps waived its right to a jury trial against Yodlee pursuant to an agreement that FinApps and Yodlee executed, the case will be decided in two separate trials (both of which are to be scheduled): first, a jury trial on FinApps' claims against Envestnet, to be followed by a bench trial on FinApps' claims against Yodlee. (D.I. 250 at 4, 10; *see also* D.I. 442; D.I. 445 at 1, 5, 7)[1]

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). If the moving party has sufficiently demonstrated the absence of such a dispute, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for

---

[1] While Defendants jointly pleaded the defamation counterclaim with identical allegations, (D.I. 160 at ¶¶ 94-101), FinApps filed the instant Motion only as to Envestnet, (D.I. 453 at 1 n.1, 20 n.10).

trial." *Id.* at 587 (internal quotation marks, citation and emphasis omitted). If the nonmoving party fails to make a sufficient showing in this regard, then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is "genuine," only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, asserting that a fact is—genuinely disputed must support the assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.     DISCUSSION

As explained in the January 31 MO, the defamation counterclaim expressly identifies three statements attributed to Mr. Kasowitz (the "Alleged Defamatory Statements").[2] The first two statements were published in a July 30, 2019 article in *RIAbiz*, an online journal about the financial advice business, entitled "Entrepreneurial firm hits Envestnet with $100-million lawsuit for alleged Yodlee 'Trojan Horse' scheme used to steal proprietary technology" (the "RIAbiz article") and the third was published online by *Financial Planning* in an article entitled "Envestnet accused of stealing trade secrets, hit with lawsuit" (the "Financial Planning article"):

---

[2]     Envestnet asserts that, nevertheless, there are three additional defamatory statements at issue in this case beyond just the three referenced in the defamation counterclaim; it claims this is so because those three additional statements were published in the articles that were attached as exhibits to the defamation counterclaim and because "[d]iscovery made [these additional three statements] apparent[.]" (D.I. 491 at 1 & n.3; *see also* D.I. 551 at 1; D.I. 406 at 3)

Envestnet may not rely on the three additional statements that were not alleged in the defamation counterclaim itself. (*See* D.I. 551 at 1-3) For one thing, it is improper to amend a pleading through arguments in a brief in opposition to a motion for summary judgment. *See, e.g.*, *Zoppas Indus. de Mex. v. Backer EHP Inc.*, C.A. No. 18-1693-GBW, 2022 WL 10341384, at *3 (D. Del. Oct. 3, 2022); *cf. Kilborn v. Amiridis*, No. 22 C 475, 2023 WL 2058061, at *6 n.4, *9 (N.D. Ill. Feb. 15, 2023) (rejecting the plaintiff's attempt to identify new allegedly defamatory statements in the plaintiff's answering brief regarding a motion to dismiss the plaintiff's defamation claim, where the new statements had been referenced in a letter that the plaintiff referred to in his operative complaint, but where the body of that complaint did not make it clear that the plaintiff was actually alleging that these new statements were defamatory statements that were a part of the defamation claim). Moreover, pursuant to Illinois law, which both parties agree applies to the Envestnet defamation counterclaim, (D.I. 453 at 1 n.1; D.I. 491 at 11), it is a matter of substantive state law that "a complaint for defamation *per se* need not set forth the allegedly defamatory words *in haec verba*, [but] the substance of the statement must be pled with sufficient precision and particularity so as to permit initial judicial review of its defamatory content[,]" *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009); *see also DeVooght v. Unity Point Health,* Case No. 4:18-cv-04197-SLD-TSH, 2019 WL 13116342, at *3 (C.D. Ill. Aug. 9, 2019) (noting that this is a matter of substantive state law, not a heightened pleading requirement). The defamation counterclaim fails to do this with respect to the additional three statements—it does not mention them nor even hint at them. (D.I. 160 at ¶¶ 73-79, 94-101) Thus, the Court here focuses on the three Alleged Defamatory Statements that were expressly identified in the defamation counterclaim.

- "'Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful.'" (D.I. 456, ex. 56 at 3; *see also* D.I. 160 at ¶¶ 74, 96);

- "[Plaintiff] already has plenty of evidence" regarding Defendants' misconduct, including that "'[t]hey were reverse engineering, but they were also misappropriating, and we have a lot of proof of that[.]'" (D.I. 456, ex. 56 at 3; *see also* D.I. 160 at ¶¶ 75, 97); and

- "'They were making misrepresentations in all directions. . . . Both to FinApps claiming to be working pursuant to the agreement, and meanwhile, telling customers it was their own technology.'" (D.I. 456, ex. 60 at 1; *see also* D.I. 160 at ¶¶ 78, 98)

FinApps moves for summary judgment on the Envestnet defamation counterclaim for multiple independent reasons. (D.I. 453 at 1; D.I. 551 at 1) The Court agrees with FinApps that summary judgment should be granted pursuant to at least one of those reasons—that is, the defamation counterclaim fails because the Alleged Defamatory Statements are subject to and non-actionable under Illinois' "innocent construction rule." (D.I. 453 at 8-9; D.I. 551 at 6-7)[3]

Pursuant to the innocent construction rule, statements "reasonably capable of an innocent construction" are not actionable as defamation *per se* (the type of defamation claim at issue here). *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1215 (Ill. 1996).[4] Whether the innocent construction rule applies to an alleged defamatory statement is a question of law, and courts must consider the statement "in context, giving the words, and their implications, their

---

[3] In light of the Court's decision in this regard, it need not examine FinApps' alternative reasons as to why the District Court should grant summary judgment with respect to the defamation counterclaim.

[4] Only a few states apply the innocent construction rule; Illinois is one of them. *See, e.g.*, *Turntine v. Peterson*, 959 F.3d 873, 883 (8th Cir. 2020) (identifying Ohio and Illinois as the only states that apply this rule); *Tuite v. Corbitt*, 866 N.E.2d 114, 122 (Ill. 2006).

5

natural and obvious meaning." *Id.*; *see also Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 943 (N.D. Ill. 2019). "When a defamatory meaning was clearly intended and conveyed," however, a court should not "strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous[.]" *Bryson*, 672 N.E.2d at 1217; *see also Tuite v. Corbitt*, 866 N.E.2d 114, 123 (Ill. 2006) ("[T]he innocent construction rule does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable.").[5]

FinApps contends that the Alleged Defamatory Statements can be innocently construed as Mr. Kasowitz's view of the merit of FinApps' lawsuit, since the statements refer exclusively to the Complaint, and since the articles at issue: (1) note that FinApps "'look[s] forward to *proving*'" its allegations in Court; and (2) provide critiques regarding the viability of FinApps' allegations. (D.I. 453 at 9 (emphasis in original) (citing D.I. 456, ex. 56 at 1-3); D.I. 551 at 6 ("[T]he articles at issue confirm that Kasowitz's statements related to FinApps' allegations, and also provide opinions of others assessing the strengths and weaknesses of FinApps' Complaint[.]"))

Controlling Illinois law dictates that FinApps is correct—the Alleged Defamatory Statements are reasonably susceptible to an innocent construction, and therefore cannot be actionable as defamation *per se*. This is best seen by reviewing the outcome in *Owen v. Carr*, 497 N.E.2d 1145 (Ill. 1986). In *Owen*, the Supreme Court of Illinois affirmed a lower court's decision that an attorney's description of a complaint's allegations, communicated to a reporter

---

[5] When Illinois first adopted a form of the innocent construction rule (it has since been modified), one of the strongest justifications provided in support of the rule was that "it comports with the constitutional interests of free speech and free press and encourages the robust discussion of daily affairs." *Chapski v. Copley Press*, 442 N.E.2d 195, 198 (Ill. 1982).

and published in an article, was reasonably susceptible to an innocent construction.  497 N.E.2d at 1148.  The plaintiff in that case was an attorney named Robert Owen ("Owen"); Owen sued the defendant, attorney Rex Carr ("Carr"), as well as publishers and a reporter (the "reporter"). *Id.* at 1146.  Owen's suit related to an article entitled "Judge Suing Lawyer Who Complained About Him" (the "article"), which was published in an issue of the *National Law Journal*. *Id.* The article, which included a number of statements from Carr, described a prior libel action that Carr had filed on behalf of a judge against Owen.  *Id.*  In that suit, Carr had sought damages from Owen relating to allegedly false and defamatory letters that Owen sent to the Illinois Judicial Inquiry Board ("Judicial Inquiry Board") accusing the judge of misconduct.  *Id.*  The article noted that the Judicial Inquiry Board had cleared the judge of the charges, and it compared Carr's libel suit against Owen with a prior successful defamation action brought by Carr.  In that prior successful defamation action, Carr had argued that certain reporters had provided the United States Department of Justice with unverified information that incriminated the plaintiff, solely to enable the reporters to cover the subsequent investigation.  *Id.*

Owen's lawsuit regarding this article asserted that the inference to be drawn from the article was that Owen had acted with an improper purpose in corresponding with the Judicial Inquiry Board.  *Id.*  Owen alleged that the following statements attributed to Carr in the article (the "Carr statements") were libelous *per se*:

> Judicial inquiries are privileged, but the defendants wrongfully abused that privilege and should be held liable, Mr. Carr claimed. Mr. Owen did not file his complaint in the interest of justice, but was instead trying deliberately to intimidate Judge Starnes and other judges in future cases involving [Owen's client] International Harvester, he said.

*Id.*

7

Carr argued that the innocent construction rule applied to these statements. *Owen v. Carr*, 478 N.E.2d 658, 660 (Ill. App. Ct. 1985). In assessing whether this was so, the lower court emphasized that the article's headline had to be considered along with the body of the article, and that the court also had to consider "[t]he import of the entire article." *Id.* at 662. Turning to the article's substance, the lower court noted that the article repeatedly reported Carr as "claim[ing]" that Owen took certain actions, while also conveying Owen's denial of the allegations. *Id.* at 662-63. In sum, the court explained:

> The entire article speaks in terms of claims, allegations, and of what Carr is trying to prove in the Starnes case. With the headline, it becomes clear that the allegations are what Carr is trying to prove. Carr, an attorney, is presenting his advocate's view of his client's cause of action. The claims are not presented as statements of indisputable fact. They are, in fact, disputed within the article.

*Id.* at 663. Moreover, the lower court pointed out that the journal in which the article was published would not have been commonly read by people inexperienced in legal matters, and thus "it is highly unlikely that the allegations were accepted or understood as anything other than unproven allegations." *Id.*

The Supreme Court of Illinois affirmed the lower court's decision. It found that the Carr statements, "considered as part of the whole article," could be reasonably said to convey an innocent interpretation. *Owen*, 497 N.E.2d at 1148. The *Owen* Court explained that while the article could be read to suggest that the defendants in the two defamation suits brought by Carr (i.e., the reporters and Owen) had ulterior motives in instigating the respective investigations, the article did not flatly state that "Owen, by corresponding with the Judicial Inquiry Board, actually intended to intimidate the judge." *Id.* Instead, Carr's statements were presented "only as an allegation to be proved at the trial of the complaint he filed against Owen" and were preceded by a concession from Carr that in order to prove his case, he would need to first learn the precise

information that Owen had provided to the Judicial Inquiry Board. *Id.* The *Owen* Court noted that the article concluded with a statement that the suit pends in circuit court. *Id.* In affirming the lower court's conclusion that the innocent construction rule applied to the Carr statements, the *Owen* Court explained that, viewed in its entirety, "[t]he article and words within it can reasonably be construed as an attorney's biased presentation of his client's view of a pending cause of action." *Id.* (quoting *Owen v. Carr*, 478 N.E.2d at 663).

Other courts applying Illinois law have similarly found that statements clearly conveying a party's litigation position can be reasonably capable of an innocent construction. For example, in *Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926 (N.D. Ill. 2019), the plaintiff issued a five-paragraph press release that described, in the first four paragraphs, the plaintiff's lawsuit against the defendant for allegedly selling counterfeit sunglasses under the plaintiff's trademark. 386 F. Supp. 3d at 936, 942. The fifth paragraph contained a quote from the plaintiff's Vice President of Global Marketing stating that companies like the defendant "undermine the integrity of the Maui Jim brand . . . . This lawsuit was filed to protect our brand and the inherent value of its earned reputation . . . . We simply cannot allow our brand to be harmed by the sale of counterfeit or non-genuine Maui Jim products[.]" *Id.* at 942 (internal quotation marks and citation omitted). The defendant subsequently filed a counterclaim for defamation relating to, *inter alia*, the fifth paragraph of the press release. *Id.* The United States District Court for the Northern District of Illinois (the "Northern District of Illinois") agreed with the plaintiff that this paragraph fell under Illinois' innocent construction rule and therefore was not actionable as defamation *per se*. *Id.* at 942-43. While the defendant did not dispute that the first four paragraphs of the press release were not defamatory because they referred to the plaintiff's allegations against the defendant, it argued that the fifth paragraph did not "signal to

the reader that [the plaintiff] is referring to allegations in its complaint." *Id.* at 943 (internal quotation marks and citation omitted). The Northern District of Illinois disagreed, emphasizing that the quote at issue: (1) specifically referred to the plaintiff's lawsuit; and (2) when read in context of the entire press release, the remainder of which dealt entirely with the plaintiff's lawsuit, clearly referenced the plaintiff's "lawsuit and its allegations against [the defendant], instead of a defamatory attack that can be separated from the bulk of the press release." *Id.*[6]

Turning now to the Alleged Defamatory Statements, the Court must consider them as part of the entire articles in which they appear, as instructed by the *Owen* Court. 497 N.E.2d at 1148. In doing so, the Court finds that the Alleged Defamatory Statements are reasonably susceptible to an innocent construction—that is, as Mr. Kasowitz's "biased presentation of his client's view of a pending cause of action." *Id.* (quoting *Owen*, 478 N.E.2d at 663). The following aspects of the articles in question make this evident. First, with respect to the RIAbiz article, which contains the first two Alleged Defamatory Statements:

- The headline, "Entrepreneurial firm hits Envestnet with $100-million *lawsuit* for *alleged* Yodlee 'Trojan Horse' scheme used to steal proprietary technology" renders it clear that the article, and the Alleged Defamatory Statements therein, are all about FinApps' lawsuit and are

---

[6] *See also, e.g., Gracia v. SigmaTron Int'l, Inc.*, 986 F.3d 1058, 1061-62, 1066 (7th Cir. 2021) (affirming a district court's determination that the defendant's statements about a former employee in the defendant's Form 10-K filed with the United States Securities and Exchange Commission were protected by the innocent construction rule, where the statements were made following a lawsuit by the former employee, disclosed the employee's name and provided the defendant's own explanation for the employee's termination; the court found that the statements were protected by the rule because the statements described the defendant's litigation position in the lawsuit); *DeNicolo v. Hubbard Radio Chi., LLC*, No. 21-cv-6292, 2022 WL 17251278, at *1-2, *6-7 (N.D. Ill. Nov. 28, 2022) (finding that statements published in an inter-office e-mail and online news column, which communicated that a former employee had filed a lawsuit and that the employer had investigated the allegations and found no evidence to corroborate them, were capable of an innocent construction, because one reasonable interpretation of the statements was that they "reveal [the employer's] position on the legal matter" (as opposed to indicating that the former employee was a liar)).

- merely allegations that FinApps is trying to prove in court, (D.I. 456, ex. 56 at 1 (emphasis added)); *see also Owen*, 478 N.E.2d at 663 ("With the headline, it becomes clear that the allegations are what Carr is trying to prove[.]");

- The first several paragraphs of the article reiterate that FinApps "has slapped a lawsuit on Envestnet for *allegedly* helping itself to the firm's algorithms" and summarizes what the suit "claims" and "charge[s]," (D.I. 456, ex. 56 at 1-2 (emphasis added)); *see also Owen*, 478 N.E.2d at 663 ("The entire article speaks in terms of claims, allegations, and of what Carr is trying to prove[.]");

- Before it even gets to the Alleged Defamatory Statements, the article provides a statement from Envestnet (indicating that Envestnet holds itself "to the highest ethical standards" and "will respond appropriately through the proper legal channels"), a paragraph about how Wall Street was "unconcerned" with the lawsuit and how Envestnet's shares were "near an all-time high[,]" and commentary from a "software guru" who noted that "such lawsuits rarely prevail in court" and that he would "like to hear the other side of [the] story[,]" (D.I. 456, ex. 56 at 2 (internal quotation marks omitted)); *see also Owen*, 478 N.E.2d at 663 (noting that a portion of the article at issue contained Owen's denial of the allegation);

- The first Alleged Defamatory Statement—Mr. Kasowitz's quote that "Envestnet and Yodlee have deliberately stolen FinApps' technology, which is entirely unwarranted and unlawful" immediately continues with a further quote from Mr. Kasowitz that underscores that FinApps' allegations must still be proven: "We *look forward to proving* that Envestnet . . . [is] liable for significant damages to our client, and *persuading the court* to issue a permanent injunction enjoining defendants from further unlawful activity[,]" (D.I. 456, ex. 56 at 3 (emphasis added)); *see also Owen*, 497 N.E.2d at 1148 ("The article presents Carr's statement only as an allegation to be proved at the trial of the complaint he filed against Owen.");

- In between the two pieces of content that make up the second Alleged Defamatory Statement—i.e., that "[Plaintiff] already has plenty of evidence" regarding Defendants' misconduct, including that "[Defendants] were reverse engineering, but they were also misappropriating,

11

and we have a lot of proof of that"—Mr. Kasowitz further stated that "he expects to obtain far more [evidence] in discovery[,]" thus further emphasizing that these are allegations made in the early stages of a lawsuit, (D.I. 456, ex. 56 at 3);

- The article continues with an in-depth summary of the allegations, repeatedly using terms like "[a]lleged[,]" "allegedly[,]" "claims[,]" "charges" and "purported" or by describing what "the suit" says or what the "court papers" say with respect to the allegations, (*id.* at 3-5);

- The article was published on a website for the financial "[a]dvisory [c]ommunity[,]" (*id.* at 1), which likely has a sophisticated audience that will presumably understand that allegations are just that, unless later proven in court, *Owen*, 478 N.E.2d at 663; indeed, following the article is one comment by an anonymous reader who opined that "[t]his suit isn't going anywhere[,]" (D.I. 456, ex. 56 at 6).[7]

Second, with respect to the Financial Planning article:

- The headline, "Envestnet accused of stealing trade secrets, hit with lawsuit" makes it clear that the article, and the Alleged Defamatory Statement therein, are all about

---

[7] The defamation counterclaim notes that one or both of the first two Alleged Defamatory Statements were also published in articles by *Street Insider* (an article allegedly entitled "Entrepreneurial firm hits Envestnet with $100-million lawsuit for alleged Yodlee 'Trojan Horse' scheme used to steal proprietary technology") (the "Street Insider article"), *Investment News* (entitled "Former Trump Lawyer suing Envestnet Yodlee") (the "Investment News article") and *Fintech Futures* (entitled "FinApps slaps $100m lawsuit on Envestnet Yodlee") (the "Fintech Futures article")—online news journals covering the financial advisory business. (D.I. 160 at ¶¶ 76-77, 79; *see also* D.I. 456, exs. 57-59)

The Street Insider article is actually titled "FinancialApps Files Complaint Against Envestnet"; it explains that FinApps "filed a complaint in Del[a]ware recently" and provides a high-level summary of the Complaint's "alleg[ations.]" (D.I. 456, ex. 57 at 1) The article closes with the words of "FinApps' lead lawyer" Mr. Kasowitz, and includes his statement that FinApps "look[s] forward to proving" the allegations in court. (*Id.*) The Investment News and Fintech Futures articles similarly describe the Complaint and use terms like "FinApps . . . claim[s][,]" "alleged" and "allegedly." (*Id.*, ex. 58 at 1-2; *id.*, ex. 59 at 1) Both articles close with statements from Envestnet's spokesperson that are similar to those that appeared in the RIAbiz article. (*Id.*, ex. 58 at 2-3; *id.*, ex. 59 at 2) In its briefing, Envestnet does not argue that the statements in these three articles should be viewed any differently from the statements in the RIAbiz article.

12

- FinApps' lawsuit and allegations that FinApps is trying to prove in court, (*id.*, ex. 60 at 1);

- The first two paragraphs of the article describe FinApps' lawsuit and speak in terms of what FinApps "allege[s]" and "claims[,]" (*id.*);

- The next paragraph includes the third Alleged Defamatory Statement from Mr. Kasowitz, who the article notes "is representing FinApps." The quotation attributed to Mr. Kasowitz continues that "[i]t's a pattern of misrepresentation that proves they were engaging in the *alleged* activity[,]" (*id.* (emphasis added));

- The article then provides the same statement from Envestnet's spokesperson as was included in the RIAbiz article, followed by commentary from "[l]egal experts" discussing strengths and weaknesses of FinApps' claims, (*id.* at 2-4);

- Just as with the RIAbiz article, presumably the Financial Planning article's readers (who are said to be involved with managing their "practices' investment performance") are sophisticated enough to understand that allegations in a lawsuit still have to be proven in court, (*id.* at 1-4).

In sum, like the article and the press release that were at issue in *Owen* and *Maui Jim*, respectively, the articles at issue here are all about FinApps' lawsuit—what FinApps has *alleged* and is *trying to prove* in a court of law. And they contain important additional context underscoring that Mr. Kasowitz's words were only one side's *allegations*, not *settled fact*—such as rebuttals from Envestnet and critical commentary about the suit by third parties. Thus, under controlling Illinois law, Mr. Kasowitz's Alleged Defamatory Statements, read in context with the entire articles of which they are a part, "can reasonably be construed as an attorney's biased presentation" of FinApps' view of this lawsuit, *Owens*, 497 N.E.2d at 1148 (internal quotation marks and citation omitted), rather than as "a defamatory attack that can be separated from the bulk of the" articles' content, *Maui Jim, Inc.*, 386 F. Supp. 3d at 943.

13

Envestnet's arguments to the contrary are not persuasive. (D.I. 491 at 15-16) It points to three cases that declined to apply the innocent construction rule. But these cases are inapposite for various reasons. (D.I. 551 at 7)

The first case Envestnet cites, *Huron Consulting Servs. LLC v. Murtha*, No. 1-11-1675, 2012 WL 6962119 (Ill. App. Ct. Feb. 15, 2012), involved a telephone call in which a company's ("Huron") managing director reported to the client of one of Huron's former employees ("Murtha") that Huron was engaged in litigation with Murtha because she "violated her noncompete agreement with Huron when she left Huron to work for [her new company]." *Huron*, 2012 WL 6962119, at *1. The Court held that this statement was not reasonably capable of an innocent construction because "its plain meaning flatly accused Murtha of violating her noncompete agreement with Huron." *Id.* at *9. Yet the statement at issue was not surrounded (as are the Alleged Defamatory Statements here) by a discussion of the specific content of a pleading in a lawsuit, nor by the other types of signals (addressed above) emphasizing that the statements at issue were simply allegations that would later have to be proven at trial.

Envestnet next highlights *Missner v. Clifford*, 914 N.E.2d 540 (Ill. App. Ct. 2009). In *Missner*, the defendant, an attorney who was alleged to have defamed the plaintiff in a press statement, was arguing that the press statement was entitled to an innocent construction. *Missner*, 914 N.E.2d at 544-45. But on appeal, the defendant's innocent construction argument was solely premised on the ground that the press statement at issue *did not explicitly name the plaintiff* as a participant in forgery and extortion. *Id*. at 554. The *Missner* Court disagreed. It reviewed the statement in question and found that it *did in fact* identify the plaintiff; the *Missner*

14

Court's entire analysis with respect to the innocent construction rule was about this "identification" issue only. 914 N.E.2d at 554-56.[8]

Envestnet finally raises *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004). In *Republic Tobacco*, the United States Court of Appeals for the Seventh Circuit found that two letters (the "Czerewko letter" and the "August 13 letter") that a party ("North Atlantic") sent to customers of another party ("Republic")—letters stating that Republic violated North Atlantic's patent-trademark, and explaining that North Atlantic's attorneys had "initiated legal action" or had "filed a lawsuit" in response—were not protected by the innocent construction rule. 381 F.3d at 723-24, 728-33. In so concluding as to the Czerewko letter, the *Republic Tobacco* Court pointed out that at the time that the letter was written, no lawsuit had actually been filed by North Atlantic, and that the letter was sent to Republic's customer "in order to convince the customer to establish an exclusive relationship with North Atlantic." *Id.* at 729-30. With respect to the August 13 letter, the *Republic Tobacco* Court concluded that it "substantively conveys objectively verifiable facts which can only be read one way." *Id.* at 733. But the letters in *Republic Tobacco* were different from our case here, in that: (1) here, the Alleged Defamatory Statements were included in articles written by reporters; (2) the articles clearly summarize a lawsuit's allegations; (3) the articles make evident that the statements at issue are from the plaintiff's attorney, who is simply presenting his client's view of the case, and they note that these allegations must be proven in court; and (4) the articles include rebuttal from

---

[8] Envestnet also points to other irrelevant excerpts from *Missner* in which the court, after moving on from its innocent construction analysis, assessed whether the statement was constitutionally protected (a question that is not at issue here). (D.I. 491 at 15 (citing *Missner*, 914 N.E.2d at 556-58))

15

the allegedly defamed party, as well as third party opinions suggesting that readers should be cautious before assigning merit to the suit.[9]

For these reasons, the Court finds that there is no genuine dispute of material fact on the question of whether the Alleged Defamatory Statements fall under Illinois' innocent construction rule; they do, and therefore they are not actionable as defamation *per se*. Accordingly, the Court recommends that summary judgment on Envestnet's defamation counterclaim be granted.[10]

## IV.  CONCLUSION

For the reasons set out above, the Court recommends that the Motion be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

---

[9] FinApps rightly notes that in addition to relying on these inapposite cases, Envestnet fails to "meaningfully distinguish" cases like *Owen* and *Maui Jim*. (*See* D.I. 551 at 7) For example, Envestnet describes *Owen* as applying the innocent construction rule because "publisher and journalist defendants included language that allowed one to construe statements as merely summaries of the allegations" and "the co-defendant attorney benefited from this[.]" (D.I. 491 at 16)  But in *Owen*, nowhere did the Supreme Court of Illinois suggest that if the publisher and journalist were not defendants in the case (along with the attorney who allegedly spoke the defamatory words), then a different conclusion would have been reached.  And Envestnet attempts to distinguish *Maui Jim* as a case wherein the "press release paragraph at issue [was] tied to [an] explanation of the lawsuit[.]" (*Id.*)  But that is not a way to distinguish *Maui Jim* from this case; instead, it highlights the ways in which *Maui Jim* is *very similar* to this case (i.e., a case in which the statements at issue are found in articles that are tied to a fulsome explanation of FinApps' lawsuit).

[10] As was noted above, Envestnet jointly pleaded the defamation counterclaim with Yodlee.  Because Yodlee resides in California, California defamation law would apply to the Yodlee defamation counterclaim. (D.I. 453 at 1 n.1); *see also Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 765-66 (D. Del. 2012) (pursuant to Delaware law, a corporate plaintiff's residence supplies applicable law for defamation claims).  To the extent that FinApps suggests that summary judgment should also be granted on Yodlee's defamation counterclaim for the same reasons that apply to Envestnet's defamation counterclaim, (D.I. 453 at 1 n.1, 20 n.10), the Court declines any such invitation.  The instant Motion only relates to the defamation counterclaim made by Envestnet.  And as noted above, only a few states recognize the innocent construction rule, and the parties did not brief whether California (Yodlee's state of residence) is one of those few states.

16

within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: July 25, 2023

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE