### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINANCIALAPPS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1337-GBW-CJB |
| | ) | |
| ENVESTNET, INC. and YODLEE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### REPORT AND RECOMMENDATION

Plaintiff FinancialApps, LLC ("Plaintiff" or "FinApps") filed this action against Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee" and collectively with Envestnet, "Defendants") asserting various federal and state law causes of action.  (D.I. 2) Presently pending before the Court is Envestnet's motion for summary judgment No. 1, in which it moves for summary judgment on FinApps' Counts 1, 2, 4, 5, 8 and 14 pursuant to Federal Rule of Civil Procedure 56 (the "Motion").  (D.I. 446)  FinApps opposes the Motion.  For the reasons set forth below, the Court recommends that the District Court GRANT-IN-PART and DENY-IN-PART Envestnet's Motion.

## I.    BACKGROUND

### A.    Factual Background

FinApps is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.  (D.I. 2 at ¶ 22)  Founded in 2014, FinApps is a software development company in the financial technology space—a technological area in which consumers can access financial services digitally.  (*Id.* at ¶¶ 1-2, 31)

Defendant Envestnet is a publicly held Delaware corporation with its principal place of business in Berwyn, Pennsylvania.  (D.I. 448 at ¶ 1; D.I. 493 at ¶ 1)  Defendant Yodlee is a

California corporation with its principal place of business in San Mateo, California.  (D.I. 448 at ¶ 3; D.I. 493 at ¶ 3)  Yodlee provides consumer-permissioned financial data aggregation services.  (D.I. 2 at ¶¶ 1, 70; D.I. 448, ex. 2 at ¶ 6)  Yodlee has been a wholly-owned subsidiary of Envestnet since 2015.  (D.I. 448, ex. 2 at ¶ 7)

FinApps alleges that by 2016, it had created a software platform (the "Platform") that was capable of analyzing vast amounts of consumer financial data in real time; the Platform was also able to generate credit risk reports for underwriters to use in making decisions on loan issuances and extensions of credit.  (D.I. 2 at ¶¶ 4, 35-36)  On January 31, 2017, FinApps and Yodlee executed a Software License and Master Services Agreement ("MSA") and other related agreements.  (*Id.* at ¶¶ 7, 83 & exs. 1-3; D.I. 160 at ¶¶ 34-35)  Pursuant to the MSA, FinApps would develop a product called Risk Insight 2.0 ("Risk Insight") that would generate financial reports for use by financial institutions in deciding whether to issue loans, and Yodlee would market and sell the product.  (D.I. 2 at ¶¶ 6, 75; D.I. 160 at ¶¶ 36-37)

Over the next few years, the relationship between FinApps and Defendants deteriorated. The Court has previously set out the parties' allegations in that regard in its July 6, 2020 Report and Recommendation ("July 6 R&R") and July 30, 2020 Report and Recommendation ("July 30 R&R").  (D.I. 109 at 1-4; D.I. 113 at 1-3)  The Court assumes familiarity with the factual background set out in its July 6 R&R and July 30 R&R.  (D.I. 109 at 1-4; D.I. 113 at 1-3)

Further relevant facts related to resolution of the Motion will be discussed as needed in Section III.

### B.    Procedural Background

On July 17, 2019, FinApps filed its Complaint in this matter.  (D.I. 2)  The case was thereafter referred to the Court to conduct all proceedings and to hear and determine all motions,

pursuant to 28 U.S.C. § 636(b).  (D.I. 18; D.I. 437)  Envestnet filed the instant Motion on

January 6, 2023, (D.I. 446), and briefing was completed on April 13, 2023, (D.I. 547).

Because FinApps waived its right to a jury trial against Yodlee by entering into the MSA,

the case will be decided in two separate trials (both of which are to be scheduled):  first, a jury

trial on FinApps' claims against Envestnet, to be followed by a bench trial on FinApps' claims

against Yodlee.  (D.I. 250 at 4, 10; *see also* D.I. 442; D.I. 445 at 5, 7)

## II.      STANDARD OF REVIEW

The Court incorporates by reference the standard of review for summary judgment

motions set out in its July 25, 2023 Report and Recommendation in this case.  (D.I. 582 at 2-3)

## III.     DISCUSSION

FinApps' Complaint alleges six remaining claims against Envestnet:  Counts 1 and 2

(claims for misappropriation of trade secrets brought under federal and state law), Count 4

(tortious interference with prospective business opportunities), Counts 5 and 8 (unfair

competition claims brought pursuant to common law and state statute) and Count 14 (unjust

enrichment).  (D.I. 2 at ¶¶ 207-40, 259-68, 280-85, 332-38; *see also* D.I. 126 at 9-10)  As to

these counts, FinApps contends that Envestnet is vicariously liable for the acts of its agent,

Yodlee, and that Envestnet also directly engaged in the alleged misconduct.  (*See* D.I. 447 at 1;

D.I. 492 at 9-14)

Envestnet moves for summary judgment on all six of these claims.  (D.I. 447 at 2)  It

asserts that it is the "wrong defendant"—i.e., that Envestnet was not a party to the MSA, that it

did not enter into any other contract with FinApps, and that it was not involved in the Risk

Insight project in any meaningful way.  (*Id.* at 1-3)

3

In order to prevail on its claims against Envestnet, FinApps must either:  (1) pierce the corporate veil to hold Envestnet vicariously liable for the misconduct of its subsidiary Yodlee; or (2) demonstrate that Envestnet directly participated in the misconduct.  With its Motion, Envestnet first argues that FinApps cannot pierce the corporate veil to hold Envestnet vicariously liable for Yodlee's misconduct because Envestnet is merely a holding company that does not dominate Yodlee's actions.  (*Id.* at 6-8; D.I. 547 at 5-6)  It then argues that there can be no direct liability for Envestnet because:  (1) there is no evidence that any Envestnet employee was involved in the alleged misconduct; (2) there is no evidence that an Envestnet employee forced Yodlee to engage in the misconduct; and (3) there is no evidence that an Envestnet employee held a position at Yodlee but was acting for Envestnet when engaging in the misconduct.  (D.I. 447 at 8-20; D.I. 547 at 6-10)  Finally, Envestnet makes more specific arguments about each of the counts against it.  The Court will take up Envestnet's arguments in turn.

## A.    Vicarious Liability

It is well-settled that, as a general principle of corporate law that is "deeply ingrained in our economic and legal systems[,] . . . a parent corporation . . . is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citations omitted).  Piercing the corporate veil is an "extraordinary remedy."  *Round Rock Rsch. LLC v. ASUSTeK Comput. Inc.*, 967 F. Supp. 2d 969, 978 (D. Del. 2013) (internal quotation marks and citation omitted).  That said, courts at times have pierced the corporate veil (that is, disregarded the corporate form) and held a parent corporation responsible for the conduct of its subsidiary.  One way courts have done so is pursuant to a particular type of agency theory; this agency theory considers the "amount of control the parent corporation exercises over the actions of the subsidiary."  *Phx. Can. Oil Co. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D. Del. 1987),

*aff'd in relevant part*, 842 F.2d 1466, 1477 (3d Cir. 1988).[1]  If the parent corporation is found to

"dominate[]" the activities of the subsidiary, then the parent corporation will be held liable for

such activities.  *Phx. Can. Oil*, 658 F. Supp. at 1084.[2]  Factors to consider in determining

---

[1]        The parties did not directly address what jurisdiction's law should apply to the vicarious liability issue.  Envestnet cites to caselaw from this Court, from the United States Court of Appeals for the Third Circuit, and from the Delaware Court of Chancery.  (D.I. 447 at 6-8; D.I. 547 at 5-6)  FinApps cites to caselaw from Delaware state courts.  (D.I. 492 at 14 n.10)  Because Envestnet is a Delaware corporation, and because no one has suggested that another jurisdiction's law would apply here, the Court will apply Delaware law to the vicarious liability issue.  *See, e.g.*, *Phx. Can. Oil*, 842 F.2d at 1477 n.4; *Phx. Can. Oil*, 658 F. Supp. at 1084 n.42.

[2]        There is a second theory under which courts will pierce the corporate veil, known as the alter ego theory; this theory will impose liability on the parent corporation when it is sufficiently demonstrated that:  (1) the two entities are not actually treated as separate entities in practice, and (2) there has been a showing of fraud or inequity in the misuse of the corporate form.  *See Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018); *Phx. Can. Oil*, 658 F. Supp. at 1084.  FinApps does not assert the alter ego theory here.  (D.I. 492 at 12 n.8)  Therefore, the Court need not address that theory further.

        Some courts interpreting Delaware law have stated that when a party seeks to demonstrate vicarious liability by establishing an agency relationship between the parent and subsidiary in which the parent dominates the activities of the subsidiary, then there must also be a showing (as is required by the alter ego inquiry) that the parent/subsidiary have introduced an element of fraud or inequity into the equation in light of their conduct.  *See, e.g. Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 271 n.15 (D. Del. 1989); *Otto Candies, LLC v. KPMG, LLP*, C.A. No. 2018-0435-MTZ, 2020 WL 4917596, at *14 n.140 (Del. Ch. Aug. 21, 2020); *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001).  On the other hand, some cases referencing this agency/domination rationale for vicarious liability do not reference a separate "fraud" element that must be satisfied.  *See, e.g.*, *Phx. Can. Oil*, 658 F. Supp. at 1084; *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 840-41 (D. Del. 1978); *Grasty v. Michail*, No. Civ.A. 02C-05-89 CLS, 2004 WL 396388, at *2 (Del. Super. Ct. Feb. 24, 2004).  The court points this out because in its opening brief, when setting out the law on the agency/domination rationale for vicarious liability, Envestnet:  (1) did not state that a fraud element was part of that legal test; and (2) focused solely on arguments as to why it did not "dominate" the activities of Yodlee.  (D.I. 447 at 6-7)  Then later in its reply brief, Envestnet for the first time explicitly argued that a showing of an element of fraud or injustice *was* required in order to demonstrate the applicability of the agency/domination rationale, and it faulted FinApps for not introducing evidence to that effect.  (D.I. 547 at 5)  A party cannot raise new arguments in its reply brief, *see Versata Software, Inc. v. NetBrain Techs., Inc.*, Civil Action No. 13-676-LPS-CJB, Civil Action No. 13-678-LPS-CJB, 2015 WL 5768938, at *15 n.17 (D. Del. Sept. 30, 2015), and so even if the agency/domination rationale does require a showing of fraud or

whether "domination" exists can include "stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets." *Id.* (internal quotation marks and citations omitted). The existence of an agency relationship is a question of fact. *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 840-41 (D. Del. 1978); *Lang v. Morant*, 867 A.2d 182, 186 (Del. 2005) ("Although a legal concept, agency depends on the presence of factual elements.  It is thus a question usually reserved to the factfinder.") (footnotes omitted).

Envestnet's primary argument is that FinApp's agency theory must fail because there is no evidence that Envestnet has "dominate[d]" Yodlee's activities.  (D.I. 447 at 7-8; D.I. 547 at 6)[3]  Instead, according to Envestnet, the evidence definitively demonstrates that:

- Envestnet is a holding company and does not sell products, (D.I. 448, ex. 2 at ¶¶ 4, 23; *id.*, ex. 3 at 20);

- Yodlee is a separate company with its own management structure that conducts business through its own departments, (*id.*, ex. 2 at ¶¶ 7, 9);

---

inequity, Envestnet has waived any argument at summary judgment that Plaintiff's vicarious liability allegation is deficient for failure to meet that element.

   [3]      Envestnet also makes a two-sentence argument in its opening brief that FinApps cannot pursue an agency theory here because its Complaint "does not contain allegations that would suffice to carry an agency theory[.]"  (D.I. 447 at 7; *see also* D.I. 547 at 6 & n.4)  The Court acknowledges that the Complaint never uses the word "agent" or "agency."  (D.I. 2)  And to be sure, Plaintiff could have been much clearer that this basis for liability was being asserted therein.  Nevertheless, the Court is not comfortable granting Envestnet's Motion on this basis. This is because there are a number of places in the Complaint where FinApps alleged that Yodlee was acting "together with, and at the direction of" Envestnet, (*id.* at ¶¶ 216, 233), and where FinApps otherwise described how Envestnet and Yodlee were said to have worked in harmony to engage in legal misconduct, (*id.* at ¶¶ 18-19, 71, 81, 140, 156-63, 219, 236); *cf. In re Generic Pharms. Pricing Antitrust Litig.*, MDL 2724, 2023 WL 2244685, at *7 (E.D. Pa. Feb. 27, 2023) (finding, at the motion to dismiss stage, that a plaintiff's complaint sufficiently pleaded an agency theory, where the complaint alleged that "[n]ot only does Pfizer [the parent entity] have to approve Greenstone's [the subsidiary] price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer") (internal quotation marks omitted).

- Yodlee maintains its own corporate books, bank accounts and records and pays its own expenses, (*id.*, ex. 2 at ¶¶ 10, 14-16); and

- Envestnet has never provided financing to Yodlee, and Yodlee is responsible for payment of its own debts and liabilities and bears the expenses of employing its own personnel, (*id.*, ex. 2 at ¶¶ 15, 18, 21).

Envestnet's evidentiary support for these assertions is found in a declaration submitted by Envestnet's Deputy General Counsel, Patrick Marr (the "Marr Declaration"), as well as in Mr. Marr's deposition testimony.  (*See* D.I. 447 at 8 n.2)

Mr. Marr asserts that beginning in January 2019, simply for purposes of Envestnet's public financial reporting, Envestnet organized its operating subsidiaries, including Yodlee, into two business segments:  Envestnet Wealth Solutions and Envestnet Data & Analytics ("Envestnet Data & Analytics" or "Envestnet D&A"), with Yodlee and its subsidiaries falling under the latter segment.  (D.I. 448, ex. 2 at ¶¶ 27-28; *see also id.*, ex. 3 at 27-28, 39-40)[4]  Mr. Marr explains that this January 2019 organization effort "did not alter the corporate structure of Envestnet or any of its subsidiaries or the ways in which any of them operate[.]"  (*Id.*, ex. 2 at ¶ 29; *see also id.*, ex. 3 at 28)  "Envestnet Data & Analytics[,]" according to Mr. Marr, is just a "brand name" used to refer to Yodlee and Yodlee's subsidiaries, and sometimes that name was used in Yodlee employees' job titles.  (*Id.*, ex. 2 at ¶ 28; *id.*, ex. 3 at 33-35; *see also* D.I. 547 at 1 ("'Envestnet D&A' is just another name for Yodlee, Inc."))  For example, according to Mr. Marr, Yodlee's Chief Operating Officer is sometimes called the "Chief Operating Officer, Envestnet Data & Analytics"—though Mr. Marr states that such a title describes "the same

---

[4]      In June 2022, Envestnet further organized the services offered by its Wealth Solutions Segment into Envestnet Solutions and Envestnet WealthTech.  (D.I. 448, ex. 2 at ¶ 27)

single role" at Yodlee; he emphasizes that Yodlee personnel are not employed by Envestnet, nor do they hold any position there otherwise. (D.I. 448, ex. 2 at ¶ 28)

FinApps, for its part, argues that there are genuine issues of material fact in the record as to each of these assertions. (D.I. 492 at 12-14)[5]  And the Court agrees that there are.

For example, with respect to Envestnet's argument that <u>Envestnet is merely a holding company that does not sell products</u>, FinApps points to purportedly contrary evidence. This includes documents indicating that Envestnet underwent its reorganization effort from 2017 through January 2019, by which it transitioned from a simple holding company into a company that would actively manage its business units, including Yodlee. (*Id.* at 12-13 (citing D.I. 494, ex. 11 at YOD12216431, -6441; *id.*, ex. 13, 19, 21); *see also* D.I. 494, ex. 15 at YOD02259151)[6]

Moreover, contrary to Envestnet's assertions that <u>the reorganization leading to the creation of Envestnet D&A was done primarily "for purposes of Envestnet's public financial reporting[,]"</u> (D.I. 448 at ¶¶ 23, 26), that <u>the reorganization did not significantly alter Envestnet's corporate structure</u> and that <u>Envestnet D&A is simply a "brand name" used to refer to Yodlee</u>:

---

[5]    FinApps also asserts that Envestnet has failed to meet its initial burden of establishing an absence of a genuine issue of material fact because Envestnet's opening brief relies on: (1) a "conclusory" declaration from Mr. Marr that cites to no documentary evidence; (2) "unsubstantiated and conclusory" portions of Mr. Marr's deposition testimony as Envestnet's corporate representative; and (3) FinApps' contracts with Yodlee. (D.I. 492 at 8-9, 13 & n.9) However, the Marr Declaration and Mr. Marr's related deposition testimony are based on Mr. Marr's personal knowledge. And they do convey plenty of facts (as opposed to merely conclusions). Thus, if FinApps were to have offered no evidence combating the Marr Declaration or Mr. Marr's testimony, then Envestnet's proffered evidence could indeed have won the day here. *See, e.g.*, *Maldonado v. Ramirez*, 757 F.2d 48, 50-51 (3d Cir. 1985) (explaining that an affidavit made on personal knowledge that sets forth facts that would be admissible in evidence is adequate to satisfy the movant's burden, while an affidavit that is "essentially conclusory" would not) (internal quotation marks and citation omitted).

[6]    Envestnet engaged PricewaterhouseCoopers ("PWC") to assist with the reorganization project, which was initially referred to as "Project Scotland" and later renamed "Project Elevate." (D.I. 494, exs. 1-19)

- Certain documents suggest that the reorganization was not undertaken primarily for public reporting purposes, and instead was done to "enhance [*Envestnet's*] ability to collaborate across the business[.]" (D.I. 494, ex. 21 at YOD12232142; *see also id.*, ex. 20 at 3 (Envestnet's January 9, 2019 United States Securities and Exchange Commission ("SEC") Form 8-K stating that Envestnet aligned its operations into two business units "to drive innovation and continued growth"); *id.*, ex. 37 at YOD02286261-62);

- Similarly, according to Envestnet's Project Elevate plan, the "new" "[o]perating [m]odel" was said to "[u]nify non-client facing activities across the corporation" with "[c]orporate [s]hared [s]ervices" to include "[f]inance, HR, [and] [l]egal" and a "[c]ore [p]rocessing [u]nit" to include "[s]olutions [c]onsulting, [o]perations, [and e]ngineering[.]"  (*Id.*, ex. 15 at YOD02259151);

- In August 2018, Envestnet appeared to refer to the reorganization "[c]hanges" not as insignificant, but instead as "pretty radical" with regard to, for example, their impact on Envestnet and Yodlee "reporting relationships."  (D.I. 496, ex. 109 at YOD02267058); and

- In its SEC Form 10-K for the fiscal year ended December 31, 2019, Envestnet noted that its Envestnet Data & Analytics business segment constituted "a leading data aggregation and data intelligence platform powering dynamic, cloud-based innovation for digital financial services, and *includes* product offerings from Envestnet │Yodlee and Envestnet │ Analytics." (D.I. 494, ex. 24 at 76 (emphasis added))  Envestnet also issued FAQs regarding the "[o]rganizational [u]pdate" on January 9, 2019 ("Envestnet's FAQs"), further explaining that Envestnet D&A was a key "business unit" that would continue to develop "*Envestnet's* data aggregation, enterprise data management and analytics offerings" and that "*includes* Envestnet │ Yodlee." (*Id.*, ex. 37 at YOD02286259-62 (emphasis added))  And a January 2019 e-mail from Jud Bergman, then-Chairman and Chief Executive Officer ("CEO") of Envestnet, to Envestnet colleagues explained that Envestnet D&A would "focus on building out *our* data aggregation, enterprise data management and analytics offerings" and that "Yodlee will continue as *our* data aggregation and technology brand[.]"  (*Id.*, ex. 21 at

YOD12232143-44 (emphasis added))[7]  This evidence could suggest, as Plaintiff argues, that Envestnet D&A is not simply a synonym for Yodlee but is instead a business unit at Envestnet, while Yodlee, meanwhile, is a separate entity or "brand" within Envestnet D&A.  (*See* D.I. 492 at 9-10)

FinApps also addressed Envestnet's assertion that <u>Yodlee is a separate company with its own independent management structure that conducts business entirely through its own departments</u>.  For example, FinApps highlighted the following facts:

- FinApps notes that contrary to Envestnet's position that Yodlee had its own "discrete management structure[,]" there was at least some overlap in management between Yodlee and Envestnet.  (*Id.* at 2-3, 13)  Prior to January 2019, Stuart DePina was a member of Envestnet's senior management, serving as the President of "Envestnet │ Tamarac."[8]  (D.I. 494, ex. 22 at YOD12230638; *id.*, ex. 25 at 16)  Envestnet's FAQs explained that Mr. DePina was then moving from his role as President of "Envestnet │ Tamarac" to become Chief Executive of Envestnet D&A, "which *includes* Envestnet │ Yodlee."  (*Id.*, ex. 37 at YOD02286259 (emphasis added); *see also id.*, ex. 20 at 3, *id.*, ex. 21 at YOD12233143-44; *id.*, ex. 24 at 15; *id.*, ex. 33 at YOD06456101; *id.*, ex. 34)  Mr. DePina's new role as Chief Executive of Envestnet D&A was described as an "expanded leadership role[]" that would continue reporting to Mr. Bergman.  (*Id.*, ex. 21 at YOD12233143-44)

- Although Envestnet insists that Envestnet D&A is just another name for Yodlee (and that therefore all personnel with Envestnet D&A in their titles are solely Yodlee personnel), (D.I. 547 at 1), and although there is record evidence supporting that assertion, (*see id.* at 3), there is also evidence to the contrary.  For example, a March 2019 Form 144 Request

---

[7]      In this e-mail, Mr. Bergman also noted that "within Envestnet Data & Analytics, reporting to [the Chief Executive thereof], we are creating Envestnet Technologies[,]" a "new group [that] will support the operations, technology, and data infrastructure needs *of Envestnet*."  (D.I. 494, ex. 21 at YOD12232143 (emphasis added))  According to Mr. Marr, however, "Envestnet Technologies" was simply a plan to create a centralized "data utility" to service Yodlee and Envestnet Wealth Solutions; he asserts that "[t]here is no business, entity, or unit within the Envestnet D&A segment called Envestnet Technologies."  (D.I. 548, ex. 12 at ¶ 7)

[8]      Tamarac, Inc. ("Tamarac") is a separate subsidiary of Envestnet.  (D.I. 448 at ¶ 12)

Letter and Consent was sent from Mr. DePina with his "Title" listed as "Chief Executive, Envestnet Data & Analytics" and his "Company" listed as "*Envestnet Inc*." (D.I. 494, ex. 31 (emphasis added))  And a document from a 2019 Envestnet Advisor Summit identifies Mr. DePina as:  "Stuart DePina[,] Chief Executive, Envestnet Data & Analytics[,] *Envestnet*[.]" (*Id.*, ex. 34 (emphasis added))  These documents could suggest that Mr. DePina worked *for Envestnet*, not simply for Yodlee.

- In his role with Envestnet D&A, Mr. DePina's "executive leadership" team consisted of, *inter alia*, Arun Anur (Chief Operating Officer), Brandon Rembe (Senior Vice President of Products) and Julie Solomon (Senior Vice President of Financial Institution and Yodlee Interactive Sales). (*Id.*, ex. 21 at YOD12232143; *id.*, ex. 27 at 2-3; *id.*, ex. 28 at 219; *id.*, ex. 29 at 15, 17)[9]  Thus, if FinApps' view of the facts is correct, these additional executives could be said to actively manage the day-to-day operations of an Envestnet entity (Envestnet D&A) while also playing an oversight role of the work of Yodlee.

- Yodlee has one board member, and in 2019 that sole board member was Mr. Bergman, who, again, was Envestnet's CEO at the time (he has since passed away). (*Id.*, ex. 38 at 86-87)

Taken together, this evidence could support the claim that:  (1) executives who are associated with Envestnet (not simply Yodlee) oversee Yodlee's work; and (2) employees that are part of the Envestnet D&A team do not just work for Yodlee, but also work for its parent, Envestnet.

Lastly, FinApps takes on Envestnet's assertion that Yodlee pays its own debts and bears the costs of employing its personnel. (D.I. 492 at 13)  It notes, for example, that Mr. Anur, Chief Operating Officer of Envestnet D&A, testified that the compensation for everyone employed by Yodlee comes from "Envestnet." (D.I. 494, ex. 28 at 21-23)[10]

---

[9]      Also among those elevated were Lisa Hingley and Tom Hempel. (D.I. 494, ex. 21 at YOD12232143)

[10]      Envestnet retorts that Yodlee's employees receive their paychecks from Envestnet Financial Technologies Inc., which is an operating subsidiary of Envestnet, and that Yodlee bears the expenses of employing its personnel. (D.I. 448, ex. 2 at ¶ 21; *id.*, ex. 3 at 34-35)

In short, FinApps has pointed to evidence that establishes disputes of fact pertaining to many of Envestnet's key assertions regarding FinApps' agency theory.  Envestnet's in-house counsel's declaration and deposition testimony paint a picture of Envestnet as a mere holding company that is entirely distinct from Yodlee.  (*See* D.I. 447 at 1, 3-5)  But FinApps musters contrary evidence suggesting that Envestnet is much more than a mere holding company, and that individuals associated with it did indeed have a fairly substantial role in managing Yodlee's operations.  It is the province of the jury to weigh this competing evidence.  The Court therefore recommends that the Motion be denied with respect to FinApp's vicarious liability theory.  *See J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, No. CIV.A. 83C-NO-98, 1988 WL 32012, at *7 (Del. Super. Ct. Mar. 30, 1988) ("[P]laintiff has cited sufficient facts to the contrary to produce the small measure of evidence necessary to rebut summary judgment on the agency relationship.").

**B.      Direct Liability**

Envestnet next argues that it is not directly liable for Yodlee's actions because there is no evidence that Envestnet employees were involved in the purported misconduct.  Envestnet's arguments take a few different tacks here, which the Court will address in turn.

**1.      Envestnet D&A and its Association with Envestnet and Yodlee**

Envestnet first (rightly) predicts that FinApps would argue that Envestnet is directly liable because:  (1) Envestnet D&A is a business unit at Envestnet that is not merely another name for Yodlee; and (2) members of the Envestnet D&A executive leadership team were responsible for the wrongdoing.  (*See* D.I. 447 at 8)  To that, Envestnet reiterates its assertion that "'Envestnet Data & Analytics' is not an entity but merely a business segment name used to refer to Yodlee and its subsidiaries in Envestnet's public filings." (*Id.*)

As described above, however, FinApps has pointed to potentially contrary evidence suggesting that:

- Envestnet D&A is a business unit *at Envestnet*, created as part of Project Scotland/Project Elevate, (*See* D.I. 492 at 9-10);

- Envestnet D&A is not just a name used to refer to Yodlee; instead, Yodlee is an entity (among others) *within Envestnet D&A*, (*see id.*); and

- Envestnet D&A is actively managed by an executive leadership team of *Envestnet* employees, including Mr. DePina, Mr. Rembe, Ms. Solomon and Mr. Anur, whom FinApps asserts is responsible for a significant amount of the purported misconduct, (*id.*).[11]

So there are disputed issues of fact in this regard.

### 2.    The Role of Envestnet D&A Executives, Including Mr. DePina and Mr. Rembe

Envestnet next (again, rightly) predicted that FinApps would point to the actions of Mr. DePina and Mr. Rembe (along with others in the Envestnet D&A leadership team), in an effort to hold Envestnet directly liable for Yodlee's actions, on the alleged basis that the two worked for both Yodlee and Envestnet.  (D.I. 447 at 9)  And here again, Envestnet doubles down on its position that Mr. DePina and Mr. Rembe did not hold any positions with Envestnet during the

---

[11]    Envestnet claims that Mr. Anur and Ms. Solomon, *inter alia*, are Yodlee personnel that have never been employed by or worked for Envestnet in any way; in support of this claim, it points to the Marr Declaration.  (D.I. 447 at 9; *see also* D.I. 448 at ¶ 11; *id.*, ex. 2 at ¶¶ 35-36)  Envestnet's assertion here is based on its argument that people employed by "Envestnet D&A" are solely employed by Yodlee, not Envestnet, since "'Envestnet Data & Analytics' often is used in the job titles of Yodlee personnel."  (D.I. 447 at 4)  But with FinApps pointing to evidence in the record suggesting that Envestnet D&A is not merely synonymous with Yodlee, there is a genuine dispute of fact with respect to this issue.

relevant time period.  (*Id.* at 9-10)  But there is sufficient evidence in the record to establish a genuine dispute of material fact on both fronts.

With regard to Mr. DePina, for example, Envestnet contends that he served solely as Chief Executive of Yodlee/Envestnet D&A from January 2019 until March 2020.  (D.I. 448, ex. 2 at ¶ 33; *id.*, ex. 3 at 29, 103-04, 196)  It further notes that only in March 2020—eight months after the Complaint in this case was filed—did Mr. DePina became President of Envestnet (a role he held simultaneously with his Chief Executive role).  (*Id.*, ex. 2 at ¶ 33)  But as noted above, there is record evidence indicating that Envestnet D&A was *not* simply just another name for Yodlee and instead that it was a division of Envestnet itself.  Were that true, then Mr. DePina's role as Chief Executive with Envestnet D&A would suggest that he *did* have a role at Envestnet during the relevant time period.  (D.I. 492 at 10-11)  And, as was noted above, in documents of record Mr. DePina was described in the relevant timeframe as working for or being associated not just with Envestnet D&A, but more broadly with "Envestnet" and "Envestnet Inc."  (D.I. 494, ex. 31 at YOD10492182-83; *id.*, ex. 34 at YOD6456108; *id.*, ex. 36 at YOD12350336)

And with respect to Mr. Rembe, Envestnet asserts that: (1) he was Senior Vice President of Products and Strategy at Yodlee from June 2018 to September 2020; and (2) only in September 2020—over a year after the Complaint was filed—did Mr. Rembe leave that role to become Chief Product Officer of Envestnet.  (D.I. 448, ex. 2 at ¶ 34; *id.*, ex. 3 at 83)  But at a minimum, Mr. Rembe was also an executive leadership member of Envestnet D&A during the time period in question, which bolsters FinApps' argument here.  (D.I. 494, ex. 21 at YOD12232143)[12]

_____

[12]     In interrogatory responses filed in May 2021 in the United States District Court for the Northern District of California in *Wesch v. Yodlee, Inc.*, Civil Case No. 20-5991-SK, Envestnet identified Mr. Rembe as Envestnet's Chief Product Officer, a "management-level"

Envestnet also makes another argument about the purported irrelevance of FinApps'

reliance on the conduct of Mr. DePina and Mr. Rembe.  It asserts that even if these two men did

play a dual role at both Envestnet and Yodlee in the relevant period, then in order to hold

Envestnet directly liable for Yodlee's actions, FinApps would have to overcome a presumption

that the executives' actions in question were conducted on behalf of Yodlee, not Envestnet.  (D.I.

447 at 10)  Here, Envestnet is relying on caselaw from the Supreme Court of the United States,

which explains that it is normal for a parent and its subsidiary to have identical directors and

officers.  *Bestfoods*, 524 U.S. at 69.  In these circumstances, the Supreme Court has noted that it

is a "well established principle" that such directors and officers "can and do change hats to

represent the two corporations separately, despite their common ownership."  *Id.* (internal

quotation marks and citation omitted); *see also Pearson v. Component Tech. Corp.*, 247 F.3d

471, 484 (3d Cir. 2001) ("[M]ere ownership of a subsidiary does not justify the imposition of

liability on the parent. . . . Nor will liability be imposed on the parent corporation merely because

directors of the parent corporation also serve as directors of the subsidiary.").  Accordingly,

"courts generally presume that the directors are wearing their subsidiary hats and not their parent

hats *when acting for the subsidiary*," and it is error to automatically "attribut[e] the actions of

dual officers and directors to the corporate parent" in order to impose direct liability on the

parent.  *Bestfoods*, 524 U.S. at 69-70 (internal quotation marks and citations omitted) (emphasis

_____

position at Envestnet—and asserted that he began in this role *on July 1, 2018*, not in September
2020.  (D.I. 494, ex. 26 at 4)  Envestnet seems to suggest that this interrogatory response was
simply incorrect; in doing so, it points to a September 25, 2020 announcement stating that Mr.
Rembe did not take on the Chief Product Officer role at Envestnet until that date.  (D.I. 547 at 4
n.2 (citing D.I. 548, ex. 24 at YOD12391308); *see also id.*, ex. 25 (Mr. Rembe's LinkedIn bio
stating that he served as the Chief Product Officer for Envestnet, Inc. from September 2020 to
September 2022); *id.*, ex. 26))  Envestnet may well be correct as to this point, of course.  But
whether admissions Envestnet made in sworn interrogatory responses were or were not accurate
is a fact question, one not suitable for resolution at the summary judgment stage.

added).  Instead, a plaintiff must put forth evidence to the contrary (i.e., that the dual officer was

acting *for the parent* when engaging in the wrongful misconduct) in order to rebut the

presumption.  *Id.* at 64, 69-70; *Pearson*, 247 F.3d at 487 (explaining that parents may be directly

liable for their subsidiaries' actions when the parent "has forced the subsidiary to take the

complained-of action, in disregard of the subsidiary's distinct legal personality"); *see also, e.g.*,

*Pennington v. Fluor Corp.*, 19 F.4th 589, 598 (4th Cir. 2021) (explaining that the direct liability

test is "a narrow test, one that is designed to apply in the unusual case where a company commits

a wrongful act through the legal form of a distinct entity"); *In re Maxus Energy Corp.*, 617 B.R.

806, 818 (Bankr. D. Del. 2020).[13]

In response, FinApps contends that "[a]mple record evidence demonstrates that [Mr.]

DePina and [Mr.] Rembe acted on behalf of Envestnet, not Yodlee . . . thus directly rebutting the

*Bestfood[s]* presumption, and raising significant questions of fact for the jury."  (D.I. 492 at 11)

The Court again agrees that the record demonstrates issues of fact in this respect.

---

[13]     FinApps suggests (in a footnote in its answering brief) that the *Bestfoods*
presumption would not apply here because in *Bestfoods*, the Supreme Court was addressing a
particular federal statute (one not at issue here).  (D.I. 492 at 11 n.7)   While it is true that the
*Bestfoods* Court was examining direct liability in the context of the Comprehensive
Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), *see Bestfoods*,
524 U.S. at 55, the Supreme Court "held that CERCLA did not change the existing common law
of direct liability that can apply when 'the alleged wrong can seemingly be traced to the parent
through the conduct of its own personnel and management' and 'the parent is direct a participant
in the wrong complained of[,]'" *A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 844–45 (E.D. Mo.
2018) (quoting *Bestfoods*, 524 U.S. at 64).  Thus, courts apply the *Bestfoods* presumption even in
cases where CERCLA is not at issue.  *See, e.g.*, *Naghavi v. Belter Health Measurement &
Analysis Tech. Co.*, Case No. 20-cv-01723-H-KSC, 2020 WL 6150431, at *7 (S.D. Cal. Oct. 20,
2020) (holding, at the motion to dismiss stage, that "[b]ecause the FAC does not include any
allegations stating that Defendants Tong and Zhong were specifically acting on behalf of [the
parent corporation] when the representations at issue were made, Plaintiffs have failed to
adequately allege direct liability as to [the parent corporation] for the alleged
misrepresentations").

The Complaint alleges, *inter alia*, that Defendants secretly worked with Equifax to develop an alternative software product to Risk Insight, using FinApps' proprietary information and technology.  (*See, e.g.*, D.I. 2 at ¶¶ 262, 278, 283)  And the record regarding those allegations could help demonstrate that certain individuals engaging in that conduct were doing so on behalf of *Envestnet*, not simply on behalf of Yodlee.  Below, the Court summarizes this evidence, noting where an actor's ties to Envestnet or an Envestnet entity appear to be prominent.

First, FinApps points to evidence suggesting that Envestnet itself was directly involved in cementing the partnership with Equifax and with the decision to unwind Defendants' relationship with FinApps.  (D.I. 492 at 4-5 (cited at *id.* at 11))  This evidence includes the following:

- E-mails from late 2018 among Equifax, Yodlee, and Envestnet personnel (including Mr. DePina, who was then a member of Envestnet's senior management and Mr. Bergman, who was then Envestnet's CEO) regarding, *inter alia*, the "discussion around a partnership between Yodlee, *Envestnet*, and Equifax[,]" (D.I. 494, ex. 39 (emphasis added); *see also id.*, exs. 40-45);

- E-mails (mostly from the time period when Mr. DePina was still a member of Envestnet's senior management) demonstrating that Mr. DePina (using his Envestnet e-mail address) helped to secure the partnership, which extended to areas including "[i]ncome, [a]sset verification and enhanced credit scores[,]" (*id.*, ex. 46; *see also id.*, exs. 47-49);

- On February 1, 2019, Mr. DePina sent an e-mail (from a Yodlee e-mail address) copying Mr. Rembe (at an Envestnet e-mail address)[14] to update Mr. Bergman

---

14      Mr. Marr submitted a supplemental declaration in connection with Envestnet's reply brief in which he states that Mr. DePina and Mr. Rembe each had @envestnet.com e-mail addresses dating from their pre-Yodlee positions at Tamarac, Inc.  (D.I. 548, ex. 12 at ¶ 15)  However, at the same time in which they were occasionally using these Envestnet-related e-mail addresses after being elevated to Envestnet D&A leadership, the two men also had @yodlee.com e-mail addresses.  It seems to the Court that one way that FinApps might demonstrate that Mr.

regarding "finalizing terms" for the partnership with
Equifax, (*id.*, ex. 50);

- On February 10, 2019, Mr. Rembe sent an e-mail (from his
Yodlee e-mail address) to, *inter alia*, Mr. DePina (at his
Envestnet e-mail address) regarding their work with
FinApps over the past two years to create Risk Insight,
(D.I. 497, ex. 159);

- On February 20, 2019, Ms. Solomon sent an e-mail to Mr.
DePina and Mr. Rembe regarding Equifax's latest proposal,
including that that Equifax was seeking "all *E[nvestnet]*
internal reviews/approvals" for the partnership," (D.I. 494,
ex. 51 (emphasis added)), and she was involved in
reviewing and finalizing open items—including walking
"the *E[nvestnet]* technical accounting team through the
proposed accounting treatment"—with respect to the
contract between Equifax and Yodlee in May and June
2019 (with Mr. Rembe also in receipt of all such e-mails),
(D.I. 496, ex. 52 (emphasis added)).

On March 8, 2019, Mr. DePina (signing as Chief Executive Officer of Yodlee) and Equifax's

CEO executed a letter of intent regarding the distribution of Yodlee's Risk Insight Reports. (*Id.*,

ex. 53)

Second, record evidence regarding Defendants' efforts to purchase the rights to Risk

Insight indicates Envestnet's involvement in that process. More specifically, in October 2018,

Mr. Rembe recognized that Yodlee/Envestnet did not "really own the Risk Insight[] code or IP"

and sought to either "completely unwind our relationship with [FinApps] and reverse engineer

their app, or find a way [to] somehow 'purchase' the ability to own the code/IP" and asked if

---

DePina and Mr. Rembe were working on behalf of *Envestnet* (and not simply Yodlee) in certain
respects, is to point out that they were not using Yodlee e-mail addresses when they were doing
such work (and instead were using their *Envestnet*-related e-mail addresses). Indeed, in its
briefing, Envestnet often pointed out when these individuals used *Yodlee*-related e-mail
addresses to conduct relevant activity, as a way of arguing that the conduct at issue was *Yodlee*-
related conduct, not Envestnet-related conduct. (D.I. 547 at 8-10) If the nature of an e-mail
address is relevant when it helps Envestnet's argument, it must also be relevant when it helps
FinApps' argument.

"we have anyone at Yodlee *or Envestnet* that we can bring in to help with this[.]"  (*Id.*, ex. 55 (emphasis added))  While Envestnet and Yodlee "clos[ed] in" on the partnership with Equifax, Mr. DePina e-mailed then-Envestnet CEO Mr. Bergman regarding "challenges" that they faced given their current relationship with FinApps, which was problematic "in terms of distribution" of Risk Insight, a problem that the companies would be "forced to ultimately address[.]"  (*Id.*, ex. 54)  Mr. DePina reported to Mr. Bergman that they had "initiated discussions . . . to purchase the rights to Risk Insight[.]"  (*Id.*; *see also* D.I. 497, ex. 159)  Mr. Bergman was "[s]upportive[,]" (D.I. 496, ex. 56), and authorized up to $10 million to acquire the rights to Risk Insight, (*id.*, ex. 57).  Mr. DePina and Viggy Mokkarala, Executive Vice President, Strategic Development *of Envestnet*, then engaged in negotiations with Bob Sullivan, President of FinApps, regarding the acquisition; these negotiations were ultimately unsuccessful.  (*Id.*, exs. 58-65; *id.*, ex. 66 at 90-91; *id.*, ex. 67 at 340-41)

Third, record evidence relating to Defendants' transition from working with FinApps on Risk Insight to Defendants' partnership with Equifax demonstrates involvement not only from Yodlee personnel, but also from Envestnet D&A personnel like Mr. DePina and Mr. Rembe (and Mr. Anur and Ms. Solomon)—i.e., personnel who could plausibly be said to have been working on behalf of Envestnet.  For example, on April 7, 2019, Mr. DePina alerted Mr. Sullivan that "Yodlee will cease marketing and selling the Risk Insight[]" product.  (D.I. 497, ex. 145)  On the same day, Mr. DePina sent an e-mail (from his Yodlee e-mail address) to, *inter alia*, Mr. Rembe (at his Envestnet e-mail address) regarding the letter that Mr. DePina sent to FinApps documenting the wind down of Risk Insight efforts.  (*Id.*, ex. 160)  An April 10, 2019 e-mail among Equifax personnel indicated that Equifax and Ms. Solomon had discussed utilizing an "exact replica of the Risk Insight" product ("Equifax MVP") that would be launched in May.

(D.I. 496, ex. 68; *see also id.*, ex. 78)  Melissa Monk of Equifax asked Envestnet D&A's executive team, including Mr. Rembe and Ms. Solomon, "to provide a deeper overview of" Risk Insight including "detailed technical and data flows" and a "detailed file layout of the report" as well as, potentially, "the API guide."  (*Id.*, ex. 79)  At least some of these materials were sent to Ms. Monk, (*id.*, exs. 80-85), and on April 16 and 17, Yodlee personnel, Ms. Solomon, and Equifax personnel met to discuss the new replacement product, (*id.*, ex. 86).

Meanwhile, Mr. DePina explained to Envestnet D&A's leadership (including Mr. Rembe and Ms. Solomon) that their "strategy is to get [Risk Insight] clients to leverage what we are doing with Equifax" and not to work with FinApps.  (*Id.*, ex. 69; *see also id.*, exs. 70-74)  On April 17, 2019, Ms. Solomon reported to Mr. DePina that $12 million of the Risk Insight "pipeline has been taken out" and all new Risk Insight deals are going to Equifax.  (*Id.*, ex. 75 (emphasis omitted))  On that same date, pursuant to Mr. Rembe's instructions, all responsibility for Risk Insight and all Risk Insight clients was transitioned to a single Yodlee employee to allow others to be "completely focused" on the partnership with Equifax.  (*Id.*, exs. 76-77)  And on the same date, Mr. Anur confirmed with Mr. DePina that they would be "taking on a significant portion of the Equifax solution build out" and would dedicate a Yodlee team to assist in the efforts.  (*Id.*, ex. 88 at YOD02762001)  Mr. Rembe instructed Michael Burger to "provide whatever support is needed" to Mr. Anur to ensure the new product was created "ASAP" with "scope to a MINIMUM and to get this work done as quickly as possible."  (*Id.*, ex. 89)  Mr. Burger confirmed his understanding that he was to "get[] this done as quickly as possible with a minimum amount of work[.]"  (*Id.*)  Mr. Anur reiterated to a team of Yodlee personnel assisting with the development of the new product that the "#1 priority is to get this done!" and that "we are under tremendous pressure to get this done very quickly!"  (*Id.*, ex. 91 at YOD00668403)

Mr. DePina was aware that a new Risk Insight product was being developed for Equifax that incorporated technology from FinApps.  (D.I. 494, ex. 25 at 227-28)  Equifax MVP used the same specification as Risk Insight to "save[] everybody's time so we need not develop it from scratch[,]" (D.I. 496, ex. 92 at 191, 199, 203, 211), used "similar attributes" as Risk Insight, (*id.*, ex. 93 at 180), and "was initially based off" of Risk Insight, (*id.* at 199-200).  Mr. Anur's team appeared to admit to reverse engineering at least certain aspects of FinApps' technology in developing Equifax MVP.  (*Id.*, ex. 93 at 253-57; *id.*, ex. 94; *id.*, ex. 95 at 91-94; *see also id.*, ex. 96; *id.*, ex. 97)

In late March and early April 2019, FinApps learned that Yodlee had accessed another piece of FinApps' software known as "YProxy[.]"  (*See* D.I. 2 at ¶¶ 16, 134, 139)  FinApps suspended access to YProxy, prompting requests from Mr. DePina and Mr. Anur to restore that access.  (D.I. 496, exs. 98-100; *see also id.*, ex. 67 at 328-29)  Defendants are alleged to have utilized YProxy to assist in the development of competing products.  (*Id.*, ex. 101 at ¶¶ 299-303; *id.*, ex. 102 at ¶¶ 702-07)

In sum, the evidence above could support the assertion that, during the key period, executives employed by Envestnet D&A (an entity affiliated with *Envestnet*), at times using their *Envestnet* e-mail addresses, worked together and with *Envestnet's* then-CEO and other *Envestnet* employees to play a lead role in negotiations and transactions related to the claims at issue in this case—such that they were involved in the process of finalizing "the effectuation of the alleged misconduct[.]"  (D.I. 492 at 11-12)  FinApps has thus established questions of fact regarding Envestnet's own involvement in the purported misconduct, which the jury must resolve.  The Court therefore recommends that the Motion be denied with respect to FinApp's direct liability theory.  *See, e.g.*, *Snee v. Marriott Resorts Hosp. Corp.*, Case No. SACV 14-1745-JLS (JCGx),

2015 WL 13919138, at *6 (C.D. Cal. Nov. 25, 2015) (denying Marriott Vacations' motion for summary judgment on the issue of direct liability, where the plaintiff "offered substantial evidence of Marriott Vacations' direct involvement in decisions and policies regarding her employment" including that she received e-mail messages regarding her employment from e-mail addresses that included "marriottvacationsworldwide" as part of the domain name, and where the relevant policy noted that the guidelines therein were subject to Marriott Vacations' management approval) (internal quotation marks and citations omitted); *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62-63 (D.D.C. 2007) (denying the defendant's motion for summary judgment, which in part claimed that the defendant could not be held directly liable for conduct committed by its indirect subsidiary, where the plaintiff put forth evidence establishing a factual dispute as to whether the defendant was involved in the misconduct "even though the corporate distinctions between the two were still observed").

## C.    Specific Claims

Envestnet finally provides additional argument regarding the specific remaining claims against it.  The Court will now take up the arguments that Envestnet made in this portion of its briefing.

### 1.    Counts 1 and 2

With respect to FinApps' trade secret misappropriation claims (Counts 1 and 2), Envestnet's primary argument[15] is that "there is no evidence that Envestnet participated in, directed, or orchestrated any purported misappropriation in connection with any Yodlee

---

[15]    Envestnet also argues that it should be granted summary judgment because FinApps' purported trade secrets do not qualify for trade secret protection, "as laid out in Envestnet's concurrently-filed Motion for Summary Judgment No. 2." (D.I. 447 at 11)  The Court will not be taking up any such argument in connection with the instant Motion.

product."[16]  (D.I. 447 at 11-12)  This argument flows from its contentions that, *inter alia*, Envestnet is just a holding company and Envestnet D&A employees were solely Yodlee employees.  (*Id.* at 12-14; D.I. 547 at 8-9)  As discussed above, FinApps has identified competing evidence on that score—i.e., that Envestnet D&A executive leadership members (including Mr. DePina and Mr. Rembe) were involved in directing the development of Equifax MVP, an accused Yodlee product, and that this product was based on (and involved the alleged misappropriation of) FinApps' technology.  (D.I. 492 at 14-16)[17]

Envestnet also argues that "no Envestnet personnel worked on Risk Insight 2.0—the project through which [FinApps] alleges Defendants gained access to its trade secrets."  (D.I. 447 at 12)  But FinApps points to record evidence establishing that, at least prior to the January 2019 reorganization, then Yodlee-employees that were later elevated to Envestnet D&A's executive leadership team (including Mr. Anur, Mr. Hempel, Ms. Hingley, Mr. Rembe and Ms. Solomon) all provided technical assistance regarding Risk Insight, and were involved with servicing Risk Insight customers.  (D.I. 496, ex. 115 at 2, 7, 10; *id.*, exs. 116-28)  Even though

---

[16]     In its Complaint, FinApps also alleges that Envestnet used FinApps' trade secrets to develop a software product called Credit Exchange.  (D.I. 2 at ¶¶ 219, 236)  In its opening brief, Envestnet contended that FinApps had abandoned any misappropriation of trade secret claims premised on Credit Exchange.  (D.I. 447 at 12; *see also* D.I. 448, ex. 10 at 224 (FinApps' technical expert, Issac Pflaum, testifying that he "did not opine that Envestnet [C]redit [E]xchange relied on FinApps' proprietary information"))  FinApps does not respond to this particular argument.  (D.I. 492 at 14-16)  Thus, the Court will not focus on Credit Exchange further herein.

[17]     In its reply brief, Envestnet asserts that Counts 1 and 2 also fail because FinApps "relies on purported evidence of reverse engineering, but reverse engineering is not misappropriation."  (D.I. 547 at 9 (citing cases))  Because Envestnet did not make this argument in its opening brief—even though FinApps' Complaint is rife with references to reverse engineering, (D.I. 2 at ¶¶ 12, 46, 94, 100, 104-08, 195, 218, 235, 302), and even though FinApps has been highlighting this type of conduct throughout this case, (D.I. 134; D.I. 189)—the Court will not consider it here.  *See, e.g., Cohen v. Cohen*, C.A. No. 19-1219-MN, 2022 WL 952842, at *4 (D. Del. Mar. 30, 2022).

23

these employees would not have been acting for Envestnet at that time, it seems relevant that they once did work on Risk Insight—in light of FinApps' claim that Envestnet D&A later participated in the development of Equifax MVP, which was based on FinApps' technology used in Risk Insight.

For these reasons, genuine issues of material fact exist with respect to Counts 1 and 2. The Court therefore recommends that summary judgment be denied as to these counts.

### 2.    Count 4

In Count 4,  FinApps alleges tortious interference with prospective business opportunities.  More specifically, it alleges, *inter alia*, that Envestnet "withh[eld] from Risk Insight clients . . . the truth about FinApps' suspension of Yodlee's services, and fail[ed] to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform."  (D.I. 2 at ¶ 262)[18]  Envestnet argues that this allegation fails because:  (1) there is no evidence that Envestnet personnel "withh[eld]" anything from Risk Insight clients; (2) FinApps cannot prove a sufficiently developed prospective business relationship with any Risk Insight client; and (3) FinApps cannot prove intentional interference. (D.I. 447 at 15-16)

The Court disagrees with Envestnet here.  FinApps points to evidence establishing genuine disputes of material fact on all three fronts.

---

[18]     In its Complaint, FinApps also made three other allegations with respect to this Count.  (D.I. 2 at ¶ 262)  In its opening brief, Envestnet asserts that these three allegations fail because they are preempted by the Copyright Act and/or the Uniform Deceptive Trade Practices Act.  (D.I. 447 at 14; *see also* D.I. 109 at 18-19)  FinApps does not respond as to these three allegations and focuses only on the fourth.  So FinApps only appears to be pressing a claim based on the fourth allegation (and facts reasonably relating thereto).

With regard to Envestnet's first argument, relating to whether Envestnet personnel withheld allegedly key information from Risk Insight clients and affirmatively provided a false narrative to those clients, FinApps does identify some evidence supporting the charge.  It cites to documents demonstrating that Envestnet D&A leadership (such as Mr. Anur) came up with a "narrative" to convey to Risk Insight customers after Yodlee's access to Risk Insight had been suspended by FinApps:  i.e., that "there is a component to the Risk Insight solution that is supported by a 3rd party and the service delivered through that 3rd party is down" and that they were "work[ing] on resolving the issue[.]"  (D.I. 497, exs. 139-40; *see also id.*, exs. 138, 141-43)[19]  Meanwhile, as seen above, there is evidence that Envestnet D&A executive leadership were concurrently involved in developing the Equifax MVP product—and that information was withheld from Risk Insight customers so that they would not continue to use Risk Insight, and would instead use the Equifax MVP product once that product was ready.  (*Id.*, exs. 144, 157-58; *see also* D.I. 496, ex. 103 at 1)

With respect to Envestnet's second argument, a tortious interference claim "generally requires a [potential] business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."  *Maxi-Taxi of Fl., Inc. v. Lee Cnty. Port Auth.*, No. 2:07-cv-82-FtM-34SPC, 2008 WL 1925088, at *12 (M.D. Fl. Apr. 29, 2008) (internal quotation marks and citation omitted); *see also Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014) ("[A] plaintiff must specifically identify the customers who actually contemplated entering into a business

---

[19]     Pursuant to the Complaint, FinApps suspended Yodlee's access to Risk Insight in June 2019 (which caused Risk Insight clients to be unable to access the Platform) because Yodlee was in breach of the MSA.  (D.I. 2 at ¶¶ 201-02)

relationship with [the plaintiff].") (internal quotation marks and citation omitted).[20]  To this, FinApps responds that:  (1) Equifax was a Risk Insight customer that generated revenues by which FinApps profited; but (2) in early 2019, Envestnet D&A "took steps to undermine that business relationship by seeking a new strategic partnership with Equifax, which deliberately excluded FinApps" and in connection with which Envestnet developed Equifax MVP from FinApps' technology; and (3) Envestnet D&A attempted to route Risk Insight's customer pipeline to the Equifax MVP product.  (D.I. 492 at 17-18)  Envestnet retorts that Equifax was Yodlee's customer (not FinApps' customer) and that FinApps' profits were a result of the contracts between FinApps and Yodlee.  (D.I. 547 at 9 (citing D.I. 448, exs. 4-6))  It also complains that FinApps fails to point to any communications between FinApps and Equifax, nor to other evidence that Equifax or other Risk Insight customers "actually contemplated" entering into a business relationship with FinApps.  (*Id.*)

This is a difficult issue.  There is certainly record evidence that the Risk Insight product involved a partnership between FinApps and Yodlee, one in which FinApps would develop the product and license it to Yodlee, and where Yodlee would market and sell the product.  (*See, e.g.*, D.I. 448, ex. 4 at §§ 2-3; D.I. 496, ex. 54)  But the Court is hindered in resolving this portion of the Motion in Envestnet's favor, because it simply does not have many facts before it about the extent to which Risk Insight customers like Equifax should have been considered solely "Yodlee[] customers" (as Envestnet alleges).[21]  As it stands, the Court cannot say that the

---

[20]     Envestnet argues that either Florida law or Illinois law likely governs the tortious interference claim, and that the outcome would be the same under either state's law.  (D.I. 447 at 15 n.3)  FinApps does not dispute this.  (D.I. 492 at 17-18)

[21]     It does appear that Yodlee alone entered into contracts between itself and Risk Insight customers.  (D.I. 448, ex. 2 at ¶ 25)

26

inference that FinApps would have it draw—i.e., that Risk Insight customers, who were subscribing to a service powered by FinApps' Platform in a manner that benefitted FinApps financially, and at least some of whom appear to have had contact with FinApps in this regard, (D.I. 497, ex. 156), could be rightly considered current and potential future customers of FinApps (at least at the point at which Yodlee was unable to provide access to Risk Insight)—is somehow legally incorrect or factually implausible.

From there, the record (as discussed above) can be read to indicate that Envestnet helped to secure the Yodlee partnership with Equifax, to include distribution of Risk Insight reports. Envestnet D&A leadership then recognized that its lack of ownership over Risk Insight was a problem, and after acquisition talks were unsuccessful, it informed Equifax that it would develop an "exact replica" of Risk Insight.  (D.I. 496, ex. 68)  It is a reasonable inference that but for Envestnet's improper interference, FinApps would have had a reasonable probability of maintaining a relationship with Risk Insight customers (via the customers' continued use of Risk Insight), to its financial benefit.

As for Envestnet's third argument, courts have held that for an intentional interference claim, the plaintiff must establish that the defendant had an intent to interfere with a business opportunity, as opposed to simply an "intent to act."  *Maxi-Taxi of Fl., Inc.*, 2008 WL 1925088, at *16; *see also* (D.I. 447 at 16).  The above-referenced evidence also demonstrates a genuine dispute of material fact regarding Envestnet's intent to harm FinApps' business opportunities with Risk Insight customers.  (*See* D.I. 492 at 18)

Therefore, the Court recommends that summary judgment be denied as to Count 4.

### 3.    Counts 5 and 8

Envestnet next moves for summary judgment with respect to Counts 5 and 8: unfair competition claims brought under common law and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), respectively. (D.I. 447 at 16-20) The Court agrees with FinApps that genuine issues of material fact exist with respect to these claims. (*See* D.I. 492 at 18-20)

For example, while certain of the allegations in the claims may not still be viable, (*see* D.I. 447 at 17 (citing D.I. 109 at 17-18)), other allegations therein remain, (D.I. 109 at 20-21). And those remaining allegations are, *inter alia*, that Defendants "remov[ed] . . . resources [needed to market and sell Risk Insight] once Yodlee had successfully stolen FinApps' proprietary information and technology" and they "withh[eld] from Risk Insight clients . . . the truth about FinApps' suspension of Yodlee's services, and fail[ed] to direct these clients to FinApps[.]" (D.I. 2 at ¶¶ 267, 283) And although Envestnet argues that "there is no evidence that [it] engaged in any of this alleged conduct[,]" (D.I. 447 at 18), as discussed above, there is in fact some such evidence. Mr. Rembe removed Yodlee employees from Risk Insight to allow them to focus on the development of Equifax MVP, (D.I. 496, ex. 76-77), and Envestnet D&A leadership came up with an allegedly false "narrative" to convey to Risk Insight's clients about why their Risk Insight services had been suspended, (D.I. 497, ex. 139; *see also id.*, exs. 138, 140-44).

Envestnet also argues that Count 8 must be dismissed for two additional reasons that may be easily disposed of. First, it contends that FDUPTA claims may only be asserted by Florida residents with respect to conduct occurring in Florida, and that there is no evidence of Envestnet personnel engaging in any alleged misconduct in Florida. (D.I. 447 at 19 (citing cases)) However, courts have rejected the notion that the offending conduct must occur *exclusively* in Florida for the FDUPTA to apply. *See, e.g.*, *Bluegreen Vacations Unlimited, Inc. v. Timeshare*

*Laws. P.A.*, Civil Action No. 20-24681-Civ-Scola, 2023 WL 4079381, at *4 (S.D. Fla. June 20, 2023) (finding that the California-based defendants' conduct had a sufficient connection to Florida to fall within the FDUTPA's scope, where the defendants were targeting timeshare owners in Florida, both plaintiffs were Florida corporations with their principal places of business in Florida, and the contracts at issue arose under a Florida statute) (citing cases); *see also Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc*., No. 10-23869, 2012 WL 1570057, at *6 (S.D. Fla. May 2, 2012). And here, there is evidence that: (1) FinApps was harmed in Florida where it resides; (2) Mr. DePina and Mr. Rembe met with Mr. Sullivan in Florida in January 2019 regarding the acquisition of FinApps; and (3) Mr. DePina communicated with Mr. Sullivan in Florida regarding the winding down of Risk Insight and regarding Yodlee's access to YProxy. (D.I. 455 at ¶ 4; D.I. 494, ex. 25 at 31-32; D.I. 496, ex. 67 at 328-29; D.I. 496, exs. 99-100; D.I. 497, exs. 145-46)

Second, Envestnet argues that the FDUTPA is meant to protect *consumers* from deceptive trade practices, and FinApps was not a consumer of Envestnet. (D.I. 447 at 20) But, as FinApps correctly retorts, (D.I. 492 at 19-20), Florida courts have explained that the FDUTPA "broadly declares unlawful any unfair or deceptive acts or practices committed in the conduct of any trade or commerce" and have rejected arguments that "summary judgment is warranted . . . because no consumer transaction is involved[,]" *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1145-46 (M.D. Fla. 2007) (citing cases); *see also E A Tapping Servs., LLC v. CDM Constructors Inc.*, Case No. 6:19-cv-1190-CEM-LRH, 2021 WL 1985338, at *8-9 (M.D. Fla. Feb. 23, 2021).

In light of the above, the Court recommends that summary judgment be denied as to Counts 5 and 8.

### 4.    Count 14

In Count 14, FinApps asserted three unjust enrichment allegations, the first of which was made against both Yodlee and Envestnet ("paragraph 333"):

> [B]y stealing and misappropriating FinApps' proprietary software and trade secrets to create and use a competing credit software product, Defendants have unjustly received the benefit of FinApps' substantial time and investment into the development of its proprietary software and trade secrets.  Defendants have avoided the expense and effort necessary to independently develop a competing product through their scheme.

(D.I. 2 at ¶ 333)[22]  In its opening brief, Envestnet argues that the Court has already concluded, in its July 6 R&R, that this allegation would be preempted (thus barring the Count against Envestnet).  (D.I. 447 at 20; *see also* D.I. 547 at 10)

Envestnet is right.  In the July 6 R&R, the Court explained that:  (1) in Envestnet's opening brief in support of its motion to dismiss, its argument that FinApps' unjust enrichment claim is preempted by the Copyright Act and/or the Uniform Trade Secrets Act solely referenced paragraph 333; and (2) FinApps' responsive brief argued only that the next two allegations (found in paragraphs 334 and 335) were not preempted.  (D.I. 109 at 23-24)  The Court thus recommended that Defendants' motion to dismiss be denied since Defendants had forfeited any arguments regarding the viability of paragraphs 334 and 335, while also noting that "Plaintiff appears to (rightly) concede that an allegation premised on the first form of alleged enrichment [i.e., on paragraph 333] would be preempted."  (*Id.* at 24)

---

[22]    The remaining two unjust enrichment allegations in the Complaint are asserted against Yodlee only.  (D.I. 2 at ¶¶ 334-35)  In its briefing, FinApps makes no argument that it could separately proceed on a claim against Envestnet based solely on these two allegations (and facts reasonably relating thereto).

FinApps' response here is only that "Defendants ignore . . . that [then-presiding Chief District] Judge Connolly specifically overruled this finding[.]"  (D.I. 492 at 20)  In an August 25, 2020 Memorandum Opinion ruling on Defendants' objections to the July 6 R&R, Chief Judge Connolly addressed the Court's note in the July 6 R&R with respect to paragraph 333:

> I understand the Magistrate Judge to be saying in this sentence that *if* Plaintiff's unjust enrichment claim *had been* based *solely* on the first "form" or set of factual allegations, the Magistrate Judge *would have* deemed that claim to be preempted.  Since Plaintiff's unjust enrichment claim was *not* based solely on the first "form," this dictum is of no moment and I will not adopt it.

(D.I. 126 at 8 n.3 (emphasis in original))

We are still left without a substantive explanation from FinApps as to how its unjust enrichment claim in paragraph 333 would not be preempted, in light of the Court's prior ruling.  And yet FinApps seems to acknowledge that paragraph 333 is based on the same facts as its misappropriation allegations.  (D.I. 492 at 20; *see also* D.I. 547 at 10)  Just as the Court indicated in the July 6 R&R (and as FinApps essentially conceded by not arguing otherwise at the motion to dismiss stage), FinApps' unjust enrichment claim against Envestnet in paragraph 333 is in fact preempted by the above-referenced statutes.  *See, e.g.*, *Ocimum Biosols. (India) Ltd. v. LG Corp.*, C.A. No. 19-2227 (MN), 2021 WL 931094, at *7 (D. Del. Mar. 11, 2021) ("Ocimum's unjust enrichment claim is based entirely on the same facts as Ocimum's trade secret misappropriation claims and is thus preempted.").  The Court therefore recommends that summary judgment be granted as to Count 14.

## IV.    CONCLUSION

For the reasons set out above, the Court recommends that Envestnet's Motion be GRANTED-IN-PART and DENIED-IN-PART.  Specifically, the Court recommends that the Motion be DENIED with respect to:  (1) FinApp's vicarious liability theory; (2) FinApp's direct

liability theory; and (3)  Counts 1, 2, 4, 5 and 8.  The Court recommends that the Motion be GRANTED solely with respect to Count 14.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation.  Any such redacted version shall be submitted no later than **August 3, 2023** for review by the Court.  It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure."  *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated:  July 31, 2023

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE