IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FINANCIALAPPS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-1337-GBW-CJB |
| ) | |
| ENVESTNET, INC. and YODLEE, INC., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM ORDER**

Pending before the Court in this action is Plaintiff FinancialApps, LLC's ("Plaintiff" or "FinApps") motion to exclude the testimony of Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc.'s ("Yodlee, and collectively with Envestnet, "Defendants") damages expert Laura B. Stamm ("Motion"). (D.I. 460)[1] For the reasons set out below, the Court DENIES the Motion.

**I.   BACKGROUND**

The Court will write briefly here and for the parties, and so it will forego a lengthy recitation of the facts. To the extent certain facts are relevant to resolution of the Motion, they will be set out in Section III.

The Motion was filed on January 12, 2023. (D.I. 460) Briefing on the Motion was completed on April 27, 2023. (D.I. 566)

**II.   STANDARD OF REVIEW**

---

[1] On October 7, 2019, United States District Judge Colm F. Connolly referred this case to the Court to conduct all proceedings and to hear and determine all motions, pursuant to 28 U.S.C. § 636(b) (the "referral"). (D.I. 18) On September 7, 2022, this case was reassigned to United States District Judge Gregory B. Williams, who subsequently ordered that the referral remained in effect. (D.I. 437)

The Court has frequently set out the relevant standard of review for assessing a motion, like this one, filed pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). One such instance came in *Integra LifeScis. Corp. v. HyperBranch Med. Tech., Inc.*, Civil Action No. 15-819-LPS-CJB, 2018 WL 1785033, at *1-2 (D. Del. Apr. 4, 2018). The Court incorporates by reference the legal standards set out in *Integra*, and will follow them herein. To the extent that additional related legal principles regarding Rule 702 and *Daubert* are relevant, the Court will set those out in Section III.

**III.   DISCUSSION**

Stamm's opinions relate to the damages allegedly sustained by Yodlee as a result of FinApps's purported misconduct; she "determined the damages necessary to restore Yodlee to the economic position it would have been in had it not entered into the Software License and Master Services Agreement (the 'MSA'[)]" with FinApps. (D.I. 462, ex. 2 ("Stamm Opening Rep.") at ¶ 12; *see also id.* at ¶ 1) With its Motion, FinApps seeks to exclude the entirety of Stamm's damages opinions, which fall into three categories: (1) Yodlee's reliance damages (the "reliance damages opinion"); (2) Yodlee's unquantified damages (the "unquantified damages opinion"); and (3) an alternative calculation of the value that Defendants received from their partnership with Equifax and sales of Snapshot 2.0 (the "alternative value opinion"). The Court will address these opinions in turn.

   **A.   The Reliance Damages Opinion**

With her reliance damages opinion, Stamm opines that "[r]estoring Yodlee to its economic position prior to its reliance on the agreements with FinApps requires awarding it payment for" Yodlee's net losses (the "net loss sub-opinion") and reimbursement payments that Yodlee made to Risk Insight 2.0 clients (the "reimbursement sub-opinion"). (*Id.* at ¶ 31) Below,

the Court will take up FinApps' arguments with respect to each sub-opinion making up Stamm's reliance damages opinion.

### 1. Net Loss Sub-Opinion

Stamm calculates Yodlee's net losses by subtracting Yodlee's total costs from the net cash receipts associated with Risk Insight 2.0. (*Id.* at ¶¶ 32-35 & Table 1) FinApps attacks Stamm's net-loss sub-opinion in a few different ways.

In calculating Yodlee's total costs associated with Risk Insight 2.0, Stamm relied on a cost spreadsheet (the "cost spreadsheet") that was prepared by Yodlee in response to FinApp's request for production. (*Id.* at ¶ 33 & n.36; D.I. 462, ex. 6 ("Stamm Reply Rep.") at ¶ 13; *see also id.*, ex. 10) FinApps' first attack is that Stamm's net loss sub-opinion is unreliable (and thus inadmissible) because Defendants created the cost spreadsheet for the purpose of this litigation, and Stamm failed to independently verify the information contained in the spreadsheet. (D.I. 461 at 6-7; D.I. 566 at 2-3)[2]

FinApps' arguments here are not well taken. While it is true that the cost spreadsheet was prepared by Yodlee in response to discovery requests, it pulled data from a project allocation file that reflects Yodlee's allocation of costs to its "Credit Initiative" in the ordinary course of business (the "project allocation file"). (Stamm Rep. Report at ¶¶ 12-13) Stamm testified that this data came from Yodlee's "accounting systems" and explained that she reviewed the project

---

[2] FinApps also suggests that the cost spreadsheet is unreliable because Defendants produced the cost spreadsheet a year after the close of fact discovery. (D.I. 461 at 6) However, Defendants retort that an earlier version of the spreadsheet was produced during discovery, and the version that Stamm relied upon was simply updated, with adjustments being made to prior allocations regarding certain relevant costs and other adjustments that do not impact Stamm's calculations. (D.I. 513 at 3 & n.2; Stamm Opening Rep. at ¶ 10 n.4) In any event, FinApps does not cite to any caselaw holding that an expert's opinion is unreliable because it relies on materials produced after the close of fact discovery.

allocation file, which contained more detail and allowed her to "see the numbers tying out." (D.I. 514, ex. 6 at 68, 70-71, 72-73)[3] Stamm also relied on "discussions with Yodlee's finance team" to further understand the cost spreadsheet. (Stamm Opening Rep. at ¶¶ 33-35 & nn.37, 39-46) In light of these facts, the Court is not persuaded that Stamm's reliance on the spreadsheet—a document that (as Stamm confirmed) reflects data collected in Yodlee's ordinary course of business—renders her opinion unreliable. Nor does the Court believe that Stamm had to independently "verify" or audit the underlying accuracy of each piece of data contained in that spreadsheet in order to rely on it. *See, e.g.*, *Barry v. Medtronic, Inc.*, CIVIL ACTION No. 1:14-cv-104, 2016 WL 7665423, at *4 (E.D. Tex. July 19, 2016) (noting that there is no "overarching general requirement . . . that a financial or economic expert independently verify each entry or document on which he bases his opinions" and that courts "have allowed expert testimony relying on reports and spreadsheets generated during litigation where the underlying data is relevant and was collected prior to litigation and during the normal course of business") (internal quotation marks and citation omitted); *see also Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 568, 570 (E.D. Pa. 2004) (rejecting the defendant's argument that an expert's analysis was unreliable because he "relied excessively on business records provided to him by" the plaintiff's president, as Federal Rule of Evidence 702 "does not require that experts eschew

---

[3] FinApps also complains that despite "multiple requests," Defendants have "refused" to produce documents that "evidence[e] the underlying data concerning Defendants' costs and spending." (D.I. 461 at 6 n.4; D.I. 566 at 3) To the extent that FinApps believed that Defendants' document production in this regard was deficient, they could have moved to compel, but have not done so. *See Shire Viropharma Inc. v. CSL Behring LLC*, Civil Action No. 17-414 CONSOLIDATED, 2021 WL 1227097, at *21-22 (D. Del. Mar. 31, 2021) (explaining that a *Daubert* motion is not the proper vehicle for litigating a discovery dispute over whether a party has received in discovery certain material relied upon by an expert).

reliance on a [party's] account of factual events that the experts themselves did not observe") (internal quotation marks and citation omitted).[4]

FinApps' next attack is that Stamm's total costs figure is unreliable because "she improperly allocates to Risk Insight 2.0 nearly *all* costs associated with Yodlee's entire credit business (*i.e.*, all credit initiatives, not just Risk Insight 2.0) from January 2017 to July 2019, based on nothing more than unexplained and unverified 'discussions with Yodlee's finance team.'" (D.I. 461 at 8-9 (emphasis in original) (quoting Stamm Opening Rep. at ¶¶ 34-35 & nn.42-46); D.I. 566 at 4-5) But the fact that a damages expert gathered certain information in discussions with company personnel does not render the expert's opinion unreliable. *See Championship Tournaments, LLC v. United States Youth Soccer, Ass'n, Inc.*, Civil Case No. SAG-18-02580, 2022 WL 1002137, at *6 (D. Md. Apr. 4, 2022); *Wonderland Nursery Goods*

---

[4] In support of its argument that Stamm's reliance on the spreadsheet (without first having independently verified the underlying data in it) renders her opinion unreliable, FinApps cites to *CareDx, Inc. v. Natera, Inc.*, Civil Action No. 19-662-CFC-CJB, 2021 WL 1840646 (D. Del. May 7, 2021), *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663 (D. Del. 2009) and *Mosaid Techs. Inc. v. LSI Corp.*, Civil Action No. 10-192-RGA, 2014 WL 807877 (D. Del. Feb. 28, 2014). (D.I. 461 at 4, 5-6) In the Court's view, these cases are distinguishable from the facts here. (*See* D.I. 513 at 4-5) In *CareDx*, the court found that an expert's opinions were, *inter alia*, unreliable, where he relied solely on "vague, undocumented, and back-of-the-envelope" estimates provided in the plaintiff's CEO's deposition testimony in order to calculate the costs of certain advertising efforts. 2021 WL 1840646, at *2-3. In *ZF Meritor*, the court found that the expert's opinion was unreliable where it did not rely on "actual financial data" but instead on "internal financial projections . . . . without knowing either the qualifications of those who actually prepared them or the validity of the underlying data and assumptions upon which the" projections were based. 646 F. Supp. 2d at 667 (internal quotation marks and citation omitted). Similarly, in *Mosaid Techs.*, the court excluded expert testimony on lost profits where the expert relied on a forward-looking business planning document, yet the expert had no knowledge of the assumptions made in that document or of the qualifications of the persons who had made the assumptions. *Mosaid,* 2014 WL 807877, at *2-3. Here, in contrast: (1) the cost spreadsheet that Stamm used included data pulled from the project allocation file (i.e., actual financial data); (2) Stamm reviewed and discussed that data with Yodlee representatives; and (3) the file does not contain forward-looking projections, but instead reflects historical data.

*Co. v. Thorley Indus., LLC*, Civil Action No. 12-196, 2013 WL 6328772, at *5 (W.D. Pa. Dec. 5, 2013). And Stamm explained her basis for her allocation analysis (including why she allocated certain Credit costs to Risk Insight 2.0) in some detail. (Stamm Opening Rep. at ¶ 35; Stamm Reply Rep. at ¶¶ 14-23; D.I. 514, ex. 6 at 120-24)[5] FinApps' criticisms go to the weight of Stamm's testimony, not to its admissibility.

Finally, FinApps argues that Stamm's net loss sub-opinion should be excluded because it just involves simple math calculations, which do not require the specialized knowledge of an expert. (D.I. 461 at 10; D.I. 566 at 9-10) The Court does not agree. Stamm did not simply add up figures, but instead analyzed costs, using her expertise, in order to determine which such costs should be properly allocated to Risk Insight 2.0, which should not, and why. (D.I. 513 at 18, 19-20); *see also, e.g.*, *Ralston v. Garabedian*, CIVIL ACTION NO. 19-1539, 2022 WL 19273, at *10 (E.D. Pa. Jan. 3, 2022) (rejecting the argument that expert's opinion was a mere mathematical calculation not based on specialized knowledge, where the expert utilized economic methods to reach his conclusions and offered opinions based on future earnings and benefits outside a juror's common knowledge).

---

[5]  For example, Stamm explained that the "COR – Software" costs reflected in the cost spreadsheet related only to Risk Insight 1.0 and Risk Insight 2.0 (the two credit products Yodlee sold between January 2017 and June 2019), and she notes that she apportioned these costs between Risk Insight 1.0 and Risk Insight 2.0 based on the "relative revenues" relating to the two products. (Stamm Reply Rep. at ¶ 15; *see also* Stamm Opening Rep. at ¶ 35) With respect to research and development costs and sales and marketing costs, Stamm explains that all of Yodlee's efforts in this regard related to Risk Insight 2.0, and so this is why she allocated 100% of those costs to that product. (Stamm Opening Rep. at ¶ 35; Stamm Reply Rep. at ¶¶ 16-17) Stamm also sets out how certain costs were allocated to the Credit initiative itself (and thereafter, to Risk Insight 2.0) based on the fact that an affected employee's "planned primary assignment" was to work on the Credit initiative; she explains why this "planned primary assignment" rationale for allocation makes sense, and why, in her view, it does not over-count attributed costs. (Stamm Reply Rep. at ¶ 22)

For these reasons, there is no basis to grant FinApps' motion as it relates to Stamm's net-loss sub-opinion.

### 2. Reimbursement Sub-Opinion

Stamm also includes in her reliance damages calculation the reimbursement sub-opinion (i.e, certain reimbursement payments that Yodlee made to Risk Insight 2.0 clients after FinApps terminated access to the product). (Stamm Opening Rep. at ¶¶ 27, 36-39) FinApps contends that the reimbursement sub-opinion is unreliable for multiple reasons, which the Court will take up in turn.

FinApps first argues that this sub-opinion is unreliable because Stamm "has conducted no investigation, verification, or other analysis demonstrating a link between the amounts in the demand or termination notices sent to Yodlee and FinApps' alleged conduct"; it claims that if she had done so, she would have determined that multiple client demands for reimbursement payments cite to *Yodlee's* misconduct (as opposed to *FinApps*' misconduct) as the primary reason for the clients' dissatisfaction. (D.I. 461 at 12) This argument is not persuasive. Stamm explains that the various demand letters themselves make clear that it was *FinApps*' termination of access to Risk Insight (and *FinApps*' failure to provide any backup option to Risk Insight clients) that was the primary cause of harm to the customers, and was what prompted each of the customers to demand payment. (Stamm Opening Rep. at ¶ 36; Stamm Reply Rep. at ¶ 29; D.I. 514, ex. 6 at 172-73) For example, while a demand letter to Yodlee from Bank of America (the "Bank of America demand letter") does allege that Yodlee breached the contract between the two entities by failing to notify Bank of America that it had engaged FinApps to provide certain support for Risk Insight, the letter goes on to note how *FinApps* "terminated the Risk Insight services product . . . which in turn terminated the provisions of these services by [Yodlee to Bank

7

of America] since June 2019, materially adversely affecting the Bank's home loans process."
(D.I. 514, ex. 12 at YOD12348216)  The Bank of America demand letter further states that Bank of America intended to claim damages reflecting "the loss caused to [Bank of America] of its investment in the infrastructure for Risk Insight services [and] the ongoing costs and expenses incurred" by Bank of America in participating in an investigation occurring in connection with this lawsuit.  (*Id.* (noting that these losses occurred "since the services cannot be utilized")) Similarly, while a demand letter sent from CoreLogic to Yodlee (the "CoreLogic demand letter") charged that Yodlee's failure to disclose that its relationship with FinApps had been deteriorating for a year was "either willfully fraudulent or grossly negligent[,]" the letter went on to explain that CoreLogic had lost its contractually-promised access to Risk Insight reports because *FinApps* had "discontinued its access to the Risk Insight[] service[.]"  (*Id.*, ex. 13 at YOD12348229-30)  CoreLogic alleged that it was owed for all payments that it made to Yodlee (because those payments were made for a Risk Insight product that was no longer available), as well as for the direct and substantial expenses that CoreLogic had incurred in designing and implementing a product that relied upon Risk Insight for content.  (*Id.*)[6]  FinApps is free to attack Stamm's opinion in this regard.  But Stamm has sufficiently explained why, in her view, Yodlee's clients' demands *are* linked to FinApps' termination of Risk Insight.[7]

---

[6]    Stamm cited to the Bank of America demand letter and the CoreLogic demand letter in her opening expert report.  (Stamm Opening Rep. at ¶ 36 n.54)

[7]    In its reply brief, FinApps asserted that Stamm's testimony as to "but-for" causation is inadmissible because she is not permitted to affirmatively testify regarding liability issues. (D.I. 566 at 6-7)  A party cannot reserve for its reply brief arguments that could have and should have been made in its opening brief, and so the Court will not consider this new argument here.  *See Versata Software, Inc. v. NetBrain Techs., Inc.*, Civil Action No. 13-676-LPS-CJB, Civil Action No. 13-678-LPS-CJB, 2015 WL 5768938, at *15 n.17 (D. Del. Sept. 30, 2015).  But the Court notes that it finds it strange that FinApps first complains about Stamm's failure to link the customer payments to its own alleged wrongful conduct, and then when Defendants point out

Second, FinApps takes issue with Stamm's conclusion that the entire amount of all reimbursement payments made to clients by Yodlee are rightly attributable to FinApps' misconduct. (D.I. 461 at 12) It asserts that Stamm's determination in this regard is without basis and is unsupported by any independent analysis or verification. (*Id.*) Here again though, Stamm explained that Yodlee would not have had to make any of these payments if FinApps had not terminated access to Risk Insight; it is FinApps' actions in that regard that made it necessary to include the entire amount of all payments in her reliance damages opinion. (Stamm Opening Rep. at ¶¶ 36-37; Stamm Reply Rep. at ¶ 29; D.I. 514, ex. 6 at 172-73) Stamm is entitled to rely on information provided to her by Yodlee about the reason for these payments, (Stamm Opening Rep. at ¶¶ 37-38; Stamm Reply Rep. at ¶¶ 29-33), and if FinApps wishes to attack Stamm for a failure to independently verify these figures, it can do so on cross-examination.

Next, FinApps argues that Stamm "undermines" her opinion that the reimbursement payments are entirely allocable to FinApps' misconduct when Stamm notes that Yodlee had to make "reimbursements *in excess of the fees received* to compensate [clients] for the clients' internal costs incurred to integrate Risk Insight 2.0 and [also to] *preserve Yodlee's reputation*[.]" (D.I. 461 at 13 (emphasis in original) (quoting Stamm Opening Rep. at ¶ 38); *see also* Stamm Reply Rep. at ¶ 30) FinApps says that Stamm's statements here amount to concessions that the payments reflect considerations other than what would make Yodlee whole for FinApps' alleged misconduct. (*Id.*) This argument is not persuasive. Stamm's opinion is that because of FinApps' misconduct, Yodlee had to: (1) reimburse clients for fees that Yodlee had received from the clients; (2) compensate clients for their internal costs associated with Risk Insight 2.0,

---

where Stamm in fact made that link, FinApps responds by asserting that Stamm is not *allowed* to make that link in the first place.

9

in order to preserve Yodlee's reputation, which had suffered due to "the negative experiences of the clients in connection with the discontinuation of [Risk Insight;]" and (3) to mitigate spillover harm relating to other products after FinApps terminated access to Risk Insight. (Stamm Opening Rep. at ¶ 38; Stamm Reply Rep. at ¶¶ 31-33)  There is nothing contradictory about this explanation.  Here Stamm is simply articulating the different ways in which FinApps' actions are alleged to have caused harm to Yodlee (ways that are not necessarily limited to Yodlee's reimbursement to clients of Risk Insight-related fees).  That is, she is noting how Yodlee had to make certain payments in order to either make clients whole for their FinApps-caused losses, or to avert further client-related losses and/or Yodlee reputational harm that would have otherwise occurred due to FinApps' actions.

Finally, FinApps asserts that Stamm's reimbursement sub-opinion should be excluded because it does not require specialized knowledge, in that Stamm here is simply totaling the amounts listed in the demand letters. (D.I. 461 at 14; D.I. 566 at 9)  The Court disagrees. Stamm's reimbursement sub-opinion involves analysis rather than pure calculations. (D.I. 513 at 19)  Moreover, this sub-opinion is part of a larger opinion with respect to reliance damages.  And that larger opinion will be helpful to the jury in determining the "measure of damages that would restore Yodlee to the economic position it would have been in had Yodlee not entered into an agreement with FinApps." (Stamm Opening Rep. at ¶¶ 30-31)

For the above reasons, the Court denies FinApps' motion as it relates to Stamm's reimbursement sub-opinion.

      **B.**     **Unquantified Damages Opinion**

In Stamm's unquantified damages opinion, she opines that her reliance damages figure

10

"likely" represents a "lower bound on economic harm." (*Id.* at ¶ 44) Her unquantified damages opinion relies on three categories of damages: additional reliance damages, expectation damages and reputational harm. (*Id.* at ¶¶ 43-50) FinApps contends that this opinion is unreliable for several reasons.

With respect to additional reliance damages, Stamm opines that "it is reasonable to assume that Yodlee could have dedicated additional resources to pursuing alternative opportunities had it not entered into an agreement with FinApps." (*Id.* at ¶ 44) FinApps argues that this claim is unreliable because Stamm "does not explain why her assumption is reasonable . . . or identify any such alternative opportunities." (D.I. 461 at 15) This ignores Stamm's analysis. She *does* explain why this assumption is reasonable; to that end, she notes that Envestnet's public filings show: (1) that partnerships are a key aspect of Defendants' operating strategies and (2) that Envestnet has in fact undertaken numerous such partnerships in recent years. (Stamm Opening Rep. at ¶ 44 & nn.63-64) The Court agrees that Stamm's assumption here is a reasonable one, and indeed, that "it would be unreasonable *not* to expect that Yodlee"—a "for profit entity with several product offerings"—"would have pursued other business absent the MSA." (D.I. 513 at 13 (emphasis in original)) And Stamm explains why she did not specifically identify any such alternative opportunities—i.e., that this would require a "wide range of assumptions" and too much speculation. (Stamm Opening Rep. at ¶ 44)[8]

With respect to expectation damages, Stamm opines that FinApps' product "suffered from 'extensive, unreasonable, and persistent technical issues,' making it impossible to

---

[8] The fact that it might be unduly speculative to attempt to identify a *particular* alternative opportunity that Yodlee did not pursue does not, at least in the Court's view, necessarily render it unduly speculative for Stamm to conclude that there would have been at least *some such* opportunity, had the FinApps partnership not existed and gone bad.

11

successfully commercialize the product." (*Id.* at ¶ 47 (citations omitted)) She continues that if FinApps had "delivered a technically sound product, Yodlee would have been able to successfully commercialize the product and generate profits" but that the extent of such profits "are difficult to ascertain" and that she therefore did not quantify them. (*Id.* at ¶ 48)[9] FinApps contends that Stamm is not qualified to opine regarding the technical soundness of software; it faults her for not better explaining her understanding of these technical issues (beyond noting that she had discussions on that score with Defendants' executive Arun Anur). (D.I. 461 at 15 (citing Stamm Opening Report at ¶ 47 n.77)) However, as discussed above, an expert may rely on discussions with company personnel to gather relevant information. *See Championship Tournaments, LLC*, 2022 WL 1002137, at *6; *Wonderland Nursery Goods Co.*, 2013 WL 6328772, at *5.[10]

With respect to reputational harm, Stamm opines that "as a result of FinApps' decision to suspend access to Risk Insight 2.0, Yodlee suffered reputational harm within the industry" and notes that Yodlee "identified three lost business opportunities associated with Risk Insight 2.0 customers as a direct result of FinApps' alleged wrongful misconduct[.]" (Stamm Opening Rep. at ¶ 49) Stamm then opines that these losses "are a direct result of FinApps' decision to suspend access to Risk Insight 2.0[,]" but acknowledges that because "these losses are intermingled with other Yodlee solutions not directly related to Risk Insight 2.0[,]" she did not quantify such

---

[9] FinApps points out that in her deposition, Stamm was forced to acknowledge that because such damages are hard to quantify, the amount of such damages "could be as low as zero[.]" (D.I. 462, ex. 7 at 218) That seems like a good answer for FinApps's counsel to elicit from Stamm when she is cross-examined, not a reason to exclude her testimony.

[10] Defendants' expert Nick Ferrara also detailed ways in which Risk Insight 2.0 performed poorly in his expert report—testimony that will rise or fall depending on its own merit. (D.I. 469, ex. 3 at ¶¶ 32-76) Stamm considered Ferrara's report in connection with her reply report. (Stamm Reply Rep. at Appendix C; *see also* D.I. 513 at 14)

damages. (*Id.* at ¶ 50) FinApps complains that this opinion: (1) fails to identify the wrongful conduct at issue; (2) fails to conduct an independent analysis regarding these opportunities; (3) fails to explain how FinApps' conduct caused them; and (4) improperly relies on discussions with Mr. Anur. (D.I. 461 at 16) Here again, this ignores that Stamm expressly identifies the alleged wrongful misconduct as "FinApps' decision to suspend access to Risk Insight 2.0[.]" (Stamm Opening Rep. at ¶ 49) Moreover, as noted above, there is nothing improper about an expert relying upon discussions with company personnel in order to learn relevant information. FinApps also argues that Stamm's opinion that the losses are a direct result of FinApps' misconduct is contradicted by her statement that they are "'intermingled'" with other Yodlee solutions. (D.I. 461 at 16) But there is nothing contradictory about this. Stamm's opinion is that after FinApps suspended access to Risk Insight 2.0, as a direct "result": (1) AvantCredit terminated a different agreement with Yodlee relating to an aggregation product; (2) PNC decided not to renew its API contract with Yodlee; and (3) Bank of America negotiated the removal of a penalty clause in a separate agreement with Yodlee. (Stamm Opening Rep. at ¶¶ 49-50) And as for Stamm's statement that these losses were "intermingled with other Yodlee solutions not directly related to Risk Insight 2.0[,]" (*id.* at ¶ 50), it is not problematic. The Court simply understands Stamm to mean that while the losses were *caused* by FinApps' conduct regarding Risk Insight, they were "felt" not only in the Risk Insight-related portion of Yodlee's business (which Stamm was specifically evaluating) but also in other parts of Yodlee's business (which Stamm was not assessing). (D.I. 513 at 15)

   Finally, FinApps argues that Stamm's claim that the reliance damages estimates that she presents would be "a lower bound" on Defendants' economic injury (since there are also these additional categories of damages that Stamm did not quantify) is speculative and therefore

13

unreliable. (D.I. 461 at 17) The Court will not exclude the unquantified damages opinion on this basis, either. Stamm properly relies on discussions with Yodlee personnel to support her opinions in this regard. And as Stamm puts it, "[t]he inability to reasonably quantify [these] damages . . . does not support a finding that there are no sources of additional harm"; instead this "is simply an acknowledgement that any attempt to quantify the harm would be inherently speculative." (Stamm Reply Rep. at ¶ 34); *see also, e.g.*, *Disney Enters., Inc. v. VidAngel Inc.*, Case No.:CV 16-04109-AB (PLAx), 2019 WL 4544428, at *5 (C.D. Cal. May 29, 2019) (explaining that an opinion regarding unquantifiable damages "is not excludable as unreliable or speculative or otherwise simply because it is qualitative instead of quantitative").

For these reasons, the Court concludes that the Motion should be denied as to Stamm's unquantified damages opinion.

### C. Alternative Value Opinion

FinApps' damages expert, DeForest McDuff, Ph.D., calculated the "value to Defendants stemming from the alleged wrongful conduct[,]" which included the value of the Equifax partnership, the value of direct sales of Snapshot 2.0, avoided investment and avoided contract fees. (D.I. 462, ex. 3 at ¶ 10) In her rebuttal report, Stamm attacks Dr. McDuff's analysis in various ways, (*id.*, ex. 4 ("Stamm Rebuttal Rep.") at ¶¶ 84-115), and she makes adjustments to the analysis in her alternative value opinion, (*id.* at ¶¶ 116-22). FinApps argues that Stamm's alternative value opinion is unreliable for four reasons. The Court will address each reason below.

Stamm opines that the "estimated . . . contract value" of Equifax's Snapshot 2.0 sales to date is $731,200 (the "$731,200 contract value"); in support, she cites to a spreadsheet prepared for this litigation and produced after the close of fact discovery. (Stamm Rebuttal Rep. at ¶ 116

14

& n.181; *see also* D.I. 514, ex. 11)  FinApps' first argument is that Stamm's reliance on this spreadsheet (with no independent verification of the information contained therein) renders her opinion unreliable.  (D.I. 461 at 18-19; D.I. 566 at 8)  The Court acknowledges that Stamm's deposition testimony on this point, read in a vacuum, would be a bit concerning.  There she reported understanding that the "origin" of the spreadsheet was Yodlee, but said that she did not know "anything more than that[,]" including "how [the spreadsheet] was created" or whether "Equifax prepared it and sent it to Yodlee" or whether Yodlee prepared it.  (D.I. 567, ex. 1 at 77-78); *Shire Viropharma Inc. v. CSL Behring LLC*, Civil Action No. 17-414 CONSOLIDATED, 2021 WL 1227097, at *20 (D. Del. Mar. 31, 2021) (noting that as a general matter, if an expert relies on a secondary source, she should demonstrate that (1) she has conducted some sort of investigation or verification to ensure that the data is accurate and helpful to the court and that (2) the investigation is sufficiently thorough such that she gained a working familiarity with the data).  That said, in her rebuttal report, Stamm demonstrated familiarity with facts relating to the spreadsheet's content—by explaining that she had discussed with Yodlee personnel the four Snapshot 2.0 clients that are listed on the spreadsheet.  (Stamm Rebuttal Rep. at ¶ 99)  And Defendants have subsequently cited to a Yodlee representative's testimony indicating that the spreadsheet's data is derived from a "schedule[]" or "regular report" prepared by Equifax, which Equifax regularly reviews with an Envestnet employee, Jeff Hollander.  (D.I. 514, ex. 7 at 78-80; *see also id.*, ex. 16)  In sum, Stamm requested the data found in the spreadsheet, (D.I. 567, ex. 1 at 78), and she is familiar with that data.  In light of this, and understanding that Stamm would

15

testify that she is aware of the spreadsheet's origins (as they are set out by Defendants above), then the Court will not exclude the testimony.[11]

Second, FinApps takes issue with Stamm's reliance on another spreadsheet prepared for this case and produced after the close of fact discovery; this spreadsheet is used to support Stamm's opinion that revenues from direct sales of Snapshot 2.0 amount to $484,555. (D.I. 461 at 19 (citing Stamm Rebuttal Rep. at ¶ 121 n.185); *see also* D.I. 462, ex. 18) However, this spreadsheet pulled data from Yodlee's "accounting systems[.]" (D.I. 514, ex. 7 at 18-19) And in her deposition, Stamm explained that she felt that the data contained in the spreadsheet was corroborated by another document she had reviewed (a Yodlee revenue recognition schedule regarding Equifax VOA MVP revenues). (D.I. 462, ex. 7 at 81-82)[12] Thus, Stamm's reliance on this spreadsheet does not require exclusion of her opinion.

Third, FinApps notes that in her alternative value opinion, Stamm attempts to identify the value of the revenue generated by the accused product, and she then apportions this value to account for non-proprietary aspects of the product. (Stamm Rebuttal Opinion at ¶¶ 109-21) FinApps argues that Stamm's apportionment does not "fit" the opinion that she purports to offer for a few reasons, including: (1) she uses the $731,200 contract value as a starting point, instead of the minimum fees that Defendants were guaranteed to receive under their MSA with Equifax;

---

[11] To the extent that FinApps argues that the resale totals reflected in this spreadsheet are "irreconcilable" with the millions of dollars in fees that Yodlee has received to date from Equifax, (D.I. 461 at 18), Defendants make the understandable retort that this is due to the particular fee structure set out in the contract between Yodlee and Equifax, which also implicates revenues from a non-accused product, (D.I. 513 at 16). FinApps is free to further explore this issue with Stamm during cross-examination.

[12] FinApps faults Stamm for misidentifying this corroborating document as an amortization agreement. (D.I. 461 at 19) But Stamm corrected this error in an Errata to her rebuttal report. (D.I. 462, ex. 5 at 1 n.1; *see also* D.I. 513 at 17 n.12)

and (2) the revenue sharing percentage that Stamm applied to the value of sales of Snapshot 2.0 (pursuant to the Equifax MSA) comes from a different contract between different parties (i.e., from the MSA between Yodlee and FinApps). (D.I. 461 at 19-20) But Stamm cogently explained in her report why she made these choices. (Stamm Rebuttal Rep. at ¶¶ 116-21; *see also* D.I. 513 at 17-18).

Lastly, FinApps again argues that Stamm's alternative value opinion should be excluded because it is nothing more than simple math. (D.I. 461 at 20; D.I. 566 at 9) The Court again rejects this argument. Stamm's alternative value opinion is not merely calculations, but instead constitutes a "detailed critique" of Dr. McDuff's analysis. (D.I. 513 at 20)

For these reasons, the Court will not grant FinApps' motion as it relates to Stamm's alterative value opinion.

### IV. CONCLUSION

For the reasons set out above, the Court hereby ORDERS that FinApp's Motion is DENIED.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **August 7, 2023** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir.

2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.


Dated: August 2, 2023

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE