## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

FINANCIALAPPS, LLC,                    )
                                       )
      Plaintiff,                     )
                                       )
    v.                              )     Civil Action No. 19-1337-GBW-CJB
                                       )
ENVESTNET, INC. and YODLEE, INC.,      )
                                       )
      Defendants.                    )

## <u>MEMORANDUM ORDER</u>

Pending before the Court in this action is Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc.'s ("Yodlee," and collectively with Envestnet, "Defendants") motion to exclude the opinions and testimony of Plaintiff FinancialApps, LLC's ("Plaintiff" or "FinApps") damages expert, DeForest McDuff ("McDuff"). (D.I. 463) For the reasons set out below, the Court GRANTS-IN-PART and DENIES-IN-PART the Motion.

## I.      BACKGROUND

The Court will write here for the parties, and so it will forego a lengthy recitation of the facts. To the extent certain facts are relevant to resolution of the Motion, they will be set out in Section III.

The Motion was filed on January 12, 2023. (D.I. 463) Briefing on the Motion was completed on April 27, 2023. (D.I. 561) The Court's referral in the case from United States District Judge Gregory B. Williams includes authority to resolve the instant Motion. (D.I. 437)

## II.      STANDARD OF REVIEW

The Court has frequently set out the relevant standard of review for assessing a motion, like this one, filed pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). One such instance came in *Integra LifeScis. Corp. v.*

*HyperBranch Med. Tech., Inc*., Civil Action No. 15-819-LPS-CJB, 2018 WL 1785033, at *1-2 (D. Del. Apr. 4, 2018).  The Court incorporates by reference those legal standards set out in *Integra*, and will follow them herein.  To the extent that additional related legal principles regarding Rule 702 and *Daubert* are relevant, the Court will set those out in Section III.

## III.    DISCUSSION

With their Motion, Defendants make three different broad sets of arguments as to why McDuff's opinions should be excluded:  (1) that his so-called "Harm to FinApps" analysis should be excluded; (2) that his so-called "Value to Defendants" analysis should be excluded; and (3) that his opinions on trade secret value should be excluded.  The Court will address these arguments in turn.

### A.    McDuff's "Harm to FinApps" Analysis

For his "Harm to FinApps" analysis, McDuff calculates such harm in two ways.  First, for his low estimate, McDuff calculates the difference between FinApps' costs to develop Risk Insight[1] and its actual returns under the parties' related Software License and Master Services Agreement ("MSA").  (D.I. 465, ex. 1 ("McDuff Opening Rep.") at ¶¶ 61-62)  He opines that were it not for Defendants' wrongful conduct, FinApps would have made at least as much as it spent on developing Risk Insight (the "Cost approach").  (*Id.* at ¶¶ 61-62, 64)  Second, for his high estimate, McDuff calculates the difference between certain forward-looking revenue projections related to Risk Insight and FinApps' actual returns under the MSA.  (*Id.* at ¶¶ 43-44)  He opines that were it not for Defendants' wrongful conduct, FinApps' actual returns under the

---

[1]    Risk Insight is a software product that FinApps developed and that Yodlee marketed and sold, until Defendants allegedly misappropriated FinApps' related trade secrets in order to develop a different product.

MSA would have met the projections and continued beyond the term of the MSA (the "Income + Market approach"). (*Id.* at ¶¶ 44, 50)

Defendants assert that McDuff's "Harm to FinApps" Analysis should be excluded for a number of reasons. The Court will address each such reason below.

### 1. Whether McDuff Sufficiently Ties Damages to the Alleged Misconduct

Defendants first argue that McDuff used an unreliable methodology in assessing how much financial harm Defendants' alleged misconduct inflicted on FinApps. They say this is so because McDuff "does not show that the failure of Risk Insight to meet expectations *was caused by* the alleged misconduct." (D.I. 464 at 3 (emphasis added))[2]

To what extent was McDuff required to attempt to affirmatively demonstrate that Defendants' alleged misconduct caused the damages at issue? On the one hand, there are some cases (with egregious-sounding facts) where courts have excluded an expert's damages analysis when the expert did not sufficiently explain how the misconduct in question caused or was linked to the damages sought. *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005) (affirming the exclusion of a damages expert's report in part because "the excluded expert report did not link a single loss to a specific misconduct[,]" in a circumstance where it was clear that the expert "ignored significant factors that might have excluded the [alleged misconduct] as the reason for the losses"); *AgroFresh Inc. v. Essentiv LLC*, C.A. No. 16-662 (MN), 2019 WL 9514565, at *1 (D. Del. Oct. 7, 2019) (excluding a damages

---

[2]        In their opening brief, Defendants additionally argued that McDuff's harm analysis was faulty because he assumed Defendants' liability in assessing the damages owed. (D.I. 464 at 4, 7)  But damages experts may properly assume the opposing party's liability (when it is established independently), *see Allscripts Healthcare, LLC v. Andor Health, LLC*, Civil Action No. 21-704-MAK, 2022 WL 3021560, at *22 n.158 (D. Del. July 29, 2022), and in their reply brief, Defendants conceded as much, (D.I. 561 at 1).

expert's testimony where the expert "fails to connect the trade secret (or any other) issues in the case with his sums of costs[,]" and where the extent of the expert's opinion was "a summation of costs from two general aspects of Plaintiff's business" that were not connected at all to the trade secrets at issue.  On the other hand, there are plenty of opinions that state that a damages expert is entitled to *presume* causation, and may then simply go on to describe what damages were purportedly caused by the misconduct in question.  *See, e.g.*, *Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, Case No. 2:15-CV-512-WCB, Case No. 2-16-CV-198-WCB, 2017 WL 1319553, at *4-6 (E.D. Tex. Apr. 10, 2017) (citing cases) (Bryson, J., sitting by designation); *Gaedeke Holdings VII, Ltd v. Baker*, Case No. CIV-11-649-M, 2015 WL 11570978, at *3 (W.D. Okla. Nov. 30, 2015).

The Court need not endeavor to reconcile these competing strands of caselaw.  That is because the record indicates that McDuff *did* attempt to explain why Defendants' misconduct in fact caused the damages in question.

Defendants argue that this is not so, asserting that the "record is full of alternative explanations for Risk Insight's poor performance, and McDuff does not meaningfully explore any of them."  (D.I. 464 at 1)  More specifically, Defendants argue that:

- McDuff ignores the high rate of failure for startups and new ventures;

- McDuff ignores evidence of challenging market conditions;

- McDuff ignores evidence that FinApps' platform (the "Platform") is not advanced or unique; and

- McDuff ignores evidence of Risk Insight's poor performance.

(*Id.* at 4-7)  Yet McDuff *did* in fact address each of these alternative explanations highlighted by Defendants—explaining why he did not find them persuasive (and thus why, in the absence of

4

any other explanation he could think of, Defendants' misconduct had to have been the cause for

Risk Insight's failure).  (*See* D.I. 465, ex. 2 at 208-209)  In that regard:

- McDuff confronted the literature that Defendants' damages expert cited regarding the high rate of failure for startups and new ventures.  He explained why this literature was "flawed and unreliable[,]" and why FinApps was not, in his view, properly considered a new technology venture. (McDuff Reply Rep. at ¶¶ 14-15);

- McDuff considered the evidence of challenging market conditions cited by Defendants and explained why he did not find it to be "influential[.]"  (D.I. 465, ex. 2 at 278-79; McDuff Reply Rep. at ¶¶ 72-74)

- McDuff addressed Risk Insight's value in a competitive market.  (D.I. 465, ex. 2 at 91)  He also took up Defendants' assertions that others in the market were giving away the same technology for free, or that a consultant had deemed the Platform to be "clever, but repeatable[;]" McDuff explained why he felt Defendants' statements in these regards mischaracterized the relevant record testimony at issue.  (D.I. 516 at 6 (citing D.I. 517, ex. 2 at ¶¶ 6-8; D.I. 465, ex. 2 at 290-91))

- McDuff opined that Risk Insight's technical issues were not significant enough to dissuade Yodlee from pursuing Risk Insight market opportunities, given, *inter alia*, Yodlee's decision to renew relevant contracts with FinApps during the relevant time period.  (McDuff Opening Rep. at ¶ 119; McDuff Reply Rep. at ¶ 71)

Essentially, as to each of these topics, Defendants' gripe is not really that McDuff did not

consider a particular alternative explanation for why Risk Insight did not find great success.

Instead, Defendants are really just articulating why they disagree with McDuff's conclusions on

these points, or why their own expert's contrary conclusions are stronger or better thought out

than McDuff's viewpoints.  Those are merits-based disagreements, not indicia that McDuff's

analysis lacks a sufficiently reliable methodology.  *Daubert*, 509 U.S. at 595 ("The focus, of

course, must be solely on principles and methodology, not on the conclusions that they

generate."); *see also* (D.I. 516 at 4).  Defendants' challenges to McDuff's failure to adequately consider "alternative explanations" goes to weight, not admissibility.  *See, e.g.*, *WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*, 628 F.3d 1032, 1039-40 (8th Cir. 2011); *Patel v. Verde Valley Med. Ctr.*, Nos. CV-05-1129-PHX-MHM, CV-05-2926-PHX-MHM, 2009 WL 5842048, at *3 (D. Ariz. Mar. 31, 2009).

The Court therefore denies Defendants' Motion as it relates to purported lack of sufficient explanation of causation, or to the failure to consider alternative explanations.

## 2.    Whether McDuff's Cost Approach Relies on Dubious Data

With his Cost approach (i.e., the difference between FinApps' costs and actual returns), McDuff explains that he "understand[s] that all of the costs represented" in a spreadsheet produced by FinApps "are associated with the development of the FinApps Platform and Proprietary Information and Technology."  (McDuff Opening Rep. at ¶ 65)  Defendants next argue that McDuff's Cost approach is unreliable because it relies on three categories of "dubious data" that the Court will now discuss.  (D.I. 464 at 7-11)

First, McDuff's Cost approach considers spreadsheets that report costs dating back to 2011; some of these costs were incurred by FinApps' parent company Freedomquest, LLC ("Freedomquest")[3] in developing a predecessor product called PowerWallet.[4]  (McDuff Opening Rep. at ¶ 65; D.I. 465, ex. 6 at 55-56; D.I. 465, exs. 10-11)  McDuff opines that "although certain costs were initially related to the development of PowerWallet starting in 2011, that development

---

[3]    FinApps was established in mid-2014.  (D.I. 465, ex. 6 at 14, 38)  When it was established it acquired the assets and liabilities of an entity known as PowerWallet (an entity that apparently produced the product referred to above, also known as PowerWallet).  (D.I. 517, ex. 2 at ¶ 4; *id.*, ex. 6 at 656-58; *see also* D.I. 465, ex. 6 at 20)

[4]    PowerWallet was a platform for individuals to use in managing their personal finances.  (D.I. 465, ex. 6 at 22; McDuff Opening Rep. at ¶ 15)

work was subsequently transitioned over to and incorporated in the [] Platform" and that "FinApps is responsible for all of the costs represented in the financial data." (McDuff Opening Rep. at ¶ 65; *see also* D.I. 517, ex. 6 at 656-57; D.I. 517, ex. 2 at ¶ 4)  Defendants contend that McDuff wrongly considered these PowerWallet-related costs, because his Cost approach is supposed to be based on "costs incurred to develop the relevant products and technologies in expectation of future benefits from bringing them to market (primarily, in verticals that were to be targeted by Risk Insight, such as credit reports for financial institutions related to credit, loans, and mortgages)[,]" (McDuff Opening Rep. at ¶ 61), and yet PowerWallet had nothing to do with credit reporting and thus did not target such verticals, (D.I. 464 at 8; D.I. 561 at 5).

The Court agrees with FinApps that McDuff's inclusion of these costs does not require exclusion.  (D.I. 516 at 8)  McDuff explains that his Cost approach considers FinApps' "historical costs" to develop the Platform, (McDuff Opening Rep. at ¶ 64), and even Defendants contend that the "core of the Platform[]came from PowerWallet[,]" (D.I. 561 at 3 n.2).  To the Court, it seems like reasonable minds could disagree about whether the costs to develop or service an important component of a product—even if they were incurred before FinApps (or the predecessor owner of PowerWallet) knew exactly how it would best utilize that component in the future—should be rightly counted in a Cost approach like this one.  Under the circumstances, Defendants' disagreement with McDuff's selection of data inputs is an argument that "should be made on cross-examination of the witness in front of the trier of fact."  *Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.*, Civil Action No. 4:15-CV-307, 2018 WL 626355, at *8 (E.D. Tex. Jan. 30, 2018) (internal quotation marks and citation omitted), *order clarified on other grounds*, 2018 WL 6930270 (E.D. Tex. Feb. 27, 2018).

Next, the spreadsheets that McDuff relies upon include interest on a loan that Freedomquest obtained in 2017 from Equity Acquisition LLC—a loan that, via a 2020 amendment, was thereafter secured by Freedomquest, FinApps, and two other affiliated entities. (D.I. 465, exs. 11-13)  While the initial loan was subject to an 18% interest rate, the 2020 amendment to the loan retroactively revised that rate to 25%.  (*Id.*, exs. 12-13; *see also* McDuff Opening Rep. at ¶ 67)  In his Cost approach, McDuff includes the interest due on this loan (utilizing the initial 18% interest rate) because these interest expenses are "associated with the financing of the development activities directed towards" the Platform and "were incurred with the expectation that FinAps would later recoup them through product commercialization opportunities that were diminished due to the alleged wrongful conduct."  (McDuff Opening Rep. at ¶ 67)  These interest payments apparently amount to an additional $18.6 million in costs. (D.I. 464 at 9)

Defendants argue that McDuff was wrong to include this interest sum in his Cost approach, because FinApps was not made liable on the loan until August 2020 (thirteen months after it initiated this lawsuit) and because by September 2020, FinApps had essentially ceased operating as a going concern.  (*Id.* (asserting that these facts "undermine [McDuff's] claim that [FinApps] incurred this liability expecting to recoup it through future business") (citing D.I. 465, ex. 13; *id*., ex. 14 at 644-53))  Further, Defendants contend that the inclusion of these interest amounts is dubious for another reason:  the lender on the loan is a holding company that owns FinApps and is controlled by principal FinApps investor Howard Dvorkin, such that this portion of the damages sum "is just the result of Mr. Dvorkin lending himself money at an exorbitant rate and then, 1[3] months into this litigation, making [FinApps] retroactively liable on that loan."  (*Id.* at 10 (citing D.I. 465, ex. 7 at 161-62))  FinApps' agreement in August 2020 to

become liable on this loan is FinApps' "own problem[,]" according to Defendants.  (D.I. 561 at 5 & n.3)

The Court will not exclude the interest expenses on these grounds.  Now, the Court certainly understands why Defendants are challenging these costs (costs that apparently make up a significant portion of McDuff's "lower-end" figure).  (*Id.* at 5)  It can see how the close relationship between Mr. Dvorkin, the lender, and the borrower seems suspicious from Defendants' vantage point.  But on the other hand, FinApp's parent entered into the initial loan before the relationship between FinApps and Defendants went bad.  And so in that respect, it seems hard to say that reliance on the fact of the loan and its impact is simply naked, *post hoc* attempt to jack up costs related to this dispute.  And from an economics perspective, the Court cannot say that it is necessarily wrong for McDuff to take into account the interest on a loan that might have been anticipated to accrue before the parties' dispute matured—even if that interest did not in fact ultimately come due until after this case was filed (and shortly before FinApps ceased to operate).  So in sum, while it seems that Defendants will have some good fodder for cross-examination regarding these interest expenses, McDuff's choice to include this figure in his Cost approach does not, in and of itself, render his methodology unreliable.  *See, e.g.*, *Quintel Tech. Ltd.*, 2018 WL 626355, at *8.

Finally, McDuff's Cost analysis includes fixed expenses, such as rent/equipment lease expenses and other overhead expenses, as part of the damages sum.  (McDuff Opening Rep. at ¶ 66)  McDuff opines that these expenses may be considered when assessing harm to FinApps because "they were incurred with the expectation that FinApps would later recoup them through product commercialization opportunities that were diminished due to the alleged wrongful conduct."  (*Id.*)  Defendants argue that this is "confusing[,]" since McDuff critiqued Defendants'

9

damages expert for employing a method that would "compensate[] Yodlee" for "*fixed costs* that are independent from and did not increase directly in connection with Risk Insight." (D.I. 464 at 10 (internal quotation marks and citation omitted, emphasis in original) (citing D.I. 465, ex. 15 at ¶ 16)) According to Defendants, McDuff is applying a different rule for FinApps, allowing it to recover fixed costs if FinApps "expected" to recoup them. (*Id.*)

The Court also will not exclude McDuff's opinion on this front. Here again, McDuff provided an explanation as to why he includes these expenses in his damages sum. To the extent that Defendants disagree with this explanation, or think that McDuff is applying a more lenient standard to FinApps than he is to Defendants, they can attack that on cross-examination.

For these reasons, the Court concludes that the Motion should be denied as to McDuff's Cost approach.

### 3.  Whether McDuff's Income + Market Approach is Unreliable

With his Income + Market approach (which calculates the difference between projections and FinApps' actual returns for Risk Insight), McDuff relies on two sets of projections: one created by Yodlee in 2016 and 2017 (the "2017 Yodlee projection") and one created by a FinApps consultant in October 2018 (the "2018 Morgan Hill projection"). (McDuff Opening Rep. at ¶ 47) He opines that had the alleged wrongful conduct not occurred, FinApps would have met these projections. (*Id.* at ¶¶ 44-46) McDuff also opines that in this hypothetical world, wherein Risk Insight was a success, the parties would have decided to extend their partnership beyond the term of the MSA; to account for this, McDuff adds a large "terminal value" to his damages estimate. (*Id.* at ¶ 50)

Defendants argue that McDuff's use of these projections renders his Income + Market approach unreliable because the projections are cherry-picked and McDuff did not vet them.

(D.I. 464 at 11-15; D.I. 561 at 6-7)  They also contend that McDuff's inclusion of a terminal

value is "mere speculation" and should be excluded.  (D.I. 464 at 15-17; D.I. 561 at 7-8)  The

Court takes up these arguments in turn below.

The Court first addresses Defendants' accusation that McDuff improperly cherry-picked

these projections, which "predict several times more future revenue than a [later-created] January

2019 Yodlee projection [the '2019 Yodlee projection'] [that McDuff] eventually discards."  (D.I.

464 at 11; *see also* D.I. 561 at 6)  The Court does not have much information about this 2019

Yodlee projection, as it is only summarized in one line of a table included in Defendants'

damages expert's rebuttal report (the "Stamm Rebuttal Report").  (D.I. 465, ex. 4 at ¶ 42)

McDuff testified that he does not remember reviewing the 2019 Yodlee projection when

preparing his opening report; he thinks that he first saw reference to it when he was reviewing

the Stamm Rebuttal Report.  (*Id.*, ex. 2 at 195)

The Court cannot conclude that McDuff's failure to rely upon the 2019 Yodlee projection

as part of his Income + Market approach amounts to the use of an unreliable methodology.  In

his reply report, McDuff explains why there is no basis to conclude that the 2019 Yodlee

projection is "more informative than" the 2017 Yodlee projection and the 2018 Morgan Hill

projection.  (McDuff Reply Rep. at ¶ 52)  On that front, he notes that:  (1) Defendants' damages

expert did not provide additional information or context regarding the 2019 Yodlee projection

and did not use it quantitatively for evaluating damages; and (2) the internal projections prepared

in January 2019 for the 2019 Yodlee projection are worthy of skepticism, because they "would

have coincided with [Yodlee's] acts of alleged misconduct that . . .were ongoing at that time."

(*Id.*; *see also id.*, ex. 2 at 189, 192-94 (noting that at the time of these projections by Yodlee,

"Yodlee [was] seeking to exit the partnership and [allegedly] making fraudulent statements to FinApps and falsely conveying their intent to proceed"))

Defendants make a few retorts in response.  But none are persuasive.

For example, Defendants argue that McDuff is wrong to say that the record provides no further context for the 2019 Yodlee projection beyond its reference in one line of the Stamm Rebuttal Report.  Here, Defendants cite to certain e-mails of record between Defendants' personnel in January and February 2019, which appear to be discussing (though it is sometimes hard to tell) the 2019 Yodlee projection.  (D.I. 561 at 6 (citing D.I. 562, exs. 25-29))  But these e-mails are few and cursory.  (D.I. 562, exs. 25-29)  And it is again worth noting that McDuff was not even aware of the existence of the 2019 Yodlee projection when he submitted his opening expert report.  (D.I. 465, ex. 2 at 195)  So how could McDuff have intentionally "cherry-picked" data by excluding that projection and crediting others, when he did not even know that the projection existed in the first place?[5]

Defendants also claim that McDuff is being inconsistent in discounting the 2019 Yodlee projection on the ground that Yodlee was allegedly engaged in acts of misconduct at the time that projection was created.  Defendants note that in its Complaint, FinApps alleged that Yodlee was engaged in relevant misconduct prior to and during 2017; thus, they argue that according to McDuff's rationale, such misconduct should also taint any reliance on the 2017 Yodlee projection and the 2018 Morgan Hill projection.  (D.I. 561 at 6; *see also* D.I. 2 at ¶¶ 75-89; D.I. 464 at 12)  But the 2017 Yodlee projection was prepared at a time when FinApps and Yodlee

_____

[5]      It is not as if Defendants' damages expert delves deeply into this 2019 Yodlee projection.  Again, so far as the Court can tell, the only time the projection is referenced in Defendants' experts report comes in a one-line notation, with no other supporting context.  *See supra* at 11.

were working together to further Risk Insight's prospects—and well prior to the point when these parties' relationship deteriorated.  (McDuff Opening Rep. at ¶ 47(a))  So even if Yodlee was allegedly covertly engaging in certain wrongful actions as of the time of the 2017 Yodlee projection, by the time of the 2019 Yodlee projection, the FinApps/Yodlee relationship was surely in a much different—and overtly antagonistic—place.  In light of this, it does not seem farfetched for McDuff to have concluded that any Yodlee projections from the 2019 period are corrupted in a way that does not apply to those Yodlee made in 2017.  As for the 2018 Morgan Hill projection, while it was prepared in October 2018, Yodlee itself is not the entity that made the projection.  Instead, Morgan Hill, a third-party consultant, did so (following meetings with FinApps and Yodlee personnel).  (D.I. 465, ex. 2 at 192-93; McDuff Reply Rep. at ¶¶ 23, 39-41) The fact that this projection was ultimately blessed by an independent third party provides an understandable reason why McDuff may have credited it, while not crediting the 2019 Yodlee projection.  (D.I. 516 at 10 n.8)

In sum, the fact that McDuff did not utilize the 2019 Yodlee projection does not require exclusion of his Income + Market approach.  *See, e.g.*, *FinancialApps, LLC v. Envestnet, Inc.*, Civil Action No. 19-1337-GBW-CJB, 2023 WL 4936007, at *2 n.3 (D. Del. July 28, 2023) ("As a general matter, in a case like this one—where there are hundreds (if not thousands) of facts that might be considered and/or documents that might be cited—an expert's failure to cite to or focus on one particular fact or one particular document that the other side is fixated on does not strike the Court as necessarily amounting to the use of an unreliable methodology.").

Next, the Court considers whether McDuff sufficiently vetted the 2017 Yodlee projection and the 2018 Morgan Hill projection.  Courts have explained that forward-looking projections can be a basis for an expert's damages opinion where the expert sufficiently explains why he

relied on the projections and why he believed them to be reliable.  *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012); *Sandoz Inc. v. United Therapeutics Corp.*, Case No. 2:19-cv-10170 (BRM) (JSA), 2022 WL 17335696, at *22 (D.N.J. Mar. 30, 2022); *Rhoads Indus., Inc. v. Shoreline Found., Inc.*, Civil Action No. 15-921, Civil Action No. 17-266, 2021 WL 2778562, at *31 (E.D. Pa. July 2, 2021), *reconsideration denied*, 2021 WL 3708672 (E.D. Pa. Aug. 19, 2021).

McDuff has satisfied these requirements here.  He explains that the 2017 Yodlee projection was prepared by "senior executives at Yodlee and members of Yodlee's finance team[,]" who were "qualified to prepare projections related to the early-stage credit initiatives at Yodlee[.]"  (McDuff Reply Rep. at ¶ 28)  The 2018 Morgan Hill projection, meanwhile, was prepared by "qualified third-party consultants" following "onsite meetings between FinApps and certain Yodlee personnel, in which Yodlee personnel represented to FinApps the importance of the partnership to Yodlee and their intentions to grow Risk Insight into a large business venture." (*Id.* at ¶ 39; *see also* McDuff Opening Rep. at ¶ 47(b))  And McDuff explains in some detail why he relied on these projections and believed them to be reasonable reflections of "market realities surrounding demand for the relevant technologies and indicators of addressable market size[.]" (McDuff Reply Rep. at ¶ 15; *see also id.* at ¶¶ 19, 25-27, 29-37, 40-51)  McDuff's explanation included an analysis of the inputs used in these projections, and why those inputs were "reliable[.]"  (*Id.* at ¶¶ 29-37, 40-51; *see also* D.I. 465, ex. 2 at 116-20, 124-26)  Moreover, McDuff acknowledges that reliance on the projections comes with "a degree of risk and uncertainty[,]" and explains that he attempted to account for this by applying a discount rate reflecting the risk characteristics of the business and by including a range of projection estimates (some lower or higher than others).  (McDuff Reply Rep. at ¶ 16)  "Counsel can cross-examine

[McDuff] and [Defendants' damages expert] about their reliance on different underlying data [in their damages opinions], and then the jury will decide whether the expert's reliance is correct or if the expert relies on the best data." *Donnelly v. Propharma Grp. Topco LLC*, CIVIL ACTION NO. 21-894-MAK, 2023 WL 418538, at *1 n.1 (D. Del. Jan. 9, 2023) (internal quotation marks and citations omitted) (concluding that damages experts' reliance on pitchbooks and valuations were reliable and admissible).[6]

Finally, Defendants argue that McDuff's inclusion of a terminal value amounts to pure speculation. (D.I. 464 at 15-17; D.I. 561 at 7-8) In support of this inclusion, McDuff notes that: (1) the projections he relies upon "generally show FinApps' expected revenues to be near their highest point in the final year of the discrete projection period, suggesting that there were likely significant potential revenues beyond that point[;]" and (2) the relevant contract agreements "included automatic renewal clauses, indicating that the parties had anticipated it would be of mutual benefit to continue the partnership beyond the discrete projection period if it were successful[.]" (McDuff Opening Rep. at ¶ 50) According to Defendants, however, McDuff's terminal value should be excluded as unduly speculative because: (1) the underlying projections are unreliable; (2) McDuff's reliance on the fact that the relevant contracts have renewal clauses

---

[6]     *See also Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*, 267 F. Supp. 3d 649, 657-58 (M.D.N.C. 2017) (rejecting the defendant's argument that an expert's damages calculation should be excluded because he did not "adequately verify the budgets and cherry picked [wildly inaccurate] budgets, without explaining his choice[,]" where the expert "concluded, as an economist and with his experience calculating damages, that [plaintiff's] budget process was exacting and reliable[,]" and where he provided an overview of that process, and he accounted for imperfections in the budgets); *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 232-33 (E.D. Pa. 2017) (rejecting the defendant's argument that a damages expert's reliance on the plaintiff's business projections rendered his opinion inadmissible, where the expert's reports and deposition testimony "demonstrate[d] that he considered the reliability of the market projections, that he understood how they were created, and that he will be able to provide detailed explanations as to why he found their use appropriate").

in order to justify application of a terminal value to the end of the contract term is "inconsistent"—in that he also added a terminal value to the end of a contract term as part of his Value to Defendants analysis, but the contract at issue there did *not* contain an automatic renewal clause; and (3) the Risk Insight project "went poorly[.]"  (D.I. 464 at 16-17)

The Court is not persuaded.  First, as discussed above, McDuff's reliance on the projections at issue does not require exclusion of his opinion.  Second, McDuff determined that a terminal value would be appropriate for reasons beyond the mere presence of automatic renewal clauses in the relevant contract documents.  (McDuff Opening Rep. at ¶ 50; *see also* McDuff Reply Rep. at ¶¶ 57-58)  Third, McDuff notes that even if Defendants are correct with respect to the technical issues associated with Risk Insight, Yodlee was still representing to FinApps that it desired a long-term partnership with FinApps, and Yodlee renewed its contract with FinApps during the relevant timeframe.  (McDuff Opening Rep. at ¶ 119; McDuff Reply Rep. at ¶ 71)

Therefore, the Court denies Defendants' Motion as it relates to McDuff's Income + Market approach.

### 4.    Conclusion

For the reasons set out above, the Court denies Defendants' Motion as it relates to McDuff's Harm to FinApps analysis.

### B.    McDuff's "Value to Defendants" Analysis

In his Value to Defendants analysis, McDuff proffers an unjust enrichment analysis that includes:  (1) the purported value to Yodlee of its partnership with Equifax (in which Yodlee and Equifax entered into a Master Services Agreement, or the "Equifax MSA," in September 2019, and via which Equifax obtained the right to re-sell Yodlee's Snapshot 2.0 product—a product that Yodlee allegedly developed through certain wrongful conduct at issue in this case); and (2)

Yodlee's direct sales of Snapshot 2.0.  (McDuff Opening Rep. at ¶¶ 10, 37, 122, 123, 157; *see also* D.I. 465, ex. 4 at ¶ 95)  Defendants argue that this approach should be excluded for a few different reasons, which the Court will take up in turn below.

First, Defendants contend that McDuff improperly relies on projected returns instead of actual returns, which is improper because "unjust enrichment is calculated by *actual* value received, not projected future value."  (D.I. 464 at 17 (emphasis in original)); *see also, e.g.*, *PMX Jewels Ltd. v. Ruvanni Inc.*, Civil Action No. 14-243, 2014 WL 1725733, at *2 (E.D. Pa. May 1, 2014) ("[C]ourts have consistently found future benefits cannot be the basis of an unjust enrichment claim.").  According to Defendants, this improper reliance on projections of future income renders McDuff's Value to Defendants analysis useless, as it would "disgorge Yodlee of profits it has not made and is unlikely ever to make under the Equifax MSA[.]"  (D.I. 464 at 17)

Taking a step back, the Court notes that McDuff provides two separate analyses regarding the value of the Equifax partnership.  (D.I. 516 at 17)  The first such analysis (introduced in his reply report) focused on the "guaranteed minimums" that Yodlee was to earn under the Equifax MSA (the "guaranteed minimums approach").  (McDuff Reply Rep. at ¶ 128; *see also* McDuff Opening Rep. at ¶ 100 (explaining that under the Equifax MSA, Equifax agreed to pay Yodlee an annual, non-refundable amount of money))[7]  Defendants' argument here about why it is wrong to rely on projected future value as to an unjust enrichment analysis does not seem to be targeted at McDuff's guaranteed minimums approach (and so the Court will not discuss that approach as to this issue).

---

[7]     Equifax also agreed to pay Yodlee a share of revenue to the extent that twice the revenue minimums were earned.  (McDuff Opening Rep. at ¶¶ 37, 102)  For each relevant year to date, Yodlee has not earned revenues exceeding the minimum revenue thresholds under the Equifax MSA; as a result, Yodlee has earned only the guaranteed minimum owed to it under the MSA for those years.  (*See* D.I. 465, ex. 4 at ¶ 99)

The second such "alternative" analysis would apply "in the event that actual revenues received through the Equifax partnership exceed the guaranteed minimums[.]" (D.I. 516 at 17; McDuff Opening Rep. at ¶¶ 102-06)  For this approach, McDuff *does* rely on projections relating to the Equifax partnership (the "projections-based approach"). (McDuff Opening Rep. at ¶¶ 103-06; *see also* McDuff Reply Rep. at ¶ 105 (acknowledging reliance on projections "for time periods through trial and final verdict for which historical data were not available as of the date of" his report))

The Court agrees with Defendants that McDuff's projections-based approach should be excluded. (D.I. 561 at 8-10)  Typically, as to an unjust enrichment claim, "only the defendant's actual profits can be used as a measure of damages in cases where profits can be proved, and the defendant is normally not assessed damages on wholly speculative expectations of profits." *Grove US LLC v. Sany Am. Inc.*, Case Nos. 13-C-677, 2019 WL 969814, at *3 (E.D. Wis. Feb. 28, 2019) (internal quotation marks and citations omitted) (allowing an expert to use hypothetical future profit figures only because the expert was not using them to measure unjust enrichment damages, but instead to assess the value of certain trade secrets at the time of misappropriation). That is because the "essence of an unjust enrichment claim is that one party *has* received money or a benefit at the expense of another." *Medidata Sols., Inc. v. Veeva Sys., Inc.*, 17 Civ. 589 (LGS), 2021 WL 4243309, at *4 (S.D.N.Y. Aug. 25, 2021) (noting that such a claim requires a benefit "already conferred") (internal quotation marks and citation omitted, emphasis in original).[8] If, by the time of trial, Yodlee has received actual revenues that exceed the

---

[8]     While unjust enrichment is a state law claim, the parties do not discuss the relevant state's law.  In any event, "the elements of unjust enrichment are similar in every state." *Medidata Sols.*, 2021 WL 4243309, at *4 (internal quotation marks and citation omitted).

guaranteed minimums, Plaintiff could seek leave to have McDuff add in those additional "actual revenues" to his damages analysis here.  Thus, the Court grants Defendants' Motion as it relates to McDuff's projections-based approach.[9]  *See, e.g.*, *id.* (excluding portions of an expert's opinion that would allow the plaintiff to recover for the defendant's hypothetical future profits under an unjust enrichment theory).

Defendants assert that both approaches are also unreliable because they include value for non-accused products.  (D.I. 464 at 17-19; D.I. 561 at 8-10)  As to this argument, the Court will focus here on McDuff's guaranteed minimums approach, since the Court has already excluded McDuff's projections-based approach.  According to Defendants, McDuff's guaranteed minimums approach, which relates to all of the guaranteed minimums that Yodlee received under the Equifax MSA, improperly sweeps in the value of:  (1) parts of Snapshot 2.0 that do not constitute FinApps' alleged trade secrets; and (2) entirely non-accused products (i.e., an Equifax product known as Cash Flow Insights).  (D.I. 561 at 9; *see also* D.I. 464 at 17-18)  Defendants point out that Yodlee and Equifax had a preexisting relationship (from 2011 through 2015, they were parties to a different agreement by which Yodlee provided data and other services to Equifax), and argue that McDuff "ignores" this prior relationship.  (D.I. 464 at 18 (citing D.I. 465, exs. 20-21))

The Court does not agree that McDuff's guaranteed minimums approach should be excluded on this basis.  McDuff sufficiently explained his reasoning for including the full value of the guaranteed minimums in this portion of his damages analysis.  To that end, McDuff stated

---

[9]   Defendants also contend that McDuff's inclusion of a terminal value in his Value to Defendants analysis renders his opinion unduly speculative.  (D.I. 464 at 19)  Because the terminal value was only included in connection with McDuff's projections-based approach, (D.I. 516 at 18 n.17), which the Court has now excluded, it need not assess this particular argument.

that these minimums were guaranteed in the Equifax MSA at a time when SnapShot 2.0 was the only credit solution at issue—i.e., before the parties later agreed to include the unaccused Cash Flow Insights product in the deal.  (McDuff Reply Rep. at ¶ 128)[10]  McDuff also cogently explained why he did not omit any value of those guaranteed minimums for non-proprietary pieces of technology (and here, he addressed the fact of Yodlee's and Equifax's prior relationship).  (*Id.* at ¶¶ 125-127)  Thus, the disagreements that Defendants have with these choices go to weight rather than admissibility.

For these reasons, the Court grants-in-part and denies-in-part the Motion as it relates to McDuff's Value to Defendants analysis.

## C.    McDuff's Opinions on Trade Secret Value

With respect to its trade secret misappropriation claims, FinApps must prove that its purported trade secrets had "economic value" and that they derived that value from their secrecy. 18 U.S.C. § 1839(3)(B); Del. Code tit. 6, § 2001(4)(a).  McDuff opines that FinApps' technology does have value.  More specifically, he asserts that it has at least a "nonzero value[.]"  (D.I. 465, ex. 2 at 302)

Defendants argue that McDuff's opinion as to the value of the claimed trade secrets must be excluded because:  (1) he provides no means by which to value the purported trade secrets—

---

[10]    Defendants suggest that this is wrong and that the Equifax MSA expressly contemplated other non-accused products when it was signed.  (D.I. 561 at 9)  In support of this, they cite to a schedule attached to the Equifax MSA.  (*Id.* (citing D.I. 465, ex. 22 at YOD01309115))  This schedule refers to SnapShot 2.0 and it also (more vaguely) refers to other "[q]ualifying [p]roducts" that would include:  (1) new products developed by Equifax using certain data and (2) "[e]xisting company [p]roducts" to which Equifax has developed significant enhancements.  (D.I. 465, ex. 22 at YOD01309115)  Defendants may further explore this issue with McDuff during cross-examination.  But in the absence of any reference to *specific*, then-existing products in this schedule, the Court simply cannot tell if the Equifax MSA actually did provide value to Yodlee for such products.  And so it cannot use this as a ground to exclude McDuff's opinion.

indeed, he does not assign a dollar value to any such trade secret—and (2) he conceded that he is not qualified to determine whether the trade secrets alleged are important to the Risk Insight product, thus rendering his value opinion *ipse dixit*.  (D.I. 464 at 19-20; *see also* D.I. 561 at 10 ("[T]he question is whether McDuff is helpful in determining whether [FinApps'] claimed trade secrets have value derived from secrecy.  But . . . his reports literally *do not mention* the Data Dictionary, the Training Powerpoint, or any other document [FinApps] claims contain its trade secrets[.]") (emphasis in original))

The Court is not persuaded that McDuff's "nonzero value" opinion must be excluded.  As an initial matter, McDuff sufficiently explained the basis behind the opinion.  During his deposition, he was asked if he was "offering opinions regarding the value of FinApps['] technology[,]" to which he replied that his damages opinion "inherently considers the value of FinApps['] technology" and such technology "certainly" has a "nonzero value"—"[t]he reason why FinApps is able to secure the relationships that it does with Yodlee and Yodlee with Equifax is because the trade secrets have value and the trade secrets are valuable."  (D.I. 465, ex. 2 at 302)  In his opening report, McDuff opines that "rather than seeking to develop an alternative solution [to FinApps' product, which incorporated FinApps' trade secrets] in-house, Defendants elected to enter (and *renew*) the contracts with FinApps and agreed to pay FinApps revenue shares of 30% or greater[,]" which "strongly suggests that the costs and risks to Defendants of developing an alternative solution in-house . . . would have been considerable."  (McDuff Opening Rep. at ¶ 119 (emphasis in original))  McDuff, in his reply report, further opines that "it is . . . likely that the revenue shares paid by Equifax to Yodlee reflect the value of the *novel* elements of the accused software solutions [based on FinApps' Platform]."  (McDuff Reply Rep.

at ¶ 127 (emphasis in original))  These opinions, FinApps points out, confirm that FinApps'

technology had "nonzero value."  (D.I. 516 at 19)[11]

Additionally, Defendants' attack of McDuff's opinion as being useless for failing to

"isolate what portion" of damages are attributable to the "purported trade secrets[,]" (D.I. 464 at

20), is not availing.  McDuff's opinion is that *all* investment dollars associated with his Cost

approach are properly attributed to the use of FinApps' Platform and proprietary information,

and that *all* damages associated with his Income + Market approach are attributable to FinApps'

Platform and proprietary information.  (McDuff Opening Rep. at ¶¶ 43, 46, 65; *see also id.* at ¶¶

13-14; D.I. 516 at 20; *supra* at 20 (discussing this issue regarding McDuff's Value to Defendants

analysis))  On this record (and without any better explanation from Defendants as to why this is

improper), the Court cannot fault McDuff's approach in this regard.  Moreover, experts are not

required to "apportion damages among different trade secrets."  *Allscripts Healthcare, LLC v.*

*Andor Health, LLC*, Civil Action No. 21-704-MAK, 2022 WL 3021560, at *18 (D. Del. July 29,

2022) (holding that an expert's essential evaluation of the plaintiff's "entire business as a trade

secret" would "constitute grounds for effective cross-examination [but] does not render his

opinion unreliable because experts need not apportion damages among different trade secrets");

*see also Dasso Int'l, Inc. v. Moso N. Am., Inc.*, C.A. No. 17-1574-RGA (consolidated), C.A. No.

19-564-RGA, 2021 WL 3476197, at *8 (D. Del. July 25, 2021) (rejecting the defendants'

unsupported contention that a damages expert must "apportion damages by 'individual trade

---

[11]      In his opening report, McDuff describes the technological components of
FinApps' Platform that constituted the trade secrets at issue.  (McDuff Opening Rep. at ¶ 14)

secret or bad act[]'"), *report and recommendation adopted*, 2021 WL 4427168 (D. Del. Sept. 27, 2021).[12]

Finally, the Court addresses Defendants' gripe that McDuff's nonzero value opinion amounts to his *ipse dixit* since he testified that he does not have the requisite expertise to determine whether specific trade secrets were important to the Risk Insight product. McDuff's actual testimony was that he did not have the expertise to determine "the technical aspect of what exactly is claimed to be trade secret information and . . . technically how that relates to the Risk Insight [P]latform." (D.I. 465, ex. 2 at 105) Defendants have not persuaded the Court that such technical expertise would be required to provide an opinion that, from an economic perspective, FinApps' trade secrets as a whole have "nonzero value." (*See* D.I. 516 at 20)

For the above reasons, the Court denies Defendants' motion as it relates to McDuff's opinion on trade secret value.

## IV. CONCLUSION

For the reasons set out above, the Court hereby ORDERS that Defendants' Motion is GRANTED-IN-PART and DENIED-IN-PART. More specifically, the Court: (1) denies Defendants' Motion as it relates to McDuff's Harm to FinApps analysis; (2) grants-in-part and denies-in-part Defendants' Motion as it relates to McDuff's Value to Defendants analysis; and (3) denies Defendants' motion as it relates to McDuff's opinion on trade secret value.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly

---

[12]    That said, McDuff noted that to the extent that the factfinder deems apportionment to specific trade secrets necessary, that "may reasonably be based on the relative share of development work applied towards each element of FinApps' [Platform]." (McDuff Reply Rep. at ¶ 135)

proposed, redacted version (if necessary) of the Memorandum Order.  Any such redacted version

shall be submitted no later than **September 18, 2023** for review by the Court.  It should be

accompanied by a motion for redaction that shows that the presumption of public access to

judicial records has been rebutted with respect to the proposed redacted material, by including a

factually-detailed explanation as to how that material is the "kind of information that courts will

protect and that disclosure will work a clearly defined and serious injury to the party seeking

closure."  *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir.

2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a

publicly-available version of its Memorandum Order.


Dated:  September 13, 2023

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE